UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

ETHAN PHELAN MELZER,

Defendant.

S1 20 Cr. 314 (GHW)

---

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT ETHAN PHELAN MELZER'S
MOTION TO DISMISS THE INDICTMENTS**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

Sam Adelsberg
Matthew Hellman
Sidhardha Kamaraju
Assistant United States Attorneys
*Of Counsel*

# **TABLE OF CONTENTS**

I.   BACKGROUND ................................................................................................. 1

    A.   Procedural History ................................................................................. 1

    B.   The SDNY and Local Rules for the Division of Business ............................. 2

    C.   The SDNY Jury Plan ................................................................................ 3

II.   APPLICABLE LAW ......................................................................................... 6

III.   ARGUMENT ................................................................................................... 7

    A.   The Defendant Was Properly Indicted by a Grand Jury Sitting in White Plains .......... 8

    B.   The Defendant's Fair Cross-Section Claim is Meritless .............................. 14

        1.   The Defendant Has Not Established That Blacks or Hispanics are Unfairly Underrepresented .................................................................................... 14

            a.   Relevant Jury Pool ............................................................... 15

            b.   Community Population ........................................................... 17

            c.   The Method of Statistical Comparison .................................... 18

            d.   Calculation of the Absolute Disparity ..................................... 19

        2.   Any Potential Underrepresentation is Not Due to Systematic Exclusion ............ 21

    C.   The Defendant's Equal Protection Claim Is Meritless ............................... 26

    D.   The Defendant's Statutory Claims Are Meritless ...................................... 27

IV.   CONCLUSION ................................................................................................. 31

In June and August 2020, amidst the ongoing global pandemic that has suspended grand juries across the country, the Government sought and obtained indictments from one of the few available federal grand juries in the District—a grand jury of the Southern District of New York (the "Southern District" or "SDNY") sitting in White Plains.  The defendant now challenges the pool from which that grand jury was drawn, alleging that it does not reflect a "fair cross-section of the community," and moves to dismiss the indictments under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* (the "JSSA"), the Sixth Amendment, and the Equal Protection Clause of the Fifth Amendment.  As set forth below, the defendant's arguments rely on faulty premises, and at any rate fail to meet the elements of claims under the JSSA, the Sixth Amendment, or the Fifth Amendment.  Therefore, the defendant's motion must be denied.

## I.  BACKGROUND

### A.  Procedural History

The charges in this case stem from the defendant's alleged role in planning a violent ambush on his fellow service members with followers of a neo-Nazi, Satanist, and anarchist extremist group in May 2020.  On or about June 4, 2020, the defendant was charged by complaint (the "Complaint") with four counts: (i) conspiracy to murder U.S. service members, in violation of 18 U.S.C. § 1117; (ii) attempted murder of U.S. service members, in violation of 18 U.S.C. § 1114; (iii) conspiracy to murder and maim abroad, in violation of 18 U.S.C. § 956(a); and (iv) provision and attempted provision of material support for terroristic acts, in violation of 18 U.S.C. § 2339A.  *See* Dkt. No. 1.  On or about June 22, 2020, the Government presented a proposed indictment (the "Original Indictment") to a federal grand jury sitting in White Plains, charging the defendant with the four counts in the Complaint and adding two additional counts: (i) conspiracy to murder U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b); and (ii)

attempted murder of U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b).  The grand jury

returned the Original Indictment the same day.  *See* Dkt. No. 6.   On or about August 18, 2020,

the Government sought and obtained a superseding indictment (the "Superseding Indictment")

from the federal grand jury sitting in White Plains.  The Superseding Indictment charged the

defendant with two additional counts: (i) the illegal transmission of national defense information,

in violation of 18 U.S.C. § 793(d); and (ii) the transmission and attempted transmission of

national defense information to a faction or citizen of a foreign country, in violation of 18 U.S.C.

§ 794(a).  *See* Dkt. No. 31.

Pursuant to Rule 6(e) of the Rules for the Division of Business Among District Judges for

the Southern District of New York (the "SDNY Business Division Rules," or the "Rules"), the

Original and Superseding Indictment were designated for Manhattan, and assigned to this Court.

## B.  The SDNY and Local Rules for the Division of Business

The defendant's brief repeatedly uses the term "Division" to describe a "White Plains

Division" and a "Manhattan Division."  (*See, e.g.*, Br. 2, 5-6).  This use of the term "division" is

imprecise and attributes legal significance where there is none.  *See infra* pp. 7-13.

Understanding how that is so requires some background.

District courts in each state in the United States are prescribed by statute.  United States

district courts in New York State are divided between four districts: Northern, Southern, Eastern

and Western.  28 U.S.C. § 112.  While certain districts in other states are further divided into

"divisions" by statute, *see, e.g.*, 28 U.S.C. § 81 (dividing Alabama into three "districts" and

multiple "divisions" within each district), the federal districts in New York State are not so

divided.  That is, in the Southern District, no "divisions" have been created by statute.  28 U.S.C.

§ 112(b).  The statute provides only that "Court for the Southern District shall be held at New

York, White Plains, and in the Middletown-Wallkill area of Orange County or such nearby location as may be deemed appropriate." *Id.*

In the Southern District, the only authority determining whether particular cases are heard in the Manhattan or White Plains courthouse is the SDNY Business Division Rules. These rules begin with an important preface: they "shall not be deemed to vest any rights in litigants." Moreover, the Rules do not describe—much less limit—what matters may be heard by what grand jury. *Cf.* SDNY Business Division Rule 6 (describing proceedings *after* an indictment has been returned). Rather, the Rules provide only that *once an indictment is returned*, "[t]he U.S. attorney designates on the criminal cover sheet that the case is to be assigned to White Plains if the crime was allegedly committed in whole or in predominant part in the Northern Counties." SDNY Business Division Rule 18(b). Furthermore, the Rules specifically contemplate that cases may be reassigned from one courthouse to another. SDNY Business Division Rule 19. Consistent with these Rules, it is common for cases to be indicted by grand juries sitting in the White Plains courthouse and tried in the Manhattan courthouse. *See, e.g.*, *United States v. Israel*, 05 Cr. 1039 (CM); *United States v. Cromitie, et al.*, 09 Cr. 558 (CM); *United States v. Annabi*, 10 Cr. 07 (CM); *United States v. Arici*, 12 Cr. 24 (LAP); *United States v. Reeves, et al.*, 16 Cr. 372 (VEC); *United States v. Turner*, 17 Cr. 549 (KMK); *United States v. Guerrier*, 18 Cr. 284 (JSR).

### C. The SDNY Jury Plan

The JSSA provides the structure for the selection of juries in federal district courts. The JSSA requires each district to devise and place into operation a written plan for random selection of grand and petit jurors. 28 U.S.C. § 1863(a). Each district in New York selects grand and petit juries pursuant to a plan adopted by the judges of the district and approved by the Judicial

Conference of the Second Circuit.  *Id.*; *see also United States v. Bahna*, 68 F.3d 19, 23 (2d Cir. 1995).  The plan for the Southern District has been in place since February 2009.  *See* Amended Plan for the Random Selection of Grand and Petit Jurors in the Southern District of New York (the "SDNY Jury Plan," or the "Plan").

Under the terms of the SDNY Jury Plan, the initial selection of persons to be considered for service as grand and petit jurors are made at random from voter registration lists.  SDNY Jury Plan at Art. III.A.  Two Master Jury Wheels are constructed from these lists: one for the Manhattan courthouse and one for the White Plains courthouse.  *Id.* at Art. III.B.  The Manhattan Master Jury Wheel draws from voter lists from the following counties: New York, Bronx, Westchester, Putnam, and Rockland.  *See id.* at Art. III.C.  The White Plains Master Jury Wheel draws from voter lists from the following counties: Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess.  *See id.*  Both Master Jury Wheels are emptied and refilled no later than September 1 following the date of each Presidential Election.  *Id.* at Art. III.B.

To meet anticipated demand for jurors, names are drawn randomly from the Master Jury Wheels.  *Id.* at Art. III.D.  These individuals are sent a questionnaire to examine their qualifications and availability for jury service.  *Id.*  Pursuant to 28 U.S.C. § 1865(b), all persons are qualified for jury service unless he or she:

   (1) Is not a citizen of the United States at least eighteen years old who has resided for a period of one year within the judicial district;

   (2) Is unable to read, write, and understand English with a degree of proficiency sufficient to fill out the juror qualification questionnaire;

   (3) Is unable to speak English;

   (4) Is incapable, by mental or physical infirmity, to render satisfactory jury service; or

   (5) Has a charge pending for the commission of, or has been convicted in a State or Federal court, of a felony and his or her civil rights have not been restored.

*Id.* at Art. VII.  Additionally, certain persons are declared exempt from jury service, including active service members in the Armed Forces of the United States, members of fire or police departments, and public officers in the executive, legislative, or judicial branches of the State or Federal Government who are actively engaged in the performance of official duties.  *Id.* at Art. V; 28 U.S.C. § 1863(b)(6).  Finally, because jury service for certain groups of individuals would "entail undue hardship or extreme inconvenience," those individuals are excused or deferred upon individual request.  SDNY Jury Plan at Art. VI.  These groups include:

(1) Persons over 70 years of age;

(2) Persons having legal custody and active daily care of a child under the age of 12, or who are essential to the daily care of aged or infirm persons;

(3) Persons who have satisfactorily served as grand or petit jurors in a State or Federal court within the last four years;

(4) Volunteer safety personnel; and

(5) Persons as to whom a judge finds, for any other reason, that jury service would constitute an undue hardship and extreme inconvenience.

*Id.*

The names of individuals who are determined to be qualified to serve as jurors, and are not "exempt, excused, or deferred," comprise the Qualified Jury Wheels—one for service at the Manhattan courthouse and one for service at the White Plains courthouse.  *Id.*, Art. IV.A-B. When jurors are needed, names are drawn randomly from the Qualified Jury Wheels, and summonses are sent to those whose names are drawn.  *Id.*, Art. IV.C.  After being summoned, these individuals are randomly assigned to jury panels as needed, for individual trials and grand juries at the courthouse corresponding to the Qualified Wheel from which they were drawn.  *Id.*

## II.      APPLICABLE LAW

"The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community."  *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996).  In *Duren v. Missouri*, the Supreme Court articulated a three part test that defendants must meet in order to establish a prima facie violation of the fair cross-section requirement: (1) the excluded group is "distinctive;" (2) representation of this group in "veniries from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;" and (3) the underrepresentation is due to "systematic exclusion of the group in the jury-selection process." 439 U.S. 357, 364 (1979).

Similarly, the JSSA sets forth a policy that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes," and prohibits discrimination on certain bases in jury selection.  28 U.S.C. §§ 1861, 1862.  The JSSA further requires each district court to devise and place into operation a plan for the random selection of juries that is designed to achieve the objectives of the foregoing sections, and sets forth certain other requirements for jury selection.  28 U.S.C. §§ 1863-66.  Finally, the JSSA provides a statutory mechanism by which a defendant may challenge failure to comply with the foregoing:

> In criminal cases, before voir dire begins, or within seven days after the defendant
> discovered or could have discovered, by the exercise of diligence, the grounds
> therefor, whichever is earlier, the defendant may move to dismiss the indictment
> or stay the proceedings against him on the ground of substantial failure to comply
> with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a).  Where such a motion is made and supported by "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title," the district court may conduct a hearing.  28 U.S.C. § 1867(d); *United States v. Young*, 822 F.2d

1234, 1239 (2d Cir. 1987).  As relevant here, "[i]f the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate."  28 U.S.C. § 1867(d).  Fair cross-section claims under the Sixth Amendment and the JSSA are evaluated using the same framework.  *See Rioux*, 97 F.3d at 660; *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986).

Finally, to succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that "(1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, *i.e.*, is the result of intentional discrimination by the District." *Rioux*, 97 F.3d at 659.  An equal protection claim can only prevail if the claimant proves that underrepresentation is the result of intentional discrimination. *United States v. Ramnath*, 131 F.3d 132, 132, 1997 WL738584 (2d Cir. 1997) (summary order); *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir. 1986).

### III.    ARGUMENT

The Government's decision to seek indictments of the defendant from a grand jury sitting in White Plains was entirely appropriate and consistent with the Constitution, the JSSA, and the SDNY local rules.  Most of the defendant's claims to the contrary rest on a faulty premise: That a defendant who is likely to be tried in the Manhattan courthouse must be indicted by a grand jury sitting in that same courthouse.  That is not the law.  *See* Part III.A, *infra*.

