UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA,                     20 CR 314 (GHW)

–against–

ETHAN MELZER,

                    Defendant.
-----------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT AS IT WAS OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSITUTION AND IN VIOLATION OF THE JURY SELECTION AND SERVICE ACT**

Mr. Melzer was denied his "right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  This Court is not "conven[ing]" in White Plains.  The relevant "community" is either "the district [Southern District] or division [Manhattan] wherein the court convenes," *id*., and each community is far more diverse than the one from which Mr. Melzer's grand jury was drawn.  The White Plains jury pool does not contain "a fair cross section of [either] community." *Id*.

The government's expert agrees: "The Manhattan and the Southern District communities are significantly more African American and Hispanic than the White Plains community.  Thus, [] the White Plains master jury wheel . . . will not be representative of the Manhattan or the Southern District community with respect to the percent African American and Hispanic." Report of Bernard R. Siskin, Ph.D., Docket Entry 68-1 ¶ 11.

That agreement resolves Mr. Melzer's motion: using a White Plains grand jury to indict Mr. Melzer, whose case is beeing prosecuted in Manhattan, was unlawful given the vast relative

underrepresentation of Black and Latino people in the White Plains jury pool.

The result is the same even looking only at White Plains.  That analysis also shows underrepresentation, and it's not attributable to anything "benign."  *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990).  The government broke jarringly from the norm by seeking an indictment from a different community than the one where the alleged offense will be tried, but also one strikingly less diverse.

The government's doing this, moreover, was totally unnecessary.  It says it obtained the indictment on June 22, 2020, "from one of the few available federal grand jury in the District." Gov't Br. 1, 8.  But a complaint was filed on June 4, 2020.  *See* Docket Entry 1.  Because "no grand jury ha[d] been in session during [the] thirty-day period" that began on June 5, the government had 60 days – until August 4 – to indict.  18 U.S.C. § 3161(b).  And a Manhattan grand jury was seated long before then: June 25.  *See* Email of June 30, 2020, from Talena Noriega to counsel, attached as Exhibit A.

In other words, a Manhattan grand jury was available, or would have been available shortly, to hear Mr. Melzer's case.  The government acknowledges this in their brief stating "By the time the Original Indictment and Superseding Indictment were returned, grand jury quorums had returned in Manhattan, but with substantially less availability than before the pandemic." Gov't Br. 8, n1.  While the pandemic may have lessened availability of Manhattan grand juries, it did not eliminate them.  In short, the COVID-19 pandemic is not to blame: the government made the conscious, aberrant and unnecessary choice to seek an indictment in this case from an exceedingly less diverse community.

Mr. Melzer has made the requisite showing for dismissal of this indictment.

<u>**DISCUSSION**</u>

I.     **Mr. Melzer's Grand Jury Was Not Drawn from a Fair Cross Section of the Community**

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  Mr. Melzer has shown all three things.

    **A.     The First Prong is Met**

The government agrees that Black and Latino people "are 'distinctive' groups, satisfying *Duren*'s first prong."  Gov't Br. 14.

    **B.     The Second Prong is Met**

The "representation of [Black and Latino people] in venires from which juries are selected" in White Plains "is not fair and reasonable in relation to the number of such persons in the community" at issue here.  *Duren*, 439 U.S. at 364.  Again, the "community" in a cross-section challenge is "the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  Here, that is either the Southern District of New York or the counties comprising the Manhattan jury pool: obviously, this Court is not "conven[ing]" in White Plains.

"The sixth amendment affords every criminal defendant entitled to a jury trial the right to trial 'by an impartial jury.'  The Supreme Court has interpreted this right to mean, among other things, that the pool from which the petit jury is drawn must represent a 'fair-cross-section' of the community in which the defendant *is tried.  The Act [§ 1861] extends this fair cross section requirement of the sixth amendment to the pool from which federal grand jurors are selected*."

