UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ETHAN PHELAN MELZER,                                    S1 20 Cr. 314 (GHW)

Defendant.

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS

AUDREY STRAUSS
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

Sam Adelsberg
Matthew Hellman
        Assistant United States Attorneys
        *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 3

  I.  Overview of O9A ...................................................................................... 3

  II. The Defendant's Radicalization ............................................................... 4

  III. Melzer Trains with the Military and Deploys to Italy ............................. 6

  IV. Melzer Begins to Communicate with CC-1 About Joining the RapeWaffen Division ........ 8

  V.  May 2020: Melzer Discloses Information on Telegram to Facilitate an Ambush on His Unit
    10

  VI. The Arrest, Charges, and Melzer's Post-Arrest Interviews ............................. 21

DISCUSSION ..................................................................................................... 24

  I. Melzer's Conduct  Occurred Within the Jurisdiction of the United States in Violation of §
  956(a)(1). ...................................................................................................... 24

    A. Applicable Law .................................................................................. 25

    B. Relevant Facts ................................................................................... 27

    C. Discussion .......................................................................................... 27

  IV. Section 1114 Applies Extraterritorially ................................................... 33

    A. Applicable Law .................................................................................. 33

    B. Discussion .......................................................................................... 35

  V.  Section 2339A Applies Extraterritorially ................................................. 38

  VI. The Counts in the Indictment are Distinct Crimes, Each of Which is Properly Charged .. 38

    A. Applicable Law .................................................................................. 39

    B. Discussion .......................................................................................... 41

  VII. The Government Complied with the Statutory Requirements of 18 U.S.C. § 2332(d) .... 46

    A. Applicable Law .................................................................................. 46

    B. Discussion .......................................................................................... 46

CONCLUSION ................................................................................................... 47

**TABLE OF AUTHORITIES**

**Cases**

*Ball v. United States*, 470 U.S. 856 (1985)..................................................................... 45
*Brown v. Ohio*, 432 U.S. 161 (1977) ............................................................................ 44, 45
*EEOC. v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ................................................... 33
*Monsanto v. United States,* 348 F.3d 345 (2d Cir. 2003) ............................................. 35
*North Carolina v. Pearce*, 395 U.S. 711 (1969)............................................................. 39
*Ortiz v. United States*, 138 S. Ct. 2165 (2019) ...................................................... 27, 29
*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016) ........................... 36
*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ............................................. 34
*Small v. United States*, 544 U.S. 385 (2005) .......................................................... 33, 34
*United States v. Abu Khatallah,* 151 F. Supp. 3d 116 (D.D.C. 2015) ......................... 43
*United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015)..................................... 45
*United States v. Al Kassar,* 660 F.3d 108 (2d Cir. 2011) ................................. 33, 35, 37
*United States v. Alahmedalabdaloklah*, No. 12 Cr. 1263 (NVW), 2017 WL 2730978
   (D. Ariz. June 26, 2017) ............................................................................................ 44
*United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) (Moore, J., concurring)........... 25
*United States v. Basciano*, 599 F.3d 184 (2d Cir. 2010) ............................................. 44
*United States v. Bin Laden*, 92 F. Supp. 2d 189 (S.D.N.Y. 2000)............................... 34
*United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720
   (S.D.N.Y. July 11, 2011), *aff'd*, 731 F.3d 233 (2d Cir. 2013)................................... 35
*United States v. Bowman*, 260 U.S. 94 (1922)............................................................. 34
*United States v. Buck*, No. 13 Cr. 0282 (VM), 2017 WL 4174931 (S.D.N.Y. Aug. 28, 2017).... 36
*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) ............................................... 39
*United States v. Chhun*, 744 F.3d 1110 (9th Cir. 2014)............................................... 31
*United States v. Dawkins*, Nos. 19-3623 (L), *et ano.*, 2021 WL 2274288 (2d Cir. June 4, 2021) 27
*United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) ............................. 34
*United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703 (S.D.N.Y. June 26, 2018) 41
*United States v. Epskamp*, 832 F.3d 154 (2d Cir. 2016)............................................... 34
*United States v. Estrada*, 320 F.3d 173 (2d Cir. 2003)................................................. 39
*United States v. Fernandez*, 559 F.3d 303 (5th Cir. 2009) ..................................... 25, 31
*United States v. Garcia Sota*, 948 F.3d 356 (D.C. Cir. 2020) ..................................... 37
*United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000)................................................... 29
*United States v. Georgescu*, 148 F. Supp. 3d 319 (S.D.N.Y. 2015)....................... 35, 43
United States v. Ghavami, No. 10 Cr. 1217 (KMW), 2012 WL 2878126
   (S.D.N.Y. July 13, 2012) ............................................................................................ 41
*United States v. Green*, 654 F.3d 637 (6th Cir. 2011) ................................................. 29
*United States v. Griffith*, No. 20 Cr. 15 (PKC), 2021 WL 275903 (S.D.N.Y. Jan. 27, 2021)...... 28
*United States v. Griffith*, No. 99 Cr. 786 (HB), 2000 WL 1253265 (S.D.N.Y. Sept. 5, 2000) .... 42
*United States v. Halkbank*, No. 15 CR. 867 (RMB), 2020 WL 5849512
   (S.D.N.Y. Oct. 1, 2020) ........................................................................................ 37, 40
*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) ............................................... 30
*United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007) ............................. 43, 44, 45
*United States v. Hausa*, 258 F. Supp. 3d 265 (E.D.N.Y. 2017)................................... 46

ii

*United States v. Hunter*, No. 13 Cr. 521 (RA) (S.D.N.Y. Oct. 15, 2018)................................ 30, 31
*United States v. Jones*, 482 F.3d 60 (2d Cir. 2006) ................................................................... 39
*United States v. Joseph Hunter, et al.*, No. 13 Cr. 521 (RA) ....................................................... 31
*United States v. Josephberg*, 459 F.3d 350 (2d Cir. 2006) .............................................. 39, 40, 42
*United States v. Leija-Sanchez*, 820 F.3d 899 (7th Cir. 2016) ............................................. 25, 31
*United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 1518675 (S.D.N.Y. Apr. 16, 2021) 40
*United States v. Maynard*, 743 F.3d 374 (2d Cir. 2014)............................................................. 28
*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) ............................................................ 40
*United States v. Medina*, No. 13 Cr. 272 (PGG), 2014 WL 3057917 (S.D.N.Y. July 7, 2014) ... 40
*United States v. Miller*, 808 F.3d 607 (2d Cir. 2015) ................................................................. 30
*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ..................................... 34, 38, 41
*United States v. Mustafa*, 753 F. App'x 22 (2d Cir. 2018) ......................................................... 38
*United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009) ....................................................... 26, 29
*United States v. Plummer*, 221 F.3d 1298 (11th Cir. 2000)........................................................ 35
*United States v. Prado*, 933 F.3d 121, (2d Cir. 2019) ............................................................... 28
*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) .............................................................. 45, 46
*United States v. Rice*, 80 M.J. 36 (C.A.A.F. 2020).................................................................. 29, 30
*United States v. Rivera*, No. 09 Cr. 619 (SJF), 2011 WL 1429125 (E.D.N.Y. Apr. 13, 2011).... 41
*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007) ............................................................... 33
*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) ........................................................ 35, 46
*United States v. Tang Yuk*, 885 F.3d 57 (2d Cir. 2018) .............................................................. 32
*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ............................................................... 33, 37
*United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011)........................................................... 34
*United States v. Weingarten*, 713 F.3d 704 (2d Cir. 2013)..................................................... 42, 44
*United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003) ........................................................... 25
*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) ................................................................. 36
*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003)................................................... 33, 34, 35, 37
*United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016). 37
*United States. v. Platter*, 514 F.3d 782 (8th Cir. 2008) ............................................................ 41
*Whalen v. United States*, 445 U.S. 684 (1980) ......................................................................... 44

**Statutes**

142 Cong. Rec. S 2517 (1995)........................................................................................ 25, 30, 32
18 U.S.C. § 1111............................................................................................................................ 43
18 U.S.C. § 1114 ................................................................................................................... passim
18 U.S.C. § 1117 ................................................................................................................... passim
18 U.S.C. § 2332 ................................................................................................................... passim
18 U.S.C. § 2339 ................................................................................................................... passim
18 U.S.C. § 2422................................................................................................................... 42
18 U.S.C. § 2423................................................................................................................... 42
18 U.S.C. § 3231................................................................................................................... 30
18 U.S.C. § 3238................................................................................................................... 30
18 U.S.C. § 3261................................................................................................................... 26
18 U.S.C. § 7....................................................................................................................... 26
18 U.S.C. § 793 ................................................................................................................... 24

18 U.S.C. § 794 ................................................................................................ 24
18 U.S.C. § 956 .......................................................................................... passim
21 U.S.C. § 959 ................................................................................................ 34
46 U.S.C. § 70502 ........................................................................................... 28

**Other Authorities**

Memorandum of Understanding Between the Ministry of Defense of the Republic of Italy and the Department of Defense of the United States of America Concerning Use of Installations/Infrastructure by U.S. Forces in Italy, It.-U.S., Feb. 2, 1995, T.I.A.S. No. 12317 ....................................................................................................... 29
U.S. Const. Art. III § 2, cl. 3 .......................................................................... 30
UCMJ.  10 U.S.C. § 802 ........................................................................... 26, 29
UCMJ. 10 U.S.C. § 803 ............................................................................ 26, 29
UCMJ. 10 U.S.C. § 805 .................................................................................. 26
UCMJ. 10 U.S.C. § 817 ............................................................................ 26, 29
UCMJ. 18 U.S.C. § 3261 ................................................................................. 29
UCMJ. 18 U.S.C. § 7 ...................................................................................... 29
Uniform Code of Military Justice ("UCMJ") at Title 10, United States Code, Chapter 47 ......... 26

**Rules**

Fed. R. Crim. P. 18 ......................................................................................... 30
Fed. R. Crim. P. 7 ........................................................................................... 41

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by the defendant Ethan Phelan Melzer ("Melzer" or the "defendant"). (*See* Dkts. 64-65 ("Def. Mem.")). The defendant's motions all request, for varying reasons, dismissal of some of the charges against the defendant. They include: (i) a motion to dismiss several counts in the Indictment because the charged statutes purportedly do not reach the defendant's conduct (Def. Mem. at 4-14); (ii) a motion to dismiss Counts One, Two, Three, Four, and Six of the Indictment as multiplicitous with Count Five (*id.* at 14-22); and (iii) a motion to dismiss Counts One and Two of the Indictment due to the Government's alleged failure to comply with the applicable statutory certification requirement under 18 U.S.C. § 2332(d).

