L7QsMELc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                          20 CR 314 (GHW)

ETHAN PHELAN MELZER,

              Defendant.

------------------------------x

                                      New York, N.Y.
                                      July 26, 2021
                                      10:00 a.m.


Before:

                 HON. GREGORY H. WOODS,

                                      District Judge


                        APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW HELLMAN
     SAMUEL ADELSBERG
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
BY:  JENNIFER WILLIS
     JONATHAN A. MARVINNY
     SARAH BAUMGARTEL

L7QsMELc

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearances for the record.

4          MR. HELLMAN:  Good morning.  Matthew Hellman and

5     Sam Adelsberg for the United States.

6          THE COURT:  Good.  Thank you very much.  Good morning.

7          MS. WILLIS:  Good morning, your Honor.  Jennifer

8     Willis, Federal Defenders of New York, on behalf of the

9     Mr. Melzer.  And joining me at counsel cable is Jonathan

10    Marvinny and Sarah Baumgartel, also Federal Defenders of

11    New York.

12         THE COURT:  Very good.  Thank you very much.

13         Good morning.

14         So first, counsel, thank you for being here.  We are

15    here for a hearing with respect to the proposed motions that

16    have been submitted to the court.  We are also here to discuss

17    the status of the case overall.

18         My agenda for the conference is relatively

19    straightforward.  What I would like to do is begin with the

20    pending motions and to ask whether there are additional

21    arguments that the parties wish to present to the court in

22    connection with those or evidence that you wish to submit to

23    the court in connection with those.  Then I hope to turn to a

24    discussion of the status of the case overall.  I understand

25    that there is a prospect of a superseding indictment, a second

1    superseding indictment.  I hope to hear about that.  And,

2    as appropriate, I hope to discuss next steps in the case

3    generally.

4            That's my agenda for the conference.  Is there

5    anything that either party would like to add to that agenda

6    before we begin with it?

7            First, counsel for the United States?

8            MR. HELLMAN:  No.  Thank you, Judge.

9            THE COURT:  Thank you.

10           Counsel for defendant?

11           MS. WILLIS:  No, your Honor.

12           THE COURT:  Good.  Thank you very much.

13           So let me begin with the pending motions.  There is a

14   motion to dismiss the indictment.  There are also a separate

15   set of motions to dismiss a number of the individual counts

16   under the indictment.  I've reviewed all of those materials.

17           The question that I have for each of the parties is

18   whether there are any facts or arguments that the parties would

19   like to present to the court here in support of your respective

20   positions before the court takes up each of those motions.  I

21   do have some very few questions, but I would like to offer you

22   the opportunity to either add to your submissions or not before

23   I proceed.

24           Counsel for the United States, do you have any

25   additional evidence that you wish to present to the court here?

L7QsMELc

1          MR. HELLMAN:  Nothing further from the government.

2          THE COURT:  Thank you.

3          Are there any arguments that you would like to add in

4    support of your motions, I should say, the parties' motions

5    here?

6          MR. HELLMAN:  No.  Thank you, Judge.

7          THE COURT:  Thank you.

8          Counsel for defendant, I have the same questions for

9    you.

10          First, is there any additional evidence that you would

11    like to present to the court in support of your motions?

12          MS. WILLIS:  No, your Honor.

13          THE COURT:  Thank you.

14          Are there any arguments that you would like to present

15    to the court to supplement the written submissions that have

16    been made to me to date?

17          MS. WILLIS:  No supplement arguments, your Honor.  Of

18    course, we are prepared to answer any questions that the court

19    may have.

20          THE COURT:  Good.  Thank you.

21          So I just have a few brief questions for each of the

22    parties.

23          First, I'll begin with the United States with respect

24    to the motion to dismiss the 956 claim or charge.

25          Counsel, there is a Seventh Circuit decision in which

1   the Seventh Circuit dicta suggests, but does not hold, that

2   there is some ambiguity in the language of this statute.

3   　　　　Your view, counsel for the United States, is that,

4   among other things, the phrase within the jurisdiction of the

5   United States is not limited to, I'll call it, borders of the

6   United States.

7   　　　　Why is that position supported in your view by the

8   text of this statute?

9   　　　　MR. HELLMAN:  Thank you, your Honor.

10  　　　　The text of this statute, the government submits,

11  supports this reading explicitly because it does not limit

12  the jurisdiction of the United States to the territorial

13  jurisdiction of the United States, as many surroundings

14  statutes, for example, do.  Variety of examples immediately

15  surrounding Section 956 discuss the United States or within the

16  United States.  But Section 956 in particular discusses the

17  jurisdiction of the United States which, as the government

18  argues, must clearly sweep more broadly than its borders.

19  　　　　THE COURT:  Thank you.  That's helpful, counsel.

20  　　　　So, counsel, is it your view, therefore, that the

21  Seventh Circuit suggestion that they might apply the rule of

22  lenity in interpreting the statute does not apply here because

23  the text of the statute itself is clear?

24  　　　　MR. HELLMAN:  Yes.  I think the court in that case

25  suggested that 956 or Section 956 may have benefited from some

1    clear language, but does not ultimately reach the issue, and

2    does offer as one potential reading of jurisdiction the reading

3    that the government urges here and the reading that the

4    government urged in that case in the Seventh Circuit.  I think

5    the reason for that is, in the government's submission, obvious

6    because by failing to mention a territorial or other physical

7    limitation to the jurisdiction of the United States, it was

8    congress' intent that Section 956 reaches broadly as the

9    jurisdiction of the United States, which, again, frequently

10   transcends its borders.

11              THE COURT:  Thank you.

12              Now, apart from the special maritime jurisdiction of

13   the United States, which is the subject of your briefing, are

14   there other aspects of, I'll call it, the jurisdiction of the

15   United States that you believe are swept in by that reference?

16              I know, for example, there is a special aircraft

17   jurisdiction of the United States.  Are there other examples of

18   the jurisdiction of the United States that you believe are

19   encompassed as a result of that reference?

20              MR. HELLMAN:  Yes.

21              So the special aircraft jurisdiction is one such

22   additional example, your Honor.  The government also mentions

23   in its briefing the uniform code of military justice, which is

24   another form of jurisdiction the United States exercises over

25   certain members of its citizenry or its armed forces anywhere

1  they are in the world based on their status within the armed

2  forces.

3              THE COURT:  Thank you.

4              Let me inquire about that.  So, counsel, I understand

5  it is the position of the United States that "within the

6  jurisdiction of the United States" reference in the statute

7  refers more than just to a geographic location.  Instead, it is

8  the view of the government that the statute applies based on

9  that example, the legal authority of the United States over the

10  individuals who are committing the offense.

11              What's the textual basis for that position, counsel?

12              I'm largely focused on the text of 956 itself, which

13  has a number of words that I will describe as cues suggesting

14  that the reference to the jurisdiction is a reference to a

15  physical location as opposed to legal authority, like the word

16  "within," like the reference to "regardless of where such other

17  person or persons are located," perhaps suggesting that the

18  preceding reference also refers to a location as well as the

19  commission of an act within the jurisdiction of the United

20  States, which appears to refer to the location of the

21  commission of the act as opposed to the person who committed

22  the act.

23              Counsel, can you respond?

24              MR. HELLMAN:  Thank you.

25              So go back to one of the first comments that I made,

1    just for the sake of comparison, 18, United States Code,

2    Section 955 begins "whoever, within the United States," and the

3    statute continues.

4         Section 959 begins "whoever within the United States"

5    and so forth.

6         Section 956 fails to mention within the United States,

7    but instead says "within the jurisdiction" to indicate a legal

8    premise rather than a physical premise.

