UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ETHAN PHELAN MELZER,

Defendant.

S1 20 Cr. 314 (GHW)

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

Samuel S. Adelsberg
Matthew J.C. Hellman
        Assistant United States Attorneys
        *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .................................................................................................................... 3

   I. Overview of O9A ........................................................................................................ 3

   II. The Defendant's Radicalization ................................................................................ 4

   III. Melzer Trains with the Military and Deploys to Italy ............................................. 6

   IV. April 2020: Melzer Begins to Communicate with CC-1 About Joining the RapeWaffen Division.............................................................................................................................. 7

   V. May 2020: Melzer Discloses National Defense Information on Telegram to Facilitate an Ambush on His Unit ....................................................................................................... 10

   VI. The Arrest and Melzer's Post-Arrest Interviews .................................................. 22

DISCUSSION ...................................................................................................................... 23

   I. Certain O9A and Jihadist Materials Located on the Defendant's iPhones and in His Barracks Should Be Admitted at Trial ........................................................................................... 23

      A. Relevant Facts ................................................................................................... 24

      B. Applicable Law ................................................................................................. 32

      C. Discussion ......................................................................................................... 35

   II. Statements of Melzer's Co-Conspirators Are Admissible ................................... 48

      A. Applicable Law ................................................................................................. 48

      B. Discussion ......................................................................................................... 51

   III. Statements by Individuals Not Alleged to be Co-Conspirators that Are Necessary to Understand Melzer's Statements Are Admissible for that Non-Hearsay Purpose .................. 53

   IV. The Defendant Cannot Offer His Own Out-of-Court Statements ....................... 54

   V. The Court Should Permit the Implementation of Limited Measures to Protect the True Name of the Military Base ....................................................................................................... 56

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

CONCLUSION...................................................................................................................... 61

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*ACLU v. Dep't of Def.*, 492 F. Supp. 3d 250 (S.D.N.Y. 2020)......................................... 60

*Alfred A. Knopf Inc. v. Colby*, 509 F.2d 1362 (4th Cir. 1975)...................................... 60

*Bourjaily v. United States, 483 U.S. 171 (1987)* ....................................................... 51

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................... 47

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ..................................................... 60

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ............................................................ 60

*Kewazinga Corp. v. Microsoft, 2021 WL 1222122, (S.D.N.Y. 2021)* .......................... 59

*Linde v. Arab Bank,* 384 F. 2d 571 (E.D.N.Y. 2005) ................................................... 43

*Old Chief v. United States*, 519 U.S. 172 (1997)........................................................ 37

*United States v. Abel*, 469 U.S. 45 (1984) ............................................................... 35

*United States v. Abu-Jihaad*, 553 F. 2d 121 (D. Conn. 2008) ..................................... 48

*United States v. Abu-Jihaad, 630 F.3d 102 (2d Cir. 2010)* ....................... 40, 41, 48, 50

*United States* v. *Ali*, 799 F.3d 1008 (8th Cir. 2015) ................................................... 45

*United States v. Alimehmeti*, 284 F. 3d 477 (S.D.N.Y. 2018) ......................... 41, 49, 59

*United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979) ................................................ 62

*United States v. Barone*, 913 F.2d 46 (2d Cir. 1990)................................................. 56

*United States v. Bellomo*, 176 F.3d 580 (2d Cir. 1999) .............................................. 55

*United States v. Bumagin*, 136 F. Supp. 3d 361 (E.D.N.Y. 2015)................................ 58

*United States v. Carboni, 204 F.3d 39 (2d Cir. 2000)*........................................... 36, 44

*United States v. Castro*, 813 F.2d 571 (2d Cir. 1987) ..................................................... 57

*United States v. Coonan*, 938 F. 2d 1553 (2d Cir. 1991) .................................................. 36

*United States v. Curley, 639 F.3d 50 (2d Cir. 2011)* ........................................................ 37

*United States v. Doe*, 629 F. 69 (2d Cir. 2015) ................................................................. 59

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997) ......................................................... 53

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) .............................................. 38, 55

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) ......................................... 40, 47

United States v. Gelzer, 50 F.3d 1133 (2d Cir. 1995) ........................................................ 38

*United States v. Glover*, 101 F.3d 1183 (7th Cir. 1996) .................................................... 57

*United States v. Gohari, 227 F. 3d 313 (S.D.N.Y. 2017)* ................................................. 36

*United States v. Hossain*, (S.D.N.Y. 2021) ....................................................................... 41

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ...................................................... 57

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) .............................................. 40

*United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) .................................................... 57

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) ....................................................... 57

*United States v. Kassir*, 2009 WL 976821 (S.D.N.Y. 2009) ............................................. 46

*United States v. Lang*, 589 F.2d 92 (2d Cir. 1978) .......................................................... 53

*United States v. Lights*, 2016 WL 7098633 (S.D.N.Y. 2016) ........................................... 37

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ........................................................ 57

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994) ................................................... 53

*United States v. McNair*, 46 F. 658 (2d Cir. 2002) .......................................................... 56

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013)................................................ 40

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009)................................................ 50

*United States v. Mostafa*, 16 F. 3d 236 (S.D.N.Y. 2014) .............................................. 46

*United States v. Mustafa*, 406 F. 526 (2d Cir. 2011) ................................................... 45

*United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990).................................................. 56

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) .................................................. 51

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) .................................................. 52

*United States v. Pugh*, 162 F. 3d 97 (E.D.N.Y. 2016)...................................... 41, 49, 50

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999).................................................. 45

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) ................................................... 51

*United States v. Reifler, 446 F.3d 65 (2d Cir. 2006)* ............................................ 36, 43

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012)................................................ 36

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ...................................... 37

*United States v. Romano*, 2014 WL 69794  (E.D.N.Y. Jan. 8, 2014)............................... 56

*United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995) .................................................... 55

*United States v. Savoca*, 335 F. Supp. 2d 385 (S.D.N.Y. 2004)..................................... 54

*United States v. Scala*, 405 F. Supp. 2d 450, (S.D.N.Y. 2005) ..................................... 62

*United States v. Schulte*, 2019 WL 3764662, (S.D.N.Y. 2019)...................................... 59

*United States v. Schulte*, 2021 WL 5232617, (S.D.N.Y. 2021)...................................... 42

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1988)............................................... 51

*United States v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995.............................................. 56

iv

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .............................................. 39, 62

*United States v. Terry*, 702 F.2d 299 (2d Cir. 1983) ................................................ 57

*United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985) .......................................... 62

*United States v. Tomero*, 486 F. Supp. 2d 320 (S.D.N.Y. 2007) ............................. 62

*United States v. Ulbricht*, 79 F. 3d 466 (S.D.N.Y. 2015) ........................................ 37

*United States v. Ullah (2018)* ................................................................................. 41

*United States v. Urena*, 8 F. 3d 568 (S.D.N.Y. 2014) ............................................. 59

*United States v. Vario*, 943 F.2d 236 (2d Cir. 1991) ............................................... 62

*United States v. Walker*, 1999 WL 777885 (S.D.N.Y. Sept. 29, 1999) ..................... 56

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) ............................................. 52

*Williamson v. United States, 512 U.S. 594 (1994)* .................................................. 52

## Statutes

18 U.S.C. § 1114 ...................................................................................................... 6

18 U.S.C. § 1117 ...................................................................................................... 6

18 U.S.C. § 2332 ................................................................................................... 6, 39

18 U.S.C. § 2339 ............................................................................................... passim

18 U.S.C. § 793 ........................................................................................... 6, 41, 42, 48

18 U.S.C. § 794 ..................................................................................................... 6, 41

18 U.S.C. § 956 ...................................................................................................... 6

## Rules

Federal Rule of Evidence 106 ................................................................................. 57

v

Federal Rule of Evidence 401 ................................................................. 35, 36

Federal Rule of Evidence 402 ................................................................. 35, 37

Federal Rule of Evidence 403 ................................................................. passim

Federal Rule of Evidence 404 ................................................................. passim

Federal Rule of Evidence 801 ................................................................. passim

Federal Rules of Evidence 804 ............................................................... passim

# PRELIMINARY STATEMENT

The defendant, Ethan Melzer, is charged in Indictment S1 20 Cr. 314 (GHW) in eight counts with: (1) conspiring to murder U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b); (2) attempting to murder U.S. nationals abroad, in violation of 18 U.S.C. § 2332(b); (3) conspiring to murder U.S. service members, in violation of 18 U.S.C. § 1117; (4) attempting to murder U.S. service members, in violation of 18 U.S.C. § 1114; (5) attempting to provide material support and resources to terrorists, to wit, intangible property, services, expert advice or assistance, and personnel (including himself), in violation of 18 U.S.C. § 2339A; (6) illegally transmitting and attempting to illegally transmit national defense information, in violation of 18 U.S.C. § 793(d); and (7) illegally transmitting and attempting to illegally transmit national defense information to a faction or citizen of a foreign country, in violation of 18 U.S.C. § 794(a).[1]

The evidence at trial will show that, while an active-duty member of the U.S. Army, Melzer sent sensitive information to members of the Order of the Nine Angles or "O9A," to facilitate a jihadist ambush on his unit (the "Unit").[2] O9A is a white supremacist, Neo-Nazi, Satanist, and

---

[1] In preparing for trial, the Government has determined that it will not proceed on Count Six of the Indictment, which charged Melzer with conspiring to murder and maim abroad, in violation of 18 U.S.C. § 956. The Government will also not proceed with the § 956 predicate crime under Count Five, which charges Melzer with providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. § 2339A. The Government has informed defense counsel of this decision.

[2] The Government respectfully submits that all of the evidence described in this brief is admissible as direct evidence of the crimes charged. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Federal Rule of Evidence 404 (b). The Government plans to continue to meet with potential witnesses between now and the trial and will supplement this notice as necessary should the Government learn of additional Rule 404(b) evidence.

pro-jihadist group that advocates extreme violence, including murder, as a means by which to accelerate the demise of liberal democracies and Western civilization. In December 2018, following core O9A tactics, the defendant joined the U.S. Army to infiltrate its ranks and further his goals as an O9A adherent. By at least April 2020, Melzer was communicating with an individual ("CC-1"), a member of O9A and the administrator of an O9A-affiliated Telegram[3] channel named "RapeWaffen Division." At around the same time, the Unit—which was stationed in Italy—was preparing to deploy to a military facility in Turkey (the "Military Base"). After learning of the deployment and attending briefings about the transfer, Melzer passed sensitive information about the deployment to CC-1, other co-conspirators (collectively, "the CCs"), and other participants in the Telegram RapeWaffen Division channel, including, among other things, the location of the Military Base, the number of soldiers who would be guarding the installation, how they would be armed, and their vulnerabilities to jihadist-led ambush attacks. Melzer told the CCs he was providing this information to cause a "mascal," meaning mass casualty, attack on his Unit, and that Melzer believed such an attack would drag the United States into a protracted new war. The defendant admitted all of this in stark detail to the Federal Bureau of Investigation ("FBI") during voluntary post-arrest interviews. At trial, in addition to the defendant's admissions to the FBI, the Government anticipates offering documentary and electronic evidence, such as the Telegram messages; O9A and jihadist propaganda and literature recovered from Melzer's cellphones and from a search of his barracks; expert testimony about, among other things, the

---

[3] Telegram is an encrypted messaging application which Melzer used on his cellphones.

ideology, methods, and tactics of O9A, which will provide necessary context for the other evidence of the defendant's activities on behalf of the group; and law enforcement, military, and civilian witness testimony.

