United States District Court
Southern District of New York
-----------------------------------------------

United States of America,

        -against-

                                                                                   S1 20 Cr. 314 (GHW)

Ethan Melzer,

                Defendant.

-----------------------------------------------

## ETHAN MELZER'S MOTIONS *IN LIMINE* AND FOR A BILL OF PARTICULARS

                                                                       Federal Defenders of New York
                                                                       Attorney for Ethan Melzer
                                                                       52 Duane Street - 10th Floor
                                                                       New York, New York 10007
                                                                       Tel.: (212) 417-8700

                                                                       *Of Counsel*


To:    Damian Williams, Esq.
        United States Attorney
        Southern District Of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn:  Samuel Adelsberg, Esq.
                  Matthew Hellman, Esq.
                  Assistant United States Attorneys

**Contents**

Table of Authorities ........................................................................................................................... i

I.   The Court should require the government to identify all of Melzer's known co-conspirators at least 45 days before trial. ................................................................................................. 1

　　A.   Background .................................................................................................................. 1

　　B.   Law ............................................................................................................................... 3

　　C.   The government should be required to identify all known co-conspirators at least 45 days before trial. ......................................................................................................... 4

II.  The Court should preclude the proposed testimony of Dr. Peter Simi. ................................ 6

　　A.   Background .................................................................................................................. 6

　　B.   Law ............................................................................................................................... 8

　　C.   The Court should preclude Dr. Simi's testimony. ..................................................... 10

　　D.   In the alternative, the Court should hold a *Daubert* hearing. ................................... 14

III. The Court should permit a limited amount of attorney-conducted voir dire. ..................... 14

Conclusion ..................................................................................................................................... 16

# Table of Authorities

**Federal Cases**

*Borawick v. Shay*, 68 F.3d 597 (2d Cir. 1995) .................................................................. 14
*Bruestle-Kumra v. Abbott Labs.*, 2017 WL 2241507 (E.D.N.Y. May 22, 2017) ........................ 10
*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001) ......... 14
*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .............................................. 8, 9, 14
*Dover v. British Airways, PLC*, 2017 WL 2480898 (E.D.N.Y. June 5, 2017) ............................ 14
*In re Omeprazole Pat. Litig.*, 490 F. Supp. 2d 381 (S.D.N.Y. 2007) ........................................... 9
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ........................................................ 10, 14
*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ............................... 12
*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) .................................................. 12
*McCullock v. H.B. Fuller Co.*, 981 F.2d 656 (2d Cir. 1992) ....................................................... 13
*Nimely v. City of New York*, 414 F. 3d 381 (2d Cir. 2005) .................................................. 9, 10
*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) ......................................................................... 9
*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) ........................................................ 13
*United States v. Barnes*, 158 F.3d 662 (2d Cir. 1998) .................................................................. 4
*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................................ 3
*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004) ..................................................................... 8
*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ........................................................ 9, 12
*United States v. Duvall*, 272 F.3d 825 (7th Cir. 2001) ............................................................... 10
*United States v. Mahaffy*, 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) ................................... 11
*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................ 3
*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ..................................................... 11, 12, 13
*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ............................................... 4
*United States v. Norris*, 2010 WL 11463301 (N.D.N.Y. Aug. 24, 2010) ................................... 15
*United States v. Oruche*, 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008) ................................. 3, 4, 5
*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018) ....................................... 3
*United States v. Valentin*, 2016 WL 1211304 (D. Conn. Mar. 25, 2016) .................................. 10
*United States v. White*, 492 F.3d 380 (6th Cir. 2007) ............................................................... 10

**Federal Rules**

Fed. R. Crim. P. 7(f) ....................................................................................................................... 3
Fed. R. Crim. P. 16(a)(1)(G) .................................................................................................. 6, 7, 8
Fed. R. Crim. P. 24(a)(1) ............................................................................................................. 14
Fed. R. Evid. 403 ........................................................................................................................... 9

Fed. R. Evid. 702 ................................................................................................... 8, 9
Fed. R. Evid. 703 ...................................................................................................... 12

Ethan Melzer respectfully moves this Court for an order 1) requiring the government to identify all of his known co-conspirators at least 45 days before trial; 2) precluding the proposed testimony of Dr. Peter Simi; and (3) permitting a limited amount of attorney-conducted voir dire.

