United States District Court

Southern District of New York

-------------------------------------------------

United States of America,

                -against-

                                        S1 20 Cr. 314 (GHW)

Ethan Melzer,

                        Defendant.

-------------------------------------------------

### ETHAN MELZER'S OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

                                        Federal Defenders of New York
                                        Attorney for Ethan Melzer
                                        52 Duane Street - 10th Floor
                                        New York, New York 10007
                                        Tel.: (212) 417-8700

                                        *Of Counsel*

To:   Damian Williams, Esq.
       United States Attorney
       Southern District Of New York
       One St. Andrew's Plaza
       New York, New York 10007
       Attn:  Samuel S. Adelsberg, Esq.
               Matthew J.C. Hellman, Esq.
               Assistant United States Attorneys

**Contents**

Table of Authorities .................................................................................................................. i

Preliminary Statement ............................................................................................................ 1

I.   The Court should preclude, or at least limit, the government's proposed "jihadist" and
     "O9A" materials. ............................................................................................................ 2

     A.   "Jihadist" materials .............................................................................................. 3

     B.   "O9A" materials .................................................................................................. 6

II.  The Court should defer ruling on the government's motion to admit statements of CC-1
     and CC-3. ........................................................................................................................ 9

     A.   The government has not shown that either CC-1 or CC-3 was in a conspiracy with
          Melzer. ................................................................................................................. 9

     B.   The government has not shown that CC-1 and CC-3 are unavailable or that their
          statements are sufficiently trustworthy. ............................................................ 12

III. While other individuals' statements may be admissible, the Court should preclude
     Melzer's statements to Individual-1. .......................................................................... 14

IV.  The Court should apply the rule of completeness to admit Melzer's own prior
     statements. .................................................................................................................... 15

V.   Melzer should be permitted to introduce evidence containing the Military Base's
     true name. ..................................................................................................................... 18

VI.  ███████████████████████████ .......................................................................... 21

Conclusion ............................................................................................................................ 24

## Table of Authorities

**Federal Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 10

*Estelle v. Williams*, 425 U.S. 501 (1976) .............................................................. 21

*Holmes v. South Carolina*, 547 U.S. 319 (2006) .................................................. 18

*Kewazinga Corp. v. Microsoft*, 2021 WL 1222122 (S.D.N.Y. Mar. 31, 2021) .......... 19

*Luce v. United States*, 469 U.S. 38 (1984) .............................................................. 9

*Phoenix Assocs. III v. Stone*, 60 F.3d 95 (2d Cir. 1995) ........................................ 15

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) .................................. 4, 6

*United States v. Alimehmeti*, 284 F. Supp. 3d 477 (S.D.N.Y. 2018) ........................ 19

*United States v. Birney*, 686 F.2d 102 (2d Cir. 1982) .............................................. 2

*United States v. Castro*, 813 F.2d 571 (2d Cir. 1987) ............................................ 15

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ............................................ 11

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) ............................................. 8

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) .............................................. 9

*United States v. Gotti*, 457 F. Supp. 2d 395 (S.D.N.Y. 2006) ................................ 17

*United States v. Hurtado*, 47 F.3d 577 (2d Cir. 1995) ............................................ 10

*United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) .......................................... 15

*United States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014) ........................................... 6

*United States v. Losada*, 674 F.2d 167 (2d Cir. 1982) ............................................ 12

*United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002) ...................................... 21

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ............................................... 15

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994) ...................................... 13, 14

*United States v. Mostafa*, 7 F. Supp. 3d 334 (S.D.N.Y. 2014) ..................... 21, 22, 23

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) ...................... 12

*United States v. Pintado-Isiordia*, 448 F.3d 1155 (9th Cir. 2006) .......................... 14

*United States v. Pugh*, 162 F. Supp. 3d 97 (E.D.N.Y. 2016) .................................... 4

*United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006) ................................ 20

*United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977) .................................... 10, 11

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1994) ........................................ 2, 15

*United States v. Savoca*, 335 F. Supp. 2d 385 (S.D.N.Y. 2004) .............................. 13

*United States v. Schulte*, 436 F. Supp. 3d 747 (S.D.N.Y. 2020) .............................. 20

*United States v. Schulte*, 2019 WL 3764662 (S.D.N.Y. July 22, 2019) ...................... 19

*United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980) .......................................... 12

*United States v. Thomas*, 757 F.2d 1359 (2d Cir. 2002) ..................................... 21, 23

*United States v. Tomero*, 486 F. Supp. 2d 320 (S.D.N.Y. 2007) ............................................ 22, 23

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989) .......................................................... 23

*United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y. 2014) ................................................. 19

*United States v. Vargas*, 2018 WL 6061207 (S.D.N.Y. Nov. 20, 2018) ................................. 18

*United States v. Vario*, 943 F.2d 236 (2d Cir. 1991) ............................................................. 21

