UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
    - v. -                                :          S1 20 Cr. 314 (GHW)
                                          :
ETHAN PHELAN MELZER,                      :
                                          :
                          Defendant.      :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Sam Adelsberg
Matthew Hellman
Assistant United States Attorneys
- Of Counsel -

i

## <u>TABLE OF CONTENTS</u>

The Defendant's Motion For A Bill of Particulars Should Be Denied ......................................... 1

   I. Applicable Law ................................................................................................................ 1

   II. Discussion ..................................................................................................................... 3

The Government's Expert Witness Should Be Permitted ................................................................. 8

   I. Relevant Facts ................................................................................................................ 9

   II. Applicable Law ............................................................................................................ 11

   III. The Defendant's Motion to Preclude the Testimony of Dr. Simi Should Be Denied ......... 15

     A. Dr. Simi's Proposed Expert Testimony Closely Hews to the Evidence .......................... 15

     B. The Proposed Testimony Complies with Rules 401, 403 and 702 ................................... 27

     C. Dr. Simi Is Qualified to Serve as an Expert Witness on White Supremacist Groups Such as O9A ...................................................................................................................... 29

     D. Dr. Simi's Proposed Expert Testimony on White Supremacist Groups and O9A Does Not Impermissibly Rely on Inadmissible Hearsay .................................................................... 32

     E. The Government Has Provided Adequate Notice of Dr. Simi's Testimony ..................... 36

     F. A *Daubert* Hearing Is Not Required ......................................................................... 37

The Court Should Deny The Defendant's Request For Attorney-Conducted Voir Dire ............. 39

**CONCLUSION** ..................................................................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329 (S.D.N.Y. 2006) .................................. 32

*Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582 (S.D.N.Y. 2021) ........................... 30, 31, 32

*Bourjaily v. United States*, 483 U.S. 171 (1987) ....................................................... 11

*Cary Oil Co. v. MG Refining & Mktg., Inc.*, 2003 WL 1878246 (S.D.N.Y. 2003) ..................... 12

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................... 29

*Crawford v. Washington*, 541 U.S. 36 (2004) ......................................................... 36

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................... passim

*Emig v. Electrolux Home Prod. Inc.*, 2008 WL 4200988 (S.D.N.Y. 2008) ............................ 32

*Howard v. Walker*, 406 F.3d 114 (2d. Cir. 2005) ..................................................... 34

*In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) .......................... 30

*In re Zyperxa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) ....................... 12, 30, 31

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
2006 WL 2128785 (S.D.N.Y. 2006)................................................................. 12

*Kewazinga Corp. v. Microsoft*, 2021 WL 4066597 (S.D.N.Y. 2021) ................................. 37

*Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999) ...................................... 13, 37

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013)................................... 35

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ........................................ 31

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)........................................... 12

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) .............................................. 39

*Sines v. Kessler*, 2021 WL 1431296 (W.D. Va. 2021) .............................................. 26

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997)........................................... 30

*State of New York v. United Parcel Serv., Inc.*, 2016 WL 4735368 (S.D.N.Y. 2016) ................ 32

*Sullivan v. Ford Motor Co.*, 2000 WL 343777 (S.D.N.Y. 2000) .................................... 30

*United States v. Abarca*, 22 F.4th 58 (2d Cir. 2021) ................................................ 26

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008)................................ 28, 34

*United States v. Addington*, 471 F.2d 560 (10th Cir. 1973)........................................ 39

*United States v. Addonizio*, 451 F.2d 49 (3rd Cir. 1971).......................................... 40

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ............................................. 14

*United States v. Barnes*, 158 F.3d 662 (2d Cir. 1998).............................................. 7

*United States v. Barone*, 2010 WL 2976505 (S.D.N.Y. 2010) ................................................. 40

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ........................................................ 15

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) ............................................. 7

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ....................................................... 5

*United States v. Boyle*, 2010 WL 286624 (S.D.N.Y. 2010) .............................................. 28, 36

*United States v. Brettschneider*, 832 F. App'x 14 (2d Cir. 2020) ........................................... 29

*United States v. Brown*, 540 F.2d 364 (8th Cir. 1976) ........................................................... 39

*United States v. Chen*, 378 F.3d 151 (2d Cir. 2004) ................................................................. 2

*United States v. Cohen*, 518 F.2d 727 (2d Cir. 1975) ............................................................... 2

*United States v. Conesa*, 899 F. Supp. 172 (S.D.N.Y. 1995) .................................................... 6

*United States v. Dey*, 409 F. App'x 372 (2d Cir. 2010) ......................................................... 27

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2002) ........................................................ 35

*United States v. Duke*, 409 F.2d 669 (4th Cir. 1969) ............................................................. 40

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) ....................................................... 13, 28

*United States v. Duncan*, 598 F.2d 839 (4th Cir. 1979) ........................................................ 39

*United States v. Facciolo*, 753 F.Supp. 449 (S.D.N.Y. 1990) ................................................. 2

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ........................................ 13, 27, 33, 34

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ....................................................... 14

*United States v. Gilberto Valle*, No. 12 Cr. 847 (PGG) (S.D.N.Y. 2013) ................................ 8

*United States v. Golfo*, 2020 WL 2513445 (E.D.N.Y. 2020) ................................................. 40

*United States v. Gottlieb*, 493 F.2d 987 (2d Cir. 1974) ........................................................... 1

*United States v. Helbrans*, 2021 WL 2873800 (S.D.N.Y. 2021) .............................................. 6

*United States v. Horge*, 2020 WL 6273932 (S.D.N.Y. 2020) ................................................... 6

*United States v. Hossain*, No. 19 Cr. 606 (SHS) (S.D.N.Y. Sept. 29, 2021) ............................ 38

*United States v. Hunt*, 534 F. Supp. 3d 233 (E.D.N.Y. 2021) ................................................ 23

*United States v. Ivanova*, 2014 WL 11510255 (S.D.N.Y. 2014) .............................................. 6

*United States v. Johnson*, 584 F.2d 148 (6th Cir. 1978) ........................................................ 39

*United States v. Joseph*, 542 F.3d 13 (2d Cir. 2008) ............................................................. 12

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) ............................................................. 27

*United States v. Kourani*, No. 17 Cr. 417 (AKH) (S.D.N.Y. 2019) ................................... 27, 28

*United States v. L'Hoste*, 609 F.2d 796 (5th Cir. 1980) ........................................................ 39

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) ............................................................. 14

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) .............................................. 13, 14, 28

*United States v. Lombardozzi*, 2003 WL 1907965 (S.D.N.Y. 2003) ............................................ 13

*United States v. Matera*, 489 F.3d 115 (2d Cir. 2007) .......................................................... 13

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ................................................. 33, 35, 36

*United States v. Middendorf*, 2018 WL 3956494 (S.D.N.Y. 2018) ............................................... 6

*United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) ......................................... 27, 33

*United States v. Mustafa*, 753 F. Appx. 22 (2d Cir. 2018) ...................................................... 33

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) .......................................... 3, 5

*United States v. Oruche*, 2008 WL 612694 (S.D.N.Y. 2008) ................................................. 3, 7

*United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. 2006) ................................................... 34

*United States v. Paracha*, 313 F. App'x 347 (2d Cir. 2008) ................................................... 34

*United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008) ........................................................... 40

*United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y. 2017) ........................................... 28

*United States v. Reinhold*, 994 F. Supp. 194 (S.D.N.Y. 1998) .................................................. 6

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) .................................................. 7

*United States v. Rosario*, 2014 WL 6076364 (S.D.N.Y. 2014) ................................................ 37

*United States v. Saipov*, 2020 WL 958527 (S.D.N.Y. 2020) ................................................... 40

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ......................................................... 40

*United States v. Salameh*, 1993 WL 364486 (S.D.N.Y. 1993) ................................................. 40

*United States v. Salazar*, 485 F.2d 1272 (2d Cir. 1973) ......................................................... 1

*United States v. Schulte*, No. 17 Cr. 548 (PAC) (S.D.N.Y. 2020) .......................................... 38

*United States v. Smalls*, 719 F. App'x 83 (2d Cir. 2018) ..................................................... 38

*United States v. Taveras*, 436 F. Supp. 2d 493 (E.D.N.Y. 2006) ........................................... 40

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1991) ............................................................ 2

*United States v. Triana-Mateus*, 2002 WL 562649 (S.D.N.Y. 2002) ......................................... 2

*United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y. 2018) ............................................... 28

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ............................................................... 2

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ....................................... 14, 15, 37, 38

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019) .......................................................... 21

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ........................................................ 14

*Wong Tai v. United States*, 273 U.S. 77 (1927) ............................................................................. 2

**Statutes**

18 U.S.C. § 3500 ............................................................................................................................. 1

**Rules**

Federal Rule of Criminal Procedure 24 ....................................................................................... 39

Federal Rule of Criminal Procedure 7 ........................................................................................... 1

Federal Rule of Evidence 16 ............................................................................................... 1, 9, 37

Federal Rule of Evidence 703 .............................................................................................. 33, 35

On February 1, 2022, defendant Ethan Melzer filed motions *in limine* (Dkt. 92, the "Def. Mot.") seeking (1) a bill of particulars relating to Melzer's co-conspirators; (2) to preclude the testimony of Dr. Peter Simi, the Government's proposed expert witness on white supremacist groups, such as the Order of Nine Angles ("O9A"), and, in the alternative, a *Daubert* hearing; and (3) attorney-conducted voir dire.  Each of these motions should be denied.

