United States District Court
Southern District of New York
-------------------------------------------------

United States of America,

                -against-

                                                  S1 20 Cr. 314 (GHW)

Ethan Melzer,

                Defendant.

-------------------------------------------------


## ETHAN MELZER'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTIONS *IN LIMINE* AND FOR A BILL OF PARTICULARS


                                                         Federal Defenders of New York
                                                         Attorney for Ethan Melzer
                                                         52 Duane Street - 10th Floor
                                                         New York, New York 10007
                                                         Tel.: (212) 417-8700

                                                         *Of Counsel*


To:    Damian Williams, Esq.
        United States Attorney
        Southern District Of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn:  Sam Adelsberg, Esq.
                   Matthew Hellman, Esq.
                   Assistant United States Attorneys

**Contents**

Table of Authorities ................................................................................................................... i

I. The Court should require the government to provide a bill of particulars. ............................ 1

II. The Court should preclude, or at least limit, Dr. Simi's testimony ........................................ 3

    A. Dr. Simi's lack of specific knowledge concerning O9A renders his testimony inadmissible ................................................................................................................. 3

    B. The Court should preclude Dr. Simi's testimony that would improperly bolster the government's narrative or usurp the jury's role. ............................................................. 6

Conclusion ................................................................................................................................ 11

## Table of Authorities

**Federal Cases**

*Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) .............................. 9

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................................... 2

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ............................................................................. 11

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ......................................................... 6

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................................... 9

*Sines v. Kessler*, 2021 WL 1431296 (W.D. Va. Apr. 15, 2021) .................................................... 10

*State of New York v. United Parcel Serv., Inc.*, 2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016) ...... 4

*United States v. Carroll*, 840 F. App'x 649 (2d Cir. 2021) ......................................................... 8

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) ............................................................. 7

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992) .................................................................... 7

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) .............................................................. 8

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) ................................................................... 7

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ........................................................... 4, 5

*United States v. Glaze*, 313 F.2d 757 (2d Cir. 1963) .................................................................. 2

*United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013) ............................................................... 10

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) .................................................................. 5

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007) ................................................................ 2

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ............................................................. 10

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................. 1

*United States v. Matera*, 489 F.3d 115 (2d Cir. 2007) ................................................................ 5

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .................................................................. 8

*United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) ........................................................ 5

*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018) ......................................... 1

*United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y. Aug. 15, 2017) ......................................... 5

*United States v. Rijo*, 508 F. App'x 41 (2d Cir. 2013) ................................................................. 7

*United States v. Valle*, 12 Cr. 847 (PGG) (S.D.N.Y. Jan. 9, 2013) ................................................ 2

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) .............................................................. 3

**Federal Statutes**

42 U.S.C. § 1985(3) ..................................................................................................................... 10

**Federal Rules**

Fed. R. Crim. P. 16(a)(1)(E) .................................................................................................. 2
Fed. R. Evid. 702 ............................................................................................................... 3
Fed. R. Evid. 704(b) .......................................................................................................... 10

Ethan Melzer respectfully submits this reply memorandum of law in support of his motions *in limine* and for a bill of particulars.

**I.      The Court should require the government to provide a bill of particulars.**

Notwithstanding the government's claims to the contrary, a bill of particulars is necessary for Melzer "to prepare his defense [and] avoid unfair surprise" at trial. *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 301–02 (S.D.N.Y. 2018) (quoting *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010)). The government argues that its description of the conspiracy in its complaint, two indictments, and response to Melzer's pretrial motions, in connection with discovery, means that Melzer is not entitled to particulars. Gov't Opp'n 3. But the problem is that the government's account of Melzer's co-conspirators has changed with each successive filing. This is evident in the government's "Online Moniker Index." *See* Ex. A to Gov't Opp'n, ECF No. 94-1. In the complaint (June 4, 2020), for example, the government listed Drifter[1] as a co-conspirator, but not FreiKorpz. In its response to Melzer's pretrial motions (June 24, 2021), however, it dropped Drifter, but added FreiKorpz. Now, in its opposition to Melzer's request for particulars (Feb. 8, 2022), it has again delisted FreiKorpz and instead refers to him only as Individual-1. *See id.* Moreover, the government's current claim that "the relevant time period of the conspiracy" is "about a month spanning late-April to late-May 2020," Gov't Opp'n 3, differs significantly from its prior representation, in its opposition to Melzer's pretrial motions, that Melzer "joined the conspiracy in the United States when he adopted O9A's murderous ideology [prior to 2019] and enlisted in the Army [in late 2018]." ECF No. 71 at 28.

