UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-*v.*-

ETHAN MELZER,

   a/k/a "Etil Reggad,"

                   Defendant.

S1 20 Cr. 314 (GHW)

**THE GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
       *of America*

Sam Adelsberg
Matthew J.C. Hellman
   Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

DISCUSSION ........................................................................................................................ 2

   I. The Defendant's Motion to Preclude Evidence Is Meritless ...................................... 2

     A. Applicable Law ....................................................................................................... 2

     B. Argument ................................................................................................................ 3

        1. The Jihadist Materials ....................................................................................... 3

        2. O9A Materials ................................................................................................. 13

   II. CC-1 and CC-3's Statements Are Admissible ....................................................... 21

     A. Applicable Law ..................................................................................................... 22

        1. Rule 801(d)(2)(E) ............................................................................................ 22

        2. Rule 804(b)(3) ................................................................................................. 23

     B. Argument .............................................................................................................. 25

        1. The Government Has Established the Existence of a Conspiracy by a Preponderance of the Evidence ................................................................................................... 25

        2. Statements By CC-1 and CC-3 Are Admissible Under Rule 804(b)(3) ...................... 31

   III. The Defendant's Admissions Are Admissible ...................................................... 34

   IV. The Defendant Cannot Offer His Own Self-Serving Statements at Trial .......................... 36

   V. The Court Should Permit the Implementation of Limited Measures to Protect the True Name of the Military Base ............................................................................................... 38

   ██████████████████████████████████████████████████████

CONCLUSION .................................................................................................................. 47

## TABLE OF AUTHORITIES

**Cases**

*Bourjaily* v. *United States*, 483 U.S. 171 (1987) ................................................................. 22, 23

*DiBacco v. Dep't of the Army*, 926 F.3d 827 (D.C. Cir. 2019) ............................................ 41

*George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) .......................................................... 13

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) .......... 22, 43

*Old Chief v. United States*, 519 U.S. 172 (1997) ................................................................... 7

*Reytan v. United States*, 2006 WL 1311955 (S.D.N.Y. 2006) .............................................. 28

*United States v. Abu-Jihaad*, 553 F. 2d 121 (D. Conn. 2008) ............................................... 9

*United States v. Abu-Jihaad*, 600 F. Supp. 2d 362 (D. Conn. 2009). ................................... 41

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) ................................................ 7, 13

*United States v. Al Fawwaz*, 57 F. Supp. 3d 307 (S.D.N.Y. 2014) .................................... 43, 45

*United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y. 2018) ................................... 9

*United States v. Aref*, 285 F. App'x 784 (2d Cir. 2008) ........................................................ 7

*United States v. Brettschneider*, 832 F. App'x 14 (2d Cir. 2020) .......................................... 18

*United States v. Dardi*, 330 F.2d 316 (2d Cir. 1964) ............................................................ 28

*United States v. DeVillio*, 983 F.2d 1185 (2d Cir. 1993) ....................................................... 23

*United States* v. *Diaz*, 878 F.2d 608 (2d Cir. 1989) ............................................................... 3

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) ........................................................ 24, 33

*United States v. El Gammal*, No. 15 Cr. 588 (ER) (S.D.N.Y. 2017) ..................................... 44

*United States v. Gallo*, 543 F.2d 361 (D.C. Cir. 1976) ......................................................... 14

United States v. *Glover*, 101 F.3d 1183 (7th Cir. 1996) ......................................................... 38

*United States v. Gonzalez*, 399 F. App'x 641 (2d Cir. 2010) ................................................. 38

*United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976) ......................................................... 24

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ........................................................ 24, 33

*United States v. Helbrans*, No. 19 Cr. 497 (NSR) (S.D.N.Y 2021) ....................................... 14

*United States v. Hossain*, No. 19 Cr. 606 (SHS) (S.D.N.Y. 2021) ......................................... 6

*United States v. Inserra*, 34 F.3d 83 (2d Cir. 1994) .............................................................. 15

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ........................................................... 38

*United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) ............................................................. 38

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) ............................................................ 37, 45

*United States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014) ............................................................ 46

*United States v. Kourani*, No. 17 Cr. 417 (AKH) (S.D.N.Y. 2019) ........................................ 44

*United States v. Losada*, 674 F.2d 167 (2d Cir. 1982) .......................................................... 31, 32

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ........................................... 19

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ................................................................ 37

*United States v. Mustafa*, 753 F. App'x 22 (2d Cir. 2018) ...................................................... 17

*United States v. Naseer*, 775 F. App'x 28 (2d Cir. 2019) .................................................... 15, 35

*United States v. Olivera*, 797 Fed. App'x 40 (2d Cir. 2019) .................................................... 34

*United States v. Ortiz*, 962 F. Supp. 2d 565 (S.D.N.Y. 2013) ................................................. 23

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) ................................... 2, 32

*United States v. Pica*, 692 F.3d 79 (2d Cir. 2012) ................................................................... 47

*United States v. Provenzano*, 615 F.2d 37 (2d Cir. 1980) ....................................................... 22

*United States v. Pugh*, 150 F. Supp. 3d 218 (E.D.N.Y. 2015) ............................................ 44, 45

*United States v. Rahimi*, No. 18 Cr. 478 (RMB) (S.D.N.Y 2017) ........................................ 6, 20

*United States* v. *Rahman*, 189 F.3d 88 (2d Cir. 1999) ............................................................. 6

*United States v. Raniere*, 2019 WL 2212639 (E.D.N.Y. 2019) ............................................... 14

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) ........................................................... 14

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................................ 35

*United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977) ......................................................... 29

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) ................................................................. 37

*United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) ...................................................... 24, 33, 34

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) .................................................. 4, 15, 22, 35

*United States v. Savoca*, 335 F. Supp. 2d 385 (S.D.N.Y. 2004) ......................................... 23, 32

*United States v. Scala*, 405 F. Supp. 2d 450 (S.D.N.Y. 2005) ................................................ 45

*United States v. Schulte*, 2019 WL 3764662 (S.D.N.Y. 2019) ................................................ 42

*United States v. Schulte*, 436 F. Supp. 3d 747 (S.D.N.Y. 2020) ............................................. 41

*United States v. Schultz*, 333 F.3d 393 (2d Cir 2003) ............................................................. 18

iii

*United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980) ...................................................... 31, 32

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ................................................ 41

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ....................................................... 39

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ....................................................... 45, 46

*United States v. Tellier*, 83 F.3d 578 (2d Cir. 1996) .......................................................... 27

*United States v. Terry,* 702 F.2d 299 (2d Cir. 1983) .......................................................... 37

*United States v. Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015) ......................................... 3, 23

*United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y. 2014) ............................................... 39, 42

*United States v. Velazquez*, 246 F.3d 204 (2d Cir. 2001) ..................................................... 7

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) ........................................................ 24, 33

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ...................................................... 24, 33

*United States v. Williams*, 927 F.2d 95 (2d Cir. 1991) ....................................................... 32

*United States v. Zazi*, 2011 WL 2532903 (E.D.N.Y. 2011) ................................................ 42

*Wilson v. C.I.A.*, 586 F.3d 171 (2d Cir. 2009) .................................................................... 40, 41

**Rules**

Federal Rule of Criminal Procedure 15 ................................................................................ 31

Federal Rule of Evidence 104 .............................................................................................. 23

Federal Rule of Evidence 106 .............................................................................................. 37

Federal Rule of Evidence 401 ................................................................................................ 2

Federal Rule of Evidence 402 ........................................................................................... 2, 36

Federal Rule of Evidence 801 .......................................................................................... passim

Federal Rule of Evidence 804 .......................................................................................... passim

iv

## **INTRODUCTION**

The Government respectfully submits this memorandum of law in further support of its motions *in limine* (Dkt. No. 90 ("Gov. Mem.")), and in response to the defendant's opposition to those same motions. (Dkt. No. 93 ("Def. Mem."). For the reasons set forth below, and those detailed in the Government's prior brief in support of its motions, the Government respectfully submits that the Court should make the following pretrial rulings:

1. O9A and jihadist related materials seized from the defendant's cellphones and barracks are admissible as direct evidence and pursuant to Rule 404(b).

2. Statements of the defendant's co-conspirators, who participated with Melzer in the charged offenses of planning a deadly ambush on Melzer's U.S. Army unit, are admissible as co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E), or alternatively as statements against interest pursuant to Federal Rule of Evidence 804(b)(3).

3. Statements made by Melzer during communications with Individual-1 are admissible under Federal Rule of Evidence 801(d)(2)(A).

4. The defendant's own out-of-court statements are inadmissible hearsay, unless and until the defendant establishes that the statements are admissible pursuant to a hearsay exception or provision of law.

5. The true name of a sensitive military installation will be anonymized at trial, and the defendant is precluded from revealing the true name in open court.

6. Reference to jurors will be made by their jury numbers, rather than names, in open court, and jurors will not be informed of the rationale of that limited protective measure.

## DISCUSSION

### I.  The Defendant's Motion to Preclude Evidence Is Meritless

The defendant's opposition to the Government's motions *in limine* seeks to preclude the Government from offering any evidence at trial that the defendant was actively consuming jihadist content immediately before and during the time that he was conspiring and attempting to facilitate a jihadist attack on his fellow servicemembers.  Similarly, the defendant's opposition also seeks to limit the Government from introducing evidence squarely proving the defendant's membership in the Order of Nine Angles ("O9A") despite denying membership in the group and indicating that this denial will be a centerpiece of his defense.

These arguments do not withstand scrutiny.  The materials are plainly relevant to establishing Melzer's commission of the charged offenses, and any risk of unfair prejudice does not substantially outweigh the probative value of the evidence, particularly given that the Government will not play or offer certain graphic portions of those materials at trial.

