UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                              *-v.-*<br><br>ETHAN MELZER,<br><br>       a/k/a "Etil Reggad,"<br><br><br>                              Defendant. | S1 20 Cr. 314 (GHW) |

**THE GOVERNMENT'S MOTION TO PRECLUDE EXPERT TESTIMONY AND FOR
DISCLOSURE OF THE DEFENDANT'S WITNESS STATEMENTS AND EXHIBITS**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
                    *of America*

Sam Adelsberg
Matthew J.C. Hellman
Kimberly J. Ravener
       Assistant United States Attorneys
              *Of Counsel*

## Table of Contents

INTRODUCTION ......................................................................................................... 1

I.    The Defendant's Proposed Expert Testimony Should Be Precluded .................................... 2

   A.    Relevant Facts ................................................................................................... 3

   B.    Applicable Law ................................................................................................. 4

      1.    Federal Rules of Evidence 702 and 703 ................................................... 4

      2.    Federal Rule of Evidence 704 and Federal Rule of Criminal Procedure 12.2(b) ........... 7

      3.    The Insanity Defense Reform Act of 1984 ............................................... 9

      4.    Federal Rules of Evidence 401, 402, and 403 ......................................... 10

   C.    Dr. Greenfield's Testimony Will Not Help the Jury Understand the Evidence .............. 11

   D.    Dr. Greenfield's Testimony Is Not the Product of Reliable Methods ........................... 17

   E.    Dr. Greenfield's Proffered Testimony Runs Afoul of Rule 704(b) and Would Constitute Improper Mental Condition Evidence ........................... 21

   F.    The Proposed Expert Testimony Runs Afoul of Rule 403 .............................................. 26

   G.    In the Alternative, the Government Requests a *Daubert* Hearing and that the Defense be Required to Supplement its Deficient Expert Notice .............................. 27

II.    The Court Should Order the Defendant to Produce his Exhibits and an Exhibit List by June 21, 2022 .................................................................................................... 30

CONCLUSION .......................................................................................................... 34

## Table of Authorities

**Cases**

*Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582 (S.D.N.Y. 2021) ......................................... 13

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) .................................... 5

*Amorgianos v. Romano Enterprises*, 303 F.3d 256 (2d Cir. 2002) ............................................... 5

*Bourjaily v. United States*, 483 U.S. 171 (1987) ....................................................................... 5

*Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................... 6, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993) .................................. passim

*Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104 (2d Cir. 2011) .............................. 28

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................................... 6

*Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................ 6, 7

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ............................................................................ 7

*In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................ 19

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785 (S.D.N.Y. 2012) ............................... 7

*Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2022 WL 671630 (S.D.N.Y. 2022) ............................. 18

*Lindsey v. Griffin*, 2019 WL 5605197 (S.D.N.Y. 2019) ............................................................ 12

*Makinen v. City of New York*, 53 F. Supp. 3d 676 (S.D.N.Y. 2014) .......................................... 20

*Munafo v. Metro. Transp. Auth.*, 2003 WL 21799913  (E.D.N.Y. 2003) ................................... 20

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................................... 5

*Rosario v. City of New York*, 2021 WL 1930293 (S.D.N.Y. 2021) ............................................ 19

*Tardif v. City of New York*, 344 F. Supp. 3d 579 (S.D.N.Y. 2018) ........................................... 19

*Tchatat v. City of New York*, 315 F.R.D. 441 (S.D.N.Y. 2016) .................................................. 14

*United States v. Benally*, 541 F.3d 990 (10th Cir. 2008) .......................................................... 14

*United States v. Brennerman*, 17 Cr. 337 (RJS) ...................................................................... 31

*United States v. Bright*, 517 F.2d 584 (2d Cir. 1975) .......................................................... 12, 21

*United States v. Brown*, 326 F. 3d 1143 (10th Cir. 2003) .................................................... 10, 25

*United States v. Cameron*, 907 F.2d 1051 (11th Cir. 1990) .............................................. 9, 10, 25

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) ............................................................. 5

*United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995) .............................................................. 9

*United States v. DiDomenico*, 985 F.2d 1159 (2d Cir. 1993) ............................................... 12, 23

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) ........................................................... passim

*United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002) .............................................................. 19

*United States v. Friedlander*, 395 F. App'x 577 (11th Cir. 2010) ............................................. 19

*United States v. Gillis*, 938 F.3d 1181 (11th Cir. 2019) ............................................................. 11

*United States v. Hsai*, 2000 WL 195067 (D.D.C. 2000) ........................................................... 31

*United States v. Huntress*, 2015 WL 631976 (W.D.N.Y. 2015) ............................................... 32

*United States v. Jasper*, 2003 WL 22312 (S.D.N.Y. 2003) ....................................................... 28

*United States v. Jones*, 2018 WL 1115778, (S.D.N.Y. 2018) ....................................... 13, 25, 26

*United States v. Joseph*, 542 F.3d 13 (2d Cir. 2008) ........................................................... 15, 18

*United States v. Maxwell*, 2021 WL 5283951 (S.D.N.Y. 2021) ............................................... 13

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008); ............................................................. 5, 6

*United States v. Moreta*, No. 19 Cr. 307 (SHS) (S.D.N.Y. 2021) ............................................. 8

*United States v. Napout*, 2017 WL 6375729, (E.D.N.Y. 2017) ................................................ 30

*United States v. Nobles*, 422 U.S. 225 (1975) ........................................................................... 1

*United States v. Percoco*, 16 Cr. 776 (VEC) ........................................................................... 31

*United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) ................................................................ 9

*United States v. Rajaratnam*, 2011 WL 723530 (S.D.N.Y. 2011) ........................................... 32

*United States v. Ray*, 2021 WL 5493839 (S.D.N.Y. 2021) ................................................ passim

*United States v. Sabir*, 2007 WL 1373184 (S.D.N.Y. 2007) ....................................... 10, 24, 25

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) .................................................................. 7

*United States v. Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. 2017) .......................................... 31

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) ....................................................... 29, 31

*United States v. Valle*, 2013 WL 440687 (S.D.N.Y. 2013) ..................................................... 14

*United States v. Weiss*, 930 F.2d 185 (2d Cir. 1991) ............................................................... 32

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ......................................................... 17

*United States v. Wilson*, 493 F. Supp. 2d 484 (E.D.N.Y. 2006) .............................................. 29

*United States v. Worrell*, 313 F.3d 867 (4th Cir. 2002) ....................................................... 9, 25

*United States v. Young*, 2000 WL 687750 (2d Cir. 2000) .................................................. 24, 33

**Statutes**

18 U.S.C. § 17 .................................................................................................... passim

18 U.S.C. § 4242 ........................................................................................................ 8

**Other Authorities**

*Overcoming Internet Addiction for Dummies* (2021) ................................................ 13

*Psychological Characteristics of Compulsive Internet Use: A Preliminary Analysis*; Cyber
    Psychology & Behavior (1999) .......................................................................... 16

*United Nations Office on Drugs and Crime* .............................................................. 17

**<u>Rules</u>**

Federal Rule of Criminal Procedure 12 ............................................................... passim

Federal Rule of Criminal Procedure 16 ............................................................... passim

Federal Rule of Criminal Procedure 26 ................................................................. 1, 29

Federal Rule of Evidence 401 ............................................................................... 10

Federal Rule of Evidence 403 ....................................................... 10, 22, 26, 27

Federal Rule of Evidence 702 ............................................................................ passim

Federal Rule of Evidence 703 ......................................................................... 4, 6, 29

Federal Rule of Evidence 704 ............................................................................ passim

## INTRODUCTION

The Government moves to preclude certain expert testimony noticed by the defendant. Specifically, the Government moves to preclude purported expert testimony from Dr. David Greenfield, the defendant's proposed expert witness on "compulsive and addictive Internet use and behavior," on several grounds. (*See* Defense Expert Notice, attached hereto as Exhibit A, at 1 (hereinafter "Def. Notice")). Dr. Greenfield's proposed expert testimony would not aid the jury because it lacks a nexus to the facts in this case, lacks support in any reliable methodology, and would violate Federal Rule of Evidence 704 and Federal Rule of Criminal Procedure 12.2 by improperly suggesting to the jury that the defendant's conduct was somehow excused by an unverified mental condition.

