UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -v.-

ETHAN PHELAN MELZER,

                    Defendant.

S1 20 Cr. 314 (GHW)


# THE GOVERNMENT'S SUPPLEMENTAL MOTION *IN LIMINE* TO ADMIT EVIDENCE OF THE DEFENDANT'S PRIOR PARTICIPATION IN AN INSIGHT ROLE AS DIRECT EVIDENCE AND PURSUANT TO RULE 404 (b)


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*


Sam Adelsberg
Matthew J.C. Hellman
Kimberly J. Ravener
      Assistant United States Attorneys
      *Of Counsel*

# <u>TABLE OF CONTENTS</u>

A. Relevant Facts ................................................................................................. 2

B. Applicable Law .............................................................................................. 9

C. Discussion .................................................................................................... 13

    1. Evidence of the Defendant's Prior Performance of an O9A Insight Role Is Admissible as Direct Evidence ................................................................................ 13

    2. The Evidence Is Also Admissible Pursuant to Rule 404 (b) ..................................... 17

    3. The Evidence at Issue Does Not Violate Rule 403 ................................................. 20

CONCLUSION ................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................................. 21, 22

*Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993) ........................................ 3

*Huddleston v. United States*, 485 U.S. 681 (1988) ..................................................................... 12

*Old Chief v. United States*, 519 U.S. 172 (1997) ....................................................................... 10

*United States v. Abel*, 469 U.S. 45 (1984) ................................................................................... 9

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) .......................................................... 9

*United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015) ................................................................... 19

*United States v. Amato*, 31 F. App'x 21 (2d Cir. 2002) ............................................................. 13

*United States v. Aminy*, 15 F.3d 258 (2d Cir. 1994) ................................................................... 20

*United States v. Caputo*, 808 F.2d 963 (2d Cir. 1987) ............................................................... 12

*United States v. Carboni,* 204 F.3d 39 (2d Cir. 2000) ................................................................ 10

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) ........................................................ 15

*United States v. Coonan*, 938 F. 2d 1553 (2d Cir. 1991) ...................................................... 10, 15

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) ..................................................................... 17

*United States v. Edwards*, 342 F.3d 168 (2d Cir. 2003) ............................................................. 11

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) ......................................................... 22

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ................................................................ 13

*United States v. Gohari*, 227 F. 3d 313 (S.D.N.Y. 2017) ............................................................ 9

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ................................................... 9, 10, 15

*United States v. Herron*, 2014 WL 1871909 (E.D.N.Y. 2014) ................................................... 13

*United States v. Kassir*, 2009 WL 976821 (S.D.N.Y. 2009) ...................................................... 19

*United States v. LaFlam*, 369 F.3d 153 (2d Cir. 2004) .............................................................. 11

*United States v. Li*, 2022 WL 1740416 (2d Cir. 2022) ............................................................... 18

*United States v. Martino,* 759 F.2d 998 (2d Cir. 1985) .............................................................. 11

*United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) .......................................................... 12

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ...................................................... 11, 23

*United States v. Mustafa*, 406 F. 526 (2d Cir. 2011) ................................................................. 18

ii

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ............................................................ 12, 21

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ................................................................. 19

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ..................................................................... 9

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012 ................................................................. 10

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................................... 13

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ...................................................................... 10

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) .......................................................... 11, 20

**Rules**

Federal Rule of Evidence 401 ....................................................................................................... 9

Federal Rule of Evidence 402 ....................................................................................................... 9

Federal Rule of Evidence 403 ................................................................................................. passim

Federal Rule of Evidence 404 ................................................................................................. passim

The Government respectfully seeks a pretrial ruling that evidence of the defendant's performance of an O9A "insight role" in 2017, which included the defendant's commission of a shooting, is admissible as direct evidence of the charged crimes or alternatively pursuant to Rule 404(b).  Specifically, the evidence shows that, in 2017, the defendant performed a drug- and gang-related O9A "insight role"—that is, the attempted infiltration of an organization to gain training, experience, commit acts of violence, identify like-minded individuals, and ultimately subvert the group from within—just as the defendant subsequently performed an insight role in furtherance of his O9A membership by attempting to infiltrate and damage the U.S. military from within.

