M5OCmelH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           20 Cr. 314 (GHW)

5    ETHAN PHELAN MELZER,

6              Defendant.

7    ------------------------------x

8                                    New York, N.Y.
                                     May 24, 2022
9                                    10:08 a.m.

10

11   Before:

12              HON. GREGORY H. WOODS,

13                                     District Judge

14                        APPEARANCES

15   DAMIAN WILLIAMS,
          United States Attorney for the
16        Southern District of New York
     BY:  KIMBERLY J. RAVENER
17        MATTHEW HELLMAN
          Assistant United States Attorney

18   DAVID PATTON
     FEDERAL DEFENDERS OF NEW YORK
19        Attorney for Defendant
     BY:  JONATHAN A. MARVINNY
20        HANNAH McCREA

21

22

23

24

25

M5OCmelH

1          (Case called)

2          MS. RAVENER:  Good morning, your Honor.  Kimberly

3     Ravener and Matthew Hellman for the government.  Joining us at

4     counsel table is our paralegal, Daniel Sitko.

5          THE COURT:  Thank you very much.  Good morning.

6          MR. MARVINNY:  Good morning, your Honor.  Federal

7     Defenders of New York, Jonathan Marvinny, Hannah McCrea and

8     joined by paralegal, Juliet Vicari for Ethan Melzer.

9          THE COURT:  Thank you very much.  Good morning.  Bear

10    with me for just one moment.

11         (Pause)

12         Thank you very much, counsel, for being here.  I

13    appreciate it.

14         Let me just lay the ground work for what I hope to

15    accomplish here.

16         I scheduled today's proceeding as a Daubert hearing

17    with respect to the anticipated testimony of Dr. Simi.  I'm not

18    going to review the standard applicable here.  The parties are

19    well familiar with the applicable law.

20         The government bears the burden of establishing

21    Dr. Simi's qualifications here.  The Court expects that, as a

22    result, the government will elicit testimony from Dr. Simi

23    regarding each of the elements that the Court must assess in

24    order to evaluate whether or not his testimony is properly

25    admissible in this case.  So I expect that the government would

M5OCme1H

1    inquire in order to establish what it believes to be a

2    sufficient factual predicate for each of the elements that the

3    Court must consider in order to determine whether or not his

4    testimony is admissible.

5         While I don't want to focus the government's

6    examination on any particular area, it's obvious from the

7    parties' briefing and the nature of the defendant's objections

8    that the Court will be focused on Dr. Simi's knowledge of the

9    O9A organization and the methodologies that Dr. Simi used to

10   develop his views regarding O9A.

11        In particular, the Court is likely to be focused on

12   how the methodologies used by Dr. Simi to accumulate his

13   information and opinions regarding O9A compare with the

14   accepted methodologies in his field with respect to the

15   development of such expertise.

16        So, after the government has completed its questions

17   for Dr. Simi, the defendant will have the opportunity to

18   question him.  I may also have questions for Dr. Simi, but my

19   expectation is I will try to see if the parties' questions

20   cover the topics in which I have an interest.  So I will most

21   likely hold many of my questions until after the defendant's

22   examination.  I may, however, interrupt, with apologies.

23        Good.  So that's my agenda with respect to the Daubert

24   component of today's proceeding.

25        I then hope, as I anticipated, to be able to discuss

M5OCmelH

| | |
|---|---|
| 1 | with the parties the process for jury selection.  My chambers |
| 2 | circulated to you a revised version of the voir dire questions |
| 3 | that responded to the parties' feedback regarding the |
| 4 | submissions that I sent to you earlier.  I hope that we'll have |
| 5 | an opportunity to talk about those, the prospect of proceeding |
| 6 | using a questionnaire, and the process that we would be using |
| 7 | is we use a questionnaire for purposes of jury selection. |
| 8 | So that is all that I wanted to say at the outset. |
| 9 | Counsel, anything that either side would like to share |
| 10 | with me before we begin? |
| 11 | First, counsel for the United States. |
| 12 | MS. RAVENER:  No, your Honor. |
| 13 | THE COURT:  Thank you.  Counsel for defendant. |
| 14 | MR. MARVINNY:  No.  Thank you. |
| 15 | THE COURT:  Very good.  Thank you very much. |
| 16 | Let's begin.  Counsel for the United States, would you |
| 17 | please call your witness. |
| 18 | MS. RAVENER:  The government calls Dr. Peter Simi. |
| 19 | THE COURT:  Ms. Joseph, would you please swear in the |
| 20 | witness. |
| 21 | PETER SIMI, |
| 22 | called as a witness by the Government, |
| 23 | having been duly sworn, testified as follows: |
| 24 | THE DEPUTY CLERK:  Thank you.  Please be seated. |
| 25 | Please state your full name and spell your last name slowly for |

M5OCmelH                        Simi - direct

1   the record.

2                THE WITNESS:  Peter Simi, S-i-m-i.

3                THE COURT:  Dr. Simi, I think you are sufficiently

4   socially distanced.  If you're comfortable, you should feel

5   free to remove your mask.

6                Counsel, you can inquire.

7                MS. RAVENER:  Thank you, your Honor.

8   DIRECT EXAMINATION

9   BY MS. RAVENER:

10  Q.  Good morning.

11  A.  Good morning.

12  Q.  Where do you work?

13  A.  I work at Chapman University.

14  Q.  Where is that located?

15  A.  It's in Orange, California, about halfway between LA and

16  San Diego.

17  Q.  What's your position there?

18  A.  I'm a professor of sociology.

19  Q.  What is the field of sociology?

20  A.  Broadly speaking, it's the study of human behavior as it

21  relates to society.  It consists of large scale macro level

22  focus on institutions like the economy, political systems,

23  government, all the way down to the micro level, looking at

24  family systems, how individuals interact with each other,

25  communications with each other and how that influences human

M5OCmelH                          Simi - direct

1   behavior.

2   Q.  What is the focus of your work within the field of

3   sociology?

4   A.  I'm focused on social movements.  The development of

5   collective identity, that is how people see themselves in

6   relation to larger groups.

7   Q.  Any particular groups or movements in particular?

8   A.  Yeah.  My research is focused on the issue of violence and

9   extremist movements, terrorism, hate groups and hate crimes.

10  Q.  Do you focus on any particular kinds of hate groups?

11  A.  Yeah.  Most of my work is focused on far right extremism

12  with specific focus on antigovernment extremism and white

13  supremacist extremism.

14  Q.  How long have you been studying far right extremism with

15  that focus on white supremacist extremism and the like?

16  A.  Since 1996.

17  Q.  Is that in excess of about 25 years?

18  A.  It is.

19  Q.  What degrees do you hold?

20  A.  I have a bachelor's degree in social science and a master's

21  and Ph.D. in sociology.

22  Q.  Where did you receive your graduate degrees in sociology?

23  A.  In the University of Nevada, Las Vegas.

24  Q.  What was the focus of your doctoral studies, Dr. Simi?

25  A.  My dissertation focused on the historical development of

1   white supremacist groups in Southern California.

2   Q.  And did that focus on any particular groups?

3   A.  Yeah.  The main focus was on racist skinheads, but it did

4   focus more broadly in that as far as their connection to other

5   types of white supremacist groups and how these interacted over

6   time in Southern California.

7   Q.  Since receiving your Ph.D., have you taught at any schools?

8   A.  The University of Nebraska.

9   Q.  And how long did you teach at the University of Nebraska?

10  A.  I was a member of the School of Criminology for 13 years

11  there.

12  Q.  And what kinds of courses did you teach?

13  A.  Introduction to criminal justice and criminology; juvenile

14  delinquency and juvenile justice; terrorism, both domestic and

15  international; hate groups and hate crime; a course on violence

16  theory; and qualitative methods or field methods at the

17  graduate level.

18  Q.  Let me ask you about a couple of those things.

19          What is criminology?

20  A.  It is essentially the study of crime.  There is criminology

21  and criminal justice.  Criminology is more focused on criminal

22  behavior whereas criminal justice is more focused on the study

23  of the system — looking at courts, corrections, and policing.

24  Q.  How does criminology relate to sociology?

25  A.  I would consider -- I think most people would consider

M5OCmelH                                    Simi - direct

criminology to be a kind of self-discipline of sociology, more

or less.  The origins of criminology are in sociology, for the

most part.

Q.  You described that you taught courses relating to

terrorism, including domestic terrorism and hate crimes; is

that right?

A.  That's correct.

Q.  What kind of material do those courses cover or did those

courses cover?

A.  It covers the history of these issues.  A course of

definitions in terms of looking at concepts and theories that

are being used and developed to try to explain these

phenomenon, reasons for folks getting involved in these, kind

of looking at factors of involvement, recruitment, the onset as

it relates to violence and how these issues can overlap with

violence to the extent that violence is central in many

respects to these issues.  So a pretty broad range of topics.

Q.  You described also that you taught a course on qualitative

methods at the University of Nebraska?

A.  Yeah, a number of times.

Q.  What did that course cover?

A.  So that was a research methods course basically teaching

students at the graduate level, mainly Ph.D. students the kind

of strategies and techniques as it relates to conducting

fieldwork, in particular focusing on participant observation

M5OCmelH                         Simi - direct

and how one accesses different kinds of fields of study, builds

rapport with their participants or subjects, engages in

observation strategies and techniques, documents their

observations, and then interviewing strategies all the way from

more formal interviewing strategies to more informal, kind of

conversational technique, and then also data analysis issues.

So once you collected data or as you're collecting data, how do

you go about analyzing this, trying to identify common themes

and essentially try to make sense out of your data.

Q.  Doctor, we'll talk more about those kinds of methods in

your work, but, in brief, you used the term fieldwork.  What is

fieldwork?

A.  Fieldwork is somewhat of a general term that includes

things like participant observation and interviewing.  So it's

essentially used synonymously with the term ethnographic

fieldwork.  You'll hear those words used interchangeably

sometimes together, ethnographic fieldwork, sometimes just

ethnography, sometimes just fieldwork.

          Essentially, ethnographic fieldwork is a methodology

that's used to try and study a culture, a community, a group, a

set of individuals by spending time in the natural settings

where these folks exist, where they reside.

          The idea is that one of the best ways to learn about

people, groups, communities, cultures is to firsthand observe

and try to immerse yourself in their world so that you can

essentially come to some perspective or try and understand

their perspective and how they see the world, how they interact

with each other, how they communicate with each other, how

their lives are organized.

So basically, those are kind of the fundamental

principles of why researchers would use that strategy.

Q.   Approximately what period of time did you work at the

University of Nebraska teaching these courses?

A.   From 2003 until 2016.

Q.   How long have you worked at Chapman University, your

current position?

A.   Since 2016.

Q.   What are your duties and responsibilities now at Chapman

University?

A.   It's a combination of research, teaching, and service.

Q.   Let's take each of those components.

In terms of teaching, can you give us some examples of

what classes you taught, such as what classes did you teach

during this past semester?

A.   This semester I taught what's called thesis seminar for

sociology majors at Chapman.  They're required to complete a

thesis project before they graduate.  That is where they

collect their own data, original data, and then write a

manuscript, a 30-page manuscript with their thesis that they

submit.  So I supervised -- in this case, it's 20 students who

1  were finishing their thesis projects before they graduated and

2  then the other course was field methods that I taught this

3  semester.

4  Q.  And what is the field methods course?

5  A.  That's basically the course I just described I taught at

6  the University of Nebraska for doctoral students, but it's

7  geared towards undergraduate students.  So you make some

8  modifications about terms of the level of the students, but it

9  essentially covers the same topics as what I previously

10  described.

11  Q.  And with respect to the thesis advising that you do, is

12  that also in the field of sociology?

13  A.  Yeah, these are all sociologically related topics.  It's

14  their choice, so whatever they're most interested in.  So it's

15  a very broad range of topics that the students will complete

16  their thesis exam.

17  Q.  And in addition, have you taught other courses at Chapman

18  University during your tenure there?

19  A.  Yeah, I taught a course on white supremacy in America, a

20  course on victimless crimes, course on globalization crime.  So

21  I mainly have been teaching the thesis and the field methods

22  most of my time at Chapman.

23  Q.  Just taking as an example, the course you taught on white

24  supremacy at Chapman University, what did that course cover in

25  general?

M5OCmelH                              Simi - direct

1   A.   The history of white supremacist movements and groups.  It

2   was focused primarily on the United States.  So we were

3   focusing on mainly domestic issues as it relates to history,

4   the different types of groups, the different aspects of the

5   ideology as far as the major attendance of the ideology.

6   Again, their relationship to violence, given that that is a

7   core aspect of the white supremacist movement.  Looking at

8   disengagement, that is folks who end up of leaving white

9   supremacist groups and some of the issues that lead folks to

10  leave and how that unfolds.  So, again, pretty broad range of

11  issues.

12  Q.   Now, you also mentioned that you performed service as part

13  of your duties at Chapman University.  What are your duties and

14  responsibilities with respect to service?

15  A.   Well, service is kind of cut up into three areas — service

16  to the community, service to the profession, and service to the

17  university.  So I conduct or perform service in all three

18  areas.

19  Q.   Can you give some examples of how you perform service to

20  the university.

21  A.   Sure.  Yeah.  I -- just until just recently, I was a

22  co-chair of the institutional review board.  Every university

23  has an institutional review board, or IRB, which is basically

24  the board that oversees all research that's being conducted at

25  the university and relies on the Department of Health and Human

M5OCmelH                          Simi - direct

1    Services federal regulations as it relates to the protection of

2    human subjects and other issues related to conducting research.

3          So as co-chair of that board, we would review

4    protocols to see if they met the guidelines and standards for

5    human subject protection and related issues.  And I served on

6    that as co-chair for about three years, I think it was.

7          Also served on various other committees across the

8    university, search committees when we're hiring new faculty,

9    members, for example.  I served on the curriculum committee for

10   the department of sociology for a period of time.

11         So, those are kind of some of the examples in the

12   university related committees that I served on and other

13   faculty members serve on.

14   Q.  And fair to say that, for example, in your role at the IRB,

15   as one part of your service, you were tasked with ensuring the

16   university complied with the standards of the sociological

17   profession?

18   A.  I think that's fair.

19   Q.  And you also mentioned service to the community.  Could you

20   give us an example of how you've participated in that.

21   A.  Yeah.  I volunteer with an organization in Orange County,

22   the Orange County Human Relations Commission.  I've provided

23   volunteer training for that organization.  They monitor -- one

24   of the things they do is monitor hate crimes in Orange County,

25   California, and work with citizens and community groups to

1    address these issues.  So I've done some work with them.

2           As part of my service, I serve on the board of

3    directors for an organization, it's a private nonprofit called

4    Life After Hate.  They were founded by former white

5    supremacists who are -- the mission of the organization is

6    basically try and help individuals leave white supremacist

7    groups and transform their lives in a positive direction.  So

8    I've served on their board since 2017.  And I'm actually

9    currently volunteering in the capacity of serving as their

10   interim executive director while we search for a new executive

11   director on a permanent basis.

12   Q.  And doctor, forgive me, you mentioned a third category of

13   service?

14   A.  Profession.

15   Q.  Can you give an example how you give service to your

16   profession?

17   A.  One of the things faculty members do oftentimes is review

18   peer reviewed manuscripts.  They serve as volunteer reviewers

19   for research that's essentially consistent with their areas of

20   expertise.  So academic journals, peer reviewed journals.

21   We'll send a faculty member to review a manuscript in a blinded

22   process where they offer their expertise about the quality of

23   the research, the methodological rigor and so forth.  So I do

24   serve as a reviewer on a regular basis for academic journals as

25   well as for grant agencies, like the National Student Justice

M5OCmelH                    Simi - direct

1   or the National Science Foundational Service as a reviewer for

2   their proposals to essentially evaluate the merit of the

3   proposal.

4   Q.  And what is the National Institute for Justice?

5   A.  It is a research arm that is housed under the Department of

6   Justice.  So the National Institute of Justice federally funds

7   research as it relates to criminology and criminal justice

8   issues in a broad sense of a -- it's a different --

9   solicitations and portfolios of research are very diverse and

10  across the board that will fund research on policing, studies

11  of courts, corrections, but also various studies related to

12  criminal behavior.

13  Q.  How about the National Science Foundation, what is that?

14  A.  Also a federal agency.  Even broader in terms of their

15  focus of funding for research.  Covers both social science

16  disciplines as well as natural science disciplines.  And

17  essentially, their mandate is to accumulate scientific

18  knowledge and help inform government practices as it relates to

19  the accumulation of that knowledge.

20  Q.  You described that you also peer review manuscripts for

21  certain academic journals; is that correct?

22  A.  Yes, that's correct.

23  Q.  Can you give us some examples of those journals?

24  A.  Sure.  American sociological review.  So I would break it

25  down into -- well, it's across a number of discipline —

1  sociology, criminology, political science, anthropology,

2  psychology, all those disciplines.  And within, for example,

3  sociology, it will be what are called generalist journals.  So

4  examples would be the American Journal of Sociology or America

5  Sociological Review.  Then, more specialist would be the

6  studies in conflict of terrorism or terrorism and political

7  violence.  These are specialist journals that focus

8  specifically about political violence and terrorism.  So,

9  again, my reviews would cross all of that broad range.

10 Q.  Now you also mentioned that research is part of your work

11 at Chapman University.  Do you engage in your own academic

12 research?

13 A.  Yes, I do.

14 Q.  Generally speaking, what is your field of research?

15 A.  I would describe it, generally speaking, hate crimes, hate

16 groups, domestic terrorism, social movements, specifically in

17 terms of white supremacist movement.

18 Q.  Bear with me, doctor.

19 A.  Sure.

20 Q.  Just for some brief context as we discuss your background,

21 what do you mean when you use the term white supremacist

22 movement?

23 A.  Just in a nutshell, think about social movement as a set of

24 individuals, organizations, groups that are interested in

25 changing society in some fashion.  Some social movements

1   explicitly advocate the use of violence, other social movements

2   are committed to nonviolence.  So you're going to get a range

3   of strategies and tactics the social movement will utilize.

4          In this case, it's a social movement that's organized

5   around basically the idea the white race is superior, and that

6   what they would call nonwhites are inferior.  It would involve

7   or it does involve high levels of antiblack racism,

8   anti-immigrant xenophobia, antisemitism, misogyny.  So these

9   would be some of the kind of core characteristics that would

10  allow us to talk about it as a kind of cohesive movement.

11  Q.  What kinds of groups are encompassed within the white

12  supremacist movement?

13  A.  Again you're going to get a very broad range here.  It's

14  going to be -- might sound odd, but it's diverse in a sense of

15  a lot of different kinds of groups.  Of course, historically

16  speaking, in the United States, the oldest, most notable, would

17  be the Ku Klux Klan, which was founded shortly after the U.S.

18  Civil War, but you're also going to also have various types of

19  Neo-Nazi groups, national socialist groups, you're going to

20  have Christian identity groups, you're going to have

21  Neo-Paganist groups, you're going to have skinhead groups, it's

22  very wide range.  You're going to have a lot of folks that are

23  not necessarily specific to any kind of group, in other words,

24  more generic white supremacist.

25  Q.  And we'll turn to specifically discussing certain of those

1  groups and elements a bit litter, but to give us a sense of

2  scope, approximately how many white supremacist groups exist

3  within this movement?

4  A.  I don't think we really know, frankly.  I mean, we're

5  talking hundreds, thousands.  Some groups are longstanding,

6  they've had a presence for decades, if not longer, and other

7  groups are fairly short run.  So they may exist for a short

8  period of time and leave little mark, little permanent traces

9  in terms of historical record.  So we know that it's a number

10  that's influxed, that's dynamic, and that there is a fair

11  amount of turnover, but we also know it's very robust.  The

12  Southern Poverty Law Center tries to track the number of groups

13  and usually you get estimates there, but I think the most

14  honest answer, frankly, is that we don't really know the exact

15  number.

16  Q.  Would you say it's more than 50?

17  A.  Oh, well more, yeah.

18  Q.  And you mentioned the Southern Poverty Law Center in brief.

19  What's that?

20  A.  It's a nongovernmental organization — it's been around

21  since the 1970s — that monitors white supremacist extremism.

22  Part of their efforts have been to file civil suits aimed at

23  certain white supremacist organizations holding them liable for

24  various types of violent acts committed by their members.

25  Q.  Now, within this vast array of groups that you described,

M5OCmelH                    Simi - direct

 1  have you focused your research on any particular singular

 2  group?

 3  A.  No.

 4  Q.  Why not?

 5  A.  Well, my focus has really been trying to understand the

 6  culture of the movement more broadly.  So, certainly, that

 7  involves looking at various groups, but that's not the point or

 8  the focus.  It's not to do any deep dive into one specific

 9  group.  It's really to try and identify broader core

10  characteristics to understand questions of how people become

11  involved, different kinds of recruitment strategies that are

12  utilized.  The aspect of in terms of cyberspace and digital

13  technology and the role that it plays in the larger movement,

14  the different types of violence that are committed by adherence

15  of this worldview.  And how individuals who leave, how that

16  disengagement and deradicalization process can fold in some

17  cases.  So these are some of the kind of core things that I've

18  looked at as opposed to looking at one specific type of group.

19  Q.  In the course of your research, in order to achieve that

20  mission, have you also come across numerous groups and

21  ideologies that you have studied?

22  A.  Yes, I have.

23  Q.  In the course of your work, have you encountered a group

24  known as the Order of the Nine Angles or O9A?

25  A.  Yes, I have.

M5OCme1H                          Simi - direct

1    Q.   In your view, is O9A part of the white supremacist

2    movement?

3    A.   Yes, it is.

4    Q.   We'll return to that group later.  But first, I'd like to

5    discuss in a little more detail your research on the white

6    supremacist movement.

7    A.   Sure.

8    Q.   When did you first begin studying the white supremacist

9    movement?

10   A.   In 1996.

11   Q.   What did you do?

12   A.   My first step was to really try and get a sense of the

13   world, what it looked like in terms of websites.  I started

14   doing what's called a content analysis of different websites

15   that were relatively accessible through simple keyword searches

16   using various internet browsers that were available at that

17   time.  That allowed me to access dozens of different white

18   supremacist websites and I began to carefully comb through

19   those websites in order to try and understand some of the

20   grievances, some of the way in which the worldview is kind of

21   structured or organized, key aspects of the culture at least as

22   what can be discerned through different websites, and kind of

23   cataloging those websites and studying them.  And then that led

24   me to start conducting fieldwork with active members in the

25   winter of 1997.

M5OCmelH                      Simi - direct

1   Q.   When you said you commenced fieldwork in approximately

2   1997, broadly speaking, what do you mean by that?

3   A.   Well, that was my -- so January of 1997 was the first time

4   I made contact in person.  I had previously written a letter to

5   a group that I became aware of, had their P.O. box.  This was

6   at a time -- at this point in time, P.O. boxes were still

7   relatively common among white supremacist groups.  We're still

8   in the -- '96, '97 were still in the fairly early days of the

9   internet.  So a lot of groups that didn't necessarily have

10  websites would have P.O. boxes instead, some groups had both.

11          But this group had a P.O. box, I wrote them a letter,

12  asked if they would be willing to meet with me, told them I was

13  a student and received a response shortly thereafter.  And they

14  expressed a willingness to meet with me for lunch and,

15  depending on how the lunch went, they said that they might be

16  willing to show me the movement, which, from a fieldwork

17  perspective, that's what I was looking for, was that kind of

18  access with folks that were actively involved in the movement.

19          And so, in January of 1997, had the first meeting with

20  them -- with two of their members in person, had the lunch, and

21  then they invited me to come back.  And then that's when the

22  fieldwork kind of commenced as far as in more detail.

23          THE COURT:  Thank you.  Counsel, can you pause before

24  your next question.

25          MS. RAVENER:  Certainly, your Honor.

1          THE COURT:  Thank you.

2          (Pause)

3          Thank you.  Counsel, you can proceed.

4  Q.  Dr. Simi, you were describing some of your research.  Have

5  you published any findings from your research on the topic of

6  the white supremacist movement?

7  A.  Yes, I have.

8  Q.  What kinds of publications have you written?

9  A.  Peer reviewed journal articles, a book manuscript that I

10 coauthored, and a number of book chapters for edited volumes

11 which are a common kind of outlet for research that's used in

12 academic scholarship.

13 Q.  What was your book?

14 A.  The title?

15 Q.  Yes.

16 A.  American Swastika:  Inside the White Power Movement's

17 Hidden Spaces of Hate.

18 Q.  What do you mean by hidden spaces of hate?

19 A.  Well, that's kind of the focus of the book, which is

20 looking at the nature of the culture that's central to the

21 white supremacist movement, in particular, some of the kind of

22 more hidden or private or covert aspects of the culture and the

23 different kinds of spaces that individuals in groups rely on to

24 cultivate their beliefs and transmit their beliefs and engage

25 in recruitment, engage in strategizing.  In some cases,

1    engaging in planning violence.

2    Q.   Please describe what research you did in order to prepare

3    the book.

4    A.   So that would be the ethnographic fieldwork that I

5    described earlier, which would have included or did include the

6    participant observation I mentioned earlier, also interviewing,

7    and the website analysis that I mentioned I started in '96.  Of

8    course, that continued.  So continued to monitor the kind of

9    digital spaces online, not just websites, but also eventually

10   web forums where, unlike the websites, which are a little bit

11   more one dimensional.  The web forums, people are actually

12   communicating with each other back and forth and you have

13   different threads that end up being somewhat like conversations

14   online.  So my research also involved the analysis of those

15   types of sites.

16        Of course, also, as part of academic research, you're

17   reviewing the scholarship in that area in terms of previous

18   studies to ground your research within what's already been

19   identified as key findings and existing knowledge in that area.

20        Part of the analysis also involved looking at primary

21   sources.  That is when you're talking about the white

22   supremacist movement.  It is prolific in many respects in terms

23   of producing texts, documents, whether it be books that purport

24   to be fictional like the Turner Diaries, or whether it's

25   different types of essays that advocate for different

1    strategies.

2           These kind of primary sources are obviously an

3    important piece of understanding any kind of community or

4    culture or worldview.  You want to look at some of the things

5    that are produced by those individuals that make up that

6    community to better understand their perspective.

7    Q.  Now, as part of this ethnographic fieldwork, did you

8    attempt to actually access these hidden spaces of hate that you

9    speak of directly?

10   A.  Yes, I did.

11   Q.  What were some of those spaces?

12   A.  Private homes, small gatherings.  In some cases, on private

13   property.  In some cases, in residential homes.  Small music

14   shows that sometimes were also in private homes.  Sometimes in

15   kind of private bar locations, that is they had secured the bar

16   for that specific music show so that so called outsiders would

17   not be allowed entrance.  Some cases, groups may have property

18   or what sometimes are referred to as compounds or encampments.

19          So, for example, Aryan Nations, which I visited on a

20   number of occasions and stayed at during some of their

21   gatherings, what they called congresses, they had 20 acres of

22   property at that time in northern Idaho, Hayden Lake.  They

23   certainly weren't the only group that had that kind of a

24   property setup.  And those were obviously used for holding

25   gatherings where people from not only across the United States

M5OCmelH                          Simi - direct

would attend, but from other countries, as well.  In that case,
they would have speeches, religious ceremonies, cross burnings,
swastika burnings, sometimes music.  So the private spaces
ranged.

          And I would be remiss if I left out cyberspace as an
important part of this in terms of affording some security and
privacy.  That's, I think, two of the key characteristics to
understand what we mean by hidden spaces, is that spaces that
afford some degree of privacy and security so that white
supremacists are able to engage in some of the discussions and
practices that they'd like to without fear of repression.
Q.  And what's the point, as a sociologist, of going to these
kinds of events, spaces, in order to perform the ethnographic
fieldwork?
A.  Well, the basic goal -- and this cuts across any type of
ethnographic fieldwork, no matter what the topic is or the
focus.  You're trying to understand -- it's called empathetic
understanding, deep understanding.  You're trying to see the
topic of your focus, their perspective to try and gain a better
degree of insight with the premise that one of the best ways to
understand people is to study them in natural environments.

          And you can think about this in contrast to a
laboratory experiment, which is a powerful way of studying
human behavior.  And certainly we can learn a lot from
laboratory experiments, but it's also very artificial.  So you

M5OCmelH                        Simi - direct

1  have some issues with laboratory experiments in terms of some

2  of the results may or may not apply to the so called real world

3  because a lab is, like I said, pretty artificial.

4          Ethnographic fieldwork is premised on the opposite.

5  The idea is go to the natural settings where people exist and

6  try and learn by observing and talking with them to see if, in

7  those natural settings, there are certain patterns.  There are

8  certain kinds of things that you can discern in terms of better

9  understanding their worldview, their culture, their behavior.

10 Q.  You referred, in brief, to visiting the Aryan Nations; is

11 that right?

12 A.  That's correct.

13 Q.  And so what is the Aryan Nations?

14 A.  It's been defunct for a while, but it was at that time --

15 we're talking about in the late '90s, early 2000s.  By that

16 time, it had become a pretty substantial national organization

17 in the United States with some global -- a fair amount of

18 global connections.

19         They were primarily a combination of Neo-Nazi and

20 what's called Christian identity.  And their founder, Richard

21 Butler, was considered kind of a, quote-unquote, statesman of

22 the movement at that point in time.  He died, I think, in 2004.

23 But they've since -- after he died, they continued to exist for

24 a period of time and then eventually fragmented and broke up.

25 But, at the time that I was doing fieldwork there, they were a

1   pretty substantial national organization.

2   Q.  Now, as part of this fieldwork, did you interview members

3   of the white supremacist movement?

4   A.  Yes, I did.

5   Q.  Approximately how many interviews did you conduct?

6   A.  Over 200.

7   Q.  And did that consist of active members of the white

8   supremacist movement?

9   A.  It did in part, although we've since begun interviewing

10  former members, as well.

11  Q.  So both active and former members?

12  A.  That's correct.

13  Q.  Were your subjects members of one particular group or

14  multiple groups?

15  A.  A variety of different groups, and some were not members of

16  any groups.  Again, they were more of this generic white

17  supremacist that's quite common.

18  Q.  What did you observe about whether these groups interacted

19  with each other?

20  A.  Well, there is -- there is a lot of overlap and

21  interaction.  One of the things that's certainly noted by I

22  think most, if not all, scholars who study the white

23  supremacist movement is there is a fair amount of internal

24  conflict and sometimes dispute over doctrine and so forth.

25  Sometimes it's more interpersonal kinds of conflicts, but you

1    get a range of different conflicts that are present.  But there

2    is also a tremendous amount of interaction, there is a

3    tremendous amount of efforts to create coalitions of sorts, to

4    coordinate across different types of groups.  So, yeah, there

5    is a lot of interaction.

6    Q.  What was the objective of the book?

7    A.  Of American Swastika?

8    Q.  Yes.

9    A.  I think the objective of most academic research is to try

10   to raise awareness and try and inform the public about whatever

11   it is you're studying.  I can only speak for myself, but you

12   want your research to have practical relevance in terms of

13   being able to inform potential policymakers, educators, and

14   have an impact potentially in terms of shedding light on

15   something that maybe others don't fully understand or because

16   they haven't looked at it in the level of detail that an

17   academic researcher may be.  You're hoping to increase that

18   awareness about the topic.

19   Q.  How long did it take you to research the book?

20   A.  Well, it started in '96 and the first edition was published

21   in 2010.  We published a second edition in 2015 and now

22   actually just asked to work on a third edition.

23   Q.  And how much time did it take to conduct the ethnographic

24   fieldwork that underlies a component in the book?

25   A.  That, as I mentioned, started in '97.  And the last major,

1    I guess you might say, period of fieldwork was the summer of

2    2004.

3    Q.  So, is that approximately seven years?

4    A.  Yes, I believe so.

5    Q.  Did you continue to stay current with literature, web

6    presences, and other steps that you described during that

7    period.

8               MR. MARVINNY:  Your Honor, I object to the leading.

9               THE COURT:  Thank you.  I will accept the answer.  You

10   can proceed, counsel.

11   Q.  Doctor, you described that as part of research for the

12   book, you did conduct other research steps in addition to the

13   ethnographic fieldwork.  Did you continue those steps after the

14   2004 period as you prepared the manuscript?

15   A.  Yes, I did.

16   Q.  Approximately how many hours did you spend conducting

17   fieldwork?

18   A.  Thousands of hours.  I mean, in some cases, I lived with

19   families.  I lived -- the summer of 2004, I lived with a family

20   in Southern California for five weeks.  So I was with them --

21   it depends whether you count hours sleeping or not, but we're

22   talking about 16 hours in the day that I'm basically spending

23   time with them immersed in their lives.  In other cases, in

24   Aryan Nations, for example, I stayed in their bunkhouse during

25   some of their congresses.  So again, I was there around the

M5OCmelH                        Simi - direct

1   clock.  In other cases, people allowed me to stay on their

2   living room couch, crash out.  So we're talking about pretty

3   high level of immersion, I would say.  So we are talking about

4   thousands of hours.

5   Q.  You described that the book was first published, the first

6   edition in approximately 2010.  Around that time, did you

7   publish any other pieces that related to this body of research

8   that you conducted?

9   A.  Yeah, prior to American Swastika's first publication,

10  published a number of peer reviewed journal articles related to

11  various topics in terms of the white supremacist movement,

12  different aspects of it, and book chapters and edited volumes.

13  Q.  Could you provide an example?

14  A.  The first article we published in 2004 in a journal called

15  Social Problems, it's a general sociological journal that

16  publishes a wide range of research within the field of

17  sociology, and that actually was focused specifically on the

18  issue of free spaces or, as you mentioned, hidden spaces

19  earlier, which is kind of a term that can be used

20  interchangeably.  And we looked at some of the ethnographic

21  data from that perspective of free spaces.

22  Q.  Was that article subjected to peer review?

23  A.  It was.

24  Q.  When we talk in general about peer review, can you explain

25  to us, what does that mean?

A.   Yeah.  I mean, generally, it's a process used within

science, both natural and social sciences to increase the

likelihood of valid research that's being published to evaluate

the quality of the research.

          Academic journals typically use what's called a

blinded review process.  So the editors of the journal will

receive a submission for potential publication and they will

identify reviewers that they feel are qualified or have

expertise in the area of research that the article is focused

on.  They will then send -- once they get the agreement from

the reviewers, then they will send that article to them without

the reviewer knowing who wrote the manuscript.  So the

authorship is blinded.  That's done very intentionally to try

and increase the likelihood that reviewers will not be biased.

You're trying to reduce bias by blinding the review process.

So that's kind of the review process in a nutshell.

Q.   Dr. Simi, I believe you mentioned this earlier, but to be

clear, as part of your work do you also participate in peer

reviewing the work of others?

A.   Yes, I do.

Q.   How often?

A.   Regular basis.

Q.   Based on that experience, approximately how many academics

participate in a peer review of an article?

A.   It depends on the journal, but typically, it's between

M5OCme1H                         Simi - direct

1    three and five.