That foundational error is fatal to the defendant's fair cross-section claim.  When the proper comparators are considered—the White Plain Master (or Qualified) Wheels to the voting age population of the counties from which juries in White Plains are drawn, rather than the defendant's apples-to-oranges comparison of the White Plains Qualified Jury Wheel to the

population of the Manhattan "Division"—the defendant fails to establish unfair underrepresentation under the second prong of the *Duren* test.  *See* Part III.B.1, *infra*.  Moreover, the defendant's fair cross-section claim fails for two additional reasons: (1) the factors cited by the defendant have only minimal effect on the disparity that he alleges; and (2) any underrepresentation is the product of "external factors" affecting the jury-selection process that the Second Circuit and other courts have repeatedly found do not meet the third prong of *Duren*, and not of "systematic exclusion."  *See* Part III.B.2, *infra*.

Finally, the defendant's equal protection and statutory claims are meritless for these and other reasons.  *See* Parts III.C & D, *infra*.

### A. The Defendant Was Properly Indicted by a Grand Jury Sitting in White Plains

At the heart of the defendant's fair cross-section claim is his contention that the Government seeking indictments from a grand jury sitting in White Plains—which was one of the few available federal grand juries in the District, due to the global pandemic[1]—"was a deviation from the established, court-tested and constitutional practice of indicting defendants in the division where the case will be tried."  (Br. 2)  Because the defendant assumes that his jury trial will occur in the "Manhattan Division," he argues that the "appropriate comparator," for the

---

[1] As detailed above, this case was indicted on June 22, 2020 and then again on August 18, 2020. Earlier, grand juries sitting in White Plains were the only readily available grand juries in the District.  By the time the Original Indictment and Superseding Indictment were returned, grand jury quorums had returned in Manhattan, but with substantially less availability than before the pandemic.  As a result, the Government sought indictments from grand juries sitting in White Plains and Manhattan, as availability permitted.  The global pandemic's effect on grand jury availability continues to evolve, but at no point have grand juries in White Plains or Manhattan resumed normal activity.  Given the Chief Judge's order dated November 30, 2020, which suspended additional empanelment of grand juries through at least January 19, 2021, the Government expects that grand jury availability will continue to be an issue in the months to come.  *See* 20 Misc. 622 (CM).

purpose of his fair cross-section claim is "between the Manhattan Division and the qualified

wheel for White Plains." (Br. 8). This premise is faulty.

"It is well-settled that neither the jury selection statute nor the Constitution requires that

jurors be drawn from an entire district." *Bahna*, 68 F.3d at 24 (collecting cases); *see also United*

*States v. Plaza-Andrades*, 507 F. App'x 22, 26 (2d Cir. 2013) ("[O]ur precedent makes clear that

the Sixth Amendment does not entitle a defendant to be tried in a geographic location any more

specific than the District where the offense was allegedly committed."). Rather, "[c]ourts have

broad latitude in defining the geographic area from which juries will be selected." *United States*

*v. Yonkers Contracting Co.*, 682 F. Supp. 757, 768 (S.D.N.Y. 1988). Consistent with the

foregoing, the SDNY Jury Plan creates two separate Master Wheels—one for the White Plains

courthouse and one for the Manhattan courthouse, each of which draws from certain counties,

with some overlapping counties. SDNY Jury Plan Art. III.B. This is perfectly consistent with

the JSSA, *see* 28 U.S.C. § 1869(e), and with longstanding precedent, as Judge Hand has

explained:

> [T]he district and circuit courts have had power since the first Judicial Act of 1789 to
> divide a district territorially in the interest of an impartial trial, of economy, and of
> lessening the burden of attendance. There cannot be the faintest question of the
> constitutionality of the statute; the courts have again and again recognized its validity.
> Furthermore, it would be impossible in practice to administer it, if it were a condition that
> that divisions made must be so homogeneous that they showed an equal percentage of all
> possible groups. There are probably no districts in the Union, which can be divided
> without disclosing in the sections different racial, religious, political, social or economic
> percentages. To demand that they shall not, would be a fantastic pedantry which would
> serve no purpose and would put an end to the statute.

*United States v. Gottfried*, 165 F.2d 360, 364 (2d Cir. 1948); *accord Bahna*, 68 F.3d at 24-25.

There is accordingly no constitutional or statutory basis for the defendant's claimed

entitlement to a grand jury drawn from the population of the same "division" in which he

assumes he will ultimately be tried. To the contrary, the Second Circuit has rejected a similar

claim.  In *Bahna*, a defendant in the Eastern District of New York was initially convicted at a

trial held at the Brooklyn courthouse; after that conviction was vacated, he was again convicted,

this time at a trial held at the Uniondale courthouse.  68 F.3d at 20.  Under the relevant jury plan,

jurors for trials held in Brooklyn were drawn from the entire Eastern District, while jurors for

trials held in the "Long Island Division," which included the Uniondale courthouse, were drawn

from Nassau and Suffolk Counties.  *Id.* at 24.  The defendant argued that the district court erred

by selecting the jury from the "Long Island Division" wheel because there was under-

representation of Blacks and Hispanics in that "division" as compared to the Eastern District as a

whole.  *Id.* at 23-24.  The Second Circuit rejected the argument, finding that it "[wa]s based on

an improper premise."  *Id.* at 24.  Contrary to the defendant's claims, "[w]here a jury venire is

drawn from a properly designated division, we look to *that division* to see whether there has been

any unlawful or unconstitutional treatment of minorities."  *Id.* (emphasis added).

Consistent with *Bahna*, courts have repeatedly found that defendants in criminal cases

have no constitutional or statutory right to a jury drawn from the entire district or from a

particular geographic area within a district, such as the county or "division" where the offense

was committed.  *See, e.g.*, *Rutenberg v. United States*, 245 U.S. 480, 482 (1918) (rejecting claim

that defendant had Sixth Amendment right to jury drawn from entire district); *United States v.

Miller*, 116 F.3d 641, 659 (2d Cir. 1997) ("Th[e] [Sixth] Amendment's guarantees of an

impartial jury 'of the State and district' in which the crime was committed does not require a

narrower geographical focus than the district itself."); *United States v. Richardson*, 537 F.3d 951,

959 (8th Cir. 2008) (a criminal defendant "does not have a right to have his trial in or jurors

summoned from a particular division of the state and district where the crime was committed");

*United States v. Herbert*, 698 F.2d 981, 984 (9th Cir. 1983) (finding that "[a] petit jury may be

drawn constitutionally from only one division and not the whole district"); *Zicarelli v. Dietz*, 633 F.2d 312, 316-18 (3d Cir. 1980) (finding "there is no constitutional right to a jury chosen from the division where the offense was committed or from the entire district which includes that division"); *United States v. Florence*, 456 F.2d 46, 49-50 (4th Cir. 1972) (holding that a defendant has no constitutional or statutory right to a jury selected from the entire district or from a particular division).

Because the defendant has no right to insist that either the grand or petit jury be drawn from any particular geographic area within the Southern District, he is wrong to assert that his fair cross-section claim must be analyzed against the geographic location in which the trial is expected to occur.  Rather, "[w]here a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has been any unlawful or unconstitutional treatment of minorities."  *Bahna*, 68 F.3d at 24 (emphasis added).  Here, consistent with the SDNY Grand Jury Plan, the venire for the grand jury that indicted the defendant was drawn from the voter lists of the following counties: Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess. That is undoubtedly a "properly designated division" pursuant to the JSSA.  As noted, the Southern District is not divided into "divisions" by statute.  *See* 28 U.S.C. § 112(b).  For purposes of the JSSA, district courts in such undivided districts have the authority to determine "divisions" comprised of "counties, parishes, or similar political subdivisions surrounding the places where court is held."  28 U.S.C. § 1869(e).  Accordingly, while the SDNY Jury Plan neither creates nor ever uses the term "White Plains Division" or "Manhattan Division," it contemplates Master Jury Wheels drawn from two geographic areas that satisfy the definition of "division" under the JSSA.  Thus, in evaluating the defendant's fair cross-section claim, this Court must "look to *that division*"—the counties from which the White Plains Master Wheel is

drawn—"to see whether there has been any unlawful or unconstitutional treatment of minorities." *Bahna*, 68 F.3d at 24 (emphasis added).

In the face of this authority, the defendant cites only two district court cases for the proposition that "community" for purposes of a fair cross-section claim is "widely understood to mean 'the district or division where *the trial* will be held.'"  (Br. 8 ((quoting *United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998) (emphasis added) and citing *United States v. Kenny*, 883 F. Supp. 869, 874 (E.D.N.Y. 1995))).  Not only is the authority cited non-binding, but it is inapposite as well: Both cases appear to concern instances in which the grand jury and trial jury sat in the same courthouse, and thus there was no cause to consider whether the same "community" was relevant to separate challenges to the grand and petit juries.  *See Johnson*, 21 F. Supp. 2d at 334-35; *Kenny*, 883 F. Supp. at 874.  As such, neither case supports the proposition that where a defendant is challenging the selection of the *grand* jury, the relevant "community" is the population of the location in which his *trial* will be held.  Such a comparison is unjustified, as *Bahna* makes clear: That case appears to involve conduct that occurred in Brooklyn, appears to have been indicted in Brooklyn, was originally tried in Brooklyn, and was later transferred to Uniondale, where it was tried with a jury drawn from the "Long Island Division."  Yet the Second Circuit rejected the defendant's claimed entitlement to a jury drawn from Kings, Queens and Richmond counties, or the entire Eastern District, because that argument—like the defendant's here—was based on a flawed premise.

The defendant's proposed rule—comparing the composition of the *grand jury* venire to the population of the expected *trial* location—makes little legal or practical sense.  Where, as here, the defendant's challenge is to the indictments, the proceeding for which the defendant is entitled to expect a jury drawn from a fair cross-section of the community is not the trial, but the

grand jury proceeding itself.  The defendant appears to acknowledge as much at the outset of his brief, arguing that certain minorities were improperly excluded "from having a say as to whether Mr. Melzer's indictment was sustained by probable cause."  (Br. 1).  Indeed, that *must* be the case, as it is not yet determined where the trial in this matter will in fact occur.  The defendant assumes that his trial will ultimately be held at the Manhattan courthouse. While that is *likely* to be the case, it is not necessarily so.  *Bahna* again illustrates the point, as a case originally tried in Brooklyn was reassigned to Uniondale for the retrial "to accommodate trial congestion in the court's calendar during a period of judicial emergency."  *United States v. Soares*, 66 F. Supp. 2d 391, 397 n.2 (E.D.N.Y. 1999).  In the Southern District, cases are commonly transferred from one courthouse to another, including cases that are indicted in White Plains but tried in Manhattan.  *See supra* p. 3 (collecting examples).  That is entirely consistent not just with the foregoing authority, but also with the Southern District's Local Rules for the Division of Business.  *See* SDNY Business Division Rules 18, 19.  Criminal cases are also sometimes transferred to other Districts for trial.  *See* Fed. R. Crim. P. 21.  Under the defendant's approach, it would be impossible for prosecutors to determine *ex ante* that that they were seeking an indictment from a grand jury drawn from a representative cross-section of the relevant community, because they would not yet know with certainty in which community the case will be tried.

The defendant's argument therefore boils down to an unfounded accusation that it is "most unusual" to seek an indictment in a courthouse other than the one in which the case will likely be tried and that such a practice opens the door to "prosecutorial gamesmanship where the government can forum shop for the racial, gender and economic demographics of their choice." (Br. 1, 2).  This argument is inconsistent with the foregoing law that the defendant has no right to

13

jurors drawn from any particular geographic area within the district.  *See also Rosencrans v. United States*, 165 U.S. 257, 260-63 (1897) (finding no error in grand jury returning indictment in a division different from the division in which the trial proceeded).  It also finds no support in the SDNY Business Division Rules, which vest no rights in any parties and, in any event, contemplate that judges may reassign cases from one courthouse to another.  And it falls exceedingly flat on the facts of this case.  The Government did not "forum shop" to achieve some perceived advantage.  Rather, it sought indictments from a grand jury in White Plains because it was one of the few grand juries with a quorum sitting in the Southern District at the time (a relatively rare situation created by an unprecedented public health crisis).

In sum, the decision to indict the defendant in White Plains was entirely proper, and the lack of any constitutional or statutory basis for the defendant's contrary argument is fatal to his fair cross-section claims, as described below.

### B.  The Defendant's Fair Cross-Section Claim is Meritless

The defendant's fair cross-section claim is based on the assertion that Black or African-American and Hispanic or Latino individuals are unfairly underrepresented in the relevant jury pool.  (Br. 9).  While these are "distinctive" groups, satisfying *Duren*'s first prong, the defendant's claim fails on each of the other two prongs.