3

*United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986) (emphasis added; quoting *Duren*, 439 U.S. at 363).  Again, the "Sixth Amendment requires that jury panels be drawn from a source representing a 'fair cross section' of the community in which the defendant is tried." *United States v. Jackman*, 46 F.3d 1240, 1244 (2d Cir. 1995).

The government says the "community" here should be the counties "from which juries in White Plains are drawn."  Gov't Br. 7.  But that is plainly wrong, as the plain text of § 1861 refers to the "community in the district or division wherein the court convenes."  That is not White Plains.  "Although the *Duren* court did not clearly define the term 'community,' it is generally accepted that the term refers to the district or division where the trial is to be held." *United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998).  Again, not White Plains.

The "community" here is the Southern District or Manhattan, as they are, respectively, the "district [and] division wherein the court convenes."  § 1861.  Mr. Melzer has the right to a grand jury "selected at random from a fair cross section of th[at] community."  *Id.*

The government nonetheless pleads with the Court to look only at White Plains, quoting one line from one case: "'Where a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has been any unlawful or unconstitutional treatment of minorities.'"  Gov't Br. 10 (emphasis in Gov't Br; quoting *United States v. Bahna*, 68 F.3d 19, 24 (2d Cir. 1995)).  Yet "language in one judicial opinion . . . cannot be uncritically applied to other cases."  *Villanueva v. United States*, 893 F.3d 123, 129 (2d Cir. 2018).

The defendant in *Bahna* was tried on Long Island before a jury "from the 'Long Island Division' jury wheel."  68 F.3d at 23.  He preferred to have a jury "culled only from Kings, Queens and Richmond Counties," *id*. at 26, and thus wanted a jury from somewhere *other than* the place of trial.  That's the opposite of Mr. Melzer's claim.  *Bahna* assumed, moreover, the

very premise lacking here: a jury "drawn from a properly designated division." *Id*. at 24. As shown, White Plains was not "properly designated" to indict Mr. Melzer. *Bahna* even supports this: "Each [court] selects *grand and petit juries* pursuant to a plan . . . and, as a general rule, selections are made from the area surrounding the courthouse *where the case is to be tried*." *Id*. at 23 (emphasis added). *Bahna* thus favors Mr. Melzer. *Bahna* does nothing for the government, *which cites utterly no case endorsing what it did here*.

Per the government, comparing the White Plains jury pool to Manhattan or the Southern District is an "apples-to-oranges comparison." Gov't Br. 7. But that's simply what the law requires in this abnormal situation, which the government chose – needlessly – to put us all in.

Normally, an indictment is obtained from a grand jury sitting in the same community in which a trial jury will render judgment. That consistent approach, which precludes crimes being alleged by one community but then judged by a different one, forestalls predictable cross-section challenges in areas like greater New York, where communities change drastically upon traversing a particular bridge, tunnel or rail line. *See also* Declaration of Jeffrey Martin, Docket Entry 61-1 ¶ 7 ("In my experience of over 50 federal jury challenges [] since 1997," and "[u]ntil this case, I have not been involved in any jury challenge where the Grand Jury came from one division and the trial jury came from a different division.").[1]

The government's unilateral and unnecessary decision to violate the norm does not entitle it to rewrite the law to suit its purposes. Pursuant to § 1861, *Duren*, *LaChance*, *Jackman*, *Bahna* and *Johnson*, the "community" here is either the Southern District or the Manhattan counties.

---

[1]    The government says "it is common for cases to be indicted by grand juries sitting in the White Plains courthouse and tried in the Manhattan courthouse." Gov't Br. 3. Yet it cites just seven cases in the last 15 years. And using this aberrant procedure a few times in the past – apparently, without objection – has no bearing on whether doing so here is lawful.

And as Mr. Melzer's expert has shown, and the government's expert agrees, both of those communities are significantly more diverse than the White Plains jury pool.