As detailed below, the defendant is a member of the Order of the 9 Angles or "O9A," a white supremacist, neo-Nazi, Satanist, and anarchist group that advocates extreme violence, including murder, as a means by which to accelerate the demise of liberal democracies and Western civilization. Additionally, from in or about December 2018 through at least June 2020, the defendant was a member of the U.S. Army and the 173rd Airborne Infantry Division. By at least in or about April 2020, Melzer began communicating with an individual ("CC-1") who was the administrator of a Telegram channel affiliated with O9A known as "RapeWaffen Division." At around the same time, Melzer also learned that his Unit—which was stationed in Italy at the time— was going to be deployed to another military facility in Turkey ("Military Installation-1"). After learning of the deployment and attending briefings about the transfer, Melzer began to pass sensitive and classified information about the deployment to CC-1 and other participants in the RapeWaffen Division channel based in the United States and elsewhere, regarding, among other things, the location of the military installation in Turkey, the number of soldiers who would be

1

guarding the installation, and how they would be armed.  Melzer provided this information to—in his own words—facilitate a "mascal," or "mass casualty" attack on his Unit that Melzer hoped would drag the United States into a war.

The Court should deny the defendant's motion to dismiss Count Six of the Indictment, which charges the defendant with violating 18 U.S.C. § 956(a)(1), because the charge accurately tracks the language of the statute and alleges the approximate timeframe of the offense.  Although the Court will resolve disputes about the elements of Count Six in connection with its instructions to the jury, the defendant's motion is based on a misinterpretation of the statute and a mischaracterization of the evidence.  With regard to the latter, even if the defendant is correct that § 956 requires conduct in the territorial United States—and he is not—the Government will establish at trial that Melzer engaged in such conduct by joining O9A prior to deploying, joining the Army, at least in part, to further the conspiracy, and furthering the conspiracy by disseminating classified materials into the United States to carry out the ambush.

The defendant next argues that Counts Three and Four of the Indictment, which charge the defendant with conspiracy and attempted murder of U.S. service members in violation of 18 U.S.C. §§ 1114 and 1117, cannot be applied extraterritorially.  These motions are foreclosed by binding Second Circuit precedent.  Relatedly, the defendant further asks the Court to strike §§ 956 and 1114 from the predicate offenses underlying Count Five, which charges the defendant with attempting to provide and providing material to support to terrorists in violation of 18 U.S.C. § 2339A(a), on the ground that those predicates do not reach extraterritorial conduct.  However, § 956 explicitly contemplates extraterritorial application, and the Second Circuit has interpreted § 1114 in a similar fashion.

The defendant next claims that Count Five is multiplicitous with Counts One, Two, Three, Four, and Six, and therefore the Court should direct the government to pursue only a selection of these charges. The Superseding Indictment alleges as predicates to Count Five §§ 2332(b) (as charged in Counts One and Two), §§ 1114 and 1117 (as charged in Counts Three and Four), and § 956(a)(1) (as charged in Count Six). This motion is at a minimum premature, as well-established Second Circuit precedent holds that a decision on multiplicitous counts of conviction be withheld until after trial. Nevertheless, the Court can deny the motion now because the statutes at issue have distinct elements and thus allege violations of distinct crimes.

Finally, the defendant moves to dismiss Counts One and Two, which charge the defendant with violations of § 2332, because the Government failed to comply with that statute's certification requirement. The Court should deny this motion because no such failure occurred: on June 18, 2020, the Deputy Attorney General properly issued the required certification, and the defendant was indicted four days later.

## FACTUAL BACKGROUND

### I. Overview of O9A

O9A is a white supremacist, neo-Nazi, Satanist, and anarchist group that originated in the United Kingdom in the 1970s and now operates around the world, including in the United States through its affiliate, Temple ov Blood. The group professes admiration both for Adolf Hitler and jihadist figures like Usama Bin Laden.

O9A promotes extreme violence in order to overthrow Western civilization. For example, in the past year, four individuals, primarily teenagers, with links to O9A were convicted in the United Kingdom of terrorist offenses, including attempting to firebomb synagogues in the United Kingdom. One of the defendants had written his own O9A-inspired manifesto titled, "Storm 88:

3

A manual for practical sensible guerrilla warfare against the kike system in Durham city area, sieg hiel."[1]  The manifesto provided guidance in furtherance of perpetrating violent attacks against Jews in the city of Durham.

Based on the contents of an O9A manifesto obtained from Melzer's iCloud account pursuant to a search warrant, O9A instructs its followers to engage in "sinister" deeds.  These include, for example, O9A followers performing "insight roles," where they attempt to infiltrate various organizations, such as the military, to try to gain training and subvert those groups from within.  O9A also maintains various Telegram channels in which its followers communicate, including the RapeWaffen Division, which CC-1 created and administered.[2]

## II.  The Defendant's Radicalization

Based on his Telegram communications, Internet search history, and post-arrest statements, Melzer became a follower of O9A well before he joined the military.  For example, in communications with his co-conspirator CC-1, Melzer claimed to have "self-initiated," or joined, O9A, and that he had performed his first "insight role"—as noted above, a core O9A concept—in or about 2015 or 2016 as a "runner for some bhbs."[3]  Melzer also told CC-1 that he performed an "insight role" with Antifa for approximately six months.  In 2018, Melzer enrolled in the U.S.

---

[1]  *See* The JC: Teenage Neo-Nazi Who Plotted to Attack Synagogue Sentenced (Jan. 7, 2020), *available at* https://www.thejc.com/news/uk/teenage-neo-nazi-who-plotted-to-attack-synagogues-sentenced-1.495110.

[2] Based on our investigation to date, it appears that CC-1 is likely a minor based in Canada who was posing as a Canadian ex-paratrooper.

[3] During his post-arrest interview, Melzer told investigators that he fell in with the wrong crowd as a teenager, which he described as "gang-affiliation type shit….the Bounty Hunter Bloods…. like there was a couple friends that I hung out with that were Bloods."  This appears consistent with the defendant's reference to CC-1 to his conduct "as a runner for some bhbs."

Department of Labor's Job Corps program, and while in the Job Corps program, Melzer researched O9A and its American affiliate, the Temple ov Blood.  Melzer later explained in a post-arrest interview that he began performing Satanic rites during this period, which are rituals typically involving the worship of Satan and the drawing of blood.  In one exchange, CC-1 asked Melzer to give background on "sinister deeds," or acts in support of O9A, that Melzer had performed in the past, and Melzer told CC-1 that while in Job Corps he engaged in recruitment efforts related to O9A, and noted, "[in] Job Corp got a small following of people and used them for feeding. If we're talking like actual growth wise."

Melzer enlisted with the U.S. Army in December 2018, and was originally stationed at Fort Benning, in Georgia.  In Telegram communications, however, Melzer routinely proclaimed his lack of patriotism or allegiance to the military.  For example, on or about April 25, 2020, he wrote to another O9A member ("CC-4") who was considering joining the U.S. Marine Corps, "Good luck it's great for training…Just don't become a fuckin patriot…Train and get the fuck out…I'm not patriotic for shit…All of these places the vast majority deserve to be burned."[4]  Melzer also made clear to CC-1 that the purpose of his military service was another "insight role" to further his goals and skills within O9A.  In one exchange, CC-1 suggested to Melzer that joining a group such as Al Qaeda could be valuable to O9A as "an insight role," and Melzer replied, "I've thought about it…But it would have to be after this…"  Melzer next described the potential fallout if he joined a terrorist organization before leaving the military, writing, "The amount of heat from a "us paratrooper goes awol and joined [redacted]….After these 4 years are up I can't wait to

---

[4] Unless otherwise indicated, spelling and grammatical errors are set forth as they appear in the original communications.

actually start doing shit."   After CC-1 responded by asking Melzer if he had reenlisted in the Army, Melzer answered, "Fuck no…Well not 4 years now but still…Like 2 but fuck it…Not re-enlisting I got what I wanted."

### III.   Melzer Trains with the Military and Deploys to Italy

When Melzer enlisted with the Army in December 2018, he executed a "Statement of Enlistment," which contained, among other things, a regulation entitled "PARTICIPATION IN EXTREMIST ORGANIZATIONS OR ACTIVITIES," stating that "[m]ilitary personnel must reject participation in extremist organizations and activities" and are prohibited from "[a]ttending a meeting or activity with knowledge that the meeting or activity involves an extremist cause when on duty, when in uniform, when in a foreign country (whether on− or off−duty or in uniform), when it constitutes a breach of law and order, when violence is likely to result, or when in violation of off-limits sanctions or a commander's order."   Although Melzer signed enlistment paperwork in December 2018, his service in the military did not begin until on or about June 4, 2019, the day he reported for active duty at Fort Benning.   The day he began active duty service in June 2019, Melzer completed and signed another "Statement for Enlistment" form, which again contained a section titled "PARTICIPATION IN EXTREMIST ORGANIZATIONS OR ACTIVITIES" which included, among other things, the following:

   a.   Participation in extremist organizations and activities by Army personnel is inconsistent with the responsibilities of military Service.

   (1) Participation. Military personnel must reject participation in extremist organizations and activities. Extremist organizations and activities are ones that advocate racial, gender, or ethnic hatred or intolerance; advocate, create, or engage in illegal discrimination based on race, color, sex, religion, or national origin; advocate the use of or use force or violence or unlawful means to deprive individuals of their rights under the United States Constitution or the laws of the United States or any State; or

6

advocate or seek to overthrow the Government of the United States, or any State by unlawful means.