9         I think that the opening gamut of this statute is the

10   clearer support for the idea that congress intended to reach

11   those individuals within the jurisdiction of the United States,

12   which in many cases is beyond the United States' borders.

13        THE COURT:  Counsel, in that instance, why "within"

14   instead of "subject to?"

15        In other words, if the reference to "within the

16   jurisdiction of the United States" refers to the whoever as

17   opposed to the conspires, why is "within" the right word there?

18        I understand your argument, counsel.  You're

19   suggesting that the words "within the jurisdiction of the

20   United States" refers to the government's authority over the

21   person rather than the government's authority over a place.  So

22   part of that analysis depends on whether that clause "within

23   the jurisdiction of the United States" refers to the act, i.e.,

24   the conspiracy, whoever, comma, within the jurisdiction of the

25   United States, comma, conspires, so that that clause refers to

1  the location of the conspiracy as opposed to the person and the

2  government's authority over the person, which I understand to

3  be the predicate for the government's position that a person

4  subject to military justice system is, quote/unquote, within

5  the jurisdiction of the United States.

6  MR. HELLMAN:  I think I understand the court's point,

7  and I suppose, again, this is in part what the Seventh Circuit

8  struggled with.  I don't know that it is a perfect drafting,

9  but if a person is within the jurisdiction of the United

10  States, they may be in the United States or they may be out of

11  the United States at the time they are within the jurisdiction.

12  Since the statute opens with "whoever" and then

13  further identifies that person as a person who is within the

14  jurisdiction of the United States, that would be potentially a

15  person who was located extraterritorially, but was brought

16  within the sweep of the jurisdiction of the United States by

17  virtue of their conduct, as is the case here.

18  THE COURT:  Thank you.  Good.

19  Counsel for defendant, I have one short question for

20  you, which is on a different topic.  Before I turn to that, do

21  you have any comments regarding the proper construction of 956?

22  Response to the government's comments here

23  MS. BAUMGARTEL:  Your Honor, I think our papers do

24  respond to many of the points the government made.  Just to put

25  it in context, obviously, there are a number of counts against

1    Mr. Melzer that we have not challenged.  There are a number of

2    criminal statutes that could reach this conduct, and there is

3    no dispute about that.

4         So the specific question here is really the statutory

5    interpretation of 956.  It is a relatively narrow question.

6    For the reasons we highlighted in our brief, we believe that

7    the text conveys that it is intended to reach people within the

8    jurisdiction, meaning within the physical borders, and, at

9    best, for the government, it would be ambiguous.

10        I think your Honor's colloquy with government counsel

11   reflects that there is some struggle to understand what this

12   provision means.  To the extent that there is any ambiguity

13   there, that needs to be construed in favor of the defendant

14   under the rule of lenity.  We would just emphasize that

15   research has not revealed a case where a court has adopted the

16   government's proposed definition of 956.

17        THE COURT:  Let me just ask you about that.  You make

18   that point in your reply, among other places.

19        What's the significance of that, given that, as I

20   understand it, in none of the cases that have considered the

21   issue was the issue that is presented here at issue.  In other

22   words, in each of those cases, an act or conduct occurred

23   within the borders of the United States, so the court didn't

24   need to consider whether within the jurisdiction of the United

25   States was a broader than the scope of the territory of the

1    United States.

2              MS. BAUMGARTEL:  Two primary responses.

3              The government says that, but, in fact, for example,

4    if the court reads the post-trial motions in some of the other

5    briefing in <u>Hunter</u>, the case before Judge Abrams, there was a

6    serious factual dispute between the parties as to whether

7    particular defendants had committed acts within the United

8    States.

9              So it is true that the government conceded and agreed

10   to have that definition, but there was certainly a factual

11   dispute about whether that was true.  So that issue, in fact,

12   did occur in that case, and even though it was ultimately with

13   the government's consent, the court adopted this definition

14   that required the physical presence in the United States.

15   That's one point.

16             Another point is that I think that really emphasizes

17   the extent to which the government here is seeking a novel

18   application of the statute that is not consistent with its

19   plain terms.  The fact that there is not another case where

20   people have been prosecuted for this under this statute for

21   acts committed outside the physical borders of the United

22   States I think emphasizes that other people historically

23   looking at this statute have not thought that that was a proper

24   application.

25             THE COURT:  Thank you.

L7QsMELc

1          Just one brief question for the United States on this

2     point.

3          The Fifth Circuit, again, not presented specifically

4     with this issue, did, in summarizing the elements of the

5     offense, describe one of the elements as requiring the showing

6     that or proof that an overt act happened within the United

7     States.  They alternately referred to within the jurisdiction

8     of the United States, but it may be that they were not laser

9     focused on this issue.  But in their description of the

10    elements of the offense, insofar as it related to the

11    commission of an overt act, they did not refer to jurisdiction

12    of, but instead referred to the United States.

13          What's your view regarding what weight the court

14    should provide the Fifth Circuit's restatement of the elements

15    of this offense?

16          MR. HELLMAN:  Well, so in the first, the government's

17    frontline position is the court's question a moment ago.  The

18    cases that the government found and that counsel for the

19    defendant found uniformly address situations in which at least

20    one member of the conspiracy committed an offense from within

21    the physical borders of the United States, and that was the

22    case in Fernandez, which I believe is the Fifth Circuit case as

23    well.  So I believe that that restatement should be given

24    relatively little weight for two reasons.

25          In the first, there are essentially two restatements

L7QsMELc

1    within the decision.  One referring to jurisdiction and one

2    referring to the act being within the United States.  But

3    second, and relatedly, the reference to the act being committed

4    within the United States, the government submits, like the

5    other cases, has been in the form of shorthand because it

6    really was not an issue that was in dispute.

7            The government in the Hunter case here in this circuit

8    was able to prove that the defendants had committed acts here

9    within the United States in furtherance of their conspiracy to

10   commit murder abroad, and extensively discussed those facts at

11   trial and post-trial litigation and before the Circuit

12   decision, which I believe is pending.

13           And so the facts being dissimilar thusly not

14   applicable here because each and every one of those cases

15   addressed the scenario in which one person was present within

16   the United States, although the government here in this case

17   has argued that the defendant, in fact, did commit particular

18   acts from within the United States.

19           THE COURT:  Thank you.  Good.

20           So, counsel for defendant, with respect to the

21   cross-section argument, my principal question for you, having

22   reviewed all of the papers in depth, is:

23           What is the basis for the defendant's position that

24   the government's conduct in pursuing an indictment in White

25   Plains was gamesmanship?

L7QsMELc

1    That was an issue that appears to have influenced

2  Judge Torres in her decision.  The principal thing that I'm

3  curious about, just to be very overt, is it's not clear to me

4  what that strategy is.  Because I know that the defense is

5  pursuing that argument in cases involving defendants with

6  different demographics who committed their crimes in different

7  places and it is pursuing the same argument.  Here, with a

8  person with different demographics and with the nature of the

9  crimes asserted here.

10    So what is the alleged gamesmanship here that applies

11  equally across the spectrum regardless of the demographics of

12  the defendant and the nature of the charges, counsel?

13    MS. WILLIS:  Your Honor, I suppose the core part of

14  the argument, irrespective of who the accused is and of the

15  conduct, is that in this jurisdiction, per our individual rules

16  of practice, an indictment is sought in the location wherein

17  the court convenes.  So if a case is to be tried in Manhattan,

18  then the indictment has historically been sought by the

19  Manhattan or before the Manhattan grand jury.  If it is to be

20  tried in White Plains, it is sought in White Plains.