In advance of trial, the Government respectfully submits these motions *in limine* seeking the following pretrial rulings:

1. O9A and jihadist related materials seized from the defendant's cellphones and barracks are admissible as direct evidence and pursuant to Rule 404(b).

2. Statements of the defendant's co-conspirators, who participated with Melzer in the charged offenses of planning a deadly ambush on Melzer's U.S. Army unit, should be admitted as co-conspirator statements pursuant to Federal Rule of Evidence 801 (d)(2)(E) and as statements against interest pursuant to Federal Rule of Evidence 804 (b)(3).

3. Statements made by other individuals during communications with Melzer are admissible for the limited purpose of providing context for and understanding of the defendant's statements, and are not offered for the truth of the matters asserted.

4. The defendant is not permitted to offer his own out-of-court statements, which constitute hearsay, unless and until the defendant establishes that the statement is admissible pursuant to a hearsay exception or provision of law.

5. The Court should adopt the limited protective measures of permitting the Government to anonymize the true name of a sensitive military installation at trial and preclude the defense from revealing—or eliciting testimony that would reveal—the true name in open court.

6. The Court should adopt the limited protective measures of referring to jurors by their jury numbers rather than names in open court, without informing the jurors of the implementation of the protective measures.

For the reasons set forth below, the Court should grant the Government's motions.

## **BACKGROUND**

### I. Overview of O9A

O9A is a white supremacist, Neo-Nazi, Satanist, and pro-jihadist group that promotes extreme violence to accelerate and cause the demise of Western civilization. O9A members

believe that the natural essence of Western civilization is pagan, but that this natural state has been corrupted by Judeo-Christian religious and political values. Evidence at trial—including from O9A materials found on Melzer's cellphones and in his barracks, Melzer's Telegram communications, and expert testimony—will demonstrate that O9A's ideology is defined by its advocacy of extreme violence in order to overthrow Western civilization. The evidence will show that O9A has found common cause with and admiration for Islamist jihadist ideology and the violent tactics of jihadist groups. The evidence will also show how O9A members are instructed to fulfill so-called "sinister" deeds. These include, for example, O9A followers performing "insight roles," where they attempt to infiltrate various organizations, including the military and law enforcement, to gain training, experience, commit acts of violence, identify like-minded individuals, and ultimately subvert those groups from within. O9A also maintains various Telegram channels in which its followers communicate, including the RapeWaffen Division channel, which CC-1 created and administered.

## II. The Defendant's Radicalization

The Government expects that the evidence—including Melzer's Telegram messages, photographs recovered from Melzer's cellphones, Melzer's discussions with peers, including other service members and friends prior to his deployment, and post-arrest statements—will show that Melzer became a follower of O9A well before he joined the military. For example, in communications with CC-1, Melzer claimed to have "self-initiated," or joined, O9A, and that he

had performed his first "insight role" for O9A in 2015 or 2016 as a "runner for some bhbs."[4] Melzer also told CC-1 that he performed an "insight role" with Antifa for approximately six months. In 2018, Melzer enrolled in the U.S. Department of Labor's Job Corps program, and at that time researched O9A and its American affiliate, the Temple ov Blood. Melzer explained in a post-arrest interview that he began performing Satanic rites during this period, which are rituals promoted by O9A involving the worship of Satan and the drawing of blood. In one Telegram conversation, CC-1 asked Melzer to give background on "sinister deeds," or acts in support of O9A, that Melzer had performed in the past, and Melzer told CC-1 that while in Job Corps he engaged in recruitment efforts related to O9A, and noted, "[in] Job Corp got a small following of people and used them for feeding. If we're talking like actual growth wise."[5]

Melzer enlisted with the U.S. Army in December 2018, and was originally stationed at Fort Benning, in Georgia. In Telegram communications, Melzer explained that he joined the Army because of O9A, and explained his disdain for patriotism or allegiance to the U.S. military. For example, on April 25, 2020, he wrote to another O9A member ("Individual-1") who was considering joining the U.S. Marine Corps, "Good luck it's great for training . . . Just don't become a fuckin patriot . . . train and get the fuck out . . . I'm not patriotic for shit . . . all of these places the vast majority deserve to be burned." Melzer also told CC-1 that his military service

---

[4] During his post-arrest interview, Melzer told investigators that he fell in with the wrong crowd as a teenager, which he described as "gang-affiliation type shit….the Bounty Hunter Bloods…. like there was a couple friends that I hung out with that were Bloods." This appears consistent with the defendant's reference to CC-1 to his conduct "as a runner for some bhbs."

[5] Unless otherwise indicated, spelling and grammatical errors are set forth as they appear in the original communications.

was another "insight role" to further his goals and skills within O9A.  In one exchange, CC-1 suggested to Melzer that joining a group such as al Qaeda could be valuable to O9A as "an insight role," and Melzer replied, "I've thought about it . . . But it would have to be after this."  Melzer next described the potential fallout if he joined a terrorist organization before leaving the military, writing, "The amount of heat from a us paratrooper goes awol and joined [redacted][6] . . . . After these 4 years are up I can't wait to actually start doing shit."  After CC-1 responded by asking Melzer if he had reenlisted in the Army, Melzer answered, "Fuck no . . . Well not 4 years now but still . . . Like 2 but fuck it . . . Not re-enlisting I got what I wanted."

### III.  Melzer Trains with the Military and Deploys to Italy

Consistent with O9A directives, Melzer kept his affiliation with O9A a secret when he joined the military, knowing that his O9A membership was in direct contravention of his agreements with the U.S. Army.  In December 2018, Melzer executed a "Statement of Enlistment," which contained, among other things, a regulation entitled "PARTICIPATION IN EXTREMIST ORGANIZATIONS OR ACTIVITIES," stating that "[m]ilitary personnel must reject participation in extremist organizations and activities" and are prohibited from "[a]ttending a meeting or activity with knowledge that the meeting or activity involves an extremist cause when on duty, when in uniform, when in a foreign country (whether on− or off−duty or in uniform), when it constitutes a breach of law and order, when violence is likely to result, or when in violation of off-limits sanctions or a commander's order."  Although Melzer signed enlistment paperwork in December

---

[6] As in original.

2018, his service in the military did not begin until June 4, 2019, the day he reported for active duty at Fort Benning.  The day he began active-duty service in June 2019, Melzer completed and signed another "Statement of Enlistment" form, which again informed Melzer that he was prohibited from joining or associating with extremist organizations or activities.

On June 14, 2019, Melzer began his basic training.  During his first few months in the Army, Melzer received several trainings relating to counterintelligence, counterterrorism, and operational security.  These trainings outlined, among other things, the importance of service members maintaining proper operational security, the dangers associated with releasing sensitive information on social media, and the type of national security damage that could result from the unauthorized disclosure of sensitive U.S. government information.

In September 2019, the Unit deployed to Camp Ederle, which is part of a joint Italian-American military complex in Vicenza, Italy where the U.S. Army Command for Africa and the 173rd Airborne are headquartered, and thousands of U.S. military active-duty personnel and civilian employees serve.

On November 19, 2019, Melzer obtained SECRET and SECRET/NATO security clearances and signed a "Classified Information Nondisclosure Agreement," which stated, among other things, that unauthorized disclosure of classified information may constitute a violation of federal criminal law.

## IV.  April 2020: Melzer Begins to Communicate with CC-1 About Joining the RapeWaffen Division

By April 2020, Melzer had begun communicating via Telegram with other members of O9A, identifying himself as a self-initiate of the group and a member of the U.S. armed forces.

On April 7, 2020, Melzer's cellphone captured the below photograph, which appears to depict Melzer with an M4 rifle and a skull mask.[7]



On April 21, 2020, Melzer and CC-1 exchanged Telegram messages regarding Melzer joining the RapeWaffen Division Telegram channel. After CC-1 told Melzer that O9A initiation was a prerequisite to membership in the RapeWaffen Division, Melzer confirmed that he had already been initiated into O9A. In detailed responses to a series of 40 "vetting" questions posed by CC-1, Melzer outlined his extremist views and detailed his efforts to join 09A. Melzer asserted his belief in "Anarcho-fascism," that he looked up to "heros" including "AH [Adolf Hitler], Stalin, [and] David Myatt [the purported founder of O9A]," and attributed his early interest in O9A to "family" and "reading." In response to a question from CC-1 regarding fascism and Melzer's

---

[7] The photo was obtained from Melzer's iPhone 11. The Government expects to introduce evidence, including the metadata associated with the photo, which shows that Melzer's device was used to create the image. Furthermore, the firearm in the photo appears to be Melzer's rifle. During a subsequent search of Melzer's barracks, Army investigators recovered what appears to be the skull mask depicted in the photo.

worldview, Melzer replied, "fascism is more the law of nature than anything, [my] world view is that by causing absolute chaos, anarchy, whatever you want to call it, the law of nature will naturally take over once again."

The day after this exchange, on April 22, 2020, Melzer took a photograph, depicted below, of a book titled "The Sinister Tradition: Order of Nine Angles," along with a knife, a skull mask, and his Army beret, which included the Unit's insignia.[8] "The Sinister Tradition: Order of Nine Angles" is an O9A manifesto setting forth the core beliefs for the group, including the importance of engaging in "sinister" deeds and "insight roles," which, as described above, involve O9A followers attempting to infiltrate and undermine organizations such as the military.

---

[8] The photo was obtained from Melzer's iPhone 11. The Government expects to introduce evidence, including the metadata associated with the photo, which shows that Melzer's device was used to create the image on April 22, 2020. The book, along with what appears to be the skull mask depicted in the photograph, were retrieved during a June 17, 2020 search of Melzer's barracks.



## V. May 2020: Melzer Discloses National Defense Information on Telegram to Facilitate an Ambush on His Unit

In or about April 2020, Melzer learned that he and the Unit would deploy to the Military Base in Turkey in the following months. Over the course of the next month, in preparation for the deployment to Turkey, Melzer and his platoonmates received extensive training, which included an orientation about the geography and purpose of the Military Base, potential attack scenarios at the facility, battle drill rehearsal, and classified and unclassified briefings regarding the Military Base. As Melzer was briefed on the details of his deployment, he also accessed and stored jihadist and O9A propaganda materials and literature as described in more detail below, including videos and graphics disseminated by jihadist media outlets celebrating and depicting brutally violent attacks on Western forces, the deaths of American soldiers during a jihadist ambush, and the execution of captive soldiers.