**I.  The Court should require the government to identify all of Melzer's known co-conspirators at least 45 days before trial.**

### A.  Background

Melzer is charged by superseding indictment (the "S1 indictment") with, as relevant, three conspiracy counts (Counts One, Three, and Six).[1] *See* ECF No. 31. Each count alleges that he conspired with "others known and unknown" from "at least in or about 2019 up to and including in or about May 2020" to murder members of his U.S. Army unit, which was stationed abroad. *See id.* ¶¶ 1, 7, 15. Paragraph three of the S1 indictment lists a series of alleged overt acts that applies to all three conspiracy counts. All of these overt acts occurred in the 12 days from May 14 to May 25, 2020, and concerned Melzer's participation in exchanges of electronic communications in various "channels," or, "chat rooms," of certain messaging applications. *E.g.* ¶ 3(a) ("On or about May 14, 2020, MELZER sent an electronic message that stated, in substance and in part, that MELZER believed that his 'military training, survival, [and] links to other groups' could be useful to other members of the extremist group Order of the Nine Angles ('O9A').");  ¶ 3(b) ("On or about May 17, 2020, MELZER exchanged electronic communications in an O9A-related chatroom regarding the anticipated deployment of MELZER's U.S. Army unit and passed information regarding the deployment to a purported member of al Qaeda.");  ¶ 3(c) ("On or about May 23, 2020, MELZER sent electronic communications to participants in an

---

[1] The government has informed the defense that it anticipates dropping Count Six prior to trial. This would not impact Melzer's request for particulars.

1

O9A-related chat group, in which MELZER wrote, in substance and in part, that he was 'risking [his] literal free life' by disclosing information regarding his unit's deployment and was 'expecting results'; that his 'life would be absolutely meaningless in the amount of shit it [i.e., the attack] would cause'; that the attack would cause a 'new war'; and that the attack would result in 'mascal,' which another participant explained meant 'mass casualty.'").

Though the indictment does not identify any specific co-conspirators, the government, in its opposition to Melzer's pretrial motions, so identified four of the chat participants ("CC-1" through "CC-4"). For example, the government describes CC-1 as "the administrator of a Telegram channel affiliated with O9A known as 'RapeWaffen Division,'" and says that its investigation has revealed that "CC-1 is likely a minor based in Canada who was posing as a Canadian ex-paratrooper." ECF No. 71 at 1, 4 n.2. The government alleges that Melzer began communicating with CC-1 "in or about April 2020," *id.* at 1, which was either before, or at roughly the same time, he began communicating with CC-2, -3, and -4. The government has not identified any other co-conspirators in any court filing or in any disclosure to the defense.

The government has claimed that it will establish at trial that Melzer "joined the conspiracy in the United States when he adopted O9A's murderous ideology [prior to 2019] and enlisted in the Army [in late 2018] while planning to use his anticipated military training" to further the conspiracy. *Id.* at 28.[2] And, in discovery, the government has produced thousands of online communications, dating back to at least 2018, involving Melzer and a large number of

---

[2] The government appears to argue that because Melzer purportedly "joined" O9A prior to 2019, and because "one of the principal goals of O9A is infiltrating institutions like the military," *id.* at 31, Melzer is guilty of joining the charged conspiracy at the time that he allegedly joined O9A. It is not clear when the government believes that to have taken place, beyond the imprecise claim that Melzer "became a follower of O9A well before he joined the military." *Id.* at 4.

2

other individuals on multiple online platforms.[3] Marvinny Decl. ¶ 3 (Ex. A). Yet the government has not identified a single individual with whom he supposedly conspired at any time prior to April 2020.