*United States v. Walia*, 2014 WL 3734522 (E.D.N.Y. July 25, 2014) ..................................... 18

*United States v. Williams*, 927 F.2d 95 (2d Cir. 1991) ......................................................... 13

**Federal Statutes**

18 U.S.C. § 793(d) .................................................................................................................. 19

18 U.S.C. § 794(a) .................................................................................................................. 19

**Federal Rules**

Fed. R. Evid. 106 ............................................................................................................. 15, 17

Fed. R. Evid. 401 ................................................................................................................... 2

Fed. R. Evid. 402 ................................................................................................................... 2

Fed. R. Evid. 403 ............................................................................................................. 4, 15

Fed. R. Evid. 611(a)(1) ......................................................................................................... 16

Fed. R. Evid. 801(d)(2)(E) ..................................................................................................... 9

Fed. R. Evid. 804(b)(3) .......................................................................................................... 9

Ethan Melzer respectfully submits this memorandum of law in opposition to the government's motions *in limine*.

## Preliminary Statement

The charges in this case are sensational, the facts less so: No "jihadist ambush" on Melzer's unit happened, none was close to happening, and Melzer had no intention of seeing one happen. In post-arrest interviews with law enforcement he made clear that he never intended to see an attack occur and that he believed that his interlocutors were "jokers" who similarly had no intentions or capabilities of orchestrating one. Melzer was correct. The most active chat participants were fundamentally misrepresenting themselves—including the CS, who was working with the FBI, and CC-1, who, despite claiming to be a former Canadian paratrooper who had been injured during combat in Iraq, was in fact a mentally ill 15 year old who had been hospitalized for psychiatric care just months before he began communicating with Melzer.

The government's efforts to paint Melzer as an O9A-devotee committed to murdering his fellow soldiers are overblown. The Court should preclude, or at least restrict, much of the government's proposed evidence. Nor should the Court permit the government to cherry pick Melzer's prior statements, including those in his online chats and his three post-arrest interviews, while simultaneously seeking to preclude him from introducing contemporaneous statements from the same sources that meaningfully rebut them. To that end, the Court should apply the rule of completeness to ensure that the government's presentation of evidence does not leave the jury with a misimpression of what Melzer actually said, particularly during his post-arrest interviews, which amounted to full-throated denials of the most serious charges against him. Fairness requires that the jury know the full story.

For the reasons that follow, the Court should grant some of the government's requests, deny others, and reserve decision on those where the issues have not yet ripened. We address the government's requests in order:

## I.   The Court should preclude, or at least limit, the government's proposed "jihadist" and "O9A" materials.

The government seeks to admit photographs and portions of videos and documents recovered from Melzer's electronic devices and barracks that it characterizes as "jihadist" and "O9A" materials. The government claims that these materials are admissible as direct evidence and under Rule 404(b). *See* Gov't MIL 23–48. As to the "jihadist" materials, the Court should either preclude them outright or, at the least, trim the volume of material it permits the jury to see. As to the "O9A" materials, the Court should admit some, but exclude others as irrelevant or unduly prejudicial or cumulative. For all materials the Court admits, it should issue a limiting instruction regarding what inferences the jury may draw from them.

The fundamental legal principles at issue are straightforward. Evidence is relevant if "it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is generally admissible, Fed. R. Evid. 402, but may be excluded under Rule 403 where "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In applying Rule 403, a "district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1994) (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982)).

### A.    "Jihadist" materials

The government describes these materials (five videos and one image) generally as "propaganda [materials] disseminated by jihadist media outlets" that "glorify jihadists" engaged in "violent ambush operations against military targets" and "the lead-up to the execution of military captives." Gov't MIL at 25–26.[1] These materials are not only inflammatory; they are also irrelevant to any charge in Melzer's case and should be precluded.

Melzer is not accused of committing any actual act of violence. Nor is he accused of belonging to or providing support to ISIS, al Qaeda, or any other identifiable "jihadist" group. The government instead accuses him of belonging to O9A (a claim Melzer denies), which is described in materials produced by the government as a white supremacist and occultist group that practices "esoteric Satanism." Though the government says that "O9A has found common cause with and admiration for Islamist jihadist ideology," Gov't MIL at 4, to the extent that description is accurate, it is hardly O9A's defining feature; O9A is not, for example, a designated foreign terrorist organization. Despite these facts, the government seeks to introduce videos depicting horrific acts of violence that have nothing to do with Melzer or his case, committed by jihadist groups with which he is not alleged to be affiliated.

Melzer will not contest at trial that ISIS and other jihadist groups are willing and able to commit deadly attacks on U.S. military compounds and soldiers using a variety of weapons, including mortars. And, as the government will inform the jury, Melzer admitted in his post-arrest statements to disclosing information about his unit's upcoming deployment in online chats.