## THE DEFENDANT'S MOTION FOR A BILL OF PARTICULARS SHOULD BE DENIED

 The defendant's motion for a bill of particulars should be denied.  In addition to three detailed charging instruments, the Government has produced comprehensive and itemized Rule 16 discovery, substantial materials pursuant to 18 U.S.C. § 3500, detailed factual accounts relating to Melzer's co-conspirators in pre-trial briefing, and an index laying out the online identities of the co-conspirators.  Moreover, in stark contrast to cases where courts have granted a bill of particulars for the identities of co-conspirators, the relevant time period of the conspiracy here lasted a matter of weeks and involved three alleged co-conspirators, not a much larger number. Taken together, the Government's productions to date more than satisfy the applicable legal standard of enabling the defendant to understand the charges, prepare a defense, and protect against double jeopardy.

### I.  Applicable Law

 Rule 7(f) of the Federal Rules of Criminal Procedure permits the Court to direct the Government to file a bill of particulars.  A bill of particulars is not, however, a general investigatory tool for the defense.  *See United States v. Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973).  Nor is it a device to compel disclosure of the Government's evidence or its legal theory prior to trial. *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974).  Rather, the sole purpose of a bill of

particulars is to furnish facts that are necessary to apprise a defendant of the charges against him with sufficient precision to (i) enable him to prepare his defense, (ii) avoid unfair surprise at trial, and (iii) preclude a second prosecution for the same offense.  *See Wong Tai v. United States*, 273 U.S. 77, 80-82 (1927); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1991).

Indeed, "a bill of particulars should be required only where the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234; *accord United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004). Furthermore, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (affirming denial of request for a bill of particulars where the Government adequately informed the defendant of the nature of the charges against him through discovery).  Ultimately, "[i]n deciding a motion for a bill of particulars, '[t]he important question is whether the information sought is necessary, not whether it is helpful.'" *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (quoting *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990)).  Moreover, where, as here, the defendant is charged with criminal conspiracy, the Second Circuit has made clear that "[t]he Government need not . . . set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy." *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir. 1975) (citing *Wong Tai*, 273 U.S. at 81).

Finally, "[i]n considering a request for particulars as to the names of unindicted coconspirators, a court considers the following factors: (1) the number of co-conspirators, (2) the duration and breadth of the alleged conspiracy, (3) whether the Government otherwise has provided adequate notice of the particulars, (4) the volume of pretrial disclosure, (5) the potential

danger to co-conspirators and the nature of the alleged criminal conduct, and (6) the potential harm

to the Government's investigation."  *United States v. Oruche*, No. 07 Cr. 124 (WHP), 2008 WL

612694, at *3 (S.D.N.Y. Mar. 5, 2008) (citing *United States v. Nachamie*, 91 F. Supp. 2d 565,

572–73 (S.D.N.Y. 2000)).

## II.  Discussion

The defendant moves to compel the Government to identify all known co-conspirators at

least 45 days before trial.  (Def. Mot. at 4).  But the defendant, like all defendants, is entitled to

sufficient information to understand the charges against him, to prepare a defense, and to protect

against double jeopardy.  The Government has provided such information, and more, in the 19-

page Complaint, the 14-page Indictment, the 14-page Superseding Indictment, the extensive and

organized discovery and 3500 productions, the Government's response to the defense's pre-trial

motions (*see* Dkt. No. 71 ("Gov. Pre-Trial Mot.")), and the detailed discussion regarding co-

conspirators and co-conspirator communications in the Government's brief in support of its

motions *in limine* (*see* Dkt. No. 90 ("Gov. Mot.")).

The charging instruments, the produced discovery, and the Government's factual

recitations in its pre-trial briefing provide more than sufficient information to satisfy its obligations

and demonstrate that a bill of particulars is not warranted in this case under the applicable legal

framework outlined above.  Those materials set forth in considerable detail the contours of the

alleged conspiracy, including the relevant time period of the conspiracy—namely about a month

spanning late-April to late-May 2020—and the substance of communications between the

defendant and his three co-conspirators during that finite period.   Moreover, the Government is

also providing the defense with an index delineating the online monikers for the co-conspirators

referenced in the Complaint, the Indictment, the Superseding Indictment, and the Government's briefing, attached hereto as Exhibit A.

As detailed in the charging instruments, the produced Telegram chats, and the Government's court filings, CC-1 (using the Telegram moniker Sinistrous) was the administrator of the Telegram channel affiliated with O9A known as "RapeWaffen Division."  (*See, e.g.*, USAO_005516[1]; USAO_012447 at 4488; Gov. Pre-Trial Mot. at 4; Gov. Mot. at 2, 51).  By at least late-April 2020, Melzer and CC-1 exchanged Telegram messages regarding Melzer being an O9A member, which CC-1 explained was a prerequisite to joining the RapeWaffen Division.  (*See, e.g.*, USAO_012447 at 4487; Gov. Pre-Trial Mot. at 9; Gov. Mot. at 8-9).  CC-1 then vetted Melzer—asking him 40 questions regarding Melzer's knowledge of and adherence to O9A dogma and practices—before providing him access to the RapeWaffen Division channel.  (*See, e.g.*, USAO_012447 at 4488-4492; Gov. Pre-Trial Mot. at 9; Gov. Mot. at 8-9).  After Melzer learned of his unit's deployment, Melzer transmitted information via the Telegram channel to CC-1 and CC-3 (while CC-3 was using the Telegram moniker Jaww), among other participants in the RapeWaffen Division channel, regarding, among other things, the location of the military base in Turkey where Melzer's unit was set to deploy, the number of soldiers who would be guarding the installation, and their weaponry.  (*See, e.g.*, Complaint ¶ 12(5)-(23); USAO_005516-005583; USAO_012447 at 5317-5330, 4429-5525; Gov. Pre-Trial Mot. at 15-21; Gov. Mot. at 16-22).  CC-1 and CC-3 asked Melzer follow-up questions about the ambush and the military base, requesting information, in particular, about the defensive capabilities of the facility and the troops stationed there, which Melzer supplied.  (*See, e.g.*, Complaint ¶ 12(18)-(23); USAO_012447 at 5508-5330;

---

[1] The notation "USAO_" refers to the Bates number range in the Government's discovery productions.

Gov. Pre-Trial Mot. at 16-21; Gov. Mot. at 18-20, 51).  CC-1 also identified CC-2 (using the Telegram moniker @Kurt_Cobani) to Melzer as a member of the Grey Wolves, who joined al Qaeda, to which Melzer responded optimistically regarding CC-2's potential to help with the attack.  (*See, e.g.*, Complaint ¶ 12(18)-(23); USAO_012447 at 4514-4515; Gov. Pre-Trial Mot. at 14; Gov. Mot. at 13-14).

Notably, all of these communications occurred within the time period of just over a month—namely, between late-April 2020 and May 29, 2020.  And the Government does not presently intend to allege any additional co-conspirators—other than CC-1, CC-2, and CC-3—at trial, nor does it intend to call any of these co-conspirators as witnesses.  Nor is there any allegation that Melzer ever met any of these three co-conspirators in person or exchanged communications with them outside of Telegram.  Against this backdrop, the Government's robust disclosures easily satisfy the requirement that the defendant have adequate notice of the charges and the evidence to enable him to prepare for trial and avoid unfair surprise.  The Second Circuit has made clear that "[i]f the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  All told, these materials provide the defendant with more than a sufficient basis to understand and defend against the charges.

Furthermore, the factors cited in *Nachamie*, 91 F. Supp. 2d at 572–73, also militate in favor of denying the defendant's motion for a bill of particulars regarding the identities of co-conspirators.  Here, the relevant time period for the charged conspiracy, as discussed above, is a matter of weeks in late-April and May 2020; the conduct involved a handful of co-conspirators; and, as set forth above, the Government has provided adequate notice of the particulars in the charging documents, the discovery, the Government's court filings, and the attached co-

conspirator index. *See United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *2 (S.D.N.Y. Aug. 17, 2018) (denying request for disclosure of co-conspirator identities for "a conspiracy lasting two years" and focusing on six co-conspirators, noting that "cases in which such a request is granted generally involve conspiracies with a large number of co-conspirators over a long period of time").

In short, the information provided by the Government to date regarding the charged conspiracy and alleged co-conspirators is more than sufficient to ensure both that the defendant is apprised of the nature of the case against him and will not be unfairly surprised at trial. *See United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 2873800, at *18 (S.D.N.Y. July 8, 2021) (denying defense request for disclosure of identities of co-conspirators "because such information must only be disclosed if and when the Government chooses to call such individuals as witnesses at trial"); *United States v. Horge*, No. 19 Cr. 96 (LTS), 2020 WL 6273932, at *3 (S.D.N.Y. Oct. 26, 2020) (denying defense request for disclosure of identities of co-conspirators, finding that the Government—through the charging instruments, discovery, and court filings—had provided the defendant "with sufficient information to identify the charges against him, prepare for trial, prevent surprise, and to interpose a plea of double jeopardy"); *United States v. Ivanova*, No. 11 Cr. 614 (VM), 2014 WL 11510255, at *2 (S.D.N.Y. Mar. 19, 2014) (denying request for disclosure of identities of co-conspirators and holding that "information about the identities of other alleged conspirators treads impermissibly into the 'with whom' specifics of the charges, which is beyond the scope of a bill of particulars"); *see also United States v. Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (denying request for bill of particulars where "[t]he . . . indictment is detailed in its allegations" and "[the] defendants have had extensive discovery"); *United States v. Conesa*, 899 F. Supp. 172, 176 (S.D.N.Y. 1995) (denying request for bill of particulars because "[t]he

Indictment sufficiently advises defendants of the specific acts of which they are accused" and "the Government . . . has made available to defense counsel extensive discovery that supplements the information provided in the . . . Indictment").  Further, the Government will follow its customary practice of marking and producing trial exhibits in advance of trial, which will serve as another safeguard ensuring that the defendant has an adequate opportunity to prepare his defense.  *See United States v. Rigas*, 258 F. Supp. 2d 299, 304-05 (S.D.N.Y. 2003) (pretrial disclosure of trial exhibits can be factor supporting denial of request for bill of particulars).