---

[1] The government has identified alleged co-conspirators only by their screen names, with the exception of CC-1 (Sinistrous/GvlagKvlt), whose true name the government has disclosed to the defense.

1

So while the government's present accounting of the conspiracy's duration and membership is helpful, there is little assurance it will not change yet again. The government says that it "does not presently intend to allege any additional co-conspirators." Gov't Opp'n 5. But the government refuses to provide a bill of particulars only so that it might continue to amend its theory of the case before trial without risking engaging in an impermissible variance. *See United States v. Kaplan*, 490 F.3d 110, 129 (2d Cir. 2007) ("A variance [] occurs when … the facts proven at trial differ from those alleged in the indictment or bill of particulars."); *United States v. Glaze*, 313 F.2d 757, 759 (2d Cir. 1963) (holding that, once the government has provided a bill of particulars, it is "strictly limited to proving what it has set forth in it"). We are now some 20 months from when Melzer was first charged in this District, and less than three months from trial. Any further modification of the government's case theory would amount to the very kind of unfair surprise a bill of particulars is designed to prevent.

The government fails to meaningfully distinguish Melzer's case from *United States v. Valle*, 12 Cr. 847 (PGG) (S.D.N.Y. Jan. 9, 2013), where Judge Gardephe ordered the government to identify all of Valle's known co-conspirators prior to trial. *See* Gov't Opp'n 8. Nor could it— the cases are essentially on all fours. Both concern alleged criminal conduct committed entirely online over an extended period of time, and both involve a large number of potential co-conspirators who could be located anywhere in the world. The Court accordingly should follow Judge Gardephe's reasoning and order the government to particularize Melzer's co-conspirators.

Finally, the government should be required to produce all material in its possession concerning all of Melzer's alleged co-conspirators—including CC-1 (Sinistrous/GvlagKvlt), CC-2 (Kurt_Cobani), and CC-3 (Jaww)—pursuant to Fed. R. Crim. P. 16(a)(1)(E) and *Brady v. Maryland*, 373 U.S. 83 (1963). The government bears the burden of proving at trial that these

individuals were in a genuine conspiracy with Melzer to murder his Army unit. Therefore the government should produce any material in its possession—and that it can reasonably obtain—that is relevant to his alleged coconspirators' identities and states of mind.[2]

## II. The Court should preclude, or at least limit, Dr. Simi's testimony.

The Court should preclude Dr. Simi's testimony entirely because he lacks specific expertise concerning O9A, a problem exacerbated by the fact that no court in the country has approved expert testimony about the group. Should the Court admit some of his proposed testimony, however, it should, at a minimum, preclude those portions that would improperly bolster the government's factual narrative or usurp the jury's role.

### A. Dr. Simi's lack of specific knowledge concerning O9A renders his testimony inadmissible.

The government bears the burden of demonstrating that Dr. Simi has the requisite specialized knowledge concerning O9A to admit his testimony under Rule 702. *See* Fed. R. Evid. 702, 2000 Advisory Committee Notes ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). But the government's brief confirms that Dr. Simi has never written or testified about O9A and that his field research into white supremacist groups has not involved meeting or interviewing any purported active or former members of the

---

[2] The government has disclosed, for example, that, while CC-1 claimed online to be a former Canadian paratrooper who had served in Iraq and Afghanistan and had access to powerful weapons, he was actually a 15-year-old boy residing in Canada. The government also disclosed that he was arrested in January 2020 (just months before he began communicating online with Melzer) and, in connection with that arrest, detained in a mental health facility at a hospital. The government should accordingly disclose all information and records concerning CC-1's prior arrest and mental health.