### A.  Applicable Law

"The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds."  *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164-65 (S.D.N.Y. 2006) (citations omitted).  Relevant evidence, however, is generally admissible and, consequently, not subject to preclusion.  *See* Fed. R. Evid. 402.  Evidence is relevant if it has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more *probable* or less probable than it would be without the evidence."  Fed. R. Evid. 401(a) (emphases added).  Under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of

2

unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015).  Alternative factual theories and similar "challenges go to weight rather than admissibility." *United States v. Diaz*, 878 F.2d 608, 615 (2d Cir. 1989).  Relevant evidence may be excluded pursuant to Rule 403 in the event of "unfair prejudice," which "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403, adv. cmte. note.  But "[t]he 'logical inferences' resulting from proffered evidence do not engender the 'unfair prejudice' against which Rule 403 is directed." *United States v. Diaz*, 878 F.2d at 615.

**B.   Argument**

The Government's motions *in limine* set forth the bases for the admissibility of the evidence that it will seek to offer in its case-in-chief, and are directly responsive to many of the defendant's contentions.  Set forth below are additional responses to some of his arguments.

**1.   The Jihadist Materials**

The defendant's starting position on the admissibility of the Jihadist Materials[1] is that it is irrelevant that Melzer consumed violent jihadist content at the same time that he was facilitating a jihadist attack on his fellow servicemembers.  (Def. Mem. at 3 (asserting that the Jihadist Materials are "irrelevant" and "have nothing to do with Melzer or his case")).  This unsupportable position is at odds with the Federal Rules of Evidence, case law, and common sense.  As detailed at length in the Government's motions *in limine*, the Jihadist Materials are directly relevant to each count

---

[1] The Government respectfully incorporates by reference the defined terms from its motions *in limine*, such as the Jihadist Materials (Gov. Mem. at 25-29), the O9A Materials, and the Military Base.  All such terms used herein have the meaning established in the prior submission.

in the Indictment (*see* Gov. Mem. at 34-41) and are also admissible as Rule 404(b) evidence for several reasons, including to prove Melzer's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident (*see id.* at 41-44).  Among other things, the materials shed critical light on Melzer's background research in the days and weeks before his scheduled deployment to Turkey, his reasons for identifying jihadist groups as likely allies with the means, motivation, and experience to conduct a successful attack on his unit, and his motive and intent when he transmitted national defense information to O9A members and jihadists in an attempt to foment that very attack.  Precluding this evidence would deprive the jury of critical context regarding the defendant's state of mind—something the defendant is putting squarely at issue.  (*See* Def. Mem. at 1 ("No 'jihadist ambush' on Melzer's unit happened, none was close to happening, and Melzer had no intention of seeing one happen.").  Simply put, evidence tending to prove that the defendant discreetly researched jihadists and their operations designed to kill U.S. and allied soldiers—as displayed in the Jihadist Materials—is directly relevant to the Government's burden at trial.[2]

---

[2] In a footnote, and without citing any support, the defense claims that "in order for the videos to have any relevance to his case," the Government must prove that the defendant "actually watched them."  (Def. Mem. at 3, n.1).  The defense asserts the same with respect to some of the O9A Materials.  (*Id.* at 8).  The Government intends to prove through the metadata associated with the materials that the defendant in fact accessed these videos in the weeks leading up to, and during, the time he was sharing sensitive information about his unit and their deployment.  In any event, even the fact that the defendant possessed jihadist videos and O9A materials on his personal iPhones in a case alleging that he orchestrated—alongside other O9A members—a jihadist attack clearly satisfies Rule 401's threshold requirement for relevance.  *See* Fed. R. Evid. 401.  Accordingly, any such arguments go to the weight of the evidence rather than their admissibility.  *See United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) (affirming the admission of jihadist documents "possessed" by the defendants as evidence of "the conspiracy's motive and intent to bomb targets in the United States");  *United States v. Pugh*, 162 F. Supp. 3d 97, 117 (E.D.N.Y. 2016) (noting that evidence of terrorist propaganda "speaks directly to state of mind because it was found in [defendant's] *possession*," and the prosecutor could argue that possession "shows the

Melzer next argues that the Jihadist Materials should be precluded because he "is not accused of committing any actual act of violence." (Def. Mem. at 3). But whether Melzer is accused of committing an act of violence does not drive the analysis here; Melzer is accused of conspiring and attempting to murder his fellow servicemembers in a jihadi-led ambush. These materials thus directly bear on his state of mind: Melzer's possession and consumption of jihadist materials demonstrate his understanding of jihadist tactics, abilities, and methods, which, in turn, informed his decision to provide actionable information about his unit's movements, weapons, numbers, and vulnerabilities to the very same type of attackers he was researching. The defense's position here is akin to suggesting that evidence of a defendant researching the capabilities of drug suppliers in a narcotics conspiracy is irrelevant if the defendant "is not accused of any act of [drug selling]". (*Id.* at 3). This is simply not the law.

Melzer's next argument—that the Jihadist Materials are irrelevant because O9A is not a "designated foreign terrorist organization" and Melzer is not "accused of belonging to or providing support to ISIS, al Qaeda, or any other identifiable 'jihadist' group" (Def. Mem. at 3)—fares no better. For one, Melzer's knowledge of ISIS and al Qaeda—two of the most prominent jihadist groups operating in the vicinity of Turkey—is probative of his motive, intent, and plan to commit the charged crimes, since he conspired to enlist jihadists in the region to commit the violent ambush. In fact, while transmitting information about his unit to O9A members on Telegram,

---

media that [defendant] *consumed* before he flew to Turkey" in furtherance of the charged offenses (emphases added)). In any event,

Melzer and CC-1 explicitly discussed CC-2, a purported al Qaeda member, assisting in the ambush. (*See* Gov. Mem. at 51). Relatedly, Melzer told members of the RapeWaffen Division that he "[u]sed to be cool with a couple IS [ISIS] members," a statement made while outlining the planned attack on Telegram in an apparent effort to establish his bona fides and demonstrate his willingness to follow through on the ambush. (*See* Gov. Mem. at 16). In any event, the absence of any allegation that the defendant himself joined a jihadist group or a group designated as a foreign terrorist organization is no bar to this evidence being admitted. *See, e.g.*, *United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) ("The Government was free to demonstrate [defendant's] resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal attacks against the United States."); *United States v. Hossain*, No. 19 Cr. 606 (SHS), Dkt. No. 158 at 13-21 (S.D.N.Y. Sept. 29, 2021) (granting Government's *in limine* motion to admit jihadist propaganda materials as relevant in case without allegations of defendant joining a designated foreign terrorism organization); *United States v. Rahimi*, No. 18 Cr. 478 (RMB), Dkt. No. 113 at 9 (S.D.N.Y Aug. 15, 2017) (addressing parallel objection and admitting jihadist materials in case that did not include a material support charge, finding the evidence to be indicative of "the defendant's motive and intent to engage in violent jihad and conduct a terrorist attack that would cause death, injury and property destruction, as charged in the Indictment"). Indeed, there is no requirement that a defendant himself join a terrorist group in order for the Government to admit otherwise relevant evidence regarding jihadists. And, as noted above and detailed at length in the Government's motions *in limine*, the Jihadist Materials are plainly relevant to the charges at issue here.

Melzer next argues that the Jihadist Materials are irrelevant because he "will not contest at trial that ISIS and other jihadist groups are willing and able to commit deadly attacks on U.S. military compounds and soldiers using a variety of weapons, including mortars." (Def. Mem. at 3). As an initial matter, Melzer's proposed stipulation leaves out a crucial component—namely, that Melzer himself *knew* that jihadist groups were willing and able to use a variety of weapons to commit lethal attacks on U.S. forces. The Jihadist Materials clearly establish Melzer's knowledge on this score. Even so, it is well-established that the Government "is entitled to prove its case free from any defendant's option to stipulate the evidence away." *United States v. Aref*, 285 F. App'x 784, 791 (2d Cir. 2008) (quoting *Old Chief v. United States*, 519 U.S. 172, 189-90 (1997)); *see also United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir. 2001) (affirming district court's admission of autopsy photos showing the extent of the victim's bruising, even though the defendant offered to stipulate that the assault had occurred). Melzer's proposed stipulation also overlooks a critical part of the Government's rationale for admitting these materials: their relevance in demonstrating Melzer's research of jihadist capabilities in April and May 2020. Indeed, evidence of Melzer discreetly accessing this specific content at the precise time he was planning the ambush demonstrates that he was conducting necessary due diligence for the operation, providing crucial evidence of his participation in the conspiracy, and his motive and intent to commit the attack. *See United States v. Abu-Jihaad*, 630 F.3d 102, 133-34 (2d Cir. 2010) (affirming district court's finding that the "pro-jihadist contents of the [terrorist propaganda] videos were relevant to understanding [the defendant's] motive and intent"). Put another way, there is clearly a meaningful difference between Melzer conceding—in the abstract—that jihadists attack U.S. forces, and the jury learning that Melzer himself conducted research on specific jihadist

7

capabilities during the period that he was disclosing sensitive information to members of a pro-jihadist group with the explicit aim of facilitating a jihadist ambush on his own unit.