The Government also respectfully requests that the Court set a date for the defendant to disclose prior statements of witnesses he will call to testify. *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975). The Government provided nearly all its witness statements in August 2021 and has been producing additional 3500 material on an ongoing basis. Consistent with the Government's provision of 3500 material relating to Government witnesses far in advance of trial, the Government requests that the defendant produce such materials promptly and no later than June 21, 2022. Similarly, on June 3, 2022, the Government provided a draft exhibit list and copies of Government exhibits.[1] Accordingly, the Government respectfully requests that the Court set a deadline of on or before June 21, 2022 for the defendant to similarly provide its exhibits in advance of trial.

---

[1] The Government reserves the right to alter, amend, modify, or supplement the exhibit list and the exhibits in advance of trial.

1

## I.    The Defendant's Proposed Expert Testimony Should Be Precluded

Dr. Greenfield's testimony regarding "compulsive and addictive Internet use and behavior" should be precluded for multiple reasons.  (Def. Notice at 1).  First, the defense has not established any basis to believe that Dr. Greenfield's testimony would help the jury to understand the evidence or to determine a fact at issue in the context of this particular case.  Nor has the defense provided any basis to conclude that the defendant suffers from any syndrome identified by Dr. Greenfield, or even any indication that Dr. Greenfield's opinions and methodology have ever been applied in the context of terrorism, white supremacy, or radicalization.  The jury is capable of understanding the evidence regarding Internet usage on its own and Dr. Greenfield's proffered opinions on the general characteristics of purported "Internet addiction" are not sufficiently tied to the facts of this case.  Second, Dr. Greenfield's methodology is, by his own admission, not generally accepted in his field.  This lack of acceptance, and a review of his methodology itself, supports the conclusion that his proffered testimony does not qualify as the product of reliable principles and methods.  Third, Dr. Greenfield's apparent proposed testimony would invade the province of the jury and the Court, and improperly attempt to inject expert testimony relating to the defendant's mental condition, bearing on the issue of his guilt, while circumventing the requirements of Federal Rule of Evidence 12.2.  For these reasons, the Court should preclude Dr. Greenfield's proffered testimony.  To the extent the Court is not inclined to preclude his testimony at this time, a *Daubert* hearing should be held to examine the bases and reliability of Dr. Greenfield's methodology and proffered testimony as applied to this case, and the defense also should be required to supplement its expert notice, which is deficient under Rule 16, including by providing further details regarding Dr. Greenfield's proffered opinions and the bases for those opinions.

### A.    Relevant Facts

On May 24, 2022, the defendant notified the Government of its intention to call Dr. David Greenfield as an expert witness.  (Def. Notice at 1).  The disclosure described Dr. Greenfield as a psychologist "with expertise in compulsive and addictive Internet use and behavior" and attached his curriculum vitae.  (Def. Notice at 1, Ex. A to Def. Notice).  With respect to the substance of the proposed testimony, the notice states that Dr. Greenfield is expected to testify on "the causes and characteristics of compulsive Internet use."  (Def. Notice at 2).  According to the Defense Notice, Dr. Greenfield would testify about the following topics:

- "[U]se of the Internet, social media, video games, and related technologies that is repetitive and quasi-involuntary, continued by users despite the negative consequences that stem from such behavior.  These negative consequences may include the expenditure of an inordinate amount of time, the opportunity cost of other uses of time and energy, the clouding of a user's judgment, and the loss of one's ability to discern fantasy from reality."  (Def. Notice at 2).

- "Dr. Greenfield will testify that it is often difficult to separate reality from fantasy on the Internet. He will share a finding from his own research, including a survey of 18,000 Internet users, that approximately fifty percent of users admit to lying or misrepresenting facts online with regularity. As a result, Dr. Greenfield will testify, the Internet is a forum where it can be difficult or impossible to discern what is true or real from what is false, fictitious, or fanciful."  (Def. Notice at 2).

- "Based on his research, Dr. Greenfield will similarly testify that the Internet's 'perceived anonymity' causes users to experience 'disinhibition,' and that Internet users often assume that their online speech has no real-world consequences. In online chat or community spaces, this 'disinhibition' effect is enhanced by a phenomenon that Dr. Greenfield describes as 'accelerated intimacy.' Heavy Internet users in online conversation mistakenly come to view total strangers with whom they chat as familiar. This erroneous perception of familiarity prompts even greater feelings of disinhibition, making users even more likely to engage in fantastical or role-playing behaviors and discussions."  (Def. Notice at 2).

3

- "Dr. Greenfield will also explain to the jury the basic neurobiological mechanisms that make heavy Internet use addictive. The human brain, like all mammalian brains, contains pathways and systems developed over millions of years to help ensure species' survival. The limbic system is the part of the brain responsible for, among other things, emotional and behavioral responses linked to survival-based behaviors such as sustenance and procreation. Within the limbic system, the nucleus accumbens, the brain's main 'pleasure center' or 'reward center,' is a dense collection of cells that are receptive to the neurotransmitter dopamine. Dopamine is excitatory and highly stimulating; it causes humans to feel pleasure. Dr. Greenfield will explain that the Internet is a highly effective dopamine delivery platform. Using the Internet—like drugs, alcohol, sex, food, and gambling— elevates a person's dopamine levels and can lead to compulsive or addictive use and the behaviors that accompany further potential dopamine hits. Additionally, Dr. Greenfield will testify about the concept of 'synergistic amplification,' applied in the context of Internet use to mean that more potent and stimulating content is more likely to have compulsive or addictive potential. Use of the Internet in and of itself sends dopamine to the brain. That dopamine hit is amplified by content that is more extreme or exciting."  (Def. Notice at 2-3).

- "Dr. Greenfield will also discuss the connection between social isolation and compulsive Internet use. People with fewer sources of real-time social stimulation are at greater risk of using the Internet compulsively. He will explain the concept of 'broadcast intoxication,' the phenomenon of Internet and social media users experiencing an intoxicating effect—elevated dopamine levels—from posting content on the Internet and receiving social validation. He will also discuss the 'maybe factor,' the dynamic of variable reinforcement on the Internet. As with a slot machine, social media users post online without knowing what content will be rewarded or validated."  (Def. Notice at 3).

**B.    Applicable Law**

**1.    Federal Rules of Evidence 702 and 703**

Rule 702 establishes that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion."  Fed. R. Evid. 702. However, under Rule 702, four criteria must be satisfied for such expert testimony to be allowed:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

4

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The party who is proffering the expert testimony bears the burden of demonstrating that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). In determining the admissibility of expert testimony, the trial judge serves a "gatekeeping role" and must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). In conducting this analysis, the "district court must focus on the principles and methodology employed by the expert" and should exclude testimony that is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002); *see Amorgianos v. Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002) (district court should undertake a rigorous examination of the facts on which the expert relies, the expert's methodology, and the application of that methodology to the facts). The mere fact that an expert possesses "specialized knowledge" does not automatically signify that his opinions in a specific case are reliable. *Id.* at 267.