This evidence is admissible as direct evidence of the crimes charged in the Indictment and, in the alternative, as proof of the defendant's motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  This evidence provides important background and context to complete the story of the crimes charged by giving the jury the full picture of how the defendant first began performing insight roles for O9A.  That Melzer invoked this experience in establishing his credentials when communicating with his co-conspirators further underscores that his 2017 insight role is inextricably intertwined with the charged conduct.  Furthermore, this evidence provides relevant context for the jury with respect to the defendant's longstanding commitment to O9A and his motive and intent in planning an O9A-inspired attack against his fellow servicemembers.  And the evidence directly rebuts the defense arguments, raised at proceedings before the Court and through the defense's recent notice of intent to offer the purported expert testimony of Dr. David Greenfield, that the defendant never joined O9A and that his statements regarding ambushing his unit were detached from any real-world consequences and

1

not intended to cause real harm. Finally, the significant probative value of this evidence outweighs any potential prejudicial effect, particularly in light of the seriousness of the crimes charged as compared to the possible prejudice stemming from the proffered evidence, and given that the Government's evidence of the prior insight role will consist of limited and streamlined witness and documentary evidence, as delineated in greater detail below.

As discussed herein, this evidence is admissible as direct proof of the charged crimes. Through this motion, the Government also supplements its notice of February 1, 2022 (Dkt. No. 90) regarding evidence of prior crimes, wrongs, or other acts pursuant to Rule 404(b). All of the evidence discussed herein, including police reports, witness statements, photographs, and social media posts related to the 2017 shooting, has previously been produced in discovery to the defense, on August 21, 2020 and April 22, 2022.[1]

Accordingly, the Government respectfully seeks a pretrial ruling that the evidence discussed below is admissible.

### A.  Relevant Facts

As previously set forth in the Government's February 1, 2022 motions *in limine* (Dkt. No. 90 ("Gov't. Mot.")), the Government expects that the evidence at trial—including Melzer's Telegram messages, photographs recovered from Melzer's cellphones, and Melzer's discussions with associates, including other servicemembers and friends prior to his deployment—will show that Melzer became a follower of O9A well before he joined the military. (Gov't. Mot. at 1-6).

---

[1]  *See* USAO_004178-004180; 004190-004196; 004439-004441; 012994-012999; 013006; 013035-013039; 013040-013054; 013058-013065; 013085-013095; and 013121-013159.

The evidence—in the form of O9A materials located on Melzer's devices, Melzer's Telegram messages, and expert testimony[2]—will further show how O9A members are instructed to fulfill so-called "sinister" deeds.  These include, for example, O9A followers performing "insight roles," where they attempt to infiltrate various organizations, including the military and law enforcement, to gain training, experience, commit acts of violence, identify like-minded individuals, and ultimately subvert those groups from within.  The Government intends to prove that Melzer joined the U.S. Army to further his goals and skills as an O9A adherent.

In particular, the evidence will show that Melzer joined O9A years before joining the military, and that he linked his membership in O9A to his first "insight role" for O9A, which involved gang- and narcotics-related activities.  Melzer discussed these activities in both group and individual chats using Telegram.  On April 21, 2020, in a one-on-one chat, Melzer told CC-1 that he "already self initiated" and was willing to join CC-1's "nexion," or cell, of O9A, called "RapeWaffen Division" or "RWD."  CC-1 then asked Melzer to respond to a series of 40 vetting questions regarding Melzer's desire, qualifications, and suitability to join CC-1's nexion.  Some of these questions, and Melzer's answers, directly addressed Melzer's prior acts (including drug-,

---

[2] On May 24, 2022, the Court held a *Daubert* hearing with respect to proposed expert testimony from Dr. Peter Simi, which concerns, among other things O9A's practice of sinister deeds, including insight roles.