2    Q.   Turning back to your research experience, Dr. Simi, after

3    you completed the fieldwork for your book, American Swastika,

4    what research project did you do next?

5    A.   Well, in 2005, 2006, we received a grant award from the

6    National Institute of Justice to study recruit and

7    radicalization as it related to a sample of far right federal

8    indictees, that is individuals who have been indicted on

9    federal terrorism related charges in the 1980s and '90s.  We

10   were studying that sample of individuals trying to better

11   understand the recruitment and radicalization processes.

12   Q.   What methods did you use in order to conduct that research?

13   A.   That was called what's called open source data analysis.

14   It relies on secondary sources.  So unlike what I've been

15   describing in terms of the participant observation and

16   interviews, this is relying on existing sources that are

17   publicly available, so open source.

18            So, in our cases, we started with federal court

19   documents.  These are, again, as I mentioned, all individuals

20   who had been indicted on federal terrorism related charges in

21   the '80s and '90s.  We used that as the starting point as far

22   as the court documents.  In some cases, the court documents

23   were helpful in terms of providing details about the

24   individuals' lives as it related to their involvement and even

25   preceding their involvement.

1          We were trying to understand as much as possible their

2     biographies, basically looking at their childhood, adolescent

3     upbringings and experiences to see if there might be things

4     relevant in that background in terms of what ultimately

5     happened as far as them becoming involved in far right

6     terrorism.

7          So, we started with the court documents.  From the

8     court documents, we then moved to other types of open sources

9     that might be available.  Now that's going to vary from

10    indictment to indictment.  So you're going to get a lot of

11    variability in terms of what sources are or are not available.

12    But in some cases, there had been books written, for instance,

13    investigative journalists about some of these cases because

14    they had received quite a bit of media attention in some cases.

15         And so, in those books, we went through and did what's

16    called content coding, and this is what we did with the court

17    documents, as well.  Content coding is what I described earlier

18    as it related to the websites that I mentioned in '96.  Content

19    coding, you're going through trying to identify relevant

20    information.  Again, for us, we had specific points of focus

21    that we're looking for as far as their backgrounds and

22    biographies, but you're going through and seeing whether you

23    can pull or identify relevant information, and pulling that

24    out, recording it, documenting it in some type of spreadsheet,

25    like an Excel or SPSS — a statistical software — spreadsheet,

M5OCmelH                         Simi - direct

1   and that allows you to better document, keep track of the

2   information that you're identifying and ultimately trying to

3   identify patterns.

4         That's kind of that project in a nutshell.

5   Q.  Dr. Simi, can you provide some examples of the subjects you

6   studied as part of this research project related to indicted

7   extremists?

8   A.  One of the things that came up -- we actually weren't

9   looking for this, but we thought it was interesting and decided

10  to focus on it more, but we found that about 30 percent of the

11  indictees had military experience in their background, which,

12  you know, that's a pretty striking number, given what we find

13  in the general population in terms of military experience.

14        So we wanted to look more carefully at that, because

15  like I said, we weren't necessarily looking for that.  We

16  wanted to understand why does this relationship exist.  So we

17  did continue to pursue that angle and focus on it more.

18  Ultimately published an article specifically about that issue.

19  Q.  And what was that article?

20  A.  It was an article focused on -- called Involuntary Exits

21  and Identity Discrepancies, as it relates to military

22  experience and the overlap with far right extremism.

23  Q.  Where was it published?

24  A.  That was published in Studies of Conflict and Terrorism.

25  Q.  And about how many subjects were part of the sample that

M5OCmelH                          Simi – direct

1    you studied as part this project into indicted extremists?

2    A.   Approximately 120.

3    Q.   And what were some of the events or individuals that were

4    part of the study?

5    A.   Yeah.  As I mentioned, this covered the '80s and '90s.  So

6    of course you had the Oklahoma City bombing.  Tim McVeigh and

7    his coconspirators would have been the folks indicted during

8    that time period.

9         You had a group in the '80s called the Silent

10   Brotherhood or the Order.  They were basically an underground

11   terrorist cell that was active.  They formed in the Pacific

12   Northwest, but this had folks across the country that were

13   involved in their underground terror cell.  They eventually

14   robbed, successfully, an armored Brinks truck for over

15   $2 million.  They also killed several people.  They

16   assassinated a Jewish radio, talk show host in Denver, Alan

17   Berg.  So they were involved in a substantial amount of

18   violence.  They planned on, tried to overthrow the government.

19   Their purpose for forming was essentially to lead a van guard

20   revolution, this white revolution that they hoped to foment.

21        So they were the subject of a Rico indictment --

22             MR. MARVINNY:  Your Honor, I object to the relevance.

23             THE COURT:  Thank you.  I'll accept the answer.  But,

24   counsel, I will ask you to move along.

25             MS. RAVENER:  Sure.  No problem, your Honor.

M5OCmelH                          Simi - direct

Q.  Dr. Simi, you referred earlier that one of the findings
from the study was the relationship between military experience
and some of the subjects in your study.  What did you find in
that research?

        MR. MARVINNY:  Objection to relevance, your Honor.

        THE COURT:  Thank you.  You can answer the question.
Q.  What did you find in your research about that relationship?
A.  Broadly speaking, we found that involuntary exits, that is
dishonorable discharges, or in some cases not necessarily a
dishonorable discharge, but when a person has a goal of
achieving a higher status within the military and is able to
accomplish that goal, then it creates certain kind of what you
might call incongruence or a discrepancy in terms of their
aspirations and the actual reality of their lived experience.

        That generates a degree of turmoil that you might
describe as a kind of identity crisis.  And that, as a coping
mechanism for that crisis, in some cases, involvement in white
supremacist extremism may help kind of address those needs,
some of those kind of emotional and psychological stressors
that the person is experiencing, in part because white
supremacists will acknowledge the person in terms of value them
for their military experience, for the training that they've
received, and treat them almost like a hero of sorts.  So it
gives that kind of validation that the person wasn't able to
achieve during their time in the military.

1          We see that as one type of vulnerability as it relates

2     to why we're finding this relationship between military

3     experience and far right extremists.  It's not the only, I

4     should say.  There are other aspects to it, which I'm happy to

5     address if that's relevant.

6     Q.  In brief, if you can, Dr. Simi.

7          MR. MARVINNY:  Your Honor, I continue to object.

8     Dr. Simi has not been noticed as an expert on the relationship

9     of white supremacy and the military or anything like that.

10         THE COURT:  Thank you.  I'm happy to accept the

11    answer.  You can proceed, Dr. Simi.

12    A.  One of the things white supremacist groups do is they

13    advocate for infiltration into the military.  So that is they

14    want people who are at adherence, who are already involved in

15    white supremacist extremism to join the military.  So,

16    essentially, part of the reason why there is a relationship is

17    folks in some cases are joining the military who are already

18    involved in white supremacist extremism.

19         On the back end, that is folks who have left the

20    military, white supremacist groups are going to, in many cases,

21    seek out veterans to try and recruit into the white supremacist

22    movement because they, again, are seeking some of the skills

23    that they may have and will value the training that they may

24    have been provided during their time in the military.

25         So there is kind of different aspects to why there is

M5OCmelH                         Simi - direct

1    this overlap.

2    Q.  Dr. Simi, have you continued to study the white supremacist

3    movement since conducting that research project in

4    approximately 2006?

5    A.  Yes, I have.

6    Q.  And what have you done?

7    A.  Well, in 2012, we started doing interviews with former

8    white supremacists, that is people who had disengaged from

9    their involvement in the white supremacist movement.

10            There is a point of distinction here between

11   disengagement and deradicalization.  These individuals had all

12   more or less cut their ties, but in some cases they had changed

13   their beliefs and in other cases they had not.  Some had

14   deradicalized and some had not, but they had all disengaged.

15   So that was -- we were trying to understand the disengagement

16   process, but also, because of the method we were using, which

17   was intensive life history interviewing, we were able to

18   collect data about their entire life histories.

19   Q.  Focusing on the life history research project,

20   approximately how many people have you interviewed over the

21   past 10 years, I believe you indicated?

22   A.  Over a hundred.

23   Q.  Approximately how many hours did you spend on average

24   conducting each of those interviews?

25   A.  Those interviews ranged between five and seven hours on

M5OCmelH                          Simi - direct

1    average.

2    Q.  Now, in addition to your book, have you also published

3    articles regarding white supremacy?

4    A.  Yes, I have.

5    Q.  Approximately how many?

6    A.  More than 50 journal articles, book chapters, and added

7    volumes and related types of writings.

8    Q.  When you refer to those publications, approximately how

9    many were peer reviewed?

10   A.  I couldn't tell you off the top of my head in terms of

11   certainly dozens.

12   Q.  And over what time period did you publish those in excess

13   of 50 articles and dozens of peer reviewed articles?

14   A.  Primarily from 2004 to the present.

15   Q.  I believe you've given us a few, but could you remind us of

16   some examples of articles you published in a peer review

17   setting?

18   A.  We published in what's called Sociological Quarterly, an

19   article looking at the role of music within the white

20   supremacist movement, how that informs the culture.  We've

21   published articles related to cyber culture and the role that

22   that plays within the movement and the integration between off

23   and online aspects of peoples' lives as it relates to their

24   involvement in the white supremacist movement.  We've published

25   articles about the disengagement process.  We've published

1    articles about violence and the role that violence plays,

2    looking at, for instance, a recent article that we published in

3    2020, I believe, about some of the micro situational aspects of

4    white-supremacist-related violence based on the interviews we

5    did where they kind of talked through some of the acts of

6    violence that they were previously involved in and some of the

7    thought processes, some of the situational characteristics that

8    led to the violence.

9             So, essentially, we're trying to better understand

10   kind of what are some of the factors that lead to these

11   different types of violent incidents in that article.  So it's

12   a pretty broad range of issues that we covered as it relates to

13   articles on the white supremacist movement.

14   Q.  Dr. Simi, you used the term micro situational aspects.

15   What do you mean by that?

16   A.  It's focused on things, internal processes, in other words

17   things that people are thinking about prior to committing

18   violence, while they're committing violence, the emotional

19   aspect of committing violence.  So it's at that kind of

20   individual level or situational level where we're trying to

21   understand where this violence, what factors kind of influence

22   the violence, from their perspective, at least, based on their

23   accounts.

24   Q.  Was your book peer reviewed?

25   A.  So books, academic books, they're peer reviewed, but

M5OCmelH                    Simi - direct

1   they're not blind peer reviews.  So a book publisher will send

2   a book manuscript out to a certain number of reviewers, but the

3   reviewers do know who the author is.  So it's a little bit

4   different in that respect, but it certainly is a review

5   process.

6   Q.  Dr. Simi, in addition to the ongoing life history research

7   project, what other kinds of steps have you taken, if any, to

8   stay current on the issue of the white supremacist movement?

9   A.  Well, again, that would be in part the review of

10  scholarship in the field, you know, staying current on articles

11  and books that have been published as it relates to this issue.

12  It would be the time I spent online in terms of reviewing

13  different platforms, looking at some of the videos and other

14  types of text messages that are being shared on these

15  platforms, reviewing some of the text and other types of

16  publications that white supremacists are publishing, either

17  online or offline.  So really trying to stay current on

18  materials that are produced by the white supremacist movement.

19  Q.  We'll talk more about that ongoing research as we continue.

20          For now, let me turn to some of your other experience.

21          Dr. Simi, prior to today, have you testified in any

22  other court proceedings as an expert witness regarding the

23  white supremacist movement?

24  A.  I have.

25  Q.  And approximately how many times have you done that?

M5OCmelH                    Simi - direct

1    A.  Twice.

2    Q.  Can you identify the cases that you testified in?

3    A.  Yeah, just recently, last fall, in a federal civil trial,

4    Science v. Kessler, related to the Unite the Right event that

5    turned violent in Charlottesville, Virginia in 2017.  And then

6    a case in the State of Oregon, in Motonaga County.  I testified

7    on behalf of the prosecutor's office in a double homicide case.

8    Q.  And in those cases, was your testimony focused on the white

9    supremacist movement broadly or any particular subgroups?

10   A.  Broadly.

11   Q.  Have you ever been precluded by a judge from testifying as

12   an expert witness?

13   A.  No, I have not.

14   Q.  Have you served as a consultant on the white supremacist

15   movement and its subgroups in any other criminal cases?

16   A.  Yes, I have.

17   Q.  Approximately how many times?

18   A.  About a dozen, I would say.

19   Q.  What are some of the entities you consulted for?

20   A.  The federal public defenders office.  Multiple public

21   defenders offices across the U.S.  The defense attorneys who

22   are basically contracted with the CJA.  Those were mostly

23   federal cases.  The U.S. Attorney's Office in Southern

24   California.  Those would be a few examples.

25   Q.  To be clear, you've done so for prosecutors?

1    A.  Yes, I have.

2    Q.  And you've also done so for defense attorneys?

3    A.  Yes, I have.

4    Q.  Generally, what were some of the kinds of charges at issue

5    in those cases?

6    A.  Most of the cases involved murder.  There was a sedition

7    case.  There were several Rico cases.  Many of the cases have

8    been post-conviction capitol cases where I've been asked to

9    consult by federal public defenders' offices in a couple

10   different districts.

11   Q.  Have you testified before the United States Congress?

12   A.  Yes, I have.

13   Q.  How many times?

14   A.  Oral testimony, twice, and written testimony, four times.

15   Q.  Have you testified before any particular committees?

16   A.  Yeah.  Most recently the Veterans Affairs, oral testimony.

17   I actually, more recent, submitted testimony for the J6 select

18   subcommittee that's investigating the January 6th insurrection.

19   The oversight committee prior to that on two different

20   occasions as far as one-time oral testimony, another time, just

21   written.

22   Q.  What was the subject of your testimony before the U.S.

23   Congress in these contexts?

24   A.  The first time was the issue of white supremacist

25   infiltration into law enforcement.  Second time was the overlap

M5OCmelH                    Simi - direct

1    between antigovernment militia extremism and white supremacist

2    extremism.  The third time was the issue of military

3    involvement in overlap with far right extremism.  The most

4    recent was the J6 that I mentioned already.

5    Q.  You mentioned that you testified specifically about the

6    overlap between white supremacist groups and the U.S. military;

7    is that right?

8    A.  Yes, that's correct.

9    Q.  Generally, what was the topic of your testimony in that

10   context?

11   A.  I basically described the different pathways for trying to

12   understand -- trying to helping understand how this overlap

13   kind of occurs and what explains it, and, in particular,

14   focusing on this issue about involuntary exits and the

15   vulnerabilities that can create in terms of someone being

16   susceptible to recruitment into far right extremism.

17   Q.  Did you discuss the risks of infiltration that you

18   described earlier?

19   A.  Yes, I did.

20   Q.  You talked a little bit before about what you've learned

21   from your research on that relationship between white supremacy

22   and the military.  But, to be clear, what sources have you used

23   to understand that relationship?

24            MR. MARVINNY:  Objection to relevance.

25            THE COURT:  Thank you.  I'll accept the answer.  You

M5OCmelH                    Simi - direct

1  can proceed, Dr. Simi.

2  A.   So this would be a pretty wide range of different sources.

3  So this would include court documents I mentioned, it would

4  include interviews, it would include participant observation,

5  it would include investigative journalistic accounts as it

6  relates to some of these issues, it would include law

7  enforcement bulletins, other intelligence bulletins.  For

8  example, in 2009 the Department of Homeland Security released a

9  bulletin that addressed this issue, in part, is one of the main

10 points of focus of that report.  So, again, it would be broad

11 range of multiple sources.

12 Q.   Have you also studied any historical sources?

13 A.   Oh, absolutely.

14 Q.   How is this a historical issue?

15 A.   Well, I mean, when you look at the founding of the Ku Klux

16 Klan, for example, it was founded by former Confederate

17 officers.  At any point in time throughout U.S. History, you

18 can find an overlap between U.S. military involvement and white

19 supremacist groups or the movement more broadly.

20 Q.   Have you done any work for the United States Government

21 prior to this case?

22 A.   Yes, I have.

23 Q.   Can you give us some examples of what you've done.

24 A.   Sure.  I've done trainings on behalf of the Department of

25 Justice, the Department of Homeland Security, the federal

M5OCmelH                      Simi - direct

1    probation.  I've done trainings for the Department of Defense.

2    So those would be a few examples of trainings I've done for the

3    federal government.

4    Q.  And what kind of trainings are you referring to?

5    A.  Oh, these are trainings specifically about white

6    supremacists groups, issues related broadly to the white

7    supremacist movement.

8    Q.  Are those trainings limited to any particular subgroup

9    within the white supremacist movement?

10   A.  No, they're not.

11   Q.  Generally speaking, how did that work drawing your

12   knowledge and experience studying the white supremacist

13   movement, given these trainings?

14   A.  Well, the data that we've collected informs the trainings

15   to a substantial extent.  So, for example we've collected data

16   specifically about different vulnerabilities in a person's

17   background, childhood in adolescence where risk factors or

18   different kinds of trauma that a person might experience in

19   childhood adolescence and how that may be related to later

20   involvement in white supremacist extremism.  So as part of the

21   trainings, I'll oftentimes present that data very specifically,

22   which is possible because of the research that we had

23   conducted.

24   Q.  Dr. Simi, have you also provided commentary as a scholar on

25   the white supremacist movement?

M5OCmelH                        Simi - direct

1    A.  Yes, I have.

2    Q.  Where have you done that?

3    A.  Various television media, print media, do it in public

4    settings, community groups that invite me to give talks.  So

5    it's a pretty broad range.

6    Q.  And approximately when have you participated in providing

7    commentary as a scholar on this subject to the media or a

8    community group?

9    A.  It's pretty much ongoing.  Just last week, I was

10   interviewed by Don Lemon on CNN about the Buffalo terror

11   attack.

12   Q.  Just so the record is clear, what do you mean by the

13   Buffalo terror attack?

14   A.  The Saturday -- I guess it was last Saturday, the Saturday

15   before.  My days are a little off here.  The attack of the

16   white supremacist extremist who attacked individuals at the

17   supermarket outside of Buffalo.

18   Q.  In addition to providing commentary to the media and

19   various publications, have you conducted -- I'm sorry.

20          In addition to your job at Chapman University, do you

21   hold any other positions?

22   A.  Yes.  I serve on the executive advisory board for NCITE,

23   which is at the University of Nebraska, Omaha.  It's the most

24   recent center of the excellence that was developed by the

25   Department of Homeland Security to address the problem of

1   terrorism or help address the problem of terrorism in terms of

2   studying the causes of terrorism, but also relevant factors in

3   terms of counterterrorism in terms of what seems to be

4   effective and what helps prevented terrorism and other aspects

5   of trying to counter terrorism.

6   Q.   Apologies if I missed, what does NCITE stand for?

7   A.   Now you've asked a tough question.  The national counter --

8   to be -- you'd have to refresh my memory on that, to be honest

9   with you.

10  Q.   No problem, Dr. Simi.  Correct me if this is mistaken, but

11  does it stand for the National Counterterrorism Innovation

12  Technology and Education Center?

13  A.   Thank you.

14  Q.   You described in brief what the center does, but what is

15  your role there?

16  A.   Well, the advisory board provides consultation as it

17  relates to different points of focus, areas that are important

18  to focus on within the field.  The mission of the center is to

19  serve as a consortium that is funding research projects across

20  the country, and even across -- from other countries, as well,

21  addressing this issue.

22       So the advisory board helps serve in terms of the

23  mission as far as what are the key areas that should be points

24  of focus where research is needed, where there are gaps in our

25  knowledge, what kinds of things would be helpful for us to have

M5OCmelH                        Simi - direct

1   more research on.  So those are kind of some of the basic

2   issues.

3   Q.  During your time at Chapman University, have you held any

4   other roles or positions in addition to the ones we've already

5   discussed?

6   A.  Yeah.  I served for a period of time as the director of the

7   Earl Babbie Research Center.

8   Q.  What is the Earl Babbie Research Center?

9   A.  It is a research center named after Earl Babbie, who is

10  retired from Chapman University.  He is well known within the

11  field of sociology of research methodologists.  So the center

12  is focused on providing consultation related to research

13  methods, helping students and faculty members address different

14  needs as it relates to problems they might be having or

15  obstacles they might be having in terms of research projects

16  that they're working on or planning to work on.

17          And then, when I took over as director, I also made it

18  as a point of focus, radicalization and extremism research as

19  kind of under that umbrella as one kind of spoke underneath

20  that.  And so that also became a point of focus.

21  Q.  And so what are some of the things that you did, for

22  example, to promote the research center's work on the area of

23  extremism?

24  A.  My first year, we hosted a one-day, basically, research

25  consortium meeting where we invited scholars from across the

M5OCmelH                          Simi – direct

country, practitioners, as well as to present research related
to different aspects of violent extremism.  Everything from
white supremacist extremism, to Sovereign citizens, to Islamic
extremism.  So it covered a pretty broad range.  The speakers
did in terms of their presentations.  We had students also
presenting research projects that they had been working on in
the form of poster sessions and we had a dinner meal.  It was
kind of a center point for the event.

Q.  As part of putting that together, did you participate at
all in reviewing the work of other academics for inclusion in
this event?

A.  Yes, I did.

Q.  Have you also participated in other similar kinds of
academics, symposia, or events?

A.  Yes, quite a few.

Q.  Approximately, how many times?

A.  Dozens and dozens.

Q.  Have you served as a speaker at such academic events?

A.  Yes, I have.

Q.  Or a panelist?

A.  Yes, I have.

Q.  Has your academic research received support outside of your
university?

A.  Yes, it has.

Q.  And what are some of the sources that have supported your

M5OCmelH                    Simi - direct

1    research?

2    A.   The National Science Foundation, National Institute of

3    Justice, Department of Homeland Security, Harry Frank

4    Guggenheim Foundation.

5    Q.   What is the Harry Frank Guggenheim Foundation?

6              MR. MARVINNY:  Your Honor.  Objection to relevance.

7              THE COURT:  Thank you.  You can answer the question.

8    A.   It's a private foundation that focuses specifically on

9    research related to the causes and consequences of violence.

10   Q.   How is your work selected for support by these

11   organizations?

12   A.   Most organizations, whether federal agencies or private

13   foundations, go through a peer review process of some kind

14   where they vet the proposals for the quality, the merit of

15   what's being proposed in terms of the study, and potential

16   relevance and implications the study might have.

17   Q.   And so, have you made proposals or submissions in order to

18   qualify for certain grants?

19   A.   Yeah.  All the ones I mentioned would have involved

20   proposals that were reviewed through some kind of peer review

21   process.

22   Q.   Dr. Simi, does the U.S. Government's grant process have any

23   impact on your testimony here today?

24   A.   No, it does not.

25   Q.   Are you being paid for your time in connection with this

M5OCmelH                         Simi - direct

1   case, including your time testifying here today?

2   A.  Yes, I am.

3   Q.  And what is your rate?

4   A.  $300 an hour.

5   Q.  Is that consistent with rates charged by your colleagues?

6   A.  It is.

7   Q.  Does that have any impact on your testimony here today?

8   A.  No, it does not.

9   Q.  Dr. Simi, I'd like to talk even a little more in depth

10  about your academic research relating to white supremacy.

11  A.  Okay.

12  Q.  Overall, during the course of your career, what methods do

13  you use to conduct your research?

14  A.  Well, it would be a combination of the participant

15  observation, interviews, analysis of various types of

16  documents, both virtual as well as offline documents that are

17  generated by different white supremacist groups and so forth.

18  It would involve reviewing the scholarship on the topic.  That

19  would also include or extend into looking at various

20  publications generated by groups that monitor the white

21  supremacist movement, like the Southern Poverty Law Center that

22  we talked about earlier, The Antidefamation League, looking at

23  investigative journalists, and some of the work that they've

24  done on the topic.  It's a pretty broad range of trying to be

25  as thorough as possible and meticulous in looking at a variety

M5OCmelH                          Simi - direct

1    of different kinds of sources.

2    Q.  And I believe you mentioned some of the sources that you've

3    drawn when surveying literature, but could you review that for

4    us in general.  What are some of the sources when you review

5    the existing literature and academia or primary sources that

6    you've drawn?

7    A.  I guess I'm not fully understanding the question.  Do you

8    mean the types of or --

9    Q.  Yes, the types.

10   A.  That would include books, scholarly books written on the

11   topic.  It would include the peer review journal articles that

12   we've been talking about.  In terms of scholarly work, those

13   would be the two main kinds.

14   Q.  What about primary and secondary sources that you use?

15   A.  So the primary sources from the movement itself would be

16   books.  That's not uncommon to have books that are published by

17   white supremacist groups, individuals, leaders, organizational

18   pamphlets of various kinds, magazines, all sorts of different

19   publications are generated by, you know, through the white

20   supremacist movement.  So that's a pretty broad range of

21   different kinds of sources that one would want to be as

22   familiar with as possible.

23   Q.  We spoke earlier about some of your ethnographic fieldwork

24   and what that is, but let me ask you this:  Do others in the

25   field of sociology employ ethnography as a method of research?

1    A.  Yes, they do.

2    Q.  How long has ethnography as a method in sociology?

3    A.  More than a hundred years, I'd say.

4    Q.  And you mentioned, as well, the concept of or method of

5    participant observation.

6    A.  That's correct.

7    Q.  What is participant observation?

8    A.  Well, if you think about this kind of like a continuum.  On

9    the one end, you can have what's called a total participation

10   where a person essentially becomes a member of whatever it is

11   they're studying, whether it's a community or culture or group.

12   On the other hand, you have a total observer, and that would

13   be, if you think of some kind of crowd behavior, an event, a

14   festival at a park, for example, you could sit on the

15   boundaries of that event and not be participating at all and

16   just be totally observing.  So participant observation includes

17   that broad range across that continuum.  I think most field

18   workers are somewhere in the middle.  So they're doing some

19   combination of the observation along with the participation.

20   That certainly would be the case what I did in terms of my own

21   fieldwork experience.

22   Q.  What kinds of environments are included in participant

23   observation?  Where can you conduct participant observation?

24   A.  Pretty much anywhere.  You can do it in public spaces,

25   private spaces, you can do it in virtual spaces.  So, yeah,

1    it's applicable to pretty much any setting where there is

2    humans to observe.

3    Q.  Just so we're clear, are the environments that you've

4    observed personally always physical?

5    A.  No, they're not.

6    Q.  Why not?

7    A.  Because virtual space plays an important role in the white

8    supremacist movement.  So as a researcher, you're trying to

9    respond as you learn more about an environment and you learn

10   what's important within that environment, you start to pay

11   attention to those different things.

12          So, again, as I mentioned, I started out looking at

13   the websites in '96.  Once I arrived the importance of the role

14   that websites play within the movement and learned more about

15   things like web forums, then, of course, that drew my attention

16   as wanting to continue to monitor those and spend time there

17   and observe and try and document the kinds of interactions and

18   things that people are communicating about and the role it

19   seems to play within the movement.

20   Q.  Now I think this term may have come up already in your

21   testimony, but are you familiar with the term free space?

22   A.  Yes, that's the kind of key concepts that guides a lot of

23   our research.

24   Q.  What do you mean by free space and why is it a key concept?

25   A.  So free space is not a concept that we created or

M5OCmelH                        Simi - direct

generated.  It's an existing concept within the field of social

movements principally, and it's a concept that was developed to

try and understand how more private spaces may influence

political activists who are involved in a social movement.

        So you think about a bookstore meeting where activists

are involved in a movement.  You know, that's not the kind of

typical thing you think about when you think of a social

movement.  You typically think about larger rallies, marches,

that kind of thing.  Obviously, those are important for a

social movement, but free spaces that work, that concept has

suggested -- it's not just the marches and rallies.  You have

to look at some of these smaller settings where people are

coming together and sharing ideas and sharing strategies.  So

free spaces which are typically characterized by spaces that

are relatively free from the potential of repression.

        So every social movement faces the prospect of

repression because a social movement wants to change something

about society, and especially social movements that advocate

the use of criminal, especially violent tactics, they very much

face the prospect of repression.  So it becomes very important

for them to develop these kind of free spaces where they can

get together with like-minded folks, share their ideas about

the world, share strategies, talk about what seems to be

effective in terms of strategy and what's not.  So that's kind

of how we've used the concept in our research.

M5OCmelH                      Simi - direct

1   Q.  You gave the example of a bookstore as a gathering point.

2   Are these free spaces always physical?

3   A.  No, they're not.

4   Q.  Why not?

5   A.  Again, we're back to the importance of virtual spaces and

6   what that potentially provides in terms of safety, in terms of

7   privacy and security.  And so, within the virtual world,

8   certainly white supremacists really have seized the opportunity

9   the virtual spaces provide.  This is actually pretty

10  longstanding.  If you look at the 1980s, for example,

11  electronic bulletin boards, white supremacists utilized that

12  technology at that time and so have continued to use the

13  different technologies that are available in digital or virtual

14  spaces as it relates to some of the issues we've been

15  discussing.

16  Q.  Are there any particular terms in the sociological field to

17  refer to the ethnographic study of these virtual spaces?

18  A.  Yeah, you'll find the term virtual ethnography is pretty

19  common and essentially that -- sorry.

20  Q.  I think we're on the same page, Dr. Simi.  What does that

21  mean?

22  A.  Essentially, it's the same principles that we've already

23  discussed as it relates to fieldworker ethnography, but applied

24  to the virtual realm.  So the idea is you can take those same

25  techniques those same strategies, participant observation,

1    interviewing observation in terms of not interacting, as well

2    as observation coupled with participation.  All of those can be

3    utilized in virtual spaces along with the same types of

4    strategies in terms of documentation with field notes.

5           In the case of the virtual realm, it's somewhat easier

6    because you can do things like take screenshots and so forth,

7    but you can essentially capture the kinds of data that's

8    available in these virtual spaces and conduct the kinds of

9    analyses that you would do in non-virtual spaces.  So it really

10   is the same principles methodology, but just applied to the

11   virtual realm.

12   Q.  Approximately how long has virtual ethnography been used in

13   the field of sociology?

14   A.  Pretty longstanding.  I think one sociologist started to

15   recognize the importance of digital spaces in terms of human

16   behavior, certainly you started seeing this strategy being

17   utilized.  So we're talking decades.

18   Q.  Dr. Simi, we spoke earlier about your life history project.

19   What is life history interviewing as a sociological method?

20   A.  It's basically a strategy technique to gather information

21   about a person's biography, about their life from their

22   perspective.  They come in different forms.  They can be more

23   structured or less structured.

24          More structured, you might see researchers employ

25   things, what are called life history calendars.  You might see

M5OCmelH                        Simi - direct

1    very specific structured questionnaires that are used as part

2    of the life history interview.

3            Less structured types of life history interviews are

4    more focused on the person generating a narrative about their

5    life, in other words, trying to make sense of how they got from

6    point A to point B.

7            And a life history interview can literally start with

8    a person's earliest memories and have them narrate from those

9    earliest memories to the present.  You can do some combination

10   of the more structured and the more unstructured, and we've

11   actually done that.  We've done both the unstructured and the

12   structured as part of our life history interviews so that we

13   can generate the narratives, which we think are important in

14   terms of the level of detail, but also cover specific issues

15   with the more structured type of life history interview

16   questions.

17   Q.  How does life history interviewing as a sociological method

18   assist you to study, say, the white supremacist movement?

19   A.  We found with interviewing former folks involved in the

20   white supremacist movement was that, you could imagine with the

21   participant observation, sometimes it's difficult to ask

22   certain kinds of questions because of concerns about me being

23   some type of undercover law enforcement or something of that

24   nature, and some questions you have to be careful about the

25   person feeling like they're being judged or they're being held

M5OCmelH                      Simi - direct

1      under a microscope.

2              With the interviews with former white supremacists,

3      there has been a real opportunity to go into some very

4      sensitive issues, including some of the things I mentioned

5      earlier as far as childhood and adolescent experiences related

6      to traumas, physical abuse, sexual abuse, things of that

7      nature.  We've been able to kind of detail some of those

8      experiences.  With the life history interviews in a way that

9      was more difficult with the participant observation and

10     fieldwork.

11     Q.  Are now, Dr. Simi, are there standards that apply in the

12     field of ethnography?

13     A.  Yeah, lots of standards.

14     Q.  Who sets those standards?

15     A.  Well, you have agencies like the National Science

16     Foundation.  They'll issue reports about standards.  You have,

17     certainly, textbooks that are published in the field that are a

18     way of helping generate a kind of consensus about valid methods

19     and what's more effective and what's less effective.

20             You actually have a whole field of study that is

21     focused on trying to determine the different aspects of any

22     methodology.  You'll find a literature that basically exists

23     that is assessing the effectiveness of that particular method.

24             So in ethnographic fieldwork, there is a whole

25     literature that examines different aspects of it and what's

M5OCmelH                        Simi - direct

1   most effective.  So by being familiar with that literature,

2   obviously that's a way of kind of assessing what to do and what

3   not to do.

4   Q.  So just taking an example, Dr. Simi, in ethnography, how do

5   you assess whether you have a sufficient sample size of data?

6   A.  I think it's important to keep in mind that with

7   ethnographic fieldwork, sample size is a little different than

8   what you might think of in terms of say large scale survey

9   studies or what's called big data projects where you have very

10  large samples in many cases.  So, oftentimes, you'll see a

11  sample and a survey study and you'll have thousands of

12  respondents.

13          With an ethnographic field study, you're really

14  focused on depth rather than breadth.  So you're going to have

15  much smaller samples.

16          In a life history study, for example, a sample of 50

17  is actually considered pretty robust.  So certainly a sample

18  over 100 would be quite large.

19          So there is no magic numbers.  There is no formula

20  that says you have to have X number for it to be valid.  You

21  have to assess the study kind of on its merits and look at the

22  strategies that were employed, look at the type of data that

23  was collected, the quality of the data.  So it's kind of a --

24  you have to look at each case and see kind of where it lies.

25  Q.  What kinds of methods do you use to analyze ethnographic

M5OCmelH                         Simi - direct

1   data?

2   A.   So data analysis in terms of qualitative methods is, I

3   mentioned earlier, content coding.  When you have data using a

4   qualitative approach, you're going to have one of two types of

5   date, primarily.  I should say one of three types.  You're

6   going to have field notes that you've generated yourself as a

7   field researcher; you're going to have interview transcripts,

8   so in case of the life history interviews, those are typically

9   audio recorded and you generate some type of written transcript

10   of the interview; or you'll have the primary text that we were

11   talking about earlier.

12          In any of those three cases, those are all different

13   types of qualitative data that can be analyzed and you're

14   essentially going to go through those either inductively,

15   deductively, or some combination.

16          Inductively is where you're trying to go into the data

17   blank, which is -- obviously, none of us are blank slates, but

18   you're trying to reduce any preconceived notions or looking for

19   specific things.  You're going in and kind of seeing what

20   emerges from the data.  It's called grounded theory.