### 1.  The Defendant Has Not Established That Blacks or Hispanics are Unfairly Underrepresented

The second prong of the *Duren* test requires the Court to determine whether representation of either or both of the "distinctive" groups in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community. *Duren*, 439 U.S. at 364.  This requires determining the relevant comparators—*i.e.*, what is the

"relevant jury pool" and what is the "community" population against which it is compared—as well as the appropriate method of statistical comparison. *See Rioux*, 97 F.3d at 656.

a. *Relevant Jury Pool*

Here, the defendant contends that the "relevant jury pool" is the White Plains Qualified Wheel. (Br. 8). The Government believes that the "relevant jury pool" is the White Plains *Master* Wheel, but, as set forth below, the defendant's claim fails even using the White Plains Qualified Wheel.

"Neither the Supreme Court nor the Second Circuit has defined the 'relevant jury pool' with any specificity." *United States v. Rioux* 930 F. Supp. 1558, 1565 (D. Conn. 1995). In a detailed survey of the case law, the district court in *Rioux* found that cases have examined different relevant pools, including the master wheel, the qualified wheel over a period of time, the venires appearing around the time of the defendant's trial, or some combination thereof. *Id.* Ultimately, the district court in *Rioux* found that the teaching of *Duren* and the Second Circuit's subsequent cases is that "the court must assess representativeness in the context of the systematic defect identified by the defendant." *Rioux*, 930 F. Supp. at 1566-68. In that case, the claimed defects were in the construction of the qualified wheel and, therefore, the "relevant jury pool" was the "qualified wheel over the life of the wheel." *Id.* at 1575.

Affirming that decision, the Second Circuit did not hold that the qualified wheel is necessarily the "relevant jury pool," as the defendant's cursory treatment of the issue suggests. (*See* Br. 8-9 (citing *Rioux*, 97 F.3d at 655-56)). Rather, after stating that the relevant jury pool "may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three," the Circuit noted that the parties had agreed that the district court properly used the qualified wheel over the life of the wheel as the "relevant jury pool." *Rioux*,

97 F.3d at 657.  The court's acceptance of the qualified jury wheel as the "relevant jury pool" for

that case—an issue which was not in dispute—does not mean it necessarily must be applied in all

cases.  *Id.*  Indeed, in other cases where the claim of error was *not* focused on the construction of

the qualified wheel, different "relevant jury pools" have been used by the Second Circuit.  Most

notably, in *Biaggi*, the main thrust of the defendant's fair cross-section claim was that reliance on

voter registration lists systemically excluded African-Americans and Hispanics from jury

service—a claim which is directed at the composition of the master wheel—and the Second

Circuit identified the district's *master* wheel as the "relevant jury pool."  *United States v. Biaggi*,

909 F.2d 662, 677 (2d Cir. 1990).

Here, the defendant claims that the alleged underrepresentation is based on the following

factors: (1) the SDNY Jury Plan draws exclusively from voter registration lists; (2) by

replenishing the Master Jury Wheels only once every four years, younger eligible jurors and

those who move into the White Plains counties are excluded toward the end of the life of the

Master Jury Wheel; and (3) failures to comply with the SDNY Jury Plan, including (a) improper

apportionment among counties and exclusion of inactive voters; (b) incorrect "proration" of

jurors between Manhattan and White Plains; and (c) exclusion of individuals who included an

alternate mailing address when registering to vote in certain counties .  (*See* Br. 12-16, 21-22;

Martin Aff. ¶¶ 79-89).  All but one of these claims[2] is directed at the composition of the *master*

wheel, not the qualified wheel.  Because the "systematic defect[s] identified by the defendant"

---

[2] Due to a technical error, the zip codes for individuals who provided an alternative address when
they registered to vote were not included on the Master Jury Wheel.  (*See* Martin Aff. ¶ 42).
Because those individuals likely did not receive questionnaires, none of them were moved from
the Master Jury Wheel to the Qualified Jury Wheel.  As discussed below, if this issue were
corrected, the representation of Black or African-American and Hispanic or Latino individuals
on the White Plains Qualified Jury Wheel would actually *decrease*.  *See* Part III.D, *infra*.

relate to the Master Jury Wheel, consistent with *Biaggi*, the White Plains Master Jury Wheel is the appropriate "relevant jury pool."[3]  *Rioux*, 930 F. Supp. at 1566-68.

Although the Master Jury Wheel does not include reliable information regarding the race and ethnicity of the individuals selected from voter registration lists, the racial and ethnic makeup of the White Plains Master Jury Wheel can be estimated using geocoding and Bayesian Improved Surname Geocoding ("BISG").[4]  Taking into account those estimates, the White Plains Master Wheel is 11.20% Black or African-American and 12.97% Hispanic or Latino.  (Siskin Aff. at ¶ 28).  By contrast, the White Plains Qualified Wheel is 8.76% Black or African-American and 10.48% Hispanic or Latino.  (*Id.* at ¶ 17).

### b.  *Community Population*

The "community population" for purposes of assessing representativeness is the population eligible for jury service in the community.  *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 524 (1975) (focusing on population eligible for jury service); *Rioux*, 97 F.3d at 657 ("appropriate measure in this case is the eighteen and older subset of the population").  But how should the relevant "community" be defined?  The defendant contends that it is the jury eligible population of the "Manhattan Division," because that is where he assumes he will be tried. (Br.

---

[3] The difference between the White Plains Master Jury Wheel and the White Plains Qualified Jury Wheel is that the Qualified Jury Wheel does not include those individuals from the Master Jury Wheel who were determined to be unqualified or exempt, or whose service was deferred or excused for undue hardship.  The defendant makes no allegation that the qualifying and exemption criteria or bases for excusal and deferment are discriminatory or unconstitutional.

[4] As detailed in the expert report of Dr. Bernard R. Siskin, which was originally prepared in connection with the parallel litigation in *United States v. Souleymane Balde*, 20 CR 281 (KPF), geocoding is based on estimating the proportion of persons who are of a given race or ethnicity based on the racial and ethnic area in which they live.  (*See* Affidavit of Dr. Bernard R. Siskin ("Siskin Aff."), attached hereto as Exhibit A, at ¶ 26).  BISG enhances the accuracy of geocoding for Hispanic or Latino persons by using information about persons' last names.  (*Id.*).

2).  As set forth above, he is wrong.  The relevant comparator is the jury eligible population of the five counties from which the White Plains Master Wheel is drawn.  *See* Part I, *supra*.

The American Community Survey ("ACS") 2018 data indicate that the jury eligible population for the White Plains counties in 2018 was 12.45% Black or African-American and 14.12% Hispanic or Latino.[5]  (*See* Siskin Aff. at ¶ 19; *see also* Martin Aff. at ¶ 21).

   c.  *The Method of Statistical Comparison*

Once the relevant comparators are defined, an additional threshold question is the statistical method by which to compare them.  Courts have applied different approaches over time, such as the statistical decision theory, the comparative disparity theory, and the absolute disparity theory.  *See Rioux*, 97 F.3d at 655.  Although no method is perfect, *see Berghuis v. Smith*, 559 U.S. 314, 329 (2010), the Second Circuit has made clear that the comparative disparity theory is disfavored and strongly suggested that the absolute disparity theory is generally appropriate, *see Rioux*, 97 F.3d at 655-56; *see also United States v. Barnes*, 520 F. Supp. 2d 510, 514 (S.D.N.Y. 2007) ("[T]he absolute disparity approach is the primary approach used in this Circuit.").

The "absolute disparity" approach measures the absolute numerical difference between the distinctive group's representation in the "community population" and the group's representation in the "relevant jury pool."  *See Rioux*, 97 F.3d at 655; *United States v. Barlow*, 732 F. Supp. 2d 1, 30-31 (E.D.N.Y. 2010), *aff'd* 479 F. App'x 372, 373 (2d Cir. 2012).  For

---

[5] The American Community Survey gathers demographic information in between the decennial census, and is published by the United States Census Bureau.  (*See* Siskin Aff. at ¶ 18).  The latest available data is the 2018 five-year survey combining the 2014, 2015, 2016, 2017, and 2018 survey data.  (*Id.*).

example, if Blacks represented 10% of the community population but only 2% of the relevant jury pool, the "absolute disparity" would be 8%.

There is no specific numerical threshold that constitutes unacceptable disparity under the "absolute disparity" method.  Perfectly proportional representation is not required, since no source list will be an exact statistical mirror of the community.  *United States v. Guzman*, 337 F. Supp. 140, 143 (S.D.N.Y. 1972); *see also Taylor*, 419 U.S. at 538.  The mere fact that a jury selection system is imperfect does not make it invalid.  *Swain v. Alabama*, 380 U.S. 2020, 209 (1965) (overruled on other grounds).  Accordingly, the Second Circuit has found that absolute disparities as high as nearly 5% fail to establish a prima facie case of underrepresentation.  *See, e.g.*, *Biaggi*, 909 F.2d at 677-78 (3.6% for Blacks and 4.7% for Hispanics); *Ramnath*, 131 F.3d at 132 (3.45% for African-Americans and 4.87% for Hispanics); *see also Barlow*, 732 F. Supp. 2d at 34-35 (collecting out-of-circuit cases rejecting claims presenting similar and even higher disparities).[6]

### d.  Calculation of the Absolute Disparity

Properly calculated, the "absolute disparity" in this case falls comfortably within the range deemed acceptable by the Second Circuit and other courts.

---

[6] In *United States v. Jackman*, the Second Circuit held that an absolute disparity of 2.5% for Black or African-American persons and 3.4% for Hispanic or Latino persons was sufficient to satisfy the second prong of the *Duren* test. 46 F.3d 1240 (2d Cir. 1995).  The unique facts of *Jackman* make it readily distinguishable.  The jury clerk in *Jackman* relied on a qualified jury wheel that was mostly drawn from a master jury wheel that *completely* excluded potential jurors from two cities in the Division—cities that accounted for 62.93% of the voting-age Black population and 68.09% of the voting-age Hispanic population in the division.  *Id.* at 1242-44. This resulted in a venire comprised of no Black or African-American persons and one Hispanic or Latino person.  *Id.* at 1244; *see also id.* at 1252 (Walker, J., dissenting) (stating that the majority's decision was "at odds with every decision in every circuit applying the *Duren* test").

As noted, the "relevant jury pool" is the White Plains Master Wheel, which is comprised of 11.20% Black or African-American persons and 12.97% Latino or Hispanic persons.  (Siskin Aff. at ¶ 28).  The "community population" is the jury eligible population for the five counties from which the White Plains Master Wheel is drawn, which was comprised of 12.45% Black or African-American persons and 14.12% Hispanic or Latino persons in 2018.  (*Id*. at ¶ 19).   This yields an "absolute disparity" of 1.25% for Black or African-American persons and 1.15% for Latino or Hispanic persons. (*Id.* at 28).   That disparity does not rise to the level of satisfying the second prong of the *Duren* test.

The result is the same even if the defendant's preferred "relevant jury pool" is used.  The White Plains Qualified Wheel is comprised of 8.76% Black or African-American persons and 10.48% Latino or Hispanic persons. (*Id.*  at ¶ 13; *see also* Martin Aff. at ¶ 55).  This results in absolute disparities of 3.69% and 3.64%, respectively.  These figures are also comfortably within the range that the Second Circuit has determined does not satisfy the second prong of the *Duren* test.  Moreover, as explained in more detail below, the factors that cause the disparity between the White Plains Qualified Wheel and the White Plains Master Jury Wheel, as well as the voting age population, are not the result of the factors identified by the defense.

As these comparisons illustrate, it is only by employing an applies-and-oranges method of comparing the White Plains Qualified Wheel to the jury eligible populations of the "Manhattan Division" or the entire Southern District that the defendant is able to identify disparities that might arguably satisfy the second prong of *Duren*.  Because that method has no basis in the law, the defendant's claim fails at the second prong.

## 2. Any Potential Underrepresentation is Not Due to Systematic Exclusion

Even assuming the defendant had satisfied the second prong of the *Duren* test, he most certainly has not demonstrated that any underrepresentation is "due to *systematic exclusion* of the group *in the jury-selection process*." *Rioux*, 97 F.3d at 654 (emphasis added). That is, he cannot establish that the exclusion is the product of "jury selection itself, *rather than external forces*." *Id.* at 658 (emphasis added). He therefore cannot satisfy the third prong of *Duren*.