Whereas 20.92% of Manhattan's eligible jurors are Black, only 8.76% of the qualified White Plains jurors are Black.  Martin Decl. ¶¶ 20, 55.  That's an "absolute disparity" of 12.16%.  *Id*. ¶ 61.  Even starker, 28.06% of Manhattan's eligible jurors are Latino, but only 10.48% of the qualified White Plains jurors are Latino.  *Id.* ¶¶ 20, 55.  That's a disparity of 17.58%.  *Id.* ¶ 62.

Similar underrepresentation exists if White Plains is compared to the Southern District.  In the District, 18.09% of eligible jurors are Black, but only 8.76% of qualified White Plains jurors are Black.  *Id*. ¶¶ 19, 55.  That's a disparity of 9.33%.  *Id.* ¶ 59.  Likewise, 23.41% of eligible jurors in the District are Latino, but only 10.48% of qualified White Plains jurors are Latino.  *Id*. ¶¶ 19, 55.  That's a disparity of 12.93%.  *Id.* ¶ 60.

Thus, the "absolute disparities" in this case range from 9.33% to 17.58%.  *See id*. ¶¶ 59, 62.  The government's expert does "not dispute [these] reported absolute disparities."  Siskin Rep. ¶ 40.  And they easily fit the "not fair and reasonable" bill.  *Duren*, 439 U.S. at 364.  *See, e.g., Biaggi*, 909 F.2d at 677-78 (disparities of "3.6 percentage points [for Black people] and for Hispanics, 4.7 percentage points," are tolerable but are at the "limit" of what is tolerable, and only if there is a "benign" explanation); *United States v. Rioux*, 97 F.3d 648, 656 (2d Cir. 1996) ("We conceded" that in *Biaggi*.); *United States v. Barlow*, 732 F. Supp. 2d 1, 34 (E.D.N.Y. 2010) (Bianco, J.) (noting that courts outside the Second Circuit have, more demandingly, "required the absolute disparity to meet a 10% threshold before finding unfair underrepresentation"), *aff'd*, 479 F. App'x 372 (2d Cir. 2012).

The government "believes that the 'relevant jury pool' is the White Plains *Master Wheel*," Gov't Br. 15 (emphasis in original), meaning Black and Latino people in White Plains

who are theoretically eligible – but have not been deemed qualified – for jury service.  Yet fair-cross-section motions concern the actual "venires from which juries are selected."  *Duren*, 439 U.S. at 364.  *See also Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) ("[T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community.").  Thus, the proper jury pool to examine is the "pool serving as the source of names" for actual jury service: the "Qualified Wheel."  *Jackman*, 46 F.3d at 1244.  As shown, the pool of qualified White Plains jurors seriously underrepresents Black and Latino people when compared to either the Manhattan or Southern District "community in which the defendant is tried."  *Id*.  Once again, the government's expert agrees: "[S]ince the percent African American and Hispanic in Manhattan and the Southern District are significantly larger than in White Plains, and the master jury wheel is designed to represent White Plains, by design the White Plains master jury wheel and hence its qualified jury wheel will be significantly demographically different."  Siskin Rep. ¶ 40.

In any case, substantial differences also exist even if one looks to eligible rather than qualified White Plains jurors.  Whereas 20.92% of Manhattan's eligible jurors are Black, only 12.45% of those in White Plains are Black.  *See* Martin Decl. ¶¶ 20, 21.  That's a disparity of 8.47%.  Even starker, 28.06% of Manhattan's eligible jurors are Latino, but only 14.12% of those in White Plains are Latino.  *Id.*  That's a disparity of 13.94%.  The numbers are again similar when comparing White Plains to the Southern District.  Whereas 18.09% of the District's eligible jurors are Black, only 12.45% of those in White Plains are Black.  *Id.* ¶¶ 19, 21.  That's a disparity of 5.64%.  Even starker, 23.41% of the District's eligible jurors are Latino, but only 14.12% of those in White Plains are Latino.  *Id.*  That's a disparity of 9.29%.  These disparities – particularly the 13.94% one – are "not fair and reasonable."  *Duren*, 439 U.S. at 364.