(2) Prohibitions. Soldiers are prohibited from the following actions in support of extremist organizations or activities. Penalties for violation of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (Uniform Code of Military Justice (UCMJ)) and administrative;

\*　　\*　　\*

(4) Attending a meeting or activity with knowledge that the meeting or activity involves an extremist cause when on duty, when in uniform, when in a foreign country (whether on− or off−duty or in uniform), when it constitutes a breach of law and order, when violence is likely to result, or when in violation of off−limits sanctions or a commander's order;

\*　　\*　　\*

(6) Recruiting or training members (including encouraging other Soldiers to join);

(7) Creating, organizing, or taking a visible leadership role in such an organization or activity; or

(8) Distributing literature on or off a military installation the primary purpose and content of which concerns advocacy or support of extremist causes, organizations, or activities and it appears that the literature presents a clear danger to the loyalty, discipline, or morale of military personnel, or if the distribution would materially interfere with the accomplishment of a military mission.

b. I acknowledge that I have read and fully understand the Army's policy regarding a Soldier's participation in extremist organizations or activities. If I request, a complete copy of AR 600−20, paragraph 4−12, will be provided to me.

On or about June 14, 2019, Melzer began his basic training. During his first few months in the Army, Melzer also received several trainings relating to counterintelligence, counterterrorism, and operational security. These trainings outlined, among other things, the importance of service members maintaining proper operational security, the dangers associated

7

with releasing sensitive information on social media, and the type of national security damage that could result from the unauthorized disclosure of sensitive U.S. government information.

Following basic training, Melzer was originally slated to deploy with his unit (the "Unit") to Turkey.  However, in September 2019, the Unit was re-directed to Camp Ederle, which is part of a joint Italian-American military complex in Vicenza, Italy where the U.S. Army Command for Africa and the 173rd Airborne are headquartered and thousands of U.S. military active-duty personnel and civilian employees serve.

In October 2019, Melzer arrived in Vicenza and soon thereafter, on November 19, 2019, Melzer obtained SECRET and SECRET/NATO security clearances.  On the same day, Melzer signed a "Classified Information Nondisclosure Agreement," which stated, among other things, that unauthorized disclosure of classified information may constitute a violation of federal criminal law.

## IV.   Melzer Begins to Communicate with CC-1 About Joining the RapeWaffen Division

Beginning in April 2020, Melzer became even more overt about his radicalization and affiliation with O9A.  On April 7, 2020, Melzer appears to have taken the below photograph of an individual, possibly himself, with an M4 rifle and a skull mask.  The photo was obtained from the "Photos" section of Melzer's iCloud account and dated April 7, 2020.  The firearm in the photo appears to be the type of rifle issued to Melzer and the other soldiers in the Unit.  During a June

17, 2020 search of Melzer's barracks, Army investigators recovered what appears to be the skull mask depicted in the photo.



On April 21, 2020, Melzer and CC-1 exchanged Telegram messages regarding Melzer joining the RapeWaffen Division. After CC-1 explained that O9A initiation was a prerequisite to membership in the RapeWaffen Division, Melzer confirmed that he had already been initiated into O9A. In detailed responses to a series of 40 "vetting" questions posed by CC-1, Melzer expressed his extremist views and provided background on his efforts to join 09A. Melzer asserted that he believed in "Anarcho-fascism" and looked up to "heros" including "AH [Adolf Hitler], Stalin, [and] David Myatt [the founder of O9A]," and attributed his early interest in O9A to "family" and "reading." In response to a question from CC-1 regarding fascism and Melzer's worldview, Melzer replied, "fascism is more the law of nature than anything, world view is that by causing absolute chaos, anarchy, whatever you want to call it, the law of nature will naturally take over once again."

The day after this exchange, on April 22, 2020, Melzer took a photograph, depicted below, of a book titled "The Sinister Tradition: Order of Nine Angles," along with a knife, a skull mask,

and his Army beret. "The Sinister Tradition: Order of Nine Angles" is an O9A manifesto setting forth the core beliefs for the group, including the importance of engaging in "sinister" deeds and "insight roles," which, as described above, involve O9A followers attempting to infiltrate and undermine organizations such as the military. The photo was obtained from the "Photos" section of Melzer's iCloud account and dated April 22, 2020. The book, along with what appears to be the skull mask depicted in the photograph below, were retrieved during a June 17, 2020 search of Melzer's barracks. Accordingly, it appears that Melzer possessed these items during his deployment to Italy



## V.    May 2020: Melzer Discloses Information on Telegram to Facilitate an Ambush on His Unit

In or about April 2020, Melzer learned that he and the Unit would deploy to Military Installation-1 in Turkey in the following months. Over the course of the next month, in preparation for the deployment to Turkey, Melzer received extensive training, which included an orientation

about the geography and purpose of Military Installation-1, battle drill rehearsal, and classified and unclassified briefings regarding Military Installation-1 and the surrounding area.

For example, on May 6 and May 7, 2020, Melzer received a set of briefings about Military Installation-1. One of the briefings involved the use of a terrain model—a cardboard replica used as a training aid—of Military Installation-1.[5] Melzer was among the soldiers who helped construct the terrain model. During these briefings, the Unit was also provided with a detailed overview of Military Installation-1, a breakdown of the Unit's duties and responsibilities at Military Installation-1, its uniform and weapons requirements during the deployment, and its chain of command. The Unit also received an in-depth training about possible threat scenarios at Military Installation-1, including how to react to insider threats, outsider threats, protests, and indirect fire. The briefing materials, including as depicted below, explained the Unit's training, tactics, and procedures in the event Military Installation-1 experienced any of these threats. The presentation materials noted that the Unit at Military Installation-1 would include "38 total personnel" and Melzer was informed that the Unit would be carrying only M4 rifles and pistols.

---

[5] Because of the nature of the information discussed herein, the Government has redacted certain sensitive details and requests that the redacted portions of this motion be maintained under seal. The Government has also filed an unredacted copy of the motion under separate cover and provided an unredacted copy to defense counsel.





On May 14, 2020, Melzer and CC-1 continued discussing via Telegram Melzer's desire to further RapeWaffen Division's mission.  For example, in response to a question from CC-1 about why Melzer wanted to join RapeWaffen Division and how he thought he could benefit the group, Melzer explained that he planned to "hopefully help this become an actual active nexion" (nexion is a term used by O9A meaning chapter or branch) and "to help it grow, I'd be lying if I didn't say to help me grow as well."  Melzer explained that he could offer RapeWaffen Division his "military training, survival, [and] links to other groups."

Though Melzer appears to have deleted the Telegram messages in which he initially disclosed that his Unit would be deploying to Turkey, by May 17, 2020, CC-1 knew about the upcoming deployment and asked Melzer whether he had arrived in Turkey, to which Melzer responded, "Getting ready to go."  CC-1 explained his reasons for asking, "[CC-2] needs to know, he has plans…inshallah my brother, allahu akbar." Melzer then replied, "Fuck yea…28th[,]" which appears to be a reference to May 28, 2020 as the date of the Unit's deployment.  Later in

the same conversation, CC-1 identified "[CC-2]" to Melzer as "a grey wolf…he was joining the Turkish army at some point for training…was*…forgot he's joining AQ lmao."  In response, Melzer wrote optimistically about [CC-2's]" potential, and stated "Well I'm sure they have the re[s]ourses."  CC-1 responded "yeah fair enough…but you do realize what AQ is right? Al Q****…is all I'll say."  Melzer then expanded on his belief that al Qaeda could assist in the ambush attack on his Unit, and replied, "Obviously…They have links everywhere they should definitely at least have one Turkish army guy."

On May 20, 2020, Melzer signed another "Classified Information Nondisclosure Agreement" and received a classified briefing and an unclassified briefing regarding the Unit's upcoming deployment. ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

_____

████████████████████████████████████████████████



Between May 23 and May 29, 2020, Melzer, using the alias "Etil Reggad," identified himself on at least two O9A Telegram chats as a member of the U.S. Army in Vicenza, Italy. On May 23, 2020, after CC-1 forwarded approximately four of Melzer's communications about the possibility of the attack on his Unit to a Telegram O9A chat group titled "Order of Nine Rapes" with 18 members (one of whom was an FBI confidential source (the "CS") located in the United States), Melzer sent a series of messages to the group, writing that he was a U.S. service member stationed in Vicenza who was "[g]oing to Turkey for a deployment" and that a "date and time [for the deployment] will be given soon." Melzer also stated that he "[u]sed to be cool with a couple IS [Islamic State of Iraq and al-Sham or ISIS] members who lived in France." When asked whether he was willing to die in an attack on the Unit, Melzer responded "[i]f we were to trigger this the

15

right way the amount of shit this would cause would cover it," and that his "life would be absolutely meaningless in the amount of shit it would cause" if the Unit was attacked in Turkey. Melzer described the proposed attack as "mascal," which another participant in the exchange explained meant "mass casualty."

On May 24, 2020, Melzer and CC-1 exchanged a series of direct messages on Telegram. During the messages, CC-1 asked Melzer directly, "are we literally organizing a jihadi attack." Melzer replied, "And yes probably…as long as I get the info I need to give you all."  CC-1 replied, "that's kinda baste," using an alternative spelling of the term "based," a phrase right-wing groups use to express praise.  Voicing agreement, Melzer replied, "Actually like a 8 outta 10 on the baste scale if I do say so myself…as long as I get what I need."  After CC-1 noted again that Melzer could die in an attack, Melzer said, "Who gives a fuck…the after effects of a convoy getting attacked would cover it…it would be another war…I would've died successfully…cause if another 10 year war in the Middle East would definitely leave a mark."  CC-1 concurred: "Yeah true."