21    So here, you have this unusual procedure where a case

22  that will be tried here in Manhattan was indicted in White

23  Plains.  And that decision, which is a choice that was made by

24  the government, leads to a grand jury that was far, far less

25  representative of both black and Latin people than it would had

1    the indictment been brought in Manhattan.

2         So the gamesmanship, to sort of borrow from some of

3    the logic utilized by Judge Torres in her recent decision under

4    the Fifth Amendment, is that regardless of what the government

5    may think about, well, is this a person who would benefit from

6    having a grand jury that has more black or brown people, it is

7    a choice that has that direct result.

8         So I don't know that it's the obligation of the

9    defense to sort of attempt to think about what advantage might

10   the government gain or not gain.  We can see from the data that

11   that choice, which is unusual, which does not follow the

12   typical procedures in this jurisdiction, and which, per the

13   JSSA, shouldn't be happening because you should be seeking an

14   indictment in the place wherein the court convenes.  So by

15   failing to follow the JSSA, by failing to follow the typical

16   procedure, it results in a grand jury that is under-

17   representative when compared to what it would have been in

18   Manhattan.

19        I think the idea of what strategic advantage or what

20   rationale the government might have is not a question that the

21   defense can answer.  What we are looking at is we know that,

22   having made this choice, it's led to under-representation.  And

23   when you think about Mr. Melzer or any other defendant's rights

24   with respect to the Sixth Amendment, they are not based on the

25   membership of the accused in a distinct group, right.  The case

L7QsMELc

1    law is not premised on the idea that if a black person is

2    indicted, look to the demographics of black people on the grand

3    jury.  That is obviously not what the case law is premised on.

4            Instead, Mr. Melzer, regardless of what his racial

5    identity or any other defendant's racial identity is, has a

6    right under the Sixth Amendment, under the JSSA, to a grand

7    jury drawn from a fair cross-section of the community, the

8    community wherein the court convenes, which is the Manhattan

9    jury wheel.

10           So regardless of what his identity is and whether it

11   is the same as the group of people who are under-represented,

12   that's not the basis of his constitutional right.  And the fact

13   that his charges are what they are versus charges that someone

14   else may have is also beyond what the Sixth Amendment speaks

15   to, beyond what Supreme Court precedent speaks to.

16           I think, instead, what we look at is what is the

17   effect of this unusual choice that the government has made, and

18   it was a choice that led to significant under-representation to

19   an extent that deprived Mr. Melzer of his Sixth Amendment

20   rights as well as his rights under the JSSA.

21           THE COURT:  Thank you.

22           Counsel for the United States, any response?

23           MR. HELLMAN:  The Sixth Amendment requires the jury

24   represent a fair cross-section of the community, and I have to

25   agree with counsel that there is a certain irony to this case,

L7QsMELc

1    your Honor, given the nature of the allegations and the

2    particular claims which are being raised with respect to the

3    grand jury selection process here.

4         But that irony doesn't really affect the legal

5    analysis in this case because the defendant, irrespective of

6    who he is and what he is accused of doing, is entitled to a

7    fair cross-section.  I think that is the government's view as

8    well.

9         The government's view is he also received that fair

10   cross-section, and ultimately Judge Torres' decision was flawed

11   because of the interpretation it contained of how and when the

12   government, quote-unquote, selected a jury in this case, which

13   it actually did not do in the case of the grand jury.

14        The White Plains grand jury being used by the

15   government in this case, because of reasons which were truly

16   extraordinary, related to the pandemic, in the instance of the

17   first indictment or the original indictment, as it is defined

18   in the government's papers, at a point in time which there was

19   no Manhattan grand jury seated.  And in the second instance,

20   for the superseding indictment, a time when meetings of a

21   Manhattan grand jury were extraordinarily limited and

22   unavailable to the government.  The government's contention is

23   that the interest of justice would have been harmed by

24   additional delay occasioned by failing to utilize the properly

25   selected grand jury available to it in White Plains.

1           THE COURT:  Thank you.

2           Yes.  It's clear that defendant's rights don't depend

3      at all on the demographics of the defendant.  I ask only

4      because Judge Torres was influenced by, as I understand it, her

5      view that the government failed to put forth sufficient

6      evidence, what she viewed as an inference of discrimination

7      raised by the statistical evidence.  That's in that context

8      that I ask this question, that is, weighing the government's

9      evidence to rebut the inference of discrimination against some

10     alternative motivator as to which no particular evidence has

11     been submitted.

12          So thank you very much, counsel.

13          Let me do this.  I would like to just spend a few,

14     some of your time now, if you don't mind, to rule on the

15     majority of these motions.  I've considered your arguments and

16     the briefing submitted to the court with respect to each of

17     them.  I'm going to rule on all of them now orally with the

18     exception, I think, of the 956 issue, as to which I'm expecting

19     to issue a separate written opinion.

20          But let me begin with the motion to dismiss the

21     indictment.  Mr. Melzer has filed a motion to dismiss the

22     indictment on the ground that the grand jury that returned the

23     indictment did not reflect a fair cross-section of the

24     community.  In particular, Mr. Melzer argues that the grand

25     jury sitting in White Plains under-represented black and

L7QsMELc

Hispanic individuals, in violation of the Jury Selection and

Service Act of 1968 ("JSSA"), 28 U.S.C. 1861 et seq., and the

Fifth and Sixth Amendments of the United States Constitution.

I am not the first court in this district to consider

substantially the same arguments.  All but one of the judges in

the district who have considered these issues have ultimately

disagreed with the foundation of the defendant's motion --

namely, that the proper comparator for evaluating the fair

cross-section challenge is the population from which the

Manhattan calls its juries, as opposed to White Plains.

Judge Torres recently granted such a motion, but she did not

disagree with the basic analysis presented by her colleagues --

instead, among other things that the government had failed to

put forth sufficient evidence to rebut what she viewed as the

inference of discrimination raised by the statistical evidence.

The cases that I have considered that have considered this

issue in which I have reviewed are:  U.S. v. Allen, et al.,

20 CR 366, in which Judge Roman issued an opinion on

February 8, 2021; U.S. v. Schulte, 17 CR 548, decided by

Judge Crotty on March 24, 2021; United States v. Tagliaferro,

19 CR 472, decided by Judge Crotty on March 29, 2021;

United States v. Segovia-Landa; 20 CR 287, decided by

Judge Oetken on May 17, 2021; U.S. v. Balde, 20 CR 281, decided

by Judge Failla on May 17, 2021; United States v. Charles,

20 CR 419, decided by Judge Marrero on June 16, 2021; and most

1    recently, U.S. v. Scott, 20 CR 332, decided by Judge Torres on

2    June 28, 2021.  I have reviewed all of those decisions in

3    depth, as well as the briefing in this case.  Given that the

4    issues that are raised in this motion have been reviewed in

5    depth by those courts, for expediency, this court largely

6    adopts the reasoning of Judge Crotty in United States of

7    America v. Schulte, 17 CR 548, 2021 WL 1146094 (S.D.N.Y.

8    March 24, 2021), in which he denied a nearly identical motion

9    to the one under consideration here.  I am supplementing his

10   analysis by reference to portions of the decision by

11   Judge Failla in Balde.  Finally, I will spend some time

12   highlighting some of the reasons why I believe that the

13   conclusion of Judge Torres in Scott does not apply here.