On May 6 and May 7, 2020, Melzer and his cohort received a set of detailed briefings about the Military Base. One of the briefings involved the use of a terrain model—a cardboard replica used as a training aid—of the Military Base.[9] Melzer was among the soldiers who helped construct the terrain model. During these briefings, the Unit was also provided with a detailed overview of the Military Base, the number of soldiers who would be present at the facility, a breakdown of the Unit's duties and responsibilities at the Military Base, its uniform and weapons requirements during the deployment, and its chain of command. The Unit also received an in-depth training about possible threat scenarios at the Military Base, including how to react to insider and outsider threats,[10] protests, and indirect fire. The briefing materials, including as depicted below, explained the Unit's training, tactics, and procedures in the event the Military Base experienced any of these threats. The presentation materials noted that the Unit at the Military Base would include "38 total personnel" and Melzer was informed that the Unit would be carrying only M4 rifles and pistols.

---

[9] Because of the nature of the information discussed herein, for purposes of this motion *in limine*, the Government has redacted certain sensitive details and requests that the redacted portions of this motion be maintained under seal. The Government has also filed an unredacted copy of the motion under separate cover and provided an unredacted copy to defense counsel.

[10] An insider threat typically refers to a security risk that comes from within an organization or facility (*i.e.*, from within the U.S. Army or within the Military Base). An outsider threat, on the other hand, emanates from outside an organization or facility.



On May 6, 2020, the first day of his above-described briefings regarding the Military Base, Melzer took a screenshot, depicted below, of a satellite photo of the Military Base, which investigators later recovered from his iPhone 11.



On May 14, 2020, Melzer and CC-1 continued to discuss Melzer's desire to further O9A and the RapeWaffen Division's mission. For example, after CC-1 asked why Melzer wanted to join RapeWaffen Division and how he thought he could benefit the group, Melzer explained that he planned to "hopefully help this become an actual active nexion" (nexion is a term used by O9A meaning chapter or branch) and "to help it grow, I'd be lying if I didn't say to help me grow as well." Melzer explained that he could offer RapeWaffen Division his "military training, survival, [and] links to other groups."

By May 17, 2020, Melzer had informed CC-1 about the upcoming deployment. That day, CC-1 asked Melzer whether he had arrived in Turkey, to which Melzer responded, "Getting ready to go." CC-1 explained that he asked because, "[CC-2] needs to know, he has plans . . . inshallah my brother, allahu akbar." Melzer then replied, "Fuck yea . . . 28th[,]" a reference to May 28, 2020 as the date of the Unit's deployment. Later in the same conversation, CC-1 identified "[CC-

2]" to Melzer as "a grey wolf . . . he was joining the Turkish army at some point for training . . . was* . . . forgot he's joining AQ lmao."[11]  In response, Melzer wrote optimistically about [CC-2's] potential, and stated "Well I'm sure they have the re[s]ources."  CC-1 responded "yeah fair enough . . . but you do realize what AQ is right? Al Q**** . . . is all I'll say."  Melzer then expanded on his belief that al Qaeda could assist in the ambush attack on his Unit, and replied, "Obviously . . . They have links everywhere they should definitely at least have one Turkish army guy."

On May 20, 2020, Melzer signed another "Classified Information Nondisclosure Agreement" and received two briefings regarding the Unit's upcoming deployment.  The briefings included a country threat briefing about Turkey and noted that foreign intelligence entities would find value in information about the U.S. military's "Operational Plans/Intentions, Force Capabilities, Organizational Structure, [and] Force Protection Vulnerabilities."  The briefings also addressed "proper OPSEC for Social Networking,"[12] and, as depicted in a slide from one of the briefings below, the "Terrorist Planning Cycle."  This slide set forth the planning stages that terrorists typically undergo before orchestrating an attack, including "Target Selection," "Surveillance," and "Planning," and also included a "Potential Observation Indicators" section intended to educate the Unit about how to spot individuals planning an attack.[13]

---

[11] The Grey Wolves are a Turkish far-right organization and movement affiliated with an ultra-nationalistic, Islamist, and neo-fascist ideology.

[12] OPSEC or operations security is a process that identifies sensitive information and outlines selected measures to prevent the information from getting into the wrong hands.

[13] The portion marking "FOUO" on the slide denotes the dissemination control marking, "For Official Use Only."



In between the two May 20, 2020 briefings, Melzer signed another "Classified Information Nondisclosure Agreement," which stated, among other things, that unauthorized disclosure of classified information may constitute a violation of federal criminal law. Melzer and his platoonmates then received the second briefing, which included classified information relating to the deployment, including the purpose of the Military Base. Melzer and his Unit were also briefed about jihadist threats in Turkey, including threats posed by the Islamic State of Iraq and al-Sham ("ISIS") and the Kurdistan Workers' Party ("PKK").[14]

---

[14] The PKK is a Kurdish militant political organization and armed guerrilla movement, which operates primarily in southeastern Turkey and northern Iraq.

Between May 23 and May 29, 2020, Melzer, using the alias "Etil Reggad," identified himself in at least two O9A Telegram chats as a member of the U.S. Army in Vicenza, Italy. On May 23, 2020, CC-1 forwarded approximately four of Melzer's initial communications about the proposed attack on his Unit to a Telegram O9A chat group titled "Order of Nine Rapes" with 18 members, including Melzer and an FBI confidential source (the "CS"). Melzer then sent a series of messages to the group, writing that he was a U.S. service member stationed in Vicenza who was "[g]oing to Turkey for a deployment" and that a "date and time [for the deployment] will be given soon." Melzer and the group members discussed the possibility of a jihadist attack on the Unit's deployment, and Melzer mentioned that he "[u]sed to be cool with a couple IS [Islamic State of Iraq and al-Sham or ISIS] members who lived in France." When asked whether he was willing to die in an attack on the Unit, Melzer responded "[i]f we were to trigger this the right way the amount of shit this would cause would cover it," and that his "life would be absolutely meaningless in the amount of shit it would cause" if the Unit was attacked in Turkey. Melzer described the proposed attack as "mascal," which another participant in the exchange explained meant "mass casualty."

On May 24, 2020, Melzer and CC-1 exchanged a series of direct messages on Telegram. CC-1 asked Melzer, "are we literally organizing a jihadi attack[?]" Melzer replied, "And yes probably . . . as long as I get the info I need to give you all." CC-1 approvingly replied, "that's kinda baste."[15] Melzer agreed: "Actually like a 8 outta 10 on the baste scale if I do say so myself . . . as long as I get what I need." After CC-1 highlighted again that Melzer could die in the attack

---

[15] "Baste" is an alternative spelling of the term "based," a phrase members of RapeWaffen Division used to express praise or approval.

Melzer was proposing, Melzer replied, "Who gives a fuck . . . the after effects of a convoy getting attacked would cover it . . . it would be another war . . . I would've died successfully . . . cause if another 10 year war in the Middle East would definitely leave a mark."  CC-1 concurred: "Yeah true."

 On May 25, 2020, CC-1 asked Melzer to provide additional, specific information:

"Okay, how many people will be in the convoy, are you gonna be there, is it gonna be air to ground, or is it gonna be on the ground . . . What will be carried . . . Whats the plans . . . And, I heard you may be reconsidering, but, make a [Telegram] group for you, me, and the rest of the people.  We still need the info, so give it us out of good faith . . . Also this is a serious thing, if you [get] this done we need proper organization . . . . we're not into larping [live action role-playing] or big tall, especially not her.  So if youre not serious, let her/us know."

Melzer quickly replied by disclosing information he and his fellow soldiers had received in the briefings: "40 people [in the convoy] that are actual soldiers . . . small arms . . . for all [I know] so far [the vehicles] could just be busses."  Melzer also explained that he believed an attack on the Military Base, rather than the attack on the Unit's convoy to the Military Base as he initially proposed, would be ideal: "That's what I meant by reconsidering because I found out that units replace each other up there every 2-4 months . . . more time to plan it out especially since I mean haven't really been there before and all we were shown was a satellite image for 2 seconds."  In response to CC-1's request for a map or a description of the location's topography, Melzer replied, "[the Military Base] . . . look that up . . . [they're] storing artillery there as well."  Using information provided to him by Melzer, CC-1 subsequently located and posted an open-source satellite image of the Military Base, along with the facility's coordinates, and then asked Melzer if the particular coordinates he had found were accurate.  Melzer confirmed the coordinates and provided

additional information about the purpose and defensive capabilities of the U.S. Army installation at the Military Base. CC-1 asked, "okay, [] . . . so . . . its near the mountains, so we could have some guys doing watch-over there?" and then provided latitude/longitude coordinates. In response to a question from CC-1 regarding the possible presence of mobile armor, meaning tanks, at the Military Base, Melzer replied, "yea should be . . . none . . . haven't been on the base yet but they would usually say if there was."

Later that day, CC-1 started a smaller, invite-only chat group on Telegram and invited vetted participants, including Melzer, the CS, and a few other individuals Confirming the group's core plan to provide Melzer's information to jihadists who would commit the attack, CC-1 initially named the group "Jihad," changed it later to "Jihadist Caliphate," and then changed it yet again to "Op Hardrock."[16] There, the participants further discussed the prospective attack on the Military Base. Melzer explained again that he "need[s] some Turkish people to cause some shit to put it lightly," and, when asked how many "jihadis" he wished to recruit, Melzer responded "squad size" or "Plt [platoon] size actually if [they're] placed right again gonna [go] over the layout of the terrain later today." Consistent with the information Melzer received during the Army briefings, Melzer also once again disclosed the geographic coordinates for the Military Base to the group; described the facility's purpose; revealed the fact that it was guarded by 40 individuals with

---

[16] Telegram group names are visible to all participants on a banner with text located at the top of the chat display.

"[s]mall arms" and "just m4s"[17]; and confirmed the route that the Unit would take to travel there. Explaining the Unit's vulnerability to the ambush-style attack he was proposing, Melzer predicted that "[e]very fire-team [would be] essentially crippled," and that there would be no "Carl Gustavs/at4s" or "CAG support."[18] Melzer also promised to give the group the frequency and channel for U.S. Army radio communications, so that his co-conspirators could, in the words of CC-1, "[l]isten in on shit in real time." Melzer further noted that the Military Base was "on a mountaintop so when I get there I'll scout out a spot that could be good" and that the base would not be on "high alert." Melzer also informed the group of the anticipated date of the Unit's deployment and suggested that the attack could be conducted against a unit set to replace his Unit in several months, which would allow more time for Melzer to research the Military Base, identify additional vulnerabilities, and pass information to the CCs to plan the attack. Melzer also promised that he would use a "burner" phone when he arrived in Turkey and would send photographs and additional details from the Military Base.

In another exchange in the group, as CC-1 and another conspirator ("CC-3") further discussed the information Melzer had provided, CC-1 suggested that attackers should mount the assault from high ground by firing weapons from multiple directions at the Military Base. CC-3

---

[17] This appears to be a reference to pistols and M4 rifles, which, as noted above, Melzer had previously learned would be the Unit's only weaponry during the deployment.