**B.    Law**

Fed. R. Crim. P. 7(f) authorizes the Court to direct the government to particularize its evidence. "The purpose of a bill of particulars is to supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 301–02 (S.D.N.Y. 2018) (quoting *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010)). In determining whether to order particulars, courts "must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).

"In considering a request for particulars as to the names of unindicted coconspirators, a court considers the following factors: (1) the number of co-conspirators, (2) the duration and breadth of the alleged conspiracy, (3) whether the Government otherwise has provided adequate notice of the particulars, (4) the volume of pretrial disclosure, (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct, and (6) the potential harm to the Government's investigation." *United States v. Oruche*, 2008 WL 612694, at *3 (S.D.N.Y. Mar. 5,

---

[3] Because of the format in which these communications have been produced—primarily through extraction reports of Melzer's various electronic devices—it is difficult to precisely quantify the amount of discovery at issue. But it is equivalent to many thousands of pages of documents. Marvinny Decl. ¶ 3.

3

2008) (citing *United States v. Nachamie,* 91 F. Supp. 2d 565, 572–73 (S.D.N.Y. 2000)). As the court wrote in *Nachamie*:

> If there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met. If the Government has failed to provide adequate notice of the particulars, or if the discovery has been voluminous, identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial.

91 F. Supp. 2d at 572–73.

### C. The government should be required to identify all known co-conspirators at least 45 days before trial.

Melzer's case, as framed by the date ranges in the S1 indictment and as described in the government's opposition to his pretrial motions, exemplifies the type of "conspiracy count cover[ing] a complex series of events over a number of years" where a bill of particulars identifying co-conspirators is appropriate. *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998); *see also Oruche*, 2008 WL 612694, at *4 (where charged narcotics conspiracy spanned a number of years, requiring the identification of "any known unindicted co-conspirator with respect to each paragraph of the Indictment in which the word 'others' appears"). Accordingly, the Court should order that, at least 45 days prior to trial, the government specifically identify Melzer's known co-conspirators. The government should be required to identify these individuals at a minimum by their screen names and, if known, by providing their true identities.

In a case in this District with similar facts—*United States v. Gilberto Valle*, 12 Cr. 847 (PGG), which involved allegations that Valle had agreed with others over the internet to kidnap, cook, and eat various women—Judge Gardephe ordered the government to identify Valle's alleged co-conspirators in advance of trial. *See* ECF No. 40 at 7 (Jan. 9, 2013) (Ex. B). Judge Gardephe found that the following factors, among others, supported disclosure: the large number

of Valle's potential co-conspirators (more than 20); the duration and breadth of the charged conspiracy (about 10 months); the fact that Valle allegedly conspired with others over the internet, meaning that his co-conspirators could be anywhere in the world; and the large volume of discovery the government had produced. *Id.* at 7–8. Judge Gardephe held that, in light of these factors, the defense was entitled to know who the government would contend were co-conspirators in order to avoid unfair surprise at trial. *See id.* at 8 (requiring particulars where "the defense must prepare for the possibility that the Government will argue at trial that anyone of more than 20 individuals is a co-conspirator").

Each of these factors is present in Melzer's case to the same degree or more so than in *Valle*. Melzer chatted with scores of people online between 2018 and 2020, meaning that his co-conspirators could be numerous and could be located anywhere in the world. And the government has produced voluminous discovery concerning his online communications, yet has not specified any of his alleged co-conspirators beyond the four discussed above. This Court should therefore conclude, in accord with Judge Gardephe's reasoning in *Valle*, that Melzer will be prejudiced at trial absent the government's disclosing this information.

Finally, there are no countervailing factors militating against disclosure. For example, there is no risk that identifying unindicted co-conspirators will threaten any ongoing investigation, as Melzer's arrest was highly publicized by the government and he has been in custody for well over a year and a half. *See Oruche*, 2008 WL 612694, at *4.

For these reasons, the Court should require the government to identify all known co-conspirators at least 45 days before trial.