---

[1] Though the videos were recovered from Melzer's iPhones, we do not concede that he had actually watched any of them. The government represents that it can prove that he did; obviously this is something the government must demonstrate at trial in order for the videos to have any relevance to his case.

*See* Gov't MIL at 22. It is therefore hardly "essential," *id.* at 26, that the jury see these "jihadist" materials in order to decide any material fact. *Cf. United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010) (admitting jihadist videos in defendant's possession partly to establish his *mens rea* where evidence that he had transmitted sensitive information to jihadist organization was only circumstantial).

To the extent the materials are marginally relevant, they should be precluded under Rule 403 since they contain disturbing depictions of violence that are likely to inflame the jury. To begin, it matters not that the materials were "culled down" from a larger, "more graphic" set of materials. Gov't MIL at 25. Each item the government seeks to introduce must satisfy Rule 403, both individually and when viewed in connection with the other items. *See* Fed. R. Evid. 403 (court may exclude "needlessly [] cumulative evidence"). The "jihadist" videos the government seeks to admit do not pass that test. For example, multiple videos contain images of dead soldiers, including U.S. soldiers, which would be particularly prejudicial imagery given the accusations in this case. *See generally United States v. Pugh*, 162 F. Supp. 3d 97, 117 (E.D.N.Y. 2016) (precluding an ISIS "Kill Obama" video on Rule 403 grounds because "a jury is likely to have a viscerally negative reaction to an image of the shooting of an American President"). Moreover, the videos are entirely in Arabic and include Arabic text and singing and chanting and so, beyond communicating a general enthusiasm for violence, convey no meaningful information to a non-Arabic-speaking viewer like Melzer. *See id.* (preclusion warranted where video was "entirely in Arabic and d[id] not contain subtitles," meaning that, beyond a "broad message" of violence, "the video would have offered Pugh very little information about ISI[S]'s organization, goals, or operation[s]").

4

At bottom, admitting these videos would serve only to cause the jury to imagine an attack that never occurred, was never close to occurring, and that Melzer never believed would occur. That is, in the absence of any actual attack or any actual plan of attack, the government will use these videos' graphic depictions of unrelated attacks as proxies in the jurors' imaginations. This is inappropriate.

To the extent the Court is inclined to admit some of the "jihadist" materials, the Court should decline to admit the videos in favor of the graphic at GX 537, which the government describes like this:

GX 537. A graphic, located in the defendant's iPhone 8 and accessed by him on or about May 28, 2020, with the title "Harvest of the Soldiers: Results of the Attacks by Islamic State Soldiers During the Week of 23rd Through 29th Sha'ban 1441," which appears to depict the number of soldiers killed by ISIS during attacks during a week in April 2020. The graphic claims that 247 soldiers were killed over 86 operations, claiming that 23 of them were "Crusaders," which appears to be a reference to soldiers serving in militaries from the West. The graphic also claims that ISIS destroyed 42 vehicles and 11 armored vehicles, and that the group burned two barracks.

Gov't MIL at 29. This graphic tends to establish the same concepts as the videos and would suffice to show that Melzer was aware of ISIS and other jihadist groups' capabilities and intentions, while sparing the prejudice of the jury's seeing gratuitously violent videos. It would therefore be a sensible compromise to admit the graphic but not the videos.

If the Court is nevertheless inclined to admit some videos, at the least the Court should trim the volume of material and edit the admitted evidence to remove unnecessarily inflammatory segments. In particular, the videos at GX 801, 804, and 810 are violent and upsetting, yet have zero evidentiary value. GX 801—which depicts an attack on a military compound in an unidentified location—shows individuals recovering a U.S. military uniform before setting the compound on fire. GX 804—which depicts another attack on a military compound, this one apparently in Niger—shows individuals firing multiple times into a soldier's

5

lifeless body. And GX 810—which depicts an attack on a U.S. military convoy in an unidentified location—shows multiple dead U.S. soldiers' bodies covered in blood, and the bloody and mangled arm of an additional soldier who is apparently filming via helmet-mounted camera. Even with the government's proposal to play GX 810 without audio, Gov't MIL at 29, its contents are far too disturbing to be admitted. Meanwhile, there is no connection between the disturbing images on any of these three videos and the chats that the government intends to present as Melzer's plan of attack. The Court should therefore preclude them or meaningfully edit them.

Finally, if the Court admits any "jihadist" materials, it should issue a limiting instruction regarding what inferences the jury may draw from the evidence. *See Abu-Jihaad*, 630 F.3d at 133. In particular, the Court should tell the jury that Melzer is not on trial for committing the acts depicted in the materials, for holding certain religious or political views, or for sympathizing with any jihadist organization. And the Court should specifically caution the jury that Melzer has a First Amendment right to view and possess the materials. *See United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014) (approving similar instructions).