The defendant's request to compel the production of additional information through a bill of particulars is therefore without merit.  *See United States v. Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have 'almost uniformly been denied.'" (internal quotation marks omitted)).  Nor do the cases cited by the defendant counsel otherwise.  Each of those cases involved charged conspiracies and discovery the nature and extent of which are starkly distinguishable from this case, including in terms of the number of co-conspirators, the scope of the conspiracy, the time period of the conspiracy, the level of detail in the information provided by the Government, and/or the volume and accessibility of discovery materials.  *See United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998) (finding a bill of particulars to be appropriate where "the indictment provided not a shred of detail" and the "conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *see also Oruche*, 2008 WL 612694, at *4 (ordering bill of particulars where narcotics conspiracy "spann[ed] a number of years and continents," the charging instruments "allege only one specific act by [the defendant]," and "the Government produced 8000 pages of linesheets of conversations in a foreign language (Igbo), compact discs containing 7326

audio files, and over 2300 pages of documents"); *United States v. Gilberto Valle*, No. 12 Cr. 847 (PGG), Dkt. No. 40 at 7-8 (S.D.N.Y. Jan. 9, 2013) (ordering bill of particulars two weeks before trial in case involving, among other things, conspiracy with "more than twenty" alleged co-conspirators, a time period of "at least ten months," and "a million or more pages of documents" produced by the Government).  Here, in contrast, the Government has produced substantial, detailed, and itemized information about the charged conduct and co-conspirators, the charged conspiracy involves a handful of alleged co-conspirators, and the Government's evidence relating to those three alleged co-conspirators spans a matter of weeks.

In sum, the Government has more than satisfied the applicable legal standard of enabling the defendant to understand the charges, to prepare a defense, and to protect against double jeopardy.  The defendant's request for a bill of particulars should therefore be denied.

## THE GOVERNMENT'S EXPERT WITNESS SHOULD BE PERMITTED

The defendant's motion to preclude the Government's expert should also be denied.  Dr. Simi is a highly qualified professor possessing ample expertise regarding white supremacist groups such as O9A, and his proposed expert testimony will be cabined and focused on explaining concepts and terms referenced in the evidence in this case, including Melzer's own statements and those of his co-conspirators, consistent with Federal Rules of Evidence 401, 403, and 702.  In seeking to disqualify Dr. Simi as an expert, Melzer's motion minimizes Dr. Simi's qualifications and overlooks established case law about the scope of expertise required for qualifying an expert witness.  Dr. Simi is qualified to be an expert on white supremacist groups, and he is accordingly qualified to testify about O9A, a white supremacist group.  Furthermore, Dr. Simi's factual bases and methodology are in line with that employed by experts who have been permitted to testify in a range of cases on analogous groups, including extremist organizations and the Mafia.  Melzer's

motion should be therefore denied without a *Daubert* hearing.

## I.   Relevant Facts

On December 9, 2021, the Government provided the defendant with notice, pursuant to Rule 16(a)(1)(G), of its intent to call Dr. Simi as an expert witness on white supremacist movements and groups, including O9A.  (*See* Dec. 9, 2021 Expert Notice, attached as Exhibit B). The Government informed the defense that Dr. Simi was expected to testify regarding "O9A history, leadership, philosophy, structure, goals, objectives, and means and methods," including the following, as set forth in Exhibit B:

> (i) current and historical sources and influences on O9A's ideology and objectives, including Neo-Nazi and white supremacist ideology and groups (such as the Temple ov Blood and Atomwaffen), Islamist jihadist ideology and groups (such as al Qaeda), and Satanic, fascist, occultist, and anarchist ideologies and groups; (ii) O9A literature, including *The Sinister Tradition*; (iii) key events in O9A's history, including historical acts of violence perpetrated by O9A members and associates; (iv) the organization's use of encrypted messaging applications (such as Telegram) to recruit members and further its objectives; (v) the meaning and significance of certain terms (including slang words), images, symbols, and other content used by O9A members and associates, including terms, images, symbols, and other content located in the defendant's electronic devices, online accounts, and other materials recovered during the investigation of this case; (vi) O9A structure and organization in the United Kingdom, the United States, and elsewhere, including particular O9A subgroups; and (vii) O9A methods and tactics, including the promotion of "insight roles," which refer to the group's practice of infiltrating organizations, including law enforcement and the military, to further the goals of O9A.

In serving that notice, the Government attached Dr. Simi's *curriculum vitae*, which detailed his extensive qualifications.  (*See* Simi *Curriculum Vitae*, attached as Exhibit C).  As detailed in Exhibit C, Dr. Simi serves as an Associate Professor in the Department of Sociology at Chapman University.  He has studied far-right extremist groups and violence for more than 20 years and has written extensively on white supremacist and Neo-Nazi groups, including authoring dozens of peer-reviewed articles and book chapters.  As part of his research, Dr. Simi has also studied the originating influences of far-right extremist groups, the links between Satanism, paganism, Neo-

Nazism, and white supremacist ideology, and the direct and indirect connections between white supremacists and jihadists.  Dr. Simi is also co-author of *American Swastika: Inside the White Power Movement's Hidden Spaces of Hate*, which chronicles the white supremacist movement through case studies, interviews, and first-person accounts and explains how white supremacy groups cultivate their membership through, among other things, online propaganda.  Dr. Simi has twice testified as an expert witness on white supremacist movements (copies of which testimony were previously provided to the defense), in a criminal case involving a white supremacist charged with murdering two Black teenagers and in a civil case involving the 2018 Unite the Right rally in Charlottesville, Virginia.  Dr. Simi has also testified before Congress[2] and lectured about these topics extensively, including to several federal law enforcement agencies.

On January 26, 2022, the Government provided the defendant with additional information regarding Dr. Simi's anticipated trial testimony.  (*See* Jan. 26, 2022 Expert Notice, attached as Exhibit D).  The Government explained that Dr. Simi's "testimony will be based on a synthesis of, among other things, Dr. Simi's review of academic literature (including peer-reviewed articles) concerning white supremacist and Neo-Nazi groups; extensive online research, including review of online gathering spaces for white supremacist, Neo-Nazi, and accelerationist groups, including O9A, on online platforms including Telegram and Discord; review of publicly-available O9A materials, including primary source documents such as books, essays, and Internet blog posts; and his field research embedded with white supremacist and Neo-Nazi groups."  (*Id.* at 2).  The Government described, in detail, Dr. Simi's opinions about (i) O9A's origins within the white

---

[2] *See* Testimony of Dr. Peter Simi, U.S. House of Representatives House Committee on Oversight and Reform, "Confronting White Supremacy: Examining the Rise of Militia Extremism" (May 26, 2021), available at https://oversight.house.gov/legislation/hearings/confronting-violent-white-supremacy-part-v-examining-the-rise-of-militia.

supremacist movement; (ii) O9A literature and philosophy; (iii) O9A's structure; (iv) the convergence of O9A and jihadists; (v) O9A's emphases on deception and violence; (vi) O9A's use of certain terms, images, symbols and memes; and (vii) O9A's use of encrypted messaging applications. (*Id.* at 3).

The defendant now moves to preclude Dr. Simi from testifying, arguing that that (1) Dr. Simi's testimony is not relevant under Rule 401 and unfairly prejudicial under Rule 403; (2) Dr. Simi is not qualified to testify about O9A; (3) Dr. Simi's testimony about O9A is based on publicly-available documents to which he will not have applied any expertise; and (4) the Government's notices are insufficient. In the alternative, the defendant argues that the reliability of Dr. Simi's methods and his qualifications must be tested at a hearing under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (Def. Mot. at 6-14). The defendant is wrong on all counts. Because Dr. Simi has specialized knowledge that will assist the jury in understanding the evidence and determining key facts in dispute, and because the probative nature of his testimony outweighs any potential prejudice, his testimony should be admitted. A *Daubert* hearing is neither required nor warranted in this case, and the Government has provided ample notice of Dr. Simi's anticipated testimony.

## II. Applicable Law

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The party that proffers expert testimony bears the burden of showing that it is admissible.  *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

A threshold issue is whether the witness "is qualified to be an 'expert'" in the subject matter at issue.  *See Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005).  "In assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement."  *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006).  Analyses of expert qualifications typically proceed in two parts.  Courts "first ascertain whether the proffered expert has the educational background or training in a relevant field" to qualify as an expert.  *Cary Oil Co. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003).  Courts then "compare the expert's area of expertise with the particular opinion the expert seeks to offer."  *Id.*

In keeping with the "liberal" construction of the expert-qualification requirement, courts in this Circuit have emphasized that an expert "should not be required to satisfy an overly narrow test of his own qualifications."  *Johnson & Johnson*, 2006 WL 2128785, at *5.  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *In re Zyperxa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).  That is because, in considering qualifications, the "only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."  *Johnson & Johnson*, 2006 WL 2128785, at *5.  Other "[q]uibbles with an expert's academic training" go to weight, not admissibility.  *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008).

The trial court must also find that the proposed testimony is both relevant and reliable prior to admitting it into evidence. *Daubert*, 509 U.S. at 589-90; *Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, the trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Applying Rule 702, the Court must determine whether the expert's reasoning and the methodology underlying his or her testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire Co.*, 526 U.S. at 148-49.

The Second Circuit has also consistently held that expert testimony can be helpful to "shed light on activities not within the common knowledge of the average juror." *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[E]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative . . . ."). This standard requires a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993).