group. The government instead asserts a purported syllogism: since Dr. Simi is an expert on white supremacist groups, and since O9A is a white supremacist group, Dr. Simi is therefore an expert on O9A. *See, e.g.*, Gov't Opp'n 30 ("[B]ecause O9A is a white supremacist group, Dr. Simi's indisputable qualifications as an expert on white supremacist groups qualify him to testify about O9A."). The problem is the government's failure to substantiate the second premise: beyond offering conclusory assertions, the government has not shown that O9A is a white supremacist group sufficiently like the white supremacist groups Dr. Simi has actually studied such that his expertise necessarily applies to O9A. On this point, we note that, in 2020, Dr. Simi co-authored an expert report on the U.S. white supremacist movement on behalf of the plaintiffs in *Sines v. Kessler*, 17-CV-72 (NKM-JCH), a civil action in the Western District of Virginia. That 63-page report discussed the historical roots of the modern white supremacist movement and described what Dr. Simi termed the movement's "core characteristics." *See* ECF No. 832-2 at 7–30. Notably, the report does not include a single mention of O9A, and nowhere identifies Satanism or occultism—arguably O9A's primary ideological features—as among those core characteristics. This is further evidence that Dr. Simi's expertise on the white supremacist movement does not necessarily encompass O9A. Absent showing otherwise, the government has not met its burden. *See, e.g.*, *State of New York v. United Parcel Serv., Inc.*, 2016 WL 4735368, at *8 (S.D.N.Y. Sept. 10, 2016) (precluding expert's testimony where he lacked the requisite qualifications to design and conduct the consumer survey that formed the basis of his report).

    The Second Circuit's reasoning in *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), a case cited by the government, illustrates the problem with admitting Dr. Simi's testimony. There, the Circuit found that the government's expert was qualified to testify about al Qaeda because, among other reasons, he had authored various academic papers and a book on al Qaeda; he had

4

provided consulting services on terrorism and al Qaeda to various federal agencies; and he had made ongoing efforts to collect, analyze, and catalogue written, audio, and visual materials relevant to al Qaeda in particular, including the records of guilty pleas and confessions from admitted al Qaeda operatives. *Id.* at 158–59. And, the Circuit noted, before admitting his testimony, the district court had considered the record of a *Daubert* hearing in another case in which he was proffered as an expert. *Id.* at 159. Here, in contrast, Dr. Simi has never written a word about O9A and the government has not shown that he has made "ongoing efforts" to study the group. Nor is there any prior *Daubert* hearing on which this Court might rely. *Farhane* therefore does not support the government's position.

Nor does the government's litany of cases admitting expert testimony on organizations like the New York mafia, al Qaeda, Hezbollah, and ISIS support its position. *E.g. United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (mafia); *United States v. Kadir*, 718 F.3d 115, 121 (2d Cir. 2013) (al Qaeda and Hezbollah); *United States v. Mustafa*, 406 F. App'x 526, 529 (2d Cir. 2011) (al Qaeda); *United States v. Rahimi*, 16 Cr. 760 (RMB), ECF No. 113 at 17–18 (S.D.N.Y. Aug. 15, 2017), (al Qaeda and ISIS). These cases concern well-researched organizations, and proposed expert testimony addressing them has withstood numerous challenges. *See, e.g.*, *Matera*, 489 F.3d at 121 ("This circuit has approved the admission of expert testimony in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families.") (collecting cases). O9A simply does not have that same track record, or any track record at all: We are aware of no case admitting expert testimony on O9A, from Dr. Simi or anyone else, and the government has cited none. O9A's novelty therefore compounds the problem, and makes cases where experts have been permitted to offer testimony on more common subjects, despite not having specific expertise in those subjects, inapposite. *See, e.g.*,

5

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (finding expert testimony admissible despite expert's lack of experience performing air quality studies).

The Court should not excuse Dr. Simi's lack of expertise on O9A and should preclude his testimony altogether. At a minimum, the Court should conduct a *Daubert* hearing before deciding whether to admit it.

### B. The Court should preclude Dr. Simi's testimony that would improperly bolster the government's narrative or usurp the jury's role.