Melzer's next argument—that the Jihadist Materials are not needed "to decide any material fact" (Def. Mem. at 4)—is belied by his own brief. In particular, Melzer later contends that the jihadist ambush was "never close to occurring, and that Melzer never believed [that the attack] would occur." (Def. Mem. at 5). In fact, given the defendant's arguments up to this point, Melzer's intent appears to be the central defense to be presented at trial. (*See also* Def. Mem. at 1 ("No 'jihadist ambush' on Melzer's unit happened, none was close to happening, and Melzer had no intention of seeing one happen."); *id.* at 16 ("The fact is that, though Melzer admitted to providing certain information concerning his unit's deployment in the chats, he repeatedly denied sympathizing with O9A, intending to commit an attack, or believing that the people he was chatting with intended to commit an attack, either.")). That Melzer was viewing videos of jihadists ambushing U.S. and allied military convoys and installations—simultaneous to his planning discussions with co-conspirators regarding an attack to be executed by jihadists—is clearly probative of a "material fact," namely, Melzer's intent to actually commit such an attack and his membership in the conspiracy. It is also probative of Melzer's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident, as he intended his information to reach jihadists who, based on his own research of their methods, tactics, and successes, were absolutely capable of committing the attack he proposed.

Nor does Rule 403 counsel in favor of precluding the Jihadist Materials. Instead of engaging with the Government's detailed arguments and case law outlining how and why the Jihadist Materials do not run afoul of Rule of 403 (*see* Gov. Mem. at 44-48), the defense resorts to

8

conclusory assertions, including that the "videos contain[ing] images of dead soldiers, including U.S. soldiers" would be "particularly prejudicial" if admitted.  (Def. Mem. at 4).  But there is no such bright line rule and courts routinely admit graphic and violent materials when Rule 403's balancing requirements are met.  *See, e.g.*, *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. No. 96, at 13-17 (S.D.N.Y. Jan. 5, 2018) (granting Government's *in limine* motion to admit jihadist propaganda materials found on electronic devices seized from defendant, including graphic footage of ISIS fighters carrying out violent combat operations and attacks, as well as footage showing the lead-up to the execution of captives, and explaining that the "materials bear on whether Alimehmeti had the required state of mind," as "Alimehmeti's possession of them suggests that he was supportive of terrorist ideology in general and of ISIS in particular"); *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 127-28 (D. Conn. 2008) (noting that while certain jihadist videos "are violent and depict bloody and sometimes dismembered fighters and soldiers," they are probative because, among other things, "the Government in this case will have to answer the question of why Mr. Abu-Jihaad would send information to terrorists that could be used to blow up the very ship on which he was stationed").  And here the videos containing limited depictions of lifeless soldiers following jihadist attacks—namely, GX 804 and 810, which were already highly excerpted to remove their most graphic elements and only briefly depict the deceased soldiers—are highly probative of Melzer's intent to *murder* his fellow servicemembers, an element of several offenses in the Indictment.  Indeed, Melzer himself discussed his knowledge that the attack would result in the death of his fellow soldiers at various stages of the plotting.  (*See* Gov. Mem. at 16, 19).

*United States v. Pugh*, 162 F. Supp. 3d 97, 117 (E.D.N.Y. 2016), the sole case cited by the defendant to support his argument on this score, only supports admission of the Jihadist Materials. In *Pugh*, the Government sought to admit several ISIS videos located on the defendant's laptop, including a video depicting the prelude to a mass execution of "half-clothed prisoners" forced "to lie down in a sprawling human pile," which the court described as "undoubtedly disturbing," as well as another video portraying ISIS "executioners wielding knives, in the moments before an unseen execution," which the court characterized as "viscerally disturbing."   *Id.* at 117-18. Nevertheless, the court concluded that both videos were not "unduly prejudicial," noting, with respect to the latter video, that the evidence was highly relevant because the defendant's "state of mind [was] a critical issue in dispute," "the fact that the video was found in Pugh's possession speaks strongly to his state of mind," "the 'gory excerpts' were part of the propaganda that the Government intends to show that Pugh consumed in the days leading up to his flight to Turkey," and because the "video depicts the actions of ISI[S] fighters on the battlefield . . . [it] speaks directly to the charged conduct." *Id.* at 117-18.   On the other hand, the sole video that the court deemed inadmissible was "far removed from the charged offense" and "unduly prejudiced" the defendant since the "jury is likely to have a viscerally negative reaction to an image of the shooting of an American President." *Id.* at 117.   Thus, the court's reasoning in *Pugh* only supports the Government's argument that the Jihadist Materials—which constitute relevant evidence tied directly to the charged offenses and which have already been culled down and edited to avoid undue prejudice (*see* Gov. Mem. at 27-29, 35-41)—should be admitted.

Melzer also cites *Pugh* to argue that that the Jihadist Materials should be precluded because they contain Arabic.  (Def. Mem. at 4).  First, not all of the videos contain Arabic.  (*See, e.g.*, GX

805, 810).  Second, Melzer accessed the videos without knowing Arabic and so, in their current form, the jury would view the videos just as the defendant did when he accessed them in April and May 2020.  Third, while there is no evidence that Melzer was fluent in Arabic, the evidence indicates that he was familiar with at least one significant Arabic phrase that is repeated throughout the videos—"Allahu Akbar," meaning "God is Great."    The Government expects its expert witness to testify that the phrase "Allahu Akbar" is often used by jihadist groups in connection with committing acts of violence, and that it has featured in jihadist propaganda circulated by white supremacist organizations (including O9A) and has also been a phrase used by those white supremacist organizations to refer to jihadist attacks.  Indeed, the Government's proof at trial will include Melzer's own communications with co-conspirators that contain references to this phrase. For example, CC-1 wrote to Melzer on May 17, 2020, inquiring about the timing of the unit's upcoming deployment to Turkey, to which Melzer responded, "Getting ready to go."   CC-1 explained that he asked because, "[CC-2 needs to know, he has plans . . . inshallah my brother, allahu akbar."  Melzer then replied, "Fuck yea . . . 28th[,]" a reference to May 28, 2020 as the date of the unit's deployment.  The use of this Arabic phrase—which has a specific connotation when used by jihadists—in nearly all the videos is thus relevant to Melzer's state of mind, his comprehension of the jihadist videos, and important context for his communications with CC-1. Finally, even accepting the defense's argument that the Arabic in the videos is irrelevant and unduly prejudicial (which it is not), the appropriate remedy is not preclusion.  Instead, the Court could, for example, issue a limiting instruction to the jury, allow the Government to provide transcripts for the videos, or play portions of the videos on mute.

As fallback proposals, the defendant urges the Court to preclude all of the Jihadist Materials—except for GX 537—or just preclude GX 801, 804, and 810.  (Def. Mem. at 5-6).  Neither of these suggestions is appropriate.  As an initial matter, the Government has already significantly trimmed the volume of these videos down from a larger—and decidedly more graphic—set of jihadist materials located on Melzer's iPhones, including jihadist videos of civilian decapitations and point-blank shooting executions of civilians and soldiers.  The remaining videos were also trimmed down significantly, removing the most graphic and viscerally disturbing portions to mitigate potential prejudice to the defendant.  Because the Government already outlined the relevance of each of the five jihadist videos in its motions *in limine* and tied each video to specific issues in dispute in the case, as well as Melzer's conduct and communications (*see* Gov. Mem. at 25-28), it will not rehash those arguments here except to note that each of the videos is highly probative of central issues in the case—namely the defendant's intent to commit a murderous attack on his fellow soldiers and his knowledge of specific jihadist capabilities to attack U.S. forces, convoys, and military installations.  Admitting only GX 537 will prejudice the Government and risk misleading the jury by inadequately conveying highly relevant evidence to the jury showing the defendant's extensive operational research and due diligence on jihadist capabilities as he planned and prepared for the ambush—evidence that has already been clipped and culled down to mitigate prejudice to the defendant.  In assessing whether the defendant was serious about committing this attack, the jury should have the benefit of viewing videos accessed by him—during the precise window of time that he began sending sensitive information to jihadists—depicting the very same types of jihadist attacks that he is charged with attempting and conspiring to facilitate.

Finally, to the extent the Court has any concern about the risk of unfair prejudice in connection with the admission of the Jihadist Materials, this can be addressed through a limiting instruction to the jury, which the defense proposes as well. *Abu-Jihaad*, 630 F.3d at 134 (proper limiting instruction minimizes risk of undue prejudice from admission of relevant terrorist propaganda materials); *see, e.g.*, *Pugh*, 162 F. Supp. 3d at 118 ("[T]o the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at the request of the Defendant.").

At bottom, the defendant is seeking to preclude the Jihadist Materials because they are devastating evidence of his true intent—a cornerstone of his defense. But that is not a reason to preclude otherwise probative evidence. Accordingly, the Government respectfully seeks a pretrial ruling that the Jihadists Materials are admissible.

### 2. O9A Materials

The defendant concedes that "some of [the O9A Materials] are admissible to help establish Melzer's state of mind, including his knowledge of O9A and its ideology." (Def. Mem. at 7). Nevertheless, the defense claims that because much of the O9A Materials are cumulative, "the government can establish everything it wants in that regard with far fewer materials than it seeks to admit." (*Id.*).

Pursuant to Federal Rule of Evidence 403, "The court may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of . . . *needlessly* presenting cumulative evidence." Fed. R. Evid. 403 (emphases added). "Because Rule 403 permits the exclusion of probative evidence, it is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990).