Even if the district court determines that the expert testimony is reliable, it must still consider whether the testimony will assist the trier of fact. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). For example, if the proffered testimony pertains to "matters that the average juror is . . . capable of understanding on his own," it is inadmissible. *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (district court should not admit testimony that is "directed solely to lay matters which

5

a jury is capable of understanding and deciding without the expert's help"). Expert testimony must also be relevant to the issues of the case; as the Supreme Court noted in *Daubert*, expert testimony regarding "the phases of the moon" may be relevant to a trier of fact's understanding of "whether a certain night was dark," but barring evidence supporting a link between the moon and the facts at issue, the same testimony would be irrelevant and inadmissible. *Daubert*, 509 U.S. at 591; *id.* at 597 (trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). This "fit" requirement calls for scientific validity to link the expert testimony and the facts of the case. *Id.* The trial judge's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139, 142 (1997).

Though an expert may base an opinion on facts or data upon which other "experts in the particular field would reasonably rely," Rule 703 precludes an expert from disclosing to the jury "facts or data [that] would otherwise be inadmissible" unless the court determines that their probative value "substantially outweighs their prejudicial effect." Fed. R. Evid. 703. Thus, experts cannot be used as a substitute to calling witnesses to the events or facts at issue. Any testimony along these lines would constitute impermissible hearsay. *See, e.g.*, *Mejia*, 545 F.3d at 197 ("The expert may not, however, simply transmit hearsay to the jury . . . . Otherwise, the expert is 'simply repeating hearsay evidence without applying any expertise whatsoever.'") (citations and quotations omitted); *see Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180, 183 (S.D.N.Y. 2008) ("[The expert] has no personal knowledge of these facts and they are lay matters that the jury is capable of understanding and deciding without [the expert's] testimony.").

6

### 2. Federal Rule of Evidence 704 and Federal Rule of Criminal Procedure 12.2(b)

Furthermore, under Rule 704(b), "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b); *see, e.g.*, *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469-70; *LaSalle Bank Nat'l Ass'n*, 2012 WL 466785, at *7. Moreover, a district court must exclude expert testimony that "expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (collecting cases). As the Second Circuit explained, "[e]ven if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Id.* at 364.

Furthermore, an expert cannot speculate as to the state of mind or motivations of the defendant or others. *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury."); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("Additionally, an expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses").

Relatedly, Federal Rule of Criminal Procedure 12.2(b) provides in relevant part that "[i]f a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of guilt . . . , the defendant must—within the time provided for filing a pretrial motion or at any later time the court sets—notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk."  The "objective of Rule 12.2(b) is to give the government time to prepare to meet the issue, which will usually require reliance on expert testimony."  *See United States v. Moreta*, No. 19 Cr. 307 (SHS), Dkt. No. 150 at 47 (S.D.N.Y. Oct. 13, 2021) (internal quotation marks and citations omitted); *see also* Fed. R. Crim. P. 12.2(b), Advisory Committee Comments, 1983 Amendments (noting that inadequate notice prejudices the Government because the Government would not be prepared to cross-examine the expert or have "an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony on defendant's claim").  Notice under Rule 12.2(b) must therefore be "meaningful," and include "the specific nature of any testing that the defense experts would perform or have performed."  *United States v. Ray*, No. 20 Cr. 110 (LJL), 2021 WL 5493839, at *3 (S.D.N.Y. Nov. 22, 2021).  Providing such notice triggers the provisions of Rule 12.2(c)(1)(B), which requires that "[i]f the defendant provides notice under Rule 12.2(a), the court must, upon the Government's motion, order the defendant to be examined under 18 U.S.C. § 4242."  Section 4242(a) in turn provides that following notice by the defendant that he intends to invoke a defense of insanity, "the court, upon motion of the attorney for the Government, shall order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court."

### 3.    The Insanity Defense Reform Act of 1984

Mental health defenses are subject to the limitations of the Insanity Defense Reform Act of 1984 (the "IDRA," codified at 18 U.S.C. § 17) and the cases interpreting that Act. The IDRA defines an insanity defense and makes clear that "[m]ental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17. While the IDRA "does not preclude a defendant from submitting mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime," *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006), courts have consistently cautioned that under the IDRA the admission of such evidence should be permitted only in rare and narrowly defined circumstances. *See id.*; *United States v. Pohlot*, 827 F.2d 889, 900 (3d Cir. 1987); *United States v. Cameron*, 907 F.2d 1051, 1066 (11th Cir. 1990). Accordingly, when confronted with an effort to introduce mental condition evidence to negate intent—typically, in the form of expert testimony—courts should be extremely cautious. *See Pohlot*, 827 F.2d at 905 (directing district courts to carefully examine psychiatric testimony offered to negate intent because of the "strong danger of misuse" in this area). This caution is warranted due to the high likelihood that such evidence—even if characterized as strictly relevant to negate intent—will resurrect precisely the kinds of defenses (such as "diminished capacity," "diminished responsibility," "mitigation," and "justification") that the IDRA was enacted to prohibit. *See, e.g.*, *Cameron*, 907 F.2d at 1066; *Pohlot*, 827 F.2d at 905; *United States v. Childress*, 58 F.3d 693, 730 (D.C. Cir. 1995). "The language of the [IDRA] leaves no room for a defense that raises 'any form of legal excuse based upon one's lack of volitional control' including 'a diminished ability or failure to reflect adequately upon the consequences or nature of one's actions.'" *United States v. Worrell*, 313 F.3d 867, 872 (4th Cir. 2002) (citing *Cameron*, 907 F.2d at 1061).

Therefore, in determining whether evidence of a mental impairment is admissible under the IDRA, courts have strictly required the defendant to "demonstrate clearly, in advance of trial, that there is a direct link between such evidence and the specific *mens rea* that the Government must prove." *United States v. Sabir*, No. 05 Cr. 673 (LAP), 2007 WL 1373184, at *5 (S.D.N.Y. May 10, 2007); *United States v. Dupre*, 339 F. Supp. 2d 534, 539 (S.D.N.Y. Oct. 8, 2004) ("Given that defendants are not foreclosed from presenting mental disease evidence towards the *mens rea* element of a charged offense, it is necessary to identify whether any elements of the charged offenses require the Government to prove intent in a way that could be meaningfully refuted by the type of mental disease evidence [the defendant] seeks to present."); *see also United States v. Brown*, 326 F. 3d 1143, 1147 (10th Cir. 2003) (the admissibility of psychological or psychiatric evidence that negates the essential element of specific intent "will depend upon whether the defendant clearly demonstrates how such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse'") (quoting *Cameron*, 907 F.2d at 1067).

### 4.    Federal Rules of Evidence 401, 402, and 403

Rules 401 through 403 provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

**C.      Dr. Greenfield's Testimony Will Not Help the Jury Understand the Evidence**

Dr. Greenfield's opinions regarding Internet usage are not relevant to help the jury understand the evidence because his proffered testimony is not grounded in the facts of this case. There is no indication that Dr. Greenfield has examined the defendant, or that the defendant suffers from the purported effects of "compulsive" and "heavy" Internet usage, rendering Dr. Greenfield's opinions on these subjects irrelevant to the case.  (*See* Def. Notice at 2).  In fact, there is no indication that Dr. Greenfield has ever applied his theories about Internet use and behavior to any matter involving terrorism, white supremacy, or radicalization, as presented in this case, or that he has ever studied the use of the Internet in those contexts.