3

violence, and gang-related conduct, as well as his commitment to performing insight roles) for

O9A, including, among others, the following:[3]

| CC-1: | 19. What are your skills/traits you have? |
| Melzer: | 19. Military training, survival, links to other groups |
| CC-1: | 20. Are you ready to cause damage both mentally, physically and magickally, and be serious. |
| Melzer: | 20.i already have so yes |
| CC-1: | 21. Do you own any firearms? |
| Melzer: | 21. not here but yes |
| CC-1 | 22. Do you have any issues with substance abuse or use illegal drugs? (To be in RWD you must be able to use these substances regulated, and you cannot be addicted. ) |
| Melzer: | 22.no but I can't do them now it would compromise what I have going rn |
| CC-1: | 27. How do you incorporate the Sinister-Numinous way in your life? |
| Melzer: | 27. Always working on some form of insight role working the pathways when I have time, building up to internal adept |

On or about May 8, 2020, in a Telegram channel with approximately 50 participants,

Melzer further discussed his participation in those activities prior to joining the military.  First,

Melzer expressed his interest in participating in drug sales to a chat participant, discussing his

prospective involvement in narcotics distribution, writing, "When I get back I might want to help

_____

[3] The evidence will show that CC-1's questions were sent in a single list, and that Melzer's answers came in subsequent blocks; CC-1's questions and Melzer's corresponding answers are combined here to clarify the passages.  Unless otherwise indicated, spelling and grammatical errors are set forth as they appear in the original communications.

out if your willing . . . I should still have some connects I can get back into contact with."  As the conversation continued, Melzer wrote, "I used to work with just bloods an GDs," which appear to be references to gangs in the United States.  Asked about particular "set" affiliations within the gangs Melzer mentioned, Melzer replied, "Victor park and fuckin bounty hunter bloods . . . Victor park was crips also though."  Later, on or about May 26, 2020, in the one-on-one chat with Melzer—and in the midst of planning the ambush on Melzer's unit—CC-1[4] asked, "Yo can you give me some background like some sinister deeds you've done[?]"  Melzer affirmed that his gang and drug activity was not only an insight role, but also constituted "sinister deeds" directly connected to his self-initiation into O9A, writing, "Well we've talked about it a little but first actual insight role was being a runner[5] for some bhbs when I was younger. That was about 4-5 years."

On or about January 9, 2017, during the period of time Melzer identified in the May 2020 Telegram chats as the period during which he was a member of the Bounty Hunter Bloods working as a street-level drug dealer, Melzer shot an individual ("Victim-1") during a drug transaction ("Shooting-1").  Shooting-1 occurred in the vicinity of the Rolling Hills Apartment Homes (the "Apartments"), located at 9100 Rainbow Springs Ct., in Louisville, Kentucky, an apartment complex where Melzer lived at the time.  The Government expects that the evidence it seeks through this motion to admit at trial—which would include limited witness testimony and

---

[4] Unless otherwise indicated, defined terms have the same meaning set forth in the Government's prior motions *in limine*.

[5] A "runner" is typically a person engaged in street-level drug transactions and other acts of street violence perpetrated by drug distribution organizations.

photographs as further described below—would establish that Victim-1 agreed to meet Melzer to sell a quantity of marijuana to Melzer, and Victim-1, Victim-1's girlfriend, and Melzer met in a car near the Apartments.  After Victim-1 provided a quantity of marijuana to Melzer, Melzer ran from the car, and Victim-1 gave chase.  Melzer then drew a handgun and fired several shots at Victim-1, striking Victim-1.  Victim-1 and Melzer struggled physically in the moments after Shooting-1 until Victim-1 realized he had been hit.  Melzer then ran inside one of the Apartment buildings.  Victim-1 was treated at a local hospital; he sustained a gunshot wound to his left arm which shattered his humerus and caused him to lose full use of the arm.  The Government intends to introduce images of Victim-1's injury, taken at the hospital in the hours after Shooting-1 occurred.

Melzer discussed Shooting-1, his gang affiliation, and other acts of violence with others. For example, one friend of Melzer's ("Witness-1") knew that from approximately 2015 to 2017 Melzer associated with a gang with predominantly black members located in downtown Louisville. From conversations with Melzer, Witness-1 learned that Melzer robbed stores with those gang members, sold drugs, and wore a red bandanna every day in his rear pants pocket.  In or about early 2017, Witness-1 learned about Shooting-1 from Melzer.  In particular, Melzer told Witness-1 that Victim-1, whom Witness-1 knew, was going to sell an ounce of marijuana to Melzer; that Melzer told Victim-1 he was going to rob Victim-1; that Melzer shot Victim-1 with a handgun; and that Melzer stole Victim-1's marijuana.