21          Deductive is when you have specific things you're

22   looking for.  So, for instance, if you were interested in the

23   issue of violence, you could go through an interview transcript

24   and specifically try and focus on any issues related to

25   violence and you would basically code or identify those

M5OCmelH                    Simi - direct

1   aspects, those statements that are in the interview transcript

2   or in the field notes or in the primary text, you would

3   identify those, distinguish them, document them, and then look

4   for patterns within the interview transcript or within the

5   primary text.  And then, assuming you have multiple interview

6   transcripts or multiple sets of field notes or multiple primary

7   texts, then you can start conducting a between-case analysis.

8         So I just described a within-case analysis.  The next

9   step would be the between-case analysis to see whether any of

10  the patterns or themes that you identified in that first set of

11  data applies to other cases within your larger data set.

12        So it is a pretty involved process, I would say, and

13  pretty tedious, to be quite honest.

14  Q.  Do you use any quantitative methods in ethnography?

15  A.  Yeah, we have.  It's not always used, but certainly when I

16  mentioned the issue of the traumas and the risk factors, that's

17  something we go through and we quantify.  We generate,

18  basically, frequencies, percentages of the number of people who

19  reported experiencing, for example, physical abuse as a child.

20  So that would be a quantification of that experience across all

21  of our cases, and that allows you to say X percent of our

22  respondents or our interview participants reported physical

23  abuse.  So that would be a type of quantification.

24  Q.  Now, Dr. Simi, I want to talk a little bit more about

25  virtual ethnography, the technique that you discussed earlier.

M5OCmelH                    Simi - direct

1           How have you personally used the method of virtual

2    ethnography?

3    A.    It's been a way to supplement the, initially -- initially,

4    it was a way to get a sense of a world that I didn't have any

5    direct experience with.  So when I initially started looking at

6    websites in 1996, I had no direct contact with the white

7    supremacist movement.  I had no prior experience or a frame of

8    reference to guide me as a researcher.  So I needed to look at

9    those websites to get a better sense.  I had obviously seen

10   movies and documentaries, but no kind of direct contact or

11   experience with folks involved in the white supremacist

12   movement.  So the initial websites provided at least something

13   to help give me a frame of reference or a better frame of

14   reference that I had.

15          And then as I, you know, started the fieldwork, then I

16   started using, you know, as I learned the importance of the

17   virtual realm, then basically started using the virtual

18   ethnographic techniques to supplement the ethnographic

19   fieldwork of being able to look at how people communicate with

20   each other online and how does that compare to the kind of

21   communication I was able to observe offline.  How does

22   communication in a web forum -- does it look like communication

23   at a music show or another type of large gathering?  How does

24   it compare to the private conversations that people are having

25   at a house party or at a family setting situation?  So that's

been kind of one of the ways -- it's a point of comparison, really.

           But I think as social media has become so prevalent and important within the larger culture, within larger society, then recognizing the role it plays within the white supremacist movement has also been a major point of focus and really seeing how different kinds of videos are being shared, different types of propaganda, frankly, is being distributed, the role it means and how that kind of emerged as a very salient part of the culture.  So really looking at kind of the virtual realm as a culture not that's disconnected from offline, but just the importance of it, I think, certainly seems to have increased with the advent of social media.

Q.  And what are some of the platforms that you've personally used in order to conduct virtual ethnography as part of your understanding of the white supremacist movement?

A.  This would range from everything from web forums like Stormfront, which is one of the more older kind of white supremacist web forums.  It was probably one of the most influential for a long period of time, but certainly more recent platforms in terms of white supremacists kind of presence on these platforms, this would be Telegram and Discord, Gab.  So these are all platforms.

           I mean, the case of Telegram and Discord, these are not explicitly or exclusively white supremacist platforms, but

M5OCmelH                        Simi - direct

1    certainly they have been platforms where white supremacists

2    have congregated and developed a pretty substantial presence.

3    So these would be a few examples.

4    Q.  Just briefly, what's Telegram?

5    A.  It is an application, a communication application that

6    anyone could download, as we speak, on their phone or on their

7    desktop, and it allows for you to set up what are called

8    channels on the platform and communicate with others through

9    this channel mechanism.  It allows for text messaging, it

10   allows for video sharing.  You can upload different visual

11   images as well as video image.

12   Q.  And what's Discord?

13   A.  It's a similar type of platform.  Also communication,

14   essentially, platform.  It became especially popular, it's used

15   widely across of people of all walks of life that have nothing

16   to do with the white supremacist movement.  We're talking about

17   millions of users here, more broadly.

18        But it did become popular particularly with gamers,

19   and white supremacists began to gravitate towards Discord in

20   part because of the privacy and security it provides, but also

21   in part to be able to try and recruit from the gaming

22   subculture, which has become a point of focus in recent years

23   for the white supremacist movement to see the potential avenues

24   of recruitment as it relates to the gaming subculture, and

25   that, I should say, is not uncommon to try and identify

M5OCmelH                          Simi - direct

1  different subcultures where there might be opportunities for

2  recruitment.

3  Q.  And you mentioned a platform called Gab.  In brief, what's

4  Gab?

5  A.  It was developed -- I'll use their terms.  They describe

6  themselves as a free speech platform alternative to Twitter.

7  But, explicitly, the founder is, by his own description, a

8  Christian Nationalist and became very much kind of a haven for

9  white supremacists on Gab that definitely frequent and

10  congregate on that platform and use it for various purposes.

11  Q.  Dr. Simi, can you approximate for us about how much time

12  have you spent conducting virtual ethnography relating to the

13  white supremacist movement in these kinds of spaces?

14  A.  I mean, over the years, we're talking about thousands of

15  hours, certainly.

16  Q.  Why is virtual ethnography, in your view, an important tool

17  for studying the white supremacist movement in particular?

18  A.  Well, there is such an emphasis within the white

19  supremacist movement on the virtual realm that, to really

20  understand the movement, you kind of have to go where they

21  congregate to understand the cultural dimensions, the way in

22  which they utilize this technology.  Ignoring it would be

23  ignoring a big part of the movement, basically, is what it

24  comes down to.

25  Q.  Approximately how many online chatrooms, channels, or

1   similar virtual spaces for the white supremacist movement have

2   you visited as part of your research?

3   A.  Cross platforms?

4   Q.  Yes.

5   A.  Oh, hundreds, if not, thousands.

6   Q.  And were those spaces, chatrooms, channels devoted to

7   specific white supremacist groups?

8   A.  Not -- in some cases, we're talking about web forums that

9   may be generated by a specific group, but in many cases, no,

10  it's much more kind of diffuse.

11  Q.  And to the extent people are congregating in a virtual

12  space based on a group, based on your observations, do people

13  still interact across those groups online?

14  A.  Yes, they do.

15  Q.  Dr. Simi, in the course of your own education, did you take

16  courses relating to ethnographic methods?

17  A.  Yes, I did.

18  Q.  Please give us an overview of the kind of coursework you

19  did in this area.

20  A.  Well, in graduate school, we were required as part of our

21  coursework training to take a series of research methods

22  courses, and one of those methods courses focused specifically

23  exclusively on ethnographic fieldwork method.

24  Q.  Do you teach ethnography and related methods to your

25  students now?

M5OCmelH                    Simi - direct

1    A.  Yes, I do.

2    Q.  What courses do you teach relating to this method?

3    A.  It's actually called field methods.

4    Q.  What does that course cover?

5    A.  All the things we've been discussing.

6    Q.  Does it include virtual ethnography as a method?

7    A.  Absolutely.  Yeah.

8    Q.  And in your experience, are these ethnographic methods

9    generally accepted in your field?

10   A.  Very much.

11   Q.  Has your ethnographic work been subjected to peer review in

12   the course of publication?

13   A.  It has.

14   Q.  Has your work on virtual or digital ethnography been

15   subjected to peer review?

16   A.  It has.

17   Q.  Can you give us some examples of that.

18   A.  I think I mentioned earlier a 2006 article about cyber

19   culture.  So that would be a good example.  Although,

20   certainly, the data that has been collected online in different

21   virtual spaces has informed a lot of other research that we've

22   conducted.  American Swastika has a chapter about cyber

23   culture.  So it shows up in other places throughout, really,

24   the publications that we've generated.

25   Q.  As part of your chapter, for example, relating to cyber

M5OCmelH                    Simi - direct

1    culture in your book, what did you do to prepare that, what

2    kind of research?

3    A.   Everything that we've been discussing, all the different

4    types of data collection and analysis would have been basically

5    what went into that chapter.

6    Q.   Did that include, for example, reviewing

7    white-supremacy-related websites or social communication

8    platforms?

9    A.   Absolutely.

10   Q.   Based on your research, how, if at all, does a movement's

11   virtual spaces relate to the real world?

12   A.   Well, actually, the main --

13           MR. MARVINNY:  Objection.

14           THE COURT:  Thank you.  I'll accept the answer.  You

15   can proceed.

16           THE WITNESS:  Thank you.

17   A.   The main point of focus in the 2006 article I referenced is

18   really trying to underscore the importance of looking at on and

19   offline as integrated.  There is a tendency I think sometimes

20   for us to think about these as completely distinct, and I think

21   that's a pretty big mistake.  The on and offline worlds that

22   many, many of us inhabit, increasingly, in terms of looking at

23   sheer usage of virtual spaces and how pervasive that's becoming

24   across the globe, really, you really have to look at on and

25   offline as kind of combined in some kind of integrated fashion.

1  They compliment each other oftentimes.  So understanding what's

2  happening online, obviously important, but seeing how offline

3  might be influencing that, and vise versa, seeing how online

4  dynamics are influencing what people are doing offline.  So

5  really seeing that back and forth, I think, is really critical.

6  Q.  Dr. Simi, just again, focusing on your research experience

7  and methodology, with respect to the cyber culture article that

8  you referenced, what methods are used to prepare that article?

9  A.  It would be what we've discussed thus far.

10  Q.  And did you also conduct interviews of white supremacists?

11  A.  Absolutely.

12  Q.  Approximately how many?

13  A.  For that article, I'd have to -- you'd have to refresh my

14  memory.  It was a substantial number.

15  Q.  Sure.  Can I ask you to take a look at your binder and let

16  me direct you to 3501-15 at the bottom of page --

17  A.  I'm sorry.  Could you repeat that.

18  Q.  Sure it's 3501, tab 15, Dr. Simi.

19  A.  Now I'm going to have to test my vision on this.  35, you

20  said?

21  Q.  I'm sorry, Dr. Simi.  The entire book is 3501, and then

22  just look at tab 15.  If I could ask you to turn to the bottom

23  of page 5, top of page 6.  Take a look for yourself.

24          THE COURT:  Counsel, just a brief note.  I'm going to

25  look for a time for us to take a lunch break.  If you find a

M5OCmelH                    Simi - direct

 1    natural place for us to take a break, please let me know.

 2              MS. RAVENER:  I'll let you know, your Honor.  I think

 3    we can get there shortly.

 4              THE COURT:  Thank you.

 5    A.  I'm tracking with you now.

 6    Q.  Dr. Simi, dos that refresh your memory about approximately

 7    how many interviews you conducted as part of that article's

 8    research?

 9    A.  Yes, it does.

10    Q.  Approximately how many?

11    A.  107 face-to-face interviews with 63 activists or white

12    power or white supremacist activists.

13    Q.  As part of that research, did you also examine websites and

14    internet forum groups?

15    A.  Yes, we did.

16    Q.  Approximately how many?

17    A.  Where am I?

18    Q.  Bottom of page 5, top of page 6, Dr. Simi.

19    A.  I must be missing it.  Apologies.

20    Q.  The first full paragraph on page 7.  Does that refresh your

21    memory?  Take a minute to look for yourself.

22    A.  I see here 48 websites and four internet forum groups.

23    Q.  And is that the kind of virtual ethnographic methodology

24    that we were discussing earlier?

25    A.  Exactly.

M5OCmelH                    Simi - direct

1    Q.  Dr. Simi, have you, yourself, participated in peer

2    reviewing other academics' work that involved the method of

3    virtual ethnography?

4    A.  Yes, I have.

5    Q.  Can you give some examples of journals you review for that

6    publish on that method or area?

7    A.  Let's see.  Deviant Behavior would be one example.

8    Terrorism or -- Terrorism and Political Violence, Journal of

9    Terrorism and Political Violence would be another example.

10   Social Problems, Sociological Quarterly.  So those would be a

11   few examples.

12   Q.  Dr. Simi, as part of your own work teaching education

13   research and participation in peer review and other academic

14   processes, what is your understanding of whether virtual

15   ethnography is a generally acceptable technique in your field?

16   A.  I would say it's generally accepted, absolutely.

17   Q.  Dr. Simi, in your experience, have you also studied acts of

18   alleged racially motivated violence by white supremacist

19   actors?

20   A.  Yes, I have.

21   Q.  Approximately how many?

22   A.  Hundreds.  Certainly hundreds.

23   Q.  Can you provide some examples of those acts of violence

24   that you've personally studied.

25   A.  Sure.

M5OCmelH                         Simi - direct

1          MR. MARVINNY:  Objection.

2          THE COURT:  Thank you.  You can proceed.

3     A.  We studied the Oklahoma City bombing, for example.  I think

4     I was mentioning to you earlier about the 1980s underground

5     terror cell.  Silent Brotherhood, that would be another

6     example.  In our life history interviews, they were often

7     detailing for those that were directly involved in violence.

8     Certainly, we ask a lot of questions about participation in

9     violence and, in many cases, they describe, quite in detail,

10    different types of hate crimes that they may have been involved

11    in or committed.  So those would be a broad range of things,

12    including even things like planning terror attacks, attempted

13    bombings in some cases.

14          One of the people I conducted fieldwork with in

15    Southern California -- this would have been ten years prior,

16    but he ultimately he committed a terror attack in Oak Creek,

17    Wisconsin, a shooting rampage.  He killed six people in a

18    temple.

19          So, yeah, we've collected and studied data as it

20    relates to a broad range of violence.

21    Q.  Dr. Simi, what kinds of methods have you used to study

22    those individuals and events?

23    A.  Well, in the case of the person I just mentioned, that

24    would have been participant observation and interviewing.  In

25    the case of the life history interviews, it would be just the

M5OCmelH                          Simi - direct

1    interviews.  In the case of the federal grant that I had

2    mentioned earlier, that was the open source document analysis.

3            So we looked at those incidents of violence through a

4    variety of secondary sources, like the court documents I

5    mentioned, and various other sources that had relevant

6    information in them.  So it's, I would say -- I would describe

7    it as a multisource approach that is trying to rely on

8    different types of data to come to some understanding about the

9    role of violence.

10   Q.  Dr. Simi, has your work on this topic of acts of racially

11   motivated violence been subjected to peer review?

12   A.  It has.

13   Q.  Can you give us an example from your recent work?

14   A.  Sure.  I think probably, just most recently, the article I

15   described earlier about the micro situational characteristics,

16   that was published in 2020, it focused specifically on this

17   issue.  Certainly other articles.  And our book, American

18   Swastika, it focuses to a large extent on the role of violence.

19           MS. RAVENER:  Your Honor, we could propose to break

20   now if the Court desires or we can continue until --

21           THE COURT:  Thank you.  I think this is a good time.

22   I appreciate you keeping your eye on the clock.

23           It's about noon, just after noon by my clock.  I

24   propose we take a half hour for lunch just to make sure

25   everybody is fortified for the remainder of today's proceeding.

M5OCmelH                        Simi – direct

1        So, counsel, please be back here and ready to proceed

2    at 12:30.

3        Dr. Simi, you should feel free to take the witness

4    stand as soon as you return.

5        Anything else we should take up before we take up our

6    short recess?  First, counsel for the United States.

7        MS. RAVENER:  Nothing for the government.

8        THE COURT:  Thank you.  Counsel for defendant?

9        MR. MARVINNY:  No, thank you.

10       THE COURT:  Very good.  I'll see you here shortly.

11       (Luncheon recess)

12       (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

                            AFTERNOON SESSION

1                            12:34 p.m.

2

3              (In open court)

4              THE COURT:  Counsel, welcome back.

5              Counsel, you can proceed.

6              MS. RAVENER:  Thank you, your Honor.

7   BY MS. RAVENER:

8   Q.  Dr. Simi, before the break, we were talking about the white

9   supremacist movement, how it encompasses different groups.  Do

10  you recall that testimony?

11  A.  Yes, I do.

12  Q.  And what are some of the strains or variants of the white

13  supremacist movement?

14  A.  Yeah.  You have different factions of Ku Klux Klan.  You

15  have neo-Nazi, National Socialist, Christian Identity,

16  neo-paganism, you've got skinheads, and then, like I said

17  earlier, couple times, there's a fairly large degree of kind of

18  a generic white supremacist that's a component of this as well.

19  It's hard to necessarily characterize it in any of these

20  specific strains.

21  Q.  And are those strains exclusive or are those just some

22  examples of some of the significant variants of the movement?

23  A.  I would say the latter.

24  Q.  Let's just talk about them briefly.

25              What's the Ku Klux Klan?

M5O1MEL2                        Simi - Direct

A.  It was the organization founded during the Reconstruction

Era, after the U.S. Civil War, and it was one of many different

kind of paramilitary organizations founded in the former

Confederacy to essentially fight against the Reconstruction Era

policies and try and reinstitute a white supremacist system,

basically.  The Klan, you know, has ebbed and flowed over time,

and the '20s was probably its period of kind of the most

substantial national single organizational structure with, you

know, nearly 5 million members nationwide at that time.  But

it's ebbed and flowed and fragmented, and certainly there's

lots of different kinds of Klans.

        Neo-Nazis emerged in the post-World War Two era in the

U.S., preceded by protofascists that were kind of their

predecessors.  The neo-Nazi movement has grown in prominence in

the post-World War Two era in the United States.

        Racist skinheads were a subculture that emerged

initially in the UK in the '60s, kind of made their way to the

US as a subculture more broadly by the late '70s in the US, and

you started to see a racist faction emerge, especially in the

'80s and '90s, that became very visible because of their style

and their involvement in various forms of violence.

        Christian Identity is one of the main kind of

religious aspects of the white supremacist movement, based on

British Israelism.  In a nutshell, it suggests that whites are

the true children of god, that what they call nonwhites are

1    "mud people," and not fully human, and that Jewish people are

2    the literal descendants of Satan.

3           On the other hand, not all white supremacists are

4    followers of Christian Identity.  You have folks that are into

5    various forms of neo-paganism.  Nordic mythology, for example,

6    is quite popular, quite prominent, but various -- various

7    aspects of neo-paganism play an important role in the white

8    supremacist movement.

9           So, yeah, those are kind of, in a nutshell, some of

10   the strains.

11   Q.  And we may talk about some of those strains further later.

12          Is the movement confined to the United States?

13   A.  No, it's not.

14   Q.  Where does it exist?

15   A.  It's a global movement.

16   Q.  And what, if anything, unites these diverse groups'

17   variants?

18   A.  I think the main thing that unites them, provides a glue of

19   sorts, are key beliefs and emotions, and those cut across --

20   even though, you know, what I've just described are quite, you

21   know, substantial differences in many respects, but that there

22   are some key beliefs that provide a foundation of sorts.

23   Q.  What are those key beliefs?

24   A.  Most prominent are different aspects of what we might call

25   racist ideology, and I'm using the word "racist" in a pretty

M5O1MEL2                          Simi - Direct

1    general sense.  That would include antiblack racism, it would

2    include antisemitism, it would include various kinds of

3    xenophobia or anti-immigrant sentiments; it would include

4    misogyny, homophobia; all these would be key elements in

5    varying degrees that kind of make up the ideology that's at the

6    core of the white supremacist movement.

7    Q.  Does the white supremacist movement share a common goal?

8    A.  Generally speaking, yes.

9    Q.  What is it?

10   A.  The development of some kind of white ethnostate or some

11   type of essentially restructuring of society that is consistent

12   with some of these core beliefs.

13   Q.  In the course of your research, Dr. Simi, how do you assess

14   whether a group is properly classified as part of this white

15   supremacist movement?

16   A.  Yeah.  So we are dealing with something that has somewhat

17   porous boundaries to some extent, so we're not talking about

18   where you have a card-carrying membership that clearly

19   demarcates who's in and who's out of the white supremacist

20   movement.  You have to look more deeply in terms of some of

21   these key beliefs and look for consistency.  And so you can

22   take any, you know, example and use it, essentially set it next

23   to the white supremacist movement and look at some of these key

24   characteristics, some of these core beliefs that I just

25   described, and you can look for degrees of overlap and you can

1    look for shared terminology, for example, you can look for kind

2    of the extent to which some of these beliefs are shared

3    across -- that would suggest some consistency.

4    Q.  And so for example, do members of the white supremacist

5    movement use any distinct terminology?

6    A.  Yeah, a variety of different terms.

7    Q.  And is some of that terminology used across different

8    variants or groups?

9    A.  Yes.

10   Q.  And Dr. Simi, have you become familiar with some of that

11   terminology as part of your work?

12   A.  Yes, I have.

13   Q.  In the course of your writing and testimony about the white

14   supremacist movement, have you previously identified any core

15   characteristics that signal membership in this movement?

16   A.  Yes, we have.

17   Q.  And what are those?

18   A.  Well, the role of violence is important in terms of kind of

19   signaling and referencing the importance and kind of

20   glorification of violence, and that's done in a host of

21   different ways.  There are key kind of symbols or terms

22   referencing some of the beliefs, the way in which references

23   to -- for example, Hitler is a key kind of indicator;

24   references to key symbols, in some cases numerical symbols, may

25   be important; various kind of ancient symbols—in some cases,

1    certain runes are key indicators.  So there's -- yeah, there's

2    quite a range of different aspects to the indicators that would

3    suggest some type of consistency with the white supremacist

4    movement.

5    Q.  And how have you identified the core characteristics of the

6    white supremacist movement in the course of your research?

7    A.  Well, that would be through the methodology that we've been

8    discussing this morning—the participant observation, the

9    interviews, and then the looking at the primary texts that are

10   produced by different individuals and groups, but also looking

11   at various secondary sources.

12   Q.  Does that include literature by other academic researchers?

13   A.  Yeah, absolutely.  The literature review is always a staple

14   to the research method.  You're always going to be steeping

15   yourself in previous studies of the same topic.

16   Q.  And so you described I believe racist ideology, the use and

17   glorification of violence as two core characteristics.  Are

18   there any other core characteristics that you've observed?

19   A.  Yeah.  Front- and backstage behavior, which is a general

20   sociological concept, and the plausible deniability, which is

21   also a general concept that extends beyond the white

22   supremacist movement.

23   Q.  I want to ask you what you mean by each of those things,

24   but before we do, I just want to be clear—are those core

25   characteristics used solely by you or also by others in your

1    field?

2    A.  Others in the field.

3    Q.  And has that analysis or the use of these core

4    characteristics been subjected to peer review within the field

5    of sociology?

6    A.  Yes, it has.

7    Q.  Can you give us some examples.

8    A.  Excuse me.  Yes.  Mitch Berbrier, for example, who's a

9    retired sociologist from the University of Alabama Birmingham,

10   has written pretty extensively about the white supremacist use

11   of front- and backstage behavior.  His research has appeared in

12   sociological peer-reviewed journals like *Social Problems* and

13   various other similar types of journals.  You have Betty

14   Dobratz and Stephanie Shanks-Meile who have published on this

15   issue of front- and backstage behavior.  You know, frankly, the

16   use and glorification of violence is a very prominently

17   referenced characteristic throughout the study of the white

18   supremacist movement, so that's very broad.  So yeah.  And of

19   course, in our own work we've also discussed these issues, and

20   that's been peer reviewed as well.

21   Q.  And Dr. Simi, how about the -- I think you mentioned the

22   concept of plausible deniability.  Has anyone written on topics

23   relevant to that in peer-reviewed spaces?

24   A.  Yeah.  Cynthia Miller-Idriss.

25   Q.  And who is she?

1    A.   She's a sociologist at American University.

2    Q.   And so Dr. Simi, just to be clear, are those examples of

3    others in your field or the entirety of the literature that's

4    relevant to these things?

5    A.   Just examples, yeah.  There's certainly a much longer list.

6    Q.   So let's talk about these concepts.  I believe you started

7    off with discussing racist ideologies and then we also

8    discussed briefly the use and glorification of violence.  How

9    is that a core characteristic of the white supremacist

10   movement?

11   A.   I'm sorry.  Are you referring to racist ideologies or the

12   violence issue?

13   Q.   Well, why don't we go ahead and go back over all of them.

14   Let's start with racist ideologies.

15   A.   Okay.

16   Q.   How is that a core characteristic?

17   A.   Well, I mean, at the end of the day, first and foremost,

18   the movement is about a set of ideas.  That's what galvanizes

19   people; that's what ties people together.  Of course that's

20   true of any culture.  Ideas play a central role in terms of

21   forming and developing, and the persistence of any culture is

22   going to be based on some key kind of core ideas, and that's

23   certainly not any less true with the white supremacist

24   movement, and in that respect, it's the racist ideologies that

25   create these points of agreement, this uniformity.  Even though

there are some of the differences that we discussed earlier,

when you have the agreement on certain key ideas, that's what

allows for the sense of what we call collective identity or

sense of "we" to form is around some of these core ideas.

Q.  And what do you mean by the use and glorification of

violence in the movement?

A.  As I mentioned earlier, not all social movements rely on

violence as a tactic or strategy.  Some social movements are

deeply committed to nonviolence, for example.  The white

supremacist movement, since its beginning, has been quite the

opposite.  It's always relied on violence as a key aspect of

its strategy to catalyze or generate change of some kind.  Of

course that goes back in the US to the founding of the Ku Klux

Klan, which was involved in all sorts of violence across the

former Confederacy, and it's persisted throughout the 20th

Century and into the 21st Century, where violence is viewed as

two things—one, necessary to achieve certain goals; but also

because of some of the key beliefs about the idea of the white

race being on the verge of extinction, this so-called

replacement theory that we've heard a lot about just in the

last week because of what happened in Buffalo, but also just

the notion of white genocide, that whole kind of framework or

frame of reference.  What that does is it generates the sense

that violence is a form of self-defense.  So any kind of

violence is really your striking out to help defend your

people, so to speak.  So violence is viewed as necessary and

it's viewed as a form of self-defense, and it's pervasive

throughout the history of the movement.

Q.  And you referred in passing to replacement theory.  In

brief, what do you mean by that?

A.  It's the idea that the white race is being replaced by

so-called nonwhites through low birth rates, through

immigration regulations.  Those are the two principal things

that are often pointed to by white supremacists as generating

this replacement of whites.

Q.  And Dr. Simi, I think the characteristic you referred to is

front-stage/backstage behavior strategy.  What is that?

A.  Yeah.  Again, this is a general sociological concept

pioneered in the work of Erving Goffman, who was one of the

more important sociologists of the 20th Century in terms of

studying human behavior more broadly.  So his work wasn't

focused on the issue of the white supremacist movement; it was

focused more broadly on human interaction and how people

develop a sense of self and how that influences their behavior,

in a general sense.  And he developed the concepts front- and

backstage to suggest that there are certain settings, certain

situations that are structured in a certain kind of way, that a

person will put on their kind of -- put their best foot

forward, right?

So if you think about -- front-stage behavior would be

1   consistent with an employment interview, where you're trying to

2   ascertain a job and you're trying to present yourself in a very

3   favorable way.  In that front-stage setting, you're going to

4   act a certain way; you're going to present yourself a certain

5   way.  You're going to be very cognizant of trying to manage the

6   person who's interviewing you, their impressions.

7               Backstage is a different type of situation, structured

8   in a different way.  It allows a person to kind of so-called

9   let their hair down, act in ways -- interact in ways that are

10  more reflective of how they truly feel, maybe.  Backstage is

11  going to be typically a more kind of private-type setting that

12  allows for that kind of presentation of self that's quite

13  different than the front-stage.

14  Q.  And so what are some examples of like a backstage type of

15  setting?

16  A.  If you think about -- a person's home can be a backstage;

17  any kind of setting that affords some degree of privacy could

18  be a backstage.  So that, you know, home is a kind of an easy

19  example of -- private property that's kind of secluded would be

20  an example where you could have backstage behavior.

21  Q.  How does that idea apply, if at all, to the internet?

22  A.  Yeah.  Definitely there are certain aspects of the internet

23  that can be either front- and/or backstage.  And keep in mind,

24  a situation can -- because the dynamics may change and the

25  structural characteristics of that same situation might change,

M5O1MEL2                          Simi - Direct

1    a front-stage can become a backstage and vice versa, a

2    backstage could become a front-stage, and certainly in

3    cyberspace you see that back and forth quite a bit.

4    Q.  So from your ethnographic work, how have you observed

5    examples of front-stage/backstage strategy used by the white

6    supremacist movement?

7    A.  Sure.  When, for instance, I've had -- through my

8    participant observation, I've had folks describe that when

9    they're initially trying to engage with, say, a new neighbor

10   who's moved into the neighborhood where they live, they have a

11   desire to want to present themselves in a certain kind of way,

12   to use what you might call a "soft sell" approach in terms of

13   trying to feel that person out.  They're going to be engaging

14   in front-stage behavior in terms of how they present

15   themselves, not being too extreme or over the top in how they

16   communicate their beliefs as they get to know this person

17   initially, even though on the backstage, they're thinking

18   about, okay, where are my opportunities to eventually start to

19   try and pull this person in and reveal more about my beliefs.

20   So that was something interesting that I learned in my

21   fieldwork is the way in which people try and feel out these

22   situations and go back and forth between front- and backstage

23   in order to try and potentially recruit somebody into the fold.

24   Q.  And why is it that this front-stage/backstage strategy is a

25   core characteristic of the white supremacist movement?

A.  Because the nature of the white supremacist movement, based on the issues that we discussed already as far as the core beliefs and the violence, is such that it is extremely important for it to be able to maintain itself.  For it to be able to persist, for it to grow in strength, it has to effectively navigate the front- and backstage.  It becomes critical for it as a movement to find ways to present itself in certain fashion that may seem less extreme, less violent on the front-stage, but because that is the core of what the movement stands for and represents, it also has to find backstages where it can express its true self, and where individuals can really discuss what they really desire, which is, frankly, a race war, the development of a white ethnostate.  All of these key aspects that are part of their goals and beliefs need expression.  You can't just keep that to yourself because you run the risk of -- for one, it's not -- when people hold strong beliefs, expression and communication is really important to that, and not being able to communicate and express these kind of key beliefs is psychologically very difficult for individuals.  And so having those backstages to really kind of talk how they want to talk and express their beliefs in the way that they'd like to is very important.

Q.  You mentioned the concept of a race war.  What is that and how does it factor into this?

A.  A race war is the general idea that society is

1   contaminated, it's polluted such that it requires a massive

2   cleansing of sorts, and that massive cleansing is envisioned by

3   white supremacists as involving a major conflict between the

4   white race and what it views as its racial enemies, and that is

5   often then described in short as race war.

6   Q.  And are there other terms within the movement for that as

7   well?

8   A.  Sure.  I mean, sometimes people will talk about an

9   apocalypse of sorts.  You know, in more recent years you've

10  started to see the popularization of the term "Boogaloo," you

11  know, people will sometimes talk about a civil war, so you'll

12  see various phrases and terms that are used to essentially

13  describe the same thing.

14  Q.  And what is your understanding of whether the notion of

15  front-stage/backstage strategies is a generally accepted

16  concept in the field of sociology?

17  A.  It's -- I would consider it to be definitely one of the

18  central kind of key concepts, again, as a general kind of way

19  to understand human behavior, not -- certainly not specific

20  exclusively to the white supremacist movement.

21  Q.  And though as I believe you previously testified—correct me

22  if this is wrong—there are a number of other scholars who have

23  applied that concept to white supremacists; is that right?

24  A.  That's correct.

25  Q.  And you gave us some of those names.

M5O1MEL2                         Simi - Direct

1    A.  I did.

2    Q.  Dr. Simi, you also referred to a fourth characteristic,

3    this concept of plausible deniability.

4    A.  Mm-hmm.

5    Q.  What is that?

6    A.  Yeah.  Plausible deniability is a type of communication

7    strategy that is meant to provide a form of built-in defense—in

8    other words, especially useful when trying to conceal criminal

9    and/or violent behavior.  If you communicate -- structure

10   communication in certain ways, you can try to build in a

11   defense so after the fact you have this kind of denial

12   mechanism that you can use to try and shield yourself and

13   others from potential culpability.

14   Q.  And from your ethnographic work, how have you observed

15   examples of plausible deniability as a strategy in

16   communication?

17   A.  Yeah.  One of the things we see is with the use of humor,

18   for example.  There will be expressions advocating for violence

19   that may be built in to different types of humor and the way

20   it's manifested within these cultures, and because it is framed

21   as a joke, that then allows for those expressing or

22   communicating those messages to then, after the fact, say,

23   well, it was just a joke, though, it wasn't meant to be taken

24   seriously.  So that would be an example.

25   Q.  And in your opinion, based on your research, do white

M5O1MEL2                        Simi - Direct

1    supremacists employ certain tactics when conversing among

2    themselves?

3    A.   Sure.  Yeah.

4    Q.   Okay.  What methods have you used to identify those

5    tactics?

6    A.   Yeah.  So this is where the qualitative data analysis comes

7    in, where you're subjecting the different types of data that

8    you're collecting, whether it's through the participant

9    observation in terms of your field notes, whether it's through

10   the interviews and the transcripts that get generated, or

11   whether it's the data you're collecting in virtual spaces or in

12   other -- other sources, you're looking for indications that

13   there may be the presence of these kinds of cultural dynamics

14   or cultural practices that are being used.  Now sometimes you

15   have to draw inferences based on the type of evidence, but

16   other times you actually are able to draw from the participants

17   themselves who will speak to the issue.  So we've been able to

18   ask direct questions of participants active in white

19   supremacist groups about some of these communication

20   strategies, and in some cases they've actually been pretty

21   transparent and spoken fairly openly about, for instance, the

22   use of humor and how it's kind of set up in this kind of way to

23   create plausible deniability.

24   Q.   And so to be clear, from your ethnographic work, have you

25   observed actual examples of this use of humor as plausible

1    deniability, for example?

2    A.   Sure.  Certainly, you know, very early in the fieldwork,

3    began to observe the importance of humor within the white

4    supremacist culture, and the way in which humor is closely

5    linked to the glorification certainly of violence, right, so a

6    lot of very violence-laden jokes, quote-unquote, are definitely

7    a prominent part of the culture that I began observing very,

8    very early on in the fieldwork and making note of that.  And

9    certainly that's been something that's been observed and

10   discussed within the broader literature in terms of the study

11   of the white supremacist movement is the prominence of this

12   feature as it relates to humor.

13   Q.   Can you give us an example of where that's been written

14   about, either in a peer-reviewed article or book within the

15   sociological literature.