As then-District Judge Bianco explained, "systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." *Barlow*, 732 F. Supp. 2d at 40; *see also United States v. Barlow*, 479 F. App'x 372, 373 (2d Cir. 2012) (affirming Judge Bianco's "thorough and well-reasoned" opinion). Indeed, "[a] selection process that is facially neutral is unlikely to demonstrate systematic exclusion." *United States v. Savage*, 970 F.3d 217, 259 (3d Cir. 2020). Moreover, a defendant cannot "make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332 (emphasis in original).

Insofar as the underrepresentation is measured by a comparison of the White Plains Qualified Wheel to the jury eligible population of the "Manhattan Division" or entire Southern District, the defendant contends that the "primary reason" for the alleged underrepresentation is the prosecution's decision to pursue an indictment in White Plains rather than Manhattan. (Br. 12.) That decision was entirely proper, as set forth above. *See* Part III.A, *supra*. And even if it were the case that this decision resulted in substantial underrepresentation, it nevertheless does not amount to "systematic exclusion . . . *in the jury-selection process*." The prosecution's decision as to where to seek an indictment has nothing to do with the process by which the grand

21

jury is selected.  Thus, the remedy for any sort of forum shopping alleged by the defendant would not be a fair cross-section claim.

The defendant also contends that, even if the relevant "community" is the White Plains voting age population, "there are still systematic reasons for the significant levels of underrepresentation" of Blacks and Hispanics.  (Br. 13).  However, none of the laundry list of factors cited by the defendant and his expert (*see* Br. 13-16; Martin Aff. ¶¶ 79-89), either in isolation or in combination, supports a finding of systematic exclusion in the jury-selection process.

First and foremost, the factors identified by the defendant—refilling the Master Jury Wheel every four years, exclusive reliance on voter registration lists, exclusion of inactive voters from certain counties, incorrect "proration" of jurors between the overlapping counties, and failure to update addresses (*see id.*)—affect the construction of the *Master* Jury Wheel, and not the *Qualified* Jury Wheel.  By far, the primary factor affecting the construction of the Qualified Jury Wheel was that Black or African-American persons and Hispanic or Latino persons were qualified at a significantly lower rate than other races or ethnicities, and were excused from jury service at a significantly higher rate than other races or ethnicities.  (*See* Siskin Aff. at ¶¶ 4, 37). The defendant makes no accusation that any of the qualification questions or other steps between the formation of the Master and Qualified Jury Wheels are discriminatory.

Additionally, while the defendant identifies several factors that he claims results in the "significant levels of underrepresentation of Black or African-American and Hispanic or Latino people," the defendant never attempts to measure the extent to which those factors *actually* cause disparities.  (Br. 13).  In other words, the defendant never attempts to answer the relevant

question: what is causing the difference between the White Plains Qualified Jury Wheel and the White Plains voting age population?

The Government's expert did answer that question. As the following table illustrates, the factors relied upon by the defendant explain relatively little of the absolute disparity between the White Plains Qualified Jury Wheel and the White Plains voting age population.  (*See* Siskin Aff. at ¶ 38).

| ANALYSIS OF ABSOLUTE DISPARITY BETWEEN QUALIFIED JURY WHEEL AND COMMUNITY AND THE CAUSES AND IMPACT OF THE CAUSES ON THE ABSOLUTE DISPARITY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent of Entry | | Absolute Disparity: Difference in Percentage Points From Community | | Difference in Percentage Points Due to Cause | | Percent of Difference Qualified Jury Wheel to Community Due to this Cause | |
| Entry | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino |
| Cause of differences between entry demographics: | | | | | | | | |
| Qualified jury wheel | 8.76 | 10.48 | 3.69 | 3.64 | | | | |
| Due to differences in being found to be qualified as a juror or being excused | | | | | 2.58 | 2.59 | 69.9% | 71.2% |
| Due to clerical error in handling alternative mailing address | | | | | -0.14 | -0.10 | -3.8% | -2.7% |
| Master wheel | 11.20 | 12.97 | 1.25 | 1.15 | | | | |
| Failure to consider inactive voters except in Dutchess | | | | | 0.34 | 0.43 | 9.2% | 11.8% |
| Due to underrepresenting counties in both Manhattan and White Plains | | | | | 0.34 | 0.39 | 9.2% | 10.7% |
| Master wheel if simple random sample | 11.88 | 13.79 | 0.57 | 0.33 | | | | |
| Differences in U.S. citizens voting age and those registered to vote and/or disconnect in time between community benchmark and voter lists | | | | | 0.57 | 0.33 | 15.4% | 9.1% |
| Community | 12.45 | 14.12 | | | | | | |

In other words, by far the most significant factor affecting the absolute disparity between the White Plains Qualified Jury Wheel and the White Plains voting age population is the qualification, exemption, and excusal of potential jurors—which the defendant does not challenge as being discriminatory.  As the chart above shows, 69.9% of the reason for the difference between Black or African-American individuals on the White Plains Qualified Jury Wheel and the White Plains voting age population and 71.2% of the reason for the difference between Hispanic or Latino individuals on the White Plains Qualified Jury Wheel and the White Plains voting age population are the qualification, exemption, and excusal of those individuals.

23

The defendant therefore fails to prove that the factors he cites are in fact responsible for the disparity he alleges.

The defendant's claim fails for a second, independent reason. Each of the factors cited by the defendant is the sort of "external force" that does not amount to "systematic exclusion." For instance, the defendant criticizes the "exclusive reliance on voter registration lists." (Br. 13). But courts, including the Second Circuit, have repeatedly held that reliance on voter registration lists is proper, even if it results in underrepresentation of a particular group because that group votes in lower proportion than others. *See, e.g.*, *Biaggi*, 909 F.2d at 676–78; *Schanbarger v. Macy*, 77 F.3d 1424 (2d Cir. 1996); *Savage*, 970 F.3d at 260; *United States v. Ireland*, 62 F.3d 227, 231 (8th Cir. 1995).

The defendant also argues that by replenishing the Master Jury Wheels once every four years, rather than more often, the SDNY Jury Plan excludes younger voters and those who move towards the end of the life of the wheel, which in turn results in underrepresentation because minorities are disproportionately represented within these groups. (Br. 13-15). Even taking at face value the assertions about these consequences,[7] they do not constitute "systematic exclusion." As the Second Circuit explained in rejecting a similar claim in *Rioux*, "[t]he inability to serve juror questionnaires because they were returned as undeliverable is not due to the system [of jury selection] itself, but to outside forces, such as demographic change." 97 F.3d at 658. That the "external force" of "demographic change" may result in some underrepresentation does

---

[7] This factor identified by the defendant is of limited probative value because, again, it compares apples to oranges. The defendant complains that individuals who were too young to register to vote in November 2016 are not included in the Master Jury Wheel. However, those individuals are not necessarily included in the community benchmark used by the defendant—which is based on the 2018 ACS 5 year average (2014 through 2018)—either. In other words, comparing a group at one point in time to a group over a different period of time, does not necessarily provide conclusive evidence of contemporaneous disparity. (*See* Siskin Aff. at ¶ 43).

not constitute "systematic exclusion." *Id.*; *see also United States v. Ross*, 468 F.2d 1213, 1218 (9th Cir. 1972) (rejecting challenge to jury plan that provided for refilling the master jury wheel every four years and noting that the JSSA "does not mention when the wheel is to be refilled" and "it . . . seems clear that Congress originally intended to allow the districts considerable flexibility in determining when the master jury wheel is to be refilled"); *Guzman*, 337 F. Supp. at 142 (rejecting challenge to jury plan that replenished master wheel every four years, which resulted in the exclusion of persons between the ages of 21 and 24).

Finally, the defendant identifies what he claims are certain "failures to comply" with the SDNY Jury Plan, such as the exclusion of inactive voters in certain counties, incorrect "proration" of jurors in Westchester, Putnam, and Rockland counties between Manhattan and White Plains, and exclusion of individuals who provided alternate mailing addresses when registering to vote. (Br. 6, 15). However, such racially neutral processes are "unlikely to demonstrate systematic exclusion." *Savage*, 970 F.3d at 259; *see also Plaza-Andrades*, 507 F. App'x at 26 (finding that random assignment of criminal cases based on a neutral case assignment plan does not constitute "systematic exclusion" of any group from jury service); *see also Berghuis*, 559 U.S. at 332–33 & n.6 (no clearly established precedent that social and economic factors can give rise to a fair cross-section claim). In any event, the defendant offers only speculation that these alleged instances of non-compliance with the Jury Plan disproportionately affects Black or African-American and Hispanic or Latino persons. (*See, e.g.*, Martin Aff. at 79-89). In fact, as described above, these factors account for an insignificant percentage of the disparity claimed. *See* pp. 22, *supra*. This is plainly insufficient to establish systematic exclusion. *See Bates v. United States*, 473 F. App'x 446, at *5 (6th Cir. 2012) ("[S]peculation that an issue might contribute to the underrepresentation of African-Americans is

not enough to establish a prima facie Sixth Amendment violation."); *see also Berghuis*, 559 U.S. at 332 (speculation that factors "*might* contribute to a group's underrepresentation" is insufficient to make a prima facie case).

Accordingly, the defendant's claim also fails at the third prong of *Duren*.

### C.  The Defendant's Equal Protection Claim Is Meritless

It is well-established that a claimant under the Fifth Amendment must establish intentional discrimination. *Ricketts v. City of Hartford*, 74 F.3d 1397, 1407 (2d Cir. 1996).  To succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that "(1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, *i.e.*, is the result of intentional discrimination by the District." *Rioux*, 97 F.3d at 659. The defendant cannot satisfy this test, either.

Simply put, the defendant cannot establish "intentional discrimination," required to sustain a Fifth Amendment claim.  The defendant has not alleged any intentional discrimination by those who oversaw the jury selection system. *Rioux*, 97 F.3d at 659; *see also Ricketts*, 74 F.3d at 1409 n.4 (noting that in successful Fifth Amendment challenges to jury selection process, "the engine of discrimination was a considered governmental policy, rather than the series of mishaps and botches").  Nor could he.  Indeed, absent "positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection." *United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997); *see also Schanbarger v. Macy*, 77 F.3d 1424, 1424 (2d Cir. 1996) (per curiam); *Biaggi*, 909 F.2d at 676-78.  Accordingly, his claim must fail. *See Reyes*, 934 F. Supp. at 556

26

("It is clear from *Biaggi* that in this circuit, a Fifth Amendment challenge to the composition of a jury pool, based on the equal protection component of that amendment's due process clause, will not stand absent evidence that an underrepresented group has been hindered in registering to vote.").[8]

### D.  The Defendant's Statutory Claims Are Meritless

Fair cross-section claims under the JSSA are evaluated under the *Duren* test.  *Rioux*, 97 F.3d at 654.  Because the defendant fails to meet the second and third prongs of the *Duren* test, as discussed above, his fair cross-section claim under the JSSA fails.  Nevertheless, the defendant claims that "the choice to indict a Manhattan case in the White Plains Division" violates the JSSA.  (Br. 20).  The defendant also claims that the JSSA was also violated by (1) the exclusion of inactive voters from Westchester, Putnam, Rockland, Orange, and Sullivan counties; (2) the erroneous "proration" of counties; and (3) the exclusion of individuals who provided an alternative address when registering to vote in certain counties.  (*Id.* at 20-22).  The defendant is wrong on all counts.

While "substantial failures to comply" with the JSSA are actionable, "[m]ere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply

---

[8] The defendant contends that Comparative and Standard Deviation analysis "make clear that the level of underrepresentation here . . . 'is the result of a systematic process,'" which is sufficient to shift the burden to the Government to provide a "'plausible justification'" for the methods used to populate the Master Jury Wheel.  (Br. 17).  First, the defendant has not established that any underrepresentation is either "substantial" or the result of a "systematic process."  *See* Part III.C (refuting defendant's claim of "systematic exclusion"), *supra*; *see also Kenny*, 883 F. Supp. at 876 (dismissing Fifth Amendment claim when defendant failed to establish the second prong of the *Duren* test).  Assuming, arguendo, that the burden has shifted, as set forth below, the Government has demonstrated that the methods used to populate the Master Jury Wheel are justifiable and that the factors assailed by the defendant as causing underrepresentation have minimal effect on the representation of Black or African-American individuals and Hispanic or Latino individuals.  *See* Part III.D, *infra*.

with its provisions." *LaChance*, 788 F.2d at 870. "Whether a violation is 'substantial' or merely 'technical' depends upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived." *Id.*; *see also United States v. Beardon*, 659 F.2d 590, 601 (5th Cir. 1981) ("The mere claim the Plan has been violated is insufficient, absent a further showing the Act itself and its goals have been frustrated."). "A 'substantial failure' occurs when the violation of the Act frustrates the policy objectives of the Act, namely the random selection of jurors and the objective determination of juror disqualification, exemptions and excuses." *United States v. Purdy*, 946 F. Supp. 1094, 1104 (D. Conn. 1996); *accord United States v. Awadallah*, 457 F. Supp. 2d 239, 242-43 (S.D.N.Y. 2006).