### C.      The Third Prong is Met

There was plainly "systematic exclusion . . . in the jury-selection process" here, *Duren*, 439 U.S. at 364, as the government excluded "communities with large minority populations" by going to White Plains. *Jackman*, 46 F.3d at 1241. Mr. Melzer need not show the government intended the resulting underrepresentation or that it was even the actor responsible for any underrepresentation. *See Duren*, 439 U.S. at 360 (finding systemic exclusion of women even though they were not excluded, but were "exempt[ed] [] from jury service upon request").

Of course, the government undisputedly is the actor responsible for the exclusion of large swaths of Black and Latino people. The White Plains jury pool is "not [] representative of the Manhattan or the Southern District community with respect to the percent African American and Hispanic," Siskin Rep. ¶ 11, yet the government went to White Plains anyway— needlessly.

That conduct easily counts as "systematic exclusion," especially given the government's doing it several times this year to indict Manhattan cases in White Plains even though a Manhattan grand jury was available for all but a meager three months spanning March and June. *See also, e.g., Jackman*, 46 F.3d at 1241 (finding violation even in a discarded "process that had inadvertently, but systematically, excluded from petit jury venires all residents of Hartford and New Britain, communities with large minority populations").

The government says its "decision as to where to seek an indictment has nothing to do with the process by which the grand jury is selected." Gov't Br. 21-22. That couldn't be more wrong. By choosing to seek an indictment in White Plains, the government chose a grand jury selection process guaranteed to draw from a pool vastly less diverse than Manhattan and the Southern District. Mr. Melzer was denied a fair cross section not by "outside forces," *Rioux*, 97 F.3d at 658, but by the government's deliberate, aberrant and gratuitous conduct.

Having satisfied all three prongs, Mr. Melzer has shown a "prima facie fair-cross-section violation." *Duren*, 439 U.S. at 367. And the government has not shouldered its "burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id*. at 368. The indictment must be dismissed.

### D.      The Result is the Same Even Looking at the White Plains "Community"

As shown, the plain text of § 1861, along with the interpretation the Supreme Court, the Second Circuit and the courts in this District have all given it, provide that the "community" here is either Manhattan or the Southern District. *See Duren*; *LaChance*; *Jackman*; *Bahna*; *Johnson*. There is no authority for rewarding the government's gamesmanship of unlawfully and needlessly asking a community far less diverse than the proper one to indict Mr. Melzer.

Though this Court therefore shouldn't indulge the government's request to look only at White Plains in adjudicating Mr. Melzer's motion, doing so doesn't change the result.

The "absolute disparity" between eligible and qualified Black jurors in White Plains is 3.69%. Martin Decl. ¶ 63. As to Latino people, it is 3.64%. *Id*. ¶ 64. Such disparities, generally at the "limit" of the tolerable, *Biaggi*, 909 F.2d at 678, are not tolerable here given their resulting from "circumstances far less benign than those in [cases of] apparently inadvertent exclusion." *Jackman*, 46 F.3d at 1247. There's no "inadvertent exclusion" in this case: the government consciously ruled large numbers of Black and Latino people out of Mr. Melzer's jury pool by choosing White Plains as the place to indict this Manhattan case.

That's the "basic flaw in trying to justify what occurred in [this] case by an absolute numbers approach." *Id*. ("Absolute numbers" describes "the degree of underrepresentation" – the "absolute disparity" – in terms of "how many individuals from the distinctive group would have to be added to a randomly drawn venire to make [it] representative." *Id*. at 1246 n.4. *See*

*also Rioux*, 97 F.3d at 655 (referring to "the absolute disparity/absolute numbers approach").)

The "absolute" approach is "inappropriate" in cases of deliberate irregularity, as the approach presumes the normal and consistent use of "benign" methods to select a jury. *Jackman*, 46 F.3d at 1247.  The process here was just the opposite: the government broke sharply with the usual and legally specified practice, producing a far less diverse jury pool.  The needlessness of doing so only makes the government's conduct all the less "benign."