Hours after the May 24, 2020 exchange and in the early morning hours of May 25, 2020, CC-1 asked Melzer to provide specific information:

> "Okay, how many people will be in the convoy, are you gonna be there, is it gonna be air to ground, or is it gonna be on the ground…What will be carried…Whats the plans…And, I heard you may be reconsidering, but, make a [Telegram] group for you, me, and the rest of the people.  We still need the info, so give it us out of good faith…Also this is a serious thing, if you [get] this done we need proper organization….we're not into larping [live action role-playing] or big tall, especially not her.  So if youre not serious, let her/us know."

Melzer quickly replied, "40 people [in the convoy] that are actual soldiers…small arms…for all [I know] so far [the vehicles] could just be busses."  Melzer explained further, "That's what I meant by reconsidering because I found out that units replace each other up there

every 2-4 months…more time to plan it out especially since I mean haven't really been there before and all we were shown was a satellite image for 2 seconds."



Melzer confirmed the coordinates and provided additional information about the purpose and defensive capabilities of the U.S. Army installation at Military Installation-1. CC-1 asked, "okay, []…so…its near the mountains, so we could have some guys doing watch-over there?" and then provided latitude/longitude coordinates. In response to a question from CC-1 regarding the possible presence of mobile armor, or tanks, at Military Installation-1, Melzer replied, "yea should be…none…haven't been on the base yet but they would usually say if there was."

Later that day, CC-1 started a smaller, invite-only chat group on Telegram and invited Melzer, the CS, and a few other individuals. The group was initially named "Jihad," then "Jihadist Caliphate," then "Op Hardrock.". During the chat, the participants further discussed the prospective attack on Military Installation-1. Melzer reiterated that he "need[s] some Turkish people to cause some shit to put it lightly," and, when asked how many "jihadis" he wished to recruit, Melzer responded "squad size" or "Plt [platoon] size actually if there placed right again gonna [go] over the layout of the terrain later today." Melzer also disclosed the geographic coordinates for Military Installation-1 to the group; described the facility's purpose and the fact that it is guarded by 40 individuals with "[s]mall arms" and "m4s," which is consistent with the

information Melzer received during the Army briefings described above; and confirmed the route that the Unit would take to travel there. Melzer added that "[e]very fire-team [would be] essentially crippled" in the contemplated attack, and that there would be no "Carl Gustavs/at4s" or "CAG support."[7] Melzer further wrote that Military Installation-1 was "on a mountaintop so when I get there I'll scout out a spot that could be good" and that the base would not be on "high alert." Melzer also informed the group of the anticipated date of the Unit's deployment and that he preferred for the attack to be conducted against a unit that would replace his Unit in several months, because that would allow more time to plan the attack. Melzer also promised that he would obtain a "burner" phone when he arrived in Turkey and would send photographs and additional details from there.

During this exchange, while Melzer was still in the chat, CC-1 and another participant in the chat ("CC-3") also discussed the information Melzer had provided. In particular, after CC-1 suggested that attackers should mount the assault from high ground by firing weapons from multiple directions at Military Installation-1, CC-3 suggested that attackers "should come from the mountain. . . could make them panic the shit outta them." CC-3 then asked, "Do you know which nations? . . . are within the walls of the base." CC-1 responded, "American." CC-3 replied "aight . . . Well if it is done very quickly . . . then no worries about air support . . . Plus I guess they wouldn't bomb their own base." CC-3 further stated, "Since you know the approximately number of soldiers in the base, you already won the battle, as sun tzu says lol." CC-1 later asked,

---

[7] "Carl Gustavs" and "at4s" are references to anti-tank weapons, and "CAG support" refers to close air support, such as helicopters or jet aircraft.

"So . . . with the turks already riled up . . . and the severly underdefended [Military Installation-1]. . . This..is look good?"  CC-3 replied, "Fuck yeah lol."

The Unit was scheduled to deploy to Military Installation-1 on May 28, 2020 but the deployment was delayed once the U.S. Government learned of Melzer's plan.  Melzer posted again in the Op Hardrock chatroom on May 29, 2020, hours before military authorities took him into custody as discussed below.  Melzer falsely reported to the chat participants that he had already left the garrison at Vicenza and traveled to the Air Force installation in Aviano, Italy to make final preparations for his deployment to Turkey.  Melzer also explained additional measures he expected to take once he arrived at Military Installation-1 in Turkey, reaffirming his commitment to the planned attack and elaborating on his plan to further the attack by collecting additional intelligence once he had arrived at Military Installation-1.  CC-1 asked whether Melzer had "any new info on the [] base?" and Melzer replied, "Until I get there no…but when I do if you know anybody that could pull location from pics that would be based…cause there gonna have us put up our phones during patrols but I'm bringing a shitty burner on me so I can take pics…at like the guard towers and shit that they'll probably set us up at."  When CC-1 expressed doubt that the metadata from the images would provide helpful information, Melzer replied, "I figure even if you can't get the local just being able to see what they can see from the towers would help…you'll be able to see what anyone in those towers can see and that would help a lot more."  CC-1 agreed, and asked if Melzer could obtain additional information for planning the attack: "Likely would, a full overview of the base from a tower would also be useful" to which Melzer replied, "Exactly that's the plan . . . Only place I can't go into is []…but I'll probably be able to see it from one of the posts I imagine though."  CC-1 and Melzer then discussed the function of Military Installation-1.  CC-1 asked if

Melzer could get clear images when taking photographs of Military Installation-1, to which Melzer replied, "Definitely…if not I'll literally take pics of anything important but I figure the posts are elevated." As to the installation's defenses, Melzer also stated "the road has those barricades up to make you have to snake a car through…the road is the only entrance exist from what I'm hearing."

In this same chat, the CS asked Melzer a series of questions about Melzer's involvement in the attack plot. In one exchange, the CS asked Melzer, "what makes you think that you can actually get away with fucking with the US military." Melzer responded, "because I fly under the radar already act completely normal around other people outside and don't talk about my personal life or beliefs with anyone." Melzer later noted that "isis and the Turks have been getting heavier near the border again…So that would also cover it I'd imagine considering IS isn't exactly a country anymore." Later, after the CS expressed skepticism that Melzer could use his "burner" iPhone to take pictures of Military Installation-1, Melzer explained, "Obviously I'm going to be more careful about it then just holding it up in front of everyone."

The CS also asked why Melzer had deleted messages from earlier chats. Melzer explained that he was nervous about the Italian Carabinieri (*i.e.*, Italian police) present at his Unit's base, writing, "You telling me about the carbs didn't help…I just thought they were like the MPs we have…also the reason I deleted the messages is because it was right [after] that argument started between you and me so I assumed you were blocking me." After further discussion on the topic, the CS wrote, referring to Melzer's discussion in the deleted messages about the attack plot, "You deleted them because that's treason . . . Duh" to which Melzer replied, "Kek."

The CS was located within the continental United States during all group chats and direct conversations involving Melzer, and the CS discussed this fact with Melzer and his co-conspirators. For example, on or about May 23, 2020, in the O9A Telegram chat, Melzer asked about the CS's connection to O9A and the CS answered, in part "I'm from Italy but in US now and these are more or less my first encounters with anyone stateside claiming O9A." Melzer acknowledged the CS's answer and responded, "Well interesting I'm in Italy right now . . . But from America . . . [in] Vicenza . . . I'm stationed here." On or about May 25, 2020, after Melzer and the CS joined the smaller Op Hardock chat to discuss the proposed attack on Military Installation-1, the CS wrote, "From Europe but now in US." Later, on or about May 31, 2020, in the Op Hardrock chat where Melzer was still a participant, CC-3 asked the CS, "You're in the US?" to which the CS replied, "Yeah…my father is an American." The CS and CC-3 then continued a discussion in the group chat of American laws as compared to laws in another European country.

## VI. The Arrest, Charges, and Melzer's Post-Arrest Interviews

On May 30, 2020, military investigators took Melzer into custody. That same day, military and FBI investigators conducted a video-recorded, *Mirandized* interview of Melzer, during which Melzer admitted to providing sensitive U.S. military information to the O9A Telegram chat group and orchestrating the planning of an attack on his Unit. In particular, Melzer admitted to disclosing information about the Unit's upcoming deployment to the RapeWaffen Division for the purpose of facilitating a deadly attack on his Unit, that his actions rendered him a traitor, and that his acts were tantamount to treason. He also admitted to using the "Etil Reggad" username and, when shown Telegram communications on his cellphone that was seized incident to his arrest, admitted to sending those messages. Over the course of the interview, Melzer denied that he was a member of O9A and at times attempted to minimize his conduct as satire or dark humor.

On June 4, 2020, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued a warrant for the defendant's arrest based on a complaint. The complaint charged Melzer with conspiring and attempting to murder U.S. nationals abroad, conspiring and attempting to murder U.S. service members, conspiring to murder and maim abroad, and providing and attempting to provide material support for terrorist acts.

On June 11, 2020, the FBI transported Melzer back to the United States from Germany, where he had been transferred after his initial military detention. During the flight, the agents conducted a second *Mirandized* interview, which was not recorded. Melzer again admitted that he had disclosed sensitive information to the RapeWaffen Division, and that he had placed his fellow soldiers in danger by doing so. During the interview, Melzer claimed that he had disclosed this information because he wanted to impress the participants in the RapeWaffen Division, although he also maintained that he was not a member of O9A. He further asserted that during the course of his communications he became concerned that some members of the group—in particular CC-1, CC-3, and the CS—were serious about committing the attack, and that he falsely told them that he was traveling to Aviano (which he did just hours before his arrest, as described above) in order to cut off communications with them.

After landing in the Southern District of New York, the FBI conducted another *Mirandized* interview of Melzer on June 11, 2020, which was video-recorded. During this interview, Melzer again admitted that he disclosed sensitive information to members of the RapeWaffen Division and also reiterated some of his claims attempting to minimize his conduct as discussed above.