14        First, Judge Crotty considered the Sixth Amendment

15   challenge.  To establish a violation of the Sixth Amendment

16   right to a jury venire drawn from a fair cross-section of the

17   community, a defendant must prove, "(1) 'that the group alleged

18   to be excluded is a distinctive group in the community; (2)

19   that the representation of this group in venires from which

20   juries are selected is not fair and reasonable in relation to

21   the number of such persons in the community; and (3) that this

22   under-representation is due to a systemic exclusion of the

23   group in the jury selection process.'" Id. at *2-3 (quoting

24   Duren v. Missouri, 439 U.S. 357, 364 (1979).  Like the

25   defendant in Schulte, Mr. Melzer fails to meet the second and

1    third prongs of this test.  For the reasons that Judge Crotty

2    set forth in his decision, I believe that the proper jury pool

3    to analyze the challenge is the White Plains master wheel, and

4    the relevant community against which to evaluate any disparity

5    are the northern counties from which White Plains draws its

6    jury pool.  *Id.* at *4-5. (I also refer to Judge Failla's

7    careful examination of these issues in her decision in <u>Balde</u>,

8    which I incorporate here.  Balde transcript 13, 18-24:5).  To

9    determine whether the representation is "fair and reasonable"

10   under the second prong, the Second Circuit uses the absolute

11   disparity method, which "measures the difference between the

12   groups' representation in the relevant community and their

13   representation in the jury venire." *Id.* at *7.  African-

14   Americans make up 12.45 percent of the jury eligible population

15   in White Plains and 11.2 percent of the White Plains master

16   wheel (an absolute disparity of 1.25 percent), while Hispanic

17   Americans make up 14.12 percent of the jury eligible population

18   in White Plains and 12.97 percent of the White Plains master

19   wheel (an absolute disparity of 1.15 percent) in both cases,

20   the disparities are insufficient to satisfy <u>Duren's</u> second

21   prong.  See *Id.* ("Under Second Circuit precedents, absolute

22   disparities nearly as high as five percent have not been found

23   to satisfy the under-representation element under <u>Duren</u>").

24   With respect to the third prong, Mr. Melzer, like the defendant

25   in <u>Schulte</u>, fails to show that the exclusion of African-

L7QsMELc

1    Americans and Hispanic Americans from the jury pool is the

2    result of "the system of jury selection itself, rather than

3    external forces." *Id.* (internal citation omitted).

4          Mr. Melzer's Fifth Amendment and JSSA arguments are

5    likewise unavailing.  For the reasons Judge Crotty offers in

6    <u>Schulte</u>, Melzer's statutory claims fail because he has not

7    demonstrated a "substantial failure to comply" with the JSSA.

8    See *Id.* at *9-10 (internal citation omitted).  Finally,

9    Mr. Melzer fails to establish a violation of the equal

10   protection clause.  I adopt Judge Crotty's reasoning on this

11   issue as well.  To establish a violation of the equal

12   protection clause, a defendant must offer "proof of

13   discriminatory intent" *Id.* at *9 (citing <u>United States v.</u>

14   <u>Biaggi</u>, 909 F.2d 662, 677 (2d Cir. 1990).  Melzer offers no

15   such proof, and this court "will not assume or infer that this

16   district has been operating under an intentionally

17   discriminatory jury plan since 2009" *Id.*  I would like to add a

18   few comments to supplement Judge Crotty's findings in <u>Schulte</u>

19   on this point.  As Judge Failla described in <u>Balde</u>, "although

20   clear statistical evidence may raise a presumption of

21   intentional discrimination in some cases, that presumption may

22   be rebutted by the government.  Here, Mr. Balde alleges that

23   the racial disparities in the jury pool are caused by clerical

24   errors used in processing alternate addresses, removal of

25   inactive voters, the decision to update the master jury wheel

1    every four years, and the allegedly improper proration of

2    voters across overlapping counties.  But all of these issues

3    are facially race neutral, and their impact on the racial

4    composition of the wheels is neither inevitable nor

5    substantially demonstrated.  Mr. Balde has further not shown

6    how the jury plan might itself potentially be susceptible to

7    abuse.  For these reasons, the court is not persuaded that it

8    can reasonably infer that the jury plan is intentionally

9    discriminatory..." Balde transcript 29:10-24.  The same

10   analysis applies here.

11         Judge Torres reached a different conclusion in Scott,

12   but she focused, in part, on the decision making by the

13   government in its choice to indict the case in White Plains,

14   rather than on the structure of the jury plan itself.  Like

15   Judge Crotty and Judge Failla, I think that the appropriate

16   focus is on the jury plan.  Assuming, however, that the

17   government's decision to bring the case in White Plains as

18   opposed to Manhattan is the appropriate focus.  As the

19   government argues, the remedy for government forum shopping

20   would not being a fair cross-section claim.  To the extent one

21   considers the government's decision regarding where to indict

22   Mr. Melzer, I think that there is more than sufficient

23   non-discriminatory justification for that decision as a result

24   of the impact of the COVID-19 pandemic on the district's

25   ability to convene grand juries at the time.  At the time of

L7QsMELc

the original indictment and the amended indictment in this

case, which were returned on June 22 and August 18, 2020,

respectively, there were substantial limitations on the

availability of grand juries in Manhattan.  We all operated

differently as a result of the COVID-19 pandemic -- such an

obvious, non-discriminatory reason for the government to pursue

an indictment in White Plains is sufficient in my view to rebut

any possible inference of discrimination.  Moreover, I note

that this case is unlike the many other similar challenges

brought in this court because of the nature and location of

Mr. Melzer's alleged illegal conduct.  Mr. Melzer is not

alleged to have committed his crimes in the Southern District

of New York.  His connection to this district is that he was

first returned here from abroad.  He first entered the district

in one of the northern counties of the district, not Manhattan

or the Bronx.  Simply put, the countering argument, that is to

count the government's assertion that it made the decision to

charge him in White Plains because of the COVID pandemic was

the result of gamesmanship by the government, has very little

weight.  For all of these reasons, I am denying Mr. Melzer's

motion to dismiss the indictment on the basis of his challenges

under the Fifth and Sixth Amendments and the JSSA because I am

not going to dismiss the indictment.

I will now turn to a discussion of Mr. Melzer's

pretrial motions.

1    On May 24, 2021, Mr. Melzer moved to dismiss certain

2    charges against him.  First, Mr. Melzer challenges the

3    extraterritorial application of the statutes underlying certain

4    of the counts against him.  He argues that Counts Three, Four,

5    and Six should be dismissed because of the statutes underlying

6    those counts do not cover overseas conduct.  He also asks the

7    court to hold that 18 U.S.C. 2339A(a) -- the statute that

8    Mr. Melzer is charged with violating under Count Five and which

9    prohibits the provision of material support in furtherance of

10   certain federal offenses -- only applies extraterritoriality to

11   the same extent as its predicate offenses.  Second, Mr. Melzer

12   argues that because Count Five is multiplicative of Counts One,

13   Two, Three, Four, and Six, the government should be prohibited

14   from pursuing the counts as charged, at risk of obtaining an

15   improper verdict that violates the double jeopardy clause.

16   Third, Mr. Melzer argues that Counts One and Two should be

17   dismissed because the government failed to comply with the

18   statutory certification requirement for those charges.  The

19   government opposed Mr. Melzer's motion on June 24, 2021, and

20   Mr. Melzer replied on July 7, 2021.

21        1. Extraterritorial application of the statutes

22   underlying Counts Three and Four.

23        Mr. Melzer has moved to dismiss Counts Three and Four,

24   which charge him with attempting to murder conspire to murder

25   U.S. service members, in violation of 18 U.S.C. Sections 1114

L7QsMELc

and 1117.  In indictment, docket number 31, paragraph six to 11.