[18] "Carl Gustavs" and "at4s" are references to anti-armor weapons that can also be used against enemy personnel and/or fortified positions, and "CAG support" refers to close air support, such as helicopters or jet aircraft.

replied that attackers "should come from the mountain. . . could make them panic the shit outta them," and then asked, "Do you know which nations? . . . are within the walls of the base." CC-1 responded, "American." CC-3 replied "aight . . . Well if it is done very quickly . . . then no worries about air support . . . Plus I guess they wouldn't bomb their own base." CC-3 further stated, "Since you know the approximately number of soldiers in the base, you already won the battle, as sun tzu says lol." CC-1 later asked, "So . . . with the turks already riled up . . . and the severly underdefended [the Military Base]. . . This..is look good?" CC-3 replied, "Fuck yeah lol."

By on or about May 26, 2020, law enforcement identified the Unit from the information Melzer provided in the Telegram messages. The Unit's scheduled May 28, 2020 deployment to the Military Base was postponed by the military as the investigation continued. On May 29, 2020, hours before military authorities took him into custody as discussed below, Melzer posted again in the Op Hardrock chatroom, reaffirming his commitment to the attack on the Military Base. Melzer also explained additional measures he expected to take once he deployed to Turkey, including collecting additional intelligence once he had arrived at the Military Base. CC-1 asked whether Melzer had any new information, to which Melzer replied, "Until I get there no . . . but when I do if you know anybody that could pull location from pics that would be based . . . cause there gonna have us put up our phones during patrols but I'm bringing a shitty burner on me so I can take pics . . . at like the guard towers and shit that they'll probably set us up at." When CC-1 expressed doubt that the metadata from the images would provide helpful information, Melzer replied, "I figure even if you can't get the local just being able to see what they can see from the towers would help . . . you'll be able to see what anyone in those towers can see and that would

help a lot more."  CC-1 agreed, and asked if Melzer could obtain additional information for planning the attack: "Likely would, a full overview of the base from a tower would also be useful" to which Melzer replied, "Exactly that's the plan . . . Only place I can't go into is  the rad[ar] zone . . . but I'll probably be able to see it from one of the posts I imagine though."  CC-1 and Melzer then discussed the function of the Military Base.  CC-1 asked if Melzer could get clear images when taking photographs of the Military Base, to which Melzer replied, "Definitely . . . if not I'll literally take pics of anything important but I figure the posts are elevated."  As to the installation's defenses, Melzer also stated "the road has those barricades up to make you have to snake a car through . . . the road is the only entrance [that] exist[s] from what I'm hearing."

    In this same chat, the CS asked Melzer a series of questions about Melzer's involvement in the attack plot.  In one exchange, the CS asked Melzer, "what makes you think that you can actually get away with fucking with the US military[?]"  Melzer responded, "because I fly under the radar already act completely normal around other people outside and don't talk about my personal life or beliefs with anyone."  Relying on information received in the briefings, Melzer also explained that his involvement in promulgating the attack would likely be undetected as "isis and the Turks have been getting heavier near the border again . . . So that would also cover it I'd imagine considering IS isn't exactly a country anymore."  Later, after the CS expressed skepticism that Melzer could use his "burner" iPhone to take pictures of the Military Base, Melzer explained, "Obviously I'm going to be more careful about it th[a]n just holding it up in front of everyone."

    The CS also asked why Melzer had deleted messages from earlier chats.  Melzer explained, in substance, that he was nervous about law enforcement detection.  After further discussion on

the topic, the CS wrote, referring to Melzer's discussion in the deleted messages about the attack plot, "You deleted them because that's treason . . . Duh" to which Melzer replied, "Kek."[19]

## VI. The Arrest and Melzer's Post-Arrest Interviews

On May 30, 2020, military investigators took Melzer into custody. That same day, military and FBI investigators conducted a video-recorded, *Mirandized* interview of Melzer, during which he admitted to disclosing information about the Unit's upcoming deployment in the RapeWaffen Division channel and elsewhere on Telegram for the purpose of facilitating a deadly attack on his Unit, that his actions rendered him a traitor, and that his acts were tantamount to treason. He also admitted to using the "Etil Reggad" username and, when shown Telegram communications on his cellphone that was seized incident to his arrest, admitted to sending those messages. Over the course of the interview, however, Melzer denied that he was a member of O9A and at times attempted to minimize his conduct as satire or dark humor.

On June 11, 2020, the FBI transported Melzer to the United States from military detention in Germany, where he had been transferred after his initial military detention in Italy. During the flight, the agents conducted a second *Mirandized* interview, which was not recorded. Melzer again admitted that he had disclosed sensitive information in the Telegram chats, and that he had placed his fellow soldiers in danger by doing so. During the interview, Melzer claimed that he had disclosed this information merely because he wanted to impress the participants in the RapeWaffen Division Telegram channel, and maintained that he was not a member of O9A. He further asserted

---

[19] "Kek" is an alternative form of the internet shorthand "lol" and is commonly used in far-right community chatrooms.

that during the course of his communications he became concerned that some members of the group—in particular CC-1, CC-3, and the CS—were serious about committing an attack, and that he falsely told them that he was traveling to Aviano (which he did just hours before his arrest) in order to cut off communications with them.

After landing in the Southern District of New York, the FBI conducted another *Mirandized* interview of Melzer on June 11, 2020, which was video-recorded. During this interview, Melzer again admitted that he disclosed sensitive information to O9A members, including about the nature of security and defensive weaponry at the Military Base. Melzer also reiterated some of his earlier claims and minimized his conduct as discussed above, but told the FBI that he believed the CCs were serious about using the information he provided to commit an attack as discussed in the Telegram chats, and that some of the CCs were dangerous.

## DISCUSSION

### I. Certain O9A and Jihadist Materials Located on the Defendant's iPhones and in His Barracks Should Be Admitted at Trial

At trial, the Government plans to introduce portions of videos, certain photographs, and excerpts of documents found on the defendant's iPhones and in his barracks that are direct proof of his knowledge and intent relating to O9A and jihadist methods and ideology as he actively planned an ambush on the Unit by recruiting O9A and jihadist co-conspirators. The significant probative value of such materials—namely, their force in explaining to the jury the defendant's motive and intent in planning an O9A-inspired attack to be executed by violent jihadists— outweighs any potential prejudicial effect, particularly given that the Government will omit certain

especially graphic portions from the videos that it offers, as discussed below. Accordingly, the Government respectfully seeks a pretrial ruling that the materials discussed below are admissible.

## A. Relevant Facts

At trial, the Government expects to present expert testimony about O9A from Dr. Peter Simi, an expert on white supremacist and Neo-Nazi movements.[20] Such testimony will explain, in substance and among other things, that O9A is a white supremacist, Neo-Nazi, and Satanist group that professes admiration both for Nazi and jihadist figures alike. At the core of O9A's ideology is a militant support for the promotion of extreme violence in order to overthrow Western civilization. Over time, the group has embraced Islamist jihadist ideology and the violent tactics of jihadist groups, such as ISIS and al Qaeda, as a means to accelerate the decline of Western society. Dr. Simi will explain that leading white supremacist figures (including figures embraced by O9A) have voiced admiration for jihadists' abilities to effectively use violence to achieve global aims and have expressed an interest in emulating jihadist tactics to confront their shared enemies. O9A (and the white supremacist sources from which it draws) share with jihadist ideology the perception of a shared enemy (*i.e.*, Jews and the State of Israel), an ideological commitment to a culture of violence as a means to achieve ideological ends, and apocalyptic and accelerationist worldviews.

---

[20] On December 9, 2021, the Government provided notice to the defense of its intent to offer expert testimony from Dr. Simi on these topics. On January 26, 2022, the Government supplemented its notice regarding Dr. Simi's testimony.

From at least approximately April 2020 through the time of his arrest in June 2020, the defendant accessed and stored on his phones various videos, images, and documents promoting and glorifying jihadist and O9A ideology. At trial, the Government anticipates offering certain of these materials relating to jihadism (the "Jihadist Materials") and O9A (the "O9A Materials," collectively, the "Materials").[21] The Materials were culled down from a larger—and decidedly more graphic—set of jihadist and O9A materials located on Melzer's iPhones, including jihadist videos of civilian decapitations and point-blank shooting executions of civilians, a video depicting the lynching of a black woman by men standing in front of a Confederate flag, videos of Nazi propaganda from the Holocaust, and an image of a man standing in front of an O9A flag pointing an automatic weapon at a hooded and bound kneeling woman. As described below, the Government has identified a small and highly probative set of materials to introduce at trial.

**The Jihadist Materials**

The Jihadist Materials consist of five videos and one image accessed and saved on Melzer's iPhones.[22] As noted above, the Government has selected this limited set of jihadist propaganda from a broader collection saved on Melzer's devices. The Jihadist Materials principally contain propaganda films disseminated by jihadist media outlets. These videos glorify jihadists and, as

---

[21] The Government will provide the Court and defense with a copy of the Materials on a compact disc under separate cover. The Government reserves the right to identify additional materials that it intends to offer at trial, as the Government prepares and finalizes its exhibits.

[22] It appears that Melzer switched cellphones—from an iPhone 8 to an iPhone 11—on or about April 19, 2020. All but one of the jihadist videos are located on his iPhone 11. Both cellphones were recovered during the course of Melzer's arrest.

described further below, depict, in large part, jihadist fighters engaging in violent ambush operations against military targets, including attacks with assault rifles and improvised explosive devices.  Importantly, Melzer accessed and saved these videos during the precise time that he was planning the deadly ambush on his Unit to be carried out by jihadist fighters.

At trial, the Government plans to offer excerpts of the Jihadist Materials and to offer evidence and testimony explaining the metadata associated with those videos, which shows that Melzer accessed and saved the videos during the same time period that he was planning to use jihadist fighters to attack a U.S. military facility.  Those video excerpts, which are described in detail below, include footage of jihadists carrying out violent ambush operations and attacks against military personnel and facilities, as well as footage showing the lead-up to the execution of military captives.  The videos demonstrate the tactics, weapons, and capabilities of jihadist militants against military personnel.  As discussed below, it is essential for the jury to see such footage in order to understand Melzer's background research, his reasons for identifying jihadist groups as likely allies with the means, motivation, and experience to conduct an attack on his Unit, and his motive and intent when he transmitted national defense information to O9A members and jihadists in an attempt to ambush his Unit.

Each of the Jihadist Materials that the Government seeks to offer is described below.  As noted further below, in the first instance, the Government will not include in the excerpts offered at trial any footage of executions as they are actually carried out, footage showing mutilated bodies resulting from such executions, or audio from portions of the videos that is particularly graphic including, for example, the screams of an American soldier while he was being pursued by jihadist

fighters.  In particular, the Government seeks to offer the following five videos and one image

found on the defendant's cellphones:

- <u>GX 801.</u>  Approximately one minute excerpt of a nine minute video accessed by the defendant from Telegram on or about May 3, 2020, and then saved on his iPhone 11, depicting an ambush by jihadists on a military compound.  During the video, the jihadists attack a military installation and recover what appears to be a U.S. military uniform before setting the installation on fire.[23]  The video ends with an arrangement of weapons and material that appear to have been seized by jihadist forces.