## II. The Court should preclude the proposed testimony of Dr. Peter Simi.

### A. Background

The government alleges that Melzer was a member of the Order of Nine Angles ("O9A"). The complaint describes O9A as "a Satanic anarchist group founded in the United Kingdom and now operating around the world, including in the United States." ECF No. 1 at ¶ 11(a). According to the complaint, "O9A has expressed, among others, Satanic, anarchist, neo-fascist, neo-Nazi, and anti-Semitic beliefs," ¶ 11(b), and has indicated support for Usama bin Laden, Nazi Germany, and the violent overthrow of Western civilization. ¶ 11(c)–(e). The complaint says that O9A (here, referred to as "ONA") describes its organizational structure like this:

> The criteria for belonging to the ONA is th[e] pursuit of similar, sinister, subversive interests, aims, and life-styles, together with the desire to co-operate when it is beneficial to them and the pursuit of our shared aims. There is thus no formal ONA membership, and no Old-Aeon, mundane, hierarchy or even any rules.

¶ 11(a) (alteration in original).

Melzer denies belonging to O9A. Though O9A-related texts were found in his possession upon his arrest, and though he claimed online to have self-initiated into O9A, in his post-arrest statements to law enforcement he repeatedly denied having joined. He said instead that his claims of membership were bluster—falsities designed to impress the people he was communicating with online. Melzer—who when speaking to law enforcement repeatedly erroneously referred to the group as the Order of the Nine "Angels"—explained that, though he had some "curiosity" about O9A, he believed it was "weird," "out there," and "pretty much a cult," and considered its beliefs to be the "polar opposite" of his own. Marvinny Decl. ¶ 4.

On December 9, 2021, the government advised pursuant to Fed. R. Crim. P. 16(a)(1)(G) that it would seek to call Dr. Peter Simi, an Associate Professor of Sociology at Chapman

University, "to testify as an expert on white supremacist movements, including the Order of Nine Angles ('O9A')." Gov't Expert Notice Letr. at 1 (Ex. C). The notice, which attached Dr. Simi's CV (Ex. D) and transcripts of two examples of his prior testimony, provides:

> The Government plans to offer testimony from Dr. Simi regarding O9A history, leadership, philosophy, structure, goals, objectives, and means and methods, including: (i) current and historical sources and influences on O9A's ideology and objectives, including Neo-Nazi and white supremacist ideology and groups (such as the Temple ov Blood and Atomwaffen), Islamist jihadist ideology and groups (such as al Qaeda), and Satanic, fascist, occultist, and anarchist ideologies and groups; (ii) O9A literature, including The Sinister Tradition; (iii) key events in O9A's history, including historical acts of violence perpetrated by O9A members and associates; (iv) the organization's use of encrypted messaging applications (such as Telegram) to recruit members and further its objectives; (v) the meaning and significance of certain terms (including slang words), images, symbols, and other content used by O9A members and associates, including terms, images, symbols, and other content located in the defendant's electronic devices, online accounts, and other materials recovered during the investigation of this case; (vi) O9A structure and organization in the United Kingdom, the United States, and elsewhere, including particular O9A subgroups; and (vii) O9A methods and tactics, including the promotion of "insight roles," which refer to the group's practice of infiltrating organizations, including law enforcement and the military, to further the goals of O9A.

Gov't Expert Notice Letr. at 1.