### B.    "O9A" materials

These materials consist of 16 images, 12 documents, and one video, which the government breaks down into four subcategories: (1) O9A, neo-Nazi, and satanic images, documents, and one video; (2) photographs of O9A symbols taken by Melzer; (3) photographs of Melzer performing O9A rituals; and (4) O9A and anarchist books recovered from Melzer's barracks. Gov't MIL 29–32. The government says these materials "outline O9A's ideology and illustrate, in combination with other evidence the Government plans to present at trial, Melzer's devotion to it." *Id.* at 29.

We do not dispute that, under Rule 401's broad definition of relevance, some of these materials are admissible to help establish Melzer's state of mind, including his knowledge of O9A and its ideology. But the government can establish everything it wants in that regard with far fewer materials than it seeks to admit. The Court accordingly should preclude certain materials as irrelevant, cumulative, or unfairly prejudicial. Specifically, we object to the following government exhibits:

- GX 504: This photograph of an individual holding a knife is irrelevant unless the government can establish that it actually depicts Melzer performing an O9A ritual, as the government alleges. In his post-arrest interviews, Melzer denied performing any rituals specifically related to O9A. And even if the photograph depicts what the government says, it is independently prejudicial because the fact that the individual (allegedly Melzer) is holding a knife would unfairly communicate to the jury that he is dangerous.
- GX 507: This photograph of an individual (allegedly Melzer) wearing a skull mask and holding a powerful gun is unduly prejudicial where the presence of the gun is likely to frighten the jurors and communicate dangerousness. Melzer of course is not accused of committing any actual act of violence, much less one involving a gun of this sort, so to present an image of him holding a weapon is needlessly inflammatory.
- GX 510: Same objection as to GX 504.
- GX 513: This image depicting a figure in a skull mask and the text "Rapists Its [sic] Time to Mobilize" is irrelevant and unduly prejudicial. Melzer of course is not accused of rape, and though that word may appear in other portions of the evidence at trial, this exhibit is inflammatory and gratuitous.
- GX 536: This photograph of an unidentified person in military fatigues arranging blocks of TNT into a swastika is an irrelevant and unduly prejudicial invocation of Nazi iconography that is likely to inflame the jury.
- GX 802: This video of an identified individual in military fatigues waving a Nazi flag, accompanied by aggressive heavy metal music with lyrics in a foreign language, has no relevance to the charges in Melzer's case, is unduly prejudicial, and cumulative of other "Nazi" evidence.
- GX 908: This is a document recovered from Melzer's iPhone titled "The Rape Anthology" that is little more than a vile anti-Semitic screed, including language that "[t]he Jew is the demon behind the corruption of mankind." It is irrelevant yet highly prejudicial.
- GX 911: This is a document recovered from Melzer's iPhone titled "The Requisite ONA" and includes a swastika and inflammatory statements invoking Adolph Hitler and denying

the Holocaust. It is unduly prejudicial and should be precluded, or, at the least, further redacted to remove pages 6–9 of the exhibit, which describe "The Mass of Heresy," a description of a kind of ritualistic performance that includes objectionable references to Hitler and the Holocaust.

- GX 912: This is a document recovered from Melzer's iPhone titled "Understanding National Socialism." It is riddled with Holocaust-denialism and includes strongly anti-Semitic language that would inflame the jury. It is irrelevant to the charges and highly prejudicial.

We agree that additional O9A-related documents found on Melzer's iPhones, specifically those at GX 901–07 and 909–10, are admissible. But the Court should issue a limiting instruction that they are not being admitted for the truth of their contents, but only—to the extent the government can show that Melzer actually read them—for his state of mind. As to a book recovered from Melzer's barracks, "The Sinister Tradition" (GX 301), we agree that the fact that Melzer possessed it is admissible. But its contents—some 350 pages—should not be admitted absent the government's linking specific portions to a pertinent fact in Melzer's case. If the government is able to do so, then only those portions should be admitted. That is, the Court should not issue a blanket ruling that all 350 pages are relevant evidence. As to an additional book recovered from Melzer's barracks, "The Anarchist's Cookbook" (GX 302), the Court should preclude it entirely—Melzer has not admitted to reading any portion of it, and the government has not identified any particular segments that are relevant to his case.[2] *See generally United States v. Curtin*, 489 F.3d 935, 956 (9th Cir. 2007) (en banc) (noting difficulty with admitting literature against a criminal defendant, and concluding that, while literature may be relevant to intent, its relevancy depends upon the particular facts of the case).

---

[2] The government says that the book contains "detailed instructions for the manufacture and use of explosives and weapons," Gov't MIL at 32, but does not attempt to tie any of the book's specific contents to the facts of Melzer's case.