Applying these principles, the Second Circuit has repeatedly approved of the admission of expert testimony to explain historical background, ideology, and terminology relating to groups and organizations in various contexts, in cases ranging from those involving extremist organizations to La Cosa Nostra. *See, e.g.*, *United States v. Farhane*, 634 F.3d 127, 158-59 (2d Cir. 2011) (affirming expert testimony regarding the "history and structure" and "background" on

13

al Qaeda); *United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (approving the admission of expert testimony regarding "the composition and structure of organized crime families generally" and noting that "this Circuit has approved the admission of expert testimony in organized crime cases 'to help explain the operation, structure, membership, and terminology of organized crime families'") (collecting cases); *United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (affirming the admission of expert testimony "regarding the organization, structure and terminology of organized crime families" and noting that such testimony lies "beyond the knowledge of the average citizen"); *Locascio*, 6 F.3d at 936 (upholding admission of expert witness testimony "on the nature and function of organized crime families, imparting the structure of such families and disclosing the 'rules' of La Cosa Nostra").

As with all evidence, courts may only exclude the evidence under Rule 403 if the probative value of the evidence is "*substantially* outweighed by the danger of unfair prejudice." *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) (emphasis added). Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Rule 403, Advisory Comm. Note. Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999).

Finally, a district court is not required to hold a formal *Daubert* hearing prior to qualifying an expert witness. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [the expert's]

methodology, it does not necessarily require that a separate hearing be held in order to do so."). Rather, the admission of expert testimony pursuant to Rule 702 is satisfied "if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record." *Id.* (citing 4 Weinstein's Federal Evidence § 702.02[2] (2d ed. 2006)).

## III.   The Defendant's Motion to Preclude the Testimony of Dr. Simi Should Be Denied

The defendant's challenges to Dr. Simi's proposed testimony should be denied.  As detailed below, the proposed testimony is closely hewed to the evidence in this case, including Melzer's communications with other O9A members and his possession of O9A texts and materials. Furthermore, the highly probative nature of Dr. Simi's testimony outweighs any potential prejudice.  Dr. Simi—whose experience and expertise qualify him to be an expert on white supremacist groups, including O9A—will also rely upon a commonly accepted methodology. Finally, the Government has provided ample notice of Dr. Simi's anticipated testimony and a *Daubert* hearing is unwarranted in this case.

### A.   Dr. Simi's Proposed Expert Testimony Closely Hews to the Evidence

Dr. Simi's proposed testimony will provide the jury with appropriate context to evaluate the defendant's words and actions—information Dr. Simi has gleaned by virtue of his specialized experience and training, and which lies beyond the ken of the average juror.  As further detailed below, Dr. Simi's anticipated testimony is directly relevant to assessing the defendant's knowledge, understanding, and motive in joining O9A and choosing O9A members to be his accomplices for facilitating a mass casualty attack on his unit.  Dr. Simi's testimony will cover limited topics, closely hewed to specific evidence that the Government will offer at trial, to help the jurors understand specific white supremacist terminology, practices, and ideologies referenced by Melzer and others in connection with the charged conspiracies.  *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony admissible to "help a jury understand

15

unfamiliar terms and concepts").  Specifically, the Government seeks to elicit the following expert

testimony from Dr. Simi, which relates to specific evidence and is admissible as set forth below.

### 1.  O9A's Origins Within the White Supremacist Movement

Dr. Simi will provide a brief introductory background regarding O9A's origins within the

white supremacist movement, consisting, in substance, of the following:

> O9A originated in the United Kingdom in the 1970s from the writings of
> pseudonymous author Anton Long.  O9A's ideology is centered on the worship of
> Satan and the supremacy of the white race.  O9A's leaders and members identify
> as Neo-Nazi, professing admiration for Adolf Hitler.  Like several other white
> supremacist groups, O9A teaches that the natural essence of Western civilization is
> pagan, and that Western civilization has deviated from this natural ethos.  At the
> core of O9A's ideology is a militant support for the promotion of extreme violence
> in order to overthrow Western civilization.  The group also promotes human self-
> sacrifice.  Over time, the group has embraced Islamist jihadist ideology and the
> violent tactics of jihadist groups, such as ISIS and Al Qaeda, as a means to
> accelerate the decline of Western society.  Accordingly, leaders and members of
> O9A often profess admiration for jihadist figures like Usama Bin Laden.

(*See* Ex. D at 2).

Testimony providing an introductory background on O9A, its core ideology, and its roots

in the broader white supremacy movement, will help the jury understand why the defendant, a self-

avowed member of O9A, provided sensitive information to fellow members of the group in order

to facilitate a jihadist attack on his military unit, which Melzer hoped would drag the United States

into an apocalyptic war.  For example, on May 24, 2020, after CC-1 and Melzer agree that they

are "organizing a jihadi attack," CC-1 wrote, "i mean yeah but if you get shot . . . your fault lol,"

to which Melzer replied "Who gives a fuck . . . the after effects of a convoy getting attacked would

cover it . . . it would be another war . . . I would've died successfully . . . cause if another 10 year

war in the Middle East would definitely leave a mark."  Here, Melzer is exhibiting both a desire

to accelerate the decline of Western civilization and for human self-sacrifice—core O9A concepts.

Furthermore, Dr. Simi's anticipated testimony about O9A's promotion of extreme violence

with the goal of overthrowing Western civilization—and its embrace of Islamist jihadist ideology and the violent tactics of jihadist groups seeking the same goal—is crucial to understanding Melzer's ideological alignment with O9A and jihadists and his decision to conspire with O9A members in a jihadist plot to murder his fellow soldiers to instigate a new war in the Middle East. For example, this testimony will contextualize Melzer's May 23, 2020 statement to members of the RapeWaffen Division that he "[u]sed to be cool with a couple IS [Islamic State of Iraq and al-Sham or ISIS] members," a statement Melzer made while outlining the planned attack in an apparent effort to establish his bona fides with respect to his willingness to follow through on the ambush.  Similarly, the proposed testimony would shed light on Melzer's statements to CC-1, described further below, about having contemplated engaging in an insight role for al Qaeda, which similarly furthered Melzer's apparent efforts to burnish his pro-jihadist credentials to CC-1 to support Melzer's bid to join the RapeWaffen Division Telegram channel.

Finally, Dr. Simi's testimony about O9A's adulation of Hitler will also help the jury contextualize Melzer's April 21, 2020 statement, made in detailed responses to a series of 40 "vetting" questions posed by CC-1, that he viewed Hitler as a hero.  That Melzer's expressed admiration of Hitler is fully consistent with O9A ideology will help the jury understand both Melzer's decision to join the group and CC-1's decision to grant him entry into the RapeWaffen Division Telegram channel, only after learning of Melzer's pro-Nazi beliefs.  Both of these decisions provide crucial context for the relationship between Melzer and CC-1 and the conspiracies that unfolded in the following weeks.

### 2.  O9A Literature and Philosophy

Dr. Simi will testify regarding O9A literature and philosophy, consisting, in substance, of the following:

O9A texts, including books, essays, and blog posts, set forth the core themes of
O9A philosophy, including that Western civilization has been diverted from its
true, pagan ethos and that the breakdown of the current societal order is necessary to
allow individual and societal evolution toward enlightenment.  Some O9A texts
exalt Hitler and the Third Reich and also set forth core O9A tactics, including the
importance of engaging in "sinister" deeds.  These include, for example, the
performance of "insight roles," whereby O9A members are instructed to infiltrate
various organizations, including the military, to gain training and subvert those
groups from within.  Key O9A texts in this regard include *The Sinister Tradition:
Order of Nine Angles*, *Hostia: Secret Teachings of the O.N.A.*, and *The Seven Fold
Way Of The Order Of Nine Angles: A Modern Practical Guide*.

(*See* Ex. D at 2).

Testimony regarding the importance of certain O9A texts and their contents—each of

which the Government will show that Melzer possessed in either physical or digital form on his

iPhone and in his barracks—will aid the jury in understanding Melzer's dedication to O9A and his

decision to share sensitive and actionable information to O9A with the explicit aim of facilitating

a jihadist ambush on his unit.  Moreover, the specific O9A texts about which Dr. Simi will testify—

which again are firmly rooted in the evidence because each was possessed by Melzer—provide

crucial context for his decision to perform an "insight role" for O9A by joining the military.  For

example, on April 25, 2020, he wrote to another O9A member ("Individual-1") who was

considering joining the U.S. Marine Corps, "Good luck it's great for training . . . Just don't become

a fuckin patriot . . . train and get the fuck out . . . I'm not patriotic for shit . . . all of these places

the vast majority deserve to be burned."  On another occasion, Melzer recounted to CC-1 a number

of different insight roles he had previously performed for O9A, noting that his military service was

another "insight role" to further his goals and skills within O9A.  In one exchange on May 17,

2020, CC-1 suggested to Melzer that joining a group such as al Qaeda could be valuable to O9A

as "an insight role," and Melzer replied, "I've thought about it . . . But it would have to be after

this."  Dr. Simi's testimony as summarized above will therefore aid the jury in understanding

Melzer's references to performing insight roles for O9A.

### 3. O9A Structure

Dr. Simi will testify regarding O9A structure, consisting, in substance, of the following:

O9A is an international, largely clandestine, collective of individuals and groups (known in O9A parlance as "nexions") committed to satanic, Neo-Nazi, and pro-jihadist principles and practices. Individuals can self-initiate into O9A by performing certain rituals, typically involving the drawing of blood. Today, O9A adherents and nexions appear to be concentrated in Europe and the United States. In the United States, the group operates primarily under the name, "Temple ov Blood."

(*See* Ex. D at 3).