Should the Court admit some of Dr. Simi's testimony, it should preclude those portions that would improperly bolster the government's narrative or usurp the jury's role. We note that the government has now withdrawn its earlier request to have Dr. Simi testify about prior acts of violence committed by O9A. Gov't Opp'n 29. As to the remainder of his proposed testimony, we object to the following portions, several of which the government has identified for the first time in its brief:

- testimony that O9A "promotes human self-sacrifice" (*id.* at 16);
- testimony that "while performing 'insight roles,' O9A initiates are instructed not to divulge to anyone that they have infiltrated the target organization on behalf of O9A or that they are affiliated with O9A" (*id.* at 22); and
- testimony that "O9A and other white supremacist groups [] regularly employ 'double-speak,' 'just joking' and 'front-stage/back-stage' strategies in communications" (*id.* at 23).[3]

---

[3] The government defines these terms like this: "'Double-speak' is a strategy intended to simultaneously reveal and conceal meaning embedded in words and to create plausible deniability for ideas or actions that would attract legal or social sanctions. Relatedly, 'front-stage/back-stage' behavior involves the use of cultural themes, graphics, symbols, and code words that are widely understood by those immersed in the white supremacist culture to convey a meaning to insiders that differs from its surface meaning. And 'just joking' strategies afford adherents plausible deniability when conveying certain racist or violent messages by

6

The government says these proposed subjects are necessary to explain, respectively, why Melzer would plan an attack on his own unit that might potentially result in his death (*id.* at 16); why Melzer did not tell fellow soldiers of his affiliation with O9A (*id.* at 22); and why the jury should reject arguments that Melzer never intended to actually facilitate a deadly ambush and that he was only joking during his communications with other members of O9A (*id.* at 26). None of this testimony is admissible.

"[T]he use of expert testimony is not permitted if it will usurp … the role of the jury in applying th[e] law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) (emphasis in original) (internal quotation marks omitted). In light of these principles, the Second Circuit has frequently criticized expert testimony that purports to describe the supposedly "common" or "typical" behaviors of criminal groups. As the Circuit explained in a narcotics-related case, for example, it is improper for the government to call an expert to testify as to how drug dealers "typically" work and offer testimony that seeks to mirror that of the government's fact witnesses, because such testimony "implicitly encourage[s] the jury to draw the government's preferred inferences." *United States v. Rijo*, 508 F. App'x 41, 45 (2d Cir. 2013); *see also United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992) (cautioning that expert testimony must not be used "solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events"); *United States v. Castillo*, 924 F.2d 1227, 1233–34 (2d Cir.

---

intentionally giving the impression that the participants are not serious about their communications." *Id.* at 24–25.

1991) (finding prejudicial error where court admitted "expert" testimony aimed at corroborating government witness's account).

As to expert testimony regarding a group's specialized terminology, "district courts are charged with careful oversight of such testimony, as it 'may unfairly provide the government with an additional summation by having the expert interpret the evidence, and may come dangerously close to usurping the jury's function.'" *United States v. Carroll*, 840 F. App'x 649, 650 (2d Cir. 2021) (quoting *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)). The Circuit has observed the following about the government's use of these tactics in drug cases:

> An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. If the officer expert strays beyond the bounds of appropriately 'expert' matters, … the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them. … In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict . . . .

*United States v. Mejia*, 545 F.3d 179, 190–91 (2d Cir. 2008).

Here, the Court should not permit the government to have Dr. Simi testify about cherry-picked aspects of "typical" O9A ideology and behavior—matters about which he appears to have no prior expertise—in order to have the jury draw the government's preferred inferences from the evidence at trial. For example, the government says it needs Dr. Simi to discuss O9A's promotion of "human self-sacrifice" to explain why Melzer would plan an attack on his own unit. But the government will introduce evidence that, in a chat, Melzer said of such an attack, "Who gives a fuck … the after effects of a convoy getting attacked would cover it … it would be another war … I would've died successfully." Gov't Opp'n 16. The government can argue that