13

The Government, because of its heavy burden of proof, is entitled to present arguably cumulative evidence so long as that evidence is relevant. *United States v. Gallo*, 543 F.2d 361, 365 (D.C. Cir. 1976) (affirming the admission of cumulative evidence and finding that the evidence was not "improperly cumulative" given its relevance to the defendant's knowledge, a disputed issue in the case); *see United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (affirming district court's admission of defendant's conversations with prostitutes other than the victim—even though defendant had already stipulated that he had "promoted prostitution on an occasion in the past"—and concluding that the conversations "were not cumulative of [the defendant's] stipulation" since the "stipulation did not 'complete the story'"); *United States v. Helbrans*, No. 19 Cr. 497 (NSR), Dkt. No. 424 (S.D.N.Y Nov. 1, 2021) (admitting relevant but "cumulative" testimony and noting that the cumulative nature of the testimony is not the "sole" factor to be considered in excluding testimony); *United States v. Raniere*, No. 18 Cr. 2041 (NGG), 2019 WL 2212639, at *8 (E.D.N.Y. May 22, 2019) (rejecting defense argument that evidence that "may corroborate" other evidence is needlessly cumulative). The assertion that evidence of a proposition is cumulative "implies that the other evidence . . . was more than sufficient." *Gallo*, 543 F.2d at 365. "The Government has a heavy burden of proof beyond a reasonable doubt as to all elements of the offense, and it is not to be restricted to a modest quantum of evidence that will support the indictment." *Id.*

Here, the O9A Materials are not cumulative. These materials—which outline and depict O9A's ideology and illustrate Melzer's devotion to it—"furnish an explanation of the understanding or intent with which certain acts were performed," namely, Melzer's decision to disclose sensitive information to O9A members in a plot to murder his fellow soldiers. *Salameh*,

152 F.3d at 111.  In particular, these materials demonstrate how the defendant embraced O9A's ideology, including its Neo-Nazi, Satanic, and anarchist elements, and its promotion of extreme violence in order to overthrow Western civilization.  *See United States v. Naseer*, 775 F. App'x 28, 30 (2d Cir. 2019) (rejecting evidentiary objections, including cumulativeness, for jihadist materials and other related evidence, including al Qaeda training videos, because the evidence "helped establish the existence of a terrorism conspiracy, as well as the conspiracy's purpose and its *modus operandi*" and "provided necessary background that was critical to understanding Naseer's coded communications with al-Qaeda and his role in the broader terrorism conspiracy").  Furthermore, the fact that the defendant accessed and possessed the O9A Materials, including materials directing O9A members to conduct insight roles in the military, on his own cellphones and maintained physical copies in his barracks corroborates his statements that he joined the military to perform an insight role for O9A.  Relatedly, the sheer quantity of the O9A Materials found on Melzer's devices is relevant to show that his interest in the group and its ideology was not just a passing fad for him.  (*See* Def. Mem. at 17 (seeking to admit defendant's statements that "though he had some 'curiosity' about O9A, he believed it was 'weird,' 'out there,' and 'pretty much a cult,' and considered its beliefs to be the 'polar opposite' of his own.")).  Rather, his possession of several different forms of O9A media—including online treatises, books, images, and a video—goes directly to his state of mind and his dedication to O9A's ideology.  This evidence is highly probative of the defendant's motive and intent in providing O9A members sensitive information about his deployment and is crucial "to provide the jury with the complete story of the crimes charged."  *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).

Moreover, to the extent that any of the O9A Materials are cumulative, they are not

*needlessly* so, particularly because the defendant has staked out a position vigorously disputing his membership in O9A, his commitment to their ideals, his decision to commit an attack with members of O9A, and his belief that providing sensitive information to members of O9A would lead to an attack.  (*See* Def. Mem. at 1 ("The government's efforts to paint Melzer as an O9A-devotee committed to murdering his fellow soldiers are overblown."); *id.* at 16 ("The fact is that, though Melzer admitted to providing certain information concerning his unit's deployment in the chats, he repeatedly denied sympathizing with O9A, intending to commit an attack, or believing that the people he was chatting with intended to commit an attack, either."); *id.* at 17 (seeking to admit defendant's statements that he "hated" the O9A members in the RapeWaffen Division Telegram channel "and so he started 'fuckin[g] with them'"; "that his claims of membership in O9A were bluster"; that he was not a member of O9A and "that his online claims to the contrary were lies"; that "he joined the Army, not to further O9A's ideology (as the government now alleges), but because multiple generations of his family had served"; and that "he had provided information about his unit's deployment only to gain credibility in order to learn more about O9A")).  In seeking to distance himself from O9A and its ideology, the defendant even claims that he erroneously thought the group was called the Order of Nine *Angels*—a patently meritless claim given the dozens of O9A documents saved in his iPhones (of which only a select few were marked as exhibits), his performance of painful O9A rituals, and his willingness to risk his liberty (and even his life) to provide O9A members with sensitive information in furtherance of a deadly attack. (*See* Dkt. No. 92 at 6).  The defendant clearly intends to dispute the Government's arguments on these points.  As such, and consistent with the clear text of Rule 403 and the case law, the Government should be permitted to present the O9A Materials—including demonstrating their

scope and quantity—to meet its heavy burden.

The defendant sets forth additional objections to selected Government exhibits.  (*See* Def. Mem. at 8).  While the Government's motions *in limine* set forth the bases for the admissibility of all of the O9A Materials (*see* Gov. Mem. at 29-32), below are additional responses to the defendant's arguments:

- **GX 504, 507, and 510**: GX 504 is an image that appears to depict Melzer—hooded except for his eyes—holding a knife, a tool often used in O9A blood ritual practice. GX 510 is a picture that appears to depict Melzer—wearing the same hood, covering his face except for his eyes and nose—holding the same knife with a bandage around his hand.  For additional context, the Government also intends to introduce another image (GX 506) of what appears to be the defendant—hooded except for his eyes—holding up a book with blood smeared on a passage in the book and the book itself (GX 301), with blood smeared on the same passage.  GX 507 is an image that appears to depict Melzer wearing a skull mask associated with white supremacists, including O9A, and holding his own rifle, which is identifiable by the color of the ammunition.  During a subsequent search of Melzer's barracks, Army investigators recovered what appears to be the skull mask depicted in the photo.

  These materials demonstrate Melzer's commitment to O9A and are relevant to his motive and intent in revealing sensitive information to O9A members in a plot to murder his fellow soldiers.  In particular, Melzer's performance of O9A rituals— including a ritual requiring him to cut his hand, draw blood, and smear the blood on a particular passage in a book entitled "The Sinister Tradition: Order of Nine Angles"—demonstrate his devotion to O9A and its practices (a fact that the defendant has squarely put at issue, as described above).  In addition to shedding light on Melzer's motive and intent in providing O9A members with sensitive information about his deployment, these materials are relevant to rebut any defense argument that Melzer was merely living a digital fantasy in assisting O9A. Defense's argument that GX 504 and 510 are not relevant "unless the government can establish that it actually depicts Melzer performing an O9A ritual" (Def. Mem. at 7) clearly goes to weight, not admissibility, given that the photographs were found on Melzer's phone and their content—in combination with the other evidence described above—clearly supports the conclusion that they depict Melzer performing an O9A ritual.  *See United States v. Mustafa*, 753 F. App'x 22, 36 (2d Cir. 2018) (rejecting evidentiary challenge to the admission of terrorist literature found in defendant's apartment as "probative of Mustafa's intent to support terrorism and to do so through violence" and noting that "Mustafa's argument that

others had access to the locations where this evidence was stored goes to the weight of the evidence, not its admissibility"); *see also United States v. Schultz*, 333 F.3d 393, 416 ("[F]actors which make evidence less than conclusive affect only weight, not admissibility.").  Notably, the fact that Melzer "den[ied] performing any rituals specifically related to O9A" in his post-arrest interviews (Def. Mem. at 7) does not support preclusion of these materials.  If anything, Melzer's self-serving post-arrest statements on this score—to the extent admissible at trial—only make evidence of him performing O9A rituals more relevant to his state of mind and a disputed issue between the parties.   Furthermore, contrary to the defendant's argument (Def. Mem. at 7), Melzer's possession of a knife and an M4 rifle is hardly unduly prejudicial in light of the charges.  *See United States v. Brettschneider*, 832 F. App'x 14, 19 (2d Cir. 2020) (noting that the Rule 403 balancing test is satisfied if the evidence is not "any more sensational or disturbing than the alleged crime"). Melzer's possession of the M4 rifle is additionally relevant to his knowledge of the particular weapon, in light of Melzer disclosing to his co-conspirators on Telegram that his unit will be armed with "just m4s" during their deployment.  (*See* Gov. Mem at 19).

- **GX 513, 536, and 802**: GX 513 is an image, accessed by the defendant on May 1, 2020, depicting what appears to be an individual wearing a skull mask (akin to the one retrieved from the defendant's barracks) with the text "Rapists Its Time to Mobilize."  GX 536 is a picture, accessed by the defendant on March 22, 2020, of an individual in military fatigues arranging blocks of the explosive TNT into a Nazi swastika and GX 802 is a 28 second video, downloaded onto the defendant's phone on April 29, 2020, depicting a man in military fatigues performing the Sieg Heil salute while holding a Nazi flag.  The Government will play GX 802 without audio.