The Defense Notice first asserts that Dr. Greenfield would testify regarding the "causes and characteristics of compulsive Internet use," which the notice describes as "use of the Internet, social media, video games, and related technologies."  (Def. Notice at 2).  To the extent Dr. Greenfield's opinions relate to the generic characteristics of Internet use, untethered to the facts of this case, such testimony would cover a basic topic that jurors are capable of understanding on their own.  Indeed, given the ubiquity of Internet usage today, the jury does not need help from an "addiction" expert to understand that people seek validation or relief from social isolation on the Internet or that people sometimes lie online. *See United States v. Gillis*, 938 F.3d 1181, 1192 (11th Cir. 2019) (affirming the preclusion of analogous expert testimony and noting that the witness's proffered testimony "that some information people communicate anonymously over the Internet is false . . . was within the common knowledge of laypersons").  The use of the Internet, and how individuals seek validation or behave online, is not a matter outside the typical understanding of jurors.  And the commonly known fact that individuals lie regularly on the Internet—more than

11

50% of people, according to Dr. Greenfield's 1999 study (Def. Notice at 2)—further supports preclusion here since expert testimony on a "relatively commonplace experience is simply inappropriate." *United States v. DiDomenico*, 985 F.2d 1159, 1161-62 (2d Cir. 1993) (excluding psychiatric expert testimony, concluding that the "so-called disorder" at issue in the expert's proffered testimony "is surely one of the host of attitudes and syndromes that are a part of daily living"); *see also United States v. Bright*, 517 F.2d 584, 585-86 (2d Cir. 1975) (rejecting claim that district court erred in excluding psychiatric expert testimony to the effect that the "appellant was a gullible person but a person unaffected by psychosis or neurosis"). Nor is there any reason to believe that jurors would be operating under any misconceptions regarding Internet usage that would require correction through expert testimony. *See Lindsey v. Griffin*, No. 16 Civ. 119 (KMK) (PED), 2019 WL 5605197, at *32 (S.D.N.Y. Aug. 20, 2019) ("[t]he utility of an . . . expert is . . . most significant where it can be found that the jury is operating with misconceptions"). The Internet has served as a feature of daily life for many people for over 20 years. The vast majority of Americans today access and use the Internet for a wide range of activities, including but not limited to work, entertainment, obtaining information, and making and maintaining friendships and other relationships.

For proffered expert testimony to be helpful to the jury, it must "comment[ ] beyond what could be ascertained based on the testimony of laypeople." *Dupre*, 339 F. Supp. 2d at 541. None of the testimony proffered by the defendant—with the exception of the neurological mechanisms of Internet addiction, which as discussed further below has no apparent connection to the facts at issue here—are beyond the ken of the jury. If the defendant would like to testify that he "assume[d] that [his] online speech ha[d] no real-world consequences," that he was "engag[ing] in fantastical

12

or role-playing behaviors," or that he "receive[d] social validation" from his messages with other O9A members (Def. Notice at 2-3), he may seek to do so at trial. But he cannot introduce that self-serving testimony under the guise of an expert witness. As Judge Liman recently noted in granting the Government's motion to preclude defense expert testimony on delusional disorders in a separate case, "[the defendant] himself will be able to testify to his 'subjective beliefs and experiences,' whether or not they are tethered to reality." *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 292800, at *16 (S.D.N.Y. Feb. 1, 2022).

Ultimately, "*Daubert*'s 'fit' requirement is really just a specialized relevance inquiry that asks 'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *5 (S.D.N.Y. Nov. 11, 2021) (quoting *Alto v. Sun Pharm. Indus., Inc.*, No. 19 Civ. 09758 (GHW), 2021 WL 4803582, at *3 (S.D.N.Y. Oct. 13, 2021)). As discussed above, the defendant here falls well short of sufficiently tying the proposed expert testimony to the facts of this case. *See United States v. Jones*, No. 16 Cr. 553 (AJN), 2018 WL 1115778, at *6 (S.D.N.Y. Feb. 27, 2018) (precluding expert testimony where the defendant "has not presented a direct link between his alleged delusional disorder and a lack of intent to defraud"). The absence of any tie between the expert's conclusions and the facts present here is all the more salient given Dr. Greenfield's own writings stressing the need for an individualized professional evaluation by a treating mental health provider prior to diagnosing Internet addiction. *See* David N. Greenfield, *Overcoming Internet Addiction for Dummies* 158 (2021) ("There is no way of knowing if you're experiencing symptoms related to Internet addiction without evaluating an individual situation."); *id.* at 178 ("Any attempts at medical and psychiatric diagnoses must be performed in the context

of a professional evaluation or consultation by a psychologist, psychiatrist, or other licensed mental health or addictions professional – preferably one who has experience in the diagnosis and treatment of Internet and screen-based addictions."). Testimony regarding this purported disorder is therefore irrelevant in much the same way as would be generic testimony not grounded in the facts of the particular case regarding schizophrenia, or any number of psychiatric diseases and phenomena. *See Tchatat v. City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. July 14, 2016) (precluding expert testimony from psychiatrist that defendant suffers from "personality disorder in which the sufferer 'may' repeatedly lie" because the psychiatrist never evaluated the patient and any probative value is "far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a medical professional"); *see also United States v. Benally*, 541 F.3d 990, 995 (10th Cir. 2008) (affirming the preclusion of expert testimony where the expert "did not examine [the defendant], and was not going to specifically discuss him or the circumstances surrounding his [conduct]"). Simply put, it is not helpful for the jury to learn about the generic characteristics of Internet addiction to answer the question in dispute: whether the defendant participated in a conspiracy to orchestrate an attack against his military unit and is guilty of the charged crimes.

Instead, for the proffered testimony to be permissible, there must be a clear nexus between the theory that is the subject of the proffered testimony and the defendant in question, and the testimony must concern a subject matter that is uniquely beyond the jury's lay comprehension. *See, e.g.*, *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *4-*7 (S.D.N.Y. Feb. 2, 2013) (permitting expert testimony on paraphilia when the defendant had engaged in electronic conversations discussing extreme violence toward women in a sexual context and noting that "the

14

Court has no reason to believe that 'the average juror' is familiar with the role-playing activity that Dr. Herriot [is] prepared to explain in the specific context of sexually oriented conversations in cyberspace" and that "the Court likewise has no reason to believe that the 'average juror' will be familiar with the sexual fetish websites on which the Defendant encountered his alleged co-conspirators"); *United States v. Joseph*, 542 F.3d 13, 22 (2d Cir. 2008) (noting that while "some jurors may have familiarity with Internet messaging, it is unlikely that the average juror is familiar with the role-playing activity that Dr. Herriot was prepared to explain in the specific context of sexually oriented conversation in cyberspace"); *see also United States v. Bright*, No. 19 Cr. 521 (PKC) (S.D.N.Y. Feb. 7, 2020) (permitting expert testimony defining "age-based role play," but barring that expert's proposed testimony about "characteristics of pedophiles, likelihood that a pedophile would engage in age-based role play, or whether or not the willingness to engage in such role play is predictive or not of whether somebody will engage in bad conduct"). By contrast, here, there is no clear nexus between Dr. Greenfield's generic theories and the defendant, and there is nothing unique about compulsive use of the Internet, the defendant's choice to commit his crimes using the Internet, or the defendant's formation of online relationships, that is uniquely beyond the jury's lay comprehension. Further, unlike the tailored testimony in the above-referenced cases, which involved idiosyncratic attributes of sexually oriented conversation or communities online, the ubiquity of Internet use in modern life makes the average juror abundantly capable of evaluating generic claims about the Internet's role, and whether or not it led this defendant to engage in "fantastical or role-playing behaviors and discussions." (Def. Notice at 2).