The Government expects that the proffered evidence would show that Melzer also discussed Shooting-1 with another friend ("Witness-2"), who lived with Melzer from the time he

was a sophomore in High School until his freshman year of college. Witness-2 knew Melzer sold marijuana and ecstasy, and Witness-2 learned that in 2016 or 2017—during the period Witness-2 lived with Melzer—Melzer planned to rob Victim-1 by offering to sell Victim-1 drugs before stealing Victim-1's money.  Melzer told Witness-2 that when an altercation ensued with Victim-1, Melzer shot Victim-1 in the shoulder with a .44 caliber Highpoint pistol.  Witness-2 recalled seeing a photograph of Victim-1's injuries taken inside the hospital shortly after the incident. Witness-2 knew that Melzer sold the handgun used in Shooting-1 on an online firearms exchange forum.[6]  Melzer also made statements to Witnesses-2 demonstrating the progression of his ideology of time.  For example, Witness-2 described Melzer as being interested in neo-Nazi ideology years before he joined the military, and Melzer growing an interest in radical extremism as he got older.  Another example is that in or about 2013, Melzer told Witness-2 that Melzer purchased Doc Martin brand boots because Melzer believed they were worn by Nazis, and discussed that he would use the boots to "stomp" an "[n-word]" in the event he was fighting a black person.  And following the June 2016 Orlando Pulse Nightclub shooting, which was perpetrated by an ISIS follower and which left 50 dead and dozens injured, Melzer told Witness-2 that he was happy the shooting had happened because gay people were killed.  Melzer also told Witness-2 he was happy the October 2017 Las Vegas Route 91 Harvest Festival shooting, which

_____

[6] Melzer also told Witness-1 that in 2015 or 2016, Melzer committed a robbery of an individual ("Victim-2") in the street, and shot Victim-2 ("Shooting-2") because Victim-2 refused to provide his wallet.  The Government notes that it does not at this time intend to offer evidence regarding Shooting-2 in its case-in-chief.

ISIS claimed responsibility for and which left 60 dead and hundreds injured, had occurred.  Melzer also told Witness-2 about his anti-Jewish views, made racist comments, and Witness-2 knew from his conversations with Melzer that Melzer held those beliefs before Melzer joined the military.

On May 26, 2020, Melzer also told CC-1 that following the gang- and drug-related insight role activity described above culminating in the 2017 shooting he had performed another "insight role," writing, "even though I didn't actually go even a full 6 months I trained with some antifa faggots but they were insufferable."  In 2018, Melzer enrolled in the U.S. Department of Labor's Job Corps program., and at that time researched O9A and its American affiliate, the Temple ov Blood.  In the same May 26, 2020 Telegram conversation described above, Melzer told CC-1 that while in Job Corps he engaged in recruitment efforts related to O9A, and noted, "[in] Job Corp got a small following of people and used them for feeding.  If we're talking like actual growth wise."

Melzer also made clear in his Telegram communications that his enlisting in the U.S. Army was yet another insight role.  Melzer enlisted with the U.S. Army in December 2018, and was originally stationed at Fort Benning, in Georgia.  In Telegram communications, Melzer explained that he joined the Army because of O9A.  As noted above, Melzer explicitly linked his military service to developing his goals and skills within O9A in his conversations with CC-1, writing that he was "Always working on some form of insight role" and noting his value to O9A included his "military training."  Additionally, on April 21, 2020, Melzer described himself in response to CC-1 vetting questions as "focused. currently in active duty 173rd 503rd inf bat" immediately before writing that he wanted to join RWD because they were "like minded people, [and to] hopefully help this become an actual active nexion."  Days later, on or about April 25, 2020, he wrote to

8

another O9A member, Individual-1, who was considering joining the U.S. Marine Corps, "Good luck it's great for training . . . train and get the fuck out."

### B.  Applicable Law

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of Evidence.  *See* Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984).  Rule 403 allows a trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.

"To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."  *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010).  Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency.").  Thus, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted); *see also United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (evidence is admissible if it relates to conduct that:  (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" (quoting *United States*

9

*v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012))).  "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted); *see United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is direct evidence (and not other act evidence under Rule 404(b)) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *Gonzalez*, 110 F.3d at 942); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"); *see also* Weinstein's Federal Evidence § 404.20 [2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence"). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

Under Rule 404(b), evidence of uncharged crimes, wrongs, or other acts by a defendant may be admitted for purposes other than proving the defendant's propensity to commit crimes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).  Evidence is admissible under Rule 404(b) if it (1) is advanced for a proper purpose; (2) is relevant to a material issue at trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) is admitted

subject to a limiting instruction, if one is requested.  *See United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004).