16   A.   Sure.  There's a retired sociologist in the UK, Michael

17   Billig, who has written pretty extensively, actually, a number

18   of important pieces on this issue, where he looks at a variety

19   of different sources of data online in terms of white

20   supremacist humor and how it's structured to provide this kind

21   of plausible deniability in part, among other things.  For

22   example, he analyzed what was essentially a memorial web page

23   to the lynchings of African Americans, not in terms of the

24   victims but the perpetrators.  It was celebrating the

25   perpetration of those acts of violence, but it was done in a

way to where you get these layers where it suggests at times in

the website text that this is actually not meant to be taken

seriously, it's more as a joke, but then there are other kind

of inconsistencies in the way the text is written that says to

the insiders that you know this is actually not meant to be

taken as a joke.  And that's kind of what's at play on a

regular basis is, it's a form of what we also call

double-speak.  So you can send one message to insiders while

you're sending another message to outsiders, and outsiders

aren't going to necessarily have all the frames of reference

that an insider has, so you can communicate in this kind of way

that is, you know, in many respects quite deceptive in the

sense of glorifying violence to other insiders but then

establishing that plausible deniability to outsiders, where you

can say, hey, wait a second, this was never meant to be taken

serious.

Q.  And is this something that's unique to online spaces like a

website?

A.  No, it's not.

Q.  Where else have you seen it?

A.  I've been able to observe it directly in the course of

observing larger gatherings, smaller gatherings, you know,

settings involving people's private residences, so, you know, a

broad range of offline spaces where I've directly observed

this.

M5O1MEL2                    Simi - Direct

1    Q.  Have you discussed this strategy of humor with white

2    supremacist movement members in your research?

3    A.  Yes, I have.

4    Q.  Can you give us an approximation of about how many times

5    you think you've discussed that in your interviews with active

6    or former white supremacists.

7    A.  Yeah.  Well, the interviews with formers, it's a regular

8    kind of point of focus because there's greater I think --

9    likelihood would be the best way to put it -- greater

10   likelihood that you'll get some transparency in terms of

11   response.  With current members it was, you know, more

12   difficult, and of course I had to be a little bit more careful

13   about those kinds of questions and who I could pose those to.

14   There were some current members, though, that I had spent

15   enough time with, there was enough rapport built where I was

16   able to ask those questions as well.  So, you know, it's --

17   between the two, certainly, you know, we're talking more than a

18   dozen.

19   Q.  And what did you learn from those interviews about this

20   particular communication strategy?

21   A.  Well, I think that, you know, from the interviews, we get a

22   lot of confirmation that (a) humor is important within the

23   culture; that (b) it is prominently organized around the use

24   and glorification of violence; and (c) that it does have this

25   kind of built-in strategic aspect to it that provides the

M5O1MEL2                          Simi - Direct

1   opportunity to say, yeah, but it's only a joke.

2   Q.   And what's the purpose of having an opportunity to say,

3   it's just a joke?

4   A.   So, well, one, that's the, you know -- can reduce

5   culpability potentially, but two really is the humor in general

6   for culture in general is very important.  We use, as humans,

7   humor as a way to express ourselves and communicate with each

8   other.  So in that respect, the white supremacist use of humor

9   is not really surprising.  But because their humor is so

10  closely associated with violence and because their key beliefs

11  are so focused not just on violence but on dehumanization, the

12  way in which those that they perceive as enemies are

13  consistently dehumanized as subhuman, for example, that is very

14  prominent in their beliefs and how those beliefs manifest.  The

15  humor helps aid that dehumanization process.  It helps

16  normalize some of these ideas in terms of dehumanization.  It

17  desensitizes people in terms of it.  And of course what we know

18  in terms of the study of violence more broadly is that violence

19  can be a key component in facilitating the actual commission of

20  violence because of some of the things I just mentioned in

21  terms of dehumanization, normalization, and desensitization.

22  Q.   Dr. Simi, what groups in the white supremacist movement use

23  this strategy of humor, in your view?

24  A.   I don't think it's specific to any one group.  It seems

25  pervasive across the culture.  That's what we've both observed,

1   that's what other scholars in the field have noted, that this

2   isn't unique to a specific group.

3   Q.   What are some of the other ways you've observed this

4   strategy develop in the white supremacist movement?

5   A.   Well, I don't think we've really discussed so much the

6   virtual spaces where the use of humor is quite prominent, and

7   of course in virtual spaces, communication is a little bit

8   different than offline in some respects in terms of being able

9   to share things like memes or videos that may express some of

10  these issues; text messages of various sorts that may be

11  articulated and expressing the use of humor but laced with

12  violence, you see a lot of this in various virtual spaces.

13  Q.   And within the white supremacist movement, have you

14  observed any areas where there is guidance given on this

15  strategy of humor?

16  A.   Yeah.  There is what's called the *Daily Stormer* style

17  guide.  This was developed by Andrew Anglin and his associates.

18  The *Daily Stormer*, for a period of time, was one of the most

19  popular neo-Nazi websites really in the world that received a

20  substantial amount of traffic, and at some point Andrew Anglin

21  and his colleagues that ran the *Daily Stormer* developed what

22  they called the style guide.  They literally called it a style

23  guide.  I should say the *Daily Stormer*, what it was principally

24  was a website that functioned as a news outlet—that is, they

25  would take news stories from, say, *Reuters* or *AP* and re --

1    rewrite them from a white supremacist perspective, basically.

2    So as part of those efforts to essentially shape the narrative

3    and market their ideas—which was essentially what the *Daily*

4    *Stormer* was, was a marketing vehicle for white supremacist

5    ideas—as part of that, they developed this style guide, and

6    they very explicitly laid out instructions for those that would

7    be writing articles as part of the *Daily Stormer* and for the

8    broader community and culture, guidelines to adhere to in terms

9    of how to present one's self in the front-stage, in many

10   respects, and specifically, there are a couple excerpts from

11   the *Daily Stormer* style guide that address humor very

12   specifically and the importance of humor, and in fact, as I

13   recall—I'll paraphrase here, but in one portion of the style

14   guide, they say something to the effect of the fact that "I

15   want to gas Jews"—and of course they don't use that term; they

16   phrase it a little differently—"the fact that I want to gas

17   Jews is neither here nor there; what I want is for it to be

18   perceived by outsiders as a joke.  I do want to gas Jews."  He

19   then follows -- that statement is then followed with a very

20   explicit declaration that "We do want to gas Jews," but, again,

21   this takes priority in terms of that presentation in order to

22   appeal to a potential novice or somebody who is not, you know,

23   an adherent at that point in time.

24   Q.  And just focusing on the example of the *Daily Stormer* style

25   guide, what's the point of giving that direction or keeping it

1    ambiguous as to whether it's a joke?

2    A.   The point is to sow confusion, right?  A big part of the

3    white supremacist movement strategies, broadly speaking, is

4    sowing confusion, creating instability in terms of people's

5    perceptions.  That allows them opportunities to try and shape

6    the narrative they believe, it allows them to try and more

7    effectively recruit if they create an appearance that's not

8    quite accurate, that's advantageous from their perspective.  So

9    again, it fits into a lot of what we've already discussed as

10   far as front-stage and backstage; it also connects to the

11   plausible deniability issue that we've already discussed.  So

12   it has a lot of different functions, I would say.

13   Q.   You testified earlier that this strategy also relates to

14   avoiding culpability, I believe.  What do you mean by that?

15   A.   Well, again, given that we are talking about the use and

16   glorification or glamorization of violence, we are talking

17   about a movement that advocates the use of violence and commits

18   acts of violence, and that this is pervasive, and so there's

19   certainly an interest among folks associated with that culture,

20   with that movement, in not being necessarily held responsible

21   for violence that's committed, being able to frame it as a form

22   of self-defense, for example.

23   Q.   Where else have you seen this kind of instruction, whether

24   formal or informal?

25   A.   I'm sorry.  Can you rephrase the question.

M5O1MEL2                           Simi - Direct

1    Q.  Which other areas have you observed this kind of
2    instruction about the strategy of humor, whether in a formal
3    setting or informal gathering setting, or conversation?
4    A.  Oh, sure.  I mean, again, it was something I observed right
5    away in terms of the fieldwork, where people are on a regular
6    basis in informal gatherings, whether it be a house party or
7    some kind of, you know, barbecue type deal, the use of the
8    humor is just very prominent.  You hear it repeatedly.  And
9    again, it's very filled with dehumanizing language, language
10   that degrades those they perceive as enemies, and again, often
11   connected to the use of violence.
12   Q.  And why is dehumanization important?
13   A.  It's -- this is what underscores the infrastructure of
14   their beliefs.  The idea of white superiority requires them to
15   also dehumanize those that they perceive as not being white as
16   less than, inferior, and the easiest way to justify and
17   rationalize the idea that whites are superior is by
18   characterizing, representing others as not fully human in some
19   kind of -- as animal-like.  And it also allows for very adverse
20   treatment to occur to those who are being dehumanized.  So
21   there is a reason that the propaganda during Nazi Germany was
22   structured and organized the way it was in terms of how it
23   characterized Jewish people, for example, as rodents of sorts.
24   There's a reason why, in contemporary white supremacist
25   propaganda, it's not uncommon to see immigrants, for example,

M5O1MEL2                        Simi - Direct

1    portrayed as cockroaches.  So this is the kind of underpinning
2    that they believe in, A, and it's important in their mind to
3    help kind of solidify the way that they think about the world
4    and the necessity of using violence to deal with the world as
5    they believe it's structured.
6    Q.  And so do you see this plausible deniability strategy of
7    humor used also in free spaces within the white supremacist
8    movement?
9    A.  Yes.
10   Q.  Why would insiders use a communication strategy like that
11   when speaking among themselves in a free space?
12   A.  Well, part of it is that once you start develop -- once
13   practices within a culture start getting developed, it's not
14   uncommon to see those become pervasive across the culture, but
15   also, you have to think about culture in many respects is a
16   type of school, in a way, if you want to refer to it in that
17   sense, in that people who are more experienced or veterans
18   within the culture are often modeling for more novice folks who
19   are less experienced in the culture, how things work.  How the
20   world works out there but also how the world works internally
21   in terms of how the movement's organized, the key beliefs, the
22   key operating principles, these things are getting transmitted
23   within these kind of more free spaces that are more private,
24   and as a way to kind of role model and show others this is kind
25   of how you do things, so to speak.

1  Q.   Is the issue of avoiding culpability still present in free

2  spaces?

3  A.   Well, sure.  Because you have to keep in mind, if an act of

4  violence gets planned in a free space and then ultimately

5  executed outside of the free space, that built-in plausible

6  deniability is going to be important, and establishing that

7  early is going to be more effective, obviously, than doing it

8  after the fact or later in the process.

9  Q.   Dr. Simi, how is it that you assess this to be an

10 intentional strategy versus truly just a joke?

11 A.   Well, I'll just be completely honest in terms of saying, I

12 don't claim -- I don't think any of the scholars who study the

13 issue of humor within the white supremacist movement would

14 claim that they're mind readers and could say, you know,

15 explicitly what is and what isn't a joke.  What we're talking

16 about is the use of humor within the culture, its significance,

17 some of the general practices and characteristics related to

18 the use of humor within the culture, and what I can also say is

19 that to the extent that these things we're talking about are,

20 quote-unquote, just jokes, that's not insignificant.  The fact

21 that someone derives pleasure from the degradation and

22 dehumanization of others is not insignificant.  That's an

23 important cultural feature, and it will have implications

24 beyond just those -- the utterance or the expression of that,

25 quote-unquote, just a joke.

1    Q.  And Dr. Simi, you mentioned another concept, the concept of

2    double-speak.  What is double-speak?

3    A.  Yeah.  That is a type of communication where you're able to

4    say a word or a phrase, a statement, that has multiple

5    meanings, depending on the audience.  And again, just to

6    reiterate, this goes back to insider/outsider dynamics.  So the

7    same statement may mean one thing to insiders, who have a

8    different frame of reference, than outsiders, who may take a

9    different meaning from it because they don't have the same

10   frame of reference as the insiders.  So same word, same

11   statement, but different meanings, depending on the audience.

12   Q.  And from your ethnographic work, how have you observed

13   examples of double-speak?

14   A.  Yeah.  You see a lot of this both on- and offline.  For

15   instance, often you see the phrase "Love your race."  Now to an

16   outsider, and it might be coupled with, say, a photo or some

17   kind of depiction, visual image of a child oftentimes, "Love

18   your race," and there's a white child, and you say, well, from

19   an outside perspective, that seems pretty innocuous.  They're

20   just talking about love, and there's a little kid, so how could

21   that be dangerous, violent, or threatening?  But to insiders,

22   that means a lot more than just "Love your race," and there's a

23   little child, because insiders understand that loving your race

24   means defending your race.  It means that self-defense is

25   required to love your race, which means violence is required to

M5O1MEL2                        Simi - Direct

1   love your race.  So that little seemingly

2   innocuous-to-outsiders message has a whole different message to

3   insiders who understand the context of that statement, or

4   phrase.

5   Q.  Dr. Simi, have you reviewed any books or articles in the

6   academic literature that discuss these concepts of plausible

7   deniability such as "just joking" or double-speak as a strategy

8   applicable to the white supremacist movement?

9   A.  Yes, I have.

10  Q.  Can you provide us some examples of that.

11  A.  Sure.  So earlier I mentioned Michael Billig, who's written

12  extensively about this issue; Kathy Blee, she's written about

13  this issue; Abby Ferber; James Aho; Richard Mitchell would be a

14  few examples.

15  Q.  And have you written on the use of humor at all?

16  A.  Yes, we have.

17  Q.  Can you give me an example.

18  A.  Sure.  In the book *American Swastika*, we discuss the

19  importance of humor within the culture and its connection to

20  violence.

21  Q.  You offered several names, including Billig, Blee, Ferber,

22  Aho, and Richard Mitchell.  In brief, who are these people?

23  A.  Sociologists, either current or retired.

24  Q.  And in general, are you referring to professors at various

25  universities?

1  A.  Yeah.  Excuse me.  Yeah.  They're either current or retired

2  sociology professors.

3  Q.  For example, where does Ms. Blee work?

4  A.  University of Pittsburgh.

5  Q.  And how about Mr. Billig?

6  A.  Billig was in the UK.  I'm not going to be able to recall

7  off the top of my head where -- he's retired now, but I

8  wouldn't be able to recall off the top of my head the

9  university he was affiliated with.

10 Q.  Okay.  Just for examples.

11 A.  Sure.

12 Q.  Thank you.

13       I'd like to turn back to the concept of the variants

14 that you discussed in the white supremacist movement.  And you

15 brought up a term, neo-paganism.  What is neo-paganism?

16 A.  Well, I mean, the term "paganism" comes from the early

17 Christian Church that basically used that term to refer to even

18 earlier spiritual belief systems, sometimes polytheistic, so

19 that term "paganism" really is in reference to these earlier

20 belief systems that predated Christianity.  Neo-paganism are

21 more contemporary versions of these earlier pagan belief

22 systems.

23 Q.  And how do white supremacists use neo-paganism?

24 A.  Well, it acts as kind of in a similar way as just religion

25 more generally acts in terms of helping provide certain key

beliefs and practices and rituals and ceremonies, so in that
sense, you know, it's serving as kind of a framework of sorts.
In part, this, you know, comes from the fact that there were
certain occult roots to Nazi Germany, and so there's the
carrying on kind of that tradition in terms of the white
supremacist orientation or gravitation toward neo-paganism kind
of comes out of its association or admiration for Nazi Germany.
Q.  What does sort of paganist or pre-Christian traditions,
what ideas do white supremacists apply from that kind of
tradition, for example?
A.  Yeah.  I mean, it's -- again, it ranges quite a bit, but
you're going to see, for example, symbols appropriated.  So
ancient runes, it's not uncommon to see that appropriated by
white supremacists across the culture.  Of course that was also
done by the Nazis as well.  You're going to see certain
practices, certain terms, references.  So for example, Nordic
mythology, or Odinism, as it's sometimes referred to, is quite
prominent within white supremacist circles.  You'll see a lot
of references, for example, in that kind of strain or variant
to Thor.  You'll see, you know, common various kind of gods or
figures related to Odinism will be used as in some cases
tattoos or as monikers in terms of names, things of that
nature.
Q.  Is there any kind of underlying strain or belief within,
say, Odinism or similar pagan traditions or philosophies that

1   align with the white supremacist movement or have been used by

2   the white supremacist movement in furtherance of their goals?

3   A.  Well, this is kind of a hotly debated issue in terms of,

4   we're talking about peer appropriation or not.  Certainly white

5   supremacists see an alignment, which is why they gravitate

6   towards it.  They see this kind of emphasis on cultural history

7   and heritage as it relates to, you know, these various European

8   tribes as an important part of their world, an important part

9   of how they see themselves, and so any kind of association or

10  identification kind of helps them in terms of establishing

11  their sense of identity.

12  Q.  And what about the role of nature?  Does that have a part

13  in this?

14  A.  Yeah.  Certainly within paganism, nature figures

15  prominently, and you certainly see that within white

16  supremacist culture as well.  A focus on ecology, on nature, in

17  some cases it's more secular, in other cases it's very

18  spiritual, in terms of assigning kind of certain spiritual

19  significance to different aspects of nature that white

20  supremacists will do.

21  Q.  And how would like a state of nature relate to the white

22  supremacist movement's racist ideologies?

23  A.  Well, this would probably most closely connect to one of

24  the kind of key underpinnings I would consider to characterize

25  the white supremacist movement, which is essentially the way of

1    looking at the world you might describe as social Darwinism, a

2    survival of the fittest, this sense of kind of a "might makes

3    right" approach to the world, a sense that some people are

4    intellectually and physically superior to others, and that

5    that's kind of a part of the natural laws of the world that

6    you've got some that rise to -- the kind of cream of the crop

7    rise to the top, and others who are, you know, kind of -- they

8    hold society down, right?  They are a weakening society because

9    of their lack of capacity, lack of abilities and so forth.  So

10   this kind of social Darwinism is very much at the core of the

11   white supremacist movement and is very critical in terms of how

12   they see nature and the natural existence of different racial

13   groups, for example.  They see that as part of nature.  That,

14   you know, what they call race realism, race is a very real

15   thing.  It's not a social construct, it's not a cultural

16   construct; it's a physical reality that these races exist and

17   some have characteristics that are superior to others.

18   Q.  What are some examples of white supremacist groups that

19   utilize neo-paganism?

20   A.  Various white supremacist prison gangs.  Of course most

21   notorious in that realm would be like the Aryan Brotherhood.

22   Certainly you've got, you know, dozens, hundreds of white

23   supremacist prison gangs across the United States, and there

24   are certainly not all of them that adhere to neo-paganism, but

25   certainly not uncommon in that variant of the white supremacist

1    movement.  You've got, for instance, historically speaking,

2    various neo-Nazi and skinhead groups that would adhere to

3    aspects of neo-paganism.  So for instance, you know, going back

4    a bit to the early 2000s, Volksfront was a group that was

5    prominent for a period of time that was very much, you know,

6    neo-paganist in orientation and emphasis.  So, I mean, there's

7    lots of different examples here.  It's, again, one of the more

8    common variants within the movement.

9    Q.  And you mentioned also a relationship to Nazi Germany.  How

10   has that emerged between -- the relationship between

11   neo-paganism and Nazi Germany in the white supremacist

12   movement?

13   A.  Well, because of the influence that paganism had on Nazi

14   Germany, that's identified by contemporary white supremacists.

15   They see that.  They are aware of it.  They understand it.  And

16   so that, you know, takes on importance because of that.

17   Q.  And Dr. Simi, what are some of the ways in which you've

18   observed this neo-paganist strain in white supremacy during

19   your research?

20   A.  Sure.  Again, as part of participant observation, I've been

21   able to observe it in terms of some tattoos, I've been able to

22   observe it in terms of what people say and do as far as

23   expressions.  In some cases ceremonies or cultural ritual

24   practices that relate to neo-paganism were things that I can

25   observe.  So it was, you know, a pretty broad range of things

1   the fieldwork would expose you to as it relates to this.

2   Q.  And have you written on neo-paganism as it applies to white

3   supremacy?

4   A.  Yes.  In *American Swastika*, we discussed that variant as

5   one of the more important ones.

6   Q.  And have you also surveyed other academic literature and

7   sources relating to this subject?

8   A.  Yes, I have.

9   Q.  Let me ask you about satanism.  What is satanism?

10  A.  You know, I think it's fair -- first of all, I would be

11  careful, satanisms with an S, plural, because there's really

12  not -- it's not a monolithic, that there's one satanism, so if

13  we say satanisms with a plural, I'd just like to emphasize

14  that.

15          But in general, when we're talking about satanism, we

16  are talking about a type, essentially, of paganism,

17  neo-paganism, right?  So in that respect, I think you can

18  fit -- you can fit satanism in that kind of bucket, if you want

19  to use that term.

20  Q.  And so how does satanism -- how is satanism a kind of

21  neo-paganism?  Can you explain that to us.

22  A.  Yeah, well, the fact that it kind of has a strong emphasis

23  on kind of pre-Christian traditions, right, it's rooted -- it

24  finds significance and relevance in these pre-Christian

25  traditions, typically kind of essentially rejects

1  Judeo-Christianity, broadly speaking here, so -- and oftentimes

2  kind of overlaps in terms of some of what it's identifying as

3  key kind of rituals or influences would be tied up into, you

4  know, paganism.

5  Q.  And Dr. Simi, are you familiar with the term

6  "accelerationist" in your work?

7  A.  Yes, I am.

8  Q.  What does it mean?

9  A.  Well, it essentially refers to kind of a -- you might say a

10  subset of white supremacists.  The term's kind of become

11  somewhat widely used in just recent years.  It more or less is

12  referring to the idea that, you know, white supremacists in

13  general, as we've talked about, core characteristics, the use

14  and glorification of violence, but there is some variability

15  among white supremacists in terms of what that means and how it

16  manifests itself.  With accelerationists, it manifests itself

17  in the sense that the use of violence, the glorification of

18  violence, is not some unknown time in the future or next year,

19  it's now.  We need to accelerate, literally accelerate -- the

20  term "accelerate" refers to using violence now to accelerate

21  essentially the complete destabilization of society so that you

22  have a massive breakdown and that you can bring about a new

23  order that you envision as preferable to the current status

24  quo.  So heavy reliance on immediate use of violence.

25  Q.  Dr. Simi, I want to ask you about a different subject,

M5O1MEL2                      Simi - Direct

1   jihadist terrorism.  How do members of the white supremacist

2   movement regard jihadist terrorism, based on your research?

3   A.  It varies.

4   Q.  And are there examples of white supremacist groups that

5   have embraced jihadism?

6   A.  Yes.

7   Q.  Can you give us some examples.

8   A.  Sure.  There are, you know, when we speak historically --

9   for instance, I've mentioned a couple times the underground

10  terrorist cell the Silent Brotherhood active in the 1980s.

11  They weren't successful, but they did have an interest in

12  bridging this gulf and developing ties with -- they actually

13  made outreach -- it wasn't successful, but they did make

14  outreach to try and develop a relationship, an alliance of

15  sorts, with Islamic extremists.  You see more recently, for

16  instance, after 9/11 and the attack on the Twin Towers in New

17  York, that we had a group Aryan Nations, who we talked about

18  earlier, at that time one of their leaders, August Kreis, made

19  a statement where he essentially said he -- how much he admired

20  the bombers, the 9/11 bombers, and that he was recommending

21  that white supremacists emulate that and develop the same kind

22  of courage.  And eventually Aryan Nations, not long after that,

23  literally developed an outreach arm to their organization that

24  was meant to try and further build relationships between white

25  supremacists and Islamic extremists.

M5O1MEL2                         Simi - Direct

1           When you look at, for instance, Atomwaffen, which

2   would be an example of accelerationists we've been talking

3   about, you look at somebody like one of the co-founders, Devon

4   Arthurs, who eventually became an Islamic extremist; he

5   converted, became a jihadi extremist.  We certainly have

6   various historical examples we could point to where there have

7   been these efforts.

8   Q.   You mentioned Atomwaffen.  What is Atomwaffen?

9   A.   Well, they were a group initially founded by principally

10  two individuals—the person I just previously mentioned and

11  Brandon Russell—on a web forum that's now defunct, Iron March,

12  back around 2015, it seems, and from there, they grew into a

13  network that basically promoted paramilitary guerrilla warfare.

14  Again, this accelerationism violence, now they've been linked

15  to at least five murders in the United States.  They held

16  paramilitary training camps, that they called hate camps, in

17  various parts of the country.  They had networks both

18  nationally as well as internationally.  So that's kind of

19  Atomwaffen in a nutshell.

20  Q.   Now, Dr. Simi, through your research, have you formed any

21  opinions regarding why certain white supremacist groups support

22  jihadist terrorism?

23  A.   Yes, I have.

24  Q.   And what's your view?  Why is that?

25  A.   I think it comes down to a few different things you have to

1    look at.  One is that there is a shared, quote-unquote, common

2    enemy.  That is both extremist ideologies -- even though they

3    certainly have differences, but both extremist ideologies put

4    this idea of an international Jewish conspiracy at the core or

5    at the center of their world view.  So they have this common

6    enemy that they share in terms of the so-called international

7    Jew.

8           Also, they share the use and glorification of

9    violence.  So in both extremist ideologies, violence is

10   critical.  It's viewed as necessary to achieve goals, and it's

11   also viewed as a form of self-defense in both extremist

12   ideologies.

13          So I would say those two things in particular are

14   significant in terms of facilitating this kind of desire or

15   idea that some type of alliance or coordination is an effective

16   potential strategy.

17   Q.  Dr. Simi, you referred to this concept of a shared enemy in

18   some sort of international Jewish influence; is that right?

19   A.  That's correct.

20   Q.  Are there any terms used for that idea within the white

21   supremacist movement?

22   A.  Yeah.  Probably the most common would be what's called

23   ZOG—Z-O-G—and that's short for an acronym for Zionist

24   Occupational or Occupied Government.

25   Q.  And Dr. Simi, what sources are you relying on in order to

1      form this view related to the convergence between jihadism and

2      certain white supremacist beliefs?

3      A.   That would be multifaceted.  It would be, of course, again,

4      starting with the literature, so what have other people found,

5      previous studies, you know, grounding, you know, using that as

6      a starting point; but then also the data that, you know, I've

7      collected myself independently from that literature in terms of

8      the participant observation, the interviews; you know, looking

9      at primary texts that are generated by white supremacists,

10     looking at the virtual spaces; so basically all the things

11     that, you know, we've been talking about this morning.

12     Q.   Dr. Simi, I'd like to turn now to the group that we noted

13     earlier in your testimony, the Order of the Nine Angles.  What

14     the Order of the Nine Angles?

15     A.   It is a type of world view that involves satanic elements,

16     neo-Nazi elements.  It is at its most basic level, I'll say, in

17     my view, social Darwinist in orientation.  It's a world view

18     that has a group component to it, formed originally, by most

19     accounts, in the late '60s in the UK and then developing

20     further from that point forward to the point in more recent

21     years where it has an international presence outside of the UK,

22     and -- yeah, so I think that's kind of a brief -- would be a

23     brief summary.

24     Q.   Is it known by any other names?

25     A.   Well, I believe -- I'm sorry.  What did you initially refer

1   to, Order of the Nine Angles?

2   Q.  Order of the Nine Angles.

3   A.  Sure.  There's acronyms.  You'll see it oftentimes O, the

4   number 9 and then A, or sometimes O, the letter N for the Nine,

5   and then A.  I'd say those are probably the most -- most

6   common.

7   Q.  Does it use any other names in the United States?

8   A.  Yes.  So some of the -- what are referred to as nexions or

9   other networks outside of the UK will have various names.  In

10  the US, Temple of Blood is one of the more kind of notable

11  manifestations of O9A; not exclusive or not the only one in the

12  US, certainly.  And certainly other names in other parts of the

13  globe, in other countries as well.

14  Q.  You used the term "nexion."  What is that?

15  A.  It's, you know, the O9A terminology specific for what

16  amounts to basically a network or an offshoot that forms -- it

17  could be a small group, but it also could be -- you could have

18  a one person -- you could have a single person that makes up a

19  nexion, so -- but more or less it's a configuration, a O9A

20  configuration.

21  Q.  Is that a term distinctly used within O9A, based on your

22  research and experience?

23  A.  I don't think I've ever seen it outside O9A, yeah.

24  Q.  Dr. Simi, is it difficult to research O9A?

25  A.  Yes, it is.

1  Q.   Why?

2  A.   It's been pretty secretive, clandestine in many respects.

3  I mean, there's quite a web presence so there is that component

4  to it, but as far as, you know, offline, that I would say is

5  quite difficult to employ the kinds of methods that I've

6  previously employed, for example.

7  Q.   When did you first encounter O9A in your work as a

8  sociologist?

9  A.   Well, I mean, I couldn't tell you specific day, but

10  certainly, in terms of reviewing literature, would have been

11  reading about O9A going back, you know, a number of years.  For

12  example, as I was finishing grad school, Mattias Gardell's

13  book, *Blood of the Gods [sic]*, that was published in 2003, so

14  it was towards the end of my grad school, just as I was

15  finishing up, and, you know, I certainly recall reading that

16  book, and there's certainly a discussion of O9A in that book.

17  I would say, you know, over those years, I certainly would have

18  been exposed and would have read some aspects related to O9A

19  during that time frame.  But I would say a more kind of

20  heightened awareness would be more about five -- five years

21  ago, approximately.

22  Q.   And why is it that within the past five years you've become

23  more aware or given more attention to O9A?

24  A.   Well, frankly, you know, they've received a lot more

25  attention in the last five years.  There's been a lot more

1    media attention devoted specifically to O9A.  There's been some

2    high-profile criminal cases allegedly connected to O9A.  So,

3    you know, that kind of attention, as a researcher, you're

4    looking at the topic that you study and you're trying to kind

5    of monitor and maintain a sense of where the trends are and

6    what's getting more attention, and of course you're trying to

7    look at those things and assess for yourself from a research

8    standpoint what's actually happening here, is there a trend or

9    is it possible that there's something -- some kind of, you

10   know, confusion of sorts or something inaccurate that's being

11   reported.  So, you know, as part of that, as, you know, I think

12   all good researchers are doing that in terms of monitoring

13   their topic and looking for, you know, trends that are

14   emerging, trends that are new, but also things that are old and

15   maybe didn't receive as much attention in previous -- at

16   previous points in time.

17   Q.  And Dr. Simi, when you talk about, you know, incidences of

18   criminal cases relating to O9A starting about five years ago,

19   are you referring to this case?

20   A.  No, I'm not.

21   Q.  What methods have you used to learn about the Order of the

22   Nine Angles?

23   A.  O9A specifically has -- I've relied principally on a

24   variety of sources.  One --

25            MR. MARVINNY:  Excuse me.  Could we get a time frame

1   for this answer, please.

2            THE COURT:  Thank you.  Yes.  You'll hear the answer,

3   counsel, and if you'd like to clarify, you should feel free to

4   do so.

5            MS. RAVENER:  Sure.

6   BY MS. RAVENER:

7   Q.  So let me just situate this a little bit, Dr. Simi.  You

8   indicated that originally you learned of O9A through academic

9   literature; is that right?

10  A.  That's correct.

11  Q.  And approximately when was that?

12  A.  Again, I would say 2003.

13  Q.  Okay.  And from the period of approximately 2003 to the

14  present, what methods have you used to learn about the Order of

15  the Nine Angles?

16  A.  Okay.  So again, starting with the scholarly literature,

17  that's always -- kind of step one is looking at, you know, what

18  scholars have written, reviewing, you know, keeping track.  I

19  mean, part of what you do when you're studying a topic like

20  this is you're reading books, as the Gardell book that I

21  mentioned, when it's published; I mean, you're trying to keep

22  track of new books and review those and make note of things

23  that you think are important in terms of themes and so forth,

24  so that, obviously, process is unfolding over time.

25            Articles, looking at journal articles that may have

1   relevance.

2           Looking at, again, media treatment that, you know --

3   investigative journalistic accounts that may have relevance.

4           Of course, in the course of, you know, my fieldwork,

5   although not specific to O9A, but certainly lots of references

6   to, you know, neo-paganism that are, you know, something I'm

7   monitoring.  That is part of my data collection.

8           And then, you know, obviously as part of, you know,

9   the primary source analysis that really kind of grounds, in

10  many respects, the method or certainly as a pivotal part,

11  looking at texts, you know, produced by O9A and reviewing

12  those, books produced by, written by, for example, Anton Long,

13  you know, looking at that material, trying to assess the

14  themes, the ideas that seem to be present in those materials.

15  Q.  Dr. Simi, I want to ask you about each of those areas, but

16  first, help us understand, have you used all of these methods

17  in combination to understand O9A?

18  A.  Yes.

19  Q.  Why use more than one method?

20  A.  Well, you do that with anything you study, frankly, and

21  certainly that's been the case with the work that I've been

22  involved in on the white supremacist movement.  It's always

23  involved these multiple sources as much as possible, and that's

24  just a methodological principle.

25  Q.  You referenced that one of your sources of information and

M5O1MEL2                    Simi - Direct

1   methods you've used to learn with the Order of Nine Angles was

2   reviewing the work of Anton Long.  Who is Anton Long?

3   A.  He was identified early in O9A's history as essentially the

4   leader.  Most accounts suggest that there was an initial

5   formation by an unnamed female, who then allegedly kind of put

6   Anton Long basically in charge, to put it in layperson terms.

7   So Long, for a period of time, was essentially the name

8   associated as the leader of O9A and was quite prolific in terms

9   of publishing books and other essays as part of that kind of

10  name representing O9A.

11  Q.  Now when you say it's a name representing O9A, is Anton

12  Long understood in the scholarship to be the name of a real --

13  a genuine name of a real person?

14  A.  Yeah, I should clarify.  Anton Long is not the name of a

15  real person.  It's a pseudonym of sorts.  It's thought to be

16  by, you know -- there is some debate about this, but most

17  scholars I would say seem to agree that they believe Anton Long

18  to be David Myatt.

19  Q.  And who is David -- well, before I ask you about that, have

20  you reviewed the scholarship at all relating to that

21  assessment?  Do you understand its sources?

22  A.  Yes, I have.

23  Q.  And what is that assessment that Anton Long and David Myatt

24  are the same person based on, in general?

25  A.  It appears that the assessment focuses on a few different

1    things.  One, looking at kind of -- David Myatt, I should say,

2    was pretty prolific as well in terms of producing writings, and

3    so that provides a corpus of sources for Myatt's writings to be

4    analyzed to Long's writing, which I said were also pretty

5    prolific.  So some of those folks who have looked at this issue

6    specifically have essentially put these writings side by side

7    and have claimed that there's some substantial similarities in

8    the content, in the style of the writings.  I believe there's

9    been some efforts to kind of identify overlapping potential

10   biographical markers between Long and Myatt.  So I think those

11   are the two kind of principal -- there's also been -- frankly,

12   if you look at some of the texts produced by O9A, they

13   acknowledge Long as being Myatt too, so there's -- some of

14   that's kind of based on internally what's been represented by

15   O9A.

16   Q.  And who is David Myatt?

17   A.  So Myatt was a UK-based neo-Nazi, National Socialist,

18   involved in a variety of different groups linked to Combat 18,

19   for example, which was a UK-based terrorist group, active

20   there.  There were reported connections between Myatt and

21   Copeland, which was the nail bomber who was a terrorist active

22   in the UK for a period of time.  Again, as I mentioned, a

23   prolific kind of writer and strategist and advocacy for, you

24   know, general kind of neo-Nazi principles.