As an initial matter, the defendant is wrong that the exclusion of potential jurors from New York and Bronx counties in the White Plains Master Jury Wheel violates the JSSA's requirements. As discussed above, it is clear that criminal defendants are not entitled to juries drawn from an entire district. *See, e.g.*, *Bahna*, 68 F.3d at 24 ("It is well-settled that neither the jury selection statute nor the Constitution requires that jurors be drawn from an entire district."); *see also* 28 U.S.C. § 1869(e) (authorizing courts in districts that are not divided by statute to create divisions which may be composed of certain counties or other political subdivisions surrounding the courthouse).

Additionally, the alleged "failures" do not violate the JSSA. For instance, the "proration" of jurors from the overlapping counties—*i.e.*, sending more individuals from the overlapping counties to Manhattan for jury service than White Plains—is entirely appropriate as not to overburden registered voters in those overlapping counties with jury service, while at the same time providing the busier courthouse (Manhattan) with sufficient potential jurors. *See Yonkers Contracting Co.*, 682 F. Supp. at 768 (rejecting argument that it is improper to send nine-tenths

of the jurors from the overlapping counties to Manhattan because "Manhattan gets a disproportionately high share of the nation's (and even the world's) litigation").  Additionally, there is no specific provision of the JSSA that prohibits the exclusion of inactive voters.

Moreover, the violations alleged by the defendant had minimal effect on the makeup of the White Plains Master Jury Wheel, which render his claims under the JSSA inactionable. Again, the defendant makes no attempt to measure the extent to which the alleged violations actually cause any disparity.  Had he done so, he would have found that correcting these "errors" would have almost no effect on the Master Jury Wheel.  For example, if the "overlapping counties"—Westchester, Putnam, and Rockland counties—were "pro-rated" such that each registered voter in those counties had a 1-in-3 chance of selection, instead of a 1-in-4.5 chance of selection, the percentage of Black or African-American persons would have been 11.54% of the White Plains Master Jury Wheel (which is 0.32 percentage points greater than the actual White Plains Master Jury Wheel), and the percentage of Hispanic or Latino persons would have been 13.36% of the White Plains Master Jury Wheel (which is 0.39 percentage points higher than the actual White Plains Master Jury Wheel).  (*See* Siskin Aff. at ¶ 32).  And if inactive voters from the counties other than Dutchess county—*i.e.*, Westchester, Putnam, Rockland, Orange, and Sullivan counties—were added to the voter lists from which the Master Jury Wheel was drawn, it is estimated that Black or African-American persons would have made up 11.88% of the White Plains Master Jury Wheel (which is 0.34 percentage points higher than the actual White Plains Master Jury Wheel) and Hispanic or Latino persons would have made up 13.79% White Plains Master Jury Wheel (which is 0.43 percentage points higher than the actual White Plains Master Jury Wheel).  (*See id.*).

Finally, failing to include individuals who provided an alternate mailing address when registering to vote due to a technical glitch would have had almost no effect on the White Plains Qualified Jury Wheel, and does not violate the JSSA.  Had this error not been made, representation of Black or African-American individuals and Hispanic or Latino individuals on the White Plains Qualified Jury Wheel would actually have *decreased* by 0.14 percentage points and 0.10 percentage points, respectively (from 8.76% to 8.62% for Black or African-American persons and from 10.48% to 10.38% for Hispanic or Latino persons).  (Siskin Aff. at ¶ 36).  Additionally, technical errors resulting in such minor differences do not violate the JSSA.  *See United States v. Huber*, 457 F. Supp. 1221, 1231 (S.D.N.Y. 1978) ("There is no substantial failure to comply with the Act because of the minor deviations occasioned by the use of electronic equipment . . .").

Ultimately, none of the violations alleged by the defendant frustrate the policy objectives of the JSSA.  The defendant does not allege that the determination of juror disqualification, exemptions and excuses under the SDNY Jury Plan was anything other than objective.  To the extent the selection of the Master Jury Wheel was not completely *statistically* random (*see* Siskin Aff. at ¶ 13), the law is clear that the "random selection" of jurors required by the JSSA is not the same as "statistical randomness."  *See Bearden*, 659 F.2d at 602 ("The legislative history makes clear that Congress did not intend for 'random selection' under the Act to be defined as 'statistical randomness[.]'").  Instead, "random selection" under the JSSA requires "the methods used [to select a jury] must not result or have the potential to result in discrimination among cognizable groups of prospective jurors."  *Id.*  The defendant has failed to make such a showing, and accordingly, his statutory claims should be rejected as well.

## IV.    CONCLUSION

For the reasons stated above, the defendant's motion to dismiss the indictments should be

denied.

Dated:  New York, New York
        December 30, 2020

                                         Respectfully submitted,

                                         AUDREY STRAUSS
                                         Acting United States Attorney
                                         Southern District of New York

By:   /s _____

                                         Sam Adelsberg
                                         Matthew Hellman
                                         Sidhardha Kamaraju
                                         Assistant United States Attorneys
                                         Tel.: (212) 637-2494

**REPORT**
**in the matter of**

**United States of America v. Souleymane Balde**

**by**

**Bernard R. Siskin, Ph.D.**
**Director**
**BLDS, LLC**

**December 7, 2020**

**REPORT**
**in the matter of**
**United States of America v. Souleymane Balde**

**Bernard R. Siskin, Ph.D.**

I.      **INTRODUCTION**

1. I am a Director of BLDS, LLC, a specialty consulting firm.  Prior to joining BLDS, I did similar work at the specialty consulting firms, LECG, LLC, the Center for Forensic Economic Studies, Inc., and National Economic Research Associates (NERA).  Prior to that, I was a tenured faculty member and Chairman of the Department of Statistics at Temple University in Philadelphia.  I received my Ph.D. in Statistics with a minor in Econometrics from the Wharton School of the University of Pennsylvania in 1970.  I have authored four books on statistical methodology, three book chapters, four research monographs, and numerous papers, including articles on the role of statistics in the analysis of employment discrimination issues. Since receiving my Ph.D., I have specialized in the application of statistics to the analysis of employment practices.  In this capacity, I have been retained by numerous governmental private organizations including, but not limited to, the Third Circuit Task Force on Race and Gender, the Equal Employment Opportunity Commission (EEOC), the Civil Rights Division of the United States Justice Department, the Office of Federal Contract Compliance (OFCCP), the Federal Bureau of Investigation, and various states and municipalities as well as numerous private corporations.  My resume is attached as Appendix A.

II.     **ASSIGNMENT**

2. I have been asked by Counsel for the United States to assess the extent to which the master jury wheel and qualified jury wheel drawn for use in White Plains, in the Southern

District of New York from the November 1, 2016 jury eligible population is representative of the community from which it is supposed to be drawn. The population for which the jury is meant to be representative is normally defined as the population of citizens of the United States who are at least 18 years old who reside in the community. To the extent there is a difference in representation between the qualified jury wheel and the community of African Americans or Blacks (referred to herein as African Americans) and of Hispanics or Latinos (referred to herein as Hispanics), I was asked to assess the cause(s) of the difference. I also was asked to comment on the appropriateness and accuracy of the defendant's expert Jeffery Martin's assessment of the difference between the qualified jury wheel and the community.

### III.   EXECUTIVE SUMMARY

3. The African American percentage of the White Plains qualified jury wheel was 3.69 percentage points lower than that in the White Plains community (8.76% versus 12.45%, respectively) and the Hispanic percentage was 3.64 percentage points lower than that in the White Plains community (10.48% versus 14.12%, respectively). This is consistent with what Defendant's expert Mr. Martin reports in his declaration.

4. The disparities were almost exclusively due to the pattern of African Americans and Hispanics having been sent a juror questionnaire, and being found to be qualified as a juror and not excused at a significantly lower rate than other races or ethnicities after returning the questionnaire. Of the 3.69 percentage point difference by race (African American), 2.58 (or 69.9% of the absolute disparity) is caused by this factor. Of the 3.64 percentage point difference by ethnicity (Hispanic), 2.59% (or 71.2% of the absolute disparity) is caused by this factor.

5. Tracking the percent African American and Hispanic individuals in the community through to the percent African American and Hispanic individuals on the White Plains qualified

3

jury wheel, I was able to identify and measure the various causes of the absolute disparity between the community and the qualified jury wheel.

6. The first step in the process of analyzing the qualified jury wheel is to re-create the master jury wheel.  The master jury wheel is supposed to be a simple random selection from the voter registration lists.  The master jury wheel was chosen from the November 1, 2016 county voter registration lists.  Based on geocoding the master jury wheel, I was able to estimate that a proper random sample from the complete November 1, 2016 voter registration lists would have been 11.88% African American and 13.79% Hispanic.  Hence, if a simple random sample had been selected, the absolute difference between the African American percent in the master jury wheel and the community would have been only 0.57 percentage points, and the absolute difference between the Hispanic percent in the master jury wheel and the community would have been only 0.33 percentage points.  Hence, the voter lists are a good representation of the community benchmarks for representation of African Americans and Hispanics

7. As pointed out by defendant's expert Mr. Martin, the selection of the individuals on the master jury wheel was not a simple random sample from the November 1, 2016 voter registration lists. That is, all registered voters did not have an equal chance of selection.  There were two reasons for this.  One, registered voters from the counties which provided jurors to both the Manhattan and White Plains master jury wheels were less likely to be selected than registered voters in counties which fed only the White Plains master jury wheel.  Two, except for Dutchess County, inactive registered voters were not selected for the master jury wheel.[1]  These reasons were responsible for the actual master jury wheel being only 11.20% African American and

---

[1] The voter registration lists for all counties but Dutchess did not include inactive registered voters.

4

12.97% Hispanic.  Thus, the decision to not draw a proper random sample accounts for 0.68% of the absolute disparity between the actual master jury wheel and a random sample master jury wheel for African Americans and 0.82% of the absolute disparity for Hispanics.

8. Based on the geocoding of the master jury wheel, it is evident that the percentage of African Americans and Hispanics of the actual White Plains master jury wheel is similar to the estimate of the percentage of African Americans and Hispanics in the White Plains community. The percent African American of the master jury wheel is 1.25 percentage points lower than that of the community, (12.45% versus 11.20%) and the percent Hispanics of the master jury wheel is 1.15 percentage points lower than that of the community (14.12% versus 12.97%).

9. Mr. Martin notes that the disparity between the master jury wheel and the qualified jury wheel is impacted by a clerical error in transcribing the individual's mailing address.  This clerical error affected every county except Westchester.  However, the impact of this clerical error on the absolute difference between the master jury wheel and the qualified jury wheel for the African American percentage is negligible, and the error actually reduced the absolute difference between the master jury wheel and the qualified jury wheel for African Americans and Hispanics.

10. In sum, as (i) the voter registration lists and the master jury wheel created from these lists reasonably mirror the representation of the community (an absolute disparity equal to or less than 1.25%), but (ii) because African Americans and Hispanics were less likely to respond to the questionnaire used to determine if the potential juror was qualified, and/or (iii) because African Americans and Hispanics who responded were less likely to be found qualified, and/or (iv) because African Americans and Hispanics who were found qualified were more likely to be excused, the absolute disparity between the White Plains qualified jury wheel and the White

Plains community benchmark for African Americans increased from 1.25% to 3.69% and for Hispanics increased from 1.15% to 3.64%.

11. Mr. Martin also compared the qualified jury wheel for White Plains with the Manhattan community and for the overall Southern District community.  The White Plains master jury wheel is designed to be representative of the White Plains community, not the Manhattan or Southern District community.  The Manhattan and the Southern District communities are significantly more African American and Hispanic than the White Plains community.  Thus, since the White Plains master jury wheel is designed to be representative of the White Plains community, by design it will not be representative of the Manhattan or the Southern District community with respect to the percent African American and Hispanic.