Thus, the "absolute" approach "cannot save [the] underrepresentation" here.  *Id*. at 1248. The government's aberrant conduct resulted in a pronounced "departure[] from the representations in average venires that would regularly be selected" by drawing from the Manhattan counties.  *Id*.  "[A]bsolute numbers w[ere] not [] appropriate on the *Jackman* facts because the selection practices at issue there (a system that excluded whole towns with significant minority populations) were hardly benign."  *Rioux*, 97 F.3d at 656.  Likewise, the government here intentionally and gratuitously excluded highly diverse communities by going to White Plains despite knowing this case has nothing to do with White Plains.

On these particular facts, Mr. Melzer "has shown a significant level of underrepresentation of Blacks and Hispanics for purposes of the Sixth Amendment."  *Jackman*, 46 F.3d at 1248.

The "comparative disparity" approach is further proof of that.  Though the "absolute disparity" approach is the norm, it's the norm only in normal cases.  *See Jackman*, 46 F.3d at 1247; *Rioux*, 97 F.3d at 656.  And this is no normal case.  Here, the "comparative disparity" approach shows "29.63% under representation" of Black people in the White Plains qualified jury pool and "25.80% under representation" as to Latino People.  Martin Decl. ¶¶ 71, 72.  This, as with the non-"benign" conduct here, satisfies *Duren*'s second prong.  *See, e.g., Garcia-*

10

*Dorantes v. Warren*, 801 F.3d 584, 601 (6th Cir. 2015) (second prong met by "3.45% and 1.66% absolute disparities, and 42% and 27.64% comparative disparities for African Americans and Hispanics"); *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1166 & 1173 (9th Cir. 2014) (en banc) (finding "significant evidence regarding underrepresentation of African Americans" given "32.7% comparative disparity").

Finally, as detailed above, the third prong is satisfied given the "systematic exclusion . . . in the jury-selection process" here.  *Duren*, 439 U.S. at 364.

\* \* \*

From any perspective, Mr. Melzer was denied his right to a grand jury drawn from a fair cross section of the community.  And as the government's conduct is the cause, dismissing the indictment based on that conduct should be the cure.  Doing so does not call into question the White Plains jury selection plan or any White Plains indictments returned in White Plains cases. Rather, dismissal here is a surgical and limited remedy to redress the government's deliberate, aberrant and unlawful choice to needlessly indict this Manhattan case in White Plains and thus deny Mr. Melzer a fair cross section.

There is no need to adjudicate the validity of the White Plains plan itself.  Nonetheless, Mr. Melzer's reply arguments on that point are set out below.

## II.    The Arbitrary Deprivation of Thousands of Registered Voters From Having the Opportunity to Be Selected for Jury Service Substantially Violates the JSSA.

Contrary to the government's contention, Gov't Br. 30, a claim that a jury selection procedure violates the JSSA may, but *need not*, allege that a cognizable group is disproportionately affected or that the demographic makeup of the jury wheel is substantially altered. Indeed, the statute has strict procedural requirements for alleging a statutory violation – which are indisputably satisfied here – but its "protections go beyond the remedy available under

the Sixth Amendment." *United States v. Jackman*, 46 F.3d 1240, 1250 (2d Cir. 1995) (Walker, J., dissenting) (had defendant complied with procedural requirements, JSSA statutory claim would have been be viable notwithstanding lack of underrepresentation proof); *United States v. Bearden*, 659 F.2d 590 (5th Cir. 1981); *United States v. Coleman*, 429 F. Supp. 792 (E.D. Mich. 1977).  Thus whether a procedural irregularity is a violation of the statute turns on whether an important JSSA policy is frustrated, and the significance of the deviation. *See, e.g.*, *Coleman*, 429 F.Supp. 792 (dismissing indictment because jury wheels were filled in untimely fashion).