On June 18, 2020, Deputy Attorney General Jeffrey A. Rosen certified, pursuant to 18 U.S.C. § 2332(d), that "the conspiracy and attempt to kill United States national outside the United

States involving Ethan Phelan Melzer and others was intended to coerce, intimidate, and retaliate against a government and a civilian population."[8]

On June 22, 2020, a Grand Jury in the Southern District of New York returned Indictment 20 Cr. 314 (GHW) (the "Original Indictment"), charging the defendant with six counts: (i) conspiracy to murder U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b); (ii) attempted murder of U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b); (iii) conspiracy to murder U.S. service members, in violation of 18 U.S.C. § 1117; (iv) attempted murder of U.S. service members, in violation of 18 U.S.C. § 1114; (v) conspiracy to murder and maim abroad, in violation of 18 U.S.C. § 956(a); and (vi) provision and attempted provision of material support for terrorist acts, in violation of 18 U.S.C. § 2339A.  (Dkt. 6).

On August 18, 2020, a Grand Jury in the Southern District of New York returned Superseding Indictment S1 20 Cr. 314 (GHW) (the "Indictment"), charging the defendant with eight counts.  (Dkt. 31).  Count One charges Melzer with, from at least in or about 2019, up to and including in or about May 2020, conspiring to murder U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b).  Count Two charges Melzer with, from at least in or about 2019, up to and including in or about May 2020, attempting to murder U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b).  Count Three charges Melzer with, from at least in or about 2019, up to and including in or about May 2020, conspiring to murder U.S. service members, in violation of 18 U.S.C. § 1117.  Count Four charges Melzer with, from at least in or about 2019, up to and including in or about May 2020, attempting to murder U.S. service members, in violation of 18 U.S.C. §

_____

[8] On or about June 22, 2021, the Government provided a copy of this certification to the defendant subject to the protective order previously entered in this case.

1114.  Count Five charges Melzer with, from at least in or about 2019, up to and including in or about May 2020, attempting to provide material support and resources to terrorists, to wit, intangible property, services, expert advice or assistance, and personnel (including himself), and aiding and abetting the same, in violation of 18 U.S.C. § 2339A.  Count Six charges Melzer with, from at least in or about 2019, up to and including in or about May 2020, conspiring to murder and maim abroad, in violation of 18 U.S.C. § 956.  Count Seven charges Melzer with, in or about April and May 2020, illegally transmitting and attempting to illegally transmit national defense information, in violation of 18 U.S.C. § 793(d).  Count Eight charges Melzer with, in or about April and May 2020, illegally transmitting and attempting to illegally transmit national defense information to a faction or citizen of a foreign country, in violation of 18 U.S.C. § 794(a).

## DISCUSSION

### I.  Melzer's Conduct  Occurred Within the Jurisdiction of the United States in Violation of § 956(a)(1).

The Court should reject the defendant's argument that Count Six should be dismissed because, in the defendant's view, his conduct occurred outside the territorial United States.  The Indictment tracks the language of § 956, the Court can resolve disputes over the interpretation of the statute at trial when determining the appropriate legal instructions to provide regarding the elements of the offense, and the jury will resolve whether the Government's proof establishes a violation of the statute.  The defendant's statutory interpretation is also wrong.  And even if the defendant's reading of § 956 was correct, the Government will establish at trial that he entered the charged conspiracy while he was in the United States when he joined O9A and enlisted in the Army in 2019.

A.  **Applicable Law**

§ 956(a) states, in relevant part:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

18 U.S.C. § 956(a)(1).  Though the Second Circuit has yet to address the reach of § 956, the legislative history of the statute reflects congressional intent that some "members of the conspiracy would not have to be in the United States" to violate the statute.  142 Cong. Rec. S 2517 (1995). Other Circuits have interpreted the statute consistent with that intent. *See United States v. Wharton*, 320 F.3d 526, 537-38 (5th Cir. 2003) ("To obtain a conviction for conspiracy to kill in a foreign country, the government must prove that . . . at least one of the conspirators was within the jurisdiction of the United States when the agreement was made."); *United States v. Fernandez*, 559 F.3d 303, 325 (5th Cir. 2009) (citing *Wharton*); *United States v. Amawi*, 695 F.3d 457, 494 (6th Cir. 2012) (Moore, J., concurring) (quoting *Wharton*); *United States v. Leija-Sanchez*, 820 F.3d 899, 901 (7th Cir. 2016) (finding no plain error where court instructed jury that "jurisdiction" in § 956 meant that "the United States had the authority to penalize this murder" in case involving murder in Mexico where defendants conspired with U.S.-based person but did not enter the U.S.).

Title 18 does not exhaustively define the term "jurisdiction of the United States," but provides an example of jurisdiction in § 7, the "Special maritime and territorial jurisdiction of the United States."  As is relevant here, the jurisdiction of the United States includes, "with respect to offenses committed by or against a national of the United States . . . the premises of United States . . . military or other United States Government missions or entities in foreign States, including the

25

buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those mission or entities, irrespective of ownership." 18 U.S.C. § 7(9)(A); *see also* 18 U.S.C. § 3261. "Congress intended 'premises of a military mission' to denote a permanent location," and defined such premises to include "fixed physical locations, i.e. land and buildings, on which the United States has established a 'military mission.'" *United States v. Passaro*, 577 F.3d 207, 213-14 (4th Cir. 2009). *Passaro* further outlined nonexclusive relevant considerations in identifying qualifying military missions, such as "the size of a given military mission's premises, the length of United States control over those premises, the substantiality of its improvements, actual use of the premises, the occupation of the premises by a significant number of United States personnel, and the host nation's consent (whether formal or informal) to the presence of the United States." *Id.* at 214.

In addition to the provisions of Title 18, active-duty military personnel such as Melzer are also subject to the jurisdiction of the United States as set forth in the Uniform Code of Military Justice ("UCMJ") at Title 10, United States Code, Chapter 47. All "members of a regular component of the armed forces . . . and other persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it" are "subject" to the UCMJ. 10 U.S.C. § 802(a)(1); *see also* 10 U.S.C. § 803 (further defining the "jurisdiction of this chapter"); 10 U.S.C. § 817(a) ("Each armed force has court-martial jurisdiction over all persons subject to this chapter."). The "territorial applicability" of the UCMJ reaches "all places." 10 U.S.C. § 805. Military courts hear a variety of cases, including cases outside issues specific to the armed forces, and "the jurisdiction of those tribunals

overlaps substantially with that of state and federal courts." *Ortiz v. United States*, 138 S. Ct. 2165, 2170 (2019).

## B. Relevant Facts

Since at least 1951, the United States and Italy have been party to a series of bilateral agreements governing the U.S. military's operations within Italy and American military control of land and facilities in support of those missions. As part of the U.S. Army's Garrison in Italy, Camp Ederle has been occupied by U.S. military forces since in or about 1963. The U.S. Army Southern European Task Force ("SETAF") moved its headquarters there in 1965. Melzer's unit, the 173rd Airborne, was assigned to SETAF and has occupied Camp Ederle since 1973. Today, Camp Ederle consists of numerous permanent structures controlled by the United States Government, including the on-base dormitory-style barracks where Melzer was housed while he was messaging about the ambush on the Unit, as well as family and officer housing, a school, a health clinic, dining facilities, a post exchange, a theater, a commissary, and numerous training facilities. In addition to the 173rd Airborne Brigade Combat Team, Camp Ederle is also home to U.S. Army Africa Headquarters, and Army units including, among others, 1st Battalion, 508th Parachute Infantry Regiment; the 509th Signal Battalion; the 21st Theater Sustainment Command Italy; the 14th Transportation Battalion; the U.S. Army Health Clinic Vicenza; a U.S. Army Dental Clinic; and Armed Forces Network Europe - Radio and Television.

## C. Discussion

Count Six tracks the statutory language of § 956 and alleges in approximate terms that the conspiracy offense took place between 2019 and May 2020. Nothing more is required. *E.g.*, *United States v. Dawkins*, Nos. 19-3623 (L), *et ano.*, 2021 WL 2274288, at *4 (2d Cir. June 4, 2021). At bottom, the defendant questions whether the Government can establish that he violated

the statute, which is a sufficiency claim to be resolved by the jury after the Court determines and provides the appropriate legal instructions. *E.g.*, *United States v. Griffith*, No. 20 Cr. 15 (PKC), 2021 WL 275903, at *2 (S.D.N.Y. Jan. 27, 2021) ("A pretrial motion to dismiss an indictment must not weigh the sufficiency of the evidence."). The defendant's premature sufficiency claim is based on a misinterpretation of § 956, which he argues—incorrectly—requires him to have engaged in conduct "within the borders of the United States." (Def. Mem. at 6). Rather, the statutory phrase "within the jurisdiction of the United States," 18 U.S.C. 956(a)(1), includes Melter's conduct abroad at Camp Ederle because he is a U.S. soldier on a U.S. military base. Finally, even if the defendant's interpretation of § 956 is correct, the Government will establish his guilt at trial on Count Six because he joined the conspiracy in the United States when he adopted O9A's murderous ideology and enlisted in the Army while planning to use his anticipated military training in furtherance of the § 956 conspiracy.

### i. The "jurisdiction of the United States" is Not Limited to U.S. Territory

The pertinent language in § 956 is an example of "[l]egislative, or prescriptive, jurisdiction," which "concerns itself with the reach of a nation's (or any political entity's) laws." *United States v. Prado*, 933 F.3d 121, 133 (2d Cir. 2019). In the provision at issue in *Prado*, Congress placed express limitations on the term "vessel subject to the jurisdiction of the United States" by defining it. *See* 46 U.S.C. § 70502(c). Congress did not define "within the jurisdiction of the United States" in § 956, but the Court should interpret it in accordance with "the ordinary or natural meaning of the words chosen by Congress." *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (internal quotation marks omitted). While a person within the territorial United States is, as the defendant contends, "within the jurisdiction of the United States," so too is an active-duty Army enlistee on a U.S. base subject to overlapping provisions of Title 18

28

and the UCMJ.  *See* 18 U.S.C. §§ 7(9), 3261(a); 10 U.S.C. §§ 802, 803, 817; *Ortiz*, 138 S. Ct. at 2170 (reasoning that "the jurisdiction" of courts-martial "overlaps substantially with that of state and federal courts").