Courts presume that congress ordinarily legislates "within the territorial jurisdiction of the United States." Morrison v. National Australia Bank Limited, 561 U.S. 247, 255 (2010)(citation and internal quotation marks omitted). Nevertheless, this presumption may be "overcome by clearly expressed congressional intent for a statute to apply extraterritorially." Weiss v. National Westminister Bank PLC, 768 F.3d 202, 211 (2d Cir. 2014).  The Supreme Court's recent Nestle USA, Inc. v. Doe decision recounted the now familiar two-step framework for analyzing extraterritoriality issues: "First, we presume that a statute applies only domestically and we ask" whether the statute gives a clear affirmative indication "that rebuts this presumption." Nestle USA, Inc. v. Doe, 2021 WL 2459254 (U.S. June 17, 2021)(quoting RJR Nabisco Inc. v. European Community, 579 U.S. 325, 337, 136 S.Ct. 2090 (2016)). "Second, where the statute ... does not apply extraterritorially, plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" *Id.* (citation omitted).  If it did, "then the case involved a permissible domestic application even if other conduct occurred abroad" *Id.* (citation omitted).  However, "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible

extraterritorial application regardless of any other conduct that occurred in the U.S. territory." <u>RJR Nabisco, Inc. v. Euro Community</u>, 136 S.Ct. at 2101 (2016).  As the Second Circuit has explained, "the focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." <u>United States v. Napout</u>, 963 F.3d 163, 178 (2d Cir. 2020)(citations alterations and internal quotation marks omitted).

Section 1114 provides that:

"Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished" --

(1) In the case of murder, as provided under Section 1111;

(2) In the case of manslaughter, as provided under Section 1112; or

(3) In the case of attempted murder or manslaughter, as provided in Section 1113."

18, United States Code, Section 1114.  Section 1117

makes it a crime when "two or more persons conspire" to violate

Section 1114 and "one or more of such persons do any overt act

to affect the object of the conspiracy." 18, United States

Code, Section 1117. Sections 1114 and 1117 do not expressly

speak to extraterritorial application one way or the other.

Therefore, at the first step, the presumption against

extraterritoriality has not been rebutted.

As both parties have recognized, there is Second

Circuit precedent on this issue. The Second Circuit has

unambiguously held that Sections 1114 and 1117 apply

extraterritorially. See United States v. Al Kassar, 660 F.3d

108, 118 (2d Cir. 2011)(reasoning that "the nature of the

offense -- protecting U.S. personnel from harm when acting in

their additional capacity -- implies an intent that [the

statute] applies outside of the United States" and joining the

district courts in the Second Circuit and courts in other

circuits in "concluding that Sections 1114 and 1117 apply

extraterritorially"); see also United States v. Siddiqui,

699 F.3d 690, 701 (2d Cir. 2012)(reaffirming the Second

Circuit's decision in Al Kassar that 18, United States Code,

Section 1114 applies extraterritorially and explaining that the

Circuit "sees no basis for expecting congress to have intended

to limit these protections to U.S. personnel acting within the

United States only"); United States v. Georgescu, 148 F. Supp.

3d 319, 324 (S.D.N.Y. 2015)("It is well established in this

1    circuit that Section 1114 falls into this exception and applies

2    extraterritorially").

3            Mr. Melzer suggests that Al Kassar and Siddiqui, which

4    are still binding in this circuit, were wrongly decided because

5    they do not address the Supreme Court's decision in Morrison v.

6    National Australia Bank Limited, 561 U.S. 245, 255 to 62 (2010)

7    which instructed courts to apply a resumption against

8    extraterritoriality.  See defendant's brief at ten note three.

9    On this basis, Mr. Melzer argues that I am not bound by

10   Al Kassar and Siddiqui because they have implicitly overruled

11   by the Supreme Court's decision in RJR Nabisco.  I understand

12   the issue raised by Mr. Melzer and the need to consider the

13   Second Circuit's prior decisions in light of the Supreme

14   Court's decisions on the proper analysis for evaluating a

15   statute's extraterritorial reach.  It is true that at least one

16   other circuit court has taken the same position as Mr. Melzer.

17   See United States v. Garcia Sota, 948 F.3d 356, 360 (D.C.

18   Circuit 2020).  (Vacating defendant's conviction under Section

19   1114 after finding that the statute had a "purely domestic

20   scope" and explaining that "we acknowledge that since AEDPA,

21   the Second Circuit has joined the Eleventh Circuit in finding

22   Section 1114 applicable abroad.  See United States v. Siddiqui,

23   699 F.3d 690, 701 (2d Cir. 2012)(following the court's prior

24   decision in United States v. Al Kassar, 660 F.3d 108, 118

25   (2d Cir. 2011).  But neither of these circuits addressed the

L7QsMELc

striking differences between Section 1114 and its neighbor

Section 1116, or grappled with the Supreme Court's recent

admonitions regarding the presumption against

extraterritoriality").  I have read the D.C. Circuit's opinion

and believe that there is a strong, logical basis for its

conclusion.  Nonetheless, the Second Circuit has spoken on the

precise statutes at issue, and Al Kassar and Siddiqui are still

the prevailing law in this circuit.  RJR Nabisco and the

Supreme Court's universe of cases on extraterritoriality

analysis do not address Sections 1114 and 1117.  It's not clear

that the Second Circuit would necessarily arrive at a different

conclusion if it evaluated Sections 1114 and 1117 under the

RJR Nabisco framework.  Ultimately, because I am bound by

Second Circuit precedent, "unless and until that case is

reconsidered by [the Second Circuit] sitting in banc (or its

equivalent) or is rejected by a later Supreme Court decision,"

Mr. Melzer's request to dismiss Counts Three and Four against

him are denied.  See Monsanto v. United States, 348 F.3d 345,

351 (2d Cir. 2003).

        A.  Count Five.

        Under Count Five of the indictment, Mr. Melzer is

charged with "providing material support to terrorists"

18 U.S.C. 2339(a).  Section 2339(a) provides:

        "(a) Offense -- whoever provides material support or

resources or conceals or disguises the nature, location,

source, or ownership of material support or resources, knowing

or intending that they are to be used in preparation for, or in

carrying out, a violation of [certain enumerated statutes] or

in preparation for, or in carrying out, the concealment of an

escape from the commission of any such violation, or attempts

or conspires to do such an act, shall be fined under this

title, imprisoned not more than 15 years, or both, and, if the

death of any person results, shall be imprisoned for any term

of years or for life.  A violation of this section may be

prosecuted in any federal judicial district in which the

underlying offense was committed, or in any other federal

judicial district as provided by law.

> *Id.*

In connection with his requests to dismiss Counts Six,

Three, and Four, Mr. Melzer has also asked that I strike

Section 956 and 1114 from the predicate offenses underlying

Count Five because they do not reach extraterritorial conduct.

As I have explained, I could not find that it is appropriate to

dismiss Counts Three and Four at this time based on

Mr. Melzer's argument regarding extraterritoriality.

Furthermore, as the Second Circuit has explained, congress'

2001 amendment of Section 2339(a) "expanded the statute's

territorial reach." United States v. Mostafa, 753 F. App'x 22,

29 (2d Cir. 2018).  I am taking up Mr. Melzer's arguments

regarding Section 956 separately by written decision, which I

L7QsMELc

1    hope to issue shortly.  But at this point, I am denying

2    Mr. Melzer's motion to dismiss Sections 1114 and 956 from the

3    predicate offenses underlying Count Five at this time.

4              2. Motion to dismiss multiplicitous charges.

5              Mr. Melzer also claims that Count Five is

6    multiplicitous of Counts One, Two, Three, Four, and Six.

7    Mr. Melzer argues that the government must elect which path to

8    pursue before trial.

9              The double jeopardy clause of the Fifth Amendment

10   provides that no person "shall ... be subject for the same

11   offense to be twice put in jeopardy of life or limb" United

12   States Constitution Amendment V. "This constitutional command

13   encompasses three distinct guarantees: (1) it protects against

14   a second prosecution for the same offense after acquittal.