  This video is probative of Melzer's research, motive, and intent in planning the ambush on his Unit and the Military Base.  Simultaneous to his planning discussions with co-conspirators regarding an attack on the Military Base executed by jihadists, Melzer was reviewing videos demonstrating the capacity of jihadist groups to ambush a military compound and the intent of these jihadist groups to target, in particular, U.S. military facilities and personnel.

- <u>GX 803.</u>  Approximately 14 second video accessed by the defendant from Telegram on or about April 25, 2020, and then saved on his iPhone 11, depicting jihadist propaganda of an improvised explosive device exploding under what appears to be a lightly armored vehicle, consistent with the type of vehicles operated by American or U.S.-allied forces in the Middle East.

  This video is probative of Melzer's research, motive, and intent in planning the ambush on his Unit.  The fact that Melzer was reviewing a jihadist video depicting a sophisticated roadside ambush on American or U.S.-allied forces is highly probative of his knowledge that jihadist groups can effectively ambush military convoys, a distinct plan Melzer discussed in his Telegram chats.   For example, on May 23, 2020, Melzer wrote about "a convoy coming through Turkey soon and date and time will be given soon."  Melzer subsequently provided the name of the road that the convoy was expected to take en route to the Military Base.

- <u>GX 804.</u>  Approximately 2 minute video from Telegram saved by the defendant on or about May 5, 2020, on his iPhone 11, depicting an attack by jihadists on a military compound. The video briefly depicts what appears to be a soldier who had been killed during the attack but does not include footage of the soldier's death.  During the video, the jihadists, using

---

[23] The un-excerpted video also depicts the body of what appears to be a soldier who had been killed during the attack and the brutal execution of several individuals by gunfire and knife.  The Government has excerpted these portions out of the video.

automatic weapons and heavy artillery, conquer the military compound and remove the flag of what appears to be Niger.

This video is probative of Melzer's research, motive, and intent in planning the ambush on the Military Base. Melzer's review and possession of a video depicting jihadists ambushing a military compound days before he sought to provide jihadists with information to ambush the Military Base is clearly probative of his awareness of jihadist capabilities and their ability to successfully attack military compounds.

- <u>GX 805.</u> Approximately 28 second video from Telegram saved by the defendant on or about May 24, 2020, on his iPhone 11, depicting a jihadist firing three mortars, which are weapons designed to be used at range to drop explosive or incendiary rounds on enemy targets, including targets in fortified positions.

  This video is probative of Melzer's research, motive, and intent in planning the ambush on his Unit and the Military Base. Melzer saved this video during the precise window of time that he was seeking to send sensitive information to jihadists for an attack on his Unit, including one that would likely involve mortar fire. For example, on the day after he saved this video, Melzer wrote the following on Telegram: "Again 40 people so a well hidden plt size element or even some mortar team could absolutely reek havoc." The video is thus probative of his awareness of specific jihadist capabilities involving mortars and jihadist abilities to effectively mount an attack on his Unit and the Military Base.

- <u>GX 810.</u> Approximately 44 second video from Telegram saved by the defendant on or about May 5, 2020, on his iPhone 8, depicting an attack by jihadists on a U.S. military convoy. Throughout the video, ISIS's black flag appears in the top right corner. The video appears to contain footage from the vantage point of a U.S. soldier wearing a helmet-mounted camera during the attack.[24] The video also briefly depicts what appears to be another U.S. soldier killed during the attack but does not include footage of the soldier's death. The video contains footage of what appears to be the bloody arm of the solider wearing the helmet camera. At the end of the video, another deceased solider is briefly depicted with blood on his knee and face; this portion of the video is not from the perspective of the helmet camera, but instead appears to depict a recording of one of the soldiers killed during the ambush after his equipment, boots, and weapon have been stripped from his body. The audio of the video appears to include the screams of the

---

[24] This footage appears to be video released as propaganda by ISIS in the wake of a 2017 ambush that resulted in the deaths of four American servicemen in Niger. *See, e.g.*, "In Niger Ambush, Rushing Into the Gunfire to Save the Fallen," N.Y. Times, May 10, 2018, https://www.nytimes.com/2018/05/10/us/politics/niger-report-video.html (retrieved January 25, 2022).

American soldier wearing the helmet-mounted camera as he is being pursued by jihadist fighters. The Government will play this video without audio.

This video is probative of Melzer's research, motive, and intent in planning the ambush on his Unit and the Military Base. That Melzer was viewing a video of a jihadist ambush on a U.S. military convoy days before he began sharing sensitive information about planning the exact same kind of attack is highly probative. The video also demonstrates Melzer's knowledge of the capacity of jihadist groups to ambush military convoys and the intent of these jihadist groups to target, in particular, U.S. military personnel.

- <u>GX 537.</u> A graphic, located in the defendant's iPhone 8 and accessed by him on or about May 28, 2020, with the title "Harvest of the Soldiers: Results of the Attacks by Islamic State Soldiers During the Week of 23rd Through 29th Sha'ban 1441," which appears to depict the number of soldiers killed by ISIS during attacks during a week in April 2020. The graphic claims that 247 soldiers were killed over 86 operations, claiming that 23 of them were "Crusaders," which appears to be a reference to soldiers serving in militaries from the West. The graphic also claims that ISIS destroyed 42 vehicles and 11 armored vehicles, and that the group burned two barracks.

This graphic is probative of Melzer's research, motive, and intent in planning the ambush on his Unit and the Military Base. Specifically, the graphic displays ISIS's attacks on Western forces in the Middle East, demonstrating Melzer's knowledge of the capabilities of jihadist groups to attack military targets, including military installations and vehicles.

**<u>The O9A Materials</u>**

The O9A Materials consist of 16 images, 12 documents, and 1 video obtained from Melzer's iPhones and barracks depicting his devotion to O9A through his possession of O9A symbols, literature, propaganda, and ideology. Again, these materials have been selected by the Government from a broader set of materials seized from Melzer's devices and his barracks. These materials—which outline O9A's ideology and illustrate, in combination with other evidence the Government plans to present at trial, Melzer's devotion to it—are crucial to understanding Melzer's decision to conspire with other O9A members in a plot to murder his fellow soldiers. In particular, these materials demonstrate how the defendant embraced O9A's ideology, including its

Neo-Nazi and Satanic elements. The O9A Materials also serve as crucial context for the jury to understand "insight roles" and their centrality to O9A's mission, which elucidate Melzer's purpose in joining the military and planning the ambush on his Unit.[25] The O9A Materials that the Government seeks to admit fall into the following categories:

- *O9A, Neo-Nazi, and Satanic Images, Documents, and One Video:*
  <u>GX 501, 508, 511, 513, 514, 535, 536, 802, 901 – 912</u>

  This category of exhibits consists of 7 images, 12 documents, and one video seized from the defendant's iPhones. These materials depict O9A and other Neo-Nazi and Satanic symbols, literature, and ideology. For example, GX 901 is a document titled "The Seven Fold Way Of The Order Of Nine Angles A Modern Practical Guide," which was accessed by the defendant on April 23, 2020, during the precise span of time that Melzer was communicating with O9A members, including CC-1, in advance of his deployment to the Military Base. The document describes in detail how to perform "insight roles" and even suggests the following role for O9A initiates: "Join the Police or one of the armed forces and live the active life that such a profession entails." Another example of evidence in this category is GX 513, an image, accessed by the defendant on May 1, 2020, depicting what appears to be an individual wearing a skull mask (akin to the one retrieved from the defendant's barracks) with the text "Rapists Its Time to Mobilize." Similarly, GX 511 is a picture of the O9A symbol alongside a photograph of Adolf Hitler and GX 514 is a picture of a Nazi soldier performing the Sieg Heil salute while a skull mask is transposed on the soldier's face. GX 536 is a picture of an individual in military fatigues arranging blocks of the explosive TNT into a Nazi swastika and GX 802 is a 28 second video depicting a man in military fatigues performing the Sieg Heil salute while holding a Nazi flag.

  As noted above, Melzer described Hitler as one of his heroes when he provided detailed responses to CC-1's vetting questions and expressed his Neo-Nazi views in order to join RapeWaffen. These materials corroborate Melzer's statements to CC-1 about his insight role in the military and are crucial to understanding Melzer's ideological alignment with O9A—including its Neo-Nazi elements—and his decision to conspire with O9A members in a plot to murder his fellow soldiers.

---

[25] As detailed further below, these materials outline O9A's concept of "insight roles," whereby O9A adherents attempt to infiltrate various organizations, such as the military, to try to gain training and subvert those groups from within. Melzer described to CC-1 that he previously conducted several insight roles for O9A and made clear to CC-1 that the purpose of his military service was to perform another "insight role" for O9A.

- *Photographs of O9A Symbols Taken by Melzer:*
  GX 502, 503, 505, 507, 512

This category of exhibits consists of five photographs seized from Melzer's iPhone 11 that depict O9A symbols alongside Melzer's possessions. For example, GX 512 depicts the O9A manifesto titled "The Sinister Tradition: Order of Nine Angles," along with a knife, a skull mask, and Melzer's Army beret. The book and the mask were retrieved during a subsequent search of Melzer's barracks. Similarly, GX 502 depicts the same book alongside what appears to be Melzer's rifle, and GX 503 depicts the book on top of a U.S. Army uniform with the U.S. Army "Airborne" patch clearly displayed.

These materials, among other things, help identify Melzer as the author of the Telegram messages in that they tie him—and notably, his military service—to O9A and its ideology, symbols, and practices. These images also corroborate Melzer's claims that he joined the military to perform an "insight role" for O9A. In showcasing Melzer's devotion to O9A, these photographs also provide important context for Melzer's decision to disclose sensitive information to O9A members in a plot to murder his fellow soldiers.

- *Photographs of Melzer Performing O9A Rituals:*
  GX 504, 506, 509, 510

This category of exhibits consists of four photographs, seized from the defendant's iPhone 11, depicting the defendant performing O9A rituals. For example, GX 506 depicts what appears to be the defendant holding up a book with blood smeared on a passage in the book. The book, with blood smeared on the same passage, was later retrieved during a search of Melzer's barracks. Similarly, GX 510 is a picture which appears to depict Melzer—hooded except for his eyes and nose—holding a knife with a bandage around his hand.

These materials demonstrate Melzer's commitment to O9A and are relevant to his motive and intent in revealing sensitive information to O9A members in a plot to murder his fellow soldiers. In particular, Melzer's performance of O9A rituals—including a ritual requiring him to cut his hand and draw blood—demonstrate his devotion to O9A and its practices. In addition to shedding light on his motive to provide O9A with information about his Unit, these materials are relevant to rebut any defense argument that Melzer's was merely living a digital fantasy in assisting O9A.