After receiving this notice, Melzer requested by letter dated January 11, 2022, that the government provide additional information concerning Dr. Simi's proposed testimony. Def. Letr. at 1 (Ex. E). Melzer requested that the government supply any opinions Dr. Simi would offer and the bases for those opinions, and an explanation of how Dr. Simi is qualified to provide expert testimony on O9A, including whether he had ever researched or written or testified about O9A previously. *Id.*

The government responded with supplemental notice by letter dated January 26, 2022. The supplemental notice states that Dr. Simi has "studied the originating influences of far-right

extremist groups, the links between Satanism, paganism, Neo-Nazism, and white supremacist ideology, and the direct and indirect connections between white supremacists and jihadists." Gov't Sup. Notice at 1 (Ex. F). The supplemental notice further provides that Dr. Simi's testimony

> will be based on a synthesis of, among other things, Dr. Simi's review of academic literature (including peer-reviewed articles) concerning white supremacist and Neo-Nazi groups; extensive online research, including review of online gathering spaces for white supremacist, Neo-Nazi, and accelerationist groups, including O9A, on online platforms including Telegram and Discord; review of publicly-available O9A materials, including primary source documents such as books, essays, and Internet blog posts; and his field research embedded with white supremacist and Neo-Nazi groups.

*Id.* at 2.

The supplemental notice also contains a more detailed list of topics Dr. Simi will cover, including "O9A's origins within the white supremacist movement"; "O9A literature and philosophy"; "O9A structure"; "The convergence of O9A and jihadists"; "O9A's emphases on deception and violence"; "O9A's use of certain terms, images, symbols and memes"; and "O9A's use of encrypted messaging applications." *Id.*

 **B.** **Law**

Fed. R. Crim. P. 16(a)(1)(G) requires the government to provide a "written summary of [expert] testimony that the government intends to use" that "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Pursuant to Fed. R. Evid. 702, the Court acts as a "gatekeeper" for expert testimony to ensure that such testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004). Before admitting proffered expert testimony, the Court must conclude not only that such testimony is reliable, but that it "fits" the facts of the case and will thereby assist the

jury in understanding the evidence or some factual issue in dispute. *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702. "[E]ven if the methodology used by the expert is considered to be reliable, the expert's testimony will nevertheless fail to meet the 'fit' requirement and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *In re Omeprazole Pat. Litig.*, 490 F. Supp. 2d 381, 401 (S.D.N.Y. 2007) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 67–68 (2d Cir. 1997)).

Expert testimony must also satisfy Rule 403 and may be excluded if its "probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; *see United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("Even if the testimony is admissible under Rule 702, it still must pass muster under Rule 403: Its probative value must not be substantially outweighed by unfair prejudice."). As the Second Circuit has cautioned, "[t]he very breadth of the discretion accorded trial judges in admitting [expert opinions] under Rules 702 and 403 should cause them to give the matter more, rather than less, scrutiny. A trial judge should … weigh carefully the risk of prejudice." *Nimely v. City of New York*, 414 F. 3d 381, 397 (2d Cir. 2005) (quotations omitted).

A threshold issue is whether a witness is qualified as an expert to render a proposed opinion. *See id.* at 396. "The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not rationally based on his or her perception." *Id.* at 396 n.11 (cleaned up). Thus, "whether a witness's area of expertise [is] technical, scientific, or more generally 'experience-based,' Rule 702 require[s] the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

9

intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 399 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Id.* at 399 n.13. The trial court "retains the screening function traditionally played by trial judges, and must determine whether the expert is qualified to testify in the specific or specialized area at issue." *N.K. by Bruestle-Kumra v. Abbott Labs.*, 2017 WL 2241507, at *3 (E.D.N.Y. May 22, 2017) (quotations and alterations omitted).

As for the expert notice itself, the notice is inadequate where it merely informs the defense of the "general subject matters to be covered" but does not "identify what opinion the expert w[ill] offer on those subjects." *United States v. White*, 492 F.3d 380, 407 (6th Cir. 2007) (quotations omitted); *see also United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("[The] government's notice did not adequately summarize or describe [the expert's] trial testimony. The Rule requires a summary of the expected testimony, not a list of topics."); *United States v. Valentin*, 2016 WL 1211304, at *2 (D. Conn. Mar. 25, 2016) (finding expert notice insufficient and ordering additional disclosures where "the letter does not identify the substance of his opinions").