Finally, we note that the positions we have taken here represent our current view of these materials' admissibility, based in part on the government's representations in its motion. We reserve the right to raise additional objections depending on how the case develops, what other evidence the government seeks to admit, and the eventual testimony at trial. For example, should the government fail to prove that Melzer actually consumed any of these materials, as opposed to having merely possessed them, then our position on their admissibility would almost certainly change. *See generally Luce v. United States*, 469 U.S. 38, 41 (1984) ("Rulings on motions *in limine* are subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in a party's proffer.") (cleaned up).

## II.   The Court should defer ruling on the government's motion to admit statements of CC-1 and CC-3.

The government asks the Court to admit a number of statements made by two alleged co-conspirators, CC-1 and CC-3, on the grounds that they are statements in furtherance of the conspiracy (Fed. R. Evid. 801(d)(2)(E)) or statements against interest (Fed. R. Evid. 804(b)(3)). Gov't Mot. at 48–53. This motion is premature at best. The Court should rule on the admissibility of these statements at the appropriate time and only after the government has made a sufficient showing that they qualify under one or both rules, which, as will now be shown, the government has not yet done.

### A.   The government has not shown that either CC-1 or CC-3 was in a conspiracy with Melzer.

As to the claim that CC-1's and CC-3's statements are admissible as co-conspirator statements, the government has not shown that either CC-1 or CC-3 was in fact in a conspiracy with Melzer and that the pertinent statements were made in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *see also United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)

("To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy."). Melzer denies participating in any unlawful conspiracy with anyone, including CC-1 or CC-3. It is the government's obligation to prove—at this stage by a preponderance of the evidence to the Court, but at trial beyond a reasonable doubt to the jury—that Melzer had an actual agreement to murder his Army unit with at least one other individual who was not a government informant. *See United States v. Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995) (conspiracy requires agreement between at least two "private individuals") (citations omitted); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) ("Unless at least two people commit the act of agreeing, no one does.") (cleaned up).

Demonstrating that there was a genuine agreement between Melzer and CC-1 will be particularly difficult for the government. CC-1 was blatantly lying to Melzer and all other chat participants during the entirety of their communications about seemingly every detail of his identity, capabilities, and intentions. The government has revealed in a disclosure to the defense that, while CC-1 claimed online to be a former Canadian paratrooper who had served in Iraq and Afghanistan and had access to powerful weapons, he was actually a 15-year-old boy residing in Canada. The government has further revealed that he had been arrested in January 2020 and, in connection with that arrest, was detained in a mental health facility at a hospital, just months before he began communicating online with Melzer.[3] This information is devastating to the

---

[3] We have written the government to request, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), that it provide all information in its custody and control that may be favorable to Melzer's defense, including unredacted information relating to his alleged co-conspirators. *See* ECF No. 92-5. This would encompass information concerning CC-1's prior arrest and mental health. The

government's claim that CC-1 conspired with Melzer—if CC-1 was not serious about his intention, desire, or ability to facilitate an attack on Melzer's unit, then there was no requisite "meeting of minds" between them. *See Rosenblatt*, 554 F.2d at 38 ("When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone.").

As for CC-3, the government offers no details about his true identity to substantiate that he was accurately representing himself online such that the jury, or this Court, might conclude that he was in a genuine conspiracy with Melzer. The government observes that Melzer said in a post-arrest interview that CC-3 had claimed to be "located in Turkey, approximately 1,000 miles from the Military Base." Gov't MIL at 52. But, as the government is surely aware, Melzer was confused, and was instead describing information communicated by the person the government now identifies as CC-2. CC-3, on the other hand, had claimed to be living in France, and represented that he was not Turkish and did not know anyone in Turkey, except CC-2. This confusion underscores the need for the government to identify all of Melzer's known co-conspirators in advance of trial, including by providing their true identities, as he has requested in his pending motion for a bill of particulars. *See* ECF No. 92. For now, it is not enough for the government to rely on Melzer's mistaken description of CC-3 to establish CC-3's conspiratorial bona fides. More is required.

---

government has not yet responded. The government should produce this material as soon as possible and in a manner that allows the defense to make "effective use" of it through pretrial investigation and at trial. *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001).

**B.     The government has not shown that CC-1 and CC-3 are unavailable or that their statements are sufficiently trustworthy.**

As to the claim that CC-1's and CC-3's statements are admissible as statements against interest, the government has not made the requisite showing that CC-1 and CC-3 are "unavailable" or that their statements are supported by "corroborating circumstances that clearly indicate [their] trustworthiness" under Rule 804(a). As to unavailability, the rule requires that a statement's proponent (here, the government) show that it "has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony." The mere fact that CC-1 and CC-3 may be located abroad is insufficient, on its own, to satisfy this requirement. *See, e.g., United States v. Losada,* 674 F.2d 167, 172 (2d Cir. 1982) (finding that, where declarant was a Colombian citizen living in Colombia, the pertinent inquiry under Rule 804(a) "is whether the government used 'other reasonable means,' such as a voluntary request, to obtain his attendance"); *United States v. Sindona,* 636 F.2d 792, 804 (2d Cir. 1980) (finding that "the Government had done all that it could" under the rule where it had been in contact with four declarants for between 4 and 12 months and had promised to pay their expenses to travel to the U.S. to testify, an offer they refused); *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 176 (S.D.N.Y. 2006) (unavailability established where government took ultimately unsuccessful steps to locate declarants via law enforcement contacts in Turkey). Here, the government has not set forth any steps it has taken to obtain CC-1's or CC-3's attendance at trial, much less that those steps amount to the kinds of "reasonable means" that would permit this Court to deem them unavailable. The government's failure to do so is especially problematic as to CC-1 because, as discussed, the government knows exactly who and where he is.