Testimony to explain O9A's diffuse and clandestine structure—and the ability of individuals to self-initiate into the group—will be crucial to aiding the jury in understanding how Melzer joined O9A and why he was ultimately accepted into the RapeWaffen Division Telegram channel, all important background for his decision to conspire with O9A members using the channel to commit the charged crimes. For example, on April 21, 2020, Melzer and CC-1 exchanged several Telegram messages regarding Melzer joining the RapeWaffen Division Telegram channel. After CC-1 told Melzer that O9A initiation was a prerequisite to membership in the RapeWaffen Division, Melzer confirmed that he had been self-initiated into O9A. Then, in detailed responses to a series of 40 "vetting" questions posed by CC-1, Melzer outlined his extremist views, and described his efforts to join 09A. In addition, Melzer explained his rationale to CC-1 for wanting to join the RapeWaffen Division as "hopefully help[ing] this become an actual active nexion" and "to help it grow, I'd be lying if I didn't say to help me grow as well." Moreover, Melzer mentioned O9A's American affiliate—Temple ov Blood—regularly in his chats and saved Temple ov Blood literature on his iPhone 11. Dr. Simi's testimony will help decipher these essential terms regarding O9A's structure—such as self-initiation, nexion, and Temple ov Blood— for the jury and help explain how someone like Melzer was able to join a secretive global extremist

19

group via self-initiation.

Dr. Simi's testimony will also aid the jury in understanding the relevance of Melzer's performance of O9A rituals.  As detailed in the Government's brief in support of its motions *in limine*, GX 506 depicts what appears to be the defendant holding up a book with blood smeared on a passage in the book.  The book, *The Sinister Tradition: Order of Nine Angles*, was later retrieved during a search of Melzer's barracks and contained blood smeared on the same passage. (*See* Gov. Mot. at 31).  Similarly, GX 510 is a picture which appears to depict Melzer—hooded except for his eyes and nose—holding a knife with a bandage around his hand.  (*See id.*).  Melzer also explained in a post-arrest interview that he began performing Satanic rites in 2018, when he enrolled in a Job Corps program and researched O9A and its American affiliate, the Temple ov Blood.  By explaining to the jury how O9A requires members to perform rituals involving the worship of Satan and the drawing of blood in order to self-initiate, Dr. Simi will provide essential context for Melzer's joining and continuing affiliation with O9A.  This evidence is relevant to demonstrate Melzer's commitment to the group and to elucidate Melzer's motive and intent in revealing sensitive information to O9A members in a plot to murder his fellow soldiers.  By laying bare Melzer's devotion to O9A and its practices, evidence of Melzer's performance of O9A rituals is also relevant to rebut any defense argument that Melzer was not a member of O9A or that he was merely living a digital fantasy in assisting O9A.  (*See, e.g.*, Def. Mot. at 6 (noting that Melzer stated in his post-arrest interviews that his "claims of membership" in O9A were mere "bluster" and that he was not in fact an O9A member)).

### 4.  The Convergence of O9A and Jihadists

Dr. Simi will testify regarding the convergence of O9A and jihadists, consisting, in substance, of the following:

O9A's praise for jihadists and their attacks on Western society is an outgrowth of the larger white supremacist movement's celebration of jihadists in the last 20 years. Leading white supremacist figures (including figures embraced by O9A) have voiced admiration for jihadists' abilities to effectively use violence to achieve global aims and have expressed an interest in emulating jihadist tactics to confront their shared enemies. O9A (and white supremacists more broadly) share with jihadist ideology the perception of a shared enemy (*i.e.*, Jews and the State of Israel), an ideological commitment to a culture of violence as a means to achieve ideological ends, and apocalyptic and accelerationist worldviews.

(*See* Ex. D at 3).

Testimony regarding the convergence and collaboration of O9A and jihadists, a concept that is neither intuitively obvious nor within the ken of the average juror, will aid the jury in understanding why the defendant and his co-conspirators sought to enlist jihadists to carry out the ambush on Melzer's U.S. Army unit. Indeed, that information is directly relevant to assessing the defendant's knowledge, understanding, and motive in selecting jihadists to further his stated goal of dragging the United States into a protracted new war in the Middle East. Relatedly, Dr. Simi's testimony on this score, including the admiration in the white supremacist community for jihadist capabilities, will assist the jury in understanding why the defendant believed that sharing this information with O9A members would lead to a *successful* jihadist attack. Dr. Simi's testimony will also provide a backdrop for why Melzer and his O9A co-conspirators planned their attack using a jihadist-themed Telegram channel, which at one point during the planning was named "Jihad" and then "Jihadist Caliphate." Thus, Dr. Simi's testimony will provide necessary context for why the defendant and his O9A associates admire jihadists and their violent means of achieving their global aims, and why they sought the assistance of jihadists in planning their attack. *See United States v. Young*, 916 F.3d 368, 379-80 (4th Cir. 2019) (affirming admission of expert testimony regarding "white separatists and the neo-Nazi movement," and on the "historical backgrounds of and connection between Nazism and militant Islamism," when "the

evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam, as well as white supremacism" (internal quotation marks omitted)).

### 5. O9A's Emphases on Deception and Violence

Dr. Simi will testify regarding O9A's emphases on deception and violence, consisting, in substance, of the following:

> O9A literature advocates the use of deception and violence to achieve the group's aims. O9A adherents similarly promote these concepts in their propaganda and discourse. For example, while performing "insight roles," O9A initiates are instructed not to divulge to anyone that they have infiltrated the target organization on behalf of O9A or that they are affiliated with O9A. With respect to violence, O9A followers condone and encourage murder and rape as legitimate means of furthering the objectives of the group.

(*See* Ex. D at 3).

Testimony regarding O9A emphases on deception and violence will assist the jury in understanding Melzer's motive and intent in committing an "insight role" for O9A by joining the military and why he then sought to commit a violent and murderous attack against his fellow service members. Similarly, O9A's focus on rape will help explain, as detailed further below, the name of the *Rape*waffen Telegram channel and Melzer's possession of O9A propaganda using the term. Furthermore, Dr. Simi's testimony about O9A's emphasis on deception is also relevant to contextualize why Melzer never told his fellow soldiers about his affiliation with O9A, why he deleted some of his Telegram messages, and why he was not fully truthful in his post-arrest statements with law enforcement. Relatedly, to the extent defense counsel argues that Melzer was not in fact a member of O9A—as it has signaled it will (*see* Def. Mot. at 6)—this testimony would be relevant to show that O9A adherents are instructed to lie about their affiliation with O9A and that the jury should evaluate the defendant's statements regarding his association with the group in that context.

22

6.  **Use of Certain Terms, Images, Symbols and Memes in the White Supremacist Community**

Dr. Simi will testify regarding the use of certain terms, images, symbols, memes in the white supremacist community, consisting, in substance, of the following:

> O9A members, consistent with the larger white supremacist movement, use certain terms (including slang words), images, symbols, memes, and other content to recruit new members and communicate shared goals and ideology.  O9A and other white supremacist groups also regularly employ "double-speak," "just joking" and "front-stage/back-stage" strategies in communications.

(*See* Ex. D at 3).

Testimony regarding the meaning and use of certain terms, images, symbols, memes, and other content by O9A and related "accelerationist" and white supremacist groups (such as the Rapewaffen Division) will aid the jury in understanding the communications between the defendant and his co-conspirators.  These terms, images, symbols, and memes are likely to be unfamiliar to many jurors, particularly as they are used by O9A members and other white supremacists.  *See United States v. Hunt*, 534 F. Supp. 3d 233, 246 (E.D.N.Y. 2021) (admitting expert testimony regarding white supremacist and anti-Semitic propaganda, beliefs, and symbols referenced in the defendant's communications as context for the defendant's criminal conduct).  In particular, the defendant and his co-conspirators used certain terms and concepts, images, symbols, and memes—including rape, baste, and kek—while planning the ambush on Melzer's U.S. Army unit.  For example, Dr. Simi is expected to testify about the meaning and use of the term "rape" to O9A and related "accelerationist" groups (such as the Rapewaffen Division), including the dual-use of the word as a reference to "accelerationist" goals, that is, advocating the use of rape as a means by which to propagate the white race and/or subjugate and destroy non-white communities, and also as a means of signaling membership in O9A.  This testimony is relevant since Melzer communicated with his co-conspirators on the *Rape*waffen Division Telegram channel.  Similarly,

23

this testimony will help explain Melzer's possession of an image, marked as GX 513 and accessed by the defendant on his iPhone 11 on May 1, 2020, depicting what appears to be an individual wearing a skull mask (akin to the one retrieved from the defendant's barracks) with the text "Rapists Its Time to Mobilize." (*See* Gov. Mot. at 30).

Similarly, Dr. Simi will explain the meaning of the word "baste" in white supremacist communities as a means of expressing praise or approval. For example, on May 24, 2020, Melzer and CC-1 exchanged a series of direct messages on Telegram using this term. CC-1 asked Melzer, "are we literally organizing a jihadi attack[?]" Melzer replied, "And yes probably . . . as long as I get the info I need to give you all." CC-1 approvingly replied, "that's kinda baste." Melzer agreed: "Actually like a 8 outta 10 on the baste scale if I do say so myself . . . as long as I get what I need." Dr. Simi will also explain the use of the word "kek" in these extremist online communities as a way of signaling that the writer embraces the principles of chaos and destruction that are central to white supremacist ideologies. For example, on May 29, 2022, hours before he was arrested, the CS asked Melzer why he deleted messages about the attack plot, writing "You deleted them because that's treason . . . Duh" to which Melzer replied, "Kek." Similarly, Melzer used the term "kek," as detailed in the following paragraph, when discussing the possibility of performing an insight role for al Qaeda.