8

Melzer was serious, and the defense can counter that he was blustering. But Dr. Simi's testimony that O9A encourages self-sacrifice is not necessary to understand Melzer's words, and would instead serve only to highlight a purported aspect of O9A ideology that happens to mirror the government's trial evidence so as to encourage the jury to adopt the government's narrative. So too proposed expert testimony that O9A instructs members performing "insight roles" not to discuss their membership in O9A, which the government says is necessary to explain why Melzer did not tell his fellow soldiers of his affiliation with O9A. The jury will hardly require expert testimony to understand that a person affiliated with O9A might not wish to publicize that fact; Dr. Simi's testimony would instead serve to emphasize a "fact" about O9A that conveniently explains away evidence that is otherwise problematic for the government.

Along these same lines, Dr. Simi's proposed testimony on "double-speak," "just joking," and "front-stage/back-stage" strategies supposedly employed by O9A members would go well beyond merely translating esoteric terms and images for the jury and would instead suggest that Dr. Simi can determine the veracity of O9A members' communications, including whether they are actually joking when they say they are. This would be improper as it would usurp the jury's responsibility to decide the "ultimate issue" at trial—whether Melzer genuinely intended to murder his Army unit or not—by essentially telling it how it should interpret Melzer's chats. That is, Dr. Simi would be substituting his view of the evidence for the jury's. But expert testimony is improper where it "essentially instruct[s] the jury as to an ultimate determination that [is] exclusively within its province." *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005); *see also Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *9 (S.D.N.Y. Oct. 13, 2021) (excluding expert's opinion that sought "to expertize what, at bottom, is a lay fact issue to be addressed by the fact finder"). This testimony accordingly should be precluded.

In arguing otherwise, the government cites the district court's decision in *Sines v. Kessler*, 2021 WL 1431296 (W.D. Va. Apr. 15, 2021), which admitted Dr. Simi's testimony on "double-speak," "just joking," and "front-stage/back-stage" strategies supposedly employed by white supremacist groups. But *Sines* was a civil action (alleging civil rights violations by organizers of "Unite the Right" events in Charlottesville, Virginia, in 2017), and the relevant statute, 42 U.S.C. § 1985(3), required the plaintiffs to prove that the defendants had conspired to engage in racially motivated violence and were motivated by racial animus. *Id.* at *9. The court found Dr. Simi's proposed testimony relevant on those particular elements, and so allowed him to testify that "certain Defendants' communications were consistent with those strategies." *Id.* at *12.

Melzer's case differs in critical ways. For one, it is a criminal prosecution and so precludes expert testimony on "ultimate issues." *See* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."); *United States v. Haynes*, 729 F.3d 178, 196 (2d Cir. 2013) ("It is well established that Rule 704(b) disables even an expert from expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime. Such testimony is prohibited because it poses a uniquely heightened danger of intruding on the jury's function.") (citation omitted). For another, while the government must show that Melzer actually intended to murder his Army unit, no element of any charge requires the government to prove that he was motivated by any particular ideology or animus. In any event, it is likely that *Sines* would have come out differently in the Second Circuit, which, as discussed above, takes a restrictive view of expert testimony that approaches ultimate issues or otherwise invades the jury's province. *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) ("[I]n

Case 1:20-cr-00314-GHW   Document 98   Filed 02/18/22   Page 15 of 15

reviewing the use of expert testimony, we [] look to see if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.") (internal quotation marks omitted); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). ("This circuit is in accord with other circuits [including the Sixth and Eighth] in requiring exclusion of expert testimony that expresses a legal conclusion.") (collecting cases). *Sines* therefore should not guide this Court's analysis.

—

For these reasons and for those discussed in Melzer's opening papers, the Court should preclude Dr. Simi's testimony entirely or, at a minimum, those portions that would improperly bolster the government's narrative or usurp the jury's role.

### Conclusion

The Court should grant Melzer's motions *in limine* and for a bill of particulars.

New York, New York
February 18, 2022

Respectfully submitted,

/s/ _____
Sarah Baumgartel
Jonathan Marvinny
Hannah McCrea
Ariel Werner
Assistant Federal Defenders
212.417.8792
jonathan_marvinny@fd.org

11