  These materials—all of which contain military language (*i.e.*, "mobilize") or imagery (*i.e.*, military fatigues) alongside O9A symbols (*i.e.*, a skull mask and Neo-Nazi symbols, including a swastika and a Sieg Heil salute)—tie Melzer and his military service directly to O9A and its ideology, symbols, and practices.  As discussed above, Melzer's affiliation with O9A is a central issue in dispute in this case.  So too is Melzer's decision to join the military to perform an "insight role" for O9A.  In showcasing Melzer's devotion to O9A and his knowledge of the group's promotion of its members infiltrating the military, these exhibits provide important context for Melzer's decision to disclose sensitive information to O9A members in a plot to murder his fellow soldiers.  In arguing against the admission of GX 513, the defense contends that the reference to the word "rape" is "inflammatory and gratuitous."  (Def. Mem. at 7).  But O9A's focus on rape is inextricably intertwined with the evidence in the case.  For example, Melzer revealed the sensitive information about his unit and his deployment on the *Rape*waffen Telegram channel and the chat name was originally called "Order of Nine *Rapes*" before CC-1 changed it to "Jihad." (Gov. Mem. at 16-18).  Moreover,

18

given the centrality of "rape" in O9A and RapeWaffen Division ideology and vernacular (*see* Dkt. No. 92 at 23-24), it is no surprise that Melzer and his co-conspirators regularly used the term to foster trust and cohesiveness. For example, on May 25, 2020—the same day that Melzer revealed crucial details about his unit and its weaponry—CC-1 wrote to Melzer "Hail Rape lol," to which Melzer replied "Kek Hail rape brother." *Cf. United States v. Maldonado-Rivera*, 922 F.2d 934, 958-59 (2d Cir. 1990) (noting that statements between co-conspirators in furtherance of the conspiracy include statements that "serve to foster trust and cohesiveness"). Melzer's use of the term—combined with his possession of this graphic using the term—further supports his ideological alignment with O9A. Relatedly, the defendant's possession of an O9A call to arms, which uses clear military terminology ("mobilize") alongside a core O9A term ("rapists"), is highly relevant to the defendant's state of mind in agreeing to join an O9A conspiracy to murder his fellow servicemembers.

- **GX 908, 911, and 912**: GX 908 is a document, accessed by the defendant on April 23, 2020, titled "The Rape Anthology," which includes a cover page featuring O9A's main symbol with a swastika superimposed on top. The content of the document reflects Neo-Nazi beliefs and includes anti-Semitic language. GX 911 is a document, accessed by the defendant on May 26, 2020, titled the "Requisite O9A: A Practical Guide to the Sinister Sorcery of the Order of Nine Angles," which details O9A's practice of urging followers to perform "insight roles," (GX 911 at 3), and further forbids O9A members from discussing their insight roles with anyone, even their closest friends. (*Id.* at 4). Later in the document, on a page with a swastika in the header, O9A followers are instructed on the performance of a ritual glorifying Hitler and denying the Holocaust. (*Id.* at 6-9). GX 912 is a document, accessed by the defendant on April 23, 2020, titled "Understanding National Socialism," which argues for the legitimacy of Neo-Nazi beliefs about the Holocaust.

These materials are relevant to demonstrate Melzer's commitment to O9A and its core ideals and practices, including "insight roles" and Neo-Nazism, which are relevant to prove that Melzer was aligned ideologically with and became a member of O9A, that he joined the military to perform an "insight role" for O9A, and that he conspired with other O9A members to murder his fellow soldiers—all of which are disputed issues. Furthermore, Melzer's Neo-Nazi beliefs bear directly on crucial evidence in the case and the background for the conspiracy. For example, he invoked those beliefs, including his antipathy for Jews ("all of them deserve [redacted]"[3]) and his adulation of Hitler, when he sought to gain admission into the

---

[3] As in original.

RapeWaffen Division.  (Gov. Mem. at 8).  In addition to being part of Melzer's entrance interview for the RapeWaffen Division, hatred of Jews was a unifying belief for members of the conspiracy and they regularly expressed anti-Semitic sentiments to foster trust and cohesiveness.  For example, on May 23, 2020, during the course of planning the attack, CC-3 described his goals to Melzer and CC-1 as "kill jews and embrace tradition" and "[m]y objective is basically turning israel and their ppls to dust inshallah and imposing fashy shariah."  Similarly, in their chats planning the ambush, Melzer and his co-conspirators use the term "Hail" to address each other, a reference to the Nazi (and Neo-Nazi) term "Heil," which signals obedience to Hitler and his Nazi ideology.  (*See supra* at 18).

- **GX 301 and 302**: GX 301 is a O9A manifesto titled "The Sinister Tradition: Order of Nine Angles," which contains a passage with smeared blood consistent with an image Melzer possessed depicting the defendant holding up the book to the same page.  (GX 506).  GX 302 is a book titled "The Anarchist's Cookbook," which contains detailed instructions for the manufacture and use of explosives and weapons.  Both of these books were located in Melzer's barracks.

These materials—and the fact that Melzer owned the physical books and kept them in his barracks—demonstrate Melzer's commitment to O9A and armed anarchist resistance.  In addition to establishing his dedication to O9A and one of its core ideologies (anarchism), the books are also relevant to rebut any defense argument that Melzer was merely living a digital fantasy in assisting O9A and thus did not intend to orchestrate an attack on U.S. soldiers.  (*See* Def. Mem. at 1 ("No 'jihadist ambush' on Melzer's unit happened, none was close to happening, and Melzer had no intention of seeing one happen.")).  With respect to GX 301, the defense concedes its relevance but claims that the entire book should not be admissible. Since the Government will not seek to introduce the entire book into evidence, this argument is moot.  Rather, the Government anticipates having a witness identify the book and then offering into evidence images of the book's cover and the page containing Melzer's smeared blood.  With respect to GX 302, the defendant's claim that the "The Anarchist's Cookbook" is inadmissible because he "has not admitted to reading any portion of it" is an argument about the weight afforded to the evidence, not its admissibility. Furthermore, that the book contains detailed instructions for the manufacture and use of improvised explosives and weapons is clearly relevant to the charges since Melzer is alleged to have planned an ambush on his fellow service members in which jihadists would use explosives and weapons.  *Salameh*, 152 F.3d at 114 (admitting document containing instructions on constructing improvised explosives and weapons for evidence of intent and motive for terrorist plot); *see also United States v. Rahimi*, No. 18 Cr. 478 (RMB), Dkt. No. 113, at 22 (S.D.N.Y Aug. 15, 2017) (rejecting parallel objection and admitting bomb making instructions as "evidence to show, motive, intent, preparation, plan, and knowledge").

Accordingly, the Court should admit the jihadist and O9A related materials seized from the defendant's cellphones and barracks as direct evidence and pursuant to Rule 404(b).

## II.   CC-1 and CC-3's Statements Are Admissible

The defendant asks the Court to defer ruling on the admissibility of CC-1 and CC-3's statements, arguing that (i) the Government has failed to establish the existence of a conspiracy within the meaning of Rule 801(d)(2)(E) between Melzer, CC-1, and CC-3 by a preponderance of the evidence (Def. Mem. at 9); and (ii) the Government has not met the requirements of Rule 804(b)(3) by showing that CC-1 and CC-3 are unavailable or that their statements are corroborated by circumstances indicating their trustworthiness (Def. Mem. at 12).

The defendant is wrong. *First*, the Government's motions *in limine* provide an ample summary of the evidence establishing the existence of a conspiracy in this case, and set forth with particularity the roles Melzer, CC-1, and CC-3 fulfilled in that conspiracy. The defendant's arguments go to the weight that a jury should afford the evidence rather than admissibility. Melzer's own statements, as well as the statements of CC-1 and CC-3 (which the Government detailed in our motions *in limine* (cites)), are more than sufficient to demonstrate the existence of that conspiracy by a preponderance of the evidence, as required for their admission. *Second*, the Government has met its burden is demonstrating both that CC-1 and CC-3 are unavailable and that they would likely invoke their Fifth Amendment privilege if called. Additionally, the context of the statements and the participants in the conversations plainly establish their reliability, such that Rule 804(b)(3) provides alternative grounds for the Court to admit CC-1 and CC-3's statements as against their interest.

In connection with the defendant's motions and recent requests to the Government, the Government anticipates producing additional information to the defendant relating to CC-1 and CC-3. This additional information does not alter the conclusion that CC-1 and CC-3 conspired with the defendant. Nonetheless, the defense will have ample time in advance of trial to make any arguments to the Court regarding the additional material, and the Government will respond promptly. Ultimately, for all of the reasons set out below, the Court should find that CC-1 and CC-3's statements are admissible.

## A. Applicable Law

### 1. Rule 801(d)(2)(E)

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

To show that a conspiracy existed, the evidence must be sufficient to establish that "the . . . alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 137-38 (2d Cir. 2008) (internal citations and quotations omitted). There must be agreement "on the essential nature of the plan," which must be more than a "vague agreement to do something wrong." *Salameh*, 152 F.3d at 151 (citing *United States v. Provenzano*, 615 F.2d 37 (2d Cir. 1980)).

When determining whether the predicate conspiracy has been established, the district court is not bound by the rules of evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. 181).

Under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *Gigante*, 166 F.3d at 82. "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." *Ulbricht*, 79 F. Supp. 3d at 483-84 (citing *United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993)).

### 2. Rule 804(b)(3)

Federal Rule of Evidence 804(b)(3) provides an exception to the hearsay rule for statements against an unavailable declarant's interest, including statements against the declarant's penal interest. A witness may be found to be unavailable if located outside the United States, beyond the subpoena power of the Government, *see United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where located outside the United States at time of trial), or if the witness is expected to invoke his Fifth Amendment privilege, *see United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege.").

"In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the district court must first ask whether a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States v.*

*Gupta*, 747 F.3d 111, 127 (2d Cir. 2014).  This question "can only be answered by viewing [the statement] in context," *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007), and "in light of all the surrounding circumstances," *Gupta*, 747 F.3d at 127.  Once the trial court is satisfied that the statement is against the declarant's penal interest, it then "looks for corroborating circumstances indicating both the declarant's trustworthiness and the truth of the statement." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017).