Dr. Greenfield's proposed testimony is not only irrelevant; it also risks confusing and misleading the jury by conflating Dr. Greenfield's research about completely disparate topics with

the evidence in this case.  The Defense Notice claims that Dr. Greenfield will testify that "it is often difficult to separate reality from fantasy on the Internet" and that "the Internet is a forum where it can be difficult or impossible to discern what is true or real from what is false, fictitious, or fanciful." (Def. Notice at 2).  This sweeping testimony appears targeted to confuse and mislead the jury into thinking that the evidence in this case, consisting in significant part of communications between the defendant and his alleged co-conspirators, cannot be trusted simply because it occurred online.  This conclusion lacks support in any reliable methodology, as discussed further below.  The only concrete piece of research cited by the Defense Notice to support this conclusion is a study conducted by Dr. Greenfield himself, finding that "approximately fifty percent of Internet users admit to lying or misrepresenting facts online with regularity." (Def. Notice at 2).  Yet this survey was conducted over 23 years ago in 1999, when Dr. Greenfield found that people lie about things like their weight and age on the Internet.  *See* David N. Greenfield, *Psychological Characteristics of Compulsive Internet Use: A Preliminary Analysis*; Cyber Psychology & Behavior (1999).  These topics are not at issue in this case and, to the contrary, the evidence will show that the defendant was truthful on the Internet about his age, his background, his service in the U.S. Army, his posting in Italy, and his deployment to Turkey, among other things.  (*See* Dkt. No. 90 at 4-21).  This further demonstrates that Dr. Greenfield's sweeping theories and dated and inapposite research are not relevant to aid the jury in understanding the evidence at issue in this case.  To the contrary, Dr. Greenfield's discussion of his generalized, inapposite theories threaten to confuse and mislead the jury.

Moreover, the defense has not provided any indication that Dr. Greenfield's opinions, conclusions, and methodology have ever been applied in the context of terrorism, white

16

supremacy, jihadism, or radicalization.  Indeed, none of these topics appear to be covered in his books or any of his listed publications.  The significant use of the Internet by terrorists and terrorist organizations, for real-world purposes ranging from "recruitment, financing, propaganda, training, incitement to commit acts of terrorism, and the gathering and dissemination of information for terrorist purposes," including "material support for[] planned acts of terrorism," is a well-documented reality that is sharply distinct from the "fantasy" chat rooms discussed by Dr. Greenfield.  *See United Nations Office on Drugs and Crime*, "The use of the Internet for terrorist purposes," published by the United Nations (2012), *available at* https://www.unodc.org/documents/terrorism/Publications/Use_of_Internet_for_Terrorist_Purpos es/ebook_use_of_the_Internet_for_terrorist_purposes.pdf.  These limitations further render Dr. Greenfield's opinions irrelevant to the jury's determinations.

### D.    Dr. Greenfield's Testimony Is Not the Product of Reliable Methods

Dr. Greenfield's testimony should be precluded based on the reasons set forth above—whatever his supposed methods, the defense has failed to show that his purported opinions are relevant to help the jury based on the facts of this case.  An additional ground on which his proffered testimony should be precluded is that it is not rooted in any reliable bases or methodology, as the Defense Notice and Dr. Greenfield's own descriptions of his work make apparent.  As part of its gatekeeping function, "the district court should consider the indicia of reliability identified in Rule 702," namely "that the testimony is grounded on sufficient facts or data; that the testimony is the product of reliable principles and methods; and that the witness has applied the principles and methods reliably to the facts of the case."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Dr. Greenfield's testimony also fails to satisfy the factors set

forth in *Daubert*, which include "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," and whether the theory or technique has garnered "general acceptance" in the scientific community.  509 U.S. at 593-94.

The defendant has not established a reliable basis for Dr. Greenfield's opinions.  The Defense Notice asserts that Dr. Greenfield's opinions on Internet addiction stem from his "research," but does not provide any further details regarding how Dr. Greenfield reached these theories or whether they have been tested.  While an expert's opinion may be based on his or her "knowledge and experience" rather than "hard science methodologies," *Joseph*, 542 F.3d at 21, a bare statement of experience does not suffice to establish reliability.  An expert testifying based on his experience or research must still "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Lickteig v. Cerberus Cap. Mgmt., L.P.*, No. 19 Civ. 05263 (GHW), 2022 WL 671630, at *17 (S.D.N.Y. Mar. 7, 2022) (quoting Fed. R. Evid. 702 advisory committee note).

Notably, Dr. Greenfield acknowledges throughout his book referenced above that his theories lack general acceptance in the scientific community, which severely undermines the reliability of his potential testimony.  *See* Greenfield, *supra* at 2 ("With specific regard to Internet and technology addiction, no scientific agreement currently exists on what the final diagnostic labels will be."); *id.* at 2 (noting that "we're not quite at the point in the science of diagnosis and treatment of Internet-related disorders"); *id.* at 147 ("Internet and screen addictions are relatively new areas of study; as a result, addiction medicine has not yet fully developed definitive diagnostic

markers for these problems."); *id.* at 148 ("Currently, no final consensus exists on which diagnostic markers and symptoms are necessary to warrant an Internet and screen addiction diagnostic label."); *id.* at 224 (noting that "sometimes [Internet addiction] treatments jibe with what the evidence-based research suggests, and sometimes they do not"); *id.* at 237 ("We have been actively studying these issues for the last 25 years, and there is a lack of evidence-based data about which treatments might be best for different types of Internet addiction users.").

Further undermining the existence of any meaningful indicia of reliability here, Dr. Greenfield acknowledges that his concept of "compulsive Internet addiction" is not recognized in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) or by the World Health Organization. *Id.* at 147. This contrasts with other cases in this Circuit and elsewhere where courts routinely rely upon these scientific markers in serving their gatekeeping function under Rule 702. *See United States v. Finley*, 301 F.3d 1000, 1012 (9th Cir. 2002) (holding that a diagnosis involving the use of the DSM-IV was reliable under *Daubert*); *United States v. Friedlander*, 395 F. App'x 577, 581 (11th Cir. 2010) (affirming preclusion of testimony about the "prevalence of Internet fantasy" in which "the expert's opinion was unreliable as it was not based on the DSM IV or quantifiable scientific methodology"); *Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2021 WL 1930293, at *2 (S.D.N.Y. May 13, 2021) ("Due to the large analytical gap between the DSM-5 criteria and Fayer's diagnosis, Fayer's opinion and testimony as to ASPD are unreliable."); *Tardif v. City of New York*, 344 F. Supp. 3d 579, 600 (S.D.N.Y. 2018) (citing the Supreme Court's characterization of the DSM as "one of the basic texts used by psychiatrists and other experts" and relying upon the DSM to determine whether expert testimony was admissible); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 448-49 (S.D.N.Y. 2016) (noting that an expert's theory

19

"has not been generally accepted in the scientific community" based on, among other things, the fact that the World Health Organization "do[es] not support her opinions" on the issue); *Makinen v. City of New York*, 53 F. Supp. 3d 676, 697 (S.D.N.Y. Sept. 30, 2014) (discussing whether the DSM criteria were reliably applied under *Daubert* ); *Munafo v. Metro. Transp. Auth.*, No. 00 Civ. 0134 (ERK), 2003 WL 21799913, at *21 (E.D.N.Y. Jan. 22, 2003) (holding that a qualified psychiatrist's conclusion that plaintiff suffered from clinical depression was reliable because it appeared to be based on the criteria set forth in the DSM-IV). By contrast, there is no established method for testing Dr. Greenfield's non-standardized, nebulous labels and the defense has provided no basis for concluding his proffered testimony is sufficiently reliable to be permissible.