The Second Circuit follows "an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity."  *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (internal quotation marks and citation omitted).  The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.  *See, e.g.*, *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009).  Even prior bad acts that are remote in time may be admissible under Rule 404(b) if they are relevant and adequately probative to help a jury shed light on the issues before it.  *See, e.g.*, *United States v. Martino*, 759 F.2d 998, 1005 (2d Cir. 1985) (admitting 11-year old conviction under Rule 404(b)).

The Second Circuit has recognized that evidence of the defendant's involvement in similar crimes is particularly appropriate where, as in this case, the defendant claims that his conduct has an innocent explanation.  *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").  By the same token, the Second Circuit repeatedly has held that "[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent."  *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987); *see also Huddleston v. United States*, 485 U.S. 681, 691-92 (1988) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's

state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.").

The defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offense. *See, e.g.*, *United States v. McCallum*, 584 F.3d 471, 475-76 (2d Cir. 2009) ("Because [the defendant's] counsel did not make a statement to the court of sufficient clarity to indicate that intent and knowledge would not be disputed, those issues remained sufficiently in dispute for the similar acts evidence to be relevant and hence admissible."). With respect to the timing of the Government's presentation of the proffered evidence, the Second Circuit has made clear that where it is apparent that knowledge or intent will be in dispute, "evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992).

Finally, Rule 403 requires the Court to evaluate whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Since any evidence that is probative of guilt is, by definition, prejudicial, Rule 403 is designed to reach only unfair or undue prejudice—that which "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotation marks omitted). Rule 403, moreover, does not bar evidence of other bad acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was

charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).  Traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, arouses jurors' sense of horror, and provokes a jury's instinct to punish.  *See United States v. Herron*, 10 Cr. 615 (NGG), 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014).

### C. Discussion

#### 1. Evidence of the Defendant's Prior Performance of an O9A Insight Role Is Admissible as Direct Evidence

Evidence proving that Melzer performed a gang- and drug-related O9A insight role prior to his military service—consistent with his Telegram admissions of the same—is admissible as direct proof of the charged offenses.  As an initial matter, this evidence is important "to inform the jury of the background of the conspiracy charged" and "to complete the story of the crimes charged." *United States v. Amato*, 31 F. App'x 21, 25 (2d Cir. 2002).  Melzer's decision to perform his first insight roles as "a runner for bhbs," a gang—and his illegal and violent actions in furtherance of that role—and as a member of Antifa demonstrates his longstanding devotion to O9A, which provides relevant background to explain why he was later willing to disclose sensitive information to O9A members in a plot to murder his fellow soldiers.  Similarly, Melzer's deep-seated commitment to O9A—as demonstrated by his willingness to perform an insight role as a gang member, including the commission of a violent act in the 2017 shooting, for the group —is consistent with O9A principles and practices, as illustrated by O9A literature recovered on the defendant's iPhone directing members performing insight roles that they "must live and identify with the role they have chosen to such an extent that those around them believe they are genuinely committed to whatever task or profession or way of life they have chosen." GX 901 at 6.  Melzer's

13

gang membership, deliberate interaction with members of Antifa, and enlistment in the military are all examples of Melzer infiltrating organizations whose members and core beliefs he deeply opposed. This too, is consistent with O9A directives—another piece of O9A literature possessed by Melzer makes clear that insight roles "should be chosen so that the task undertaken is in most ways the opposite of the character of the Initiate." GX 903 at 3. The same O9A literature highlights the goals of insight roles: to develop "real sinister character in the individual" and to gain "skills" in furtherance of O9A. GX 903 at 4. In this way, Melzer's Bloods membership and his role in the 2017 shooting, as well as his affiliation with Antifa, enabled him to gain training and experience valuable to O9A while pursuing antisocial, violent, and transgressive acts as "sinister deeds." Similarly, Melzer's enlistment in the military afforded him training, lethal skills, and access to sensitive information, although its values are diametrically opposed to those of Melzer and O9A. It was also an ideal insight role to the extent it afforded Melzer an opportunity to further a core O9A goal: damaging U.S. national security and weakening America's standing in the world.