25   Q.  Over time did David Myatt also embrace other kinds of

1   principles?

2   A.   Yeah.   There were times in terms of satanism, times in

3   terms of eventually converting to Islam and became a very

4   strong advocate for the merging of neo-Naziism and Islamic

5   extremism.   Often I think he's indicated as being -- again,

6   this is a larger pattern you see, but that Myatt often is cited

7   as the person who kind of developed the most clear-cut strategy

8   to try and merge neo-Naziism and Islamic extremism.

9   Q.   Turning back to the methods you've used to study the Order

10  of the Nine Angles, Doctor, you indicated that you had reviewed

11  literature, including by Anton Long.   What are some examples of

12  that literature?

13  A.   Yeah.   The book, *The Sinister Tradition*, one of the books,

14  a number of essays, Hos -- I can never pronounce -- some of

15  these things that are hard to pronounce.   *Hostia*.

16  Q.   Is that H-O-S-T-I-A?

17  A.   Yes, yeah.

18  Q.   And what's that?

19  A.   That's one of the books that Long published under that

20  name, a number of essays related to varying aspects of O9A

21  belief system.

22  Q.   And have you actually read these texts?

23  A.   Yes, I have.

24  Q.   What is the importance of these books and essays by Anton

25  Long to members of O9A?

M5O1MEL2                         Simi - Direct

1    A.  Well, because of the recognition as a leader, you know,

2    there's going to be a degree of kind of influence among other

3    adherents when a leader kind of produces these kinds of texts.

4    Whether they be in essay form or book form, that really doesn't

5    matter so much.  It's the fact that someone who's recognized as

6    a leader is producing these kinds of materials for adherents to

7    kind of consume, and so there is a natural kind of influence

8    that the text would have for any adherents.  Of course that

9    wouldn't be unique to O9A.  That would be the case for, you

10   know, any type of situation such as this.

11   Q.  Dr. Simi, is there academic literature relating to O9A?

12   A.  There is a small body --

13   Q.  And --

14   A.  -- relatively small.

15   Q.  Approximately how much, in your estimation, exists?

16   A.  I mean, I'm aware of, off the top of my head, a dozen or so

17   scholars who have, you know, focused specifically on O9A.

18   Q.  And have you reviewed academic literature relating to O9A?

19   A.  Yes, I have.

20   Q.  Approximately how many articles or books?

21   A.  I've tried to review all of those that I'm aware of, so it

22   would be, you know, certainly in terms of books, you know,

23   Gardell's book, as I mentioned, that was published in 2003;

24   Nicholas Goodrick-Clarke has two different books that address

25   aspects of O9A; certainly there's a number of articles,

1   academic journal articles that we talked about earlier.  I

2   would say roughly ten in that -- approximately, that address

3   some facet of O9A, some -- some more specifically focused on

4   O9A as a terrorist organization and other more kind of

5   specifically focused on aspects of O9A—for example, an article

6   that looks at culling texts, specifically.  So you're going to

7   get a range in terms of the focus of these treatments.

8   Q.  And we'll talk about culling in a little bit, but in

9   general, is it a practice within O9A?

10  A.  Yes, it is.

11  Q.  Okay.  And within the books and articles that you described

12  that you've reviewed relating to O9A, do they discuss white

13  supremacy in relation to O9A?

14  A.  In the scholarly --

15  Q.  Yes.

16  A.  Yes, they do.

17  Q.  Are you also familiar with scholarships regarding white

18  supremacy that discusses O9A in, say, a chapter or in part?

19  A.  Yes, I am.

20  Q.  Can you give us an example.

21  A.  Yeah.  Jeffrey Kaplan, who's a scholar, been studying the

22  white supremacist movement for decades, has a edited volume

23  that addresses O9A in one of the chapters.  That's a broader,

24  you know, collection of work that's focused on the white

25  supremacist movement, globally speaking.

1   Q.  And Dr. Simi, in addition, have you reviewed any recent

2   scholarship on O9A?

3   A.  Well, you know, an article just was published by a scholar

4   that -- we've never met in person but we've dialogued over

5   email over the last few years, Ariel Koch in Israel.  He just

6   published an article that I became aware of recently.  I think

7   it was published -- I think the publication date is 2022, and I

8   think the journal is *Political Violence and Terrorism* that's

9   focused specifically on O9A.

10  Q.  Is that also among the sources you've studied in order to

11  learn about it?

12  A.  I have read that article, yes.

13  Q.  Have you reviewed journalistic materials in order to learn

14  about O9A?

15  A.  Yes, I have.

16  Q.  Can you give some examples.

17  A.  Well, one of the journalists who's written quite a bit

18  about O9A, Jake -- I'll probably get his name a little bit

19  wrong -- the last name Hanrahan.  He's written a number of

20  investigative pieces.

21       The nongovernmental organization Hope Not Hate has a

22  report on O9A that I've reviewed.

23       Several of those types of documents that are either

24  journalistic or kind of come out of the kind of monitoring of

25  hate groups, organizations that are doing that kind of work.

1  Q.  And approximately how many journalistic materials relating

2  to O9A do you believe you've reviewed in the course of your

3  work?

4  A.  Dozens.

5  Q.  You described that as part of your fieldwork you've

6  conducted interviews with members of groups that you believe

7  have some relevance to O9A; is that right?

8  A.  Well, certainly on, you know, neo-paganism.

9  Q.  And can you estimate approximately how many such interviews

10  related to, say, neo-paganism you've conducted.

11  A.  It's a pretty large number because that's such a

12  prominent -- features so prominently among white supremacists.

13  I couldn't give you an exact number off the top of my head.  We

14  could figure out that, though.  You know, wouldn't be too hard.

15  Q.  Do you believe that it's more than 10?

16  A.  Oh, absolutely.

17  Q.  More than 20?

18  A.  Absolutely.

19  Q.  Possibly larger?

20  A.  Yes.

21  Q.  Dr. Simi, you also referred to at least one, I believe

22  multiple websites relating to O9A.  What websites have you

23  reviewed?

24  A.  Yeah.  You know, again, with some keyword searches you can

25  identify materials that are, you know, described or that

M5O1MEL2                         Simi - Direct

describe themselves, I should say, as O9A related.  So there is

a website, for instance, O9A.org, that purports to be O9A

related and has essays available.  There's other ones that

aren't quite so self-descriptive in terms of being O9A related,

but once you get on the site, they kind of are clearinghouses,

you might describe them as, for O9A-related essays, so those

would be some of the different kind of blog sites or websites

that have texts that are, you know, connected to O9A.

Q.  And why have you reviewed websites potentially created by

O9A adherents themselves as part of your effort to learn about

O9A?

A.  That's been a staple of the research method from day one.

You know, from the beginning, back in the fall of 96, that's

how I initially started learning about these issues was by

going to websites, so -- and have continued to do that over the

last 20 plus years.

Q.  What kind of information can you find by reviewing, say,

the O9A.org website and related sites?

A.  You're able to read essays about different facets of world

view in terms of different practices, rituals, key beliefs,

things like, you know -- we talked a little bit about culling

earlier, little things we haven't talked about yet, but, you

know, obviously a key aspect is this whole notion of insight

roles.  These are described in these essays where you can, you

know, read -- read through the essays and learn a lot about

1    some of these different aspects of this kind of cultural world

2    view.

3    Q.  And do you compare what you learned, say, via looking at a

4    website or journalistic article to other sources like the

5    available academic literature and the books by Anton Long that

6    you've read?

7                MR. MARVINNY:  Objection.  Leading.

8                THE COURT:  Thank you.

9                You can answer the question.

10   A.  Yes, absolutely.  I mean, again, that's part of kind of the

11   staple of the research.  You're looking for consistency and

12   inconsistencies as you, you know -- using multiple different

13   sources.  You're trying to what's called engage in

14   triangulation, so seeing where the consistencies and

15   inconsistencies are across the sources.

16               THE WITNESS:  Any chance we could break, about five

17   minutes?

18               MS. RAVENER:  Your Honor, could we just request a

19   five-minute break for Dr. Simi.

20               THE COURT:  Thank you.  Yes, it's not a problem at

21   all.

22               THE WITNESS:  Thank you.

23               THE COURT:  So we'll take about a five-minute break.

24   By my watch, it's almost exactly 2 p.m.  I'll plan to see you

25   back here in about five minutes.

1        Thank you very much.  See you shortly.

2        THE DEPUTY CLERK:  All rise.

3        (Recess)

4        (In open court)

5        THE COURT:  Counsel, you can proceed.

6        MS. RAVENER:  Thank you, your Honor.

7    BY MS. RAVENER:

8    Q.  Dr. Simi, we were discussing some of the methods that

9    you've used to learn about O9A.  Have you used virtual

10   ethnography to learn about O9A?

11   A.  Yes, I have.

12   Q.  And why use that method to study O9A specifically?

13   A.  Again, it's a staple method, but it's especially important

14   with a particularly hard-to-reach group that may be

15   inaccessible in terms of participant observation and/or

16   interviews.  The virtual ethnography still allows you access to

17   that community culture, that population in order to try and be

18   able to try and employ some of the same methods of fieldwork in

19   studying the communication, the way people present themselves

20   and so forth.

21   Q.  And why is it difficult to, say, obtain interviews with

22   members of O9A?

23   A.  I mean, oftentimes it's hard to know who you would contact

24   as far as to do an interview, as far as names, locations,

25   things of that nature.

1    Q.  Why is that?

2    A.  It's a, you know, very -- it's historically been a very

3    secretive group.

4    Q.  And Dr. Simi, what have you done to use virtual ethnography

5    to learn about O9A?

6    A.  In particular, I've used the Telegram platform, which I

7    believe we discussed earlier as one of the platforms that white

8    supremacists have kind of gravitated towards in terms of their

9    use of that platform.  A variety of different sorts.  So as

10   part of my focus on these virtual realms, maybe three years

11   ago, started focusing on Telegram, not to study O9A exclusively

12   but to study the presence of white supremacists on Telegram.

13   And Telegram is basically searchable with keywords, so once you

14   have the app downloaded, and you've created an account, you can

15   search for different channels with keywords, similar to what

16   you do on a web search.

17   Q.  And what's a channel?

18   A.  A channel is how things are organized in Telegram.  That's

19   what -- people will set up channels in order to communicate

20   with others, in order to share texts and messages and videos

21   and other visual images.

22   Q.  And Dr. Simi, over what period of time have you used

23   virtual ethnography to understand O9A?

24   A.  I would say I started seeing O9A related, at least,

25   probably approximately a little over two years ago.

```
 1   Q.  And approximately how many channels have you observed using
 2   virtual ethnography that relate to O9A?
 3   A.  Roughly 10, approximately; 10 or so.
 4   Q.  And approximately how many hours have you spent observing
 5   those channels?
 6   A.  Well, are we talking about channels general or channels
 7   that may connect to O9A?
 8   Q.  Channels that relate to O9A.
 9   A.  Hard to say.  I mean, I've spent hundreds and hundreds of
10   hours on Telegram, if not thousands, so O9A would be a subset
11   of that, certainly.  We're talking dozens, if not, you know --
12   I would say probably somewhere close to a hundred.
13   Q.  And how do you gain access to these Telegram channels?
14   A.  Yeah.  So it's basically two ways -- one of two ways.  Some
15   channels are set up to be more or less what you might say
16   public facing—that is, if you've got a Telegram account and
17   you're on the app and you do a keyword search and you find a
18   particular channel that you want to look at more closely, you
19   can click on that channel, basically, and if it's open, then
20   you'll be able to see the people who are posting on that
21   channel.  Other channels require you to hit a button called
22   Join, so there will be just a button that says Join, and you
23   would have to click on that button.  So the -- basically it
24   comes in two forms; either it doesn't require the Join or it
25   requires the Join.  And then once you hit the Join button,
```

1   you'd be able to see what people are posting.

2   Q.  And are some channels also guarded with, say, gatekeeper

3   questions or vetting questions?

4   A.  Yeah.  I have seen that as well, where once you hit the

5   Join, then you'll get a questionnaire of sorts that is being

6   used to try and vet people.

7   Q.  In addition to the 10 or so channels relating to O9A that

8   you've observed, have you also observed additional channels

9   that discuss O9A on Telegram?

10  A.  Yes, I have.

11  Q.  And once you access a channel, how do you study its

12  activity?

13  A.  What you're trying to do is similar to what, you know,

14  we've talked about today as far as observing, documenting.  Of

15  course, like I said, it's kind of easier in some respects,

16  logistically, with virtual ethnography because you're able to

17  use computer technology to aid in the data collection so you

18  can make copies of, you know, memes that are being shared or

19  other visual images that are being shared, you can download

20  videos and make copies of the video files, you can download the

21  text messages, so all of those things, you're trying to

22  document, basically archive, in order to be able to look at

23  what the themes are that are present, what -- any patterns, if

24  any, that might emerge in the analysis.  So very similar to

25  what we've been discussing throughout the day.

1   Q.  And based on your observations and virtual ethnographic

2   work, what does O9A use Telegram for?

3   A.  What I've seen would be connected to, again, the issue

4   about violence, the glorification, use of violence, various

5   images suggestive of violence, in some cases more than

6   suggestive, that capture explicit acts of what appear to be

7   violence of some kind or another; sometimes it's even kind of

8   some self-mutilation or maybe -- it's hard to say.  Sometimes

9   the photos, you're not sure what the -- a body might be

10  exposed, it appears to have been injured in some fashion; it's

11  unclear whether the person did it to themself or someone else

12  did it to them.  There are discussions as it relates -- I've

13  come across themes related to sexual violence, for example,

14  specifically, and what you might call rape, rape culture as it

15  relates to this broader world.

16          So those would be some of the themes, but certainly

17  not all.

18  Q.  We'll talk about some of those themes, but before we do,

19  Dr. Simi, in these Telegram channels, based on your

20  observation, what's the point of an O9A member participating in

21  a Telegram channel with other adherents?

22          MR. MARVINNY:  Objection.

23          THE COURT:  Thank you.

24          You can answer it, if you can, Dr. Simi.

25  A.  Well, I would answer it this way.  I don't know that it's

M5O1MEL2                           Simi - Direct

any different than what you find more broadly in terms of the

use of Telegram channels as it relates to what I've, you know,

seen in terms of white supremacy More broadly, which is the

channels are used for privacy and security, as semi-encrypted

but also to be able to express one's self, to be able to share

with those that are like-minded, to be able to exchange ideas.

Even if they're short texts, those might be meaningful to

individuals to be able to say things that they might not be

able to say in other contexts, like at work or at school and so

forth.

Q.  Do these channels play any role in recruitment?

A.  Yes, absolutely.

Q.  How so?

A.  Well, one of the things you're trying to do is you're

trying to create interconnections with these different social

media platforms, not just Telegram, but Telegram would be an

example.  And through the use of different kinds of propaganda

memes in particular, you're hoping to attract folks that might

not be necessarily all that familiar or well versed in the

ideology or the larger culture but find it attractive, some of

the symbols related to strength or violence.  There are people

with certain susceptibilities, vulnerabilities as it relates to

being -- in terms of being drawn in by violent images, for

example, and that's going to be appealing on some level, and

then, of course, you know, you use those to your advantage in

1    terms of being able to recruit folks further in and

2    indoctrinate them more once, you know, they start getting

3    exposed further to the -- to the culture.

4    Q.  Dr. Simi, in the channels that you've observed as part of

5    your work, do people typically use their real identities?

6    A.  Not typically.

7            MR. MARVINNY:  Objection.

8            THE COURT:  I'll accept the answer.  You can proceed.

9    Q.  And as a result, have you met any O9A members in person in

10   the course of your work?

11   A.  Not that I'm aware of, but that -- you know, that's not

12   necessarily -- I mean, I'm not -- oftentimes when I meet folks

13   in terms of fieldwork and interviews, you know, I don't

14   necessarily know exactly who they are and who they're

15   affiliated with, so that's going to vary tremendously over the

16   course of, you know, the work that I've done.

17   Q.  And why would that be difficult to know, for example, with

18   respect to O9A?

19   A.  It's going to be difficult in O9A's case and other cases

20   where, again, the focus is on being secretive and clandestine

21   and private in terms of how it's organized and how people are

22   trying to remain, you know, more anonymous, basically.

23   Q.  Based on your review of the writings of Anton Long, the

24   websites that you've reviewed, and this ethnographic work, why

25   is secrecy important?

1    A.  Well, you know, we go back to the role and -- of the use

2    and glamorization of violence.  When you're advocating for

3    violence, you're putting yourself and others at pretty

4    substantial legal risk and, frankly, physical risk, even.  So

5    that secrecy is pretty critical for any kind of organization or

6    group or culture or network that's advocating violence.

7    Q.  Have you personally published any writings focused on O9A?

8    A.  No, I have not.

9    Q.  Has your written work covered topics nonetheless relevant

10   to O9A?

11   A.  Yes, it has.

12   Q.  How so?

13   A.  Well, I think much of what we've talked about today would

14   be, you know, illustration that some of these core

15   characteristics that we've been discussing are all I think

16   relevant in that respect.  The different aspects that I have

17   looked at in terms of recruitment, in terms of engagement, in

18   terms of the different kinds of susceptibility to violence, all

19   of those things I think would be relevant.

20   Q.  Based on your research and review, does O9A exhibit those

21   core characteristics of the white supremacist movement that we

22   discussed earlier today?

23   A.  I would say that there's a lot of consistency.

24   Q.  And how so?

25   A.  In terms of -- we'll start with ideology.  You look, again,

M5O1MEL2                    Simi - Direct

coming back to social Darwinism, the central role that you see

it playing in both.  When you look at, for instance, this

notion within O9A about the -- I'll probably mispronounce

this -- the magian current system, which is dominated by a

Judeo-Christian world view according to the O9A perspective.  I

mean, this is very similar to this notion of a Jewish --

international Jewish conspiracy, and how it's affected,

adversely affected society in terms of creating kind of an

effeminate quality to society that has polluted society in

certain ways, that has prevented a -- again, the kind of the

cream of the crop from rising to the top.  So there's certain

aspects of the ideologies that have a lot of commonality.

Again, the violence and the use and glamorization of violence

you find across -- you find some interesting examples in terms

of the front- and backstage behavior as it relates to O9A.  So

in some instances, you'll see -- and basically an acceptance of

some of Long's writing, which would include, you know, for

instance, the promotion of culling as a practice.  So again,

we're getting into violence, but then you'll see in that same

writer's efforts an attempt to suggest that, wait a second, O9A

isn't really that, it's really something else, it's been

misunderstood, it's been mischaracterized.  So again, you get

this issue about trying to confuse what O9A is.  That's very

similar to what you find in the white supremacist movement,

where it's consistently trying to sow confusion and create a

1    sense of uncertainty among people about, well, what is the

2    white supremacist movement, what is -- what are the key

3    beliefs.  So you see that as well.

4    Q.  And so based on your research, Dr. Simi, does O9A employ

5    the kinds of communication strategies we had previously

6    discussed, like front-stage/backstage and plausible

7    deniability?

8    A.  In my opinion, yes.

9    Q.  And how do you know that?

10   A.  Reviewing the texts, looking in terms of what, you know,

11   the data we've been collecting over these years, looking at the

12   primary sources related to O9A, looking at what I've seen on

13   Telegram, looking at what scholars have noted in terms of the

14   academic research, looking at what investigative journalists

15   have noted, so again, multiple sources, trying to see where's

16   the consistency, where's the inconsistency.

17   Q.  For example, in the Telegram channels that you've observed

18   as part of your work, have you observed this "just joking" or

19   humor strategy in O9A channels or O9A-related channels?

20   A.  One of the things I have seen, you know, the "just joking"

21   sometimes, you know, will be more explicit and sometimes less

22   explicit.  So for example, I came across a thread related to a

23   number of posts that were expressing interest in sexual

24   assault, in rape.  They were promoting rape of various sorts.

25   And that came in both text messages as well as images of women

M5O1MEL2                          Simi - Direct

1    in certain clothing, where it would then -- a meme would be

2    developed that would say something like, "Please rape me."  Now

3    I don't think in that, for instance, series of messages, anyone

4    said, "ah, but we're just joking," but certainly you can see

5    how it was being framed, where the posts are done in such a way

6    that people would say "I'm being over the top" or what's called

7    "shit posting," or I'm being ironic or sarcastic.  So these are

8    the kinds of things that are kind of embedded in the post, it's

9    not that it's explicit, where somebody actually says, "well,

10   we're just joking," but you can see how it's kind of being

11   framed, as you go through the -- what amounts to a conversation

12   of sorts.

13   Q.  And do you view those strategies as well as components of

14   plausible deniability as a concept?

15   A.  Yeah, I think it is absolutely an important part of that.

16   Q.  Why would members of a group need to use plausible

17   deniability communication strategies in a Telegram channel

18   that's confined to them?

19   A.  Well, keep in mind that, you know, we've been talking about

20   here in terms of free spaces and private secretive nature and

21   Telegram, and you'll notice I said semi-encrypted.  These are

22   not -- there are no free spaces that are truly free of the

23   potential of those who might seek to repress those spaces.

24   There are no spaces that are free of folks who may intervene,

25   who maybe surreptitiously may gain access to those spaces, and

1    folks within the culture I think are pretty well aware of that

2    in many respects.  So I think there is an understanding.  It's

3    still necessary to build plausible deniability even in a more

4    secretive, private space that you think is relatively well

5    protected.

6    Q.  And when you say like there could be an intervenor in the

7    room, what kinds of intervenors do you mean?

8    A.  Could be law enforcement, could be investigative

9    journalist, could be someone who monitors these types of

10   groups, like Southern Poverty Law Center, Anti-Defamation

11   League, whole host of different possibilities there, that, from

12   their perspective, would not be good.

13   Q.  We talked about some of the methods now that you've used to

14   understand O9A, and based on your use of those methods—your

15   review of the published material, your participant observation

16   of Telegram channels in ethnography—how, if at all, does O9A

17   relate to other kinds of white supremacist variants we've

18   discussed?

19   A.  Well, we talked earlier about, you know, accelerationists

20   and Atomwaffen in particular, and one of the things you do see

21   is some interesting overlap there, crossover.  So one of the

22   kind of key members of Atomwaffen, John Cameron Denton, was

23   photographed as, you know, there were images, where either he

24   or others posted that had him in his AWD garb but also O9A

25   patches as well, for example.  You see, you know, some cross

1   kind of referencing there in terms of admiration across --

2   between, you know -- from Atomwaffen towards O9A and seemingly

3   the other direction.  The Temple of Blood, for example, that we

4   talked about earlier, kind of this US variety of O9A, you see

5   certainly some crossover there with accelerationists and white

6   supremacists more broadly, frankly.  So that's where I think

7   you start seeing this kind of cross-fertilization.

8   Q.  And I believe you also discussed earlier paganism playing a

9   role; is that right?

10  A.  Sure.  I mean, the common denominator, you have a kind of

11  ideological backdrop that is going to provide a common frame of

12  reference in many respects.

13  Q.  And how do you see that as part of O9A, relating to O9A?

14  A.  Well, I think, I mean, you see it in their texts that they

15  produce, and references, in terms of the primary text that I

16  talked about earlier, and referencing, in some cases, you know,

17  paganism, but you also see it in terms of some of the posts

18  that we were talking about in terms of on Telegram, for

19  example.

20  Q.  Dr. Simi, you said earlier I believe that O9A started in

21  the United Kingdom; is that right?

22  A.  That's correct.

23  Q.  And where does it operate now?

24  A.  Well, I would say -- I would describe it as global.  It's

25  operating in multiple countries.

1   Q.   And does it have a leader?

2   A.   Nothing clear.  You know, sometimes groups have leaders,

3   they're not always clear in terms of who those folks are; and

4   keep in mind that there is a longstanding strategy of what's

5   called leaderless resistance, which is promoting a type of

6   organizational strategy where it's intentionally unclear who

7   the leaders are.

8   Q.   And you described that at one point it had a leader; is

9   that correct?

10  A.   Anton Long was typically identified as the leader for quite

11  some time, beginning in the early '70s to fairly recently,

12  about approximately 10 years ago.

13  Q.   And so in the absence of a leader or leadership structure,

14  how is O9A structured?

15  A.   Yeah.  Great question.  One of the things I think that's

16  important here to note is -- and this is true of the white

17  supremacist movement more broadly -- we're talking about brands

18  in a way.  We're talking about emulation.  So in other words,

19  you develop a kind of set of ideas, a world view, you develop a

20  specific group, but then what you're hoping for is that people

21  outside of that context—whether it be the national context,

22  globally—you're hoping that people, as widely as possible, will

23  start applying, will start emulating, will start modeling

24  themselves after this set of ideas in order to essentially

25  fertilize, to grow things, so you get a lot of different folks

1   in different contexts that will take the ideas and apply it in

2   a way that makes sense to them, and I think that's, you know,

3   true, again, of white supremacists more broadly, and it seems

4   to be consistent with what we see with O9A as well.

5   Q.  And Dr. Simi, you previously mentioned a unit known as a

6   nexion.  How does that play a role in the structure of O9A?

7   A.  Yeah.  Well, that would be kind of a -- like I said, an

8   organizing unit or principle that there are these nexions that

9   are noted.  You know, Temple of Blood we've already discussed.

10  There's one in California known as the -- what is it -- the

11  White Exception, something to that effect.  There are various

12  ones in various countries across the globe that would be --

13  again, part of this branding strategy, where you're taking

14  on -- it's not centralized.  There's no one person at the top

15  who's dictating all of this, in my estimation, my opinion, that

16  it's more decentralized, it's more diffuse, it's more the ideas

17  that are really driving the spread.

18  Q.  So could a person or group form their own nexion within

19  O9A?

20  A.  My understanding is yes, and even O9A literature suggests

21  that.

22  Q.  What is the goal of O9A as expressed by the group in its

23  literature and teachings?

24  A.  Well, I mentioned earlier this idea about the current kind

25  of state of affairs or system being dominated by

1    Judeo-Christian kind of philosophy or ethics and the sense from

2    their perspective that this is contaminated society, it's

3    polluted society.  It needs to be pushed through in order to

4    develop a new phase.  And O9A in their literature talks a lot

5    about different phases of development and so there is quite an

6    emphasis on the idea of pushing through this current phase in

7    order to bring about what's sometimes referred to as imperium,

8    what -- sometimes different sources have different references

9    for this kind of desired end point, but it would certainly

10   require a major overturning, breakdown, dismantling of the

11   current state of affairs.

12   Q.  And what within O9A doctrine is this imperium supposed to

13   look like?

14   A.  It's described in different terms.  I've seen one source

15   describe the idea that it would be characterized by vampire

16   men.  I've seen other sources describe it in terms of more of

17   like a new, new order, a new National Socialist order, be more

18   consistent with what was viewed as kind of an important

19   predecessor, which was Nazi Germany and Hitler's efforts.  So

20   you get a range.  Again, I think, again, because of the brand

21   and it's going to be applied and tweaked and interpreted in

22   slightly different ways depending on specific actors and

23   specific contexts, there's going to be a little bit of a range

24   there, but generally, I would say it's consistent with the idea

25   of a major change in society that would move away from

1    certainly multiculturalism and away from this idea of

2    Judeo-Christian domination.

3    Q.  And you discussed that sometimes that has a sort of occult

4    element.  Is that unusual in your view, within the white

5    supremacist movement?

6    A.  No.  It really isn't.  I mean, again, it's not consistent

7    across the board, but certainly you see that as an important

8    segment within the white supremacist movement historically.

9    Again, we mentioned earlier about some of the roots of Naziism

10   being in the occult, so there's that aspect to it as well.

11   That's I think important as part of the why you don't see this.

12   It's not uncommon to see this.

13   Q.  And you said other variations relate to kind of the

14   establishment of a Nazi-like state; is that correct?

15   A.  Can you repeat that.

16   Q.  I think you said other variations of the end goal involved

17   the establishment of a Nazi type state?

18   A.  Yes, that -- that is discussed as an end point, yeah,

19   absolutely.

20   Q.  And where have you seen some examples of this goal

21   expressed?

22   A.  Yeah.  So I've seen it in some of the posts on Telegram,

23   where you see some references; you see it in some of the

24   primary sources that I've reviewed in terms of essays.  Again,

25   it may not -- it may refer to -- maybe different terms it might

refer to National Socialists as opposed to Nazis, so the

terminology might vary a little bit, depending on specific

reference.  So that would be a combination of primary sources

in terms of O9A texts, but also online in terms of the virtual

spaces.

Q.  How does this goal compare to accelerationism in the white

supremacist movement at large?

A.  Well, I'd say it's quite consistent in many respects.  I

mean, there's I think substantial amount of overlap there.

Again, the whole notion of the current system being

contaminated by Judeo-Christian principles is, I mean, harder

to get any more consistency between that and the white

supremacist movement's view of the current problems as they

relate to contemporary society.

Q.  What means does O9A advocate to reach that goal?

A.  You know, violence is very central.

Q.  And how does a person become a member of O9A?

A.  Again, we're not talking about a card-carrying situation

here, where you get your card.  But what it describes in its

own texts is a process of initiation that individuals move

through, seven-fold path that involves various rituals,

involves various practices, it involves taking on what they

call insight roles, for example, so there are different aspects

to the process.  Again, it's not always super clearly laid out

that you're on Stage 1 or Stage 2.  And especially when you

have a situation where individuals are enlisting and kind of

taking on the brand, then obviously you're going to get some

variability from situation to situation as to what that looks

like.

Q.  So let me clarify a couple things, Dr. Simi.

A.  You.

Q.  You referred to a seven-fold path or -- is that your term

or is that O9A's term?

A.  An O9A term.

Q.  And you also referred to a kind of self-enlistment; is that

right?

A.  Yeah, that was my term.

Q.  What do you mean by that?

A.  I mean, this is a -- become increasingly clear, as we study

terrorism and extremism more broadly, that oftentimes the

involvement phase, you know, we think about a top-down process

where somebody's recruited, you know, by a recruiter and they

identify people and try and influence them and bring them into

the fold, and that certainly does happen.  But a lot of times

it's more of an enlistment process where an individual will

seek out a movement, a group, a set of ideas that correspond,

are meaningful to them in some way or attractive to them in

some way and they are the ones really driving, pushing the

process.

Q.  Does O9A advocate any rituals to signify membership?

1    A.  Yes.  There are a number of kind of practices and rituals

2    that would be involved in this kind of initiation involvement

3    process that a person may go through.

4    Q.  Can you give us any example or sense of those kinds of acts

5    or steps.

6    A.  Sure.  So I mentioned just a minute ago insight roles, for

7    example.  This is the idea that you take on a role that is

8    different than yourself, something that represents a

9    substantial departure from yourself.  You can think of it as a

10   type of infiltration.  One of the things that they advocate as

11   part of it in the texts, as part of insight roles, they use

12   various examples—for example, becoming an Islamic extremist,

13   becoming a left wing extremist, joining the military—these are

14   all three specifically cited in multiple O9As as potential

15   examples of insight roles that a person might take on.  The

16   idea is that you're going to (a) be able to influence society

17   in this kind of more surreptitious way by getting into the

18   system, and starting to exert influence in that respect.  It's

19   also a way of positioning yourself as you move forward towards

20   something more cataclysmic happening, and then you have people

21   that are positioned in society in these kind of strategic

22   manners, so that would be one example of a recommendation to

23   move through the process of taking on an insight role.

24   Q.  And where in your research have you seen this concept of

25   insight roles discussed?

A.   In multiple O9A texts, that, you know, are available in

terms of public sources.

Q.   Does that include the books by Anton Long?

A.   It would also include books as well as essays.

Q.   Have you seen it discussed in the academic research and

related literature?

A.   Yes, I have.

Q.   And I want to be clear as well, Dr. Simi, when we talk

about insight roles, is that your term or is that O9A's term?

A.   O9A.

Q.   And so you described there are particular types of

organizations that O9A instructs members to infiltrate; is that

right?

A.   They provide examples, yeah.

Q.   Okay.  And what do they say about those examples, for

example?

A.   Well, I mean, they're offered as -- again, the premise is

that you do something that's a departure from yourself.  So

these are offered -- so basically you're not a left wing

extremist, become a left wing extremist.  Insert yourself into

a left wing extremist group.  You're not an Islamic extremist,

insert yourself into that, into that type of group or culture.

You know, place yourself in a position that is going to allow

you certain opportunities, afford you certain opportunities in

terms of influencing it.

1    Q.  And what is that purpose of influence?

2    A.  Well, I mean, again, O9A is trying to move society into a

3    new stage, basically, through this current phase of

4    Judeo-Christian domination, so these are all strategies,

5    efforts, that are part of the larger goal of moving through the

6    current phase of existence, if you will.

7    Q.  So for example, when an O9A member is performing an insight

8    role, how are they supposed to act around genuine members of

9    the organization?

10   A.  Yeah, so the idea is to more or less camouflage yourself,

11   take on that role, present yourself as if you were one of them,

12   so that you can obviously gain entree and maintain access and

13   build, you know, trust, rapport, be able to exert influence in

14   more subtle ways over time.

15   Q.  How, if at all, does that relate to some of the

16   communication strategies that we discussed earlier?

17   A.  Well, it's very much core to the larger white supremacist

18   movement in terms of some of its communication to adherents, in

19   terms of the idea of infiltrating society.  It's a clear

20   example of this whole notion of, you know, front- and backstage

21   behavior, right?  The idea of the insight role is that you're

22   going to take on that role, you consider that the front-stage,

23   right.  You're going to deceive individuals by presenting

24   yourself in this front-stage way while maintaining the

25   backstage, which is your true self, and so the insight role is

1   actually a pretty good example of front- and backstage

2   behavior.

3   Q.  And why is secrecy important when performing an insight

4   role?

5   A.  Well, it's kind of like playing poker, right?  You know, if

6   you tip your hand, the element of surprise is up, so it kind of

7   defeats the whole purpose if you weren't going to be secretive

8   about it.

9   Q.  In your view, is this concept of infiltration seen

10  elsewhere in the white supremacist movement.

11  A.  I'd describe it as pervasive.

12  Q.  And in your research where else have you seen this concept?

13  A.  Historically speaking, we can go back to the late '80s,

14  early '90s.  Tom Metzger, who founded White Aryan Resistance,

15  advocated this type of an infiltration strategy.  He had been

16  working across the United States as well as various European

17  countries.  He'd been working with racist skinheads in

18  particular, and at some point he came to recognize that they

19  were too visible.  You know, the shaved heads, the tattoos, all

20  that was a hindrance, and people needed to cover up their

21  tattoos.  This is what he started advocating, not get tattoos

22  in the first place, grow your hair out and infiltrate the

23  system, join the military, become a police officer, become a

24  teacher, doctor, lawyer.  National Alliance and William Pierce

25  advocated something similar.  You had the whole notion of what

1   they called ghost skins, which was the idea -- again, going

2   back to the skinheads, the idea of kind of becoming not so

3   visible, you know, and becoming a shadow of your former self so

4   that you can better influence society in the direction that the

5   movement wants you to.  So this is, you know -- like I said, I

6   would consider it to be a pretty pervasive strategy that we've

7   seen advocated for decades, if not longer.