## IV.    DATA RELIED UPON

12. The data I received and relied upon is listed in Appendix B of this declaration.

## V.    FINDINGS

### A.  Overview of Qualified Jury Wheel Selection Process.

13. The master jury wheel which forms the basis for the qualified jury wheel for the White Plains community of the Southern District of New York is supposed to be drawn via a simple[2] random sample from the voter lists from the six counties (Westchester, Putnam, Rockland, Orange, Sullivan and Dutchess) making up White Plains.  The November 1, 2016 voter registration lists were used to construct the master jury wheel used in this matter. However, either by design or in error, the selection from the voter lists was not actually a simple

---

[2] A simple random sample is one where each person in the population has an equal probability of being selected.

random sample.  First, the inactive voters in all counties except Dutchess were excluded from selection.  Assuming that they should have been considered,[3] this exclusion resulted in the sample frame (the voter lists) being improperly defined for all counties except Dutchess.  The second issue is that, of the six counties which make up the White Plains community, three counties feed both the Manhattan and White Plains master jury wheel, while three counties feed only White Plains.  The process for selecting for the White Plains master jury wheel from the three non-overlapping counties was to select one out of every three voters, while the process for selecting from the three overlapping counties was to select one out of every 4.5 voters.[4]  Thus, the White Plains sampling methodology underrepresents the voters in the three overlapping counties.[5]

14. If the sample from the voter registration lists had been a simple random sample, then the master jury wheel would be expected to mirror that of the voter registration lists as of November 1, 2016.  Any difference would be due to chance as a result of random selection and, given the large number of selections, the difference due to chance should be trivial.  Of course, the master jury wheel could vary from the actual demographics of the community due to

---

[3] There may be some valid reason for excluding inactive voters, but inactive voters from Dutchess county were included in the selection process, and some inactive voters responded and were on the qualified jury wheel.  Thus, I assume that the exclusion of the inactive voters was in error and I explore the impact of this error in explaining any differences between the wheel and community demographics.

[4] The methodology was to first select the Manhattan wheel by selecting one out of every 3 voters from each county in the Manhattan community, and then for the overlapping counties to remove those selected for the Manhattan wheel from consideration for the White Plains community and then selecting one out of every 3 of the remaining voters.  The result is that, considering all voters in the county, only 1 out of every 4.5 are selected for the White Plains community.

[5] The procedure may have been a compromise between having an overly burdensome process for voters in the overlapping counties whose chances of jury selection would be twice that of voters in non-overlapping counties and the underrepresentation of voters in the overlapping counties in the White Plains master jury wheel.

systematic differences in the populations of those who register to vote by race or ethnicity.  That is, if African Americans or Hispanics are less likely (or more likely) to register to vote, then the selection from the voter lists would be expected to underrepresent (or overrepresent) African Americans and Hispanics to the extent that the likelihood of not registering to vote differs among the demographic groups.

15. Since jurors are always anticipated to be needed for future trials, at least once a year, persons on the master jury wheel are selected for possible jury duty via simple random sampling. Those randomly selected are sent questionnaires to determine their qualifications to sit as a juror. The names of persons who complete and return the questionnaire and are found to be qualified as jurors are placed on the qualified jury wheel from which jurors are selected, unless they are granted an exclusion from jury service.  If the demographics of the master jury wheel and qualified juror wheel differ, it is because of demographic differences in the population of those who return the questionnaire and/or are found to be qualified and/or excused.[6]

### B.  Analyzing If There is a Difference in the Demographics of the White Plains Qualified Jury Wheel and the Demographics of the White Plains Community.

16. The only statistic we actually know that will allow us to assess the difference between the demographics of the White Plains qualified jury wheel and the comparable demographics of the White Plains community is the racial and ethnic make-up of the qualified jury wheel.

17. Based on the actual potential jurors' responses concerning their race and ethnicity, the White Plains qualified jury wheel is 8.76% African American and 10.48% Hispanic.

---

[6] Some small increase or decrease in the representation of African Americans and Hispanics would be expected to occur by chance, but this is unlikely to have any meaningful impact of the absolute disparity for African Americans and Hispanics.

18. The master jury wheel, which defined the potential pool of jurors for the qualified jury wheel, was based on the voter registration lists as of November 1, 2016 and was used to select all potential pools of jurors for juries composed after that date. The date on which the comparable demographics of the community should be ascertained is unclear. Should it be the population as of November 1, 2016 or some date thereafter? Of course, data on the population in the community is not available for any specific date. The best one can do is look at the best available data closest the appropriate date. The best data source is the latest available American Community Survey (ACS) data published by the U.S. Census Bureau. The latest available data is the 2018 5- year survey combining the 2014, 2015, 2016, 2017, and 2018 survey data.[7] The 2018 survey includes data both before and after November 1, 2016. The ACS collects survey information continuously nearly every day of the 5 years and then aggregates the results. The data collection is spread evenly across the entire period represented, so as not to overrepresent any particular month or year within the period, but it does not measure the population at a single point in time. The decennial census samples are designed to measure characteristics as of a certain date (or a narrow time period). For example, Census 2010 was designed to measure the characteristics of the population and housing in the United States based upon data collected around April 1, 2010, and thus its data reflects a narrower time frame than ACS data. If areas have consistent population characteristics throughout the ACS time period, their period estimates may not look much different from estimates that would be obtained from a "point-in-time" survey design. However, if areas experience significant changes in the characteristics of the population over the time period, ACS period estimates (especially for a 5- year period) may noticeably differ from "point-in-time" estimates. I mention this only to point out that there will

---

[7] The 2019 ACS is due to be released to the public on December 10, 2020.

almost always be a disconnect between the estimate of the demographics of the community and the demographics of the master jury wheel, simply because there will be a disconnect between the timing of the two estimates. Regardless of whether one believes the appropriate point in time to define the comparable community population should be as of November 1, 2016 or some date thereafter, the best available data to estimate the demographics of the community is the 5-year 2018 ACS.

19. Using the ACS data concerning the population of U.S. citizens at least 18 years of age residing in the counties comprising White Plains, the racial and ethnic representation is 12.45% African American and 14.12% Hispanic.

20. Comparing the demographics of the White Plains community to the demographics of the qualified jury wheel, we find that the African American representation in the community is 3.69 percentage points higher than their representation on the qualified jury wheel (12.45%-8.76%) and the Hispanic representation in the community is 3.64 percentage points higher than their representation on the qualified jury wheel (14.12%-10.48%).

21. Whether this difference is practically significant or legally meaningful is a decision for the Court. To aid the Court in its determination, I have estimated the impact of the various causes for these differences.

C. **Determining and Measuring the Causes of the Difference Between the Demographics of the Qualified Jury Wheel and the Estimate of the Demographics of the Community of Which the Qualified Jury Wheel is Supposed to be Representative.**

22. As discussed above, the first step in the process of creating the qualified jury wheel is to re-create the master jury wheel. The master jury wheel is supposed to be a simple random sample from the registered voter lists of the counties making up White Plains. After selecting potential jurors for the master jury wheel, simple random samples of the potential jurors are

selected and those selected are sent a questionnaire to determine if they are qualified.  The names

of persons who complete and return the questionnaire and are found to be qualified as a juror,

unless granted an exception from jury service, are then placed on the qualified jury wheel from

which potential jurors are summoned.

23. What in this process could cause the difference in the percent African American and

percent Hispanic between the benchmark and the qualified jury wheel?  Below is a list of all

likely possible causes of such a difference.  In considering the differences, I view the process as

moving sequentially from the voter registration lists to the qualified jury wheel, and I compare

the absolute disparity in the percent African American and Hispanic at each step with that of the

community.

24. Reasons 1-3 focus on the causes of the differences between a master jury wheel that

is drawn from the voter registration list such that every registered voter in White Plains as of

November 1, 2016 had an equal likelihood of being included, and the community.  Reasons 4-5

focus on the causes of the differences between the actual master jury wheel and such a randomly

drawn master jury wheel.  Reasons 6-8 focus on the causes of the differences between the

qualified jury wheel and the master jury wheel.

**Reasons**:

Community vs Randomly Selected Master Jury Wheel from Voter Registration Lists

1) The community may differ from the randomly selected master jury wheel because U.S.

   citizens of voting age (*i.e.*, the community) and those registered to vote (*i.e.*, the master

   jury wheel) are different.

2) The estimate of the demographics of the community may differ from the demographics of

   those on the voter registration lists because the estimates are from different times and also

because the voter list demographics are as of a specific point in time, while the community estimate is over a five-year period of time (2014-2018).

3) The community may differ from the randomly selected master jury wheel because of chance in selection from the voter registration lists.

Randomly Selected Master Jury Wheel vs Actual Master Jury Wheel

4) The actual master jury wheel may differ from a randomly drawn master jury wheel because the sample selection underweights the probability of selection from the counties feeding both the White Plains and Manhattan master jury wheels.  This is referred to as the "prorating" issue.

5) The actual master jury wheel may differ from a randomly drawn master jury wheel because, in five of the six counties, the voter registration lists did not include inactive voters.  This is referred to as the "sample frame" issue.

Qualified Jury Wheel vs Master Jury Wheel

6) The qualified jury wheel may differ from the master jury wheel because of clerical errors in transferring the mailing (alternative) address to the master jury wheel, which potentially results in not being able to properly reach some potential jurors on the master jury wheel to determine if they should be placed on the qualified jury wheel.

7) The qualified jury wheel may differ from the master jury wheel because being sent a questionnaire, returning the questionnaire, and being found to be qualified as a juror and not excused are different by race or ethnicity.

8) The qualified jury wheel may differ from the master jury wheel by chance resulting from the random selection of those on the master jury wheel who will be sent a questionnaire.

25. Now that I have defined the likely causes, the next step is to estimate the effect of each of these causes.

<u>Reasons 1, 2, and 3</u>

26. The first reason requires analysis of the master jury wheel and the voter registration lists, which do not contain reliable race and ethnicity information.  Therefore, I had to estimate the race and ethnicity composition of the master jury wheel and voter registration lists.  The common and widely used method for estimating race is geocoding.[8]  Geocoding is based on estimating the proportion of persons who are of a given race based on the racial mix of where they live.  In defining where they live, I used the residence address on the voter registration list.  Conceptually, geocoding uses the racial/ethnic mix of the area where one resides to estimate the race of persons on the list from that area.  That is, if 100 persons on the master jury wheel live in an area in which 85% of the voter age U.S. citizens are African American, then we would estimate that 85 of these 100 are African American, and 15 are not.  Assuming that the probability of being randomly selected for the master jury wheel if you live in that area is the same for everyone, this estimate will be very reliable, especially if we are selecting large numbers of persons.  For example, if there are 343,984 (the size of the master jury wheel) selections from the area, the probability is 95% that the actual percent of African Americans will be within .001 percentage points of 85%.  The more homogeneous the areas defined for the geocoding, the more accurate the estimate of the race of the wheel will be.  To maximize accuracy of the geocoding, I defined the area as the census tract,[9] which is the smallest area for which information about the race of voter age U.S. citizens was available.  The smaller the area,

---

[8] Defendant's expert also geocoded the voter registration lists.
[9] Census tracts generally have a population size between 1,200 and 8,000 people, with an optimum size of 4,000 people.  A census tract usually covers a contiguous area.

and the more homogeneous the area, the more accurate the geocoding estimate.  I defined the population in the census tract as U.S. citizens of voting age.  To estimate the percent Hispanic, I used the Bayesian Improved Surname Geocoding (BISG) method, which enhances the accuracy of the geocoding by also using information about the ethnicity of a person's last name.  This method has been shown to significantly improve the estimation for Hispanics.[10]

27. There is one constraint on the accuracy of the geocoding methodology.  The basic assumption is that if the potential voting eligible population (U.S. citizens of voting age) in a census tract is 85% African American, then we would expect 85% of those on the master jury wheel who reside in that census tract to be African American.  However, since the master jury wheel is selected from registered voters and not from potentially voting-eligible persons, this assumes that the likelihood of registering to vote for those who live within the same census tract is the same by race and ethnicity.  If African Americans and/or Hispanics are less likely to register to vote, the results of the geocoding will overestimate the percent of African Americans and Hispanics on the master jury wheel (reason 1).  However, there is no valid statistical evidence to conclude there is such a difference.[11]

28. Based on the geocoding, the race and ethnicity representation of the master jury wheel is 11.20% African American and 12.97% Hispanic.  Thus, the master jury wheel is 1.25

---

[10] For additional information on BISG, see Elliott, M.N., Morrison, P.A., et al. "Using the Census Bureau's Surname List to Improve Estimates of Race/Ethnicity and Associated Disparities" in Health Serv Outcomes Res Method 9:69-83 (2009).