As explained below, and in Mr. Melzer's opening brief, the exclusion of hundreds of thousands of registered voters and the improper proration of the counties frustrates important policies in the JSSA and the Jury Plan.  The three key areas of exclusion discussed below are the exclusion of "inactive" voters, the exclusion of voters with an alternate mailing address and persons excluded due to a proration calculation error.

### A.  "Inactive Voters"

First, 97,875 people are excluded because they are considered "inactive" voters in Westchester, Putnam, Orange, Rockland, and Sullivan counties, while the inactive voters from Dutchess county are included. Martin Decl. ¶ 32. "Inactive voters" are voters who are still registered to vote but whose status is changed to "inactive" because the county elections boards have received information, whether accurate or not, that the voter has moved. *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285 (S.D.N.Y. 2020) ("Voters are moved to inactive status when a County Board receives information indicating that a voter may no longer be living at her address of registration."). The information received by the county boards is often inaccurate. *See id*. at 293 ("In practice, tens of thousands of New York voters are improperly registered to vote as inactive, even though they continue to reside at their address of

registration.). And being marked as "inactive," at least outside of Dutchess County, results in the voter's name being excluded from the White Plains Master Wheel.

The exclusion of inactive voters violates the Jury Plan and JSSA not only because it likely impacts the representativeness of the juries, (Def Memo 15-16) but because it substantially violates other provisions of the JSSA and the Jury Plan. First, the JSSA declares that it is  "the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States…." 28 U.S.C. § 1861. By excluding individuals from the five counties who are registered to vote but are marked as "inactive," the jury selection process closes the door on the only available "opportunity to be considered for service" in SDNY: being a registered voter. Other districts that rely on alternate source lists like those from the DMV do not fully deprive "inactive voters" the opportunity to be considered for service; instead those individuals may be included because they have a driver's license or the like. But in the SDNY, inactive voters outside of Dutchess county do not have "the opportunity to be considered for service" as required by the statute. 28 U.S.C. § 1861.

Second, their exclusion violates the clear language of the JSSA and the Jury Plan, which require, at minimum, the use of voter registration lists.[2] "Voter registration lists" are defined, in relevant part, as "official records maintained by State or local election officials of persons registered to vote in either the most recent State or the most recent Federal general election…." 28 U.S.C. §1869(c). As a straightforward matter of statutory interpretation, anyone who is registered to vote in the most recent State or Federal general election should be on the lists relied on by the Jury Administrator for inclusion in the Master Wheel. They should be subject to the

---

[2] The JSSA permits reliance on 'actual voter lists" but there is no indication that the SDNY uses lists of actual voters to create the Master Wheels. To the contrary, the Jury Plan is specific in its exclusive reliance on "voter registration lists."

same procedures that everyone else undergoes in order to determine whether they qualify for service. Instead, in all but one county, their names are not provided to the Jury Administrator for potential inclusion in the Master Wheel.

This practice of exclusion, whether intentional or not, is no small or "technical" matter. The violation is "substantial" because it results in the exclusion of 97,875, or nearly 7% of the jury-eligible population from consideration in the master wheel.[3] This effect far exceeds the "harmless error" example described in the legislative history of the statute. According to that history, a hypothetical non-substantial deviation from the plan would involve only a .5% departure from the jury plan, or using 1,990 names instead of 2,000. *Coleman*, 429 F. Supp. 792, 795 (describing House Report); s*ee also United States v. Carmichael*, No. 2:03-CR-0259-MHT, 2006 WL 8439345 n.78 (M.D. Ala. June 29, 2006), *report and recommendation adopted,* 467 F. Supp. 2d 1282 (M.D. Ala. 2006), *aff'd,* 560 F.3d 1270 (11th Cir. 2009). Thus the exclusion of inactive voters results in a substantial violation of the JSSA.