The defendant concedes that "[a]ctive members of the military, such as Mr. Melzer, are subject to court-martial" and "civilian criminal penalties" under § 3261.  (Def. Mem. at 2).  As a result, however, such personnel are "within the jurisdiction of the United States" under § 956 even when located outside the territorial United States.  *See United States v. Rice*, 80 M.J. 36, 41 (C.A.A.F. 2020) (reasoning that the UCMJ "depends only upon the status of the accused for jurisdiction"). Camp Ederle is also "within the jurisdiction of the United States"—more specifically, the "special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 7(9)—because United States soldiers have occupied the installation for decades, pursuant to a repeatedly renewed agreement between the Italian and American governments,[9] and the base is also home to U.S. Army Africa Headquarters, numerous other Army units, as well as units supporting the military's mission run by the U.S. Government and staffed by civilians.  *See Passaro*, 577 F.3d at 207.[10]  Because the military and civilian "judicial systems that draw their authority from the same source," *Rice*, 80 M.J. at 43, Meltzer's conduct was "within the jurisdiction of the United states" for purposes of § 956.

---

[9] *See, e.g.*, Memorandum of Understanding Between the Ministry of Defense of the Republic of Italy and the Department of Defense of the United States of America Concerning Use of Installations/Infrastructure by U.S. Forces in Italy, It.-U.S., Feb. 2, 1995, T.I.A.S. No. 12317.

[10] The defendant's reliance on *United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000), is misplaced because Congress added the provision at issue, § 7(9), in 2001 at the urging of the *Gatlin* panel. *United States v. Green*, 654 F.3d 637, 644 (6th Cir. 2011) is also inapposite because the case involved crimes within a private Iraqi residence outside of any U.S. military installation.

The Government's venue allegation that the crimes were "begun and committed outside of the jurisdiction of any particular State or district of the United States," pursuant to 18 U.S.C. § 3238, does not support the defendant's argument that "jurisdiction of the United States," under § 956, is limited to the territorial jurisdiction of the United States.  (*See* Def. Mem. at 4, 7).  Section 956 establishes a criminal offense "in chapter 45 of title 18 . . . relating to foreign relations of the United States."  142 Cong. Rec. S 2517 (1995).  § 3238, on the other hand, is one of the "generic venue-laying statutes," *United States v. Miller*, 808 F.3d 607, 614 (2d Cir. 2015), which addresses the constitutional instruction that "when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed," U.S. Const. Art. III § 2, cl. 3; *see also* Fed. R. Crim. P. 18.  All "district courts of the United States" have subject matter jurisdiction over "all offenses against the laws of the United States," including violations of § 956.  18 U.S.C. § 3231.  But the jurisdiction of any "particular . . . district of the United States" under § 3238 for purposes of venue is limited by the territory of that district.

Thus, the defendant's assertion that "within the jurisdiction of the United States" means "within the borders of the United States" is wrong.  (Def. Mem. at 6). Although several of the cases cited in support of the defendant's argument take for granted that a given defendant's entrance into a conspiracy or the commission of an overt act had occurred within the borders of the United States because of the facts particular to each of those cases, the defendant incorrectly reads those cases to narrow the scope of § 956.  In each of *United States v. Hunter*, No. 13 Cr. 521 (RA) (S.D.N.Y. Oct. 15, 2018), *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014), *United States v. Fernandez*, 559 F.3d 303 (5th Cir. 2009), and *United States v. Chhun*, 744 F.3d 1110 (9th

Cir. 2014), at least one defendant conspired to engage in § 956's prohibited conduct from a location within the United States, and were thus obviously within the jurisdiction of the United States.

For example, the defendant points out that in *Hunter*, Judge Abrams instructed the jury that the defendants must have joined the conspiracy while "physically present in the United States." No. 13 Cr. 521 (RA), 2018 WL 4961453, at *2 (S.D.N.Y. Oct. 15, 2018).  But Judge Abrams did so with the consent of the Government due to the unique facts of that case, as set forth in a letter to the court rearding the instruction:  "The Government neither concedes that physical presence is the only means of satisfying the statute's jurisdictional element nor forecloses the possibility that, in a future case, it may be appropriate for the Court to give an instruction consistent with the Government's position in *Leija-Sanchez*."  *United States v. Joseph Hunter, et al.*, No. 13 Cr. 521 (RA) at Dkt. 481.  The Government's position in *Leija-Sanchez*, as noted above, was—and is here—that "the United States had the authority to penalize this murder, and 'jurisdiction' in § 956 means no more than that."  820 F.3d at 901.

### ii. The Government Will Establish At Trial That Melzer Conspired Within the Territorial United States

Even if the Court instructs the jury in accordance with the defendant's interpretation of § 956, the Government will establish at trial that he joined the conspiracy in the United States in 2019, that he committed overt acts in the United States prior to deploying in Italy, and that he caused overt acts in the United States while at Camp Ederle by transmitting communications to this country.

Text and other propaganda seized from the defendant's devices and accounts establish that one of the principal goals of O9A is infiltrating institutions like the military and "murder[ing], kidnapping, [and] maiming."  18 U.S.C. § 956.  For example, O9A charges its members with

committing "insight roles" and acts of extreme violence, kidnapping, murder, and terrorism to bring about chaos and the downfall of the modern order.  The defendant admitted following his arrest that he joined O9A while he was in the United States prior to joining the military.  He also described infiltrating other groups, including a street gang and Antifa, to acquire training and experience necessary to further the goals of O9A and recruit O9A members, and that he joined the United States military as a full-fledged member of O9A for the same reasons.[11]  Evidence of the nature of O9A and the defendant's decisions to join O9A and the military are sufficient to establish that he joined the conspiracy while he was in the United States.  The fact that Meltzer made more specific decisions regarding victim targeting in 2020 after he had the opportunity to access sensitive information at Camp Ederle is wholly consistent with congressional intent:  "[E]ven in a completed conspiracy, the parties may, after agreeing that a category of property or person will be targeted, leave the actual selection of the particular target to their conspirators on the ground overseas."  142 Cong. Rec. S 2517 (1995).

Evidence of the defendant's communications in furtherance of the conspiracy from Camp Ederle to the United States is also sufficient to satisfy the overt act requirement in § 956.  *Cf. United States v. Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018) ("A telephone call placed by someone within the Southern District of New York—even a person acting at the government's direction—to a co-conspirator outside the Southern District can render venue proper as to the out-of-district co-conspirator so long as that co-conspirator 'uses the call to further the conspiracy.'" (quoting *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007))).  The Government will establish that

---

[11] The Government anticipates filing a superseding indictment setting forth overt acts in the United States for purposes of Count Six.

the defendant sent such communications in furtherance of the conspiracy to the CS and CC-4, and that the defendant understood those individuals to have been in the United States. Accordingly, the defendant's conduct in the United States and his communications to the United States provide an additional basis for denying his motion to dismiss Count Six.

## II.  Section 1114 Applies Extraterritorially

The defendant next argues that the Court should ignore binding Second Circuit case law and find that 18 U.S.C. § 1114 does not apply extraterritorially. Because the Second Circuit has squarely addressed this issue—concluding in two separate opinions that the statute has extraterritorial force—the Court should deny defendant's motion to dismiss Counts Three and Four. In any event, the Court need not address the question of extraterritorial application because there is a sufficient domestic nexus for the allegations in Counts Three and Four.

### A.  Applicable Law

It is well established that, "as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *EEOC. v. Arabian Am. Oil Co*., 499 U.S. 244, 248 (1991)). Although there is a "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application," *Small v. United States*, 544 U.S. 385, 388-89 (2005); *see United States v. Vilar*, 729 F.3d 62, 72-73 (2d Cir. 2013), "that presumption can be overcome when Congress clearly expresses its intent to do so," *Yousef*, 327 F.3d at 86.

Courts first look to the text of a criminal statute to determine whether Congress intended extraterritorial application. *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011)*.* The presumption against extraterritoriality, however, is "not a 'clear statement' requirement, 'if by that is meant a requirement that a statute say 'this law applies abroad,' and so 'assuredly, context can

33

be consulted as well' in searching for a clear indication of statutory meaning." *United States v. Weingarten*, 632 F.3d 60, 65 (2d Cir. 2011) (alteration omitted); *see also Small*, 544 U.S. at 386 (identifying "statutory language, context, history, or purpose" as proper tools for rebutting the presumption); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004) ("Contextual reasons" may "supply the 'affirmative evidence'" required to overcome the presumption against extraterritoriality); *United States v. Bin Laden*, 92 F. Supp. 2d 189, 193 (S.D.N.Y. 2000) (in evaluating statute's extraterritoriality, "courts should consider 'all available evidence about the meaning' of the statute" (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993))); *cf. United States v. Epskamp*, 832 F.3d 154, 164 (2d Cir. 2016) ("Even assuming for the sake of argument that the text of [21 U.S.C.] § 959(b) itself is insufficiently plain to overcome the presumption against extraterritoriality, we conclude that the statutory scheme and the context of the statute overcome the presumption against extraterritoriality."). "[W]hen a statute is silent" as to congressional intent, "courts look to the nature of an offense to determine whether to infer extraterritorial application." *United States v. Mostafa*, 965 F. Supp. 2d 451, 458 (S.D.N.Y. 2013).

It is well settled that "the presumption against extraterritorial application does not apply to those 'criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction." *Yousef*, 327 F.3d at 86 (quoting *United States v. Bowman*, 260 U.S. 94, 98 (1922)); *see also Bowman*, 260 U.S. at 98 ("[T]o limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the

law that the locus shall include the high seas and foreign countries, but allows it to be inferred

from the nature of the offense.").  Indeed, under "the rule enunciated by the Supreme Court as long

ago as 1922 in *Bowman*," Congress "is presumed to *intend* extraterritorial application of criminal

statutes where the nature of the crime does not depend on the locality of the defendants' acts and

where restricting the statute to United States territory would severely diminish the statute's

effectiveness."  *Yousef*, 327 F.3d at 87 (emphasis added); *see United States v. Plummer*, 221 F.3d

1298, 1304-05 (11th Cir. 2000) ("On authority of *Bowman*, courts in this Circuit and elsewhere

have routinely inferred congressional intent to provide for extraterritorial jurisdiction over foreign

offenses that cause domestic harm.").