15   (2) It protects against a second prosecution for the same

16   offense after conviction. (3) And it protects against multiple

17   punishments for the same offense." United States v. Josephberg,

18   459 F.3d 350, 354-55 (2d Cir. 2006)(per curiam)(alterations in

19   original)(quoting Illinois v. Vitale, 447 U.S. 410, 415

20   (1980)).  Mr. Melzer argues that the government should be

21   required to choose which counts it will pursue to avoid the

22   risk of violating the double jeopardy clause.  In such cases,

23   courts apply the test set forth in Blockburger v. United

24   States, 284 U.S. 299, 304 (1982), to determine whether the

25   double jeopardy clause is implicated:  If "the same act or

1   transaction constitutes a violation of two distinct statutory

2   provisions, the test to be applied to determine whether there

3   are two offenses or only one, is whether each provision

4   requires proof of a fact which the other does not." *Id.*

5   Lesser-included offenses and their greater offenses are

6   considered a single offense and may not be punished separately.

7   United States v. Valerio, 765 F. App'x 562, 568 (2d Cir. 2019)

8   (citing Rutledge v. United States, 517 U.S. 292, 297, 116 S.Ct.

9   1241, 134 L.Ed.2d 419 (1996).

10          I am declining Mr. Melzer's request that I require the

11  government to choose which set of charges to pursue to avoid a

12  double jeopardy violation. "Whether to prosecute and what

13  charge to file or bring before a grand jury are decisions that

14  generally rest in the prosecutor's discretion," and "a

15  defendant has no constitutional right to elect which of the

16  two applicable federal statutes shall be the basis of his

17  indictment and prosecution..." United States v. Batchelder,

18  442 U.S. 114, 124, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

19  Again, there is Second Circuit precedent that speaks directly

20  to this issue.  In United States v. Josephberg, the Second

21  Circuit held that the issue of whether any counts are

22  multiplicitous should be reserved until after trial because

23  "where there has been no prior conviction or acquittal," as

24  here, "the double jeopardy clause does not protect against

25  simultaneous prosecutions for the same offense, so long as no

more one punishment is eventually imposed." 459 F.3d 350, 355

(2d Cir. 2006. (emphasis added); see also *Id.* ("If the jury

convicts on no more than one of the multiplicitous counts,

there has been no violation of the defendant's right to be free

from double jeopardy, for he will suffer no more than one

punishment. If the jury convicts on more than one

multiplicitous count, the defendant's right not to suffer

multiple punishments for the same offense will be protected by

having the court enter judgment on only one of the

multiplicitous counts"); United States v. Maxwell, 2021 WL

1518675 at *14 (S.D.N.Y. April 16, 2021)("since Josephberg,

courts in this circuit routinely denied pretrial motions to

dismiss potentially multiplicitous counts as premature."

(quoting United States v. Medina, 2014 WL 3057917, at *3

(S.D.N.Y. July 7, 2014); collecting cases); United States v.

Ahmed, 94 F.Supp.3d 394, 434 (E.D.N.Y. 2015)(quoting United

States v. Mostafa, 965 F.Supp.2d 451, 464 (S.D.N.Y. 2013)).

("Multiplicity is properly addressed by the trial court at the

sentencing stage. At that time, the district court would be

required to vacate one of the two convictions."); cf. United

States v. Miller, 26 F.Supp.2d 415, 422 (N.D.N.Y 1998)(citing

United States v. Reed, 639 F.2d 896, 904 (2d Cir. 1981)) ("If

an indictment is multiplicitous on its face, then the

multiplicitous count be dismissed pretrial."); see also Reed,

639 F.2d at 904, n.6 (explaining that "an indictment that is

1   multiplicitous is not fatal and does not require dismissal,"

2   and that a trial court has the discretion to require the

3   prosecution to choose between allegedly multiplicitous counts,

4   particularly "when the mere making of the charges would

5   prejudice the defendant with the jury").

6          The charges are not multiplicitous on the face of the

7   indictment.  See, e.g., <u>Georgescu</u>, 148 F. Supp. 3d at 323

8   (describing the differences between Sections 1114 and 2339(a)

9   and explaining that "although defendant's alleged conduct may

10  violate both sections 2339(a) and 1114, those statutes

11  otherwise target distinct criminal conduct ... moreover,

12  because the elements of the crimes differ, the statutes require

13  different proof.  The malice aforethought requirement in

14  Sections 1114, for instance, is not an element that must be

15  proved under Section 2339(a)") Furthermore, this is not a case

16  where "the mere making" of the allegedly multiplicitous charges

17  would improperly prejudice Mr. Melzer with the jury.

18  Mr. Melzer is charged with substantive violations of the

19  predicate offenses of Count Five.  Therefore, much of the same

20  evidence will likely be introduced at trial, even if Count Five

21  is dismissed.  See <u>Reed</u>, 639 F.2d at 904, n.6; see also

22  <u>United States v. Weingarten</u>, 713 F.3d 704, 710, n.5 (2d Cir.

23  2013)("It makes no difference that the same conduct underlies

24  multiple counts of Weingarten's indictment, so long as the

25  statutes prescribe distinct offenses.") Furthermore, any

additional prejudice can be mitigated by careful crafting of

the appropriate jury instruction and, if necessary, vacating

multiplicitous convictions at the sentencing stage.

Accordingly, I am declining to exercise my discretion

and will not require the government to elect between the

allegedly multiplicitous counts.  However, I am denying this

portion of Mr. Melzer's motion without prejudice.  If

Mr. Melzer wishes to renew his application, he may do so after

trial, as contemplated by the Second Circuit precedent I have

cited, and I will evaluate the request under the framework.

3. Motion to dismiss for failure to comply with

statutory certification requirement.

Finally, Mr. Melzer moves to dismiss Counts One and

Two, asserting that the government failed to comply with the

statutory certification requirement that is needed to pursue

prosecution for those crimes.  Under Counts One and Two,

Mr. Melzer is charged conspire with conspiring and attempting

to murder United States nationals abroad, in violation of

18 U.S.C. Section 2332(b).  Section 2332(d) imposes a

limitation on prosecution for offenses under Section 2332,

stating that:

"No prosecution ... shall be undertaken by the United

States except on written certification of the Attorney General

or the highest ranking subordinate of the Attorney General with

responsibility for criminal prosecutions that, in the judgment

of the certifying official, such offense was intended to

coerce, intimidate, or retaliate against a government or

civilian population."

18 U.S.C. Section 2332(d). "Section 2332(d)'s

requirement that the Attorney General issue a certification

before 'prosecution for any offense described in [Section 2332]

shall be undertaken' is most naturally read as a requirement

that the Attorney General issue the certification either at the

time of or before the filing of the first instrument charging a

violation of Section 2332. This view furthers the purpose of

Section 2332(d) -- namely, ensuring that the statute reaches

only terrorist violence inflicted upon United States nationals,

not 'simple barroom brawls or normal street crime.'"

United States v. Siddiqui, 699 F.3d 690, 700 (2d Cir. 2012), as

amended (November 15, 2012)(citing HR Conf. Rep. 99-783 at 87,

reprinted in 1986 U.S.C.C.A.N. 1926, 1960)(emphasis in

original).

In his opening brief, Mr. Melzer asserted that the

government disclaimed having the written certification during

the February 22, 2021, conference and in prior correspondence

with the defense, and therefore, the government has admitted

that it did not comply with Section 2332(d)'s requirements.