- *O9A and Anarchist Books Recovered from Melzer's Barracks:*

<u>GX 301 - GX 302</u>[26]

This category of evidence consists of two books recovered from the defendant's barracks at the time of his arrest, including the O9A manifesto titled "The Sinister Tradition: Order of Nine Angles," and "The Anarchist's Cookbook." The "The Anarchist's Cookbook" book contains detailed instructions for the manufacture and use of explosives and weapons.

These materials demonstrate Melzer's commitment to armed anarchist resistance and O9A. In addition, his possession of physical copies of the books provides important context for his motive and intent in revealing sensitive information to O9A members in a plot to murder his fellow soldiers.

For the reasons set forth below, the Materials are admissible as direct proof of the charged offenses, and alternatively are admissible pursuant to Rule 404b).

## B. Applicable Law

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of Evidence. *See* Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984). Rule 403 allows a trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

"To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d

---

[26] The Government intends to use the physical books located in Melzer's barracks as evidence. The Government will provide the Court and defense counsel with images of the books on the compact disc provided under separate cover.

Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."). Thus, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted); *see also United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (evidence is admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012))). "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted); *see United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is direct evidence (and not other act evidence under Rule 404(b)) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence"). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should

make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

Additionally, under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted). "Rule 403 does not bar evidence of other bad acts that 'did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged.'" *United States v. Lights*, No. 15 Cr. 721 (RWS), 2016 WL 7098633, at *2 (S.D.N.Y. Dec. 5, 2016) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).

Finally, Rule 403 requires the Court to evaluate whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Since any evidence that is probative of guilt is, by definition, prejudicial, Rule 403 is designed to reach only unfair or undue prejudice—that which "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotation marks omitted).

**C.  Discussion**

**1.  The Materials Are Admissible as Direct Evidence**

The Materials—nearly all of which were accessed by the defendant and saved on his iPhones during the precise period that he learned of the Unit's impending deployment in April and May 2020 and while he was planning a jihadist ambush against the Unit in discussions with fellow O9A members—are admissible as direct proof of the charged offenses.  As an initial matter, this evidence is not hearsay, as the Government does not seek to introduce the Materials for their truth.[27]  *See* Fed. R. Evid. 801(c); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013). Instead, the evidence is relevant to show the defendant's state of mind and participation in the charged offenses—in particular, his research, preparations, and knowledge and intent relating to O9A and jihadist methods and ideology as he actively planned an ambush on the Unit by recruiting O9A and jihadist co-conspirators. As explained below, the Materials are admissible for several reasons.

First, the Materials constitute direct evidence as to each of the charged crimes.  Beginning with Counts One through Four, each of these crimes requires the Government to prove that the defendant conspired, or attempted, to murder his fellow service members (for Counts One and Two, U.S. nationals abroad and for Counts Three and Four, U.S. service members).  Here, the evidence at trial will show that the defendant sent sensitive and actionable information to O9A— a group fiercely supportive of jihadist aims—with the explicit aim of facilitating a jihadist ambush

---

[27]Accordingly, the Government will propose for the Court's consideration a limiting instruction to be read at the time these materials are admitted.

on his Unit.  Evidence tending to prove that the defendant knew that jihadists regularly engage in operations designed to kill U.S. and allied soldiers—as displayed in the Jihadist Materials—is directly relevant to the Government's burden on these counts.  Moreover, and as discussed further below, Melzer's consumption and collection of these materials demonstrate his understanding of jihadist tactics, abilities, and methods, which, in turn, informed his decision to provide actionable information about his Unit's movements, armaments, numbers, and vulnerabilities to the very same type of attackers he was researching.  The evidence showing the defendant to be a practicing member of a pro-jihadist group such as O9A, including evidence showing Melzer participating in O9A rituals, possessing O9A literature, and consuming O9A propaganda similarly constitutes direct evidence of the charged offenses.

With respect to Count Five, to establish a violation of Section 2339A, the Government must prove that the defendant attempted to provide support "with the knowledge or intent that those resources were to be used to commit specific violent crimes."  *United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009) ("Section 2339A [in contrast to Section 2339B] requires instead that the defendant provide support or resources *with the knowledge or intent* that such resources be used to commit specific violent crimes.").  The specific violent crimes identified in the Indictment are conspiring to murder and maim persons abroad, the attempted murder of U.S. service members, and conspiring and attempting to murder U.S. nationals.  Evidence that tends to prove the defendant accessed and possessed propaganda materials relating to pro-jihadist groups (such as O9A) and showcasing jihadist tactics and exploits—including ambushing, attacking, and killing U.S. and allied service members—is directly relevant to this charge.  For instance, the O9A

Materials demonstrate Melzer's devotion to O9A and the pro-jihadist elements of its ideology, thereby providing crucial evidence to explain why the defendant disclosed sensitive information to O9A members in a plot to murder his fellow soldiers. Similarly, some of the Jihadist Materials show jihadist fighters carrying automatic weapons, firing mortars, and operating heavy artillery— all weapons designed to kill a large number of people and to inflict maximum damage, which is consistent with the defendant's desire to provide this information to—in his own words—facilitate a "mascal," or "mass casualty" attack on his Unit. The Jihadist Materials also demonstrate jihadist access to and attacks against American and U.S.-allied forces in the Middle East, the location of the Military Base. Even more pointedly, the fact that the defendant accessed and saved videos showcasing successful attacks by jihadists against military targets during the precise time when he was planning the ambush on his Unit is highly probative of his intent to carry out such an attack. Indeed, the timing of his accessing the videos demonstrates that he was conducting necessary research and diligence for the operation, providing crucial evidence of his motive and intent. *See Abu-Jihaad*, 630 F.3d at 133-34 (affirming district court's finding that the "pro-jihadist contents of the [terrorist propaganda] videos were relevant to understanding [the defendant's] motive and intent"); *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) (holding that videos, images, and literature that defendant had "absorbed and endorsed" were admissible to establish that defendant was "inspired by terrorist rants" and "developed an anti-American animus" that culminated in his decision to travel to Yemen to join al Qaeda); *United States v. El-Mezain*, 664 F.3d 467, 509-10 (5th Cir. 2011) (holding that material seized from defendant, "including images of violence and videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the

[defendant] to support Hamas"); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011) (holding that televised interview with Usama bin Laden was properly admitted as "state of mind evidence"); *United States v. Hossain*, No. 19 Cr. 606 (SHS), Dkt. No. 158 at 13-21 (S.D.N.Y. Sept. 29, 2021) (granting Government's *in limine* motion to admit jihadist propaganda materials as relevant to Section 2339A charge); *United States v. Ullah*, No. 18 Cr. 16 (RJS), Dkt. No. 48 at 4-5 (Oct. 30, 2018) (allowing the introduction of terrorist propaganda materials possessed by defendant as, among other things, proof of the defendant's state of mind and motivation); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. No. 96 at 13-17 (S.D.N.Y. Jan. 5, 2018) (granting Government's *in limine* motion to admit jihadist propaganda materials found on electronic devices seized from defendant, explaining that the "materials bear on whether Alimehmeti had the required state of mind," as "Alimehmeti's possession of them suggests that he was supportive of terrorist ideology in general and of ISIS in particular"); *United States v. Pugh*, 162 F. Supp. 3d 97, 114 (E.D.N.Y. 2016) (noting that "[t]he Second Circuit has regularly allowed terrorist propaganda to be admitted, particularly in the context of material support offenses, in order to prove the *mens rea* element of the offense").

The Materials also constitute direct evidence as to Counts Seven and Eight, which charge Melzer with illegally disclosing national defense information, in violation of 18 U.S.C. §§ 793 and 794, respectively. Both of these statutes, as charged, require the Government to prove that Melzer disclosed information with the intent or reason to believe that such information could be used to cause injury to the United States. *See Abu-Jihaad*, 630 F.3d at 133-34 (noting that to convict the defendant of a violation of § 793(d), the Government must prove, among other things, that the

defendant "had reason to believe that such information could be used to the injury of the United States or to the advantage of any foreign nation."); *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2021 WL 5232617, at *11 (S.D.N.Y. Nov. 9, 2021) (noting that to convict the defendant of a violation of § 793(b), the Government must prove, among other things, that the defendant "acted with the purpose of obtaining information respecting the national defense and with the intent or reason to believe the information was to be used to the injury of the United States"). Evidence that Melzer was familiar with the ideology and capabilities of both O9A and jihadist groups is directly relevant to showing Melzer's intent to cause "injury" to the United States by providing sensitive information to them, and his reason to believe that the information he disclosed would be used for that purpose.

Relatedly, the Materials are also relevant to rebut any defense argument that the defendant never intended to actually facilitate a deadly ambush but that he was only puffing, exaggerating, or fantasizing when he provided actionable intelligence about his Unit and the Military Base to members of O9A.[28] Indeed, evidence that Melzer accessed and saved jihadist content on his own cellphones is relevant to show that he was serious about his jihadist affinities and carrying out the ambush. Moreover, Melzer's possession and consumption of the Jihadist Materials show that he was fully aware of the consequences of a jihadist attack on his Unit and the risks to himself and his fellow soldiers, undermining any potential claim that he did not believe this information—

---

[28] As described above, in certain post-arrest interviews, the defendant claimed that he only shared information about his Unit because he wanted to impress the participants in the RapeWaffen Division Telegram channel and that his Telegram messages were satire or dark humor.

which he repeatedly asked in the Telegram chats be widely disseminated to anyone with access to a jihadist audience—would harm the United States. Similarly, evidence that defendant performed O9A rituals, and consumed O9A literature and propaganda are probative of his allegiance to the group and its violent and pro-jihadist aims. These Materials are highly probative of the defendant's knowledge and intent by helping establish that he knew and intended that information about the Unit, its movements, its weaponry, and its security—put in the hands of capable jihadists—would lead to the murder of U.S. service members at the Military Base.[29]

Finally, evidence that the defendant possessed and accessed the Materials is inextricably intertwined with other evidence of the defendant's actions in furtherance of an O9A and jihadist plot to kill his fellow service members, such that presentation of those materials to the jury is necessary for the jurors to understand the complete story of the defendant's conduct and intent. *See Reifler*, 446 F.3d at 91-92 (evidence is admissible to "enable the jury to understand the complete story of the crimes charged"). The fact that the defendant accessed and possessed the O9A Materials—including materials directing O9A members to conduct insight roles in the military—on his own cellphones and maintained physical copies in his barracks corroborates his statements that he joined the military to perform an insight role for O9A. This similarly provides

---

[29] Section 2339A does *not* require that the defendant have the specific intent to commit the underlying offense for which the defendant provides material support, only that the defendant provided the charged support or resources with knowledge "that they are to be used in preparation for, or in carrying out" the underlying offenses. *See* 18 U.S.C. § 2339A(a); *see Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 586 n.9 (E.D.N.Y. 2005) ("Sections 2339A and 2339C only require knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts. Neither requires the specific intent to aid or encourage the particular attacks.").

further corroboration of Melzer's claimed devotion to the group's jihadist aims, which is relevant to show Melzer's intent in facilitating an attack on his fellow service members. In the same vein, for the jury to understand, for instance, why the defendant believed that sharing this information with O9A members and jihadists would lead to a deadly attack, it is appropriate for the jury to see videos—the same videos Melzer himself consumed and saved as he plotted the attack with the CCs—depicting how jihadists attack military forces, convoys, and installations, as well as treat military captives. The Jihadist Materials also contextualize and corroborate Melzer's statement to members of the RapeWaffen Division that he "[u]sed to be cool with a couple IS [Islamic State of Iraq and al-Sham or ISIS] members," an admission Melzer made while outlining the planned attack and one that seems to have been intended to establish his bona fides with respect to his willingness to actually follow through on the ambush and articulate his longstanding support for jihadists. For all these reasons, the Materials are direct evidence of the offenses in the Indictment.