### C. The Court should preclude Dr. Simi's testimony.

Applying these principles, the Court should preclude Dr. Simi's proposed testimony because (1) the government's notices contain only a list of topics and do not identify what opinions, if any, Dr. Simi will offer; (2) certain proposed topics are plainly irrelevant and prejudicial; (3) Dr. Simi lacks expertise about O9A specifically; and (4) Dr. Simi's testimony

about O9A appears to be based primarily on publicly available documents to which he will not have applied any particular expertise.

To begin, the government's notices contain only a list of topics and do not identify what opinions, if any, Dr. Simi will offer. This is inadequate, and by itself warrants preclusion. *See United States v. Mahaffy*, 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (precluding expert testimony because "the disclosure statement only proffered general topics and did not describe any opinions that would be offered by the witness on these topics").

Moreover, certain proposed topics are so inherently irrelevant and prejudicial that *any* testimony about them would violate Rule 403. For example, testimony about "key events in O9A's history, including historical acts of violence perpetrated by O9A members and associates," Gov't Expert Notice Letr. at 1, is irrelevant to Melzer's case and carries a risk of prejudice that substantially outweighs whatever minimal probative value it might have. *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 202 (2d Cir. 2008) (remanding for new trial where district court admitted expert testimony concerning prior acts of violence committed by defendants' gang).

Next, the notices do not establish Dr. Simi's qualifications to testify as an expert on O9A specifically, as opposed to the white supremacist movement more broadly. It appears that he has never researched or written (or testified) about O9A. For example, the lone book he has written, *American Swastika: Inside the White Power Movement's Hidden Spaces of Hate*, does not mention O9A at all. None of the other publications included in Dr. Simi's CV concern O9A, either. And his "field research embedded with white supremacist and Neo-Nazi groups," Gov't Sup. Notice at 2—which he has testified he conducted primarily from 1997 to 2004 in the west, southwest, and Pacific northwest—does not appear to have involved meeting or interviewing any purported active or former members of O9A.

11

This raises the question of how Dr. Simi will have arrived at any of his still-unidentified opinions about O9A. The government suggests that his testimony will be based on a variety of sources, including his "review of academic literature," "online research," "review of publicly-available O9A materials," and "his field research." *Id.* But, as discussed, his field research does not appear to have concerned O9A; and to the extent he will rely on "online research" or similar sources, these sources would likely constitute hearsay, and the government has not identified any sort of scientific or otherwise-reliable methodology he might apply to them. This additional consideration renders his testimony inadmissible. *See, e.g., Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013) ("Although the Rules permit experts some leeway with respect to hearsay evidence, Fed. R. Evid. 703, 'a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'" (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007))); *Dukagjini*, 326 F.3d at 59 (ruling testimony inadmissible where expert was repeating hearsay evidence "without applying any expertise").

This case is analogous to *Mejia*, where the Second Circuit remanded the matter for a new trial based on the district court's erroneous admission of expert testimony. The witness was a state police officer called as a gang expert to provide background on MS-13. 545 F.3d at 186–87. The officer's testimony was reportedly based on a variety of sources, including his own experience as a task force officer, interviews of gang members, other law enforcement reports, and internet and media research. *Id.* at 187, 194. The Circuit found that the officer was sufficiently qualified to testify as an expert and that these are the sorts of materials upon which an expert might reasonably rely. *See id.* at 194, 197. But the Circuit nonetheless found his testimony improper because (i) the testimony concerned many matters the average juror could

12

easily understand based on factual evidence and (ii) the officer's testimony was largely based on hearsay, which he transmitted to the jury without applying any real methodology. *Id.* at 194–98. Dr. Simi's testimony, which will rely heavily on his review of publicly available information, suffers from the same problems that caused the Circuit to reverse in *Mejia*.