Nor is the government's unsupported assertion that CC-1 and CC-3 are "likely" to invoke their Fifth Amendment privilege to decline to testify, *id.*, sufficient to establish their

12

unavailability under Rule 804(a)(1). The government cites *United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004), but there the court found that the declarant was likely to decline to testify only where the government represented "that the [declarant]'s lawyer has been contacted and that such attorney stated that his client would assert the Fifth Amendment privilege." In so finding, the court cited *United States v. Williams*, 927 F.2d 95, 98 (2d Cir. 1991), where the Second Circuit affirmed a finding of unavailability because the prosecutor represented that "when [he] contacted the attorneys for the four [declarants] to inquire about their clients' willingness to testify, he was informed that each of the clients would invoke his Fifth Amendment privilege if called as a witness." These cases therefore establish that the government must proffer more than mere *ipse dixit* to show that a declarant would decline to testify. Here, the government has not made anything close to a sufficient showing that CC-1 or CC-3 is unwilling to testify, so their statements cannot yet qualify as statements against interest.

Next, to admit a statement as against a declarant's interest, Rule 804(3)(B) requires "corroborating circumstances that clearly indicate" that the statement is trustworthy. As discussed above, the information we know about CC-1 shows that his statements are anything but, and the government has not proffered nearly enough information about CC-3 to enable the Court to assess the trustworthiness of his statements. The government relies on *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994), to argue that, as a general matter, "[s]tatements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule." Gov't MIL at 50–51. But *Matthews* involved a known declarant who had confessed criminal conduct "to his girlfriend, an intimate and confidante, in the private recesses of their home." 20 F.3d at 546. Under those circumstances, the Court found that there was "no reason to suspect" that the declarant's admissions were not

13

trustworthy. *Id. Matthews* is nothing like Melzer's case, where the declarants are either proven fabricators (CC-1) or entirely unknown (CC-3). Here, the government has not shown any "corroborating circumstances" to demonstrate the reliability of CC-1's and CC-3's statements; if anything, there is ample reason to view them with deep skepticism.

—

The Court should defer ruling on the government's motion to admit CC-1's and CC-3's statements until the government establishes that they were actually made in furtherance of a genuine conspiracy with Melzer, or that CC-1 and CC-3 are unwilling to testify at trial and that their statements are trustworthy.

## III.   While other individuals' statements may be admissible, the Court should preclude Melzer's statements to Individual-1.

We agree that, as a general matter, the Court can admit statements made by non-co-conspirators where those statements are offered for a non-hearsay purpose, are relevant to the charges, and do not violate Rule 403. Gov't MIL 53–54. Many of the CS's and Individual-1's statements to Melzer as described in the government's motion are therefore likely admissible.

But we object under Rule 403 to admitting *Melzer's* statements to Individual-1 concerning the military and his lack of patriotism: "Good luck it's great for training … Just don't become a fuckin patriot … Train and get the fuck out … I'm not patriotic for shit … All of these places the vast majority deserve to be burned." Gov't MIL at 5, 54. Those statements were made in private chats between Melzer and Individual-1 only, not in group chats, and the government concedes that Individual-1 was not in a conspiracy with Melzer. Melzer's statements accordingly do little to prove the charges against him, yet carry a substantial risk of prejudice because the jury is likely to hold his stated lack of patriotism and invocation of violence against him. The statements therefore run afoul of Rule 403 and should be precluded. *Cf. United States v. Pintado-Isiordia*,

14

448 F.3d 1155, 1158 (9th Cir. 2006) (affirming exclusion of photograph of defendant in military uniform where "the only apparent purpose behind [defendant's] introducing the photograph was to elicit the jury's sympathy and patriotism, which runs afoul of Fed. R. Evid. 403").

In the alternative, the Court should give a limiting instruction that Melzer has a First Amendment right to hold his political beliefs and that those beliefs are not on trial. *See Salameh*, 152 F.3d at 112.

## IV.   The Court should apply the rule of completeness to admit Melzer's own prior statements.

The Court should apply the rule of completeness in determining whether to admit Melzer's own prior statements. Fed. R. Evid. 106 provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The rule is designed to address "the misleading impression created by taking matters out of context." Fed. R. Evid. 106 advisory committee's note; *see also Phoenix Assocs. III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995) ("Underlying Rule 106 [] is a principle of fairness . . . .").