Finally, Dr. Simi's testimony about the use by O9A and other white supremacist groups of "double-speak," "just joking" and "front-stage/back-stage" strategies will aid the jury in understanding Melzer and his co-conspirator's communications. "Double-speak" is a strategy intended to simultaneously reveal and conceal meaning embedded in words and to create plausible deniability for ideas or actions that would attract legal or social sanctions. Relatedly, "front-stage/back-stage" behavior involves the use of cultural themes, graphics, symbols, and code words

24

that are widely understood by those immersed in the white supremacist culture to convey a meaning to insiders that differs from its surface meaning.  And "just joking" strategies afford adherents plausible deniability when conveying certain racist or violent messages by intentionally giving the impression that the participants are not serious about their communications.  Dr. Simi is expected to testify that white supremacists employ these tactics frequently, even when communicating amongst themselves for, among other reasons, plausible deniability if the communications are subsequently obtained by or disclosed to others outside the group.  Melzer and his co-conspirators deployed these strategies throughout their Telegram communications.  For example, Melzer appears to have engaged in "double speak" when, on May 17, 2020, after CC-1 raised the possibility of performing an insight role for al Qaeda, Melzer wrote "I've thought about it . . . But it would have to be after this . . . The amount of heat from a us paratrooper goes and awol and joined [redacted] . . . Kek."  Melzer's use of the word "[redacted]" in place of al Qaeda appears to be intended to simultaneously reveal his intentions to CC-1 while creating plausible deniability about his objectives.  An example of "front-stage/back-stage" behavior appears to be Melzer's use of coded terms such as baste and kek.  And "just joking" strategies include Melzer and his co-conspirators constantly using the terms "lol" and "lmao"—shorthand for "laugh out loud" and "laughing my ass off," respectively—in the midst of planning a deadly ambush.  For example, on May 24, 2020, after CC-1 and Melzer agree that they are "organizing a jihadi attack," CC-1 wrote, "i mean yeah but if you get shot . . . your fault lol."  Similarly, on or about May 17, 2020, CC-1 identified "[CC-2]" to Melzer as "a grey wolf . . . he was joining the Turkish army at some point for training . . . was* . . . forgot he's joining AQ lmao."[3]

---

[3] The Grey Wolves are a Turkish far-right organization and movement affiliated with an ultra-nationalistic, Islamist, and neo-fascist ideology.

Without the necessary background from Dr. Simi summarized above, the jury will be unable to understand the full meaning of these terms and strategies in context, and the significance of Melzer and his co-conspirators' incorporation of the terms and strategies into their planning and communications. *See Sines v. Kessler*, No. 17 Civ. 72 (NKM), 2021 WL 1431296, at *5 (W.D. Va. Apr. 15, 2021) (admitting expert testimony from Dr. Simi about "double-speak," "just joking" and "front-stage/back-stage" in white supremacist communities). This testimony is also relevant to rebut any defense argument that the defendant never intended to actually facilitate a deadly ambush but that he was only joking during his communications with other members of O9A.

### 7.   O9A's Use of Encrypted Messaging Applications

Dr. Simi will testify regarding O9A's use of encrypted messaging applications, consisting, in substance, of the following:

> O9A primarily communicates through encrypted messaging applications, such as Telegram. O9A uses these encrypted platforms to, among other things, express extremist views, organize overt and covert operations, recruit new members, and share propaganda amongst themselves, including Neo-Nazi and jihadist videos, images, and memes.

(*See* Ex. D at 3).

Testimony regarding O9A's use of encrypted messaging applications will aid the jury in understanding why Melzer and his co-conspirators chose Telegram—an encrypted messaging application—as the platform for planing the ambush on Melzer's unit. Furthermore, this testimony will provide context for the jury regarding why Melzer sought out fellow O9A members on Telegram in the lead-up to the planned attack. Dr. Simi—who has personally observed, studied, and researched O9A communications on applications such as Telegram—will explain how and why white supremacist groups like O9A prefer platforms like Telegram, including because law enforcement has limited visibility into the content of communications on such encrypted platforms. *See   United   States   v.   Abarca*,   22   F.4th   58,   66   (2d   Cir.   2021)   (affirming   admission

of expert testimony regarding "how [drug traffickers] use encrypted messaging services to communicate"). That Melzer chose a communication platform known to be a meeting place for members of O9A, and that he selected one that is known to be largely impermeable to law enforcement, is also relevant to rebut defense arguments that Melzer was not serious about planning an attack.

### B.   The Proposed Testimony Complies with Rules 401, 403 and 702

In each instance, as set forth above, Dr. Simi's proposed testimony on the specified topics will help the jury understand the ideology, practices, and terminology of O9A referenced in the defendant's own statements and found in materials in his own possession. Dr. Simi, with his extensive experience studying white supremacist groups like O9A, is well-positioned to provide "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a). Courts in this District and Circuit repeatedly have "approved the use of expert testimony to provide juries with background on criminal organizations," *Farhane*, 634 F.3d at 159, in particular "to help explain the operation, structure, membership, and terminology" of such organizations, *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011). Unsurprisingly, then, courts in this Circuit routinely admit expert testimony relating to extremist organizations and groups, including testimony on their ideology, membership, history, and activities. *See, e.g.*, *Farhane*, 634 F.3d at 158-60 (expert testimony regarding the "history and structure" and "background" on al Qaeda); *United States v. Kadir*, 718 F.3d 115, 121-22 (2d Cir. 2013) (expert testimony to "describe al Qaeda and Hezbollah and their activities in South America and to define various terms related to terrorism"); *United States v. Dey*, 409 F. App'x 372, 374 (2d Cir. 2010) (expert testimony regarding organized crime terminology and code language in La Cosa Nostra); *United States v. Kourani*, No. 17 Cr. 417 (AKH), Dkt. No. 105 (S.D.N.Y. May 7, 2019) (expert testimony regarding ideology, membership, history, and activities

of Hezbollah); *United States v. Ullah*, No. 18 Cr. 16 (RJS), Dkt. No. 62 (S.D.N.Y. Oct. 31, 2018)

(expert testimony regarding ISIS); *United States v. Rahimi*, No. 16 Cr. 760 (RMB), Dkt. No. 158

(S.D.N.Y. Oct. 3, 2017) (same); *United States v. Boyle*, No. 08 Cr. 523 (CM), 2010 WL 286624,

at *2 (S.D.N.Y. Jan. 15, 2010) (expert testimony regarding "the operation, structure, membership,

and terminology of organized crime families"); *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121,

123-24 (D. Conn. 2008) (expert testimony regarding "the history, structure, and goals of al Qaeda

. . . and the role of Azzam Publications among the mujahideen").  The Court should do the same

here.

At bottom, Dr. Simi's testimony will provide the jury with appropriate context to evaluate

the defendant's words and actions.   That information is directly relevant to assessing the

defendant's knowledge, understanding, and motive in conspiring with other O9A members in a

plot to murder his fellow soldiers.  Moreover, the Government submits that each of these topic

areas is beyond the ken of the average juror.  *See Locascio*, 6 F.3d at 936 (applying Rule 702 to

conduct a "common sense inquiry into whether the untrained layman would be qualified to

determine intelligently and to the best possible degree the particular issue without enlightenment

from those having a specialized understanding of the subject involved in the dispute" (internal

quotation marks omitted)); *Duncan*, 42 F.3d at 101 ("Expert witnesses are often uniquely qualified

in guiding the trier of fact through a complicated morass of obscure terms and concepts.").

Nor does Rule 403 provide any basis to reject Dr. Simi's testimony.  As outlined in detail

above, the testimony will be closely cabined and directly linked to the evidence in this case, to

help the jury understand the unique ideology, practices, and terminology discussed by the

defendant and his co-conspirators. Dr. Simi's explanation of these concepts—all of which are tied

to specific evidence that will be presented to the jury—is highly probative of the conspirators'

states of mind and communications and is not "unfairly" prejudicial.  Notably, in arguing that Dr.

Simi's testimony would be unduly prejudicial, defense counsel highlights only one topic listed in

the Government's initial expert notice: "key events in O9A's history, including historical acts of

violence perpetrated by O9A members and associates."  (Def. Mot. at 11).  The Government did

not include this topic in its supplemental notice (Ex. D) and is no longer seeking to admit testimony

on this subject from Dr. Simi.  As a result, the defendant's motion to preclude Dr. Simi's testimony

on this subject is now moot.  None of the other topics is unduly prejudicial—especially in light of

the clear relevance of Dr. Simi's limited testimony and the extremely serious nature of the charged

crimes, which involve a highly disturbing plot to carry out a mass-casualty attack on a U.S. Army

unit.  *See United States v. Brettschneider*, 832 F. App'x 14, 19 (2d Cir. 2020) (noting that the Rule

403 balancing test is satisfied if the evidence is not "any more sensational or disturbing than the

alleged crime"); *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (noting that "virtually all

evidence is prejudicial to one party or another," and so "to justify exclusion under Rule 403 the

prejudice must be unfair").

### C.  Dr. Simi Is Qualified to Serve as an Expert Witness on White Supremacist Groups Such as O9A

Next, the defense disputes Dr. Simi's qualifications as an expert on white supremacist

groups such as O9A.  As an initial matter, defense counsel does not appear to challenge that Dr.

Simi is qualified to be an expert witness about white supremacist movement groups more broadly.

(*See* Def. Mot. at 11 ("Next, the notices do not establish Dr. Simi's qualifications to testify as an

expert on O9A specifically, as opposed to the white supremacist movement more broadly.").  Nor

could they.  Dr. Simi is a highly-credentialed academic at a top American university, where he

researches and teaches courses about white supremacist groups and movements.  He has published

dozens of publications in peer-reviewed articles and book chapters on white supremacist and Neo-

Nazi groups. He has also lectured about these topics extensively, including to federal law enforcement agencies, and testified twice on the subject as an expert witness and once before Congress.