The Second Circuit has identified four relevant factors that bear on the trustworthiness of third-party confessions: "(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; and (4) the availability of the declarant as a witness."  *United States v. Guillette*, 547 F.2d 743, 754 (2d Cir. 1976).  The inference of trustworthiness "must be strong, not merely allowable."  *Gupta*, 747 F.3d at 127.  Circumstances giving rise to the requisite strong inference of trustworthiness include that: (1) "the statement was made to a person whom the declarant believes is an ally," *United States v. Saget*, 377 F.3d 223, 230 (2d Cir. 2004), rather than "to curry favor with authorities," *Williams*, 506 F.3d at 155; (2) details contained in the statement are corroborated by independent evidence, *see, e.g.*, *Gupta*, 747 F.3d at 128-29 (corroboration included proof that declarant did receive a call as described in statement); *United States v. Wexler*, 522 F.3d 194, 203 (2d Cir. 2008) (corroboration included others' testimony and documentary evidence); and (3) the statement does not reflect an effort by the declarant to shift blame onto the defendant, but rather describes actions the declarant and the defendant "jointly committed," *Saget*, 377 F.3d at 230; *see also Dupree*, 870 F.3d at 81; *Williams*, 506 F.3d at 155.

24

**B. Argument**

**1. The Government Has Established the Existence of a Conspiracy by a Preponderance of the Evidence**

As described extensively in the Government's motions *in limine* (Gov. Mem. 8-22; 51-53), the statements of CC-1 and CC-3 that the Government seeks to introduce—statements taken from direct conversations with the defendant—were plainly with respect to a conspiracy to facilitate a jihadist attack and cause the murders of the defendant's fellow servicemembers.  The statements, in which the members of the conspiracy plan the attack and discuss their commitment to O9A, forcefully establish the existence of a conspiracy, and were obviously intended to further the goals of that conspiracy.  Notably, in the context of these statements, Melzer repeatedly and enthusiastically affirmed the existence of the conspiracy, its purpose, and its scope; declared his commitment to the conspiracy was absolute, even if the attack resulted in his own demise; and shared national defense information with his conspirators in hopes of furthering the attack-plotting efforts.  The defendant's participation in these conversations sets CC-1 and CC-3's statements apart; their statements are made not only to one another, or to other members of the conspiracy, but *to the defendant*, who not only affirms to his co-conspirators his commitment to the plot, but also provides real-world information relevant to the attack at the request of those same individuals. These conversations clearly point to a fully formed conspiracy between the defendant, CC-1, and CC-3.

By at least May 17, 2020, CC-1's statements demonstrate that he had not only agreed to join a conspiracy, but had already taken steps to further it by communicating information regarding the defendant's upcoming deployment to the Military Base to at least one other conspirator, CC-

2. (Gov. Mem. at 13-14). In an exchange that day, CC-1 asked the defendant for the date of the defendant's deployment, noting, "[CC-2] needs to know, he has plans." After the defendant told CC-1 the date of the anticipated deployment, CC-1 offered CC-2's bona fides, noting that CC-2 was a member of a Turkish far-right organization who intended to join al Qaeda." (*Id.*). The defendant made clear that he understood CC-1 to be providing this information to the benefit of the planned ambush on his unit, and noting al Qaeda had "links everywhere they should definitely at least have one Turkish army guy." Later, on May 23, 2020, CC-1 sought additional conspiracy participants and forwarded information about the upcoming deployment that the defendant previously sent to CC-1 to an 18-member Telegram O9A chat group titled "Order of Nine Rapes." The defendant replied in this group chat by confirming the upcoming deployment, and discussing the possibility of a jihadist attack. (*Id.* at 16). Later in that same exchange of messages, the defendant unequivocally affirmed his own agreement to join the conspiracy, expressing his willingness to die in the event of a successful attack on his unit because "[i]f we were to trigger this the right way the amount of shit this would cause" would render his life "absolutely meaningless" by comparison. (*Id.*)

The defendant and CC-1 also repeatedly discussed and affirmed the existence of the conspiracy itself in unequivocal language. On May 24, 2020, CC-1 asked the defendant, "are we literally organizing a jihadi attack[?]" The defendant replied "yes […] as long as I get the info I need to give you all." (*Id.*). On May 25, 2020, CC-1 asked the defendant for more information, noting, "I heard you may be reconsidering, but […] we still need the info, so give it [to] us out of good faith…also this is a serious thing, if you [get] this done we need proper organization….we're not into larping [live action role-playing] […] so if youre not serious, let her/us know." (*Id.* at 17).

CC-1's statement convincingly establishes that he was "serious" about following through with the conspiracy and that CC-1 and the others needed the defendant's information and "proper organization."  The defendant replied to CC-1 by providing additional information that he had received during briefings, including factual details regarding the size of the unit's convoy during the upcoming deployment, how they would be armed, and the types of vehicles they would use. (*Id*.).  The agreement between CC-1 and the defendant to conduct an attack was explicit.

CC-3's statements are further evidence of the existence of the conspiracy.  By May 25, 2020, CC-1 founded a smaller, invite-only chat group on Telegram, to which CC-3 and Melzer were invited.  (*Id.* at 18.).  In that group, the defendant posted detailed information about the Military Base and his unit's defensive capabilities once stationed there.  CC-1 and CC-3 discussed that information, noting that attackers "should come from the mountain" surrounding the Military Base, and offered, "if it is done very quickly . . . then no worries about air support."  After CC-3 pointed out that the defendant's information was critical to the attack plan ("Since you know the approximate[ ] number of soldiers in the base, you already won the battle"), CC-1 asked if the plan to attack "the sever[e]ly underdefended" base looked good, and CC-3 agreed that it did.  (*Id*. at 20).  CC-1 and CC-3 were wholly aware of the conspiracy and its nature, and engaged in clear discussions about how best to accomplish the conspiracy's goal of murdering U.S. servicemembers.

Aside from the conversations themselves and the defendant's clear participation in them, there is ample independent evidence of the defendant's knowledge of the conspiracy and his efforts to support it.  *See, e.g., United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) (sufficient corroborating proof of the existence of a conspiracy required); *Padilla*, 203 F.3d 161 ("there must

be some independent corroborating evidence of the defendant's participation in the conspiracy."). For example, as the above-mentioned conversations show, the defendant initially provided information about his upcoming deployment to CC-1 in general terms, and pointedly noted that the jihadist attack on his unit could be executed as long as he received information he needed. Days later, the defendant provided that specific information, which the defendant obtained during numerous briefings, including at least one classified briefing, about the upcoming deployment to the Military Base. In other words, the defendant promised information to further the conspiracy, and then delivered on that promise as soon as he was in a position to do so. The conversations between the defendant and the conspirators were tethered to the defendant's access to sensitive information about his upcoming deployment, and the defendant exploited that access to further the conspiracy's goals.

In seeking to preclude admission of the co-conspirator statements, the defendant argues that the Government has offered insufficient information regarding the identities of the conspirators (Def. Mem. at 11), but the Government has made clear that the defendant's communications with CC-1 and CC-3, combined with his post-arrest admissions, adequately establish the defendant's own understanding of who CC-1 and CC-3 were when the defendant was discussing the attack plot with them. *See Reytan v. United States*, No. 04 CIV. 3635 (DAB), 2006 WL 1311955, at *4 (S.D.N.Y. May 12, 2006) (noting that it is not necessary that conspirators know each other's identities, "as long as a defendant is aware of other people's assistance in the criminal venture"). Furthermore, a defendant unaware of co-conspirator's identities "need not even know . . . the particular part they are playing." *United States v. Dardi*, 330 F.2d 316 (2d Cir. 1964). As described above, the defendant understood CC-1 and CC-3 to be assisting the attack

plotting, and passed information in response to direct questions regarding the logistics and viability of the attack on his unit and the Military Base.

The defendant's general argument that CC-1 and CC-3 may not have been "serious" or merely pretended to agree with the attack plan may be fair argument for a jury, but is insufficient speculation to stay the Court's ruling at this stage, especially in light of the preponderance of the evidence standard.  In particular, the defendant claims that CC-1 "was blatantly lying to Melzer and all other chat participants . . . about seemingly every detail of his identity, capabilities, and intentions."  Irrespective of CC-1's identity, the defendant points to no evidence to suggest that CC-1 was not serious about facilitating an attack on the unit by, among other things, passing the defendant's information to others CC-1 believed were capable of actually conducting such an attack.  CC-1 never appeared to claim in the conversations with the defendant or others that he would personally participate in such an attack; in fact, as noted above, CC-1 repeatedly made clear to the defendant that he sought information from the defendant to put it in the hands of jihadists who could conduct an attack on the unit or the Military Base.

The defendant cites no support for the proposition that any of the information disclosed by the Government about CC-1's possible identity would preclude CC-1 from conspiring with the defendant.  Moreover, the defendant's reliance on *United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977) is misplaced.  The defendant in *Rosenblatt* agreed to aid and abet certain crimes, but no one else agreed, and the defendant also did not agree to or have any knowledge of the other crimes committed by his alleged conspirators.  (*Id.* at 39).  In contrast, and as established in the statements outlined above, CC-1 had clear knowledge of the particular scheme at issue and in fact helped to define its contours.  Moreover, CC-1 recruited others to the plan, distributed critical information

to other members of the conspiracy, and asked the defendant for additional information and details that CC-1 would pass to others for the plan to succeed.  And, indeed, CC-1 in fact passed the defendant's information in encrypted online channels, thereby fulfilling the precise role in the conspiracy CC-1 claimed to occupy and the defendant expected.  This is more than sufficient to demonstrate the existence of a conspiracy between Melzer and CC-1 by a preponderance of the evidence.