Rather, Dr. Greenfield specializes in providing laypeople with self-diagnostic tools and tests to evaluate their own or others' addiction to or use of technology, video games, shopping, gambling, investing, and pornography. *See* Greenfield, *supra* at 180-90. These diagnostic tools include questions such as "Do you find yourself seeking more stimulating (that is, exciting, new, or more challenging) video games?" *id.* at 186, and "Do you find yourself repeatedly seeking more stimulating or newer content on the Internet or your smartphone?" *id.* at 180. Such a methodology does not carry the rigor required by Rule 702 and *Daubert*. His testimony should be precluded.

Even if this Court finds that Dr. Greenfield's methodology is reliable, and the defense has presented no basis for so concluding, the defendant also has failed to establish that Dr. Greenfield reliably applied any such methodology to the facts of *this* case. As Dr. Greenfield's curriculum vitae indicates, he appears to have never written, published, or presented on the nexus between Internet addiction and violent crime, extremism, or terrorism-related activity. Instead, his publications and presentations focus on the connection between Internet addiction and human

sexuality, gambling, or distracted driving.  (*See* Def. Notice, Ex. A).  This significantly undermines the reliability of applying Dr. Greenfield's opinions to the facts here, and further illustrates the danger of introducing Dr. Greenfield's opinions for the purpose of inviting the jury to do so.  *See United States v. Bright*, No. 20-3792, 2022 WL 53621, at *2 (2d Cir. Jan. 6, 2022) (affirming the district court's exclusion of certain expert testimony since the defendant "failed to disclose a reliable methodology supporting [the expert's] proposed testimony" and noting that despite the expert's "extensive experience in researching and treating pedophiles," the expert "had never conducted or reviewed any research on age play and had never examined Bright personally").  Accordingly, the defendant has failed to establish that Dr. Greenfield applied a reliable methodology appropriately to the facts of this case, and his proffered testimony should not be permitted.

## E.    Dr. Greenfield's Proffered Testimony Runs Afoul of Rule 704(b) and Would Constitute Improper Mental Condition Evidence

The Court should also preclude Dr. Greenfield's testimony because it both runs afoul of Rule 704(b) and improperly seeks to put mental condition evidence before the jury without the requisite genuine link, rooted in the facts of the case, between the proffered testimony and the issue of *mens rea*.  As noted above, the Defense Notice states that Dr. Greenfield would testify that, under his untested theory, "compulsive Internet use" causes "quasi-involuntary" behavior and provokes "neurobiological mechanisms" that control "emotional and behavioral responses linked to survival-based behaviors."  (Def. Notice at 2).  Dr. Greenfield also apparently would testify that Internet compulsivity causes "the clouding of a user's judgment, and the loss of one's ability to discern fantasy from reality."  (*Id.*).  Such testimony quite patently, and improperly, seeks to suggest to the jury that the defendant lacked the adequate mental state to commit the charged

offenses, by implying that the defendant suffered from a mental condition impairing his choices and volition, and that he therefore lacked the capacity to act with intent. The Defense Notice further claims that Dr. Greenfield would testify that "the Internet is a forum where it can be difficult or impossible to discern what is true or real from what is false, fictitious, or fanciful." (*Id.* at 2). This testimony would invite the jury to conclude that it is not possible to consider the evidence in this case to be reliable, merely because it is derived from Internet communications, a realm where truth is "impossible" to know according to Dr. Greenfield. Both strains of Dr. Greenfield's proposed testimony threaten to invade the province of the jury, and to confuse and mislead it: the testimony seeks impermissibly to offer—or at the very least, imply—a conclusion about whether the defendant could have had the requisite mental state to be guilty of the charged offenses, and also improperly seeks to raise a defense of diminished capacity or mitigation by putting before the jury evidence of a purported mental condition, without any Rule 12.2 notice. Such proffered testimony runs afoul of Rule 704(b) and IDRA. Placing the imprimatur of someone designated as an expert on such impermissible opinions also runs afoul of Rule 403, due to the increased risk of confusing or misleading the jury into accepting the opinions as conclusive on issues that are properly within the purview of the jury, not expert testimony.

For precisely this reason, the Federal Rules of Evidence and precedent in this Circuit preclude this sort of expert testimony on the state of mind of the defendant. *See* Fed. R. Evid. 704(b). For example, in *United States v. Dupre*, the defendant sought to introduce expert testimony that the defendant's "intense, pervasive religious beliefs significantly interfere with her ability to see her involvement in the 'investment project' in a realistic manner and significantly contribute to her ongoing conviction that she has been involved in a legitimate enterprise with benevolent

intentions." 462 F.3d 131, 138 (2d Cir. 2006). The Second Circuit upheld the exclusion of the expert testimony and observed that "the proffered evidence might have constituted an impermissible opinion about the 'ultimate issue' of whether Dupre possessed the mental state constituting an element of wire fraud." *Id.* The court further noted that such expert testimony would "mislead and confuse the jury, and . . . permit the defendant to put an impermissible theory of justification before the jury." *Id.*

Irrespective of whether the defendant explicitly solicits Dr. Greenfield's testimony on the ultimate issue of his intent, "this is semantic camouflage," *DiDomenico*, 985 F.2d at 1165, especially given the proposed testimony concerning the "quasi-involuntary" and "compulsive" behavior of Internet users (Def. Notice at 1). Indeed, Dr. Greenfield spends pages of his book discussing how those purportedly suffering from Internet compulsivity or addiction—just like alcohol, drug, and sex addicts—tend to lose volition and agency in making decisions. *See* Greenfield, *supra* at 51 (noting that "[m]any parents and loved ones assume that their child's excessive or addictive use of technology is *volitional* when, in fact, it is *not*."); *id.* at 151 (noting that people suffering from Internet addiction experience "cognitive distortion" which "is not entirely volitional and may not be an act of willful defense.")). The Second Circuit's decision in *DiDomenico* is instructive on this point. The panel in *DiDomenico* upheld the exclusion of expert testimony that the defendant suffered from dependent personality disorder—even though the defense claimed that the expert would not testify on the ultimate issue of mental state—concluding that the proffered expert testimony was "certainly close enough to a violation of Rule 704(b) that, when combined with the trial judge's assessment of helpfulness under Rule 702, amply justified

his exercise of discretion to exclude it." *Id.* Dr. Greenfield's proffered testimony should likewise be excluded, especially given its lack of relevance and reliability as discussed above.

Notably, the defense never provided any notice in this case under Rule 12.2(b). Instead, it now seeks to elicit testimony from Dr. Greenfield invoking psychological concepts such as "quasi-involuntary" behavior and "emotional and behavioral responses linked to survival-based behaviors" (Def. Notice at 2), which will inevitably appear to a jury as testimony pertaining to the defendant's mental condition and underlying guilt. The defense cannot perform an end-run around Rule 12.2(b), the IDRA, and Rules 702, 703, and 704(b) by eliciting expert testimony about an alleged mental health defect based on dubious methodology wholly untethered to the facts of this case. *See Ray*, 2022 WL 292800, at *10 ("If a defendant does not give the notice required under Rule 12.2(b) or submit to an examination when ordered to under Rule 12.2(c), the court may exclude any expert evidence from the defendant on the issue of the defendant's mental disease, mental defect, or any other mental condition bearing on the defendant's guilt.") (quoting Fed. R. Crim. P. 12.2(d)(1)); *see also United States v. Young*, 213 F.3d 627, 2000 WL 687750, at *3 (2d Cir. 2000) (affirming exclusion of expert testimony offered to show defendant did not act willfully where the expert testimony diverged from analysis presented in Rule 12.2 notice).