In the same vein, evidence tending to prove that the defendant previously conducted an insight role on behalf of O9A before joining the military corroborates the defendant's Telegram admissions that he joined the military to perform an insight role for O9A, which, in turn, directly bears on Melzer's intent to commit the charged crimes. (*See* 5/4/22 Tr. at 67 (the Court admitting images that "purport to establish defendant's purported membership in O9A, which is probative of his motive for joining the military in an 'insight role,' and ultimately helping to plan an attack that aligned with O9A's ideology")). *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir.

14

1992) (evidence is "not other act evidence within the meaning of Rule 404(b)" if it is "admissible to prove material facts other than [the defendant's] propensity to commit a crime"); *Gonzalez*, 110 F.3d at 941 (relevant evidence is "not confined to that which directly establishes an element of the crime"); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence, and thus not governed by Rule 404"). Put another way, for the jurors to fully grasp the complete picture of the defendant's conduct and intent, they must track Melzer's progression from his first O9A insight role as a drug dealer to his subsequent infiltration of the U.S. Army on behalf of O9A. *See Coonan*, 938 F. 2d at 1561 ("Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Relatedly, evidence that the defendant was previously willing to engage in violence in furtherance of an insight role for O9A rebuts two arguments the defense has indicated they intend to advance at trial: (1) that Melzer never joined O9A (*see* Dkt. No. 92 (defense filing stating that "Melzer denies belonging to O9A")); and (2) that Melzer's Telegram messages were the product of exaggeration, role-play, or online fantasy and that he never intended to actually carry out an ambush on his unit (*see* Dkt. No. 93 at 1 (defense filing claiming that "[n]o 'jihadist ambush' on Melzer's unit happened, none was close to happening, and Melzer had no intention of seeing one happen"); Dkt. No. 122, Ex. A (defense providing notice for expert witness to testify about how Internet use can cause "the loss of one's ability to discern fantasy from reality" and "fantastical or role-playing behaviors and discussions")). Evidence corroborating Melzer's online statements that

15

he previously committed illegal and violent acts—in the real world, not in cyberspace—in service of O9A directly rebuts both of these claims and helps demonstrate that Melzer was, in fact, serious about his stated plan to commit an illegal and violent attack against his servicemembers in service of O9A.  (*See* 5/4/22 Tr. at 71-72 (the Court admitting O9A materials recovered in Melzer's barracks and noting that "having custody of this well-known treatise in physical form on a military base is highly probative of the degree of his commitment to this anarchic worldview -- it shows that this was not an interest limited to an online rabbit hole. In sum, his possession of the physical evidence in his barracks is probative of his commitment to an anarchic and violent ideology which drove his alleged participation in the charged offenses.").  Evidence of Melzer's prior participation in an insight role and a violent act in the real world is, like the physical evidence recovered from his barracks, highly probative.  This evidence is properly admitted to give the jury important context regarding Melzer's membership in O9A and his state of mind in planning the ambush on his unit—both of which the defendant is putting squarely at issue.  In light of these defense arguments, this evidence is highly probative of the defendant's knowledge and intent to join O9A and provide its members with information that would lead to the murder of U.S. service members.

This evidence also "explain[s] how the illegal relationship between participants in the crime developed" and "the mutual trust that existed between coconspirators."  *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999).  O9A—and its core principles, including the performance of insight roles—is the connective tissue linking Melzer with his co-conspirators, including CC-1. Evidence of the organization and its means and methods – and Melzer's participation in the group and those tactics – is critical for enabling the jury to understand how Melzer and his co-conspirators