8   Q.   And in brief, Dr. Simi, what is the White Aryan Resistance

9   and the National Alliance?

10  A.   Sure.  White Aryan Resistance was, again, founded by Tom

11  Metzger in Fallbrook, California.  He developed the

12  organization as a media platform of sorts.  He used telephone

13  hotline messages, eventually websites, he organized skinheads,

14  promoted general white supremacist ideals, talked about race

15  war, was involved in developing a border vigilante group for a

16  period of time on the southern border.  He networked with

17  various folks across the movement, was considered to be very

18  influential in particular during the 1980s and '90s but also

19  even today continues to have an influence.  He's recently died,

20  but his -- some of his work and writings continues to influence

21  and shape even the contemporary white supremacist movement.

22  Q.   And Dr. Simi, based on your research, what are the core

23  tenets of O9A's ideology?

24  A.   Well, I think the most central is the—again, going back to

25  social Darwinism—this sense of survival of the fittest.  You

1   see that I think quite clearly, despite in some of their texts

2   suggesting otherwise, but again, this is I would say consistent

3   with what you see more broadly, promoting one thing and then

4   making a case for it not to be that, but -- so I think social

5   Darwinism is key.  Antisemitism is clearly very key to the

6   beliefs.  Again, this sense of, you know, the idea that the

7   Judeo-Christian tradition is dominating and is contaminating

8   society.  Anti-Christian would be prominent, although you do

9   see some variability on that.  You see I think the -- so I

10  would say those are some of the key tenets.

11  Q.  Dr. Simi, you brought up the term "culling" earlier in your

12  testimony.  What does that mean?

13  A.  Human sacrifice.  I mean, in a nutshell.  It's a process

14  for allowing for determinations to be made about who is --

15  should be subject to sacrifice, to violence, to appropriate

16  targets for violence, getting -- essentially disposing of the,

17  quote-unquote, weak links.  Those are my words, not theirs.

18  But essentially trying to identify elements in society that,

19  from an O9A perspective, are detrimental, are at odds with

20  their world view, are not healthy, from their perspective, in

21  terms of members of society.

22  Q.  And what's the importance of culling or human sacrifice in

23  the O9A world view?

24  A.  Well, one, it's a way to demonstrate commitment to the

25  world view, to the cause.  One, you know -- like violence more

generally, it's a way to engage in the ultimate action, in

terms of trying to create change in the direction that you want

to move.  Violence is in some ways the clearest form of

expression.  The clearest form of language is an act of

violence in many respects.

Q.  And what are some of the sources you've reviewed in O9A's

literature and other arenas where this is discussed?

A.  Yeah.  So, I mean, a number of essays that address, among

other things, culling, as part of the essays, there is a --

"The Esoteric Lineage of O9A" is an essay that discusses

culling.  For example, there's a set of texts referred to as

"the culling texts," which have actually received specific

treatment in the academic literature by a religious scholar who

focused specifically on the so-called "culling texts."  So,

yeah.  And as part of some of the books that Anton Long

published, there's discussions of culling, you know, not

exclusively, but as part of broader discussions of O9A and

their world view, culling is often -- often present.

Q.  Is there a concept of human self sacrifice in O9A?

A.  Yes, there does seem to be that that is another way of

potentially demonstrating commitment.

Q.  And commitment to what?

A.  The cause, the world view.

Q.  We talked a little bit about this already, Dr. Simi, but

how is the use of violence regarded by O9A?

1    A.  Again, I would say it is very much glorified, celebrated,

2    certainly you see that, as I was referencing earlier, some of

3    those Telegram chats, where specifically sexual violence is

4    being not only advocated but celebrated.  You see it in some of

5    the primary texts that talk about the violence, the valor of

6    violence.  It's kind of valorized in that respect, spoken of in

7    heroic terms in many respects.

8    Q.  How does that compare with your broader study of the white

9    supremacist movement?

10   A.  Well, I think there are a lot of commonalities there.  I

11   think, you know, everything we've been talking about this

12   morning and afternoon in terms of the central role of the use

13   of violence, glorification of violence, we're talking about

14   some substantial similarities and consistencies.

15   Q.  Are you familiar with the term "sinister deed" in the

16   context of O9A?

17   A.  Yes, I've come across that.

18   Q.  And in general, what's a sinister deed to O9A?

19   A.  My understanding is it's a way to essentially break the

20   taboos and the norms of society, so it's a set of practices

21   that allow a person to essentially reject what, from their

22   perspective, are norms and taboos that are holding people back,

23   right?  So the idea is that society is currently structured in

24   a way that's stifling human creativity, the potential for human

25   progress.  Again, going back to their idea that the

1    Judeo-Christian tradition is dominating society, contaminating

2    society, it's stifling people as well, and by committing

3    sinister deeds, breaking taboos, breaking norms, you're helping

4    unleash some of this repressed and stifled potential and energy

5    and so forth.

6    Q.  Dr. Simi, you also mentioned the concept of rape earlier.

7    I want to come back to that.  How does rape figure into white

8    supremacist ideology, generally?

9    A.  Yeah.  So this, you know -- I want to be careful here and

10   not use overly broad brushstrokes.  Misogyny—that is, you know,

11   hatred for women—is quite common within the larger white

12   supremacist movement, the expression of that, and you certainly

13   will see advocacy for different types of sexual violence—rape

14   in general.  You're not going to find that each and every

15   person, group, in the broader movement, though, but within the

16   culture, that's not uncommon.  I think similar situation can be

17   said about O9A.

18   Q.  So how does rape figure into O9A?

19   A.  Yeah.  I mean, some of the primary texts may not mention it

20   at all.  Some -- in at least one occasion I came across where

21   it actually was essentially a condemnation of rape.  On other

22   occasions, as I've mentioned, again—not to keep repeating, but

23   some of the Telegram chats, again, not only -- I mean, well, I

24   don't know how else to put it other than celebrating rape and

25   repeated references to the importance of raping, the idea of

1    impregnating women against their will, planting your seed, I

2    mean, these are all the comments that I'm referring to in this

3    thread, this particular channel, that are promoting and

4    celebrating rape.  So there is some variability there, some

5    range, but certainly that is part of the culture.

6    Q.  So for example, Dr. Simi, what are some of the ways that

7    rape is discussed among O9A members, based on your research?

8    A.  I mean, what I've seen is, again, kind of what I just

9    described.  I mean, the idea of forcing women, the idea that

10   men have a prerogative to have sex with women whether they

11   consent or not, that it's part of your, you know, your right,

12   and almost -- in some of the chats, they're almost like an

13   obligation of sorts to engage in that kind of behavior.  Again,

14   this idea of impregnating women and planting your seed is

15   something that's referenced.  So I would say this is a general

16   kind of way of characterizing some of what I've seen.

17   Q.  And what would be the purpose within O9A, for example, for

18   forcibly impregnating women?

19   A.  I think more broadly what you see with that idea is

20   producing a next generation, offspring, allowing for the

21   survival of the white race, and, of course, just the sole force

22   of domination, you know, to dominate another person, exert your

23   will in that kind of capacity; very social Darwinist.

24   Q.  Can you provide any examples of how you've observed O9A

25   members use the term "rape."

M5O1MEL2                         Simi - Direct

A.   I mean, well, do we want to -- yeah, like I said, I mean,

some of these chats, they're -- typically these chats are not

long.  They're not writing essays, per se, in Telegram.  These

are fairly short messages, so just -- and sometimes they're as

short as, you know, something like just writing "rape."  Other

times it's a little bit longer, where it's making, you know,

references, phrases about, you know, planting your seed,

impregnating women.  Again, memes sometimes pop up where there

will be a picture of a woman and then there will be discussions

about her, typically certain body parts.  In some cases -- like

I think I mentioned earlier, one meme I came across had a photo

of a woman in some type of tight clothing, and then basically

it portrayed her as saying, "Rape me"—in other words, asking to

be raped.  So these are all some of the kind of specific things

you'll see.

Q.   Have you observed the use of the term "rape" being embraced

as part of a title or other usage?

A.   Yeah.  Sometimes people will use it as their nickname,

moniker.  I mentioned the core member of Atomwaffen earlier,

Denton.  His nickname was "Rape."  That was his -- the name he

went by online and just more generally as his nickname.  You

see this group, kind of an offshoot from Atomwaffen referred to

as RapeWaffen.  Sometimes people will use it as a term of, you

know -- just kind of almost -- like instead of saying, you

know, a greeting or salutation, they might use "rape" instead.

1    So it kind of varies in terms of how it's being used, but

2    you'll see different manifestations of it.

3    Q.   And Dr. Simi, based on your research, what is the role of

4    Naziism in O9A?  Can you explain that more to us.

5    A.   Yeah.  You certainly see references to Hitler in admiring

6    terms, so you'll see Hitler and Nazi Germany more in some of

7    the writings, in some of Long's books, in some of the essays,

8    you'll see, again, just kind of praise for Hitler, for Nazi

9    Germany.  You'll see the expression of certain ideas that are

10   consistent with Naziism.  So there's various points you do find

11   in some of the literature, although they'll, again, explicitly

12   state that they're not necessarily Nazi and that they're just

13   promoting various sorts of extremism, so you do see that in

14   some of the texts as well, the notion of, basically we have our

15   own world view but we certainly want to encourage adherence to

16   gravitate towards a variety of extreme, other extreme world

17   views in order to help break taboos and break down norms.  So

18   you do see that.  But you see, again, I would come back to

19   social Darwinism.  I hate to sound like a broken record, but

20   there is a lot of consistency there between the expression of

21   social Darwinism and O9A and what you see with National

22   Socialism.

23   Q.   What are some of the ways that Adolf Hitler is regarded

24   within O9A?

25   A.   I mean, there are references to Hitler almost as kind of a,

1   oh, you know, a spiritual figure of sorts, as having, you

2   know -- somebody who, you know, accomplished things at such a

3   level that -- really, a model of sorts, a role model on a

4   substantial level.

5   Q.  Are there components of O9A beliefs that elevate Hitler

6   even beyond manhood?

7   A.  Yes, yeah.  That's the spiritual part I was referring to.

8   You do see some talk about Hitler in those terms, you know,

9   kind of almost supernatural, you might say, terms, in terms of

10  what he did and, again, from some people's perspective, what he

11  accomplished.

12  Q.  Dr. Simi, how, based on your research, are jihadists like

13  Osama bin Laden regarded within O9A?

14  A.  Again, I would say that Islamic extremism is explicitly

15  referenced as a potential insight role, so that is something

16  I've seen.  I have seen in some of the Telegram chats

17  references that are, again, kind of admiring of bin Laden, and

18  then I have seen references to the idea of jihadi extremism or

19  Islamic extremism on some of those chats in terms of visual

20  propaganda that would tend to suggest some degree of

21  admiration.

22  Q.  And so when you observe an admiration for jihadists among

23  O9A adherents, what does that tell you?

24  A.  Well, I think it tells you about the potential convergence,

25  I think it tells you that the world view sees things on some

1    level in common with this other world view that it's speaking

2    of in admiring terms, I think it tells you that there may be a

3    potential for greater coordination and collaboration between

4    those two world views.

5    Q.  And in your research in O9A, have you observed O9A spaces

6    where jihadist propaganda materials, for example, are shared?

7    A.  I mean, I've seen -- what I've seen in some of the Telegram

8    spaces has been references, for example, to white jihad.  I've

9    seen that explicitly.  I think I've seen -- I'd say that's been

10   probably the most noticeable way in which that's been shared.

11   Q.  What does white jihad mean?

12   A.  Well, typically we think about, associate, you know, jihad

13   with Islamic extremism, and so again, this is another way in

14   which the effort to try and integrate or coordinate across the

15   two extremist ideologies manifests or a strategy to try and

16   promote that idea by taking white and, you know, mixing it,

17   essentially, with jihad, and then combining the two into some

18   kind of visual picture, manifestation.  What I've seen would be

19   somebody with white complexion who is, you know, holding a

20   weapon of some sort, a machine gun, semiautomatic machine gun,

21   and dressed in some type of garb that might traditionally be

22   the sort associated with Islamic garb and that that would be

23   the kind of way in which the meme is structured or organized so

24   that it conveys that message of trying to blend these two

25   things together.

Q.  And what does the sharing of materials like that mean in
the spaces that you've observed, based on your research?
A.  Well, I mean, what sharing information does in those
spaces, it helps kind of promote certain ideas, certain
strategies.  It helps reinforce certain ideas, certain
strategies.  So that's why we share information in these kind
of spaces, to a large extent.
Q.  And how does this admiration or use of jihadism compare to
other groups in your study of the white supremacist movement?
A.  Well, I would say that, again, as we talked about earlier,
there certainly is precedent within the white supremacist
movement for, you know, expressing similar ideas, advocating
similar strategies.  This certainly is not unique to O9A.  I
mentioned earlier Aryan Nations and their efforts in this
direction.  I mentioned earlier going back to the '80s with the
Silent Brotherhood.  David Myatt as a figure, as an individual
figure, certainly is a good example here.  But it is something
definitely that exists on a broader scale among white
supremacists.  Again, I'm not suggesting each and every white
supremacist or white supremacist group would be an advocate of
this strategy.  I'm just suggesting it's certainly not
necessarily uncommon.
Q.  Dr. Simi, in academic circles have you experienced anyone
seriously disputing whether O9A has embraced the white
supremacist movement?

1    A.   Not to my knowledge.

2    Q.   And in your view what makes O9A part of the white

3    supremacist movement?

4    A.   Again, we're back to, you know, A, consistency, so looking

5    at these side by side, looking for the points in common, where

6    do these, you know, consistencies/inconsistencies lie, but then

7    we also have to look at, you know, basically the way in which

8    people who are identifying as O9A are themselves representing

9    these issues, and certainly you see examples that we've been

10   discussing where you have people identifying as O9A that are

11   talking about their, you know, admiration, if not coordination,

12   with white supremacists and who are identifying in some cases

13   as white supremacists, and we certainly see this with Temple of

14   Blood, where a strong -- you know, it's very hard to

15   distinguish between the O9A part of Temple of Blood and what

16   you might call a broader, more general white supremacist part.

17   Q.   What kind of sources have you used to see what Temple of

18   Blood, for example, says?

19   A.   Yeah.  So that would be, again, a combination.  Again,

20   multiple sources, try and use multiple sources whenever

21   possible.  It would be looking at, you know, investigative

22   journalism pieces on Temple of Blood, looking at Temple of

23   Blood materials that they've produced, books that they've

24   published, looking at, again, going to Telegram, looking at

25   Telegram channels connected to Temple of Blood.  So it's a

M5O1MEL2                     Simi - Cross

variety of sources where you're trying to kind of see where

these things line up or don't line up.

Q.   In addition, as part of your work in virtual ethnography,

looking at O9A-related Telegram channels, for example, have you

observed depictions of actual -- what appear to be depictions

of actual violence?

A.   Yes, I have.

Q.   Can you give us some examples.

A.   Yeah.  These ones are specific to O9A or O9A related?  Was

that your question?  I'm sorry.

Q.   Yes, right now, Dr. Simi.

A.   Yeah, yeah.  I've seen what appears to be a depiction of a

beheading of some kind.  Unclear whether it's a doctored photo

or not.  I've seen photos depicting -- again, I think I

mentioned this earlier.  It was unclear from the photo whether

the person -- they appeared to have various kinds of slashes of

some kind on their back, maybe from whipping.  It's unclear

from the photo, unclear if they did this to themself or someone

else did this to them.  Those two things certainly immediately

pop into mind.

             MS. RAVENER:  One moment, your Honor?

             THE COURT:  Take your time.

             MS. RAVENER:  Thank you, your Honor.

             No further questions at this time.

             THE COURT:  Thank you very much.

M5O1MEL2                          Simi - Cross

1          Counsel for defendant, let me turn to you.

2     CROSS EXAMINATION

3     BY MR. MARVINNY:

4     Q.  Good afternoon, Dr. Simi.

5     A.  Good afternoon.

6     Q.  You agree, and I think you testified, that O9A is a

7     difficult group to study; is that right?

8     A.  That's correct.

9     Q.  In fact, you would agree that O9A is more challenging to

10    study than other white supremacist groups.

11    A.  I didn't testify to that.

12    Q.  Well, would you agree with that or --

13    A.  Not necessarily.

14    Q.  Would you agree that it's more challenging to study than

15    certain other white supremacist groups?

16    A.  I would agree with that.

17    Q.  And that's because in part O9A is largely clandestine;

18    isn't that right?

19    A.  That's correct.

20    Q.  The group purposely conceals its members and tactics,

21    right?

22    A.  I would agree about the first part, as far as members.  I'm

23    not sure I would agree with the second part, about tactics.

24    Q.  Do you have your binder in front of you, Dr. Simi?

25    A.  Yes.

M5O1MEL2                         Simi - Cross

1   Q.   Okay.  I'll ask you to look in one moment.

2   A.   Okay.

3   Q.   Fair to say you've met with the government—that is, the

4   prosecutors and their staff—multiple times in this case, right?

5   A.   That's correct.

6   Q.   In preparation for your testimony and initially when you

7   were brought on to the case, right?

8   A.   That's correct.

9   Q.   Do you recall approximately how many times you've met with

10  the prosecutors and discussed the case?

11  A.   I mean, not off the top of my head.  I could give you an

12  approximate, if you --

13  Q.   Sure.  What's that?

14  A.   I met in person for the first time yesterday, and had

15  telephone conferences, I would say approximately six or so.

16  Q.   Six or so?

17  A.   That would be teleconference, videoconference, some

18  combination.

19  Q.   Do you recall a meeting you had with Mr. Hellman, who's

20  sitting there at the government's table, on January 19th of

21  2022?  That would have been about four months ago.

22  A.   Not off the top of my head, but -- I trust you.

23  Q.   Okay.  All right.  Well, do you remember having a telephone

24  call with them sometime in January 2022?

25  A.   Well, I mean, I remember having telephone calls.  I

1    couldn't -- I mean, I would be lying if I said I remember that

2    specifically on that date in January.

3    Q.   Okay.  Do you recall ever telling the government during any

4    meeting that "O9A purposely conceals its members and tactics"?

5    A.   I mean, no, I don't remember that right off the top of my

6    head.  I think I would say that there's some truth to the

7    tactics part because any time part of your tactics involve

8    violence, that would be obviously something you would want to

9    conceal.  I suppose some of their tactics are concealed and

10   some are not.  So I guess that's my qualification on what you

11   initially asked.

12   Q.   Okay.  But you agree that the group purposely conceals its

13   members.

14   A.   I would agree with that, yes.

15   Q.   And sometimes their tactics.

16   A.   Yes, yes.

17   Q.   You would agree as a broad matter that there's a lot that's

18   unknown about O9A?

19   A.   I think that's a fair statement.

20   Q.   That's your opinion?

21   A.   I think there's what we call missing data and research.

22   Q.   That makes the group harder to study?

23   A.   It does.

24   Q.   Is O9A also hard to study because it's something like -- I

25   believe your testimony was "the brand"?

A.   Yeah.  That was my testimony.  I don't know that that makes

it harder to study, but I think it makes it hard to

conceptualize and describe sometimes because our tendency is to

want to think of things in a much more concrete way, that you

have a centralized group that has clearly defined boundaries,

and when something doesn't appear that way, I think we have a

hard time conceiving of it.

Q.   I took you to mean a brand, meaning it's essentially a

collection of ideologies that's difficult to pin down.  Is that

not what you meant?

A.   Not completely.

Q.   Well, O9A is, in fact -- well, it is a brand, right?

A.   In my opinion.

Q.   And you've told the government, for example, that O9A is a

brand like the way the Aryan Brotherhood might be considered a

brand, right?

A.   Yeah.  I used that as an example.  I think there's some

interesting parallels there.

Q.   And as a brand, O9A has morphed into many different things,

right?

A.   I think that's fair to say.

Q.   Again, all of this creates the challenges you've identified

and admitted to in studying O9A.

A.   Yeah, absolutely.

Q.   Nevertheless, there are scholars, academics, researchers,

M5O1MEL2                         Simi - Cross

1    who have studied O9A, right?

2    A.   There are scholars, yes, who have published.  For instance,

3    we talked about articles, books, that address O9A specifically,

4    yeah.

5    Q.   So some of the very articles you've read about O9A, yes?

6    A.   Yeah, that's correct.

7    Q.   You talked about -- I won't go over all of them, but you

8    talked about a book by -- I forget the researcher's name --

9    around 2003, talking about O9A, right?

10   A.   Gardell.

11   Q.   Gardell?

12   A.   Yeah, Gardell.

13   Q.   And then there was another one by Goodrick-Clarke, right?

14   A.   That's correct.

15   Q.   And that was another book written in 2003.  That book was

16   called *Black Sun*; is that right?

17   A.   That's correct.

18   Q.   And that book, you've read that book, yes?

19   A.   Yes, I have.

20   Q.   And I believe you testified that you read that book roughly

21   around when it came out; is that right?

22   A.   That was Gardell's book that I testified about reading

23   shortly after it was published.

24   Q.   And that was around 2003?

25   A.   That's my recollection.

```
 1    Q.  Are you aware that Black Sun by Goodrick-Clarke was also
 2    published around 2003?
 3    A.  It sounds about right.  I couldn't, you know, certainly
 4    tell you that exactly, but that sounds about right.
 5    Q.  Well, when did you first read that book?
 6    A.  Probably would have been in some point in the next few
 7    years, in that time, general time frame.  I specifically
 8    remember Gardell in part because we relied on it pretty
 9    extensively and he had done some fieldwork at some of the same
10    locations I had and so I had a particular interest in the work
11    that he had produced, and so I just have a much more concrete
12    recollection of the Gardell book and reading it after it was --
13    shortly after it was published, more so than the
14    Goodrick-Clarke.
15    Q.  But the time of the Gardell book, O9A had been around in
16    existence for about 30 years or so, right?
17    A.  That's correct.
18    Q.  Because you testified O9A more or less, to the extent you
19    can determine with precision, came into existence in the late
20    '60s, early '70s?
21    A.  That's what most accounts indicate.
22    Q.  And most accounts say it was a woman in Wales, actually,
23    who founded O9A; isn't that right?
24    A.  That's -- that's my understanding.
25    Q.  And then an individual named Anton Long starts writing
```

1  about and kind of assuming control of O9A in the '70s, right?

2  A.  That's my understanding.

3  Q.  Now you've testified that the prevailing theory on who is

4  Anton Long is that it's someone named David Myatt, M-Y-A-T-T,

5  right?

6  A.  That's correct.

7  Q.  And he wrote a lot of I think what people consider the

8  foundational texts of O9A, yes?

9  A.  Anton Long did, yes.

10  Q.  Anton Long did; maybe David Myatt, maybe not.

11  A.  Fair enough.

12  Q.  Is that right?

13  A.  That's correct, yeah.

14  Q.  And he wrote a lot of those texts throughout the '70s and

15  '80s and '90s, right?

16  A.  That's correct.

17  Q.  So for example, you talked about a text called *Hostia*,

18  H-O-S-T-I-A.

19  A.  That's correct.

20  Q.  Do you know off the top of your head when *Hostia* was

21  published, Volume 1?

22  A.  No, I don't.

23  Q.  Okay.  If I told you it was the early 1990s, would that

24  sound about right?

25  A.  That seems reasonable.

M5O1MEL2                         Simi - Cross

1   Q.  When was the first time you read *Hostia*?

2   A.  Maybe a year ago.

3   Q.  A year ago?

4   A.  Yeah.

5   Q.  After you were retained to work on Mr. Melzer's case?

6   A.  That particular book, yes.

7   Q.  We'll talk more about that.

8            Now you've published yourself many, many articles,

9   yes?

10  A.  Yes.

11  Q.  Somewhere around 50 or 60 I believe was your testimony,

12  yes?

13  A.  That's correct.

14  Q.  And of those, a dozen were peer reviewed, right?

15  A.  That's correct.

16  Q.  You've written an article about -- among the many you've

17  written was an article about neo-Nazi movements in Europe and

18  the United States, right?

19  A.  That's correct.

20  Q.  You published that article in 2012-2013, yes?

21  A.  That's correct.

22  Q.  When did you start writing peer-reviewed articles, more or

23  less?  When was the first one?

24  A.  2004, I believe.

25  Q.  And the last one?

M5O1MEL2                          Simi - Cross

1    A.   Just had one published—I don't know—a couple months ago

2    about humor in the white supremacist movement, actually, so I

3    guess 2022.

4    Q.   2022.  So about 18 years of peer-reviewed articles?

5    A.   Yeah, sounds about right.

6    Q.   You have not written an article yourself about O9A, peer

7    reviewed or otherwise; is that fair to say?

8    A.   That's fair to say.

9    Q.   It's true, right?  It's more than fair to say, it's true?

10   A.   Yeah, that's what I think I said.  I meant true, yes.

11   Q.   Have you ever written an article about O9A?

12   A.   No, I have not.

13   Q.   Including, by the way, that article that I mentioned in

14   2012-2013, called "Neo-Nazi movements in Europe and the United

15   States," that article did not mention O9A, right?

16   A.   That article did not mention most neo-Nazi groups in Europe

17   at the time, so yeah, by definition, yes.

18   Q.   My question was:  That article did not mention O9A, right?

19   A.   That's correct.

20   Q.   It does mention -- that article does mention specific

21   groups, right?

22   A.   It does, as examples, but just I would say a tip of the

23   iceberg, so to speak.

24   Q.   Okay.  About how many groups does that article mention, if

25   you recall?

M5O1MEL2                    Simi - Cross

1    A.   You have to refresh my memory.  I'm sorry.

2    Q.   But again, it doesn't mention O9A.

3    A.   No, it does not.

4    Q.   Doesn't mention satanism?

5    A.   No, it does not.

6    Q.   Does not mention occultism?

7    A.   Does not.  Not to my knowledge.  Again, it's been a few

8    years, but -- not that I recall.

9    Q.   Would you recall as you sit here today testifying about a

10   case involving satanism and occultism, whether you'd written an

11   article about it, about those concepts?

12           MS. RAVENER:  Objection to form.

13           THE COURT:  Thank you.

14           You can answer the question if you can.

15   A.   Can you repeat the question.

16   Q.   Let me ask you in a simpler way.

17   A.   Okay.

18   Q.   As you sit here today, can you think of an article you've

19   written about satanism and/or occultism?

20   A.   I mean, certainly we've talked about neo-paganism, but no,

21   not satanism or occultism in terms of those specific terms.

22   Q.   Okay.  Let's talk about your book.  Your book is *American

23   Swastika*, right?

24   A.   That's correct.

25   Q.   You co-wrote that, yes?

1   A.  Yes, I co-authored it.

2   Q.  You played a large role in the writing of it; is that fair

3   to say?

4   A.  That's fair to say.

5   Q.  I don't want you to criticize your co-author.  The first

6   version was published in 2010?

7   A.  That's correct.

8   Q.  And then there was a second version published in 2015?

9   A.  That's correct.

10  Q.  Fair to say that that book broadly was about the culture of

11  US white supremacist movements; is that right?

12  A.  That's correct.

13  Q.  And I think you testified at length about what you called

14  the ethnographic fieldwork that you did in preparation for that

15  book, right?

16  A.  That's correct.

17  Q.  You began ethnographic fieldwork sometime before the

18  publication of the book, yes?

19  A.  Yes, sir.

20  Q.  You began in 1997, in fact.

21  A.  That's correct.

22  Q.  While you were still a graduate student, yes?

23  A.  Yes, it was.

24  Q.  Right around the time, not coincidentally, that you began

25  monitoring extremist websites and hate sites, things like that,

1    right?

2    A.   They were deeply connected to each other.  The fieldwork

3    followed the website monitoring.

4    Q.   And that began mid to late '90s, yes?

5    A.   Yeah, the websites began in the fall of '96.

6    Q.   Now --

7              THE WITNESS:  I'm sorry to interrupt.  Is there any

8    chance we could get another short break?

9              MR. MARVINNY:  That's up to the judge.

10             THE COURT:  Thank you.  Yes, I'm happy to take a short

11   recess.  It's about 3:22 by my clock.  Let me propose that we

12   reconvene here at 3:30.

13             Let me just ask or instruct you, if you can, please,

14   Dr. Simi, not to discuss this case or your testimony with

15   anyone during this short recess.  That includes the

16   representatives of the government who are here today.

17             Good.  I'll see you back here shortly.

18             THE DEPUTY CLERK:  All rise.

19             (Recess)

20             (In open court)

21             THE COURT:  Thank you.

22             Counsel, you can inquire.

23             MR. MARVINNY:  Thank you.

24   BY MR. MARVINNY:

25   Q.   Dr. Simi, we left off talking about your book *American*

1    *Swastika.*

2    A.  Okay.

3    Q.  And I think the last question I asked you, or close to the

4    last question, was that the book is about the culture of the US

5    white supremacist movement, correct?

6    A.  That's correct.

7    Q.  Now for that book you conducted firsthand ethnographic

8    accounts of individuals, yes?

9    A.  Yes.

10   Q.  In the book, you called the people you were studying

11   Aryans, with a capital A, right?

12   A.  Yeah.  We adopted their terminology in that sense.

13   Q.  I ask only because I'm going to use that same terminology,

14   so those are the people I'm referring to.

15   A.  Okay.

16   Q.  Okay.  You wrote in the book that gaining access to Aryan

17   free spaces was not easy, right?

18   A.  Yes.

19   Q.  Fair to say that your approach in conducting that

20   ethnographic research was time consuming and labor intensive?

21   A.  That's correct.

22   Q.  You describe it as emotionally draining, right?

23   A.  Yes, very much.

24   Q.  But it was important to make those efforts, right?

25   A.  Yes.

M5O1MEL2                         Simi - Cross

1    Q.  It was important to the research?

2    A.  Yes, yeah.

3    Q.  And why is that?  Why is it important?

4    A.  Why is ethnographic research important or --

5    Q.  Yes.

6    A.  Yeah.  Well, it provides a vantage point.  It's not that

7    other methods aren't important.  They all -- all methods have

8    strengths and limitations.  Ethnographic fieldwork, one of its

9    strengths is being able to study people in a natural

10   environment, a natural setting, whether it be at home or

11   whether it be in more kind of communal collective gatherings or

12   some combination, but being able to go to those spaces and see

13   people directly and spend time with them, trying to understand

14   things from their perspective, that's what ethnography lends.

15   Q.  And in fact, for your research for *American Swastika*, you

16   interviewed 128 Aryans, either in person or by telephone,

17   right?

18   A.  That's correct.

19   Q.  You did 94 follow-up interviews with those same people?

20   A.  That's correct.

21   Q.  So that was a total of 222 interviews that you conducted

22   for the book, yes?

23   A.  Yes.

24   Q.  And that ethnographic fieldwork was conducted primarily

25   from 1997 to 2004, right?

1   A.   Yes.

2   Q.   It was primarily in the western United States, in

3   California, the Pacific northwest, right?

4   A.   Yes, although participants were from all over the country,

5   and even from other countries as well, because of some of the

6   spaces that I was spending time in that drew in folks from

7   various parts of the country as well as other countries.

8   Q.   Okay.  And you used two techniques called snowball and

9   purposive—P-U-R-P-O-S-I-V-E—sampling, right?

10   A.   That's correct.

11   Q.   Now snowball sampling, if I understand it correctly—tell me

12   if I do—snowball sampling is when people you're interviewing

13   are talking with -- kind of referring you to other individuals

14   who may be similarly situated to them, right?

15   A.   Yes.

16   Q.   Okay.  And purposive sampling is kind of when you as a

17   researcher take your own initiative to go out and find

18   subjects; is that right?

19   A.   Well said.

20   Q.   Thank you.  So you did both of those techniques in

21   conducting this ethnographic fieldwork, yes?

22   A.   That's correct.

23   Q.   You did some home visits, right?

24   A.   Yeah, we used the term "home visits."  It's basically

25   you're staying with people in their homes, yeah.

M5O1MEL2                       Simi - Cross

1   Q.   For multiple days at a time, sometimes, right?

2   A.   Yeah, weeks in some cases.

3   Q.   Weeks.  Now your interviews for -- that we're describing

4   here, they included members of the following groups, right:

5   White Aryan Resistance; Aryan Nations; Hammerskin

6   Nation—H-A-M-M-E-R-S-K-I-N; National Alliance; and the Ku Klux

7   Klan; is that right?

8   A.   Those are examples of some, not -- certainly not in the

9   entirety.

10  Q.   That's not an exhaustive list.

11  A.   No, it's not.

12  Q.   Fair to say that no one that you interviewed during that

13  time period when you were preparing to write *American Swastika*

14  was a member of the Order of Nine Angles?

15  A.   Not to my knowledge.

16  Q.   Well, not to your knowledge.  Okay.  No one identified as a

17  member of the Order of the Nine Angles, right?

18  A.   That's correct.

19  Q.   People identified as members of other groups, right?

20  A.   In some cases.

21  Q.   Well, you just told us -- I gave you four examples of

22  groups, and you said that was only a subset of the groups that

23  were represented, right?

24  A.   That's correct.

25  Q.   So you knew, for at least a lot of people you interviewed,

1  which groups they belonged to, right?

2  A.  Yeah, in some cases; in other cases we didn't.

3  Q.  No one claimed, and you did not believe, that anyone was a

4  member of the Order of the Nine Angles, right?

5  A.  That's fair.

6  Q.  Now that's the same -- well, withdrawn.

7          Subsequent to that research that was done for *American*

8  *Swastika*, you've done additional interviews with current and

9  former white supremacists, for lack of a better term, right?

10 A.  Yes.

11 Q.  You've interviewed some former jihadists, yes?

12 A.  Yes.

13 Q.  You've interviewed over a hundred former far right

14 extremists in that time since the research for *American*

15 *Swastika*, right?

16 A.  Yes.

17 Q.  Now none of those people that you spoke to identified as

18 members of O9A either.

19 A.  That's correct.

20 Q.  Now you told us earlier that you have testified in two

21 court cases, right?

22 A.  Yes.

23 Q.  One was a federal civil case and one was an Oregon state

24 criminal case; is that right?

25 A.  That's correct.

M5O1MEL2                          Simi - Cross

1    Q.   The first time you testified I think was the Oregon state

2    criminal case, right?

3    A.   Yes.

4    Q.   What year was that?

5    A.   Right before COVID shutdown, so that would have been 2020,

6    I believe, right?

7    Q.   And that case involved a defendant named Jeremy Christian,

8    right?

9    A.   That's correct.

10   Q.   And fair to say Mr. Christian was not -- well, sorry.  Just

11   very briefly, what was the subject matter of your testimony in

12   that case?