[11] The only data available on citizens registering to vote by race and ethnicity is published by the U.S. Census Bureau, Current Population Survey November 2016, and it shows the rates across the state, not within the same census tract.  The difference in rates of registering by race and ethnicity statewide would be expected to be greater than within census tracts.  The data for November 2016 shows African American citizens more likely to register by 1 percentage point, and Hispanic citizens less likely to register by 7.2 percentage points.  Neither of these differences are statistically significantly.

percentage points less African American than the estimated percent in the community and 1.15 percentage points less Hispanic than the estimated percent in the community.

29. While the demographics of the master jury wheel are similar to those of community, they are not identical.  Looking at the list of reasons above, the difference between the voter registration lists and the community could be caused by reason 1 and/or by reason 2 or by reason 3, which explain why differences in the voter registration lists and a randomly drawn master jury wheel from the voter lists may occur.  Alternatively, the difference may be caused by reason 4 and/or reason 5 and/or reason 6 which explain why differences between the master jury wheel and voter lists may occur.

30. Focusing initially on the difference between a randomly drawn master jury wheel and the voter registration file, one possible cause (reason 3) is due to chance in randomly selecting from the voter registration lists.  While possible, it is highly unlikely to be a meaningful cause of the disparity.  The master jury wheel is supposed to be a simple random sample drawn from the voter registration lists.  Given the size of the sample drawn, the representation on the master jury wheel should almost perfectly mirror the demographics of the voter registration lists.  It is highly likely that chance variation would only result in at most a 0.001 difference between the master jury wheel and the voter registration lists in their demographic characteristics.  Hence, the difference between the community and a randomly drawn sample from the voter registration lists must be almost exclusively because of differences between the voter registration lists and the community (reasons 1 and 2).  As shown herein, the voter registration lists are a good source from which to pick a wheel that is representative of the community benchmarks for African Americans and Hispanics.  The absolute disparity between a randomly drawn master jury wheel from the voter registration lists is only 0.57% for African Americans and 0.33% for Hispanics.

Reasons 4 and 5

31. The actual selection of the master jury wheel was not a simple random sample from
the November 1, 2016 voter registration lists.[12]  Reasons 4 and 5 delineate why the selection
from the voter registration list was not a simple random sample.  The impacts of this can easily
be measured by simply estimating what the demographics of the master jury wheel would have
been if the sample had been a simple random sample.  The difference thus measures the impact
of not drawing a simple random sample.  For reason 4, the prorating issue, we can exactly
measure the impact by simply weighting upward the selections from the overlapping counties so
that they represent 1/3 of the registered voters in those counties, as do the actual selections for
the non-overlapping counties, and then seeing what effect it has on the percent African American
and Hispanic.  To address reason 5, the sample frame issue, in order to determine the
demographics of a random master jury wheel if they had been considered, we need to know two
things.  One, we need to know the number of inactive voters in each of these counties who were
not considered, and two, we need to know what the percent African American and Hispanic is
among those inactive voters.  While I have the counts of inactive voters in each county,
unfortunately, I was not supplied with, nor do I have access to names and addresses necessary to
determine the extent to which the demographic characteristics of inactive and active registered
voters are different.  This information is available only for Dutchess county.  Therefore,
precisely determining the characteristics of a sample frame including the inactive voters can only
be done for Dutchess county, where such data exists.  However, if we assume that the relative
difference (percent change in percent African American or Hispanic) in the percent African

---

[12] A simple random sample is one in which the sample frame is unbiased and each element in the
frame has an equal probability of selection.

American or Hispanic between active and inactive votes in other counties is the same as in Dutchess, we can estimate what the master jury wheel demographics would have been if inactive voters were considered in selecting potential jurors for all counties, not just Dutchess.

32. The analysis shows that, with respect to the prorating issue (reason 4), the impact of the proportionality was to lower the African American percentage by 0.34 percentage points and also lower the Hispanic percentage by 0.39 percentage points on the master jury wheel. The sample frame issue (reason 5) meant inactive voters were not in the sampling frame for selection to the actual master jury wheel and, as a result, the number of selections on the master jury wheel was lower than it would have been had they been in the sampling frame for selection.[13] However, the real question is what the impact of this restricted sampling frame on the African American and Hispanic percentages was. I estimate that the African American percentage was reduced by 0.34 percentage points and the Hispanic percentage was reduced by 0.43 percentage points due to the failure to consider inactive voters for the master jury wheel.

33. Thus, the failure to take a simple random sample (*i.e.*, the combination of reasons 4 and 5) resulted in the actual master jury wheel representation of African Americans being 0.68 percentage points lower and Hispanics being 0.82 lower and, as a result, the absolute disparity between the actual master jury wheel and the community was 1.25 for African Americans and 1.15 for Hispanics.

---

[13] The number of persons on the master jury wheel would have increased by 6,270 (or 7.9%). The number of master jury wheel selections from Putnam would have increased by 1,799 (or 7.8%). The number of master jury wheel selections from Rockland would have increased by 3,051 (or 6.7%). The number of master jury wheel selections from Sullivan would have increased by 2,383 (or 13.55%) and the number of master jury wheel selections from Westchester would have increased by 11,841 (or 8.1%).

<u>Reasons 6, 7, and 8</u>

34. The last step in creating the qualified jury wheel is the selection from the master jury wheel of those deemed qualified and not excused.  Reasons 6, 7 and/or 8 are the potential causes of any disparity between the qualified jury wheel and the master jury wheel.

35. Focusing on the difference between the master jury wheel and the qualified jury wheel, one possible cause (reason 8) is that the qualified jury wheel differs from the master jury wheel because of chance in selecting persons from the voter registration lists to be sent a questionnaire to determine if they are qualified and not excused and should therefore be moved to the qualified jury wheel.  While possible, it is not expected that the demographics of those mailed a questionnaire will meaningly differ from those not mailed a questionnaire.  Any variation should be random and equally likely to overrepresent or underrepresent any race or ethnicity.  Those mailed a questionnaire are chosen by a simple random sample drawn from the master jury wheel.  Given the size of the samples drawn, the representation on the master jury wheel should closely mirror the demographics of the voter lists.

36. However, some difference between the qualified jury wheel and the master jury wheel may be caused by the clerical error in transferring alternative mailing addresses to the master jury wheel (reason 6), which was noted by defendant's expert Mr. Martin.  If the clerical error disproportionately impacted African Americans and Hispanics either positively or negatively it could explain some of the difference between the qualified jury wheel and the master jury wheel.  That is, the clerical error failure to pick up the zip code from the alternative addresses on the voter registration list likely prevented the questionnaire from reaching those who provided alternative addresses.  All who were affected by this error were less likely to respond to the questionnaire, but we do not know if the error affected more African Americans

or Hispanics or fewer.  Thus, the disparity may be because the clerical error led to African

Americans and Hispanics being more likely or less likely to not respond to the mailed

questionnaire because they did not receive the questionnaire due to this issue.  I was able to

identify the persons on the master jury wheel whose questionnaire was mailed to the incomplete

alternative mailing address on the voter registration list.  None of these persons responded to the

questionnaire, presumably because they never received it due to the clerical error.  Assuming

that, absent the clerical error, these persons would have received the questionnaire and made it

onto the qualified jury wheel at the same rate as those in the county who were not subject to the

clerical error, I estimated the number of additional persons who would have made it on to the

qualified jury wheel by race and ethnicity.  Overall, 1,681 additional persons would have made it

onto the qualified jury wheel, of which 111 (or 6.60%) would have been African American and

149 (or 8.87%) would have been Hispanic.  That is, correcting this clerical error would increase

the number of persons on the qualified jury wheel, but lower the percent of persons on the

qualified jury wheel that were African American and Hispanic.  Based on this analysis, I

estimated that if the clerical error had not been made, the percent African American on the

qualified jury wheel would have slightly decreased by 0.14 percentage points (from 8.76% up

8.62%) while the percent Hispanic on the qualified jury wheel would have slightly decreased by

0.10 percentage points (from 10.48% down to 10.38%).  Obviously, this clerical error is not a

cause of the difference in African American and Hispanic representation between the qualified

jury wheel and the community.

    37. The final and dominant cause of the difference between the qualified jury wheel and

the master jury wheel, and hence the difference between the qualified jury wheel and the

community, is the fact that when African Americans and Hispanics on the master jury wheel are

randomly selected and sent questionnaires, they are less likely to return the questionnaire, and/or

they are more likely to be found not qualified as a juror when they return the questionnaire,

and/or they are more likely to be excused when found qualified, and, hence, African Americans

and Hispanics are less likely to be moved from the master jury wheel onto the qualified jury

wheel (reason 7).  As a result of this, the percent of African Americans on the qualified jury

wheel is 2.58 percentage points lower and the percent of Hispanics is 2.59 percentage points

lower.  This accounts for all of the absolute difference between the qualified jury wheel and

master jury wheel and 69.9% of the absolute difference between the qualified jury wheel and the

community for African Americans and 71.2% for Hispanics.

38. The summary of the results of the analysis of the impact of the various causes on the

difference between the qualified jury wheel and the community are presented in the table below.

**ANALYSIS OF ABSOLUTE DISPARITY BETWEEN QUALIFIED JURY WHEEL AND COMMUNITY AND THE CAUSES
AND IMPACT OF THE CAUSES ON THE ABSOLUTE DISPARITY**

| Entity | Percent of Entity | | Absolute Disparity: Difference in Percentage Points From Community | | Difference in Percentage Points Due to Cause | | Percent of Difference Qualified Jury Wheel to Community Due to this Cause | |
|---|---|---|---|---|---|---|---|---|
| | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino |
| Cause of differences between entity demographics: | | | | | | | | |
| Qualified jury wheel | 8.76 | 10.48 | 3.69 | 3.64 | | | | |
| Due to differences in being found to be qualified as a juror or being excused | | | | | 2.58 | 2.59 | 69.9% | 71.2% |
| Due to clerical error in handling alternative mailing address | | | | | -0.14 | -0.10 | -3.8% | -2.7% |
| Master wheel | 11.20 | 12.97 | 1.25 | 1.15 | | | | |
| Failure to consider inactive voters except in Dutchess | | | | | 0.34 | 0.43 | 9.2% | 11.8% |
| Due to underrepresenting counties in both Manhattan and White Plains | | | | | 0.34 | 0.39 | 9.2% | 10.7% |
| Master wheel if simple random sample | 11.88 | 13.79 | 0.57 | 0.33 | | | | |
| Differences in U.S. citizens voting age and those registered to vote and/or disconnect in time between community benchmark and voter lists | | | | | 0.57 | 0.33 | 15.4% | 9.1% |
| Community | 12.45 | 14.12 | | | | | | |

## VI.    REVIEW OF JEFFREY MARTIN'S AFFIDAVIT

39. Mr. Martin computes the percent African American on the White Plains qualified jury wheel and the estimated percent African American and Hispanic in White Plains, Manhattan, and the overall Southern District using the 5-year ACS.  I can reproduce his calculations.  He then compares the demographics of the White Plains qualified jury wheel to that of the White Plains community, the Manhattan community, and the Southern District community.

40. He computes the absolute difference between the White Plains qualified jury wheel and the White Plains community based on the 5-year 2018 ACS data, as I do.  While I did not compare the White Plains qualified jury wheel and the Manhattan and Southern District community estimates, I do not dispute his reported absolute disparities.  However, since the percent African American and Hispanic in Manhattan and the Southern District are significantly larger than in White Plains, and the master jury wheel is designed to represent White Plains, by design the White Plains master jury wheel and hence its qualified jury wheel will be significantly demographically different, since the communities' demographics are different.

41. Mr. Martin properly notes that the master jury wheel was not a valid simple random sample, so it does not properly represent the voter lists from which potential jurors are selected, due to what he labels a proration issue (the voters in different overlapping counties have a different selection rate than those non-overlapping counties) and the fact that inactive voters on the voter list were not selected in five counties.  He also points out that, in making the master jury wheel, there was a clerical error in that zip codes were not included for individuals who provided an alternative mailing address when they registered to vote.  The result of this error was that voters who provided an alternative mailing address never responded to the questionnaire, presumably because they never received it due to the clerical error.

21

42. While the issues raised by Mr. Martin are valid, he never actually measures their impact to determine if they meaningfully impact the demographics of the qualified jury wheel. If he had done so, as I actually did and report above, he would have found the issues about which he raises concerns explain relatively little of the absolute disparity in the representation of African American and Hispanic individuals between the qualified jury wheel and the community.