### B.  Voters with an Alternate Mailing Address

The same can be said for the widespread exclusion of thousands voters who included an alternate mailing address when they registered to vote. Due to a technical and systematic glitch,

---

[3] The provided Voter registration lists for the White Plains Division, which include only active voters, are Bates stamped as Orange County SDNY_JA_000750 OrangeCounty.xlsx, Putnam County SDNY_JA_000751 PutnamCounty.xlsx, Rockland County SDNY_JA_000753 RocklandCounty.xlsx, Sullivan County SDNY_JA_000754 SullivanCounty.xlsx, and Westchester County SDNY_JA_000755 WestchesterCounty.xlsx.  The total number of names on these combined lists are 1,317,125.  If inactive voters had been included the total would have been 1,415,000.  The 97,875 inactive voters who were not included thus represent 6.92% of the total number of registered voters.

76,574 are excluded through no fault of their own from jury service.  Martin Decl. ¶¶41-44.  This exclusion constitutes an additional 5.41%% of the eligible voting population.[4]

### C.  Improper Proration

Finally, as explained in Mr. Melzer's opening brief (Def Memo 21), improper proration resulted in the exclusion of 285,347 registered voters. Martin Decl. ¶ 38. The impact of the this mathematical deviation is vast --approximately 20% of registered voters are excluded.[5]  On this particular claim, the government completely misses the point. Mr. Melzer does not object to proration of the counties, Gov't Br. 28, but instead to the mathematical error that creates *improper* proration. The Jury Plan, III.A, states that the "the number of names to be drawn from each county shall reasonably reflect the relative number of registered voters in each county within the respective Master Jury Wheels."  But, as Mr. Martin explains: "the process does not maintain the relative number of registered voters in each county for the White Plains Division." Martin Decl. ¶ 36.

The government and its expert do not dispute Mr. Martin's finding, but attempt to justify it in a manner outside of the plan itself. Siskin Rep. ¶13, n.5. Substantial violations of a jury plan are actionable under the JSSA, whether or not there is a retrospective justification supporting the deviations. *See, e.g., Coleman*, 429 F. Supp. 792, 796 ("Thus, procedural regularity is the measure of the validity of the selection system. It is an appropriate measure since the bill sets up a largely mechanical process in which the role of human discretion is minimized. . . . Such

---

[4] The total number of registered voters for the White Plains Division, as discussed in note 3, is 1,415,000.  76,574 were excluded because of the use of an alternative mailing address. Martin Decl. ¶ 44. Thus these voters represent 5.41% of registered voters.
[5] As discussed in note 3, the total number of registered voters in the White Plains Division is 1,415,000.  The 285,347 voters excluded from potential jury service due to incorrect proration represents 20.17% of that total number.

procedural regularity cannot be assured when discretion is permitted to vary the manner of compliance with the plan.") (internal citations omitted).

### D. Combined Effect of Exclusions

Taken together, 459,796 registered voters were excluded because they were inactive, had an alternate mailing address or because of improper proration. Martin Decl. ¶ 45. These exclusions have a profound effect on the Qualified Wheel because 32.45% of registered voters were improperly excluded.[6] The effect of these exclusions is that the chance of being selected for the Master Wheel varies significantly by county with voters in Dutchess county having a 1 in 3.45 chance of selection and voters in Sullivan having a 1 in 6.25 chance. Martin Decl. ¶ 47. Such a substantial and arbitrary variation of the chance of being selected for jury service does not comport with the policies set forth in the JSSA and the Jury Plan.

### III.   CONCLUSION

For the above reasons, Mr. Melzer's rights, under the Fifth and Sixth Amendments and under the JSSA, to a grand jury drawn from a fair cross-section of the community were violated. The indictment should be dismissed.

Respectfully submitted,

/s/ Jennifer Willis
Jennifer Willis, Esq.
Jonathan Marvinny, Esq.

cc:   AUSA Sam Adelsberg
      AUSA Matthew Hellman
      AUSA Sidhardha Kamaraju

---

[6] The total number of registered voter for the White Plains Division, as discussed in note 3, is 1,415,000.  459,796 registered voters were excluded, which represented 32.45%.