In *United States v. Al Kassar*, the Second Circuit unequivocally joined the Eleventh

Circuit in holding that §§ 1114 and 1117 apply extraterritorially. 660 F.3d at 118 (2d Cir. 2011).

The Second Circuit confirmed this interpretation in *United States v. Siddiqui*, 699 F.3d 690, 701

(2d Cir. 2012), reaffirming that § 1114 applies extraterritorially.

**B.  Discussion**

As the defendant recognizes, his argument is squarely foreclosed by binding Second Circuit

law holding that §§ 1114 and 1117 apply extraterritorially.   (*See* Def. Mem. at 10); *see Al Kassar*,

660 F.3d at 118 (finding that §§ 1114 and 1117 apply extraterritorially); *see also Siddiqui*, 699

F.3d at 701 (same); *see also United States v. Georgescu*, 148 F. Supp. 3d 319, 323-24 (S.D.N.Y.

2015) (same); *see also United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *6

(S.D.N.Y. July 11, 2011), *aff'd*, 731 F.3d 233 (2d Cir. 2013) (same).   In light of *Al Kassar* and

*Siddiqui*, the Court should deny the defendant's motion to dismiss Counts Three and Four.   *See*

*Monsanto v. United States,* 348 F.3d 345, 351 (2d Cir. 2003) (noting that district courts and the

Second Circuit itself are "required to follow" a Second Circuit decision, even if it is in "tension"

with subsequent Supreme Court precedent, "unless and until that case is reconsidered by [the Second Circuit] sitting in banc (or its equivalent) or is rejected by a later Supreme Court decision"); *see also United States v. Wong,* 40 F.3d 1347, 1373 (2d Cir. 1994) ("[U]ntil the Supreme Court rules otherwise, the district court would be obliged to follow our precedent, even if that precedent might be overturned in the near future.").

Undeterred by the fact that the Second Circuit has spoken directly on the issue, the defendant argues that the Supreme Court in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), effectively abrogated *Al Kassar.*   (Def. Mem. at 10-12).  But the Supreme Court's decision in *RJR Nabisco*, which concerned the extraterritorial application of the Racketeer Influenced and Corrupt Organizations Act (RICO) for private civil remedies, does not mention— let alone disturb—the clear holdings of the Second Circuit in *Al Kassar* and *Siddiqui*.   *See United States v. Buck*, No. 13 Cr. 0282 (VM), 2017 WL 4174931, at *7 (S.D.N.Y. Aug. 28, 2017) (rejecting similar argument and concluding that "*Kiobel*, *Morrison*, and *RJR Nabisco* have no bearing on criminal actions brought by the United States Government to prosecute criminal offenses committed abroad . . . .").

Notably, even if *RJR Nabisco* does, as the defendant maintains, urge a reconsideration of the extraterritoriality of criminal statutes, it certainly does not follow that §§ 1114 and 1117 should be held to not apply extraterritorially.  Longstanding Supreme Court precedent for determining the extraterritoriality of criminal statutes still applies and none of the cases cited by the defendant overturn that law.  Indeed, under "the rule enunciated by the Supreme Court as long ago as 1922 in *Bowman*," Congress "is presumed to *intend* extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where

restricting the statute to United States territory would severely diminish the statute's effectiveness." *Yousef*, 327 F.3d at 87 (emphasis added). In applying that precedent to § 1114, the Second Circuit in *Al Kassar* explained that "the nature of the offense—protecting U.S. personnel from harm when acting in their official capacity—implies an intent that it apply outside of the United States. The provision protects U.S. employees, and a significant number of those employees perform their duties outside U.S. territory." 660 F.3d at 118. *Al Kassar*'s logic still carries force. *See also United States v. Vilar*, 729 F.3d 62, 73 (2d Cir. 2013) (noting that "the presumption against extraterritoriality does [not] apply . . . in situations where the law at issue is aimed at protecting the right of the government to defend itself").

Unlike in *United States v. Garcia Sota*, 948 F.3d 356 (D.C. Cir. 2020), Counts Three and Four do not involve purely extraterrestrial applications of the statutes at issue. *See United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737, at *8 (S.D.N.Y. Oct. 17, 2016) (concluding that the "question of whether the IEEPA and the ITSR apply extraterritorially need not be reached" after finding sufficient domestic connection where a defendant caused international wires to be processed by U.S. banks); *see also United States v. Halkbank*, No. 15 CR. 867 (RMB), 2020 WL 5849512, at *6 (S.D.N.Y. Oct. 1, 2020) (same). The defendant is a U.S. citizen who, as an Active Duty paratrooper in the U.S. Army stationed on a U.S. military base, knowingly disseminated information classified by the U.S. Government to an individual known to him to be in the United States, in order to ambush U.S. uniformed service members while they were to be conducting a U.S. military operation. And notably, as discussed above, the defendant caused several overt acts in furtherance of Counts Three and Four in the United States, further establishing the domestic nexus of his conduct. *See Mostafa*, 965 F. Supp. 2d at 469 (finding "a sufficient domestic nexus

. . . to avoid the question of extraterritorial application" where "[o]vert acts occurred in the United States."). Accordingly, because the defendant's conduct involves sufficient domestic nexus, the Court should deny the defendant's motion to dismiss Counts Three and Four.

### III.   Section 2339A Applies Extraterritorially

The defendant further asks that the court find that § 2339A only applies extraterritorially to the same extent as its predicate offenses, and that the Government cannot therefore rely on §§ 956 and 1114 as predicate offenses because those statutes do not have extraterritorial application. For the reasons substantially discussed above, including binding precedent regarding § 1114's extraterritorial application, and because § 956 explicitly by its terms applies extraterritorially, the defendant's motion should be denied.

Moreover, in 2001, Congress amended § 2339A and deleted an earlier requirement in that section that material support be provided within the United States, suggesting "Congress's intent to afford the amended statute extraterritorial reach."  *United States v. Mustafa*, 753 F. App'x 22, 30 (2d Cir. 2018); *see also Mustafa*, 965 F. Supp. 2d at 469 ("This specific and careful removal of a required occurrence within the United States indicates a congressional intent for extraterritorial application . . . [e]ven in the absence of this demonstrated intent that § 2339A applies extraterritorially . . . the Court could nonetheless infer congressional intent for extraterritorial application from the nature of the offense.") (internal citations omitted). Accordingly, the Court should deny the motion.

### IV.   The Counts in the Indictment are Distinct Crimes, Each of Which is Properly Charged

The defendant next claims that because Count Five is multiplicitous with Counts One, Two, Three, Four, and Six, the Court should direct the government to pursue only a selection of these

38

charges.  (Def. Mem. at 28).  Because this challenge is premature and, in any event, without merit, the Court should deny the motion.

### A.   Applicable Law

The Double Jeopardy Clause of the Fifth Amendment to the Constitution "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). Accordingly, a defendant cannot be sentenced for multiplicitous charges covering the same crime. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *see also United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) ("A claim of multiplicity cannot succeed, however, 'unless the charged offenses are the same in fact and in law.'" (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)). Although the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, a defendant does have a right not to be punished twice for the same crime. *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam).  Accordingly, "[i]f the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." *Id.*  Similarly, where the judgment of conviction has already been entered on multiplicitous counts, that right is protected by vacating the convictions on all but one count. *Id.*

The Second Circuit has clarified that district courts should not rule on a motion to dismiss a charge on multiplicity grounds until sentencing. *See id.* (vacating district court's dismissal of count as multiplicitous prior to trial, as such a determination before trial is "at best premature"). Among other reasons, courts look to "the record as a whole in determining whether an indictment

39

is in fact multiplicitous," and the record is not fully developed and established until trial is complete. *United States v. McCourty*, 562 F.3d 458, 469 (2d Cir. 2009).  Additionally, because double jeopardy is meant to protect a defendant from successive punishments for the same offense, a multiplicitous count does not violate the Double Jeopardy Clause unless and until sentence is imposed.  *See Josephberg*, 459 F.3d at 355 ("Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed.").

Following the Second Circuit's directive, courts in this Circuit regularly and appropriately defer ruling on a multiplicity motion until after the conclusion of trial.  *See, e.g.*, *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 1518675, at *14 (S.D.N.Y. Apr. 16, 2021) (denying motion to dismiss multiplicitous counts without prejudice as prematurely brought before trial); *United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *9 (S.D.N.Y. Oct. 1, 2020) (denying pretrial motion to dismiss multiplicitous count and noting that "'[c]ourts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature'" (quoting *United States v. Medina*, No. 13 Cr. 272 (PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014))); *United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. June 26, 2018) (denying pretrial motion to dismiss multiplicitous count in light of "the Circuit's controlling view that the question of multiplicitousness is properly considered only at a later point in the proceedings"); *Mostafa*, 965 F. Supp. 2d at 464 ("[M]ultiplicity is properly addressed by the trial court at the sentencing stage."); *United States v. Ghavami,* No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *11 (S.D.N.Y. July 13, 2012) ("To the extent that the Indictment alleges more than one conspiracy …, Defendants' multiplicity challenge is premature. Should the

jury convict Defendants on what the Court ultimately determines to be multiplicitous counts, the Court will enter judgment on only one of the multiplicitous convictions." (citations omitted)); *United States v. Rivera*, No. 09 Cr. 619 (SJF), 2011 WL 1429125, at *4 (E.D.N.Y. Apr. 13, 2011) ("Since it is possible that the jury will convict defendants on only one (1) of the respective counts that they allege are multiplicitous, and acquit defendants on all of the counts with which they allege that count is multiplicitous, the issue of whether the counts are multiplicitous in violation of the Double Jeopardy Clause is premature at the pretrial stage.").