The court was not privy to the parties' communications, but

that framing is not an accurate representation of the February

conference. Defense counsel raised the issue, and in response,

1   Mr. Adelsberg said, We are going to look into that and provide

2   that document, if we can provide that certification for the

3   defense." February 22, 2021 hearing transcript 17:2-8.

4           Mr. Melzer abandoned this argument in his reply brief.

5   In any event, the government has proffered that on June 18,

6   2020, then Deputy Attorney General Jeffrey A. Rosen certified

7   that Mr. Melzer's conduct was "intended to coerce, intimidate,

8   and retaliate against a government and a civil population."

9   Government brief at 46.  The government first indicted

10  Mr. Melzer on Counts One and Two on June 22, 2020.  See docket

11  number six.  Accordingly, because Mr. Rosen issued his

12  certification "at the time of or before the filing of the first

13  instrument charging a violation of Section 2332," Mr. Melzer's

14  motion to dismiss Counts One and Two is denied.

15          4.  Conclusion.

16          For these reasons, Mr. Melzer's pretrial motions are

17  denied, with the exception of the motion related to 956, as to

18  which I hope to issue a written decision shortly.

19          Good.  So let us proceed.  The next issue that I had

20  on the agenda, counsel, was the proposed second superseding

21  indictment.  I understand, counsel for the government, that one

22  is anticipated here.

23          What can you tell me about the timeline for that, and

24  does it make a difference in particular for us as we're working

25  to schedule next steps in this case?

1          Counsel?

2          MR. HELLMAN:  So, to the latter question, I don't

3    believe it will make a substantial difference or a meaningful

4    difference here.  We hope to have either a superseding

5    indictment or a decision not to seek one very soon.  There are

6    certain approvals which are required from our colleagues at

7    Main Justice in Washington, DC.  So the government proposes to

8    have a second superseding indictment within 45 to 60 days.

9          THE COURT:  Thank you.

10          You say that you don't think that that will have an

11   impact on the case management going forward.

12          Why is that?

13          MR. HELLMAN:  We don't anticipate that the second

14   superseding indictment will contain new charges.  The second

15   superseding indictment, if anything, at this time, is

16   anticipated to clarify the scope of the already existing

17   charges and potentially make slight adjustments to the date

18   ranges to the effect discussed in the government's response

19   brief.

20          THE COURT:  Thank you.

21          Can you tell me where the parties are with respect to

22   discovery, and does the superseding proposed superseding

23   indictment have any impact on the government's discovery

24   obligations here?

25          MR. HELLMAN:  The government does not anticipate

1  additional Rule 16 discovery following a second superseding

2  indictment.  It has, in its view, completed Rule 16 discovery

3  that it has in its possession or that it has knowledge of at

4  this time.

5       The government has continued productions over time as

6  it learns of new materials or new materials exist, they are

7  acquired by the government and produced.  But we're not

8  anticipating a tranche of discovery that would accompany a

9  second superseding indictment.

10       THE COURT:  Good.  Thank you.

11       So, Counsel for the United States, what's the

12  government's views -- what are the government's views regarding

13  next steps in the case?

14       Counsel?

15       MR. HELLMAN:  In the government's view, setting a

16  trial date is the appropriate next step.

17       THE COURT:  Good.  Thank you.

18       Counsel, can you remind me how long the government

19  anticipates a trial in this matter will last?

20       MR. HELLMAN:  May I have one moment?

21       (Counsel confer)

22       Subject to the usual caveats in terms of potential

23  stipulations that the parties may reach, two to three weeks.

24       THE COURT:  Thank you.

25       Good.  Let me turn to counsel for defendant.

1          What can you tell me about the status of the case

2     generally?  And I would like to turn to a discussion of your

3     view regarding appropriate next steps here.

4          In other words, should we schedule a trial date now,

5     counsel?

6          MS. WILLIS:  Your Honor, in terms of status of the

7     case, we are in receipt, obviously, of the discovery that

8     government previously tendered.  Mr. Melzer has received a copy

9     himself as well and has been reviewing it, as have we.

10          I suppose the hesitation I have with respect to a

11     trial date is that, while the government's view may be that any

12     potential superseder sort of won't change the landscape, from

13     the defense perspective, obviously, until we see any potential

14     superseding charges, we won't be able to assess whether or not

15     that potential superseder might prompt additional motions

16     practice.

17          In the government's language, the potential superseder

18     would clarify charges and potentially adjust date ranges for

19     alleged conduct.  Certainly, the commentary about clarifying

20     charges, again, raises the spectrum, at least from the defense

21     perspective, that while the government may not believe that

22     things are changed, if there is a superseder and we see it and

23     assess it, we might be of the mind that there might be

24     additional motion practice based on that superceder.

25          So when the government indicates that they think, if

L7QsMELc

1    there is a superseder, that that would be soon or that they at

2    least would receive clarity that, perhaps, they were not, in

3    fact, going to supercede, I think that from our perspective, it

4    makes the most sense to wait for what appears to be a short

5    period of time, see if there a superseder, receive that,

6    obviously, have Mr. Melzer arraigned on those superseding

7    charges, and allow us a brief period of time to assess whether

8    there is additional motions practice prior to setting a trial

9    date, your Honor.

10          THE COURT:  Thank you.

11          Counsel for the United States, what's your view

12   regarding the defendant's proposal?

13          And I construe that proposal as a suggestion that we

14   schedule a status conference for the case two months or so from

15   now, by which point the superseding indictment would or would

16   not have been issued.  That is an alternative.

17          Another alternative would be to select a trial date

18   some amount of time down the road, sufficiently down the road

19   to ensure that there is adequate time for the defense to review

20   any such superseding indictment, and potentially to entertain

21   motion practice prior to the trial date.

22          That's an alternative, but I'm not promoting it.  I'm

23   just noting that it is another potential path.

24          Counsel for the United States, what's your view

25   regarding the appropriate next steps here?

L7QsMELc

1          MR. HELLMAN:  So, in the normal course, I think the

2     first proposal would be perfectly fine, that is, wait

3     approximately two months and pick a trial date then.  The only

4     hesitation I have is the continuing COVID-19 pandemic and the

5     particularly logistics that are involved in selecting a jury or

6     putting one's court on a schedule to have a courtroom available

7     for a two- or three-week jury trial.

8          I think that given the nature of the case and also

9     where we are in the calendar, it's already too late for quarter

10    four of 2021, although I could be wrong about that.  I'm simply

11    not sure by what point in time would we need to submit, if we

12    will still need to submit, for such a courtroom for the first

13    or second quarter of 2022.

14         It may make sense to try to put in for a date sooner

15    than later and far enough out in the beginning half of 2022 so

16    that we are actually on the books.

17         THE COURT:  Thank you.

18         Good.  Counsel for defendant, what's your view?

19         The reason why I noted the existence of the

20    alternative, namely, that we set a date that is relatively far

21    out now, is exactly for the reason that the government

22    suggested.  Namely, that it would allow me to hold the time in

23    my calendar, and that if we are still operating under COVID

24    protocols, we will have as much advanced notice as we can

25    regarding the need to request a courtroom for that date.

1          My hope is that we may not be operating under COVID

2     protocols at that point, but I really have no particular

3     insight into whether or not that would be the case.  So I'm

4     looking at my calendar with those kind of framing thoughts in

5     mind, namely, that if we were to do this, that we should set a

6     date that would provide the defense adequate time to digest a

7     potential superseding indictment.

8          I am looking at potential trial dates in either late

9     March or April of 2022, and would suggest that for a trial of

10    the duration that we are suggesting, that we might select

11    either a date at the end of March or a date at the end of April

12    as the trial date.