### 2. The Materials Are Admissible Pursuant to Rule 404(b)

As explained above, the Materials are properly admitted as direct proof of the charged offenses. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is not considered other act evidence under Rule 404(b) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *Gonzalez*, 110 F.3d at 942)); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence, and thus not governed by Rule 404"). The Materials are also admissible as Rule 404(b) evidence for several

reasons, including to prove Melzer's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident.

*First*, with respect to all of the counts in the Indictment, the Materials are admissible as evidence of Melzer's knowledge, motive, and intent to commit the charged crimes. As detailed above, the Materials are highly probative of Melzer's knowledge of the existence, goals, activities, and capabilities of jihadist groups and O9A, and of his motive and intent for knowingly and intentionally conspiring with members of O9A and jihadists in a plot that would result in the murder of his fellow service members. Furthermore, these materials—many of which were accessed and saved on the defendant's devices in the weeks leading up to, or during, the time he was sharing sensitive information about his Unit and the Military Base—help establish that Melzer was motivated by his fervent support of O9A and jihadist ideology. Indeed, courts have approved this type of evidence in other terrorism trials. *See, e.g.*, *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) (affirming admission of Rule 404(b) evidence showing that defendant charged with providing material support to al Qaeda had also "associated with terrorist groups other than al Qaeda," as such evidence was "highly probative of [the defendant's] state of mind, including his intent and knowledge" (internal quotation marks omitted)); *United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) (admitting the defendant's speeches, writings, and preaching because they made motive for the crimes charged more probable); *United States v. Ali*, 799 F.3d 1008, 1026-27 (8th Cir. 2015) (affirming admission of Rule 404(b) evidence showing that defendant charged with providing material support to al Shabaab (a designated FTO) had

associated with another jihadist group generally aligned with al Shabaab, as such evidence "helped to establish [the defendant's] intent for the charged crimes").

*Second*, also with respect to all counts in the Indictment, the Materials are probative of Melzer's plan and preparation. Melzer was accessing and storing videos demonstrating the capacity of jihadist groups to ambush military compounds, fire mortars, and attack military convoys simultaneous to his planning discussions with co-conspirators regarding those precise modes of attack by jihadists. Furthermore, he was relying on pro-jihadist O9A members to help further the attack by sharing with them crucial details about his Unit and the Military Base to ensure the success of the ambush. Thus, materials that prove Melzer was conducting due diligence on jihadist capabilities and research on O9A pro-jihadist ideology shed light on his plans and preparation for the ambush. *See, e.g.*, *United States v. Kassir*, 2009 WL 976821, at * 6 (S.D.N.Y. Apr. 9, 2009) (holding that evidence seized from Kassir's residence that Kassir associated with terrorist groups is admissible to prove defendant's motive, intent, preparation, knowledge, and absence of mistake or accident).

*Third*, the Materials are also probative of Melzer's absence of mistake and lack of accident. The Materials make clear that Melzer understood what might happen if he provided actionable information about his Unit to a pro-jihadist group such as O9A and that he also understood what might happen if jihadists used that information to attack his Unit and the Military Base, namely the likely death of fellow service members. *See United States v. Mostafa*, 16 F. Supp. 3d 236, 257 (S.D.N.Y. 2014) ("The defendant's statements regarding the importance of violent jihad, the use of words as a method a waging jihad, and training for jihad are directly relevant to numerous counts

43

of charged conduct. They are probative of the defendant's knowledge of jihad, motive to support jihad, absence of mistake in taking actions that might be construed as supporting jihad, and intent to support jihad.").

Accordingly, and for the reasons described above, the Materials are admissible as Rule 404(b) evidence.

### 3. The Materials Do Not Violate Rule 403

Importantly, admission of the Materials, as direct evidence or pursuant to Rule 404(b), will not run afoul of Rule 403. The probative value of this evidence—which, again, is only a small subset of the jihadist and O9A-related propaganda located on Melzer's cellphones—is not outweighed, much less "substantially outweighed," by any risk of unfair prejudice. The defendant attempted to murder members in his own U.S. Army unit by sharing sensitive information with sworn enemies of our country infamous for their brutal tactics. This evidence is highly probative of the defendant's knowledge and intent to commit these crimes, as described above. For that reason, this evidence is prejudicial—but only insofar as it tends to prove the defendant's guilt. *See, e.g.*, *Constantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (noting that "virtually all evidence is prejudicial to one party or another," and so "to justify exclusion under Rule 403 the prejudice must be *unfair*" (emphasis added)). But the mere fact that the evidence tends to prove the defendant's guilt does not render this evidence *unfairly* prejudicial; indeed, the excerpts selected by the Government for use at trial will not depict the extreme graphic violence, such as torture, executions and beheadings, which were present in several videos found in the defendant's possession. The Second Circuit has long made clear that evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly

prejudicial. *See, e.g.*, *Herzog*, 203 F.3d at 174; *United States v. El-Mezain*, 664 F.3d at 508-11 ("Because this [is] a case about supporting terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity. It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial."). Here, the charged crimes are unquestionably "sensational" and "disturbing"; they relate to a U.S. army paratrooper's scheme to murder his fellow American service members by having jihadists ambush them.

The Second Circuit's decision in *Abu-Jihaad* is instructive. The defendant in *Abu-Jihaad*, a U.S. Navy signalman who served on a destroyer in the Persian Gulf, communicated the anticipated movements of a U.S. Navy battlegroup to persons supportive of violent jihad and was subsequently convicted of violating two statutes charged here, 18 U.S.C. §§ 2339A and 793(d). The Second Circuit affirmed the district court's determination that the probative value, on the question of the defendant's motive and intent, of video excerpts offered by the Government that depicted violent combat scenes—"including an execution and a suicide truck bombing"— outweighed the risk of undue prejudice. *Abu-Jihaad*, 630 F.3d at 113 n.12, 132-34. The Second Circuit observed that, "[a]lthough these excerpts included depictions of violence, as was necessary not to distort the sense of the films as a whole, the depictions were limited and . . . less gruesome than many seen on nightly news dispatches from Baghdad." *Id.* at 102 (internal quotation marks omitted). The district court, in the ruling affirmed by the Second Circuit, held that because the videos glorified martyrdom and the killing of non-believers, they constituted significant evidence of the defendant's intent. *See United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 128 (D. Conn.

2008) ("[I]t is difficult—if not impossible—for the Government to give the jury an accurate sense of the nature of these videos without playing for the jury some of the violent and graphic portions of the videos.  Otherwise the jury would have an inaccurate sense of their content.").  Furthermore, the district court also noted that while the videos "are violent and depict bloody and sometimes dismembered fighters and soldiers," they are probative because, among other things, "the Government in this case will have to answer the question of why Mr. Abu–Jihaad would send information to terrorists that could be used to blow up the very ship on which he was stationed." *Id.* at 127-28.

The same applies with equal force here.  The Government will need to explain both *why* the defendant wanted to plan an ambush on his fellow soldiers and show *how* he was serious about carrying it out.  In that vein, and as explained above, the Materials—which demonstrate Melzer's acute understanding of the capabilities and ideologies of jihadists and O9A—are not divorced from the charged conduct; rather, they constitute powerful, direct evidence of the *mens rea* required for Counts One through Eight.

Furthermore, as reflected in the descriptions set forth above, some of the Jihadist Materials do not contain any particularly graphic content.    And to the extent that the Materials depict violence (such as explosions, the use of artillery, or the firing of automatic weapons), this violence is mostly depicted impersonally and the most graphic of the violence has been excerpted out.  *See, e.g.*, *Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. No. 96 at 13-17 (granting Government's *in limine* motion to admit jihadist propaganda materials following similar proposal by the Government to edit out the most graphic elements of the videos); *Pugh*, 162 F. Supp. 3d at 117-18 (admitting ISIS

propaganda videos located on defendant's laptop showing mass executions and the rounding up and beheading of prisoners, provided that the Government edited the clips that it showed at trial to leave out the executions and beheadings, reasoning that while the proffered clips "show[] executioners, wielding knives, in the moments before an unseen execution," which is naturally "viscerally disturbing," such evidence "speaks strongly to [the defendant's] state of mind" and was not "unduly prejudicial"). While the Government anticipates briefly summarizing certain of the violence that has been omitted from the excerpts played at trial through the testimony of a law enforcement witness, the Government will not seek to play those portions of the videos for the jury. Moreover, the Government has sought to further address concerns about potential prejudice by restricting its offer of available terrorist propaganda to that which is directly probative of elements of the charges, as described above.

Finally, the Government notes that, to the extent the Court has any concern about the risk of unfair prejudice in connection with the admission of the Materials, any such concern can be addressed through a limiting instruction to the jury. *See United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence was "not especially worse or shocking than the transactions charged" and district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"); *Abu-Jihaad*, 630 F.3d at 134 (proper limiting instruction minimizes risk of undue prejudice from admission of relevant terrorist propaganda materials); *see, e.g.*, *Pugh*, 162 F. Supp. 3d at 118 ("[T]o the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at the request of the Defendant.").

In sum, the Materials are plainly relevant to establishing Melzer's commission of the charged offenses, and any risk of unfair prejudice does not substantially outweigh the probative value of the evidence, particularly given that the Government will not play or offer certain particularly graphic portions of those materials at trial. Accordingly, the Government respectfully requests that the Court enter an order that such evidence is admissible at trial.

## II. Statements of Melzer's Co-Conspirators Are Admissible

At trial, the Government will offer statements of the defendant's co-conspirators (specifically, CC-1 and CC-3) identified in the Background section above. These statements are admissible as co-conspirator statements, pursuant to Rule 801 (d)(2)(E), and as statements against interest, pursuant to Rule 804 (b)(3). The statements—which the Government will introduce from Telegram chats pulled from Melzer's iPhone 11—were made in the course of communications between the co-conspirators and Melzer during the charged conspiracies, and will be offered in conjunction with the defendant's plainly admissible statements from those exchanges.

### A. Applicable Law

#### 1. Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part, "A statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171,

175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 2. Rule 804 (b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804 (b)(3), the proponent of the statement must show by a preponderance

of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804 (a)(5)(B).

"A statement will satisfy Rule 804(b)(3)' s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning, and not made in coercive

atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

## B. Discussion

The statements of CC-1 and CC-3 that the Government will offer at trial, including those described above, are admissible as co-conspirator statements and as statements against interest.