Dr. Simi's lack of first-hand familiarity with O9A is particularly problematic because, to the extent reliable information on O9A exists, it shows that O9A is anything but a "traditional" white supremacist group. According to the complaint, O9A has no "formal membership, hierarchy, or even any rules." ECF No. 1 at ¶ 11(e) (cleaned up). And material provided by the government in discovery describes O9A as primarily an occultist group that practices a brand of "esoteric Satanism" that has caused traditional white supremacist groups to distance themselves from it. *See, e.g.*, SITE Intelligence Group, *Neo-Nazis Denounce Occultists Associated with Terror Plot, Favor Optics-Friendly Groups* (June 25, 2020) (Ex. G). Thus, to the extent O9A is even a coherent or identifiable organization, it is not like the kinds of white supremacist organizations Dr. Simi has studied, and the government has provided no reason to conclude that whatever expertise he possesses would necessarily apply to O9A. He should not be permitted to testify as an "expert" on O9A absent that showing. *See, e.g.*, *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) ("[A] district court may properly conclude that witnesses are insufficiently qualified … because their expertise is too general or too deficient."); *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657–58 (2d Cir. 1992) (affirming preclusion of testimony where plaintiff's proffered expert did not possess the requisite qualifications to testify as an expert on the proposed subject).

### D. In the alternative, the Court should hold a *Daubert* hearing.

In the alternative, the Court should hold a *Daubert* hearing to test Dr. Simi's qualifications and expertise concerning the proposed topics of his testimony. In *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The trial court must conclude that the "proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting *Daubert*, 509 U.S. at 597). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.'" *Kumho Tire Co.*, 526 U.S. at 141. The Second Circuit has stated that *Daubert* hearings are "highly desirable to enable the parties to present expert evidence and to test credibility through cross examination." *Borawick v. Shay*, 68 F.3d 597, 608 (2d Cir. 1995); *see also Dover v. British Airways*, *PLC*, 2017 WL 2480898, at *7 (E.D.N.Y. June 5, 2017). Here, the Court should hold a hearing because the government has failed to provide sufficient information about Dr. Simi's qualifications to testify about O9A or to describe any of his opinions and how he reached them.

### III. The Court should permit a limited amount of attorney-conducted voir dire.

Melzer requests that the Court permit each side 30 minutes of attorney-conducted voir dire as a complement and addition to the Court's voir dire. Fed. R. Crim. P. 24(a)(1) explicitly allows this, and attorney-conducted voir dire is a more effective tool for eliciting bias than questioning conducted by judges alone. Jurors are likely to feel less inhibited about offering candid responses

to an attorney than to the judge, to whom the jurors may feel more compelled to provide the "correct" answer due to the judge's role in the proceeding.

Moreover, the trial judge is necessarily less familiar with the evidence and the issues involved in a case than are the parties. This concern is particularly present in Melzer's case, which implicates a number of sensitive issues—touching on racism, misogyny, Satanism, and anti-Semitism, among others—with which jurors will have to contend. Jurors are likely to have strong feelings about these issues that can only be explored through precise questioning to uncover biases and prejudices. Such questioning is more easily accomplished by the adversarial parties.

Finally, judicial-economy concerns do not counsel against allowing some attorney-conducted voir dire. While a limited amount of additional time may be required, it should not seriously impact the flow of court business. And, for the reasons discussed, the attorneys' voir dire might ultimately be even more efficient than the Court's, given the attorneys' keen familiarity with the evidence in Melzer's case. The Court accordingly should permit a limited amount of attorney-conducted voir dire. *See, e.g.*, *United States v. Norris*, 2010 WL 11463301, at *1 (N.D.N.Y. Aug. 24, 2010) ("Given the Court's wide discretion in this area, and its belief that assistance from counsel during voir dire would be beneficial, the Court grants Defendant's Motion for partial counsel-conducted voir dire examination.") (citations omitted).

—

## Conclusion

The Court should grant Melzer's motions *in limine* and for a bill of particulars.

New York, New York
February 1, 2022

Respectfully submitted,

/s/ _____
Sarah Baumgartel
Jonathan Marvinny
Hannah McCrea
Ariel Werner
Assistant Federal Defenders
212.417.8792
jonathan_marvinny@fd.org