The Second Circuit "interprets this Rule to require that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, to avoid misleading the trier of fact, or to ensure a fair and impartial understanding of the admitted portion." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (cleaned up). Such statements are admissible even though they may be hearsay. *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007). In applying the rule, "it is the trial court's responsibility to exercise common sense and a sense of fairness to protect the rights of the parties while remaining ever mindful of the court's obligation to protect the interest of society in the ascertainment of the truth." *United*

15

*States v. Castro*, 813 F.2d 571, 576 (2d Cir. 1987) (quotation marks omitted); *see also* Fed. R.

Evid. 611(a)(1) (requiring courts to "exercise reasonable control over the mode and order of

examining witnesses and presenting evidence so as to make those procedures effective for

determining the truth").

The government has not yet identified which portions of Melzer's chats and post-arrest

interviews it will seek to introduce, so at this stage we are unable to isolate responsive portions

that should be admitted under the rule of completeness.[4] But the government's one-sided

description of Melzer's post-arrest interviews, *see* Gov't MIL at 22–23, in particular raises the

concern that it intends to cherry pick his statements and leave the jury with a misimpression that

he was admitting his guilt. Indeed, the government describes Melzer's statements in those

interviews largely as confessions to all the charges against him, while only gesturing toward his

repeated assertions of innocence. *See, e.g.*, Gov't MIL at 22 (allowing that "Melzer denied that

he was a member of O9A and at times attempted to minimize his conduct as satire or dark

humor"). The fact is that, though Melzer admitted to providing certain information concerning

his unit's deployment in the chats, he repeatedly denied sympathizing with O9A, intending to

commit an attack, or believing that the people he was chatting with intended to commit an attack,

either.

For example, in his first interview, Melzer told agents he had felt "pressure" to provide

information about his unit's deployment to Turkey, and so he "ma[d]e up some shit."[5] When

---

[4] The government should be required to produce, meaningfully in advance of trial, the portions of Melzer's interviews it seeks to offer, so that disputes between the parties can be resolved.

[5] The quotations in this paragraph are taken from draft transcripts and agent notes produced in discovery from Melzer's three post-arrest interviews.

discussing whether he intended to see an attack occur, he said he "[d]idn't mean it when [he] said it." He said also that he "hate[d]" the people he was communicating with and so he started "fuckin[g] with them" (i.e. lying to them) and had intentions to "block them" and "report them." He said "it didn't even like cross [his] mind that they were like serious people," and that he instead thought they were "jokers." He also said that his claims of membership in O9A were bluster. He explained that, though he had some "curiosity" about O9A, he believed it was "weird," "out there," and "pretty much a cult," and considered its beliefs to be the "polar opposite" of his own. In his second interview, which was not recorded, Melzer again denied membership in O9A and stated that his online claims to the contrary were lies. He said that he joined the Army, not to further O9A's ideology (as the government now alleges), but because multiple generations of his family had served. He said that he had provided information about his unit's deployment only to gain credibility in order to learn more about O9A. And in his third and final interview, Melzer again denied membership in O9A, and said that he had been routinely lying to the people he was communicating with in order to gain "leverage" with them.

Given these facts, the government should not be allowed to leave the jury with the impression that Melzer confessed to the most serious charges in this case. He did not. If the jury does not hear his contemporaneous denials they will be left with the kind of "misleading impression" that Rule 106 is designed to prevent. Fed. R. Evid. 106 advisory committee's note; *see United States v. Gotti*, 457 F. Supp. 2d 395, 399 (S.D.N.Y. 2006) ("Rule 106 does not allow the Government to cherry pick the statements it wants … and create a skewed picture of the facts."). Whether Melzer testifies at trial or not, his defense—that he did not conspire or attempt to murder his own unit—will remain consistent with what he repeatedly represented in his post-arrest interviews, so the jury should not be left with the mistaken impression that he is only

17

asserting that defense for the first time at trial. *See United States v. Vargas*, 2018 WL 6061207, at *2 (S.D.N.Y. Nov. 20, 2018) ("If the jury is only permitted to hear some of the Defendants' post-arrest statements, they may assume no other statements were made[.] Since the statements the Government seeks precluded will likely form part of Defendant['s] defense at trial, their omission could lead the jury to conclude they are a recent fabrication, inaccurately undercutting his credibility.").