Rather, defense counsel's challenge to Dr. Simi's qualification is narrower: they claim that Dr. Simi is not qualified to testify about O9A specifically. This argument fails for a simple reason: because O9A is a white supremacist group, Dr. Simi's indisputable qualifications as an expert on white supremacist groups qualify him to testify about O9A. There is no legal requirement that his experience be any more closely tailored to his proposed testimony. Indeed, proposed experts are not "required to satisfy an overly narrow test of [their] own qualifications." *Johnson & Johnson*, 2006 WL 2128785, at *5. And, as this Court recently noted, "the Second Circuit has rejected exclusion of experts based solely on an expert's lack of experience with a specific system." *Alto v. Sun Pharm. Indus., Inc.*, No. 19 Civ. 9758 (GHW), 2021 WL 4803582, at *5 (S.D.N.Y. Oct. 13, 2021). Rather, the case law is clear that if an expert is qualified "in a general field closely related to the subject matter in question," courts do not exclude witnesses for lacking "expertise in the specialized areas that are directly pertinent." *In re Zyprexa*, 489 F. Supp. 2d at 282 (Weinstein, J.); *see Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (holding that district court abused its discretion in precluding expert witness where the witness possessed sufficient experience related to general area, but not to specific question before trier of fact); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 447 (S.D.N.Y. 2016) ("An expert need not be precluded from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute."); *Sullivan v. Ford Motor Co.*, No. 97 Civ. 593, 2000 WL 343777 (RCC), at *4 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in

order to offer an opinion.").

Unable to dispute that O9A is clearly a white supremacist group, defense counsel first contends that "O9A is anything but a 'traditional' white supremacist group" (Def. Mot. at 13) and that this somehow disqualifies Dr. Simi from being able to testify about it.  But this argument fails for the same reason: because Dr. Simi is an expert on white supremacist groups, which includes O9A, and whether O9A can be characterized as "traditional" in no way determines whether he is qualified to testify about the group.  *See Alto*, 2021 WL 4803582, at *5 ("[T]o find an expert unqualified, the court must find the expert's *general* experience insufficient . . . to testify about the issue in the case at hand." (emphasis supplied)).  Moreover, Dr. Simi is expected to testify about the similarities—historically, philosophically, linguistically, and operationally—between O9A and other white supremacist groups, including the fact that many white supremacist groups anchor their ideology in Satanism and occultism.  And to the extent defense counsel is arguing that these purported differences between O9A and other white supremacist groups are so extensive (which they are not) that Dr. Simi cannot possibly testify intelligently about O9A, that meritless assertion goes to weight, not admissibility.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (expert's lack of experience performing or interpreting air quality studies was "properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility"); *Alto*, 2021 WL 4803582, at *5 ("Absent a showing of insufficient general experience, the lack of specific experience properly goes to the weight, rather than the admissibility, of an expert's testimony."); *In re Zyprexa*, 489 F. Supp. 2d at 282 ("Assertions that the witness lacks particular educational or other experiential background, go to the weight, not the admissibility, of [the] testimony.").

Relatedly, defense counsel also claims that Dr. Simi's testimony should be precluded

31

because he has never published research specifically about O9A. (Def. Mot. at 11). But this argument also fails because defense counsel's focus on O9A—and their disregard for Dr. Simi's expertise on white supremacist groups generally—is inconsistent with the case law cited above and Rule 702's "liberal standard of admissibility for expert opinions." *Alto*, 2021 WL 4803582, at *5. Indeed, Dr. Simi has researched and published extensively about white supremacist groups, of which O9A is one. In any event, it is well established that there is no requirement that a witness publish research on a specific topic to qualify as an expert. *See State of New York v. United Parcel Serv., Inc*., No. 15 Civ. 1136 (KBF), 2016 WL 4735368, at *13 (S.D.N.Y. Sept. 10, 2016) (qualifying expert who had never "written an article or published an academic paper in his area of expertise"); *Emig v. Electrolux Home Prod. Inc.*, No. 06 Civ. 4791 (KMK), 2008 WL 4200988, at *4 (S.D.N.Y. Sept. 11, 2008) (qualifying expert even though he had "not published any literature or lectured on consumer instructions or warnings"); *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006) (finding ear, nose and throat doctor qualified to opine on latex allergies even though he "never published any articles on latex allergy or any other medical subject").

Accordingly, Dr. Simi is qualified to serve as an expert on white supremacist groups such as O9A.

### D. Dr. Simi's Proposed Expert Testimony on White Supremacist Groups and O9A Does Not Impermissibly Rely on Inadmissible Hearsay

Defense counsel next seeks to preclude Dr. Simi's testimony on the grounds that his "sources would likely constitute hearsay, and the government has not identified any sort of scientific or otherwise-reliable methodology he might apply to them." (Def. Mot. at 12). This argument fails for several reasons.

As an initial matter, Dr. Simi's proposed testimony is based on reliable methodologies used in his field, including his extensive research and expertise studying white supremacist groups. In

particular, Dr. Simi's testimony will rely on a synthesis of, among other things, his review of academic literature (including peer-reviewed articles) concerning white supremacist and Neo-Nazi groups; extensive online research, including review of online gathering spaces for white supremacist, Neo-Nazi, and accelerationist groups, including O9A, on online platforms including Telegram; review of O9A materials, including primary source documents such as books, essays and blog posts; and his field research embedded with white supremacist and Neo-Nazi groups. *See* Ex. D.  Dr. Simi's factual bases and methodology are "similar to that employed by experts that have been permitted to testify in other federal cases" on analogous groups, such as terrorist organizations and the Mafia. *See United States v. Mustafa*, 753 F. App'x 22, 33 (2d Cir. 2018) (citing cases and noting that the expert's work "has undergone various forms of peer review, that his opinions are generally accepted within the relevant community, and that his methodology is similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations"); *Farhane*, 634 F.3d at 159 (finding "considerable factual basis" for expert testimony regarding al Qaeda where witness had completed relevant graduate studies, worked at organizations focusing on terrorism and al Qaeda, consulted with federal agencies, published a book on al Qaeda, and engaged in ongoing efforts to review materials relevant to terrorism and al Qaeda, including guilty pleas of operatives).  Thus, Dr Simi's methodology is reliable and in line with that of experts permitted to testify in analogous contexts.

Furthermore, regardless of whether some of Dr. Simi's sources might be considered hearsay, "[u]nder Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (internal quotation marks omitted).  Further, "it is rare indeed that an expert can give an opinion without relying to some

extent upon information furnished him by others." *Howard v. Walker*, 406 F.3d 114, 127 (2d. Cir. 2005).  This is especially true for experts studying extremist groups, who almost by definition must obtain information about their subjects second-hand given the inherent danger in conducting first-hand research.  *See Abu-Jihaad*, 553 F. Supp. 2d at 126 (admitting expert testimony about al Qaeda and noting that the expert "must, perforce, rely often on hearsay, he testified that he gathers information from multiple sources and cross-checks factual information he receives with existing information from other sources. He also works collaboratively with his peers and relies upon original information provided directly by the terrorists organizations themselves").  In fact, the Second Circuit has approved this specific methodology on multiple occasions for experts testifying about extremist organizations.  For example, in *United States v. Paracha*, No. 03 Cr. 1197 (SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006), Judge Stein addressed a parallel challenge, where the defendant characterized the expert's methodology "as a mere culling from a handful of cases and internet reports information that the user deems reliable." *Id.*  Judge Stein noted that while the expert's "methodology is not readily subject to testing and permits of no ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of information from websites and other sources." *Id.*  Judge Stein further focused on the existence of the peer review process in the expert's field and the general acceptance of his research within the relevant academic community.  *Id.*  The Second Circuit later affirmed the decision, concluding that the district court "was well within its discretion in ruling that [the expert's] methodology was sufficiently reliable and his testimony relevant to the jury's understanding of al Qaeda so as to be admissible under Fed. R. Evid. 702." *United States v. Paracha*, 313 F. App'x 347, 351 (2d Cir. 2008); *see also Farhane*, 634 F.3d at 158-59 (affirming admission of expert testimony regarding al Qaeda, where information was partly derived from Internet sources); *see also Linde v. Arab Bank, PLC*, 922 F.

34

Supp. 2d 316, 332 (E.D.N.Y. 2013) (denying motion to exclude expert on Hamas whose "research was conducted solely on the Internet" and who "synthesize[d]" materials, including "videos, recordings, or published writings of terrorists; terrorist organizations' official websites; newspaper articles, television news reports, and reputable books and magazines").

Notably, Dr. Simi is not just relying upon the statements of others; for example, his testimony will also be based on his own observations as an embedded sociologist in white supremacist communities and as an observer of online gathering spaces for white supremacists, including O9A, on platforms like Telegram.  As such, Dr. Simi will be following accepted methodologies in his field, and applying his experience with, and expertise regarding, white supremacist groups to provide his opinions during his testimony.  And to the extent Dr. Simi's testimony relies on hearsay materials, including core O9A texts, statements and writings of O9A and other white supremacist figures, and literature about O9A and other white supremacist groups—which, again, is permitted under Rule 703—his testimony will not merely be transmitting the hearsay to the jury, but rather synthesizing the information, and applying his own experience and expertise before communicating his opinions about O9A to the jury.  Furthermore, it bears noting that Dr. Simi's reliance on these types of materials in his testimony would also not constitute the introduction of impermissible hearsay if he is not offering them for the truth of the matters asserted therein.