Similarly, the defendant's arguments with respect to CC-3 fail.  While the defendant insists that the Government must "substantiate that [CC-3] was accurately representing himself online," no such requirement exists.  All that is required is showing that CC-3 joined himself to the conspiracy with the defendant.  Indeed, even if CC-3 made misrepresentations regarding CC-3's identity, this is not of itself evidence that CC-3 did not conspire, and it may in fact suggest that CC-3 was deliberately hiding or obfuscating personal details as a measure of operational security. Indeed, lying about one's identity, whereabouts, and other biographical information in the context of a plot to facilitate a jihadist attack on a sensitive American military installation overseas, while plotting in concert with an individual who claimed to be an active-duty American service member, may be viewed by a fact-finder as more prudent of CC-3 than offering personal biographical details that could lead investigators to CC-3's doorstep.  In any event, while this might make for good fodder for jury argument, it has little, if any bearing, on the question now before the Court—namely, whether CC-3's unmistakable participation with the defendant and CC-1 in the attack planning is sufficient to demonstrate the existence of a conspiracy by a preponderance of the evidence.

In sum, CC-1 and CC-3's statements alone provide more than enough evidence to establish by a preponderance of the evidence that a conspiracy existed as required by Rule 801(d)(2)(E). The defendant's arguments regarding the identities of CC-1 and CC-3, their whereabouts, or their ability to facilitate an attack on Melzer's unit are properly viewed as arguments concerning the weight, not the admissibility, of the statements themselves. The above-described statements and the statements outlined in the Government's motion *in limine*, particularly viewed in the context of the defendant's own participation in the conversations and receipt and distribution of information received during the unit's deployment briefings, provide ample basis for the Court to conclude that the Government has established the existence of a conspiracy, in furtherance of which the offered statements were made.

### 2. Statements By CC-1 and CC-3 Are Admissible Under Rule 804(b)(3)

The defendant's arguments under Rule 804(b)(3) are without merit. First, the defendant contends that the Government has not shown use of "reasonable means" to obtain the attendance of CC-1 or CC-3. The defendant concedes that to the extent the Government has information about the identities of CC-1 and CC-3, they are both located outside the United States. (Def. Mem. at 12). That is beyond the Government's ability to issue compulsory process.

The defendant's reliance on *United States v. Losada*, 674 F.2d 167 (2d Cir. 1982), and *United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980), are misplaced; neither case addresses statements against penal interest. *Losada* addressed a situation in which the Government offered "former testimony" within the meaning of Rule 804(b)(1)(A), *see Losada*, 674 F.2d at 172, and *Sindona* concerns the introduction of four depositions taken under Federal Rule of Criminal Procedure 15(a) from witnesses who refused to come to the United States, *see Sindona*, 636 F.2d

at 803.  Similarly, the unavailable witnesses in *United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006), also cited by the defense, were crime victims previously brought to the United States to testify in prior proceedings against a defendant.  Reasonable efforts to procure testimony from a witness who has previously offered testimony favorable to the proponent in the context of Rule 804(b)(1), as in *Losada* and *Ozsusamlar*, or given testimony via deposition, as in *Sindona*, are necessarily subject to a different analysis under Rule 804(b)(3).  Put another way, CC-1 and CC-3 are differently situated from the witnesses in these cases, since those witnesses either cooperated with the Government, were willing to and had been previously deposed, or were crime victims who have previously been brought to the United States to testify in a prior proceeding.

As the Government noted in its motions *in limine*, this distinction boils down to the fact that CC-1 and CC-3 are likely to invoke their Fifth Amendment privilege against testifying.  The defendant distinguishes *Savoca*, 335 F. Supp. 2d at 390 (citing *United States v. Williams*, 927 F.2d 95, 98 (2d Cir. 1991)) from the case at bar by noting that in that case and *Williams* the declarants' attorneys stated the declarants would assert the Fifth Amendment privilege if called.  But neither *Savoca* nor the other cases the defendant cites establish a requirement of a declarant's invocation, or an attorney's invocation of the right on behalf of a declarant.  Here, where CC-1 and CC-3 are located overseas, the Government has no information to suggest that either has counsel, and (given their involvement in a plot to murder U.S. servicemembers) they are likely to invoke the Fifth Amendment if questioned about their plainly illegal conduct, the Government has established both CC-1 and CC-3's unavailability under Rule 804.

Finally, the circumstances of CC-1 and CC-3's statements overwhelmingly point to their trustworthiness.  The arguments concerning their "reliability" advanced by the defendant ignore

the clear tests established under prevailing Circuit precedent, which the statements plainly satisfy. *First*, both CC-1 and CC-3 made statements to those believed to be allies. *Dupree*, 870 F.3d at 80 (noting that the fact that statements were made to "a person whom the declarant believed was an ally" contributed to the statement's trustworthiness). The communications occurred in a private chat room within an encrypted messaging application, the former of which was created for the specific purpose of plotting the attack against the defendant's military unit. Members were brought into the channel by CC-1 explicitly for the purpose of receiving, discussing, and further distributing information provided by the defendant in furtherance of the attack plan. *See Saget*, 377 F.3d at 230 (statements to friend in private setting are reliable). Moreover, CC-1 and CC-3 plainly intended to keep their statements from the authorities, much less "curry favor" with them, *see Williams*, 506 F.3d at 155, given the forum and the content of the statements themselves. *Second*, the details in the statements made by CC-1 and CC-3 are corroborated by independent evidence. There is no question the communications themselves happened, as they were later retrieved from the defendant's phone. Moreover, the actual information the defendant was receiving during the classified and unclassified briefings regarding his unit's upcoming deployment to Turkey (which the Government will establish at trial through witness testimony and documentary evidence) was the explicit subject of the communications themselves. *See Gupta*, 747 F.3d at 128-29 (corroboration included fact that recorded discussions corresponded to specific contemporary events); *Wexler*, 522 F.3d at 203 (corroboration included others' testimony and documentary evidence). Indeed, the information CC-1 and CC-3 discussed included true and accurate details provided by Melzer in advance of his deployment. *Third*, CC-1 and CC-3's statements clearly describe actions the declarants and the defendant "jointly committed," *see*

*Saget*, 377 F.3d at 230; indeed, the statements were made in the context of a group conversation in which the defendant was a participant and constituted the core of the attack plotting efforts by the conspirators.  Furthermore, the statements do not indicate in any way that the declarants were making efforts to shift blame or minimize culpability, rather, with each statement, CC-1 and CC-3 further explored the possibility of facilitating the attack on Melzer's unit and the Military Base— the unambiguous object of the conspiracy.  *See United States v. Olivera*, 797 Fed. App'x 40, 44 (2d Cir. 2019) (statements made to ally, rather than authorities, explaining motive and mechanics of crime and links between conspirators, are reliable).

Accordingly, the Government respectfully submits that CC-1 and CC-3's statements are not hearsay and should be admitted at trial under either Rule 801(d)(2)(E) or 804(3)(B).

### III.  The Defendant's Admissions Are Admissible

Melzer's motion to preclude admission of certain statements to Individual-1 regarding his military service and his lack of patriotism should be denied.  Specifically, after Individual-1 suggested he might follow the defendant's example and join the Marine Corps, the defendant replied, "Good luck it's great for training . . . Just don't become a fuckin patriot . . . train and get the fuck out . . . I'm not patriotic for shit . . . all of these places the vast majority deserve to be burned."  Although the defendant concedes that "many of . . . Individual-1's statements to Melzer as described in the Government's motion are [] likely admissible" for a non-hearsay purpose (Def. Mem. at 14), the defendant objects to admission of certain of his own statements made during the course of his conversation with Individual-1.  This motion should be denied.

The defense does not contest that the defendant's own statements are categorically non-hearsay under Rule 801(d)(2)(A).  Instead, the defendant seeks to challenge his statements to

Individual-1 under Rule 403, asserting that his statements "carry a substantial risk of prejudice." (Def. Mem. at 14). But the challenged statements do "not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged," and they are clearly relevant to the charged crimes. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). The defendant is charged with conspiring to murder and attempting to murder members of his own army unit by facilitating an attack by jihadists. The defendant's antipathy to the U.S. military and derision of patriotism as evinced in the proffered statements pales in comparison to the charged conduct. The jury will not be surprised to learn that the defendant disclaimed patriotism while a participant in chatrooms dedicated to the violent destruction of the American state. The value of the statements, in contrast, is clearly relevant and probative of the defendant's membership in and support of O9A and view of his own military service as an "insight role" as part of O9A—central issues in dispute between the parties. The defendant's statements were made days before the defendant began sharing sensitive information with the conspirators and are directly probative of the defendant's intent and purpose in providing that information about his unit and the Military Base to others.

Indeed, the Second Circuit has noted that "although it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted." *Salameh*, 152 F.3d at 111 ("evidence that provides background information necessary to the jury's understanding of the nature of the conspiratorial agreement properly is admitted to furnish an explanation of the understanding or intent with which certain acts were performed." (internal citations and quotations omitted)); *see also Naseer*, 775 F. App'x at 30 (rejecting a Rule 403 argument where the

challenged evidence helped "establish the existence of a terrorism conspiracy, as well as the conspiracy's purpose and its modus operandi").

Additionally, the defendant's request for an instruction regarding the defendant's "First Amendment right to hold his political beliefs" is inappropriate in the context of his statements to Individual-1.  (Def. Mem. at 15).  The defendant's reference to patriotism is clearly not a political statement or a description of any belief in the colloquial political sense.  Instead, the defendant is explaining to Individual-1 how joining the armed forces can be useful to O9A ("it's great for training"), but should be divorced from any genuine desire to serve the interests of the United States military.  The defendant's discussion of the O9A prerogative in using the United States military to gain training and experience demonstrates his own understanding of O9A insight roles in an operational sense, and is not political expression.  Reference to the First Amendment is irrelevant here and will only serve to confuse the jury.  *See* Fed. R. Evid. 402, 403.