Indeed, one of the core objectives of the IDRA was the "preclusion of defenses based on 'diminished responsibility' and similar theories through which defendants had previously sought to excuse or justify their conduct by relying on evidence of a mental impairment." *Sabir*, 2007 WL 1373184, at *5. Thus, absent an insanity defense, courts have permitted mental health evidence only in "rare and narrowly defined circumstances because of the high likelihood that it will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to

prohibit." *Id.*; *see also Jones*, 2018 WL 1115778, at *6 (precluding expert testimony based on lack of "direct link" between alleged mental health condition and issue of intent); *Ray*, 2022 WL 292800, at *14 (excluding evidence regarding the defendant's alleged "delusion-like beliefs" because such testimony "looks strikingly like evidence of the sort of 'justification' or 'diminished capacity' defenses foreclosed by the IDRA"). Specifically, outside an insanity defense, "psychiatric evidence must be weighed carefully to ascertain whether it would, if believed, 'support a *legally acceptable* theory of lack of *mens rea.*'" *Dupre*, 339 F. Supp. at 541, *aff'd*, 462 F.3d 131 (citing *Cameron*, 907 F.2d at 1067) (emphasis in original). A defendant must, before trial, "demonstrate a genuine link between the proffered expert testimony and the issue of intent." *Id.*; *see Worrell*, 313 F.3d at 874 (excluding expert testimony that did not address defendant's "intent, or lack of intent, to deposit threatening communications in the mails" and finding that it "provide[d] no basis to negate the specific intent element the government was required to prove"); *Brown*, 326 F.3d at 1148 ("Brown fails to connect his mental condition with any legally acceptable theory that he lacked specific intent.").

The defendant has not come close to making this showing. The "burden of showing that" mental health evidence "is offered to negate the *mens rea* element of a crime and not in support of some improper defense theory falls squarely on the defendant," and he must "demonstrate clearly, in advance of trial, that there is a direct link between such evidence and the specific *mens rea* that the Government must prove." *Sabir*, 2007 WL 1373184, at *6 (citations omitted) (collecting cases). But here, the defendant has not established how Dr. Greenfield's testimony would—even if credited—"support a *legally acceptable* theory of lack of *mens rea*." *Dupre*, 339 F. Supp. at 541. Eliciting improper testimony suggesting that the defendant's online messaging regarding a

jihadist ambush on his unit was "quasi-involuntary" and the result of compulsiveness and "basic neurological mechanisms" (Def. Notice at 2) falls far short of satisfying the rare and narrowly defined circumstances where mental health evidence is appropriate and admissible. *See Jones*, 2018 WL 1115778, at *5 ("[T]he IDRA bars use of expert testimony to support an affirmative defense excusing the defendant's conduct because he . . . could not understand the wrongness of his actions because of an 'inability or failure to engage in normal reflection.'"). The lack of any specific factual link between the evidence in this case and Dr. Greenfield's sweeping theories further reinforces this conclusion that the proposed testimony is impermissible under the framework governing expert mental health testimony discussed above.

### F.    The Proposed Expert Testimony Runs Afoul of Rule 403

Even if the defendant could articulate some theory about how Dr. Greenfield's testimony might support a legally acceptable theory of lack of *mens rea*, "if the risk that the jury will interpret the evidence to support an affirmative defense that is impermissible under the IDRA rather than to negate the *mens rea* element of the offense substantially outweighs the probative value of the evidence, it must be excluded." *Ray*, 2022 WL 292800, at *10 (quoting *Dupre*, 339 F. Supp. 2d at 540-41). Here, Dr. Greenfield's testimony poses a real risk of fostering undue prejudice and confusion. For example, and as described above, Dr. Greenfield's proposed testimony about the "quasi-involuntary" nature of Internet addiction and the inability of compulsive Internet users to separate fact from fantasy—without any actual diagnosis of such an alleged disease—would impermissibly suggest, and risk confusing the jury into thinking, that the defendant suffers from such a disease, that he did not undertake the alleged crimes voluntarily, and that he was not psychologically able to appreciate that his online actions had real world consequences. Relately,

Dr. Greenfield's proposed testimony about the general characteristics of Internet addiction would likely conflate the relevant issues (such as whether the defendant conspired to launch a mass casualty attack against his military unit) with the issue suggested by Dr. Greenfield's proffered testimony (whether the defendant's characteristics are consistent with those of someone addicted to the Internet).  Indeed, this testimony would further risk obfuscating the fact that someone addicted to the Internet easily could still commit the charged crimes with the requisite intent.  Dr. Greenfield's general characterization of Internet-based relationships as fostering "erroneous" beliefs and somehow predisposing a person to be "more likely to engage in fantastical or role-playing behaviors and discussions" is similarly highly misleading and prejudicial in the context of this case, because it suggests to the jury that it should discount the evidence of the charged conspiracy merely because the defendant committed his crimes online and his co-conspirators were online contacts.  As the *Daubert* Court held, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."  509 U.S. at 595 (internal quotation marks and citation omitted).  Even if the proposed testimony had any probative value—and it has little if any at all— it should therefore be excluded under Rule 403.

### G.    In the Alternative, the Government Requests a *Daubert* Hearing and that the Defense be Required to Supplement its Deficient Expert Notice

For the reasons outlined above, the Court should preclude Dr. Greenfield's proffered testimony.  To the extent the Court is not inclined to preclude his testimony at this time, a *Daubert* hearing should be held to examine the bases and reliability of Dr. Greenfield's methodology and

proffered testimony as applied to this case, and the defense also should be required to supplement its deficient expert notice, as detailed further below.

If the Court denies the Government's motion to preclude Dr. Greenfield's testimony, the Government respectfully requests that the Court conduct a *Daubert* hearing to evaluate the relevance and reliability of the proposed expert testimony. Dr. Greenfield's opinions are replete with vague conclusions that are disconnected from the defendant, and those conclusions alone raise significant questions regarding the relevance and reliability of the proposed testimony, as well as the reliability of Dr. Greenfield's methods. A *Daubert* hearing would therefore be appropriate before any of this confusing and prejudicial evidence is presented to the jury, especially in an area where courts have recognized that the potential for prejudice is particularly high. *See, e.g.*, *Dupre*, 339 F. Supp. 2d at 540-41 (noting the "special concerns for relevance and potential jury confusion in the case of expert testimony regarding mental disease evidence").