16

came to connect with and trust each other and why they were willing to join together to plan a deadly ambush. Indeed, in the midst of planning the attack on the Military Base, CC-1 continued vetting Melzer by asking him about his prior insight roles, to which Melzer responded by touting his "first actual insight role" as a "runner for bhbs." In this exchange, Melzer was invoking his past insight role as a drug dealer for a clear purpose: to bolster his "sinister" bona fides to CC-1, the administrator of the RapeWaffen chat, by showing CC-1 that he was willing to break the law to further O9A's goals, and specifically to infiltrate and subvert an organization – previously the gang, now the military – from within. Evidence proving that Melzer in fact acted as a drug dealer—and that he was so committed to that role that he was willing to shoot another person in the midst of a drug deal—directly corroborates this admission and elucidates for the jury how a relationship of trust developed between CC-1 and Melzer over the course of their planning the ambush together. *See United States v. Li*, No. 21 Cr. 1829, 2022 WL 1740416, at *3 (2d Cir. May 31, 2022) (affirming the admission of evidence concerning defendant's prior drug dealing as direct evidence in an extortion conspiracy since it provided "essential context for the extortion allegations, established the profound level of trust between the [defendant and his co-conspirator], and offered the jury an explanation as to [the defendant's] personal motive and interest to want [his co-conspirator's] extortion plan to succeed").

### 2. The Evidence Is Also Admissible Pursuant to Rule 404(b)

As explained above, evidence regarding Melzer's performance of an O9A insight role as a drug dealer—and his commission of a violent shooting during that insight role—is properly admitted as direct proof of the charged offenses. This evidence is also admissible as Rule 404 (b)

17

evidence for several reasons, including to prove Melzer's preparation, plan, knowledge, motive, opportunity, intent, absence of mistake, and lack of accident.

*First*, the evidence bears directly on Melzer's knowledge, motive, opportunity, and intent to commit the charged crimes.  Evidence that Melzer previously performed an O9A insight role is highly probative of his knowledge of the existence, goals, activities, and capabilities of O9A, his opportunity to perform another insight role for the organization, and his motive and intent for knowingly and intentionally conspiring with members of O9A in a plot that would result in the murder of his fellow servicemembers.  Furthermore, this evidence helps establish that Melzer was motivated by his fervent support of O9A.   Indeed, courts routinely approve evidence connecting defendants to extremist groups in terrorism trials pursuant to Rule 404(b).  *See, e.g.*, *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) (affirming admission of Rule 404 (b) evidence showing that defendant charged with providing material support to al Qaeda had also "associated with terrorist groups other than al Qaeda," as such evidence was "highly probative of [the defendant's] state of mind, including his intent and knowledge" (internal quotation marks omitted)); *United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) (admitting the defendant's speeches, writings, and preaching because they made motive for the crimes charged more probable); *United States v. Ali*, 799 F.3d 1008, 1026-27 (8th Cir. 2015) (affirming admission of Rule 404(b) evidence showing that defendant charged with providing material support to al Shabaab had associated with another jihadist group generally aligned with al Shabaab, as such evidence "helped to establish [the defendant's] intent for the charged crimes").

*Second*, the evidence is clearly probative of Melzer's plan and preparation. That Melzer performed a prior insight role for O9A is highly relevant to whether he was doing so again when he joined the military and planned an O9A-inspired attack on his fellow servicemembers. Relatedly, Melzer was relying on fellow O9A members to help further the attack by sharing with them crucial details about his unit and the Military Base to ensure the success of the ambush. Thus, evidence establishing Melzer's longstanding commitment to O9A and its practice of performing insight roles sheds light on his plans and preparation for the ambush. *See, e.g.*, *United States v. Kassir*, 2009 WL 976821, at * 6 (S.D.N.Y. Apr. 9, 2009) (holding that evidence seized from Kassir's residence that Kassir associated with terrorist groups is admissible to prove defendant's motive, intent, preparation, knowledge, and absence of mistake or accident).

*Third*, evidence concerning Melzer's 2017 insight role is also probative of Melzer's absence of mistake and lack of accident. This evidence makes clear that Melzer understood that insight roles can involve violence and illegal conduct and that O9A expects its followers to take significant risks on behalf of the group. Melzer's role in the attack plot was not incidentally related to his membership in the military; rather, he joined the military to take advantage of precisely such an opportunity. Put another way, Melzer placed himself in the precise position an O9A insight role urges, and acted on it. To the extent Melzer intends to advance an argument that he was only advancing the attack plot to continue an ongoing Internet conversation, that he never intended to murder his fellow soldiers and was pushed along to further the plot by CC-1 or the CHS, or that he was merely role playing or fantasizing about such an attack, his prior participation in insight roles, including one involving violence, strongly corroborates his lack of accident in performing