13   A.   The prosecutor's office asked me to review a number of

14   statements, some of which were Facebook posts, and other

15   aspects of Mr. Christian's background, some Department of

16   Corrections records about his previous history of

17   incarceration, and to offer an opinion about whether there were

18   things consistent with -- some of his past conduct and

19   statements that were consistent with the white supremacist

20   movement.

21   Q.   Thank you.  And Mr. Christian was not alleged and did not

22   claim to be a member of the Order of the Nine Angles.

23   A.   Not -- no.

24   Q.   The case didn't involve O9A in any way, right?

25   A.   No, it did not.

M5O1MEL2                           Simi - Cross

1    Q.  So your testimony similarly did not involve O9A, did not

2    touch on O9A?

3    A.  Correct.

4    Q.  Now the same for the civil case I referred to.  That was

5    *Sines v. Kessler*, right?

6    A.  That's correct.

7    Q.  And that was a civil case related to the so-called Unite

8    the Right events in 2017 in Charlottesville, yes?

9    A.  Yes.

10   Q.  Now again, that was a civil case.  In that case you were

11   retained by plaintiffs, right?

12   A.  Yes.

13   Q.  And by the way, on the Christian case, you were retained by

14   the prosecutor—I can't remember if you said that—yes?

15   A.  That's correct.

16   Q.  And on *Sines*, which is the civil case, you were retained by

17   the plaintiffs, yes?

18   A.  Yes.

19   Q.  And your task in that case, your assignment, was to apply

20   your expertise in the characteristics of the historical white

21   supremacist movement to the facts of that case, right?

22   A.  Yes.

23   Q.  That was your assignment?

24   A.  Yes, it was.

25   Q.  You prepared a report in that case, right?

M5O1MEL2                          Simi - Cross

1   A.  We did.

2   Q.  You and Professor Blee?

3   A.  Yes, Professor Blee and myself co-authored the report.

4   Q.  And you actually testified, right?

5   A.  I did.

6   Q.  She did not; you testified.

7   A.  She did not.

8   Q.  The report was about 66 pages, if you recall?

9   A.  Yes.

10  Q.  Now that report touched on a variety of topics, including

11  the core characteristics of the white supremacist movement,

12  right?

13  A.  Yes.

14  Q.  And you were asked some questions about that by the

15  prosecutor on direct; do you remember that?

16  A.  Yes, I do.

17  Q.  Now it's fair to say that report didn't concern Order of

18  the Nine Angles at all either, right?

19  A.  Yes.

20  Q.  That's correct?

21  A.  That's correct, yes, fair to say.

22  Q.  None of the defendants -- there were how many defendants in

23  that case?

24  A.  Approximately a dozen.

25  Q.  A dozen.  Some were individuals, some were groups, right?

1    A.   That's right.

2    Q.   None of them had anything to do, at least to your

3    knowledge, with the Order of the Nine Angles?

4    A.   That's correct.

5    Q.   Now as part of your report in that case, you were opining

6    directly -- sorry.  Withdrawn.

7          As part of your testimony in that case, you were

8    opining directly on the nature of the communications of various

9    defendants in that case, right?

10   A.   Can you restate that.

11   Q.   Sure.  One of the issues in that case was the various

12   defendants' postings on websites and applications on social

13   media, right?

14   A.   That's correct.

15   Q.   In fact, the primary kind of online venue that you were

16   looking at in that case was postings on Discord, yes?

17   A.   Yes.

18   Q.   Now Discord you testified is a kind of quasi-encrypted

19   messaging application, right?

20   A.   That's right.

21   Q.   Okay.  And as part of your report on that case, you looked

22   at about 575,000 Discord posts, right?

23   A.   That's correct.

24   Q.   You looked at some direct messages from the defendants,

25   yes?

1    A.   Yes, we did.

2    Q.   And your task in that case was to decide, determine whether

3    the defendants were at least partly motivated by racial bias in

4    participating in and organizing the Unite the Right event, yes?

5    A.   Yes.

6    Q.   You took a pretty systematic approach to your analysis of

7    Discord in that case, right?

8    A.   I would agree with that.

9    Q.   You used a deductive strategy, which means that you

10   searched for terms you knew to be associated with the white

11   supremacist movement, right?

12   A.   That's correct.

13   Q.   You did an inductive strategy, I guess which is the

14   opposite, which is kind of pulling a random sampling of Discord

15   posts without filtering for any particular terms, right?

16   A.   Yeah, that's a fair characterization.

17   Q.   You coded those Discord posts; is that right?

18   A.   That's correct.

19   Q.   And that's one of the tools a sociologist might use when

20   analyzing content, right?

21   A.   That's correct.

22   Q.   Part of what you've called virtual ethnography, yes?

23   A.   Yeah, in that case, with the Discord, yes, so that would be

24   a type of virtual ethnographic study.

25   Q.   And you approached it in a systematic way; is that fair to

M5O1MEL2                      Simi - Cross

1    say?

2    A.  It is.

3    Q.  When I say you approached it, I'm talking about your

4    process of reviewing the Discord posts in that case, in *Sines*.

5    A.  Yes.

6    Q.  Now we're going to come back to *Sines* a little bit later,

7    but it's fair to say when you conducted this comprehensive

8    review of Discord, you took a lot of notes, made a lot of

9    findings, correct?

10   A.  That's correct.

11   Q.  Did you create one of the Excel spreadsheets you talked

12   about that is typical when you're coding social media posts or

13   anything else?

14   A.  We did use the Excel spreadsheets, among other documents,

15   to help with the analysis.

16   Q.  And in that process you looked for evidence that confirmed

17   your conclusions and evidence that disconfirmed that, right?

18   A.  That's correct.

19   Q.  Now you prepared a 66-page report and you testified, right?

20   A.  Correct.

21   Q.  Nowhere in that case was Order of the Nine Angles

22   mentioned—not in your testimony, not in your report, not in any

23   of the posts that you looked at; is that fair to say?

24   A.  That's fair to say.  Well, I would say it's fair to say

25   except for -- I mean, obviously I'm not able to recall off the

1   top of my head more than half a million posts on Discord, so

2   barring that, but as far as the report and testimony,

3   absolutely, O9A is not mentioned.

4   Q.  As you sit here today, can you remember coding or otherwise

5   observing a post that was explicitly or implicitly related to

6   O9A?

7   A.  I'm sorry.  I can't answer that question.

8   Q.  Well, can you answer the question that you don't remember

9   or can you just not answer the question period?

10  A.  Well, yeah, I can't remember.  I mean, again, we're talking

11  about over a half a million posts, and there was a research

12  team, so there were three of us too, so --

13  Q.  Well, in doing work on the Melzer case, after you were

14  retained was there something you would have looked at?  Would

15  you have looked at the work you did on *Sines*?

16  A.  I guess I'm not following you.

17  Q.  Well, did you go back and look at the work you did on

18  *Sines*, the coding, the review of the Telegram posts, did you go

19  back and look at that in light of your being assigned to work

20  on the Melzer case?

21  A.  No, I did not.

22  Q.  By the way, in the core characteristics of the white

23  supremacist movement, which you talked about at length on your

24  direct testimony, which you wrote about in your *Sines* report,

25  nowhere do you say that the core characteristics include

M5O1MEL2                          Simi - Cross

1   satanism or magic or occultism; is that right?

2   A.  No, we did not.

3   Q.  So those were the two times you've testified in court,

4   apart from today, I guess, right?

5   A.  That's correct.

6   Q.  You've testified I think multiple times in front of

7   Congress in various capacities, yes?

8   A.  Yes, that's correct.

9   Q.  Various committees and subcommittees?

10  A.  Yes.

11  Q.  Now has any of your testimony in any other forum talked

12  about the Order of the Nine Angles?

13  A.  The Veteran Affairs Committee, or subcommittee, there's

14  brief mention in my written -- not my oral testimony but a

15  brief mention in my written testimony.

16  Q.  Was that from March of 2022?

17  A.  That sounds right.

18  Q.  So about three months ago?

19  A.  Yes, sounds right.

20  Q.  And your testimony, that was before a House subcommittee in

21  remarks titled "Helping Veterans Thrive," right?

22  A.  That's correct.

23  Q.  And you say you mentioned O9A in that testimony.  Isn't it

24  true that your mention of O9A was simply to say that Mr. Melzer

25  had been charged with various crimes and that he was alleged to

1    be a member of O9A?

2    A.   Yeah.  It was, like I said, a brief mention and not -- not

3    a substantive -- in what I would call a substantive discussion.

4    Q.   And specifically the mention was about Mr. Melzer, and you

5    testified to the charges that he had been indicted on; you

6    recited them, right?

7    A.   Yeah, I believe I used the term "allegations."

8    Q.   And that was it; that was your testimony about O9A or

9    Mr. Melzer, yes?

10   A.   Like I said, it was brief.

11   Q.   Okay.  And you've never testified in any other capacity—be

12   it in court, be it in Congress, or anywhere else—about Order of

13   the Nine Angles, right?

14   A.   That's correct.

15   Q.   Okay.  I wanted to turn now to discussing the specific

16   topics that you are proposing to testify about at Mr. Melzer's

17   trial, okay?

18   A.   Yes.  Sorry.

19   Q.   If it's not okay, tell me.

20   A.   No, that's fine.  Long day.

21   Q.   You're aware that the way the process works is that the

22   government, the prosecutors write up what's called a notice of

23   your testimony, right?

24   A.   I am aware of that.

25   Q.   You reviewed it in this case, in fact, right?

M5O1MEL2                    Simi - Cross

1    A.  Yes.

2    Q.  Okay.  Well, you're aware of what the prosecutors say

3    you're going to say at trial, right?

4              MS. RAVENER:  Objection.

5    A.  No.

6              THE COURT:  Thank you.  I accept the answer.

7    Q.  Sorry.  Was the answer no?

8    A.  No.

9    Q.  I might have asked that question poorly.

10             There's a notice in this case that explains the topics

11   of your testimony, right?

12   A.  That's my understanding.

13   Q.  You reviewed that notice with the prosecutors, correct?

14   A.  We -- I mean, is there -- can you refresh my memory as to

15   exactly what we're talking about, 'cause I just want to be sure

16   we're on the -- we're on the same page, so to speak.

17   Q.  Yes, I can do that.

18             MR. MARVINNY:  Your Honor, I'm happy to hand this to

19   Dr. Simi.  I only have one copy of it.  I hadn't planned on

20   introducing it or using it.  But I can show the Court and then

21   hand it to Dr. Simi.

22             THE COURT:  Thank you.  Are you referring to Exhibit C

23   or Exhibit F from the government's opposition?

24             MR. MARVINNY:  Oh.  I think it's Exhibit D to the

25   opposition, your Honor.

1          Sorry.  I'm talking about the -- I'm sorry, your

2     Honor.  I'm using the supplemental notice.  I think it's

3     Exhibit D.

4               THE COURT:  Thank you.  January 25, 2022?

5               MR. MARVINNY:  Yes.

6               THE COURT:  Thank you.  I have it.

7               MR. MARVINNY:  You have that.  Okay.  I assume the

8     government has it as well.

9               MS. RAVENER:  Your Honor, we have a copy of the

10    supplemental notice, but we would just ask that a foundation be

11    laid.

12              THE COURT:  Thank you.

13              Counsel, go ahead.

14              MR. MARVINNY:  Okay.  Your Honor, may I, with the

15    Court's permission, just hand Dr. Simi a copy of that

16    supplemental notice, since the rest of the parties have it.

17              THE COURT:  Thank you.  Yes.

18              MR. MARVINNY:  Thank you.

19    BY MR. MARVINNY:

20    Q.  I'm not going to ask you to read from that, Dr. Simi, but

21    would you just take a moment to look over that in a general

22    sense.

23    A.  Okay.

24    Q.  Okay.  You can put that down for now.  I'm just going to --

25    well, does that refresh your recollection that there was a

M5O1MEL2                    Simi - Cross

 1   notice in this case that sets forth the proposed topics of your

 2   testimony?

 3   A.  It does.  Thank you.

 4   Q.  No problem.  And have you seen that document before?

 5   A.  I've seen some version of that document.  I don't know that

 6   it's this exact specific format, but yes, I've seen the

 7   content.

 8   Q.  Something close to it?

 9   A.  Yes.

10   Q.  Okay.  So I'm not asking you to refer to it, by the way,

11   unless I ask you to.

12   A.  Okay.  Thanks.

13   Q.  So the first proposed topic -- sorry.  You know what,

14   withdrawn.

15           You testified about the work you've done to learn

16   about O9A, right?

17   A.  That's right.

18   Q.  And you testified that you've read academic articles,

19   investigative journalism, primary sources, blogs, things like

20   that, right?

21   A.  Yes.

22   Q.  Okay.  Now you met with the government about -- you met

23   with the government multiple times either by phone or in person

24   within the last week or so; is that fair to say?

25   A.  Once in person and, yeah, over videoconferencing prior to

M5O1MEL2                          Simi - Cross

1    that, and within the last week --

2    Q.  Okay.

3    A.  -- I think once or twice.

4    Q.  Now do you recall speaking with the government or meeting

5    with the government on May 20th?

6            MS. RAVENER:  Objection.  Foundation.

7            THE COURT:  Thank you.

8            Is there a question?

9    Q.  Let me ask you this.  How many articles would you say --

10   how many articles and/or books about O9A would you say you've

11   read at this point?

12   A.  Three -- let's see.  Two of -- two books published by Anton

13   Long; certainly well over a dozen, maybe two dozen essays of

14   various sorts that are attributed to O9A, some Long, some other

15   authors; I've also come across what are somewhere between an

16   essay and a book through some of the web searches, and an

17   anthology that's not -- there's no known author that it's

18   attributed to, but it's called *The Rape Anthology*.  It's

19   attributed to being connected to O9A; at least it's presented

20   that way.  So, yeah, I'd say in the multiple dozens of

21   documents.

22   Q.  The two books that you've read by Anton Long, one is

23   *Hostia*, right?

24   A.  Correct.

25   Q.  What is the other one?

M5O1MEL2                          Simi - Cross

1    A.  *Sinister Tradition*.

2    Q.  Now you testified that you didn't read *Hostia* until you

3    were retained on Mr. Melzer's case; is that correct?

4    A.  That's correct.

5    Q.  That was about a year ago?

6    A.  Approximately.

7    Q.  Okay.  As to *Sinister Tradition*, when did you first read

8    that book?

9    A.  It was around the same time.

10   Q.  You had not read that book prior to being retained on

11   Mr. Melzer's case either, correct?

12   A.  That's correct.

13   Q.  And you referenced an article, I think you said *The Rape*

14   *Anthology*?

15   A.  Yeah, that's a more recent discovery, if you want to call

16   it that, that I've made.

17   Q.  Well, you say it's a recent discovery.  Was that provided

18   to you by the government?

19   A.  No, it was not.

20   Q.  It was not?

21   A.  No.

22   Q.  Are you aware that that document is going to be a piece of

23   evidence in Mr. Melzer's trial?

24   A.  No.  I had no idea.

25   Q.  Were you aware that *Sinister Tradition* was recovered from

M5O1MEL2                          Simi - Cross

1    Mr. Melzer's barracks and is going to be in evidence at his

2    trial?

3    A.  I had no idea.

4    Q.  No one ever told you that?

5    A.  I have not seen any evidence in this case.

6    Q.  What about *Hostia*, were you told that that was found in

7    Mr. Melzer's possession?

8    A.  No idea.

9    Q.  How did you get copies of *Hostia*?

10   A.  The wonderful World Wide Web.

11   Q.  What about *Sinister Tradition*?

12   A.  Same thing.  They're readily available online.

13   Q.  Well, *Sinister Tradition* you have to order from Amazon,

14   right?

15   A.  Well, that's -- that's what I'm referring to.  Thank you.

16   Q.  Is that what you did?

17   A.  Yeah.

18   Q.  So I asked you before, do you recall speaking with the

19   prosecutors on or about May 20th of 2022, just about?

20   A.  So that was -- what's the date today?

21   Q.  I was hoping you wouldn't ask.

22           MS. RAVENER:  Your Honor, objection to foundation.

23           THE COURT:  Thank you.

24           Can I ask you to guide us to the question.  I

25   understand you're trying to refresh his recollection.  I

M5O1MEL2                         Simi - Cross

1    haven't heard a fault of recollection yet.

2    Q.  Okay.  Well, as of May 20, 2022, so this was -- today is

3    the 24th.

4    A.  Today is the 24th.  Thank you.

5    Q.  Okay.  So as of then, you told the prosecutors that you had

6    read approximately a half dozen articles or books on O9A; isn't

7    that right?

8    A.  That seems -- well, that's -- if that's -- I mean, I don't

9    recall saying that, but that's low, definitely.  I've read

10   well, well more than a half dozen.

11   Q.  Well, would looking at --

12   A.  Maybe I was referring to the books, but --

13   Q.  Well, would looking at notes from -- you said you don't

14   recall.  Would looking at notes from the prosecutors refresh

15   your recollection?

16   A.  Sure.

17   Q.  You have your binder in front of you.  Would you please go

18   to 3501-21.

19   A.  Okay.  So 35 --

20   Q.  3501-21.

21   A.  Oh, 21.  Okay.

22            There we go.

23   Q.  And I'm going to direct you down to the second to last hash

24   mark there, second to last kind of point, and just read that,

25   the one that starts, "Has read."  Just read to that to

M5O1MEL2                         Simi - Cross

1    yourself, and let us know when you're done, please.

2    A.  Yeah.

3    Q.  Okay.  Does that refresh your recollection that on May 20,

4    2022, you told the government that you had read approximately a

5    half dozen articles and books on O9A?

6    A.  It really does not.  I mean, I can see it here in --

7    obviously in the writing, but it does not refresh my

8    recollection of saying that, and frankly, like I said,

9    that's -- that's low.  That's not accurate.

10   Q.  Well, three days later, on May 23rd, which I guess was

11   yesterday, that's when you met with the government in person,

12   right?

13   A.  Mm-hmm.

14   Q.  YOU told them yesterday that you had read about 15 articles

15   and books on O9A, right?  Do you remember that?

16   A.  Where do you see that?

17   Q.  Well --

18          THE COURT:  I'm sorry.  The question is:  Do you

19   remember that?

20          THE WITNESS:  Oh.  No.  I mean, I don't specifically

21   remember that.

22   Q.  Okay.  Well, I'll direct you to 3501-22.

23   A.  Okay.

24   Q.  Are you there?

25   A.  Yup.  Oh, at the bottom?

1   Q.  At the very bottom, the last line, just take a look at it,

2   and let us know when you're done reading it, please.  Don't

3   tell us yet.

4   A.  I'm done.

5   Q.  Now does that refresh your recollection that yesterday you

6   told the government that you had reviewed approximately 15

7   articles or books about O9A?

8   A.  It does.

9   Q.  Okay.  So is it accurate that between May 20th of 2022 and

10  May 23rd of 2022, the number of articles you had read went from

11  six, approximately six to approximately 15?

12  A.  Like I said, I don't recollect saying six, and frankly,

13  part of this may be a function of the way the essays are

14  organized online in terms of these kind of websites and blogs

15  and so forth.  And so it's possible that, you know, there's

16  kind of an artificially low undercounting of different essays,

17  because I would consider each essay to be a distinct document,

18  and so maybe for whatever reasons, that wasn't conveyed

19  accurately.

20  Q.  Have you read new articles or books in the last two or

21  three days that added to the tally of the total you've read?

22  You can put that down, by the way, the binder.

23  A.  Oh, the last two or three days, nothing new.  I've

24  re-reviewed things that I had previously read.

25  Q.  Okay.  How many -- you talked about the one book in 2003

1    that you had read that mentions O9A, right?

2    A.   Correct.

3    Q.   Apart from that -- I'm sorry.  And then you also talked

4    about the Goodrick-Clarke book that you might have read at some

5    point.

6    A.   I did read, yeah.

7    Q.   Okay.  In the 2000s sometime?

8    A.   At some point, yeah.

9    Q.   Now apart from those two, prior to being retained on

10   Mr. Melzer's case, which articles, essays, and books about O9A

11   had you read?

12   A.   The -- I was certainly aware of some of what Kaplan, Jeff

13   Kaplan, had written about; I would have certainly been aware of

14   some of the journalistic investigative reports.

15   Q.   I don't want to cut you off.  I'm not asking you about what

16   you were aware of.

17   A.   Well, okay.  I'd read -- I'm sorry.

18   Q.   Yeah, which ones you had read.

19   A.   Excuse me.  So I would have read, you know, multiple

20   investigative journalistic accounts.

21   Q.   Which ones?

22   A.   Well, certainly would have read some of Jake Hanrahan's,

23   who I mentioned earlier; ProPublica did a fair amount of

24   reporting on O9A that I would have read, that I did read, prior

25   to, you know, this case in question.

M5O1MEL2                         Simi - Cross

1   Q.  Did you consider yourself an expert on O9A prior to being

2   retained on the Melzer case?

3   A.  I'm -- my -- I'm -- my presentation is as an expert on the

4   white supremacist movement.

5   Q.  Right.  So my question is:  Did you consider yourself an

6   expert on O9A prior to being retained on the Melzer case?

7           MS. RAVENER:  Objection.  Relevance.

8           THE COURT:  Thank you.

9           You can answer the question.

10  A.  No, I would not.

11  Q.  So to the extent you've developed expertise on O9A, it's

12  after being retained on Melzer, which was what date, more or

13  less?

14  A.  You have to refresh my memory.

15  Q.  Was it mid-2021, more or less?

16  A.  That sounds right, but again, you know -- I mean, if you

17  have a document that you can show me, that's -- I mean, I --

18  that sounds right.

19  Q.  Okay.  So let's now talk about the specific topics that you

20  propose to testify about.

21          The first topic is O9A's history and origins within

22  the white supremacist movement, and you propose to testify

23  things like O9A originated in the United Kingdom, O9A's

24  ideology is centered around the worship of Satan and the

25  supremacy of the white race, O9A leaders and members identify

1   as neo-Nazi, things like that.  Fair to say that you learned

2   those facts, to the extent they're facts, from the books that

3   we talked about, right?

4   A.  From -- yeah, from the scholarly treatments, previous

5   books, from primary sources, that we've been discussing, so it

6   would be a combination of sources.

7   Q.  All of which you read -- not all of which, but especially

8   the primary sources, the bulk of which you've read after coming

9   on this case, yes?

10  A.  That's correct.

11  Q.  Now you testified, and you purport to testify, that O9A

12  promotes "human self-sacrifice."  Can you tell us where you get

13  that fact from, that O9A promotes human self-sacrifice.

14  A.  In some of the primary sources there is certainly

15  discussions of, you know, human sacrifice and to some extent

16  self-sacrifice.  I couldn't give you a page number, if that's

17  what the question is.

18  Q.  Well, which primary source?  How about that?

19  A.  I would say there is -- Long discusses it and -- I believe

20  in *Sinister Tradition*.  I believe I've seen it in some of the

21  essays that we've been discussing.

22  Q.  As you sit here, you don't remember with specificity which

23  essays or which primary source you found it in?

24  A.  No, I couldn't tell you that right now.

25  Q.  By the way, are you sure that Long is the author of

1   *Sinister Tradition*, or at least alleged to be the author of

2   *Sinister Tradition*?  Is that your testimony?

3   A.   That's my testimony.

4   Q.   The second topic that you propose to testify on is O9A

5   literature and philosophy.  And the government says on your

6   behalf that O9A texts, including books and essays and blog

7   posts setting forth the O9A philosophy.  Now I don't want to

8   belabor it, but the majority, the bulk of which you read after

9   being retained on Mr. Melzer's case, probably within the last

10  year or so, yes?

11  A.   Yes.

12  Q.   Now the notice says that key O9A texts in this regard

13  include *The Sinister Tradition, Hostia*, and *The Seven Fold Way*

14  *of the Order of Nine Angles*, correct?

15  A.   Correct.

16  Q.   Now had you read any of those books prior to being retained

17  on this case?

18  A.   None of those, no.

19  Q.   And are you aware that every single one of those books that

20  I just mentioned is going to be in evidence in this trial?

21  A.   No awareness.

22          MS. RAVENER:  Objection.

23          THE COURT:  Thank you.  It's fine.  I accept the

24  answer.

25  Q.   The answer was?

1    A.  No awareness.

2    Q.  But those texts were the sources of the information on O9A

3    literature and philosophy that you're going to talk about,

4    right?

5    A.  Those are key texts, and I determined -- made those

6    determinations that it was important to review those materials.

7    Q.  And it's coincidental that all of those texts were in

8    Mr. Melzer's possession?

9    A.  Are you -- I'm not sure I'm understanding your question.

10              MS. RAVENER:  Objection, your Honor.  The witness has

11   made clear repeatedly that he has not been shown the evidence

12   in this case.

13              THE COURT:  Thank you.  Understood.

14              Go on, counsel.

15   Q.  Well, you talked about insight roles.  Let's talk about

16   that.  That's a topic noticed in Section 2.

17              Apart from those three texts that I mentioned, what

18   other sources of information about insight roles did you rely

19   on for your opinion?

20   A.  There's a pretty lengthy discussion in one of the primary

21   sources that's available online, the title of which is *The*

22   *Esoteric Origins of O9A*, I believe.  I think I nabbed that

23   pretty accurate, paraphrasing.  Maybe leaving off one word.

24   But something to the extent of *The Esoteric Origins of O9A*.

25   And there is a section in that that's a pretty extensive

1    discussion of those roles.

2    Q.  And who wrote that book?

3    A.  That is not -- well, it's not a book, it's an essay, so

4    it's a --

5    Q.  Who wrote that essay?

6    A.  That's -- there's no author indicated.

7    Q.  When was it written?

8    A.  Off the top of my head, I couldn't tell you.

9    Q.  Where did you find this essay?

10   A.  It's either on O9A.org or one of the other associated blogs

11   I was able to identify on WordPress, for example, that have

12   various sources attributed to O9A.

13   Q.  Do you have any methodology or way of ascertaining what is

14   a genuine or authoritative O9A text when you're finding it on

15   WordPress if it's no author indicated and no date indicated?

16   A.  It is -- I mean, it's a methodological limitation for sure,

17   there's no doubt about it, that that does present certain

18   obstacles.  On the other hand, I would say, as part of the

19   branding issue that we were discussing earlier, these things

20   are floating around with O9A brands and people latch onto them,

21   they identify with them, and they use them in ways that they

22   think are meaningful and significant.

23   Q.  Any individual may choose to latch onto one portion of some

24   purported ideology or another, right?

25   A.  Can you rephrase that.

1   Q.  Well, you've testified that O9A is diffuse, right?

2   A.  Yeah.  White supremacist movement is diffuse in general.

3   Q.  That it's a brand that has morphed into many things, right?

4   A.  That's correct.

5   Q.  So my question is:  Any one individual could read a text

6   and decide that it's important to them, or not, right?

7   A.  That's possible, sure.

8   Q.  You have no reliable way, reliable methodology of

9   ascertaining what these documents on the internet -- whether

10  these documents on the internet are authoritative in any

11  meaningful sense, right?

12  A.  I wouldn't agree with that.  So if you look at these texts

13  that -- that may not have an author or in some places a

14  publication, you can look at the content and compare it to

15  other things that are more recognized as, to use your

16  terminology, authoritative texts, so you could look at

17  discussions across multiple texts as it relates to, for

18  instance, in this case, insight roles and see, is there

19  consistency or are they talking about wildly different things.

20  Q.  Let's talk about No. 3.  And the topic is O9A structure.

21  The government proposes that you will testify that O9A is an

22  international, largely clandestine collective of individuals

23  and groups known in O9A parlance as nexions, right?

24  A.  That's correct.

25  Q.  Did you know the term "nexion" before you were retained on

M5O1MEL2                          Simi - Cross

1    Mr. Melzer's case?

2    A.   I don't think I was familiar with that.

3    Q.   Did you know anything about the nature of various O9A

4    rituals before you were retained on this case?

5    A.   I'd come across, you know, some -- again, as I mentioned,

6    in reading from scholarly sources and some of the journalistic

7    accounts but also in some of the material on Telegram that we

8    were discussing earlier, certainly came across some of the, you

9    know, manifestations, shall we say, of O9A.

10   Q.   And what is your understanding of how someone initiates an

11   O9A?

12   A.   Well, it's a kind of a multistep or multistage process that

13   involves things like the insight roles, it would involve

14   practices, in some cases it might, for example, involve a

15   person separating themselves and living in the wilderness for a

16   period of time on their own, you know, it involves a series of

17   steps that a person moves through in terms of a process.

18   Q.   What texts are you relying on for that information?

19   A.   Again, some of the books that Long authored, some of the

20   essays that we've already been discussing available online,

21   journalistic accounts, scholarly accounts that reference these

22   issues.

23   Q.   The things that you learned about in the last year or so?

24   A.   Well, not the scholarly accounts, not the journalistic

25   accounts, and again, not the things that I was able to observe

M5O1MEL2                        Simi – Cross

on Telegram.  All of that would have been more than a year ago.
But as far as some of the primary sources that we were just
previously discussing, yeah, that would have been within the
last year.

Q.  Is it your testimony that you had an understanding of how
one might initiate into O9A or what ritual someone might
perform prior to a year ago?

A.  I'm saying I've read material that would have addressed
those -- some of those issues, yeah, absolutely.

Q.  Let's go on to the internet spaces, which is topic 6 of
your proposed testimony.

A.  Okay.

Q.  Okay.  Now this topic is use of certain terms, images and
double-speak and "just joking."  Now you testified that these
double-speak and "just joking" and front-stage/backstage
techniques are well understood in the sociology community,
right?

A.  That's correct.

Q.  You didn't come up with these concepts.

A.  No, I did not.

Q.  Now going back to the *Sines* case, when you testified for
the plaintiffs, in that case you offered testimony about those
concepts, right?

A.  That's correct.

Q.  About double-speak, "just joking," front-stage/backstage

M5O1MEL2                          Simi - Cross

1   behavior, yes?

2   A.   That's correct.

3   Q.   It was part of your expert report and it was part of your

4   testimony, yes?

5   A.   Yes.

6   Q.   Now in that case you came to your conclusions about those

7   concepts and how they applied to the defendants in that case by

8   reviewing a Discord post that we discussed, right?

9   A.   In part.

10  Q.   And, well, there were other sources as well, there were

11  other kind of postings on social media and websites, right?

12  A.   Yeah, scholarly research, again, multiple sources, back to

13  that --

14  Q.   You reviewed the specific communications of the defendants

15  in that case, yes?

16  A.   We were provided with, yeah, a substantial amount of

17  discovery evidence.

18  Q.   And you looked at a wider sample of Discord posts to

19  compare the defendant's communications to that wider sample,

20  right?

21  A.   Yeah, that was part of what was subpoenaed from Discord.

22  Q.   And we talked about how you engaged in a kind of rigorous

23  review of those materials.

24  A.   That's correct.

25  Q.   Now your work on that case and that review didn't include a

1   systematic review of Telegram posts; is that right?

2   A.  No, we didn't look at any posts on Telegram as part of the

3   *Sines* case.

4   Q.  Now in that case, in *Sines*, you were actually asked to

5   opine, and you did opine, for the jury as to individual

6   communications from the defendants, right?  And what I mean by

7   that is, you were asked whether individual communications were

8   consistent with the double-speak, "just joking,"

9   front-stage/backstage strategies, right?

10  A.  We were provided, you know, again, all of those materials

11  as part of our assignment, so, yeah, that was part of our

12  assignment was to look at some of those specific posts and

13  assess whether we could identify whether they were consistent

14  with the longstanding tactics and the larger cultural practices

15  that were part of the white supremacist movement, historically

16  speaking.

17  Q.  And you were called upon to actually offer an opinion to

18  the jury about those specific -- those defendants'

19  communications AND whether they conformed or employed those

20  particular techniques, right?

21  A.  Yeah, yeah, the tactics and techniques.  Not so much as to

22  whether they conspired, but -- that was beyond our assignment,

23  but, yeah.

24  Q.  I said conformed.

25  A.  Yeah, yeah, yup.

1   Q.  For example, you were shown communications and asked:  Is

2   this an example of the "just joking" concept, right?

3   A.  That's correct.

4   Q.  And you were shown other communications and asked:  Is this

5   an example of double-speak or front-stage/backstage behavior,

6   right?

7   A.  That's correct.

8   Q.  And then you told the jury whether it was or it wasn't,

9   right?

10   A.  Yes.

11   Q.  Is it your belief that you have the ability to determine

12   when people online are actually joking or not joking?

13   A.  I think, as I said earlier, I don't have, nor claim to

14   have, a special power of sorts.  We were talking about the

15   larger cultural practice of using the "just joking" as

16   plausible deniability and were able to point to examples which

17   we believed illustrated or exemplified that, but we weren't

18   asked, wasn't part of our assignment to opine on each and every

19   potential post as to whether it was a joke or only meant as a

20   joke or really meant something else.  That -- that really

21   wasn't part of our assignment.  We were talking about the

22   larger cultural practices that are part of the white

23   supremacist movement.

24   Q.  Well, but you did opine on specific posts, right?  We

25   talked about that, yes?

1   A.  Yeah, we opined that these would be examples or -- yeah,

2   exemplars of these larger tactics and strategies that have been

3   identified in the white supremacist movement.

4   Q.  One example, you were shown one of the defendants' tweets

5   that said "Love your race, stop white genocide," and you

6   testified that that was an example of double-speak, right?

7   A.  Yeah, has multiple meanings to insiders and outsiders.

8   Q.  And you were shown -- you were played an audio clip of one

9   of the defendants, Cantwell, speaking, and you reviewed that

10  audio clip and you told the jury that that was an example of

11  "just joking," right?  Do you remember that?

12  A.  I do.  I believe that was a podcast.

13  Q.  Okay.  And you told the jury that his words on that podcast

14  were an example of joking, right?

15  A.  You'd have to refresh my memory, but my recollection would

16  be that that podcast was an example of how the "just joking" is

17  used strategically in that sense.

18  Q.  Okay.  And you were shown in front of the jury one of the

19  organizer's of the Unite the Right events online communication

20  and instruction that he wanted "no discussion online of any

21  resistance strategies because those would be handled through

22  secure channels"; do you remember reviewing that?

23  A.  I do, yes.

24  Q.  And you told the jury that that was an example of

25  front-stage/backstage behavior, right?

1   A.   Yup, yes.

2   Q.   In that case you interpreted and explained the meanings of

3   the defendant's communications, at least some of them, for the

4   jury, right?

5   A.   That's correct, yeah, that's what we do in ethnographic

6   fieldwork and cultural analysis.

7   Q.   And you believe you're capable of doing that.

8   A.   Of interpreting cultural references to a -- in a culture

9   that I've spent thousands and thousands of hours studying?

10  Yes.  I do believe it's not an issue of special powers, it's an

11  issue of understanding cultural references and steeping one's

12  self in that topic that allows for a person to be able to make

13  those kind of interpretations.