43. Mr. Martin's declaration expends much effort in defining populations of persons in the community who are not or cannot be in the master jury wheel (*i.e.*, reason 2 above). This is of little value. The issue is only whether and to what extent they are different, what is causing them to be different, and to what extent it causes them to be different. Thus, the issue is not whether someone is left out. For example, clearly persons in the community in 2020 who were too young to register to vote on November 2016, or persons who moved into the area after November 2016 are not on the November 1, 2016 voter registration lists. However, the issue is not who is on the current voter registration list but was not on the November 1, 2016 voter registration list. Rather, the question is what is causing the difference between the qualified jury wheel—that is based on the November 1, 2016 voter population—and the benchmark for the community—which is based on the 5-year ACS. Persons who move into White Plains are also not in the benchmark computation. If we are to update the voter registration lists to match the current community benchmarks (an impossible task) we would also need to update the community benchmark. Mr. Martin presents the difference in the wheels based on the November 2016 voter registration lists and the benchmark based on the community demographics between 2014 and 2018. The relevant question is what factors cause the difference he presents, and to what extent these factors cause the absolute disparity between the community benchmark and the

qualified jury wheel.  Mr. Martin's presentation, unlike my analysis, never does this.  Instead, he cherry picks issues which might impact the absolute disparity, but never measures the extent to which it does, or he simply cherry picks persons who are in the community currently but not in November 1, 2016, without any attempt to update the community benchmarks.

_____

Bernard R. Siskin, Ph.D.

Dated:  December 7, 2020

**APPENIDX A**

# BLDS, LLC

Bernard R. Siskin, Ph.D.
Director

1608 Walnut Street
Suite 1108
Philadelphia, PA  19103  USA

Main:  215.717.2320
Fax:    215.717.2324
Email: statgroup@bldsllc.com

**SUMMARY**

Bernard Siskin received his B.S. degree in Mathematics from the University of Pittsburgh and a Ph.D. in Statistics from the University of Pennsylvania.  For many years, he taught statistics at Temple University and served as Chairman of the Department of Statistics.

Dr. Siskin has specialized in the application of statistics in law, particularly in the area of analyzing data for statistical evidence of discrimination.  He has testified for both plaintiffs and defendants in more than 200 cases, many of which were large employment class actions.   In addition to discrimination studies, he has conducted statistical studies and has testified in commercial and environmental cases involving statistical issues.

Dr. Siskin has frequently been appointed by federal judges as a neutral expert to aid the court in statistical issues and he was the statistical consultant to the Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts.  I was also appointed by the Court as an Expert to measure the accuracy of the CCC vehicle valuation methodology and I suggested possible modifications to the methodology.

Dr. Siskin is the author of many articles and textbooks on statistics and quantitative techniques including *Elementary Business Statistics, Encyclopedia of Management* and *Quantitative Techniques for Business Decisions*.  He has also written and lectured extensively on the use of statistics in litigation.

He has served as a statistical consultant to the U.S. Department of Justice, the Equal Employment Opportunity Commission, the U.S. Department of Labor, the Federal Bureau of Investigation, the Central Intelligence Agency, the Environmental Protection Agency, the National Aeronautics and Space Administration, Consumer Financial Protection Bureau (CFPB), OFCCP and Fannie Mae (the Federal National Mortgage Association) and Freddie Mac (the Federal Home Loan Mortgage Corporation), as well as numerous other federal, state and city agencies and Fortune Five Hundred corporations.

# BLDS, LLC

**EDUCATION**
University of Pennsylvania
Ph.D., Statistics (Minor, Econometrics), 1970

University of North Carolina
Graduate Study (Major, Economics; Minor, Statistics), 1966

University of Pittsburgh
B.S., Mathematics (Minor, Economics), 1965


**PRESENT POSITION**
BLDS, LLC, Director, 2011


**TEACHING EXPERIENCE**
Temple University, Adjunct Professor of Law School, 1992 to 2005
Temple University, Tenured Associate Professor of Statistics, 1973 to 1984
Temple University, Chairman-Department of Statistics, 1973 to 1978
Temple University, Assistant Professor of Statistics, 1970 to 1973
Temple University, Instructor of Statistics, 1968 to 1970


**OTHER POSITIONS HELD**
LECG, Director, 2003 to 2011
Center for Forensic Economic Studies, Senior Vice President, 1991 to 2003
National Economic Research Associates, Inc., Senior Vice President, 1989 to 1991
National Economic Research Associates, Inc., Vice President, 1986 to 1989
Center for Forensic Economic Studies, Ltd., President, 1984 to 1986
Center for Forensic Economic Studies, Ltd., Consultant, 1980 to 1984


**PUBLICATIONS**
Books
1. B. Siskin and N. Schmidt, "Proper Methods for Statistical Analysis of Promotions," *Adverse Impact Analysis:  Understanding Data, Statistics, and Risk*, Psychology Press, 2017, S. Morris and E. Dunleavy, eds.
2. B. Siskin, "Employment Discrimination Litigation:  Behavioral, Quantitative, and Legal Perspectives" John Wiley & Sons, Inc. 2005, Chapter 5 *Statistical Issues in Litigation* (with Joseph Trippi).
3. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants:  A Study of One Lending Institution," *Mortgage Lending, Racial Discrimination and Federal Policy*, Urban Institute Press, 1996, J. Georing and R. Wienk, eds.
4. B. Siskin and J. Staller, *What Are The Chances?*, Crown Publishers, 1989.

# BLDS, LLC

**PUBLICATIONS (Continued)**
Books (Continued)

5. B. Siskin and R. Johnson, *Elementary Statistics: A First Course*, Duxbury Press, 1982.
6. B. Siskin and R. Johnson, *Elementary Business Statistics*, Duxbury Press, 1979 2nd Edition, 1985
7. B. Siskin, *Encyclopedia of Management*,  McGraw Hill, 1979. (Ed. Les Bechtel).
8. B. Siskin and R. Johnson, *Quantitative Techniques for Business Decisions*, Prentice Hall, 1976.

Articles

1. B. Siskin and D. Griffin, "Litigating Employment Discrimination & Sexual Harassment Claims," *Litigation Handbook Series*, 2002.
2. B. Siskin, H. Carter, V. Lee, G. Page, M. Parker, R.G. Ford, G. Swartzman, S. Kress, S. Singer and D.M. Fry, "The 1986 Apex Houston Oil Spill in Central California: Seabird Mortality and Population Impacts, Injury Assessments, Litigation Process, and  Initial Restoration Efforts," *Marine Ornithology*, 2002.
3. B. Siskin, AUtilizing Statistics in Discrimination Cases,@ *Litigation Handbook Series*, 2001.
4. B. Siskin, B. Sullivan, J. Staller, and E.  Hull, ADefending and Proving Damages in Employment Discrimination Cases,@ *Litigation Handbook Series*, 2000.
5. B. Siskin, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1998.
6. B. Siskin and D. Kahn, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1997.
7. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze ARandom Workplace Drug Testing.  Does It Primarily Identify Casual or Regular Drug Users?,@  *Employment Testing Law & Policy Reporter*, Vol.  4, Number One, 1995.
8. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze "Random Drug Tests at Work:  The Probability of Identifying Frequent and Infrequent Users of Illicit Drugs," *Journal of Addictive Diseases*, Vol. 14, Number 3, 1995.
9. B Siskin, J. Staller, B. Sullivan and L. Freifelder, "Litigating Employment Discrimination Cases," *Litigation Course Handbook Series*, 1995.
10. B. Siskin, "Comparing the Role of Statistics In Lending and Employment Cases," *Fair Lending Analysis:  A Compendium of Essays on the Use of Statistics*,  American Bankers Association, 1995.
11. B. Siskin, "Relationship Between Performance and Banding," *Human Performance*, Vol. 8, No. 3, July 1995.
12. B. Siskin, "Statistical Issues in Litigating Employment Discrimination Claims," *Federal Publications*, 1993.
13. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants:  A Study of One Lending Institution," *Discrimination and Mortgage Lending Research and Enforcement Conference* Department of Housing and Urban Development, May 1993.

# BLDS, LLC

**SPEECHES (Partial List)**
1. Alabama Bar Association
2. American Bar Association
3. American Financial Services Association
4. American Statistical Association
5. Defense Research Institute
6. Federal Bar Association
6. Harvard University
7. Institute of Industrial Research
8. International Organization of Human Rights Association
9. Law Education Institute
10. Law Enforcement Assistance Administration
11. Michigan Bar Association
12. National Center on Aging
13. Ohio Bar Association
14. Penn State University
15. Pennsylvania Human Relations Commission
16. Practising Law Institute
17. Security Industry Association
18. Women's Law Caucus:  National Conference

**STATISTICAL CONSULTANT (Partial List)**
1. Attorney General's Office of the Commonwealth of Pennsylvania, and states of California, Oregon, Massachusetts, Connecticut, Mississippi, Louisiana and New Jersey
2. Board of Higher Education for Massachusetts and Oregon
3. Central Intelligence Agency (CIA)
4. Environmental Protection Agency (EPA)
5. Equal Employment Opportunity Commission (EEOC)
6. Federal Bureau of Investigation (FBI)
7. Freddie Mac (Federal Home Loan Mortgage Corporation)
7. Fannie Mae (Federal National Mortgage Association)
8. Homeland Security
9. International Organization of Human Rights Associations
10. Municipal Court of Philadelphia
11. National Aeronautics and Space Administration (NASA)
12. Office of Federal Contract Compliance, Department of Labor (OFCCP)
13. Pennsylvania Human Relations Commission
14. Security Exchange Commission
15. Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts
16. U.S. Department of Agriculture
17. U.S. Department of Commerce
18. U.S. Department of Labor
19. U. S. Justice Department
20. Numerous Fortune 500 and other private corporations

# *Testimony Listing for Bernard R. Siskin, Ph.D.*

| Date | Case Name | Location | Activity | On Behalf Of |
|------|-----------|----------|----------|--------------|
| 2019 | Robertson, et al. v. Valley Communications Center | Philadelphia, PA | Deposition | Plaintiff |
| 2019 | Shauna Noel & Emmanuella Senat v. City of New York | New York City, NY | Deposition | Defendant |
| 2019 | Tillman Industrial Properties, et al. v. Mercantile Bank | Philadelphia, PA | Deposition | Plaintiff |
| 2019 | USA ex rel. Jose R. Valdez v. Aveta, Inc.; et al. | Washington, DC | Deposition | Defendant |
| 2018 | Health New, Inc. v. American International | Philadelphia, PA | Deposition | Plaintiff |
| 2018 | Kleinsasser v Progressive | Seattle, WA | Trial | Plaintiff |
| 2017 | Greater Birmingham Ministries, et al. v. Honorable Joh | Washington, DC | Deposition | Plaintiff |
| 2017 | Independent Living Center of Southern CA, et al v City | Washington DC | Deposition | Plaintiff |
| 2017 | Marc Daniel Vigna v. Allstate Insurance Company | Philadelphia, PA | Deposition | Plaintiff |
| 2017 | Mark Kleinsasser, et al v Progressive Direct Insurance | Philadelphia PA | Declaration | Plaintiff |
| 2016 | Brenda Koehler, et al v Infosys Technologies, et al | Washington DC | Deposition | Defendant |

**A P P E N D I X   B**

SDNY_JA_000001 BronxCounty
SDNY_JA_000002 DutchessCounty
SDNY_JA_000749 ManhattanCounty
SDNY_JA_000750 OrangeCounty
SDNY_JA_000751 PutnamCounty
SDNY_JA_000752 ROCKLAND COUNTY VOTERS 11132012
SDNY_JA_000753 RocklandCounty
SDNY_JA_000754 SullivanCounty
SDNY_JA_000755 WestchesterCounty
SDNY_JA_000756 JMS Wheel 5 NYC
SDNY_JA_000757 JMS Wheel 5 WP
SDNY_JA_000758 Qualified JMS Wheel 5 NYC
SDNY_JA_000759 Qualified JMS Wheel 5 WP

SDNY_JA_000116-000120 Item 8 Statistical or Demographic analyses Source List Race Gender Report

Memorandum Of Law In Support Of Motion To Dismiss The Indictment As It Was Obtained In Violation Of The Fifth And Sixth Amendments To The United States Constitution And In Violation Of The Jury Selection And Service Act

Declaration of Jeffrey Martin dated November 9, 2020

Supplemental Declaration of Jeffrey Martin dated November 20, 2020

The defense used data as of November 1, 2016:
https://www.elections.ny.gov/EnrollmentCounty.html

NYSVoter Enrollment by County, Party Affiliation and Status
Voters Registered as of November 1,
2016   https://www.elections.ny.gov/NYSBOE/enrollment/county/county_nov16.pdf