Fed. R. Crim. P. 7(c)(1) expressly permits the Government to allege "that the defendant committed [an offense] by one or more specified means." However, the trial court does have discretion to direct the prosecution "to elect among multiplicitous counts…when mere making of charges would prejudice the defendant with the jury." *U.S. v. Platter*, 514 F.3d 782, 786 (8th Cir. 2008). The court must balance its discretion with the Government's recognized "broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case." *Id*. at 796.

## B. Discussion

The defendant's motion to dismiss Counts One, Two, Three, Four, and Six for being multiplicitous with Count Five is both premature and without merit. *First*, consistent with the Second Circuit's directive in *Josephberg*, this Court should defer ruling on this motion until after trial. *Josephberg*, 459 F.3d at 355-56. The additional time will ensure that the full factual record is developed before the Court conducts the multiplicity analysis, and the motion may be mooted by the jury's verdict. *See id.* at 355 ("If the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment."); *United States v. Griffith*, No. 99 Cr. 786 (HB), 2000

41

WL 1253265, at *4 (S.D.N.Y. Sept. 5, 2000) (denying post-trial motion to dismiss as multiplicitous 18 U.S.C. § 2422 transportation charge and 18 U.S.C. § 2423(a) enticement charge involving same alleged conduct and noting "[t]hat persuasion and transportation involve proof of different facts is hardly contentious").  Therefore, the Court should deny the motion as premature.

*Second*, irrespective of the timing of this motion, while the same conduct may be broadly at issue in the counts, "[i]t makes no difference that the same conduct underlies multiple counts of [the defendant's] indictment, so long as the statutes proscribe distinct offenses." *United States v. Weingarten*, 713 F.3d 704, 710 n.5 (2d Cir. 2013).

Here, Count Five is not multiplicitous of Counts One, Two, Three, Four, and Six.  To prove that a person has violated § 2339A, as charged in Count Five, the Government must prove that he has provided "material support or resources," defined as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  On the other hand, proving that a person has violated the charges in Counts One, Two, Three, Four, and Six—which charge the statutes listed as enumerated acts for the material support charge in Count Five—does not require proving that he has provided material support.[12]  *See United States v. Hassoun*, 476 F.3d 1181, 1188 (11th Cir. 2007) (denying motion

---

[12] The elements of each of these counts are as follows:

- Count One, which charges the defendant with violating 18 U.S.C. § 2332(b), requires proof that two or more individuals conspired to commit a murder in violation of 18 U.S.C. § 1111(a) and that a co-conspirator engaged in an overt act in furtherance of the conspiracy.

42

to dismiss for multiplicity in analogous case and holding that proving the commission of an offense enumerated in § 2339A "does not require proof that the defendant provided material support or resources"); *see also United States v. Abu Khatallah,* 151 F. Supp. 3d 116, 142 (D.D.C. 2015) (denying motion to dismiss for multiplicity in analogous case and rejecting argument that counts charging both § 2339A and specific § 2339A predicates renders an indictment multiplicitous); *cf. Georgescu,* 148 F. Supp. 3d at 322-23 (S.D.N.Y. 2015) ("One may attempt to murder American officers without providing unlawful material support in violation of § 2339A, or violate § 2339A without attempting to commit murder.").

This is also true for Counts One, Three, and Six, which charge inchoate offenses.  The Government must prove that the defendant meets all the elements of these inchoate crimes to establish guilt on those Counts.  But "the Government need not prove all the elements of . . . the object offense[ ] in order to satisfy the elements of the substantive § 2339A charge."  *Hassoun*, 476 F.3d at 1188.  Rather, the plain language of § 2339A only requires that the defendant provide material support "knowing or intending" that it "be used in preparation for, or in carrying out" one

---

- Count Two, which charges the defendant with violating 18 U.S.C. § 2332(b), requires proof that the defendant attempted to commit a murder of U.S. national abroad.
- Count Three, which charges the defendant with violating 18 U.S.C. § 1117, requires proof that two or more persons agreed together to murder any employee of the United States while that employee is performing their official duty.
- Count Four, which charges the defendant with violating 18 U.S.C. § 1114, requires proof that the defendant attempted to murder any employee of the United States while that employee is performing their official duty.
- Count Six, which charges the defendant with violating 18 U.S.C. § 956, requires an agreement to murder, kidnap, or maim outside of the United States, that a co-conspirator was within the jurisdiction of the United States when the agreement was made, and that a co-conspirator committed at least one overt act in furtherance of the conspiracy.

of the object offenses. *See United States v. Alahmedalabdaloklah*, No. 12 Cr. 1263 (NVW), 2017 WL 2730978, at *2 (D. Ariz. June 26, 2017) ("It is not necessary under section 2339A that the object conspiracy be committed."). Thus, proving a violation of the predicate offenses charged in Counts One, Two, Three, Four, and Six requires proof—the completion of the predicate—that proving a violation of § 2339A does not.

The defendant's argument that "[t]here are no distinct facts" required to prove Count Five (the material support charge) and Count Five's predicate acts (Def. Mem. at 17-18) misses the point since the case law makes clear that "[i]t makes no difference that the same conduct underlies multiple counts of [the defendant's] indictment, so long as the statutes proscribe distinct offenses," as is the case here. *Weingarten*, 713 F.3d at 710 n.5; *see also United States v. Basciano*, 599 F.3d 184, 198 (2d Cir. 2010) ("[T]he critical double jeopardy inquiry is not factual, *i.e.*, whether the same conduct is at issue in charges brought under different statutes, but legal, *i.e.*, whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." (internal quotation marks omitted)). The defendant's reliance on *Brown v. Ohio*, 432 U.S. 161 (1977), and *Whalen v. United States*, 445 U.S. 684, 694 (1980), is also misplaced. The holdings in both cases rest on the principle that two offenses are the same for double jeopardy purposes if one is a lesser-included offense of the other. *Brown v. Ohio*, 432 U.S. at 168; *Whalen v. United States*, 445 U.S. 684 at 693-694. None of the statutes in the Indictment are lesser included offenses of Count Five. Rather, each requires proof of an element not required by Count Five. *See Hassoun*, 476 F.3d at1188 (quoting *Brown v. Ohio*, 432 U.S. at 168).

The Court should also reject the defendant's request that it compel the Government to proceed on a subset of the counts in the Indictment on the ground that doing so would prevent

prejudicing the jury. (Def. Mem. at 20). The Supreme court "has long acknowledged the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case." *Ball v. United States*, 470 U.S. 856, 859 (1985). Curtailing the Government's ability to proceed on clearly distinct charges would unduly infringe on that discretion. The defendant also has not demonstrated any prejudicial impact that would result from the distinct charges in the Indictment other than the conclusory and baseless argument that an Indictment with eight charges would "improperly suggest to the jury more criminal conduct than is actually alleged." (Def. Mem. at 21). In fact, were the Government to proceed with only Count Five, the Court would still instruct the jury as to the elements of the predicate offenses of Count Five, which would presumably risk the same purported jury prejudice that the defendant seeks to avoid. In any event, any such alleged "prejudice can be simply cured by, *inter alia*, an appropriate instruction to the jury." *United States v. Ahmed*, 94 F. Supp. 3d 394, 434 (E.D.N.Y. 2015).

While the defendant cites a dicta-laden footnote from *United States v. Reed*, 639 F.2d 896 (2d Cir. 1981), to further its argument on this score (Def. Mem. at 20), the holding in *Reed* cuts strongly the other way. In *Reed*, the Second Circuit rejected the defendant's multiplicity argument, noting that "although there was but one set of transactions, [there were] violations of two distinct statues, each with different elements." *Id.* at 905. The Court of Appeals then concluded that notwithstanding the one-for-one factual overlap in the offense conduct, there was no multiplicity in charging two separate statutes with distinct elements. *Id.* The logic of *Reed* applies here with equal force. Because each of the challenged statutes require proof of an element not required by any other, no two counts in the Indictment are multiplicitous.

For the foregoing reasons, the defendant's multiplicity claim is both without merit and untimely.  The Court should deny the motion.

## V.   The Government Complied with the Statutory Requirements of 18 U.S.C. § 2332(d)

The defendant next claims that Count One and Count Two, which charge him with conspiring and attempting to murder United States nationals abroad in violation of 18 U.S.C. § 2332, should be dismissed because the Government has failed to comply with the applicable statutory certification requirement pursuant to 18 U.S.C. § 2332(d).  (*See* Def. Mem. at 28).   The Court should deny this motion.

### A.   Applicable Law

Section 2332(d) states:

> No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.

The certification must be made "either at the time of or before the filing of the first instrument charging a violation of § 2332."  *Siddiqui*, 699 F.3d at 700; *see also United States v. Hausa*, 258 F. Supp. 3d 265, 271-72 (E.D.N.Y. 2017).

### B.   Discussion

The Court should deny the defendant's motion to dismiss Count One and Count Two of the Indictment because the Government fully complied with the certification requirements of 18 U.S.C. § 2332(d).  Specifically, on June 18, 2020, Deputy Attorney General Jeffrey A. Rosen certified, pursuant to 18 U.S.C. § 2332(d), that the defendant's conduct was "intended to coerce, intimidate, and retaliate against a government and a civilian population."   The Government

46

indicted the defendant on Counts One and Two of the Original Indictment four days later—on

June 22, 2020.   (*See* Dkt. 6).   Because the Deputy Attorney General issued his certification in

advance of the Government charging the defendant with violating § 2332(b), the   defendant's

motion to dismiss Count One and Count Two should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's pretrial motions.

Dated:  New York, New York
       June 23, 2021

                                Respectfully submitted,

                                AUDREY STRAUSS
                                United States Attorney
                                Southern District of New York

By:      /s/
                                Sam Adelsberg
                                Matthew Hellman
                                Assistant United States Attorneys
                                (212) 637-2494 / 2278

cc:    Defense Counsel
       (Via ECF)