13         To be more specific, I'm looking at potentially

14    March 28, 2022, or April 25, 2022, as potential options here.

15         Counsel for defendant, what's your thought about

16    whether we should set a trial date for that in order to secure

17    a time, or would those periods of time be right for the

18    defense?

19         MS. WILLIS:  Your Honor, I obviously understand the

20    concerns with respect to the current system that we've been

21    operating under when it comes to scheduling, so I don't have an

22    objection to setting a trial date in that timeframe, which I

23    think would give enough time for us to file additional motions,

24    if there are any.

25         I'm just trying to consult my calendar now, your

L7QsMELc

1    Honor, if I can just have a moment.

2            THE COURT:  It's fine.  Please take your time.

3            (Counsel confer)

4            MS. WILLIS:  Your Honor, perhaps the last week this

5    April, we are attempting to avoid some school breaks.

6            THE COURT:  Thank you.  I appreciate that.

7            That's fine.  So let me propose April 25 as the trial

8    date for this case.  What I would usually say in this

9    circumstance is that that is a firm date.  It is as firm as I

10   can have it be given the constraints on the availability of

11   courtrooms.  I will ask for that trial date.  My expectation is

12   that we will be going to trial on or around that date.

13           If we are still operating under the current COVID

14   protocols, I will let you know where we stand in the trial

15   schedule.  Given that Mr. Melzer is currently incarcerated, I

16   expect, in the triage, he will have a relatively high priority.

17   This may not being the exact date on which we go to trial, but

18   please plan we will be going to trial very close to this date.

19   It may be that, as I have experienced a couple of times,

20   unfortunately, during the pandemic, that I may ask you to be

21   flexible and take advantage of a potentially earlier trial

22   date.

23           Sometimes dates come up that are earlier than

24   anticipated, but given the difficulty in ensuring the

25   availability of a courtroom, I may encourage you to move

1    forward with the trial in a slightly earlier date than the date

2    that we are discussing here.

3         If there are dates that you cannot do during that

4    quarter, which is the second quarter of the year, please let my

5    deputy know that.  That is information that we apparently put

6    into the requests.  I have discovered, to my detriment, that

7    the trial scheduling people will schedule trials at a time that

8    is otherwise inconvenience to me, including during vacations,

9    if I do not block out that time.  So if there is a time that

10   you are not available, let me know, and we'll indicate that in

11   the request.

12        MS. WILLIS:  Your Honor, for reference, so we know the

13   timeframe, when does the second quarter begin?

14        THE COURT:  It begins April 1.

15        MS. WILLIS:   Thank you.

16        THE COURT:  Good.  So please consider this to be a

17   firm date with the caveats that I have described.

18        Let me take a moment to note something for the benefit

19   of Mr. Melzer.

20        Mr. Melzer, this is as firm a trial date that I can

21   provide you given the COVID 19 constraints.  I just want to

22   tell you that if any circumstances arise and you want or need

23   to change counsel -- I'm not suggesting that you should or

24   will -- but I want to raise this for you at this time for the

25   reasons that I'll describe.  For example, if you have appointed

L7QsMELc

1   counsel and want to retain counsel for any reason, it is

2   important that you raise that as soon as possible.  The reason

3   why I'm saying this is because a lawyer needs an adequate

4   amount of time to prepare for trial, and I expect that we will

5   be going to trial at or immediately around the date that I've

6   just established.

7           I just want you to know this because, if you had an

8   application to change counsel -- and, again, I'm not suggesting

9   that you will or should -- but if you did have one, it would be

10  in your interest to raise the issue with the court as soon as

11  possible.  That's because a lawyer needs enough time to

12  prepare.  If you raise the issue late and make the request

13  right before the trial date, I might not grant your

14  application, or I might grant it and you might be left

15  proceeding to trial with a lawyer who has had less time to

16  prepare.  So I just want to flag this for you now.

17          Good.  Counsel, I'll issue an order later today that

18  establishes the schedule for pretrial submissions, as well as

19  the final pretrial conference in this case.

20          One brief note, particularly given the amount of time

21  between now and the pretrial submissions deadlines that I

22  expect to establish.  If the parties wish, you can deviate to

23  one degree from my individual rules of practice regarding the

24  pretrial submissions.  The default rule, as you know, is that

25  each side submits to the court a separate independent proposed

L7QsMELc

jury charge.  That's fine.  I'm not ordering you to do anything

different.

I think that there can be some economies if the

parties present what I'll describe as a joint charge.  By

joint, I do not mean that I expect the parties to agree on

everything, but it streamlines my process to, in essence, have

a single document that contains each of the parties' proposal

regarding the charges.  As you know, most of the charges

overlap substantively, so it can be efficient to have, I'll

call it, a single template of the charges with, most likely, in

the scenario the defendant's proposed modifications to those

charges annotating the government's proposals.

There is no right of priority.  I'll evaluate all

proposed charges based on the law, not based on whose text is,

I'll call it, the principal text as opposed to the comments.  I

would expect any charges presented to me in either way would

contain reference to the relevant legal or other precedent,

whether that be case law or a treatise.

If the parties were to present me with a proposed

joint charge in the type I've just described, I would expect

both the government's position and the defendant's position

would be annotated and provide the court with your legal

foundation for your respective position.

So I just ask for you to consider that.  It can really

streamline the process.  If you wish to do that, I think that

1    that would require that the government prepare a proposed set

2    of jury charges substantially in advance of the deadline for

3    the submission of the charges to the court so that the defense

4    would have ample time to annotate them in advance of my

5    deadline for the submission of pretrial materials.

6            Again, I'm not ordering that you do this, but I ask

7    you to consider it as a potential way to make the process more

8    efficient.

9            Good.  I think that that's all that I have, apart from

10   the speedy trial clock.

11           Counsel for the United States, is there anything else

12   that you would like to raise before we come to that?

13           MR. HELLMAN:  No.  Thank you.

14           THE COURT:  Thank you.

15           Counsel for defendant?

16           MS. WILLIS:  No, your Honor.

17           THE COURT:  Thank you.

18           Counsel for the United States, is there an

19   application?

20           MR. HELLMAN:  Yes.

21           The government moves that the court exclude time under

22   the Speedy Trial Act through April 25, 2021, as discussed at

23   length today.  The parties in the first, there may be a

24   superseding indictment --

25           I apologize.  My colleague has noted April 25, 2022,

L7QsMELc

1    is the trial date.  I'm asking that time be excluded through

2    then.  The purpose of the exclusion is to allow the parties

3    time to address the potential superseding indictment, any

4    additional discovery which may arise, but largely to prepare

5    for trial.

6              THE COURT:  Good.  Thank you.

7              Counsel for defendant, does the defense consent to the

8    exclusion of time?

9              MS. WILLIS:  Yes, your Honor.  No objection to that.

10             THE COURT:  Thank you.

11             I will exclude time from today until April 25, 2022,

12   after balancing the factors specified in 18, United States

13   Code, Section 3161(h)(7), I find that the end of justice served

14   by excluding such time outweigh the best interest of the public

15   and the defendant in a speedy trial because it would allow time

16   for the defense to consider the anticipated superseding

17   indictment, time for the defense to review discovery materials,

18   and time for the defendant to consider any potential motions

19   with respect to the superseding indictment, if one is filed.

20   The exclusion of time will also permit the parties to prepare

21   for the trial in this case, which I have just scheduled.

22             Anything else to take up, counsel, before we adjourn

23   here?

24             First, counsel for the government?

25             MR. HELLMAN:  No.  Thank you.

L7QsMELc

1          THE COURT:  Thank you very much.

2          Counsel for defendant?

3          MS. WILLIS:  No, your Honor.

4          THE COURT:  Thank you very much.  This proceed is

5     adjourned.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25