As described in more detail in the Background section above, CC-1 was the administrator of the Telegram channel affiliated with O9A known as "RapeWaffen Division." *See supra* at 6. By at least late-April 2020, Melzer and CC-1 exchanged Telegram messages regarding Melzer being an O9A member, which CC-1 explained was a prerequisite to joining the RapeWaffen Division. CC-1 then vetted Melzer—asking him 40 questions regarding Melzer's knowledge of and adherence to O9A dogma and practices—before providing him access to the RapeWaffen Division channel. *See supra* at 12. After Melzer learned of his Unit's deployment, Melzer transmitted information via the Telegram channel to CC-1 and CC-3, among other participants in the RapeWaffen Division channel, regarding, among other things, the location of the Military Base in Turkey, the number of soldiers who would be guarding the installation, and their weaponry. *See supra* at 16-24.

CC-1 and CC-3 asked Melzer follow-up questions about the ambush and the Military Base, requesting information, in particular, about the defensive capabilities of the facility and the troops stationed there. *See supra* at 20-24. CC-1 also identified CC-2 to Melzer as a member of the Grey Wolves, who joined al Qaeda. Melzer responded optimistically regarding CC-2's potential to help with the attack. *See supra* at 16. Thus, CC-1 and CC-3's above-described statements—all made either in the immediate lead-up to, or during, the same conversation in which Melzer provided

51

sensitive information to facilitate the deadly ambush of his fellow servicemembers—were clearly in furtherance of the charged conspiracies.

The above-described statements of the referenced co-conspirators are also admissible under Rule 804(b)(3). Both of these co-conspirators whose statements the Government seeks to admit are presently unavailable because they appear to be citizens of countries other than the United States and reside outside the United States. *See United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where located outside United States at time of trial). In his post-arrest interviews, Melzer identified CC-1 as a Canadian resident who previously served in the Canadian armed forces as a paratrooper. Based on our investigation to date, it appears that CC-1 is likely a minor based in Canada who was posing as a Canadian ex-paratrooper. Similarly, in his post-arrest interviews, Melzer identified CC-3 as a Turkish or Arab male in his 20s or 30s, located in Turkey, approximately 1,000 miles from the Military Base. CC-3 also wrote in Telegram chats that he was located outside the United States. In addition, both CC-1 and CC-3 are likely to invoke the Fifth Amendment if they were questioned under oath regarding these activities. *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."). Each of the co-conspirators' statements were made in the context of helping to further Melzer's unlawful plot to attack his Unit by passing national defense information to jihadists. These statements, therefore, "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true." *Dupree*, 870 F.3d at 80; *see also Ortiz*, 962 F. Supp. 2d at 573. In addition, the statements

are sufficiently reliable because they were made in confidence to the defendant, or to others in the RapeWaffen Division channel, "whom the declarant[s] believe[d] [were] all[ies], not . . . law enforcement official[s]." *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995).

### III. Statements by Individuals Not Alleged to be Co-Conspirators that Are Necessary to Understand Melzer's Statements Are Admissible for that Non-Hearsay Purpose

The statements of the CS and Individual-1 described in the Background section above are also admissible. While the Government is not alleging that these individuals joined the charged conspiracies, Melzer made statements to them that are admissible and probative of his criminal conduct. The Government intends to offer these individuals' statements, which were made in the course of direct correspondence with Melzer, not for the truth of the matter asserted, but for the limited purpose of placing Melzer's plainly admissible statements in context and enabling the jury to understand those statements.

As an initial matter, many of these statements are questions, instructions, or proposals. *See, e.g.*, *supra* at 24 (the CS asked Melzer "what makes you think that you can actually get away with fucking with the US military[?]"). Such statements are categorically not hearsay because such statements are not offered for the truth. *See United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." (internal quotation marks omitted)).

To the extent that these individuals' statements are not covered by the aforementioned categories of non-hearsay, the Government seeks to offer such statements for the limited purpose

of placing Melzer's statements in context and not for the truth of any matters asserted.  *See, e.g.*, *supra* at 9 (Melzer responded to an inquiry from Individual-1 about whether Individual-1 should join the U.S. Marine Corps, writing "Good luck it's great for training . . . Just don't become a fuckin patriot . . . Train and get the fuck out . . . I'm not patriotic for shit . . . All of these places the vast majority deserve to be burned.").  It is well settled that statements of witnesses not appearing at trial are properly admitted for this limited purpose.  *See United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) (upholding admission of statements of "informant who is heard in a tape-recorded conversation with the defendant[,] [s]o long as the informant's recorded statements are not presented for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused"); *see also United States v. McNair*, 46 F. App'x 658, 659-60 (2d Cir. 2002) (upholding admission of recordings between defendant and non-testifying informant where informant's statements "were not offered to prove the truth of the matters asserted but only to render what [the defendant] said in these conversations intelligible" (internal quotation marks omitted) (citing *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995)); *United States v. Romano*, No. 12 Cr. 691 (JFK), 2014 WL 69794, at *1 (E.D.N.Y. Jan. 8, 2014) (same); *United States v. Walker*, No. 99 Cr. 379 (BSJ), 1999 WL 777885, at *4 (S.D.N.Y. Sept. 29, 1999) (same).

## IV.  The Defendant Cannot Offer His Own Out-of-Court Statements

The Government's proof at trial will consist, in part, of statements made by the defendant, including from his Telegram chats and post-arrest interviews.  These statements, when offered by the Government, are not hearsay and are admissible as the statements of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).

The same is not true, of course, for the defendant: "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *accord United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)). Nor does the so-called "rule of completeness" somehow transform or "render admissible evidence that is otherwise inadmissible." *United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983); Fed. R. Evid. 106. Instead, the rule of completeness requires admission of a hearsay statement only when the statement (or a portion thereof) is "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (emphasis added) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)). The burden of showing that some additional portion of a statement is necessary to clarify or explain the already-admitted portion of that statement rests with the defendant. *See United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

Accordingly, courts routinely preclude defendants from offering their own self-serving statements, including through cross-examination of the Government's witnesses. *See, e.g.*, *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (affirming trial court's preclusion of portion of tape that included defendant's "own self-serving statements"); *United States v. Bumagin*, 136 F.

Supp. 3d 361, 375 (E.D.N.Y. 2015) ("Defendant is precluded from cross-examining the Government's witnesses in an effort to elicit exculpatory statements made by Defendant because such statements are inadmissible hearsay."). Under this well-settled law, the defendant should not be permitted to offer his own out-of-court statements, including statements made in Telegram chats or during his post-arrest interviews, unless and until the defendant first establishes that the statement is admissible pursuant to a hearsay exception or provision of law.

## V. The Court Should Permit the Implementation of Limited Measures to Protect the True Name of the Military Base

The Government respectfully requests that the Court prohibit the use of the true name of the Military Base at trial; require the parties to refer to the installation as "the Military Base"; and preclude the defense from revealing, or eliciting testimony that would reveal, the true name in open court. If the Court approves these limited protective measures, the Government intends to additionally substitute the Military Base for the true name of the base within Government exhibits.

Disclosure of the Military Base's true name in open court—in combination with the specific details about the facility shared by the defendant in his Telegram chats, the latter of which will necessarily be revealed as part of the Government's case-in-chief—would pose a significant risk to the security of the Military Base and the troops guarding the facility. Indeed, as the defendant himself acknowledged in his Telegram chats, the very purpose of his revealing sensitive details about the Military Base and its potential security vulnerabilities was to facilitate a deadly attack at the base. The testimony and exhibits at trial will include information shared by the defendant such as the number of soldiers who would be guarding the installation, their weaponry (including what weapons they lacked), and which modes of attack would be most successful given

56

the topography surrounding the Military Base.  Because disclosure of the name of the facility in combination with those details would cause serious prejudice to the U.S. government and national security, the Government has not identified the true name of the facility in open court or in unsealed or unclassified submissions in this case.

Courts in this district routinely adopt limited protective measures—including approving sealing, redactions and substitutions—when important national security or law enforcement concerns are at issue.  *See, e.g.*, *United States v. Doe*, 629 F. App'x 69, 73 (2d Cir. 2015) ("The district court properly determined that sealing was required in order to serve the Government's compelling interest in promoting safety and ongoing national security investigations."); *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 3764662, at *4 (S.D.N.Y. July 22, 2019) (authorizing substitutions for names of offices and facilities used by the CIA due to national security concerns if the true names and locations were revealed); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 488 (S.D.N.Y. 2018) (partially closing courtroom to protect the identities and physiognomies of undercover agents on the basis that revealing this information in open court could "compromise important national security interests"); *United States v. Urena*, 8 F. Supp. 3d 568, 572-74 (S.D.N.Y. 2014) (approving undercover agent's use of a pseudonym at trial to, among other things, protect the agent's safety); *cf. Kewazinga Corp. v. Microsoft*, No. 18 Civ. 4500 (GHW), 2021 WL 1222122, at *3 (S.D.N.Y. Mar. 31, 2021) ("Higher values that may justify the sealing of documents include national security concerns . . . .").  Here, the true name of the Military Base is irrelevant to the charges against Melzer.  Indeed, the name of the facility itself does not "make a[ny] fact more or less probable than it would be without the evidence" nor is it "of

57

consequence in determining the action." Fed. R. Evid. 401. Yet, as described above, disclosure of this information at trial would unnecessarily risk harm to national security and the safety of U.S. troops stationed at the facility.

Notably, the fact that that certain information about the Military Base appears to have been released on the Internet has no bearing on the Government's request. None of the publicly available information about the Military Base ties it to this specific case and the security details Melzer shared about the facility. In any event, courts have repeatedly recognized that "in the arena of intelligence and foreign relations," there can be "a critical difference between official and unofficial disclosures." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). For example, "[i]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *ACLU v. Dep't of Def.*, 492 F. Supp. 3d 250, 265 (S.D.N.Y. 2020) (citing *Alfred A. Knopf Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)). "Rumors and speculations circulate" and can "get into print," and "others may [then] republish [that] previously published material," but such reports are properly understood "as being of uncertain reliability" and insufficient for courts to displace the Executive Branch's expert judgment that "damage [to] the national security" could reasonably be expected from disclosing sensitive information possessed by those with first-hand knowledge of the Nation's sensitive intelligence and law enforcement activities. *Id*. at 1368, 1370. Such determinations based on expert assessments of the potential for harm to national security are therefore "generally unaffected" by whether the information is asserted to have entered "the realm of public knowledge." *Halpern v. FBI*, 181 F.3d

279, 294 (2d Cir. 1999). Thus, notwithstanding the existence of limited open-source reporting about the Military Base, the Government respectfully submits that a pseudonym should be used when referring to the facility at trial.

Accordingly, the Government respectfully requests that the Court implement the proposed limited protective measures to ensure the true name of the Military Base is not disclosed at trial.







## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated: New York, New York
February 1, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:    \_\_\_\_/s/_____
Samuel S. Adelsberg
Matthew J.C. Hellman
Assistant United States Attorneys

Cc:    Defense Counsel
(Via ECF)