If the government wants to introduce statements it deems inculpatory, it must take the bitter with the sweet and give the jury an accurate account by including those statements' exculpatory attributes as well. *See, e.g.*, *United States v. Walia*, 2014 WL 3734522, at *8 (E.D.N.Y. July 25, 2014) ("[T]o the extent the government is seeking to introduce statements made by Defendant to law enforcement admitting his involvement in, or knowledge of, drug trafficking, Defendant's statements to law enforcement during the same interview denying any knowledge and involvement in drug trafficking are admissible."). In fact, to afford the jury the most accurate account of Melzer's post-arrest interviews, we would agree to the Court's admitting them in full. At a minimum, though, the Court should admit any responsive portions that the government omits.

## V.   Melzer should be permitted to introduce evidence containing the Military Base's true name.

The Court should permit Melzer to introduce evidence concerning the Military Base, including its true name, and evidence that he was aware that the base was easily identifiable via an open-source internet search. This evidence is necessary to Melzer's defense on Counts Seven and Eight, so precluding it would be improper. *See generally Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (quotation marks omitted).

The government cites a series of cases for the proposition that courts may adopt various "protective measures" where national security concerns are implicated. Gov't MIL at 57–58. But none of those cases are apposite, as they generally concern courtroom closures, disclosures of material under the Classified Information Procedures Act (CIPA), or requests to seal court filings, which are inapplicable here. *See, e.g.*, *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 488 (S.D.N.Y. 2018) (courtroom closure); *United States v. Schulte*, 2019 WL 3764662, at *4 (S.D.N.Y. July 22, 2019) (CIPA); *Kewazinga Corp. v. Microsoft*, 2021 WL 1222122, at *3 (S.D.N.Y. Mar. 31, 2021) (court filings). The government has not cited a case where a court has precluded at trial the use of a name of a widely publicized and readily identifiable military installation that is central to the case's allegations.

Though not directly on point, the most analogous case cited by the government is *United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y. 2014), where the court permitted an undercover detective (the "UC") to testify under an alias to preserve his safety and the viability of his current and future investigations. The court found that the UC's true name was irrelevant to the defendants' guilt or innocence, and that allowing him to testify under an alias would protect his identity "in a way that avoids drawing the jury's attention to the prophylactic measures taken by the Court." *Id.* at 573.[6]

Here, in contrast to UC's true name in *Urena*, the Military Base's true name is highly relevant to the charges. *Contra* Gov't MIL at 57. To prove Melzer guilty of having violated 18 U.S.C. §§ 793(d) and 794(a), as charged in Counts Seven and Eight, the government must prove that he disclosed information related to "the national defense." This in turn requires that the

---

[6] The court rejected the government's proposal that the UC testify under a "transparent code name" such as "UC-188," since that "might unhelpfully imply to the jury that defendants are dangerous." *Id.*

government prove "(1) that the information is closely held by the Government; and (2) that the information is the type of information, that, if disclosed, could harm the United States." *United States v. Schulte*, 436 F. Supp. 3d 747, 754 n.8 (S.D.N.Y. 2020) (quotation marks omitted). Information in the public domain "typically cannot qualify as [] closely held." *United States v. Rosen*, 445 F. Supp. 2d 602, 621 (E.D. Va. 2006). Whether information relates to the national defense is a question of fact for the jury. *See, e.g.*, Gov't Proposed Jury Instructions at 37 (requesting instruction that "[w]hether the information is connected with the national defense is a question of fact that you, the jury, must determine, following the instructions that I have just given you about what those terms mean") (collecting authority), ECF No. 88.

Requiring the parties to refer to the base only by the obviously generic term "the Military Base," as the government requests, *see* Gov't MIL at 56, would adversely impact Melzer's defense by inaccurately suggesting to the jury that the base's true name is "closely held." It is not. It is readily identifiable via an open-source internet search—indeed, there are numerous online news article naming the base, and it has its own Wikipedia page that includes its precise location in Turkey, a historical summary of its construction, and a detailed explanation of its strategic purpose, among other information. Melzer anticipates introducing evidence of these facts.

Relatedly, Melzer also should be permitted to introduce evidence that, at the time of his alleged offenses, he was *aware* that the base's name was publicly available, including evidence that he provided it to CC-1 in a chat and told him to "look that up" online, which CC-1 then did. Gov't MIL at 17. Evidence that Melzer knew that the base's name was publicly available makes it more likely that he did not consider it non-public information whose disclosure would harm

U.S. interests. All of this relevant evidence will be impossible to elicit if the parties are precluded from using the base's true name.

For these reasons, the parties should be permitted to use the Military Base's true name and to introduce evidence that includes it.

████   ██████████████████████████

          ████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████████████████

          ██████████████████████████████

██████████████████████████████████

████████████████████████████████████████





**Conclusion**

For the reasons discussed, the Court should grant some of the government's requests, deny

others, and reserve decision on those where the issues have not yet ripened.

New York, New York
February 8, 2022

Respectfully submitted,

/s/_____
Sarah Baumgartel
Jonathan Marvinny
Hannah McCrea
Ariel Werner
Assistant Federal Defenders
212.417.8792
jonathan_marvinny@fd.org