The defendant's reliance on *Mejia*, 545 F.3d at 199, and *United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002), is misplaced.  Both cases involved case agents noticed as experts who, by improperly "testifying about factual matters from first-hand knowledge"—obtained directly from their case work, including custodial interrogations—"gain[ed] 'unmerited credibility'" before the jury.  *Mejia*, 545 F.3d at 196 (quoting *Dukagjini*, 326 F.3d at 53).  The *Mejia* court also

concluded that where an expert witness merely repeats out-of-court statements made by others for their truth, without applying expertise or any expert synthesis, the testimony raises Confrontation Clause issues under *Crawford v. Washington*, 541 U.S. 36 (2004).  *See Mejia*, 545 F.3d at 199. Here, Dr. Simi is not a case agent nor will he be testifying from first-hand knowledge about factual matters related to the case.  Rather, like the scores of experts qualified by courts in this Circuit to testify about extremist and criminal groups, Dr. Simi will rely on a synthesis of sources and apply his own methodology to those sources before offering his opinions about O9A.  *See id.* at 197 (noting that testimony from an expert witness "result[ing] from his synthesis of various source materials" was proper); *see also Boyle*, 2010 WL 286624, at *2 (admitting expert testimony about "the operation, structure, membership, and terminology of organized crime families" and noting that "expert testimony does not violate *Crawford* where the expert applies his expertise to out-of-court statements and other sources, and synthesizes or analyzes that information, along with other information, in the form of an expert opinion").  If anything, *Mejia* actually supports the admission of Dr. Simi's testimony: the Second Circuit there re-affirmed the admissibility of expert testimony in organized crime cases focusing on, among other things,  "interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy," *Mejia*, 545 F.3d at 191, 195 (internal citations omitted).  Much of Dr. Simi's testimony regarding O9A will cover those same topic areas.

Accordingly, the defendant's motion to preclude Dr. Simi's testimony on these grounds should be denied.

### E.  The Government Has Provided Adequate Notice of Dr. Simi's Testimony

The Government's disclosures regarding Dr. Simi's proposed testimony, including the additionally detailed information supplied in this opposition, satisfy the requirements of Rule

16(a)(1)(G).  The Government's disclosures are more than sufficient to ensure that "the proposed testimony [will not be] a surprise."  *United States v. Rosario*, No. 09 Cr. 415 (VEC), 2014 WL 6076364, at *4 (S.D.N.Y. Nov. 14, 2014).  The Government has disclosed the specific topics of Dr. Simi's expected testimony, his qualifications, and a description of the bases for his knowledge. The fulsome preview of Dr. Simi's testimony provided above, in particular, renders the defendant's request for further disclosures moot.  The Government's disclosures regarding Dr. Simi's testimony are extensive and detailed, and easily meet the requirements of Rule 16(a)(1)(G).

## F.  A *Daubert* Hearing Is Not Required

For similar reasons, there is no basis or need for a *Daubert* hearing in advance of qualifying Dr. Simi to testify as an expert on the limited subjects set forth above.  Dr. Simi's ability to testify reliably as an expert on these squarely relevant topics is apparent and requires no additional probing.  The Supreme Court has emphasized that while a district court must serve its gatekeeping function, a court also "must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152 (noting that the "abuse of discretion" standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion" because "[o]therwise, the trial judge would lack the discretionary authority needed . . . . to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted"); *see Williams*, 506 F.3d at 161 (in a case involving ballistics expert testimony, holding that "[w]hile the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so"); *Kewazinga Corp. v. Microsoft*, No. 18 Civ. 4500 (GHW), 2021 WL 4066597, at *2 (S.D.N.Y. Sept. 1, 2021) ("The formality of a separate hearing

is not always required for a district court to effectively fulfill[ ] its gatekeeping function under *Daubert*." (internal quotation marks omitted)).

The topics on which Dr. Simi will testify are not "scientific" or "technical" in nature, but instead are based upon the type of "specialized knowledge" a person acquires over years of study and experience.  *See* Fed. R. Evid. 702.  Moreover, as detailed above, the methods by which Dr. Simi and other experts who study extremist groups acquire that specialized knowledge have been repeatedly reviewed and approved by the numerous courts that have admitted such testimony.  The Government respectfully submits that Dr. Simi's credentials and methods may be evaluated in light of his extensive *curriculum vitae* and in conjunction with the foundation the Government will lay in qualifying him as an expert before the jury; this will provide an adequate foundation for the Court to find that Dr. Simi's testimony may be admitted pursuant to Rule 702.  *See Williams*, 506 F.3d at 161-62 (upholding denial of *Daubert* hearing where the court considered the use of similar testimony in other cases, and the Government provided a thorough foundation prior to presenting expert's testimony to the jury); *United States v. Smalls*, 719 F. App'x 83, 86 (2d Cir. 2018) (affirming district court's decision to forego *Daubert* hearing because the district court "ascertained the police detective's expertise and reliability"); *United States v. Hossain*, No. 19 Cr. 606 (SHS), Dkt. No. 158 at 13-21 (S.D.N.Y. Sept. 29, 2021) (declining to hold *Daubert* hearing for expert witness on the Taliban and noting that "as long as [the defendant has] a valid, that is, a correct statement from the government of what the areas [of testimony] are, a so-called *Daubert* hearing here would simply be two bites at the apple"); *United States v. Schulte*, No. 17 Cr. 548 (PAC) (S.D.N.Y. 2020), Dkt. No. 256 at 4 (admitting without a *Daubert* hearing the testimony of expert on WikiLeaks who had not previously testified in federal court as "appropriate under FRE 702").

38

For all the above reasons, Dr. Simi's testimony should be admitted without a *Daubert* hearing.

## THE COURT SHOULD DENY THE DEFENDANT'S REQUEST FOR ATTORNEY-CONDUCTED VOIR DIRE

Melzer moves for the Court to permit attorney-conducted voir dire in this case on the grounds that attorney-conducted voir dire purportedly "is a more effective tool for eliciting bias than questioning conducted by judges alone" since "[j]urors are likely to feel less inhibited about offering candid responses to an attorney than to the judge." (Def. Mot. at 14-15). Melzer further argues that this procedure would promote judicial economy, contending that "the attorneys' voir dire might ultimately be even more efficient than the Court's, given the attorneys' keen familiarity with the evidence in Melzer's case." (*Id.*). Neither of these unsubstantiated reasons warrants a departure from the usual practice of court-conducted voir dire in this District.

Rule 24(a)(1) of the Federal Rules of Criminal Procedure states that "[t]he court may examine prospective jurors or may permit the attorneys for the parties to do so." Fed. R. Crim. P. 24. It is settled law that a trial court has broad discretion over the manner in which prospective jurors are examined and that the refusal to allow counsel to conduct the voir dire is not an abuse of that discretion. *See Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) ("[F]ederal judges have been accorded ample discretion in determining how best to conduct the voir dire."); *United States v. L'Hoste*, 609 F.2d 796 (5th Cir. 1980) (trial court is given wide discretion in deciding how to conduct voir dire), *cert. denied*, 449 U.S. 833 (1980); *United States v. Duncan*, 598 F.2d 839 (4th Cir. 1979) (same), *cert. denied*, 444 U.S. 871 (1979); *United States v. Johnson*, 584 F.2d 148 (6th Cir. 1978) (same), *cert. denied*, 440 U.S. 918 (1979); *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976) (same); *United States v. Addington*, 471 F.2d 560 (10th Cir. 1973) (same);

*United States v. Addonizio*, 451 F.2d 49 (3rd Cir. 1971) (same), *cert. denied*, 405 U.S. 936, *rehr'g denied*, 405 U.S. 1048 (1971).

Although courts may, at their discretion, permit attorneys to participate in the voir dire of potential jurors, this practice is generally frowned upon. *See United States v. Duke*, 409 F.2d 669, 671 (4th Cir. 1969) ("There are very substantial reasons for referring the direction of all inquiries to the venire through the court."), *cert. denied*, 397 U.S. 1062 (1970); *United States v. Saipov*, No. 17 Cr. 722 (VSB), 2020 WL 958527, at *1 (S.D.N.Y. Feb. 27, 2020) (rejecting identical arguments and noting that "court-conducted voir dire assures that the parties do not stray into impermissible areas that could potentially taint the prospective jurors' answers or points of view"); *United States v. Barone*, No. 09 Cr. 91 (NRB), 2010 WL 2976505, at *1 (S.D.N.Y. July 9, 2010) (rejecting request for attorney-conducted voir dire); *United States v. Salameh*, No. 93 Cr. 180 (KTD), 1993 WL 364486, at *12 (S.D.N.Y. Sept. 15, 1993), *aff'd,* 152 F.3d 88 (2d Cir. 1998) (rejecting request for attorney-conducted voir dire and noting that court-led voir dire "is the way it has been done in this district for years"); *United States v. Golfo*, No. 19 Civ. 95 (KAM), 2020 WL 2513445, at *6 (E.D.N.Y. May 15, 2020) (rejecting request for attorney-conducted voir dire); *United States v. Taveras*, 436 F. Supp. 2d 493, 504 (E.D.N.Y. 2006) (Weinstein, J.),*aff'd in part, rev'd in part on other grounds*, *United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008) ("Attorney-driven voir dire is disfavored, since the opportunity is often abused to delay and to prejudice the jury.").

Melzer fails to identify any compelling factors particular to this case that would justify a departure from the custom of court-conducted voir dire that has long existed in this District and this Circuit.  Rather, in a conclusory fashion, he contends that his case "implicates a number sensitive issues—touching on racism, misogyny, Satanism, and anti-Semitism, among others" and that "questioning [about these topics] is more easily accomplished by the adversarial parties."

40

(Def. Mot. at 15).  But Melzer cites no case law in support of his vague argument that attorneys for the defense and the prosecution are better positioned than the court to examine jurors in a manner that is both comprehensive and efficient in a case with such "sensitive issues."  Indeed, the only case he does cite (*see* Def. Mot. at 15) is an-out-district bank fraud case—which does not meaningfully support the defendant's claim that the sensitive issues presented here merit this exceptional procedure.

Melzer's unsubstantiated reasoning does not warrant a departure from the consistent practice of court-conducted voir dire in this District.  Moreover, attorney-led voir dire has the potential to cause delay and to prejudice the potential jurors.  The Court should, in its discretion, deny Melzer's motion**.**

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's motions.

Dated:        New York, New York
              February 8, 2022

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney


                             By:  ____/s/_____
                                    Sam Adelsberg
                                    Matthew Hellman
                                    Assistant United States Attorneys
                                    (212) 637-2494 / 2278