The Government respectfully submits that the defendant's statements regarding the United States military made to Individual-1 should be admitted.

## IV.  The Defendant Cannot Offer His Own Self-Serving Statements at Trial

Although the defendant acknowledges this motion is premature (Def. Mem. at 16), he nevertheless argues that the rule of completeness mandates the introduction of the defendant's own statements, going so far as to argue for their admission "in full."  (Def. Mem. at 18).  The Government will produce any excerpts of the defendant's post-arrest statements it intends to introduce sufficiently in advance of trial to allow the defendant to note any concerns under Rule 106 and raise any objections with the Court if the dispute cannot be addressed between the parties. But the Government notes that the long list of the defendant's self-serving denials outlined in the

defendant's motion (*see* Def. Mem. 16- 17), and certainly the suggestion that the entirety of the post-arrest statements should be accepted in evidence, run afoul of the limited scope of the completeness doctrine.  Accordingly, the Government will oppose any of the defendant's own statements that are not necessary to clarify or explain the defendant's admissions offered under Rule 801(d)(2)(A).

It is axiomatic that a "party's own statement, if offered against him, is not hearsay." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." (citing Fed. R. Evid. 801(d)(2)(A))).  But the defendant does not have the parallel ability he urges to offer his statements into evidence.  When a "defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (quotation marks omitted)).

The defendant seeks to introduce his own exculpatory statements, which he tellingly characterizes as "contemporaneous denials" (Def. Mem. at 17), but the rule of completeness does not mandate the introduction of such statements.  Rule 106 states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction . . . of any other part . . . that in fairness ought to be considered at the same time."  Fed. R. Evid. 106. However, Rule 106 "does not render admissible evidence that is otherwise inadmissible." *United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983).  Thus, the rule of completeness requires

admission of a hearsay statement only when the statement is "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (emphasis added) (quotation marks omitted). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (finding no abuse of discretion to preclude portion of tape that included defendant's "own self-serving statements"); *United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010) ("[T]he rule of completeness is not a mechanism to bypass hearsay rules for any self-serving testimony.").

The burden rests with the defendant to demonstrate that the portions of the statement he seeks to offer are necessary to clarify or explain the portions the Government intends to offer. *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

## V.   The Court Should Permit the Implementation of Limited Measures to Protect the True Name of the Military Base

The Court should adopt the Government's proposed limited protective measures to protect the true name of the Military Base at trial since public airing of the actual name has no relevance, while such disclosure in open court—in combination with the specific details about the facility shared by Melzer in his Telegram chats—will pose a significant risk to the security of the Military Base and the troops guarding the facility.

The defendant's arguments to the contrary miss the mark.  The defendant first contends that it would be "improper" to require him to refer to the facility as the Military Base, since that would prevent the defense from arguing that the base was "easily identifiable via an open-source internet search," as relevant for its arguments against Counts Seven and Eight.  (Def. Mem. at 18). But the defendant constructs a false dichotomy—either let the defense use the true name of a sensitive military installation in open court or the defendant will be unable to present evidence that the information about the facility exists in the public domain.  Not so.  For one, the defendant will be able to direct the jury to various Telegram messages that make this precise point, including his May 25, 2020 directive to CC-1 to "look [] up" the Military Base on the internet.   And to the extent the defendant plans to seek to adduce additional publicly available facts about the Military Base at trial (Def. Mem. at 20), use of the substituted name will not affect his ability to pursue that course.  In short, nothing about this limited protective measure prevents the defense from eliciting the fact that information about the base exists in the public domain or mounting their defense on Counts Seven and Eight.

Moreover, the Government does not oppose an appropriate limiting instruction explaining to the jury that the use of a pseudonym in the place of the facility's true name should not be considered in any way in their deliberations.  *United States v. Stewart*, 433 F.3d 273, 307 (2d Cir. 2006) (noting the "well-settled proposition" that jurors are presumed to follow limiting instructions).  Nor would it oppose a less generic sounding stand-in, since the defendant's concern appears to be the "obviously generic term 'the Military Base.'"  (Def. Mem. at 20); *see United States v. Urena*, 8 F. Supp. 3d 568, 573-74 (S.D.N.Y. 2014) (granting the Government's request to protect confidential source's true name at trial but ordering that the source use an "alias" instead

of "a transparent code name" to "avoid[] drawing the jury's attention to the prophylactic measures taken by the Court"). The Government's purpose here is straightforward: it seeks to protect the facility and those guarding it; it does not seek to handicap the defendant and his defense. Yet the defense has not established the relevance of telling the jury the *actual true* name, which is generic in itself, but traceable to a real world military facility in a way that "the Military Base" is not. The Government is prepared to work with the defense in an effort to see if the parties can agree on an alternative term to be used.

It also bears noting that in attempting to establish the relevance of the publicly available information about the Military Base, the defense overstates the facts and the law as they relate to the significance of the name of the facility. As a factual matter, the Government does not intend to argue that Melzer's disclosing the true name of the Military Base constitutes—on its own—a disclosure of national defense information. Rather, the Government's arguments on this score will largely center on Melzer revealing sensitive details about the Military Base's purpose and security vulnerabilities, including the number of soldiers who would be guarding the installation, their weaponry (including what weapons they lacked), and which modes of attack would be most successful given the topography surrounding the Military Base.

Similarly, as a legal matter, the defense overstates the significance of certain information about the Military Base being released on the Internet through non-U.S. Government sources. Courts have repeatedly recognized that "in the arena of intelligence and foreign relations," there can be "a critical difference between official and unofficial disclosures," *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009), and, have, accordingly, rejected the proposition that "information that is available to the public can never be considered national defense information," *United States v.*

*Squillacote*, 221 F.3d 542, 575 (4th Cir. 2000). *See also Wilson*, 586 F.3d at 174 (concluding that "evidence of public disclosure does not deprive information of classified status"). Thus, the question of whether information related to the national defense is "closely held" turns not merely on whether it has, in some form, been made public, but also *how* it became public. As the Fourth Circuit explained, "the central issue [of] the secrecy of the information . . . is determined by the government's actions," and the instructions to be given to a jury on this point should "properly focus[] the jury's attention on the actions of the government when determining whether the documents were related to the national defense." *Squillacote*, 221 F.3d at 577. Only "[w]here the information has been made public by the United States Government and is found in sources lawfully available to the general public, it is not 'closely held.' Similarly, where sources of information are lawfully available to the public *and the United States Government has made no effort to guard such information*, the information itself is not 'closely held.'" *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 387 (D. Conn. 2009). Accordingly, the existence of publicly available information about the Military Base that did not originate from the U.S. Government has little bearing on the question before the jury—namely, did Melzer disclose information that "is closely held by the Government." (Def. Mem. at 20 (citing *United States v. Schulte*, 436 F. Supp. 3d 747, 754 n.8 (S.D.N.Y. 2020)).

Finally, the defense's attempts to distinguish the Government's case law in unavailing. The cited precedent makes clear that courts routinely adopt limited protective measures—including approving sealing, redactions and substitutions—when important national security or law enforcement concerns are at issue. *Cf. DiBacco v. Dep't of the Army*, 926 F.3d 827, 835 (D.C. Cir. 2019) (affirming the district court's decision exempting from FOIA disclosure, among other

things, the "true names" of covert CIA employees, and the cities and countries in which CIA had

covert installations).  For example, just as in *United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y.

2014), the Government's interest in protecting the safety of the Military Base and the troops

guarding it "overwhelmingly outweighs the defendants' interest in public disclosure of [the

Military Base's] true name." *Id.* at 573 (granting the Government's request that its confidential

source testify under a pseudonym to protect his "personal safety and the viability of his current

and future undercover investigations").  Also, just as in *Urena*, the defendant has "fail[ed] to

demonstrate the materiality of [the Military Base's] real name to any issue of guilt or innocence"—

especially in light of the defendant's Telegram communications about open-source information

relating to the base (which the Government expects to admit at trial), the defense's ability to elicit

evidence about open-source materials regarding the base while using a pseudonym, and the

Government's willingness to substitute another non-generic name that ensures no prejudice flows

from the substitution. *See id.* at 573.  The defendant's attempt at distinguishing *United States v.*

*Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 3764662, at *4 (S.D.N.Y. July 22, 2019)—where the

Court authorized substitutions for names of facilities used by the CIA due to national security

concerns in a case involving unauthorized disclosures of "national defense information"—also

misses the mark.  In particular, the defendant highlights the fact that the Government moved for

the substituion in *Schulte* under the Classified Information Procedures Act ("CIPA") to contend

that the court's ruling there is inapposite.  (Def. Mem. at 19).  But that is beside the matter since

CIPA does not "alter existing rules regarding the admissibility of evidence," *United States v. Zazi*,

No. 10-CR-60 (JG), 2011 WL 2532903, at *1 (E.D.N.Y. June 24, 2011), it merely "establishes

rules for the management of criminal cases involving classified information," *In re Terrorist*

*Bombings of U.S. Embassies in E. Africa,* 552 F.3d 93, 115 (2d Cir. 2008). Put another way, the same principles that applied in *Schulte* apply here and the fact the Government did not move under CIPA for this relief does not undercut, in any way, the relevance of such precedent or the underlying merits of the Government's argument.

Accordingly, the Government respectfully requests that the Court implement the proposed limited protective measures to ensure the true name of the Military Base is not disclosed at trial.



███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
       February 18, 2022

                                        Respectfully submitted,


                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                           By:     ___/s/_____
                                        Sam Adelsberg
                                        Matthew J.C. Hellman
                                        Assistant United States Attorneys


Cc:    Defense Counsel
       (Via ECF)

47