In the event the Court seeks to conduct a *Daubert* hearing, the defense also should be required to supplement its expert notice, which is plainly deficient under Rule 16. Indeed, in addition to the substantive deficiencies in Dr. Greenfield's proffered expert testimony, the defendant's notice lacks specificity regarding Dr. Greenfield's proffered opinions and the bases for those opinions, as required by Federal Rule of Criminal Procedure 16(b)(1)(C). *See also Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104, 106 (2d Cir. 2011) ("[A]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion . . . ."); *United States v. Jasper*, No. 00 CR. 825 (PKL), 2003 WL 22312, at *3 (S.D.N.Y. Jan. 31, 2003) ("[T]he Advisory Committee

emphasized that the most important aspect of this mutual discovery obligation is the provision of a summary of the bases of the expert's opinion.").  ,

With the sole exception of alluding to Dr. Greenfield's 1999 study on lying online, the defendant's notice does not explain how Dr. Greenfield came to his conclusions or what methodologies or evidence substantiate those opinions.  It never even indicates whether Dr. Greenfield has examined the defendant, his Internet communications, or any relevant mental health records.  Defense Notice's vague statement that Dr. Greenfield will testify "based on his research" is plainly insufficient and does not  provide the Government with adequate notice of the "bases and reasons" of the witness's opinions.  See Fed. R. Crim. P. 16(b)(1)(C).  Without specific information on the bases for Dr. Greenfield's conclusions, the Court cannot "perform its function as a gatekeeper of expert testimony under *Daubert*," *United States v. Ulbricht*, 858 F.3d 71, 116 (2d Cir. 2017), and the Government cannot "test the merits of the expert's testimony through focused cross-examination," *id.* at 114.  Such vague notice defeats the purpose of disclosure under Rule 16, which is to "'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'"  *United States v. Wilson*, 493 F. Supp. 2d 484, 487 (E.D.N.Y. Dec. 13, 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee's Note to 1993 Amendments).

Accordingly, in the event that the Court conducts a *Daubert* hearing, the defense should be required to supplement its expert notice in advance of the hearing and further disclose Dr. Greenfield's particular opinions and their bases so that the Government can meaningfully prepare cross-examination and consider whether to offer additional expert testimony to rebut his opinions.

## II.    The Court Should Order the Defendant to Produce his Exhibits and an Exhibit List by June 21, 2022

The Government began producing discovery to the defendant on July 22, 2020, and requested, pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure, that the defendant provide reciprocal discovery of evidence he expects to introduce at trial.  The Government further requested, pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure, that the defendant disclose prior statements of any witnesses he will call to testify at trial.  The Government also provided the defense with nearly all witness statements in August 2021 and has been producing additional 3500 material on an ongoing basis.  To date, the defense has not responded to the Government's request for reciprocal discovery or prior witness statements.  To the extent the defendant is planning to introduce evidence at trial, the Government respectfully requests that the Court order the defendant to provide the Government with his proposed exhibits and an exhibit list by June 21, 2022.

Rule 16(b) requires the defense to disclose, among other things, (i) "documents" and "tangible objects" that "the defendant intends to use" in his "case-in-chief at trial," Fed. R. Crim. P. 16(b)(1)(A); (ii) reports of examinations and tests, Fed. R. Crim. P. 16(b)(1)(B); and (iii) expert disclosures, Fed. R. Crim. P. 16(b)(1)(C).  The term "case-in-chief" in Rule 16(b) applies not only to exhibits offered in any defense case, but also to "all non-impeachment exhibits [defendants] intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by the defendant."  *United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (noting "this interpretation of Rule 16 has been adopted by almost every district court to consider the issue" (collecting cases)).  "[W]here a defendant cross-examines a government witness to 'buttress[] her theory of the case,' rather than

to impeach the testimony given by the witness on direct examination, '[t]he cross-examination . . . is properly seen as part of the defendant's case-in-chief.'" *Id.* (quoting *United States v. Hsai*, No. 98 Cr. 57, 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000)).

Timely defense Rule 16(b) disclosures reduce the possibility of time-consuming disputes during trial over the admissibility of evidence. Courts routinely order the disclosure of a defense exhibit list in advance of trial for precisely these reasons. *See, e.g.*, *United States v. Brennerman*, 17 Cr. 337 (RJS), Dkt. No. 24 (ordering disclosure of defendant's exhibit list and witness list in advance of trial); *United States v. Percoco*, 16 Cr. 776 (VEC), Dkt. No. 396 (ordering that defendants "must produce to the Government an exhibit list and copies of the exhibits that they intend to use in their case-in-chief" in advance of trial); *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413318, at *6 (S.D.N.Y. Feb. 1, 2015) ("Here, the defense made a choice to delay its Rule 16 disclosures until the trial had commenced and then to delay the second by another week."); *United States v. Liu*, No. 19 Cr. 804 (VEC), Dkt. No. 177 (ordering that defendants must produce exhibits where "Defendant has had the discovery in this case for years and clearly is well aware of many if not all of the intercepted conversations the Government seeks to introduce."); *see also United States v. Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. Dec. 12, 2017) (Minute Entry) (reflecting mid-trial evidentiary hearing regarding authenticity and admissibility of late-produced defense exhibit).

Production of the defendant's exhibits by June 21 is necessary to ensure an orderly and efficient trial in this case. Not only does Rule 16(b) require the production of defense exhibits, but such production in advance of trial will also conserve the Court and the jury's time by permitting the parties to discuss stipulations as to those exhibits and the Government to raise any objections

to them in a timely manner.  If this process is delayed until the middle of trial, significant time and resources will be wasted.

The defendant, moreover, has had sufficient notice of the Government's anticipated evidence in order to produce its own exhibits by June 21.  As noted above, the Government has already produced its exhibits and an exhibit list, and will continue to produce § 3500 materials to the defendant on a rolling base.  Accordingly, the defendant is aware of the parameters of the Government's case and thus in a position to identify its own proposed exhibits.

In any event, courts in this District and elsewhere have repeatedly rejected the claim that defendants are not required to produce discovery or identify their exhibits until they have determined precisely what evidence they intend to introduce on the ground that such a rule would effectively nullify Rule 16(b).  In *United States v. Huntress*, No. 13 Cr. 199, 2015 WL 631976 (W.D.N.Y. Feb. 13, 2015), for example, the court rejected the argument that the defense need not provide reciprocal discovery because it had "'not made any decision as to whether it will be putting a case on at trial, as we do not know if the government will meet its burden of proof at trial.'"  *Id.* at *33; *see also, e.g.*, *United States v. Rajaratnam*, No. S2 09 Cr. 1184 (RJH), 2011 WL 723530, at *5 (S.D.N.Y. Feb. 25, 2011) ("A defendant would always like more information about the government's case before revealing anything about his or her own, but Rule 16 conditions a defendant's disclosure obligations on the government's having made certain specified disclosures, not on the government's laying open its entire case or the defendant's satisfaction."); *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991) (affirming preclusion of evidence defendant had failed to produce and explaining that permitting defendant to use documents the prosecution had not

timely seen would have given defendant an unfair advantage); *United States v. Young*, 248 F.3d 260, 270 (4th Cir. 2001) (same).

For the reasons set forth above, the Government respectfully requests that the Court order disclosure of the defendant's proposed exhibits, an exhibit list, and statements relating to the defendant's witnesses by June 21, 2022.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court exclude the expert testimony of Dr. Greenfield.  In the event the Court does not preclude Dr. Greenfield's testimony at this time, the Government respectfully submits a *Daubert* hearing is warranted, and that the Court should require the defendant to supplement his deficient expert notice.  Consistent with the Government's provision of 3500 material relating to Government witnesses and exhibits far in advance of trial, the Government requests that the Court order disclosure of the defendant's witness statements, proposed exhibits, and an exhibit list, by June 21, 2022.


Dated:  New York, New York
        June 12, 2022

                                        Respectfully submitted,


                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                            By:     __/s/_____
                                        Sam Adelsberg
                                        Matthew J.C. Hellman
                                        Kimberly J. Ravener
                                        Assistant United States Attorneys


Cc:     Defense Counsel
        (Via ECF)