19

another insight role with the military. Indeed, given his prior clandestine roles for O9A, Melzer was well equipped to appreciate what might occur if he provided actionable information to support an attack on his unit to members of O9A, namely the murder of his fellow servicemembers. And concurrently, the jury will be far better equipped to understand that Melzer's proposed attack plot was not a mistake or an accident when viewed in light of the the fact that it followed prior insight roles involving violence. *See, e.g.*, *United States* v. *Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("Where, for example, the defendant does not deny that he was present during a narcotics transaction but simply denies wrongdoing, evidence of other similar narcotics involvement may, in appropriate circumstances, be admitted to show knowledge or intent."); *Zackson*, 12 F.3d at 1182 (upholding admission of prior narcotics activity and noting that "[w]here a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged"); *Pitre*, 960 F.2d at 1119 (holding that evidence of prior narcotics activity was properly admitted "to show that [the defendants] were 'not there just to be standing there' on the night of their arrests"). Thus, Melzer's prior insight roles are highly probative of his intent and motive—and therefore his absence of mistake and lack of accident—in performing another O9A insight role and providing members of the group with actionable information to attack his unit.

Accordingly, and for the reasons described above, this evidence is admissible as Rule 404(b) evidence.

### 3. The Evidence at Issue Does Not Violate Rule 403

Admission of this evidence—either as direct evidence or pursuant to Rule 404(b)—will not run afoul of Rule 403. The probative value of this evidence is not outweighed, much less

"substantially outweighed," by any risk of unfair prejudice. The defendant attempted to murder members in his own U.S. Army unit by sharing sensitive information with an extremist group bent on violent and destructive tactics. This evidence is highly probative of the defendant's knowledge, intent, and motive to commit these crimes, as described above. For that reason, this evidence is prejudicial—but only insofar as it tends to prove the defendant's guilt. *See, e.g.*, *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (noting that "virtually all evidence is prejudicial to one party or another," and so "to justify exclusion under Rule 403 the prejudice must be *unfair*" (emphasis added)). But the mere fact that the evidence tends to prove the defendant's guilt does not render this evidence *unfairly* prejudicial. The Second Circuit has long made clear that evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *See, e.g.*, *Herzog*, 203 F.3d at 174; *United States v. El-Mezain*, 664 F.3d 467, 508-11 (5th Cir. 2011) ("Because this [is] a case about supporting terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity. It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial."). Here, the charged crimes are unquestionably "sensational" and "disturbing"; they relate to a U.S. army paratrooper's scheme to murder his fellow American servicemembers by having jihadists ambush them.

As explained above, the proffered evidence of the 2017 insight role, which demonstrates Melzer's acute understanding of—and unbending dedication to—the ideology and violent tactics of O9A, is not divorced from the charged conduct; rather, the evidence constitutes powerful, direct proof of the defendant's intent and participation in the charged crimes. In short, whether admitted

21

as direct evidence or pursuant to Rule 404(b), the evidence is highly probative and grounded in the central issues of the case, which strongly supports admission in the Rule 403 analysis.

Furthermore, as reflected in the descriptions set forth above, the Government intends to introduce this evidence in a streamlined fashion, thereby avoiding any risk of delay or confusion. Specifically, and as reflected above, the Government anticipates that it would question a limited number witnesses about the shooting, and seek to admit photographs corroborating Victim-1's injury and the location of the shooting in the immediate vicinity of Melzer's home, to explain to the jury the nature of Melzer's prior insight role and his violent conduct in furtherance of that role. The Government further notes that, to the extent the Court has any concern about the risk of unfair prejudice in connection with the admission of this evidence, any such concern can be addressed through a limiting instruction to the jury. *See United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence was "not especially worse or shocking than the transactions charged" and district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence").

In sum, this evidence is plainly relevant to establishing Melzer's commission of the charged offenses, and any risk of unfair prejudice does not substantially outweigh the probative

22

value of the evidence.  Accordingly, the Government respectfully requests that the Court enter an order that such evidence is admissible at trial.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated: New York, New York
      June 12, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York


By:       /s/
          Sam Adelsberg
          Matthew J.C. Hellman
          Kimberly J. Ravener
          Assistant United States Attorneys

Cc:    Defense Counsel
      (Via ECF)