14  Q.   So let's talk about the concept of joking.  You would agree

15  that it's a broad cultural practice, wouldn't you, joking?

16  A.   Yeah, probably universal.

17  Q.   Universal.  All cultures more or less joke, right?

18  A.   Seems to be the case.

19  Q.   Most subcultures joke with one another, right?

20  A.   That's true.

21  Q.   Humor is a way that humans use to bond and connect with

22  each other; is that right?

23  A.   That's correct.

24  Q.   Now in the notice the government has provided, topic 6,

25  they propose that you are going to testify that O9A members

1    regularly employed double-speak, "just joking," and

2    front-stage/backstage strategies in communications.  Okay?

3    A.  Okay.

4    Q.  Does that sound right?

5    A.  Sounds right.

6    Q.  Now on what are you basing your opinion that O9A members

7    regularly employ those techniques?

8    A.  Based on the materials I've reviewed, whether it be the

9    virtual spaces in terms of material in those realms, whether it

10   be the primary sources that we've already discussed, and based

11   on what's been indicated in investigative journalism accounts,

12   academic accounts, those will provide -- or those do provide a

13   basis to draw these kind of interpretations.

14   Q.  Have you done any kind of systematic or quantitative

15   assessment of communications by O9A members?

16   A.  Did you say a quantitative?

17   Q.  Yeah.  Like in the *Sines* case for the Discord posts that we

18   talked about, we talked about how you reviewed 575,000 posts,

19   you used deductive and inductive methods of comparison, you

20   coded the spreadsheets that you created.  Have you done

21   anything even remotely similar to that for O9A members'

22   communications?

23   A.  Yeah.  As part of my analysis of Telegram channels, which

24   wouldn't be exclusive to O9A, it would include the ones that

25   we've been discussing, but it would be more broad than that.

M5O1MEL2                          Simi - Cross

1     It would be, you know, a large, large number of Telegram

2     channels that I've systematically analyzed, I've documented,

3     I've, you know, reviewed the posts, created archives of, you

4     know, memes and videos that are being shared, so, yeah, that

5     would all be consistent with, you know, a larger kind of

6     virtual ethnographic systematic analysis that, you know, I

7     employed for the last several years.

8     Q.  Is your testimony that you've compiled data that someone

9     could look at on the use in O9A members' communications of

10    double-speak, "just joking," and front-stage/backstage; you

11    have quantitative data on that?

12    A.  No, not quantitative data.  This virtual ethnographic is

13    not really a quantitative -- necessarily a quantitative

14    methodology.  It may involve quantification, as was the case in

15    the *Sines* case, but it doesn't necessarily always involve that.

16    So I wouldn't saw quantitative.  Do I have -- have I collected

17    data and analyzed it in terms of themes present, yes, I have.

18    Q.  Well, correct me if I'm wrong, but my understanding of what

19    you've done in terms of looking at, quote-unquote, O9A

20    communications online is you've reviewed postings, websites,

21    and chats, right?

22    A.  Excuse me?  Can you say that again.

23    Q.  In terms of reviewing O9A members' communications, you've

24    reviewed some Telegram chats and posts and things like that,

25    right?

M5O1MEL2                         Simi - Cross

1    A.   That's correct.

2    Q.   Okay.  Now I believe you said you reviewed about 10

3    channels on Telegram, more or less, that may involve O9A

4    members' communications, right?

5    A.   Yeah, O9A or related, Temple of Blood, so forth, or some --

6    give some indications of O9A presence of some kind or another,

7    not necessarily specific O9A channels.

8    Q.   Some indication of O9A?

9    A.   Well, people posting in the channel, then making reference

10   to O9A in some form, or posting something as it relates to

11   symbols, for instance, with Temple of Blood.

12   Q.   So it could be a chat about something else by and large,

13   but if they mention O9A, that would be --

14   A.   Well, I'm reviewing the channels for their content and

15   looking at the different things, and as we discussed earlier, a

16   lot of -- there is a lot of, you know, interaction across --

17   and on Telegram you find different channels that are kind of,

18   well, shall we say, kind of a diverse hodgepodge of sorts.

19   They're not all necessarily specific to one group.  You're

20   going to have a variety of sorts who are participating in that

21   channel and potentially posting.

22   Q.   Am I correct that on direct examination you said there were

23   about 10 channels that you reviewed that you believe fall

24   within the category of O9A members' communications?

25   A.   Yeah, it would have O9A -- some presence of O9A

1   communication, or postings.

2   Q.  Can you tell us the names of those 10 channels.

3   A.  Sure.  One is simply called Order of Nine Angles.  One is

4   simply called Blood, Temple of Blood.  There's another one

5   that's called Order of Nine Asses.  There are -- I'd have to --

6   we're talking about -- I'm reviewing hundreds of Telegram

7   channels so I'm happy to provide a longer list.

8   Q.  You're reviewing hundreds, but again, it's 10, including

9   those three --

10  A.  Approximately.

11  Q.  -- that pertain to O9A?

12  A.  Yeah, approximately.

13  Q.  How many members are in each of those three -- how many

14  participants are in each of those three channels, Order of Nine

15  Angles, Temple of Blood --

16  A.  Temple of Blood, as I recall, about 50, approximately, are.

17  The other two you mentioned, I couldn't tell you off the top of

18  my head.  I don't remember either of them having very large

19  number of subscribers.  Of course you can view those channels

20  without joining, so that also affects the number of

21  subscribers.

22  Q.  So you remember the Temple of Blood Telegram channel had

23  about 50 people?

24  A.  Approximately.  That's approximately.

25  Q.  Approximately.  Order of Nine Angles, Order of Nine Asses,

M5O1MEL2                        Simi - Cross

1    you don't remember.

2    A.  Not off the top of my head.

3    Q.  Were you a member of any of those channels or were you just

4    kind of a lurker?

5    A.  No, I was able to lurk on those.

6    Q.  You weren't a member of any of them.

7    A.  No.

8    Q.  Now it's fair to say you have no way of knowing who -- you

9    have no real way of knowing who in those channels is an actual

10   member of O9A; isn't that right?

11   A.  I mean, that's the nature of Telegram.

12   Q.  What's the nature of Telegram?

13   A.  Well, it offers that kind of anonymity.  I mean, that's the

14   nature of virtual participation more broadly is that there is a

15   anonymous component to it that's very important.  You know, you

16   have people making references to O9A, suggesting --

17   self-identifying in those ways, naming their channel in those

18   respects, but yeah, ultimately, at the end of the day, that's

19   what you have.

20   Q.  And you're familiar with -- you mentioned the concept of

21   shit posting, right?

22   A.  I did.

23   Q.  You're familiar with a concept called LARP'g, right?

24   A.  Correct.

25   Q.  Live-action role playing, right?

M5O1MEL2                         Simi - Cross

1    A.   Right.

2    Q.   You're aware through your research that individuals often

3    misrepresent who they are online, right?

4    A.   I think that's fair to say, generally speaking, that

5    there's a fair amount of online misrepresentation.

6    Q.   So when you or anyone else goes into one of these purported

7    O9A chat spaces, you don't have any really reliable way of

8    knowing who is actually a member versus who is LARP'g, who is

9    role playing, something like that; isn't that right?

10   A.   I think what you have is you have representations of a

11   brand, of people projecting their identification with a set of

12   ideas, world view, with a collective identity, a group, and

13   it's -- obviously, to the extent that they're doing that, it

14   does suggest some significance for them, that they are finding

15   something either enjoyable or meaningful about it.

16   Q.   But my question was:  You don't, as a researcher, a

17   sociologist, or anyone else, you don't have a way of saying who

18   is a legitimate member or who's role playing or doing something

19   else in those spaces, right?

20   A.   That's fair.

21   Q.   Now topic 7 of your proposed testimony, which is O9A's use

22   of encrypted messaging applications, the government proposes

23   that you will testify that "O9A primarily communicates through

24   encrypted messaging applications such as Telegram."  Now from

25   what source are you deriving your opinion that O9A primarily

M5O1MEL2                          Simi - Cross

1    communicates through applications like Telegram?  How could you

2    possibly know that?

3    A.  Well, I think we know that Telegram more broadly has become

4    a preferred method of communications for white supremacists

5    that would include a variety of different associated groups,

6    and that certainly there has been, you know, a presence of O9A

7    on Telegram.  I would say it's not -- certainly not the only,

8    but --

9    Q.  Well, the language is "O9A primarily communicates."  You

10   don't know that.  "Through encrypted messaging applications

11   such as Telegram."  You have no way of knowing that, right?

12   A.  I think that's fair to say that "primarily" maybe is -- I

13   would use maybe a different term.

14   Q.  Well, Dr. Simi, you have no idea how many people in the

15   world are members of O9A, right?

16   A.  That's correct.  I mean, there are estimates that are

17   available that, you know, various sources have made in terms of

18   estimated numbers of what people believe to be O9A members

19   across the globe.

20   Q.  What's that estimate?

21   A.  I mean, you see ranges anywhere in the hundreds -- the most

22   common, I would say, estimate I see is in the thousands, low --

23   Q.  Do you have any way of knowing how many O9A members there

24   are in the United States?

25   A.  I do not.

1  Q.  Have you seen estimates?

2  A.  Not specific to the US.  I've seen global estimates.  All

3  the estimates I've seen have been global.

4  Q.  So I'll ask again then.  Without that information -- well,

5  sorry.  Let me just make sure I'm understanding.  For this

6  assessment of these 10 chat rooms, three of which you've given

7  us the names of, you haven't done the comprehensive review and

8  quantified it in a way that you did the Discord posts in *Sines*,

9  right?  This is more of a different methodology.

10  A.  It is different.

11  Q.  So you can't show us a spreadsheet just as to the Order of

12  the Nine, these 10 chat rooms or something like that.

13  A.  Not today, sitting here.

14  Q.  You haven't done that, right?

15  A.  Not in the way *Sines* -- not in the way we did with *Sines*,

16  but I have used methods that are comparable.

17  Q.  So given that you don't know the number of O9A members

18  there are in the country, given that people online may be role

19  playing, inauthentic, given that you haven't quantified these

20  chats in any meaningful way, how do you propose that you'll

21  testify that O9A members primarily communicate through

22  applications such as Telegram?

23  A.  One of the things that's clear is that they do communicate

24  through Telegram, and one of the things that's clear in other

25  accounts in terms of scholarship as well as investigative

M5O1MEL2                      Simi - Cross

journalism, as well as, you know, some of the governmental

reports, law enforcement reports, nongovernmental organizations

that monitor these issues, because it is a common denominator

in terms of the identification of Telegram as a -- certainly a

significant channel of communication, you know, the primary --

and we might want to quibble about that word specifically as to

what that means, but certainly a significant channel of

communication.  That seems pretty clear from multiple sources.

Q.  It would be more accurate to say that some people claiming

to be O9A members sometimes communicate through Telegram; would

that be more accurate?

          MS. RAVENER:  Objection.

          THE COURT:  Thank you.

          You can answer the question.

A.  I think that kind of underplays it a little bit, to be

honest.  I think Telegram, we know the significance, that

Telegram is substantial for white supremacists, broadly

speaking, and so to me, that -- yes, it is some, but it is --

it's -- I think that doesn't quite capture the importance of

Telegram.

Q.  Dr. Simi, you agree that precision on these matters is

important, right?

A.  Absolutely.

Q.  And so I think you've agreed that it's inaccurate to say

that O9A primarily communicates through encrypted messaging

1    applications like Telegram.  Is that the bottom-line answer?

2    Is that fair to say?

3    A.  That's fair to say.

4              MR. MARVINNY:  I have nothing further, your Honor.

5              THE COURT:  Thank you.

6              Good.  Let me turn to counsel for the United States.

7    Counsel?

8              MS. RAVENER:  Your Honor, if we could have a moment to

9    confer?

10             THE COURT:  Thank you.  Yes.  Please take your time.

11             (Counsel conferring)

12             THE COURT:  While you're conferring, let me just ask

13   Dr. Simi a brief question.

14             You get the thrust of counsel for defendant's

15   questioning.  It basically sounds as though you haven't done

16   the same type of work here as you did in this case in Virginia.

17   Can I rely on your testimony that you're offering here,

18   notwithstanding the fact that you did not undertake the same

19   type of analysis?

20             THE WITNESS:  Yes, your Honor.

21             THE COURT:  Why?

22             THE WITNESS:  In the *Sines* case, you know, they

23   subpoenaed -- the plaintiffs subpoenaed Discord for the

24   communication that was part of the various Discord channels

25   that were used to organize Unite the Right, so you had a very

discrete set of time related to a very specific event, and that

was provided to us to conduct the analysis that we ultimately

conducted.

On this, you have a very different scenario here.  Now

I've conducted -- as part of virtual ethnographic methods that

I've relied on for years, I've conducted or been conducting a

study of Telegram channels in order to try and understand the

extent the platform's being utilized by white supremacists

broadly, and as part of that, there is certainly a piece of

that that directly applies to O9A specifically, as well as,

more broadly, to the white supremacist movement that allows me

to still use that methodology to make an assessment about

what -- the data that I'm collecting as it relates to O9A

specifically and compare it with the other data on Telegram

that I'm also collecting that's more broad and relevant to

other groups or just more generic to white supremacists more

broadly.  And so the core -- some of the core elements of the

methodology are still intact and can be used to make these

kinds of assessments, in my estimation.

THE COURT:  Thank you.

Is it the case that the process that you used here is

what other academics in your field of research would use to

examine this kind of situation?

THE WITNESS:  Yes, it is, sir.

THE COURT:  Thank you.

1          Good.  Counsel for United States?

2          MS. RAVENER:  Yes, your Honor.  If I could just have

3   one more moment.

4          THE COURT:  That's fine.

5          (Pause)

6          MS. RAVENER:  Your Honor, if I could inquire briefly.

7          THE COURT:  Please proceed.

8          MS. RAVENER:  Thank you.

9   REDIRECT EXAMINATION

10  BY MS. RAVENER:

11  Q.  Good afternoon, Dr. Simi.

12  A.  Hello.

13  Q.  You were asked a number of questions regarding the *Sines*

14  case and the difference between your work in the *Sines* case and

15  here.  I want to be clear.  Have you reviewed the actual

16  evidence in this case, Dr. Simi?

17  A.  Not an ounce.

18  Q.  Have you been asked to review or comment on the defendant's

19  conduct in this case in any way?

20  A.  Never.

21  Q.  Have you been asked to evaluate the defendant's statements

22  in any way?

23  A.  Never.

24  Q.  Have you been asked to apply your methodology to opine on

25  the application of "just joking" or other communication

M5O1MEL2                      Simi - Redirect

1   strategies to any particular statements in this case?

2   A.   Not in this case.   Not at all.

3   Q.   What have you been asked to do?

4   A.   I've been asked to speak more broadly to the general

5   characteristics of the white supremacist movement, the

6   intersections, overlaps as it relates to O9A, some O9A-specific

7   things as it relates to world view, ideologies, how people

8   become involved, again, points of consistency between some of

9   those things and the core characteristics that have been

10  identified as part of the white supremacist movement.

11  Q.   And you were also asked a number of questions regarding

12  your lack of prior testimony on O9A specifically; is that

13  right?

14  A.   That's correct.

15  Q.   And are there other white supremacist groups that you've

16  studied but not testified about?

17  A.   Absolutely.

18  Q.   Are there other white supremacist groups that you've

19  studied but not written or published about?

20  A.   Absolutely.

21  Q.   How many, approximately?

22  A.   Well, I mean, the universe of white supremacist groups

23  is -- again, we don't know how many.   We're talking about in

24  the thousands of groups.   And some groups, again, I think as I

25  mentioned earlier, have a long history, and other groups are,

M5O1MEL2                    Simi - Redirect

you know -- exist one minute and are defunct the next minute.

So, you know, it's not possible for a person who studies this

to cover every single group that's ever existed as part of the

white supremacist movement.

Q.  And you indicated that there are some global estimates of

membership for O9A?

A.  I've seen several.

Q.  And can you give us a sense of what those estimates are.

A.  The most common you see is -- again, not precise number,

but usually 2 to 3,000, it seems like is pretty common in the

estimates that I've seen, from different sources.

Q.  And do you have a sense of whether that means it's a

particularly large group or small group within the white

supremacist movement?

A.  You know, the size of white supremacist groups varies so

much.  I mean, you have, you know, a lot of emphasis on

developing small cells, and those might be, you know, literally

just a few people, and that might be the group; and other cases

you have much larger groups that may be, you know, in the

thousands, so, you know, within a specific local context, I

should say.  So for instance, you might have in some cases

groups in southern California that have thousands of members

just in that one, you know, location, locale.  So there's such

a broad range, I think it's difficult to say, but, you know,

you get a sense of that broad range and where these estimates

M5O1MEL2                        Simi - Redirect

1    about O9A might fit.

2    Q.  And Dr. Simi, you were asked questions about how -- pardon

3    me one moment.

4           Bear with me one moment.

5           MS. RAVENER:  May I have one moment, your Honor?

6           THE COURT:  That's fine.  Please take your time.

7           (Pause)

8    Q.  Okay.  And Dr. Simi, you were asked questions, for example,

9    about whether you considered -- whether O9A was a brand; is

10   that right?

11   A.  That's correct.

12   Q.  Outside the white supremacist context, can you give us

13   examples of other organizations you view as a brand.

14   A.  Well, one of the interesting points of comparison here

15   would be how ISIS ended up functioning.  Certainly there was

16   the authentic ISIS led by, for a period of time, Baghdadi, but

17   one of the things they promoted was this brand idea, which is

18   folks who have similar ideas, similar mind-set, similar world

19   view, take on the ISIS brand and do your own thing, interpret

20   it, and use it in a way that makes sense to you, and the more

21   people do this, the better for, you know, the brand, the better

22   for the group, the better for the broader movement, frankly.

23   Q.  And Dr. Simi, you were also asked some questions regarding

24   whether or not you were an expert, in your own view, on O9A at

25   the time of your retention in that case.  Do you recall those

M5O1MEL2                       Simi - Redirect

1    questions?

2    A.  I do.

3    Q.  Okay.  And I want to ask you, when did you start following

4    the O9A-related Telegram channels that we discussed?

5    A.  That would have been pretty early in my kind of getting on

6    Telegram and starting to look, so it's been more than two

7    years.  I think I started -- my initial foray onto Telegram was

8    about three years ago when I first started kind of, you know --

9    opened up an account on Telegram and started monitoring

10   channels.  So it would have been during that year.

11   Q.  And did that process have anything to do with your

12   retention in this case, specifically?

13   A.  I'm not sure that I can answer that question.  Maybe you

14   can clarify.

15   Q.  Well, a few years ago were you retained in this case?

16   A.  No, I wasn't.

17   Q.  Okay.  And you spoke about a particular entity or channel I

18   believe called RapeWaffen.  Am I correct about that?

19   A.  I'm certainly familiar with that.  I guess we did talk

20   about it earlier in the day, yeah.  That's true.

21   Q.  And we talked about RapeWaffen in the context of O9A; is

22   that right?

23   A.  O9A and Atomwaffen, yes.

24   Q.  And when did you first identify Atomwaffen and RapeWaffen?

25   A.  Well, I was -- I would have seen the RapeWaffen

1    approximately two years ago; a little over two years ago.

2    Q.  And I believe you also testified that you had read books

3    and other academic literature relating to O9A dating back more

4    than a decade; is that correct?

5    A.  Yeah, that's correct.  I mean, the Gardell book was, like I

6    said, 2003, so --

7    Q.  You also were asked questions about certain O9A texts; is

8    that right?

9    A.  That's correct.

10   Q.  And how there's no way to tell what are the real texts or

11   what's most important or something like that; do you recall

12   questions along those lines?

13   A.  Can you restate that.  I'm sorry.

14   Q.  You were asked questions about, given the internet sourcing

15   and that use of anonymity in O9A, how you could possibly know

16   that the books you chose to read, like *Sinister Tradition* and

17   *Hostia*, were relevant texts to understanding O9A; is that

18   right?

19   A.  That's correct.  I was asked about that.

20   Q.  Okay.  So let me ask you this, Dr. Simi:  Are those texts

21   discussed in the academic literature that you've reviewed from

22   books and peer-reviewed journals?

23   A.  Yes, absolutely.

24   Q.  And how did you identify which texts to read in order to

25   better understand O9A doctrine?

1   A.  Partly from the academic literature and what had previously

2   been indicated as kind of key texts.

3   Q.  And you were also asked a series of questions about whether

4   you'd consider yourself an O9A-specific expert; is that right?

5   A.  That's correct.

6   Q.  Do you view that as your area of expertise now?

7   A.  I mean, I view my understanding of the white supremacist

8   movement and O9A's relationship to it as part of my expertise,

9   yes.

10  Q.  And you were also asked some questions regarding -- well,

11  let me back up.

12          How does your research and writing over the past 20

13  years on the white supremacist movement relate to your

14  knowledge of O9A and your expertise with respect to O9A?

15  A.  Well, it gives, you know, a person the kind of background

16  frame of reference, knowledge of the culture, understanding of

17  different tactics and strategies that exist across a wide range

18  of different groups that's not specific to any one particular

19  group, necessarily, because it's part of the broader culture.

20  Certainly the fact that, you know, a major presence, at least

21  as indicated in my own fieldwork and interviews but also more

22  broadly within the academic literature in terms of neo-paganism

23  and the presence of that within the white supremacist movement,

24  that -- that also helps prepare me for looking specifically

25  like -- at a group like O9A.  So I think it's a variety of

factors that kind of allow me, give me the kind of contextual

and background knowledge and understanding, that allows for me

to make an assessment like the one I'm making here today.

Q.  Have you observed overlapping concepts in the doctrine of

O9A to other white supremacist groups?

A.  Yeah, absolutely.  I mean, we talked about insight roles,

for example.

Q.  And how about the concept of -- well, I'm sorry.  How about

the use of terminology by O9A; how does that compare to white

supremacist groups?

A.  I've seen definitely some overlaps and then I've seen some

terms that are much more unique to O9A.  So -- and I think

you'll find that in any culture, that different variants or

strands of a culture will have things that overlap with the

broader culture, but there will also be certain things that may

be unique, and that's I think something you find across the

board and something I've found as it relates to O9A.

Q.  Does O9A's embrace of satanic influences make it unique or

outside the white supremacist movement?

A.  No.  Absolutely not.  I mean, there's, you know, a whole

history of an overlap between satanism or neo-Naziism and white

supremacy that we can look at and use as a broader framework

for understanding this particular instance of how this overlap

converges in the case of O9A, but it's definitely part of a

longer tradition, if you will.

M5O1MEL2                          Simi - Redirect

1    Q.   Does O9A's embrace of certain occult ideas make it outside

2    the scope of the white supremacist movement?

3    A.   No, absolutely not.

4    Q.   Why not?

5    A.   Again, this is not uncommon, and when you look at the

6    history of Naziism, when you look at the history of various,

7    you know -- of more contemporary white supremacist groups in

8    the United States, again, you'll find these overlaps certainly

9    not uncommon at all.

10   Q.   Dr. Simi, you were also asked about the importance of

11   encrypted communications and whether they're primarily or

12   mostly or sometimes used by O9A.  Do you recall those

13   questions?

14   A.   I do.

15   Q.   What's the importance of encrypted communications within

16   the white supremacist movement, based on your research and

17   experience?

18   A.   Again, it comes back to privacy and security and what we've

19   been discussing today in terms of free spaces, the ability to

20   minimize culpability.  Again, because of the violent nature of

21   the culture, that kind of, you know, encryption or

22   semi-encryption is going to be important, given the -- that

23   there's going to be discussions of violence, because that's the

24   nature of the culture.

25   Q.   And have you observed that significance of moving to

M5O1MEL2

1    encrypted platforms in your study of the white supremacist

2    movement in recent years?

3    A.  Yes, absolutely.

4    Q.  And have you observed what appears to be a similar practice

5    among O9A --

6    A.  Certainly their -- yeah, their presence on platforms like

7    Telegram and Discord that allow for that kind of semi-encrypted

8    protection would be an indication of that, yeah.

9            MS. RAVENER:  One moment, your Honor?

10           THE COURT:  That's fine.

11           MS. RAVENER:  No further questions.

12           THE COURT:  Thank you.

13           Counsel for defendant?

14           MR. MARVINNY:  No recross, your Honor.

15           THE COURT:  Good.  Thank you very much.

16           Dr. Simi, thank you very much for your testimony.  You

17   can step down.

18           THE WITNESS:  Thanks, your Honor.

19           THE COURT:  Thank you.

20           (Witness excused)

21           THE COURT:  Good.  So counsel, I'll try to be brief.

22   I have a short follow-up question with respect to Dr. Simi,

23   then I'd like to talk quickly, in the time that we have, about

24   the voir dire process.

25           With respect to Dr. Simi, counsel for defendant, just

briefly, in your reply brief, you did not raise the hearsay

issue, which was a prominent strand of argument in the initial

brief that you submitted.  Am I to take anything from that?  In

other words, should I find that Dr. Simi is qualified to

testify as an expert?  Does the kind of background testimony

that the government has proposed to introduce fit within the

category of I'll call it appropriate expert testimony, or is

the hearsay issue that you raised in the initial brief

something that I need to address?

          MR. MARVINNY:  Thank you, your Honor.  I do think it's

something the Court would need to address—that is, we certainly

haven't abandoned that argument and continue to press it.  I

think, frankly, a lot of the contours of that argument would

depend on what Dr. Simi's testimony was here today, and I think

his testimony today reaffirmed the idea that really the vast

majority of Dr. Simi's opinions are based on things he's read

in articles, blog posts and things like that, and since coming

on the Melzer case.  Moreover, your Honor -- so that hearsay

issue is still live.

          Moreover, your Honor, a related concept is that a very

large portion of the concepts that Dr. Simi will seek to

attribute to O9A and testify about are actually set forth in

detail in the very exhibits that the government is going to be

introducing at trial.  Now I know Dr. Simi testified he hadn't

reviewed those exhibits, but it's certainly improper for

M5O1MEL2

1     Dr. Simi to take the stand and repeat information that is

2     essentially already in evidence.  That's another way in which

3     the hearsay problem arises in this case.  So we haven't waived

4     that issue.  I would respectfully ask the Court to address it.

5          THE COURT:  Thank you very much.  Good.  Your first

6     comment answered my question.  The defense has not abandoned

7     that argument.  I will address it.  Thank you.

8          So let's talk about the jury selection process.

9     First, counsel, I circulated to you a revised set of voir dire

10    questions that responded to the parties' response to the

11    questions that I submitted to you.  We have some time now to

12    talk about any issues that you'd like to raise with the Court

13    regarding those questions.  I just emphasize the word "some,"

14    because it's almost 5, and I think that the Marshals may need

15    to leave shortly with Mr. Melzer.

16         So the things that I want to accomplish here

17    principally are (1) to hear if there's anything that you want

18    to tell me about those questions that we can discuss fruitfully

19    in the time that we have left, and (2) to let you know that I

20    think, having considered the parties' positions, that it would

21    be efficient for us to use a questionnaire for purposes of the

22    jury selection process here.  That would require a degree of

23    reformulation of at least the format of the questions—that is,

24    they would be placed in a questionnaire format.  I know that

25    some of you at least are familiar with the process that we use

M5O1MEL2

1    for the questionnaire process in this court.  I've had my staff

2    reach out to the jury department.  The way that we would work

3    it here would be that the selected panel of jurors would come

4    in on the 22nd, they would respond to the questionnaire and

5    provide responses; I would ask the parties to review all of the

6    questionnaire responses by the 24th, which is the following

7    Friday; I would ask you to—to use a phrase that is used by one

8    firm in the city—"bucketize" them into three buckets, one being

9    ones as to which there are no objections—that is, there's no

10   basis for a for-cause excuse; two are ones where the parties

11   agree there's a justification to excuse a person for cause; and

12   then three is what I would call other, so people from whom we

13   might want to hear more before the parties take a firm position

14   about whether or not there's a basis for a for-cause excuse or

15   where the parties think that additional questions of a

16   particular member of the venire should be pursued by the Court

17   before a determination is made.  So those will be the three

18   buckets.

19        What I'd ask the parties to do is to look at the

20   responses to the questionnaire and to send me a copy of your

21   list with a spreadsheet showing which jurors in which bucket by

22   the end of the day on Friday; I'd schedule a conference for

23   Monday, June 27th, in the morning, at 10, to resolve any

24   disputes; after that, the parties would prepare and send to the

25   Court a final list of all the jurors who we call back for voir

1    dire on the first day of trial.  That's July 5.  So that's the

2    process that I think will work.  Given what I understand about

3    the jury process, even in COVID times, I understand that we

4    would have about a hundred people who would be available to

5    respond to the questionnaire on the 22nd.  That is at least

6    their estimate.

7            So that's my current proposal.  I understand the

8    defense prefers that we proceed using the questionnaire and the

9    government does not have an objection.  As a result, my

10   proposal is that we proceed in that way.

11           Anything that either party would like to tell me about

12   that approach before we set that in place as our process here?

13   First, counsel for the government?

14           MS. RAVENER:  No, your Honor.

15           THE COURT:  Thank you.

16           Counsel?

17           MR. MARVINNY:  No, thank you.

18           THE COURT:  Very good.  Thank you.

19           So just one brief question for you.  I don't think

20   that I need to ask you to resolve this definitively now,

21   counsel, but I just ask you to think about it.

22           I'm going to give you a hypothetical.  Assume we have

23   a hundred jurors that respond to the questionnaire.  60 of them

24   fall into bucket A; 10 fall into bucket C; and the remaining 30

25   fall into bucket B.  C was the other, remember, where we would

M5O1MEL2

1   ask additional questions.  The thing that I'd ask you to think

2   about is whether, if we had 60 people who the parties agreed

3   should not be excused for cause, whether we should just call in

4   that group of 60 and make our determinations from amongst that

5   group or if we should instead bring in also the group C, make

6   determinations regarding whether or not they should be excused

7   for cause, and then mix them into the pool as we do our

8   individual voir dire.  I don't want to take a position on this

9   now, but I just want to raise it for you.  You can see the

10  potential efficiencies.  It turns in part on the numbers, but

11  it also turns in part on whether or not the parties think that

12  that will result in a fair process.  So I just flag it for you

13  as an issue.

14          I'm going to ask the parties to help me transform the

15  voir dire questions in the format that I've given it to you

16  into questionnaire format.  I'll ask the parties to confer

17  about which one of you wants to do that work, but I am going to

18  task it to you.

19          I think the parties are familiar with the format of

20  such questionnaires.  It's best to give them some kind of an

21  introduction to the case at the outset, and then the questions

22  are basically formulated so that they can be responded to by

23  the jurors.  One brief note on this point:  I granted the

24  government's request to refer to people by number, not name,

25  during the process.  So think about the fact that I expect that

1   presumptively there may be interest in seeing the responses to

2   the questionnaires.  So think about how prospective jurors

3   should identify themselves in that questionnaire, both so that

4   they don't get mixed up, they know who they are, but also

5   mindful of the concern that the government articulated, and

6   with which I agreed, using the other approach.  I just remind

7   you that the voir dire questionnaires are another format in

8   which that same question will arise, and I ask you to think

9   about it.

10        So that's all that I wanted to say about the process

11  generally.  What I'd ask you to do is to talk about which group

12  of lawyers wants to take up this task, collaboratively or

13  individually—maybe it's collaboratively—and give me a proposal

14  as to when you would like to turn back a proposed set of

15  questionnaires to me—that is, a form of questionnaire that we

16  can give to the jury department.  I was going to propose that

17  you give it to me by June 1, but instead what I'm going to do

18  is just ask you to talk about how you want to proceed.  It's

19  most important that we do it relatively soon so that we have a

20  final version of that by the 27th.  My preference would be that

21  you give me something that we can talk about on the 8th, should

22  we proceed to a hearing regarding the CIPA notice that was the

23  subject of my order last week.

24        In the short amount of time that we have, counsel, any

25  issues that we can discuss regarding the modifications to the

M5O1MEL2

voir dire questions as I formulated them?  First, counsel for
the government, any issues that we can discuss briefly here?
If we don't have time, we can talk about them in more depth
later.

          MS. RAVENER:  Your Honor, there's no issue with the
questionnaire from the government's perspective, but we would
just note we observed that the Court removed paragraph 54,
which referred to persons not on trial.  We have no objection
to that with respect to the questionnaire, but we would renew
our objection to improper argument from the defense on that
subject, and we would ask that that be resolved in advance of
trial.

          THE COURT:  Thank you.  Let me just respond to that.
So I deleted that because the defendant asserts that he'll
argue "that there was no actual conspiracy, and that the fact
that no one else has been charged or prosecuted supports that
argument."  There's a Second Circuit case on point, which is
*United States v. White*, which held, as I understand, that the
district courts may not presumptively exclude evidence of the
government's charging decisions, among other things.  So I
can't make a categorical determination at this point regarding
whether or not that argument should be precluded.  I think that
I need to invite supplemental submissions on it, and then I may
need to potentially both seek more briefing but, more
importantly, understand further where this argument sits, given

M5O1MEL2

1    the nature of the facts that the parties either present or

2    proffer they will present at trial.  So I didn't ask the

3    question in the voir dire questions.  I thought that I had

4    other questions that essentially asked the prospective jurors

5    whether they would follow my instructions.  I did not want to

6    do what I'll call a push/pull, which I think is what the

7    defense was concerned about, and I didn't want to make a

8    determination prematurely regarding whether or not that

9    argument was precluded.

10          So yes, I understand the argument, counsel for the

11   government, and I will expect to solicit further briefing or

12   argument on that point once I have more information, but this

13   is not the right format in which to do it.

14          MS. RAVENER:  That's fine, your Honor.

15          THE COURT:  Good.  Thank you.

16          Counsel for defendant?

17          MR. MARVINNY:  Your Honor, without waiving any

18   objections we've raised previously, we have nothing to add on

19   this questionnaire as it stands.

20          THE COURT:  Very good.  Thank you very much.

21          Good.  So please do collaborate.  Let me know, if you

22   could, by let's say Monday about how you would propose to go

23   about this.  Please feel free to reach out to court staff if

24   there's anything that you want to know about how this process

25   works with the questionnaire generally speaking.  The technical

M5O1MEL2

1    process issues, I'm sure they'd be able to work with you on.

2           I think that's all that I can take up now.  Counsel

3    for the government, anything else that we need to talk about

4    before we adjourn?

5           MS. RAVENER:  No, your Honor.

6           THE COURT:  Thank you.

7           Counsel for defendant?

8           MR. MARVINNY:  No, your Honor.

9           THE COURT:  Good.  Thank you, all.  This proceeding is

10   adjourned.

11          THE DEPUTY CLERK:  All rise.

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    PETER SIMI

 4   Direct By Ms. Ravener  . . . . . . . . . . . . 5

 5   Cross By Mr. Marvinny  . . . . . . . . . . . 166

 6   Redirect By Ms. Ravener  . . . . . . . . . . 226
```