M6GHMelC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                            20 Cr. 314 (GHW)

 5   ETHAN PHELAN MELZER,

 6              Defendant.                    Conference

 7   ------------------------------x

 8                                            New York, N.Y.
                                              June 16, 2022
 9                                            9:05 a.m.

10
     Before:
11
                       HON. GREGORY H. WOODS,
12
                                              District Judge
13
                            APPEARANCES
14
     DAMIAN WILLIAMS,
15        United States Attorney for the
          Southern District of New York
16   BY:  KIMBERLY J. RAVENER
          SAMUEL S. ADELSBERG
17        MATTHEW HELLMAN
          Assistant United States Attorney
18
     DAVID E. PATTON
19        Federal Defenders of New York, Inc.
          Attorney for the Defendant
20   JONATHAN MARVINNY
     ARIEL CHARLOTTE WERNER
21

22

23

24

25
```

M6GHMelC

1          (Case called)

2          MS. RAVENER:  Good morning, your Honor.  Kimberly

3    Ravener and Sam Adelsberg, for the government.

4          THE COURT:  Thank you.  Good morning.

5          MR. MARVINNY:  Good morning, your Honor.  Federal

6    Defenders of New York by Jonathan Marvinny and Ariel Werner for

7    Ethan Melzer.

8          THE COURT:  Very good.  Thank you very much.  Good

9    morning.

10          So I have lengthy agenda for this morning's

11    conference.  Let me tell you what I hope to cover.

12          First, I want to talk briefly about the motions

13    pertaining to defendant's purported expert.  Then I want to

14    talk some about the jury selection process, including the

15    questionnaire.  I'd like to provide some feedback with respect

16    to the issue of defendant's provision of its witness and

17    exhibit list.  I have some feedback also on the parties'

18    proposed limiting instructions.  I want to talk about the trial

19    indictment, provide you some scheduling issues, and also I will

20    seek an update regarding the CIPA issues.  Then I hope to turn

21    to a resolution of the issues related to the admissibility of

22    the testimony of Dr. Simi.

23          So is there anything that any of you would like to add

24    to my agenda before I begin with that?

25          Counsel, first, for the government?

M6GHMelC

1            MS. RAVENER:  I don't believe so, your Honor.

2            THE COURT:  Thank you.

3            Counsel?

4            MR. MARVINNY:  No, thank you.

5            THE COURT:  Good.  Thank you.

6            So with respect to the first issue, namely,

7    defendant's purported expert, I've reviewed the government's

8    memorandum.  I haven't seen the defendant's memorandum or any

9    reply yet, so I don't know what my view will be regarding the

10   arguments presented by the government.  I won't have a sense of

11   that until I've read the complete briefing.

12           I know, however, from looking at the government's

13   motion that, among other things, they challenge the

14   admissibility of the witness' testimony under *Daubert* and its

15   progeny.  As a result, I want to make sure, from a scheduling

16   perspective, given the amount of time between now and trial,

17   that we have something on the calendar for a *Daubert* hearing to

18   provide defendant the opportunity to establish the bona fides

19   of the purported expert.  Looking at my calendar, the only date

20   that works between now and trial that will also provide me with

21   ample time to resolve the issue before trial is next Wednesday.

22           So, counsel, I'm going to schedule a hearing for next

23   Wednesday, at which I expect defense will be able to present

24   evidence and testimony from the expert to establish his -- the

25   admissibility of his testimony.  It may be that I'll be able to

M6GHMelC

```
1    reach a resolution that would not require such testimony, but
2    at this point I don't know that.  So I'm going to just schedule
3    a placeholder now and direct the parties to prepare for a
4    hearing on that date.
5         With respect to the jury selection process, I've been
6    thinking about the number of alternates that we should have.  I
7    think that when we talked about it before our -- my, at least,
8    going in assumption was that we would seat only two alternates
9    as is customary practice here.  In light of COVID, I've been
10   thinking about whether or not it might not be prudent to seat
11   more than two alternates, in particular whether we should seat
12   something like four alternates for our expected two-week trial,
13   and I wanted to get the views of the parties regarding that
14   prospect.
15        Counsel for the government, what do you think?
16        MS. RAVENER:  Your Honor, we do believe that would be
17   prudent.
18        THE COURT:  Thank you.
19        Counsel for defendant?
20        MR. MARVINNY:  Your Honor, our position is that two
21   alternates is sufficient.  That is the standard in this
22   district even for cases of the anticipated length that
23   Mr. Melzer's trial will be, but we defer to the Court.
24        THE COURT:  Good.  Thank you.
25        I think that we should seat additional alternates.
```

M6GHMelC

1   The parties are aware of the fact that we've been living

2   through a pandemic over the course of the last couple of years.

3   Most recently there's been a surge which seems to be abating

4   somewhat, but, unfortunately, we face the real prospect of

5   potentially losing one, two, or -- one or two jurors during the

6   course of trial.  If we lose three, we would have to consider

7   deeply whether we wish to proceed with less than 12 jurors.

8   That's not my preference.

9           In order to guard against is that prospect, in light

10   of the fact that we are operating in the middle of a global

11   pandemic, I think it is prudent for us to select four

12   alternates.  That will change somewhat the jury selection

13   process that we discussed previously.  You can do the math

14   yourselves.  The rule tells you how many peremptory strikes you

15   have with four alternates.  I expect to proceed in that way.

16   That will mean that I think we will have to qualify 36 jurors

17   in order to arrive at a group with four alternates.

18           If for some reason we have difficulty qualifying that

19   number of prospective jurors, we'll deal with it, but at this

20   point my hope is that we'll be able to qualify 36 so that the

21   parties can exercise the appropriate number of peremptory

22   strikes to arrive at a jury of 12 with four alternate jurors.

23           As with the process that I articulated at the final

24   pretrial conference, you will know the pool of jurors against

25   whom you'll be exercising your strikes as to the alternates.

M6GHMelC

1    So you will know who those people are that will be the last

2    grouping of jurors.  So we'll have 12 that will be the selected

3    jurors, which will be the lowest numbers remaining on the

4    board, and you'll be exercising your strikes as to the

5    alternates with respect to the remaining pool.

6         So let's turn now about -- to a discussion about the

7    questionnaire and the voir dire process.  We're working with --

8    I am working with the jury department to prepare the

9    questionnaire.  Thank you very much for working, counsel, to

10   provide a version of it to me based on the questions that we

11   had worked to develop together.  I thought that your

12   questionnaire was very helpful and very well done.  I very much

13   appreciate it.  There are two issues that the parties have

14   asked me to resolve with respect to it.  I'll turn to that in

15   just a moment.

16        Now, as a reminder, the questionnaire is going to be

17   administered on the 22nd of June.  By no later than June 24,

18   2022, I will ask the parties to have reviewed all of the

19   questionnaires to determine whether there's a basis to excuse a

20   juror for cause and to discuss each of the prospective jurors

21   with that determination in mind.

22        No later than 5 p.m. on Friday, the 25th, you should

23   email the Court a list of all of the jurors divided into three

24   categories:  First are the jurors who both parties agree should

25   be excused for cause; second are jurors about whom the parties

M6GHMelC

disagree as to whether they should be excused for cause; and the third are jurors that the parties agree there is no basis to excuse for cause.  I'll look at that list and the responses to the questionnaires over the weekend, and we'll schedule a conference for Monday, the 27th, at 10 a.m. to resolve any disputes.  And then the parties will prepare and send to the Court a final list of all of the jurors to be called back for voir dire.  That list will need to be presented to me, that is, the Court, no later than 9 p.m. on the 27th.  That way the jury department can inform the selected jurors that they need to appear on the 5th.

Now, at our last conference, counsel, I asked the parties to consider a hypothetical, which is the following:  If we have a sufficient number of agreed-upon jurors to participate in individualized questioning, that is, enough people in category three, if we had 36 people in category three, would you be willing to -- or more, would you be willing to proceed to individualized voir dire with just that pool, or should we instead resolve all disputes regarding what I'll describe as category two and then engage in some process to determine which of the jurors in categories two and three should be potentially selected to be members of the jury?

Counsel, have you had an opportunity to think about that question, and if so, what are your respective views?

First, counsel for the government.

M6GHMelC

1          MS. RAVENER:  Your Honor, we have discussed it

2     hypothetically.  I think we do believe that bringing in an

3     increased group, even if we have approximately 36 people in,

4     say, the agreed-upon category, would make sense.  It leaves

5     open the risk that, upon individualized questioning, some

6     additional information might appear that would require further

7     inquiry and additional for cause excuse -- excusing of the

8     jurors.

9          THE COURT:  That's fine.

10          Let me change the hypothetical.  What if we have 60

11     people in category three?

12          MS. RAVENER:  I think that may be adequate, your

13     Honor.

14          THE COURT:  Thank you.

15          Counsel for defendant, what's your view?

16          MR. MARVINNY:  Your Honor, our view is that the Court

17     should rule on disagreements between the parties, that is, that

18     the group two should be adjudicated by the Court.  Our position

19     is that a contrary system, that is, one that just leaves the

20     jurors in the third category somewhat incentivizes parties to,

21     how should I put it, overstrike for cause, and we'd seek to

22     avoid that.

23          We think the more sensible system and the fairer

24     system is to have the parties represent their good faith

25     positions as to each juror and the Court to decide the

M6GHMelC

1    discrepancies.

2            THE COURT:  Thank you.  That's fine.  I'm happy to

3    approach it in the way that the defense proposes.

4            Good.  So we'll proceed in that way.  I will expect

5    that we will be bringing in, then, the people in categories two

6    and three, and that we'll begin our voir dire process with the

7    jurors who are in category two.  I'll make determinations

8    regarding whether or not those jurors, prospective jurors, in

9    category two should be stricken for cause.  And then we will

10   select our jurors from amongst the group two and three

11   categories.

12           I think that in order to use a randomized system, my

13   expectation going in is that we'll use -- in order to order

14   them, we'll use the randomly assigned juror numbers downstairs.

15   So to use a hypothetical, if there are 15 jurors in category

16   two and 40 in category three, we won't select from two and then

17   three for our jury.  We'll instead place those people using

18   their random numbers, that is, those that have been permitted

19   to proceed, that is, who have not been stricken for cause.

20           Good.  So in the June 9, 2022, accompanying the

21   questionnaire submitted by the parties, defendants raised two

22   issues about the questionnaire.  I'm going to resolve each of

23   those issues now.

24           First, the defendant asked the Court to revise the

25   wording of questions 55 to 66 to ask the jurors whether they

M6GHMelC

 1    would be able "to follow" as opposed to whether they would be

 2    "unable" to answer those questions.  I am denying that request.

 3    The current language is consistent with the phrasing that I and

 4    my colleagues typically use in voir dire.  I understand that

 5    usually those questions are structured so that the polarity of

 6    the responses drive a "yes" answer if there's a problem.  But

 7    the questions themselves, I think, are clearly worded, and

 8    prospective jurors will be encouraged to read the questionnaire

 9    carefully, minimizing the risk of misunderstandings.  Also,

10    each of the relevant words, I think, is bolded in the text.  So

11    I think the likelihood that they will misinterpret the question

12    based on its phrasing is very low.  I think it's really none.

13            Second, the defendant has requested that the Court add

14    a question noting that some of the evidence in this case will

15    relate to 9/11 and asking if anything about such evidence would

16    make it difficult for a juror to render a fair and impartial

17    verdict in this case.  I am going to deny that request for a

18    number of reasons.

19            First, I don't think that the question is necessary.

20    Question 44 notes already that some of the "evidence in this

21    case will relate to certain individuals' association with and

22    praise for . . . Osama bin Laden, ISIS, and al Qaeda" and asks

23    if anything about such evidence would make it difficult for the

24    juror to render a fair and impartial verdict in this case.  I

25    think that question sufficiently screens for issues related to

M6GHMelC

1    9/11 that a potential juror may bring to the Court's attention.

2            Further, the evidence related to 9/11 is very limited.

3    The governments notes that it consists of a photo on a slide in

4    a U.S. Army briefing deck, a Telegram chat that briefly

5    mentions 9/11, and an image that reflects approval for the 9/11

6    attacks.  The evidence is limited, and I am concerned that the

7    addition of the defendant's proposed question would have the

8    potential to confuse the issues in this trial by suggesting

9    that 9/11 plays a larger role in the case than it does.

10            So I am denying each of those requests for the reasons

11   that I've just described.  I think that the questions, as

12   formulated, are adequate to ascertain whether each of the

13   jurors is able to serve as a fair and impartial juror in the

14   case.

15            Again, I remind you parties that something that I said

16   during our final pretrial conference, namely, that if you have

17   additional questions for any particular prospective juror that

18   you'd like for me to ask, please feel free to remind me of

19   that.  I'm happy to do so.

20            I'd like to turn next to the government's request that

21   the defendant produce his trial exhibits, as well as a list of

22   those exhibits and any prior statement of witnesses that he

23   will call to testify by June 21, 2022.

24            Counsel, I've reviewed the parties' submissions with

25   respect to this issue.  Is there any other argument that either

M6GHMelC

1 party would like to raise with respect to this topic before I

2 take it up?

3          First, counsel for the government?

4          MS. RAVENER:  Nothing further from the government.

5          THE COURT:  Thank you.

6          Counsel for defendant?

7          MR. MARVINNY:  Just one moment, please.

8          THE COURT:  Please.

9          (Counsel confer)

10          MR. MARVINNY:  Your Honor, we just want to add one

11 brief point, which is that now that it looks like we will be

12 potentially proceeding with a *Daubert* hearing on Wednesday, the

13 22nd, it makes the obligation to provide defense exhibits by

14 the 21st even more onerous.  It was already onerous to begin

15 with for the reasons we'd stated, but this is an additional

16 consideration we ask the Court to consider.

17          THE COURT:  Thank you.  Understood.

18          Very good.  Let me just take up this issue.  As the

19 parties know, Federal Rule of Criminal Procedure 16(b)

20 provides:

21          "If the defendant requests disclosure under

22 Rule 16(a)(1)(E) and the government complies, then the

23 defendant must permit the government, upon request, to inspect

24 and to copy or photograph books, papers, documents, data,

25 photographs, tangible objects, buildings or places, or copies

1    or portions of any of these items if (i) the content is within

2    the defendant's possession, custody, or control; and (ii) the

3    defendant intends to use the item in the defendant's

4    case-in-chief at trial."

5             Pardon me.  I misread Romanette (i).

6             "If the item is within the defendant's possession,

7    custody, or control; and (ii) the defendant intends to use the

8    item in the defendant's case-in-chief at trial."

9             Federal Rule of Civil Procedure 16(b).  Information

10   subject to such disclosures includes documents and objects, as

11   well as reports of any physical or mental examination that the

12   defendant intends to use in his case-in-chief at trial.  *Id*.

13   The term "case-in-chief" has been interpreted to encompass "all

14   nonimpeachment exhibits they intend to use in their defense at

15   trial, whether the exhibits will be introduced through a

16   government witness or a witness called by a defendant."  *United*

17   *States v. Napout*, 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12,

18   2017).  In addition, Rule 26.2 requires that the defendant

19   provide prior statements by witnesses upon the government's

20   request after any witness other than the defendant testifies.

21            Notably, there's no deadline for the required

22   disclosures under Rule 16 and Rule 16's text, and Rule 26.2

23   provides the timeline that I've just outlined.  However, as the

24   government points out in its request, numerous courts in this

25   district have ordered the early disclosure of the defendant's

M6GHMelC

        1   exhibit list and witness list.  *See, e.g., United States v.*

        2   *Brennerman*, 17 Cr. 337, Dkt. No. 24 (ordering disclosure 18

        3   days prior to the start of trial); *United State v. Percoco*,

        4   16 Cr. 776, Dkt. No. 396 (ordering disclosure more than a month

        5   prior to the start of trial).

        6           The Court agrees that ordering pretrial disclosure of

        7   the requested material prior to trial will aid in the efficient

        8   and orderly presentation of the government's and the

        9   defendant's respective cases at trial.  It will allow the

       10   parties to raise any evidentiary issues with the Court in

       11   advance and, therefore, reduce the need for delay and

       12   disruption at trial and for the parties to brief and the Court

       13   to resolve any disputed issues.

       14           This is also fair in the context of this case.  As the

       15   government articulates in its letter, the government has

       16   produced the -- provided the defense with its exhibits and the

       17   vast bulk, as I understand it, of the 3500 materials.  It did

       18   so a very long time ago.  This is a complex case, and the

       19   defense has had substantial time to review those materials and

       20   to prepare for trial.  Given the age of this case and the

       21   quantum of disclosures by the government about the case, I

       22   believe that the defendant should be in a position to disclose

       23   its exhibit list and its witness list before trial.

       24           While I recognize that the defendant may need to

       25   change what it wants to do at trial, there's no reason at this

M6GHMelC

point for it not to be able to identify the universe of
documents and witnesses that it may introduce at trial, other
than to retain the tactical advantage associated with such a
late disclosure.

Given the many benefits of early disclosure for the
efficient presentation of the evidence and the opportunities
for the parties to fully develop anticipated objections to
evidence, I conclude that it's appropriate to order the
reciprocal disclosure of an exhibit and witness list here.

That said, I will not order disclosure on either of
the timelines suggested by the parties.  First, as the
defendant points out, the government has yet to produce 3500
material from trial preparation meetings, nor has it disclosed
which of defendant's postarrest interviews it will seek to
introduce.  I also understand that the defense must prepare, as
it, frankly, should have been expecting to do regardless given
the nature of the expert testimony that it anticipates, for a
*Daubert* hearing on the schedule that I've just established.  As
a result, I am not going to require that the disclosures be
provided by the 21st as recommended by the United States.

As a result of those things, I think it's reasonable
for the defendant to take more time to determine which exhibits
it will introduce at trial and to assemble its exhibit list and
witness list.  At the same time, there has been considerable
discovery in this matter, which weighs in favor of as early a

M6GHMelC

1    disclosure as possible to ensure that the parties' cases are

2    presented in as efficient a manner as possible to the Court.

3    Plus, as the government has pointed out, defendant has had

4    ample time to review the government's proposed exhibit list,

5    which should aid in the defendant's ability to compile its own,

6    and of course, defendant will remain free, within bounds, to

7    amend or supplement the exhibit and witness list as the trial

8    grows closer.  More on that point in a moment.

9        Accordingly, defendant is ordered to produce a list of

10   exhibits that he reasonably expects to introduce at trial no

11   later than June 24, 2022.  Defendant is also ordered to produce

12   a witness list and any witness statements by that date.  The

13   witness and exhibit lists are subject to good-faith revision as

14   the defense continues to prepare for its case.  But please

15   don't view that caveat as an invitation for sandbagging.  If an

16   exhibit or witness is not disclosed in accordance with the

17   Court's order, I will expect that I will ask for a

18   justification for the failure to disclose the information

19   timely, and an unsatisfactory justification may lead to the

20   exclusion of the proposed exhibit or testimony.

21       So, again, June 24 is the deadline for provision of

22   those materials by the defense for the reasons that I've

23   articulated.

24       In addition, I'm providing the parties with copies of

25   the limiting instructions that I expect to both include in the

M6GHMelC

1   jury charges and also to administer to the jury during the

2   course of trial.

3           I want to say a couple of things about these

4   instructions so that you understand what my thought process was

5   here.  I'm happy to hear further objections to them before I

6   administer them, but I want to give you both my current

7   proposals for your feedback and also provide you with some

8   reasoning behind the decisions that I have made that are

9   embedded in those instructions.  I also want to make a request

10  for you to aid me in the efficient and proper administration of

11  the trial.

12          First, as you'll see, I have not included reference to

13  the First Amendment in these instructions.  I don't believe

14  that reference to the First Amendment is necessary to instruct

15  the jury that Mr. Melzer is "not on trial for holding or

16  expressing any particular extremist or religious or political

17  beliefs" or for the "mere possession of such materials."

18  Further, the inclusion of the reference to the First Amendment

19  could needlessly confuse the jury.  This is a topic I expect

20  that we may take up in more depth as we discuss the charges

21  given the nature of the proposals by the defense on this point

22  which I read to suggest that there's a free-floating First

23  Amendment exception to criminal liability.  I want to talk

24  about that when we get to the charges.

25          Further, I've clarified the purposes for which the

evidence discussed in these instructions can be used, namely,

to show the defendant's state of mind, as did the courts in

*United States v. Hossain*, which is 19 Cr. 606, and *United*

*States v. Abu Jihaad*, 600 F.Supp.2d 362 (D.Conn. 2009).  It is

my intention that the instruction will ensure that the jury

does not do more than is proper.

          In addition, I've clarified that jurors are not

allowed to use evidence that Mr. Melzer held or expressed

certain beliefs to substitute for proof beyond a reasonable

doubt of the charged offenses.  I'm going to ask for your views

on these limiting instructions at or before -- probably at the

outset of trial.  So if you have comments on these, please do

let me know.

          I'm also going to look to you for your views regarding

the timing for administration of these instructions.  You, the

parties, know much more about the case, the evidence, and the

witnesses.  I don't know the order of the evidence that you'll

be presenting.  So I'm going to ask you to let me know when you

think it would be appropriate for me to administer any given

limiting instruction during the course of or prior to the

testimony of any given witness.

          This is part of the reason why I'm providing these to

you now, so that you can contemplate them, and let me know when

you believe that an instruction should be administered.  I've

asked that you try to alert me to that outside of the hearing

M6GHMelC

 1   of the jury, if you would, so that I can take it up in a way

 2   that will seem organic to the jury.

 3        Good.  So, again, I'll look to you for comments with

 4   respect to those issues before trial.

 5        I'd like to talk briefly about two issues related to

 6   the charge.  First is I'd like to just hear briefly from the

 7   defense about the First Amendment issue that I just alluded to.

 8   I've been engaging with that as I've been drafting the charges.

 9   But before I turn to that, I'd like to turn to a brief

10   discussion of the trial indictment.

11        The government is dismissing Count Six of the

12   indictment.  The parties, I understand, expect to use a trial

13   indictment that omits that count.  The government's proposed

14   charges run from Count One through Count Seven, while

15   defendant's run from Count One through Five, then Seven through

16   Eight.  I assumed, coming is into this, that the trial

17   indictment would run from Count One through Count Seven and

18   that conforming modifications would be made to it such that the

19   charges would refer only to seven counts; in other words, it

20   would not be transparent to the jury that a count had been

21   omitted.

22        Let me just confirm that's the parties' expectation as

23   well, and also your expectations regarding the timing for the

24   completion of the trial indictment, if you know.

25        MS. RAVENER:  One moment, your Honor.

M6GHMelC

1          THE COURT:  Thank you.  Please take your time.

2          (Counsel confer)

3          MS. RAVENER:  Your Honor, we agree that it would be

4     sensible to renumber the proposed trial indictment.

5          I would just briefly ask the Court if we could have

6     our colleague, AUSA Matthew Hellman, join us at counsel table.

7     He was delayed this morning in order to continue discussions

8     relating to the Classified Information Procedures Act issue,

9     and he is now present.

10         THE COURT:  Yes.  Thank you.  Mr. Hellman, please come

11    forward.  Thank you.

12         MS. RAVENER:  Thank you, your Honor.

13         THE COURT:  Good.  Counsel for defendant, is that your

14    expectation as well?

15         MR. MARVINNY:  Yes, your Honor.  At the time we

16    submitted our request to charge, my recollection is that the

17    sixth count hadn't even been officially dismissed yet.  So we

18    weren't asking the Court to infer anything else from that, so

19    yeah.

20         THE COURT:  Very good.  Thank you.

21         MR. MARVINNY:  Sequential numbering makes sense.

22         THE COURT:  Good.  Thank you.

23         Counsel, by when do you plan to complete the trial

24    indictment?  My hope is that work can be done well in advance

25    of trial.  I was going to propose to ask the parties to submit

M6GHMelC

1    it to me under cover of a joint letter by the 29th.

2              What's your thought regarding an appropriate schedule

3    here, counsel for the government?

4              MS. RAVENER:  We can do that by June 29, your Honor,

5    and that allows us time to prepare it and also show it to the

6    defense.

7              THE COURT:  Good.  Thank you.

8              Counsel.

9              MR. MARVINNY:  That works, your Honor.

10             THE COURT:  Thank you.

11             Please submit the proposed trial indictment to me

12   under cover of a joint letter by June 29, 2022.

13             I don't want to spend a lot of time here talking about

14   the charges.  I've been looking at the parties' proposed

15   charges.  I think I have a bead on what each of you is looking

16   for.  My hope, as I've told you before, is to send you my

17   proposed charge as early as possible, and I'm working with that

18   goal in mind.  My hope is that I'll be able to send you a

19   version of the charge either before or very early in the trial,

20   with the hope that we'll be able to take the opportunity to

21   discuss them at a reasonable time during the course of trial.

22   So my goal is to try to complete that work early.

23             The one issue that I did want to hear briefly from the

24   defense about is your First Amendment instruction, counsel.

25   Can I hear a little bit from you about that proposal, and I'll

M6GHMelC

1   just give you the floor, and then I have a particular question

2   that I'd like to raise.

3        MR. MARVINNY:  So, your Honor, of course happy to

4   address it.  I confess, that particular charge was not top of

5   mine as I wasn't sure I would be addressing it today.  So with

6   that context, we understand, to the extent the Court was

7   raising the concern that any instruction suggest that the First

8   Amendment provides a blanket excuse as to criminal liability,

9   that obviously is not the case, and we don't seek a charge that

10  says otherwise.

11       Nevertheless, given the nature of some of the

12  communications at issue here, the tender of some of the

13  communications attributed to Mr. Melzer and others, we're very

14  concerned that the jury either implicitly or explicitly

15  convicts Mr. Melzer simply because of the abhorrent nature of

16  some of those communications.  We do think it's important that

17  the jury know that holding troublesome problematic views unto

18  themselves is not unlawful in this country and that Mr. Melzer

19  can't be convicted for that reason, and that the location of

20  that right is found in the First Amendment.

21       I don't have much to say beyond the specific contours

22  at this point, your Honor, but that's the message we think

23  should be communicated to the jury, while understanding, of

24  course, they shouldn't be instructed that the First Amendment

25  provides Mr. Melzer some blanket protection.

M6GHMelC

1      THE COURT:  Understood.  I'll give you the -- I'll

2  point you to the specific sentence that I was focused on.  In

3  the proposed charge on First Amendment rights, the defense

4  includes a sentence that says, "The law may not be applied in a

5  way that abridges the exercise of these rights," which

6  suggested to me a position that if the jury found that in some

7  way the criminal law abridged the exercise of First Amendment

8  rights, that they could not enforce it.

9      I understand from your comments that's not your

10  position.  Is there anything else that you'd like to say

11  regarding this issue or why it is that that particular, I'll

12  call it, line of direction to the jury would be appropriate

13  here?

14      MR. MARVINNY:  Not at this time, your Honor, no.  Of

15  course, we're happy to discuss it again once we see the Court's

16  proposed instruction.

17      THE COURT:  Good.  Thank you very much.

18      Very good.  So just a brief comment about scheduling

19  that I'd like to hear whatever the parties can tell me about

20  your -- what you can tell me here about your discussions

21  regarding the CIPA issues.

22      This is a scheduling matter.  On the 7th of July,

23  unfortunately, I need to end the trial day a little bit early.

24  I have to end at 3:00.  That is, unfortunately, because I

25  previously scheduled a confirmation -- I should say a fairness

M6GHMelC

 1    hearing with respect to a class action for that date and time.

 2    I can't change it because the notices went out to the class a

 3    long time ago.  So, unfortunately, I need to adjourn the trial

 4    so that I can take up that fairness hearing at 3 p.m. on the

 5    7th.  So I apologize for that.  It was scheduled before we

 6    adjourned the trial to the 5th, and, again, I can't change it

 7    because there are a lot of potential class members.

 8          Good.  So the only other thing before we turn to

 9    Dr. Simi is my question about if there's anything else that we

10    can talk about here in this forum regarding the parties'

11    ongoing work with respect to the CIPA issues.  If there's

12    nothing that I can hear now, I'm happy to table it.  If so,

13    please feel free to tell me that.

14          MS. RAVENER:  Your Honor, I would ask for permission

15    for AUSA Hellman to address the Court about that matter.

16          THE COURT:  Thank you.

17          Counsel.

18          MR. HELLMAN:  Thank you, and good morning.

19          I think I can offer a little more context here which

20    may be helpful for the Court.  There are essentially two

21    buckets of materials which were at issue in the Section 5

22    notice from defense counsel.  We have essentially resolved one

23    of those two buckets, which the government understands to be in

24    the declassification process, but to have already been at least

25    orally confirmed.  Until it is actually formally declassified,

M6GHMelC

1    no final word or guarantees, but we do believe that that set of

2    materials has been resolved and will be set ahead of trial.

3            With respect to the remaining bucket, the parties have

4    been at work together on a proposed substitution with respect

5    to those materials.  There are several categories of

6    information that are implicated there, and those categories are

7    now pending final review with the original classification

8    authority.  That is a person who is located outside of the

9    United States who is a high-ranking U.S. Army member of staff

10   who has, currently, responsibility for an array of pending

11   global issues, I'll say.

12           So I have spoken at length again this morning with a

13   representatives from the Department of Defense and, in

14   particular, the Army, who are closest to the original

15   classification authority, and they have told me again that the

16   timeline that was proposed in the government's letter of

17   June 10, 2022, is reachable, that is, a final determination one

18   way or the other to put the government in a position to

19   respond, if necessary, by June 24, 2022, and to address in a

20   hearing on June 29.  I should say, the parties proposed that

21   time based on a prior conversation with chambers about the

22   Court's availability, but certainly after the 24th, when we

23   would be able to provide a final answer, we could come before

24   the Court at any point in time, subject to the availability of

25   the Court and the CISO.

M6GHMelC

|      |                                                               |
| ---- | ------------------------------------------------------------- |
| 1    | THE COURT:  Good.  Thank you.  I'll certainly try to |
| 2    | make myself available as promptly as possible for that, so |
| 3    | please let me know. |
| 4    | Thank you very much, counsel for both sides, for |
| 5    | working to resolve those issues.  I appreciate it. |
| 6    | Anything from the defense in addition to what I've |
| 7    | heard from the government on those topics? |
| 8    | MR. MARVINNY:  Not on this topic, your Honor. |
| 9    | THE COURT:  Thank you very much. |
| 10   | So, counsel, I think that that completes my agenda |
| 11   | with the exception of discussion related to Dr. Simi and his |
| 12   | testimony.  Anything else that either party would like to raise |
| 13   | with me before I turn to that topic? |
| 14   | Counsel, first, for the government? |
| 15   | MS. RAVENER:  No, your Honor. |
| 16   | THE COURT:  Thank you. |
| 17   | Counsel for defendant? |
| 18   | MR. MARVINNY:  Thank you, your Honor.  We have two |
| 19   | items, please. |
| 20   | THE COURT:  Go ahead. |
| 21   | MR. MARVINNY:  First, the Court has ordered the |
| 22   | defense to make certain disclosures, including our witness |
| 23   | list, by June 24.  We, of course, will comply with that order. |
| 24   | I would respectfully request that the Court order the |
| 25   | government to provide its witness list to us in advance of that |

M6GHMelC

1    date.  While it is true that the government has provided a

2    broad range of 3500 material, they have not specified which of

3    the individuals they provided that material for they're

4    actually going to call as witnesses at trial.  I'd respectfully

5    suggest that the Court order the government to provide their

6    witness list by the 21st.  The provision of that witness list

7    will impact our decisions as to who we might call at trial as

8    well.  Thank you.

9            THE COURT:  Go ahead.

10           MR. MARVINNY:  Two, your Honor, understand that the

11   Court has set a provisional *Daubert* hearing for the 22nd.  We,

12   obviously, have not had the chance to speak to Dr. Greenfield,

13   our proposed expert, about his availability.  We will do so

14   immediately, of course.

15           I just wanted to raise now whether -- the question of

16   whether the Court would permit Dr. Greenfield to testify at any

17   *Daubert* hearing by video.  Again, without knowing the specifics

18   of his schedule, as I sit here today, based on conversations

19   we've had with him, that might be more feasible than his

20   appearance in New York City on Wednesday.  He's not located in

21   New York City, as the Court may be aware.

22           THE COURT:  Thank you.

23           Good.  My strong preference would be for him to appear

24   in person.  Let me just say one thing.

25           First, I understand the witnesses is in Connecticut.

M6GHMelC

```
1    That's not very far from here.

2           Two, all of us have grown familiar with testimony by

3    videoconference.  We have the technical capacity here to host

4    such testimony, and I'd be happy to consider an application by

5    the parties to proceed in that way.  My default would be that

6    he should appear -- must appear here.  If the parties want to

7    work together to develop a request for the Court consistent

8    with the rules, I'm happy to consider it.  If you want to make

9    such a request, I'd ask that you confer about it and provide me

10   a letter both with the nature of the request and the legal

11   authority for me to conduct the conference by remote means.

12          As you know, in the criminal space, the CARES Act

13   provides me with some authority to conduct proceedings by

14   remote means, but I have not conducted a hearing of the type

15   that we're discussing now in a criminal case, although I'll be

16   frank that I've conducted at least one *Daubert* hearing by

17   remote means in a civil case.

18          So the question of the Court's legal authority to

19   conduct the hearing by remote means in a criminal case is a

20   question that I haven't had the opportunity to examine in the

21   past.  So I'd ask you to tell me what you believe the legal

22   authority of the Court is to do so and what findings, if any,

23   I'd need to make in order to determine that it is appropriate.

24   The civil rules I know off the top of my head impose a number

25   of required findings by the Court in order to permit remote
```

M6GHMelC

testimony.  I don't know that there are parallel rules in the

criminal context, but I'll look to the parties in the first

instance (a) to determine whether or not the expert can travel

here from Connecticut, and (b) if for any reason the answer to

that first question is no, to let me know what, if any,

authority I have to accept testimony by remote means in this

criminal proceeding.

So I'm open to it is what I'm saying, but I need to

know that I have the legal authority to do so.  And the default

rule is that the witness should expect to be here.  The

unfortunate fact is that because we're going to trial in early

July and this issue was just recently raised to my attention,

there's very little time before trial for us to conduct a

*Daubert* hearing.  Given the questions raised about the

sufficiency of the basis for his testimony raised in the

government's motion, I don't believe that I should permanent

him to testify without undertaking, at a minimum, a careful

examination.  Fulfilling my role as a gatekeeper under *Daubert*,

I don't think I can do that through live testimony in front of

the jury.  So we need to wedge in time before trial to do that

work.

MR. MARVINNY:  Your Honor, understood.  Sorry to

interrupt.

THE COURT:  That's fine.

MR. MARVINNY:  If the Court set a time for the *Daubert*

M6GHMelC

1  hearing, I missed it.

2          THE COURT:  That's fine.  Let's plan to start -- I

3  have it on my calendar at 10:00.  I can move it forward to

4  9:00.  I could move it back some as well.  Given the amount of

5  time that it took for us to go through Dr. Simi's testimony, I

6  wouldn't move it back, frankly, much after 10:00 or 11:00 so we

7  can make sure we have as much time as possible.  I'm basically

8  prepared to leave that full day free for us to complete the

9  hearing on this issue.  That will give me time to review the

10  testimony and to make a determination regarding the

11  admissibility of his testimony prior to trial.

12          Good.  Anything else, counsel for defendant?

13          MR. MARVINNY:  No.

14          THE COURT:  Thank you.

15          In terms of timing for making a proposal with respect

16  to potential remote testimony by the expert suggested by

17  counsel for defendant, I think that the latest that I can hear

18  from you, unfortunately, is going to be over the weekend.  So

19  I'll ask that any writing be submitted to me by Sunday.  That

20  will put me in a position to review it, make a decision by

21  Monday.  And then to the extent I grant the request, that will

22  give us the opportunity to put in place any necessary

23  technology in the courtroom and also for the Court to prescribe

24  parameters for the testimony through written orders.  So any

25  application for him to appear remotely must be made by Sunday,

M6GHMelC

1      and it must contain an outline of the Court's legal authority

2      to do so.

3              Again, the default rule is that he must appear here,

4      and the default will be that the hearing starts at 10 a.m. on

5      that date in this courtroom.

6              With respect to the defense's first request, counsel

7      for the United States, what's your view?  Can you provide the

8      defense with your witness list by the 21st?

9              MS. RAVENER:  Yes, we consent to that.

10             THE COURT:  Good.  Thank you.  I direct the government

11     to do so.  Very good.  So thank you all very much.

12             What I'm going to do now is I'm going to turn to the

13     *Daubert* issue with respect to Dr. Simi.  I'm going to rule on

14     this application orally.  Let me give you fair ruling -- fair

15     warning, I should say.  I have some questions for the parties

16     at the outset of this proceeding regarding some of the issues,

17     and I'm going to point you to them in a moment.  I'm going to

18     use your feedback with respect to these questions to inform my

19     decisions with respect to some of aspects of the decision.

20             Once I am able to incorporate the feedback from my

21     questions into my view of the case, I expect to turn to the

22     decision itself, which is lengthy.  And I will say I'm happy to

23     provide you with what Judge Rakoff would call a bottom line

24     regarding my determination, and I'm happy to excuse all but one

25     member of each side's legal team as I review the reasoning for

M6GHMelC

1    my decision which spans some 14 single-spaced pages.  So just a

2    note.

3            So, counsel, the parties are familiar with the

4    underlying facts and procedural history here.  Therefore, I'm

5    not going to recite them in detail.  To the extent that any of

6    the facts in this case are pertinent to my decision, those

7    facts are embedded in my analysis.  For the reasons that

8    follow, I am expecting to deny defendant's motion to exclude

9    Dr. Simi's testimony.

10           In his motion in limine, submitted on February 1,

11   2022, Defendant seeks to exclude the testimony of Dr. Simi at

12   Dkt. No. 792, which I'll describe as "Mot."  Primarily,

13   defendant argues that Dr. Simi "lacks expertise about O9A

14   specifically" and that "Dr. Simi's testimony about O9A appears

15   to be based primarily on publicly available documents to which

16   he will not have applied any particular expertise."  Id. at

17   10-11.  On May 24, 2022, the Court held a Daubert hearing to

18   evaluate the admissibility of Dr. Simi's proposed testimony.

19   See May 24, 2022, Hearing Transcript ("Tr.").  Based on the

20   parties' submissions and the testimony from Dr. Simi during

21   that hearing, I am denying defendant's motion to exclude

22   Dr. Simi's testimony.

23           Before we begin, I do have a few questions, however.

24           First, I note that the government's supplemental

25   notice does not mention that Dr. Simi will be testifying

M6GHMelC

1    regarding O9A's views on human self-sacrifice.  However, during

2    the *Daubert* hearing, Dr. Simi testified at length regarding

3    human sacrifice and its importance to the O9A worldview.

4          Counsel for the government, can I just hear from you?

5    Is it your intention that Dr. Simi testify regarding the

6    significance of human self-sacrifice to the O9A worldview, and

7    if so, the next question would be why isn't it in the notice?

8          MS. RAVENER:  Your Honor, if you could give me one

9    moment?

10          THE COURT:  That's fine.

11          (Counsel confer)

12          MS. RAVENER:  Your Honor, thank you for giving me a

13    moment to confer.

14          THE COURT:  That's fine.

15          MS. RAVENER:  I apologize.  I do not currently have

16    the notice and the supplemental notice in front of me.

17    However, our recollection is that the notice did include the

18    fact that Dr. Simi would be testifying regarding the practice

19    of culling, which is the concept of human sacrifice embraced by

20    O9A, and it's one of the terms used by the group for that

21    practice.

22          In any event, to the extent that there was any gap in

23    that notice or confusion, we believe that that should have been

24    clarified by the *Daubert* hearing testimony which has now

25    provided everyone with ample notice of the nature of that

M6GHMelC

1    testimony and its importance to the organization.

2              THE COURT:  Good.  Thank you.

3              Good.  Understood.  So I understand that the

4    government's position is that culling is included in the notice

5    and that that provides ample notice together with the nature of

6    the testimony provided by Dr. Simi in the hearing.

7              Counsel for defendant, any comments on this question?

8              MR. MARVINNY:  Your Honor, I don't have additional

9    comment.  My recollection, in fact, is that the government

10   might have mentioned something about that in their response

11   motion.  It wasn't in their supplemental notice.  So I don't

12   have anything to add.

13             THE COURT:  Thank you.

14             Good.  So I'm not sure that it is in the notice, but I

15   do believe that it was referenced in the briefing as well as

16   taken up at length during the hearing itself.

17             Just a note on this.  Defendant has objected to the

18   inclusion of testimony regarding human self-sacrifice, arguing

19   that there is already fact evidence that demonstrates that

20   Mr. Melzer was serious about the attack.  However, Dr. Simi

21   testified that "culling" and "human self-sacrifice" can be

22   shown as a means of "demonstrating commitment" to O9A.  Tr. at

23   155:19-23.  Jurors are unlikely to be familiar with those

24   practices.  Further, I believe they're relevant to the facts of

25   this case, especially given defendant's comment to other

M6GHMelC

1    apparent O9A followers that he was willing to die in the attack

2    on the U.S. military base because he "would have died

3    successfully" if the attack led to "another ten-year war in the

4    Middle East," it would "leave a mark."

5         Here, I think that the testimony regarding O9A's

6    emphasis on human self-sacrifice would be helpful to understand

7    why defendant would profess such a willingness to die in order

8    to further O9A's goals.  The Court doesn't see a basis to

9    exclude that testimony.  I think that the notice, together with

10   the briefing and the disclosures provided through the course of

11   the testimony by Dr. Simi at our hearing, provide ample notice

12   to prepare for such testimony.

13        Counsel for the United States, I have a similar

14   question regarding one aspect of Dr. Simi' testimony, which I

15   also don't recall having seen in the notice, and I don't know

16   whether this is a topic that you expect to have him testify

17   about at trial or if it's just something that came up in the

18   course of asking him questions in particular about his recent

19   testimony; namely, Dr. Simi's testimony about his research into

20   the correlation between white supremacists and individuals who

21   have served in the military.

22        Counsel, is that a topic that you expect Dr. Simi to

23   take up at trial?

24        MS. RAVENER:  One moment, your Honor.

25        (Counsel confer)

M6GHMelC

1          MS. RAVENER:  Yes, your Honor, we expect that we

2     would.  We believe that it's relevant for establishing

3     Dr. Simi's experience in this area, including the field of

4     white supremacy and the particular issues that arise in

5     connection with the idea of white supremacist groups being

6     taught to intentionally infiltrate organizations such as the

7     military.

8          THE COURT:  Thank you.

9          Let me just pause you.  There's a particular I'm going

10    to mischarach- --- I'm not going to mischaracterize, I'm going

11    to recharacterize Dr. Simi's testimony, as I recall it.

12         A part of a thread of his testimony with respect to

13    this issue was that, as I recall it, was that some people who

14    have had military service as a result of, I'll call it, their

15    experience there tend to become members of white supremacist

16    organizations.  That, in other words, there is some correlation

17    between military service and the experience of some people, who

18    I will describe as people who are not particularly successful

19    in the military, proceeding to be interested in white

20    supremacist groups.

21         That's the thread of the testimony that I'm

22    particularly interested in and want to make sure the defense

23    has an opportunity to comment on because it may suggest some

24    view that someone who has had military service is more likely

25    to be a white nationalist or supremacist.  So that was the

M6GHMelC

1   aspect of the testimony in particular that I was focused on.

2   It wasn't what you were describing, so I just wanted to direct

3   you.

4            MS. RAVENER:  Thank you, your Honor.  Give me one

5   moment to confer.

6            THE COURT:  Thank you.

7            (Counsel confer)

8            MS. RAVENER:  Your Honor, that clarification is very

9   helpful to the government.  I think that aspect that the

10   Court's referring to relates to some of Dr. Simi's findings

11   after evaluation of many individuals who had, in fact, engaged

12   in federal crimes of terrorism and related matters in the name

13   of white supremacy and then looking backwards at their life

14   histories to understand what, if any, experiences they might

15   have had in common.

16            I think the Court's particular concern that that might

17   give rise to some kind of predisposition for certain

18   individuals who've had a certain life experience to commit such

19   acts is something that we can certainly seek to cabin.  We

20   don't plan to elicit any testimony of that particular

21   conclusion, and we can work on that with respect to presenting

22   our evidence.  I believe that that is not our intention.

23            THE COURT:  Thank you.  Thank you for that

24   clarification.  I think that's helpful.  I'll hear from the

25   defense.

1           So can I ask you to continue with your description of

2     the nature of the testimony that you would expect to elicit

3     from Mr. Simi on this topic.

4           MS. RAVENER:  Your Honor, I believe that we would

5     expect to elicit Dr. Simi's general research experience, the

6     fact that he conducted research regarding, I believe it was,

7     dozens, if not over 100 individuals who had been involved in

8     white supremacist-motivated actions.  As part of his training

9     and experience that qualifies him to testify to the jury here

10    today, I believe we would elicit that he has testified before

11    Congress, including the Committee on Veterans' Affairs.  And I

12    believe we would elicit the fact that one of the reasons his

13    testimony has been sought and was relevant or the topic of his

14    testimony was of -- was given there all related to the same

15    broader thread that white supremacist organizations, other than

16    O9A but including O9A, have a practice of attempting to both

17    recruit members of the military, historical practice of doing

18    so, and that certain white supremacist organizations actively

19    encourage military service as a means of infiltrating the

20    military, gaining training in violence and other matters that

21    they view as relevant to their mission.

22          THE COURT:  Thank you.

23          Good.  So counsel for defendant, you've heard my

24    concern on this topic, which I don't believe was raised by you

25    previously, but it came to my attention during the course of

M6GHMelC

```
 1    his testimony.  You've heard how the government has proposed to
 2    cabin Dr. Simi's testimony on this point.  Any comments?
 3          MR. MARVINNY:  Yes, your Honor.  We object as
 4    vociferously as possible to any of this testimony coming in.
 5    It was not noticed by the government in its original notice, in
 6    its supplemental notice, in any of its briefing.  The first we
 7    heard of this topic was during Dr. Simi's direct exam at the
 8    Daubert hearing.  Frankly, it caught us very much off guard
 9    given the lack of notice.
10          It's irrelevant to the case as well because, as I
11    understand it, based on the colloquy the Court just engaged in,
12    the testimony essentially is that white supremacist's groups
13    recruit people from the military or someone's military service
14    makes it more likely that they will progress into a white
15    supremacist group or join a white supremacist group.
16          Of course, the government's account of this case is
17    precisely the opposite chronology.  The allegation is the
18    Mr. Melzer was a white supremacist, dyed in the wool, from
19    years before he joined the military or O9A, and that it was
20    fact his affiliation with O9A and informed by his white
21    supremacist worldview that led to his enrollment in the
22    military in the first instance.  We think the evidence is going
23    to show that to be absolutely incorrect, and the Court will
24    receive some briefing from us on that today in response to the
25    government's 404(b) motion.  But that renders Dr. Simi's
```

1    testimony, to the extent I understand it correctly, irrelevant.

2              Finally, your Honor, whatever relevance it may have,

3    it is so unduly prejudicial that it simply cannot be admitted

4    under any faithful Rule 403 balancing.  To have an expert

5    testify to the jury about the link between white supremacists

6    and violence and members who share a characteristic that

7    Mr. Melzer obviously shares, that is, being in the military, is

8    so obviously prejudicial it would completely deprive Mr. Melzer

9    of a fair trial.

10             There's going to be no dispute at trial that

11   Mr. Melzer is in the military.  The government has ample

12   evidence that he affiliated with O9A.  None of that is really,

13   frankly, going to be in dispute.  So testimony from Dr. Simi

14   with the imprimatur of an expert is particularly prejudicial

15   and unnecessary.

16             THE COURT:  Thank you.

17             Understood.  Counsel, can I ask you to respond to the

18   first prong that the government referred to in supporting the

19   admissibility of Dr. Simi's testimony on this point, namely,

20   their desire to refer to his testimony before Congress as part

21   of their -- which happened to be about this topic as part of

22   their effort to credentialize him in front of the jury.  What's

23   your view about that aspect of the proposed testimony, namely,

24   to summarize, Dr. Simi testified before Congress about X topic

25   without more?

1          Counsel for defendant?  Let me hear from defendant.

2          MR. MARVINNY:  It's preferable to the alternative, but

3     we would object to that as well, your Honor, again.  Invoking

4     this kind of -- the importance of Dr. Simi's work or the

5     importance of his testifying before Congress, it's suggesting

6     to the jury that that makes it more credible.  We think that's

7     improper as well.

8          THE COURT:  Thank you.

9          Good.  I'm going to take this issue under advisement.

10    I understand that the defense has argued that this testimony

11    should not be admitted, that is, testimony regarding the

12    correlation between service in the military and white

13    supremacists should be excluded under Rule 403.  They've argued

14    that it's got limited probative value in the context of this

15    case and that it is -- that is because of the chronology that

16    defense counsel has recounted and because of the prejudicial

17    effect of the testimony.

18         Counsel for the United States, before I move on to the

19    next topic, any response to the defense's arguments that this

20    should be excluded under 403?

21         MS. RAVENER:  Yes, your Honor.  If I could just

22    address at least two points with respect to that.  One is that

23    I think the defense may have misapprehended part of the

24    description that I gave of my recollection, at least, of

25    Dr. Simi's testimony on this topic.  I don't believe it was

M6GHMelC

1    limited to the recruitment of members of the military once they

2    were already serving.  I believe that he also discussed the

3    fact that his research has revealed that white supremacist

4    groups, including but not limited to O9A, have historically

5    taught the concept and encouraged the concept of infiltration.

6    O9A's specific terminology for that is the encouragement of

7    engagement in an "insight role," which we submit is the

8    practice that Mr. Melzer was engaged in here and is relevant

9    for that reason.

10           As the Court knows, one of the defense's objections to

11   Dr. Simi's testimony, which we expect they will continue to

12   press on cross-examination, is an attack on his credentials as

13   they apply to O9A specifically.  We believe that Dr. Simi's

14   experience observing and studying this phenomenon in the white

15   supremacist movement, which is not unique to O9A, is relevant

16   for the jury's understanding of the facts here and his ability

17   to speak to what an insight role is and how that is utilized as

18   a practice among members of white supremacist groups or the

19   white supremacist movement.

20           So I would just note that I don't believe the

21   chronology of Mr. Melzer's service is a basis to limit that

22   testimony.

23           The second point I would just note for the Court is

24   that defense counsel cross-examined Dr. Simi on his purported

25   bias because he had spoken about Mr. Melzer's prosecution on a

M6GHMe1C

1    prior occasion.  We expect they will cross-examine him about

2    that at trial.  We need to be able to elicit that fact to the

3    extent that it is a possible area of cross-examination, and

4    that occasion was this testimony before the Veterans' Affairs

5    committee.  So I want to make sure that that fact is clear to

6    the Court in making its assessment.

7              If you could give me one moment, your Honor.

8              THE COURT:  That's fine.  Please take your time.

9              (Counsel confer)

10             MS. RAVENER:  I would just note as well that the

11   concept of insight roles and their centrality to Dr. Simi's

12   testimony was included in our notice, including his testimony

13   about infiltrating the military.  We're happy to address, of

14   course, any other factual questions that the Court may have or

15   about the nature of our presentation of evidence.

16             THE COURT:  Thank you.

17             Understood.  So let me just say a couple things:

18   First, I'll comment further on Dr. Simi's testimony regarding,

19   I'll call it, insight roles generally.  I expect to find that

20   that is helpful to the jury and relevant and that it shouldn't

21   be excluded under 403.

22             The particular issue that I'm taking under advisement

23   and will rule on in advance of trial is the extent to which

24   Dr. Simi can testify regarding his research into what I'll

25   describe categorically as the correlation between white

1    supremacists or white nationalists and individuals who have

2    served in the military.  One subset of that is the fact of his

3    testimony before the Veterans' Affairs committee, which

4    happened to involve that topic.  The larger subset of that

5    category is the actual substance of the research and his

6    conclusions regarding those correlations.

7         I'm going to take up that issue mindful of the

8    defense's objections regarding to its prejudicial -- that is,

9    the prejudicial effect of such testimony regarding an asserted

10   correlation between military service and white nationalism

11   here, and I will rule on it in advance of trial.  I won't take

12   it up now.

13        So, counsel, if any one of you wanted to leave, this

14   would be the right time.  Again, I won't at all be offended if

15   you decide to limit the number of people who sit here as I

16   review my decision and the reasoning.  It is not a problem at

17   all.  The transcript of today's proceeding will be available to

18   you.  So I'll take a brief pause if you want to confer with

19   your colleagues to see if any of you would like to be excused.

20   Again, it's not a problem if you'd like to do so.

21        MS. RAVENER:  Thank you, your Honor.

22        THE COURT:  That's fine.  So Mr. Hellman is departing.

23   That's fine.  Again, not a problem.  You don't even need to

24   excuse yourself.  That's absolutely fine.

25        MR. HELLMAN:  Thank you, your Honor.  Have a good day.

M6GHMelC

1          THE COURT:  Good.  Thank you.

2          Counsel for defendant.

3          MR. MARVINNY:  We'll both remain.  Thank you, your

4     Honor.

5          THE COURT:  That's fine.  Thank you.

6          So I'm going to review my decision with respect to

7     Dr. Simi's testimony.  As I said, I'm excluding here the

8     particular topic which, like the defense, came to my attention

9     at the first time during the *Daubert* hearing.  I'm going to

10    reserve decision regarding the admissibility of that topic and

11    will rule on it after -- before the commencement of trial.  So

12    as I review the remainder of my decision, understand that I am

13    reserving with respect to that topic.

14          1.  Discussion.

15          A.  Notice.

16          The government's notice in this case was sufficient.

17    Federal Rule of Civil Procedure 16(a)(1)(G) requires that "at

18    the defendant's request, the government must give to the

19    defendant a written summary of any [expert] testimony that the

20    government intends to use . . . during its case-in-chief at

21    trial." Federal Rule of Civil Procedure 16(1)(G).  Other

22    Circuits have determined that a notice is insufficient where it

23    merely relates "general subject matters to be covered, but does

24    not identify what opinion the expert would offer on those

25    subjects." *United States v. Duvall*, 272 F.3d 825, 828 (7th

M6GHMe1C

1    Cir. 2001); *United States v. White*, 492 F.3d 380, 407 (6th Cir.

2    2007)(same).

3          As an initial matter, I note that the government

4    supplemented its initial notice on January 25, 2022.  *See*

5    Dkt. No. 94-4 (the "Notice").  The Court will treat the notice

6    as the operative notice in this case, particularly because that

7    notice has omitted topics from the scope of the testimony that

8    the government plans to elicit, including testimony regarding

9    violent acts committed by O9A in the past.

10         Here, the government's notice is sufficiently detailed

11   to satisfy the requirements under Rule 16(a)(1)(G).  The

12   government has provided a list of the topics on which Dr. Simi

13   will testify, accompanied by detailed descriptions of what that

14   testimony will entail.  The government also provided background

15   information about Dr. Simi and his résumé which outlines his

16   extensive experience in researching and commenting on white

17   supremacy.  In other words, the government did not merely

18   provide a "list of topics."  It provided a detailed summary of

19   the testimony that Dr. Simi would deliver.

20         To the extent defendant objects on the basis that

21   Dr. Simi's testimony will not provide an "opinion" but will

22   instead provide only background information about O9A, courts

23   in the circuit routinely allow expert testimony to provide

24   relevant background information about organizations.  *See,*

25   *e.g., United States v. Farhane,* 634 F.3d 127, 159 (2d Cir.

2011) (affirming introduction of expert testimony regarding the

background of al Qaeda, and commenting that the Second

Circuit has "approved the use of expert testimony to provide

juries with background on criminal organizations, notably

organized crime families*"); United States v. Kadir*

718 F.3d 115, 121 (2d Cir. 2013) (concluding that there was no

abuse of discretion in permitting expert testimony to

"describe al Qaeda and Hezbollah and their activities in

South America and to define various terms related to

terrorism").  As in those cases, background information about

white supremacy and O9A is the proper subject of expert

testimony in this case.  As I'll discuss, the testimony is

competent and will be helpful to the jury.

Accordingly, the government's notice in this case was

sufficient, and Dr. Simi's testimony will not be precluded on

those grounds.

B.  FRE 702 Generally.

The Federal Rule of Evidence 702, which governs the

admissibility of expert testimony provides:

"A witness who is qualified as an expert by knowledge,

skill, experience, training, or education may testify in the

form of an opinion or otherwise if: (a) the expert's

scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts

M6GHMelC

or data; (c) the testimony is product of reliable principles

and methods, and (d) the expert as reliably applied the

principles and methods to the fact of the case." Federal Rule

of Evidence 702.

In *Daubert V. Merrill Dow Pharmaceuticals*, *Inc.*, 509

U.S. 579 (1993), the Supreme Court explained that Rule 702

requires district courts to act as gatekeepers by ensuring that

expert testimony "both rests on a reliable foundation and is

relevant to the task at hand." *Id.* at 597. As such, the Court

must make "a preliminary assessment of whether the reasoning or

methodology underlying the testimony is scientifically valid

and whether that reasoning or methodology properly can be

applied to the facts at issue." *Id.* at 592-93. In short, the

Court must "make certain that an expert, whether basing

testimony upon professional studies or personal experience,

employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant

field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152

(1999).

C.  Qualification as Expert.

"Rule 702 requires a trial court to make an initial

determination as to whether the proposed witness qualifies as

an expert." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d

346, 352-53 (S.D.N.Y. 2003). "Courts within the Second Circuit

'have liberally construed expert qualification requirements'

when determining if a witness can be considered an expert."

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL

1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc.*

*v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y.

2002)); accord *Plew v. Ltd. Brands, Inc.,* 2012 WL 379933, at *4

(S.D.N.Y. Feb. 6, 2012).  "To determine whether a witness

qualifies as an expert, the court must first ascertain whether

the proffered expert has the educational background or training

in a relevant field."  *Crown Cork & Seal Co., Inc. Master*

*Retirement Trust v. Credit Suisse First Boston Corp.,* 2013 WL

978980, at *2 (S.D.N.Y. Mar. 12, 2013) (citation and internal

quotation marks omitted).  "Any one of the qualities listed in

Rule 702 -- knowledge, skill, experience, training, or

education-may be sufficient to qualify a witness as an expert."

Id. (citing Tiffany (N.J.) Inc. v. eBay, Inc., 576 F. Supp. 2d

457, 458 (S.D.N.Y. 2007)).

Even if a proposed expert lacks formal training in a

given area, he may still have "practical experience" or

"specialized knowledge qualifying him to give opinion testimony

under Rule 702.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d

1038, 1043 (2d Cir. 1995) (quoting Fed. R. Evid. 702) (internal

quotation marks omitted).  But "if the witness is relying

solely or primarily on experience, then [he] must explain how

that experience leads to the conclusion reached, why that

experience is a sufficient basis for the opinion, and how that

M6GHMelC

experience is reliably applied to the facts." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 Advisory Committee Note).  Where a witness's "expertise is too general or too deficient," the Court "may properly conclude that [he is] insufficiently qualified." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

A court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)).  "The expert's testimony must be related to those issues or subjects within his or her area of expertise. *Crown Cork*, 2013 WL 978980, at *2 (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the Court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl*, 117 F.3d at 80).  "Thus, an expert 'should not be required to satisfy an overly narrow test of his own qualifications,' and the court's focus should be on 'whether the expert's knowledge of the

subject is such that his opinion will likely assist the trier

of fact in arriving at the truth.'" *Crown Cork*, 2013 WL 978980

at *2 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA

Vision Corp.*, 2006 WL 288785 at *5. (S.D.N.Y. July 28, 2006).

"Assertions that the witness lacks particular educational or

other experiential background, 'go to the weight, not the

admissibility, of [the] testimony.'" *Zyprexa Prods.*, 489 F.

Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044).

           D.  Expert Testimony Must Assist the Trier of Fact

           A district court must conclude that the proposed

testimony will assist the trier of fact.  *In re Rezulin

Products Liab. Litig.,* 309 F. Supp. 2d 531, 540 (S.D.N.Y.

2004).  "Testimony's properly characterized as 'expert' only if

it concerns matters that the average juror is not capable of

understanding on his or her own." *United States v. Mejia*, 545

F.3d 179, 194 (2d Cir. 2008); see also *United States v. Amuso*,

21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit

manifest error by admitting expert testimony where the evidence

impermissibly mirrors the testimony offered by fact witnesses,

or the subject matter of the expert's testimony is not beyond

the ken of the average juror.")

           "Weighing whether the expert testimony assists the

finder of fact goes primarily to relevance." *Faulkner v.

Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014)

(citing *Daubert*, 509 U.S. at 591).  Relevance can be expressed

as a question of "fit" -- "whether expert testimony proffered
in the case is sufficiently tied to the facts of the case that
it will aid the jury in resolving a factual dispute." *Daubert*,
509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d
1224, 1242 (3d Cir. 1985)).  The testimony is not helpful if it
"usurps either the role of the trial judge in instructing the
jury as to the applicable law or the role of the jury in
applying that law to the facts before it." *United States v.*
*Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United*
*States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).
Expert testimony that is "directed solely to lay matters which
a jury is capable of understanding and deciding without the
expert's help" should not be admitted.  *United States v.*
*Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United*
*States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

     E.  Expert Testimony Must be Reliable

     In assessing reliability, courts should consider "the
indicia of reliability identified in Rule 702, namely, (1) that
the testimony is grounded on sufficient facts or data, (2) that
the testimony is the product of reliable principles and
methods, and (3) that the witness has applied the principles
and methods reliably to the facts of the case." *Amorgianos v.*
*Nat' l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)
(citing Fed. R. Evid. 702).  "Under *Daubert* factors relevant to
determining liability include 'the theory's testability, the

M6GHMelC

extent to which it 'has been subjected to peer review and

publication,' the extent to which a technique is subject to

'standards controlling the technique's operation,' the 'known

or potential rate of error,' and the 'degree of acceptance'

within the 'relevant scientific community.'" *Restivo v.*

*Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017) (quoting *United*

*States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015)).

      *Daubert* sets forth a non-exhaustive list of factors

that district courts may consider in gauging in the reliability

of scientific testimony, which include: (1) whether the theory

has been tested, (2) whether the theory has been suggested to

peer review and publication, (3) the known or potential rate of

error and whether standards and controls exist and have been

maintained with respect to the technique, and (4) the general

acceptance of the methodology in the scientific community.

*Daubert*, 509 U.S. at 593-95. "Whether some or all of these

factors apply in a particular case depends on the facts, the

expert's particular expertise, and the subject of his

testimony." *In re Fosamax Products Liab. Litig.*, 645 F. Supp.

2d 164, 173 (S.D.N.Y. 2009) (citing *Kumho Tire*, 526 U.S. at

138).

      When evaluating the reliability of an expert's

testimony, the Court must undertake a rigorous examination of

the facts on which the expert relies, the method by which the

expert draws an opinion from those facts, and how the expert

applies the facts and methods to the case at hand."
*Amorgianos*, 303 F.3d at 267.  "In undertaking this flexible
inquiry, the district court must focus on the principles and
methodology employed by the expert, without regard to the
conclusions the expert has reached or the district court's
belief as to the correctness of those conclusions."  *Id.* at
266.  But as the Supreme Court has explained, "conclusions and
methodology are not entirely distinct from one another," and a
district court is not required to "admit opinion evidence that
is connected to existing data only by the *ipse dixit* of the
expert.  A court may conclude that there is simply too great an
analytical gap between the data and the opinion proffered."
*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation
omitted).  "Thus, when an expert opinion is based on data, a
methodology, or studies that are simply inadequate to support
the conclusions reached, *Daubert* and Rule 702 mandate the
exclusion of that unreliable opinion testimony."  *Amorgianos*,
303 F.3d at 266.  On the other hand, "where an expert's
methodology overcomes the hurdle of being based on a reliable
process, remaining controversies as to the expert's methods and
conclusions generally bear on the weight and credibility . . .
but not admissibility . . . of the testimony."  *Royal & Sun
Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.*, 2011 WL
3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (citation omitted).

       If an expert's testimony falls within "the range where

M6GHMelC

experts might reasonably differ," the duty of determining the

weight and sufficiency of the evidence on which the expert

relied lies with the jury rather than the trial court. *Kumho*

*Tire*, 526 U.S. at 153.  "Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on

the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence. *Daubert*, 509 U.S.

at 596 (citation omitted).  "The proponent of expert testimony

has the burden of establishing by a preponderance of the

evidence that the admissibility requirements under Rule 702 are

satisfied." *United States v. Williams,* 503 F.3d 151, 160 (2d

Cir. 2007) (citing *Daubert* 509 U.S. at 593, n. 10).

Still, testimony that is admissible under Rule 702 may

be excluded under Federal Rule of Evidence 403 if the Court

finds that "the probative value of the evidence is

substantially outweighed by a danger of . . . unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence."  Fed. R.

Evid. 403.  Expert testimony is particularly susceptible to

these dangers "given the unique weight such evidence may have

in a jury's deliberations." *Nimely v. City of New York*, 414

F.3d 381, 397 (2d Cir. 2005).  "Expert evidence can be both

powerful and quite misleading because of the difficulty in

evaluating it.  Because of this risk, the judge, in weighing

possible prejudice against probative force under Rule 403 . . .

M6GHMelC

exercises more control over experts than lay witnesses.

*Daubert*, 509 U.S. at 595 (quotations omitted).

    II.  Discussion.

    A.  Dr. Simi's qualifications.

    Dr. Simi is sufficiently qualified to serve as an
expert in this case.  First, Dr. Simi's education and
scholarship is significant.  He obtained his Ph.D. in sociology
from the University of Las Vegas, Nevada, and served as a
professor of sociology at the University of Nebraska before he
assumed his current position as an associate professor at
Chapman University.  *See* Dkt. No. 92-4 ("Résumé") at 1.  His
scholarship focuses on "the issue of violence and extremist
movements, terrorism, hate groups, and hate crimes," and
specifically focuses on "far right extremism with [a] focus on
white supremacist extremism.  *Id.*  He's published more than 50
academic journal articles and book chapters regarding white
supremacy, dozens of which have been peer reviewed.  Tr.
39:2-11.  In addition, he authored the book *American Swastika:
Inside the White Power Movement's Hidden Spaces of Hate,* which
was selected as an "Outstanding Academic Title of the Year" in
2010.  *Id.* at 1.  He's been interviewed by numerous news
outlets and has appeared on CNN's "United Shades of America,"
MSNBC's "Hardball," and PBS "Newshour."  *Id.* 24.  Further, he's
served as an expert consultant in a number of litigations and
has testified as an expert witness is two cases.  *Id.* at 10-11.

M6GHMelC

1      Dr. Simi also has ample experience with sociological
2 methodologies.  He's taught a number of courses on qualitative
3 sociological methodologies, including at Chapman, where he
4 teaches classes on qualitative and field methods.  *Id.* at 19;
5 *see also*, e.g., Tr. 7:12-17.  He also co-chairs the
6 University's institutional review board, which oversees all
7 research conducted at Chapman.  Tr. 12:19-13:13.  Further, on a
8 regular basis, he serves as a reviewer for academic journals,
9 including the *American Sociological Review*, and also serves as
10 a reviewer for grant agencies such as the National Science
11 Foundation Service, National Institute for Justice, and the
12 National Science Foundation.  *Id.* at 15:15-16:9.
13      In short, Dr. Simi is an experienced and
14 well-respected scholar and researcher in both the study of
15 extremism and sociological methodology.  He's qualified to
16 testify as an expert in this case.
17      B.  Reliability of Dr. Simi's Testimony
18      Dr. Simi's proposed testimony is sufficiently
19 reliable.  First, Dr. Simi's testimony relies on established
20 and well-recognized sociological methodologies.  In addition to
21 his review of academic literature and primary source materials,
22 Dr. Simi testified at length regarding various types of
23 fieldwork and analysis that he employs in his work.  For
24 instance, Dr. Simi testified that he has performed ethnographic
25 fieldwork, a sociological method that has been used for "more

M6GHMelC

than a hundred years." Transcript 52:23 to 54:3. He also has

utilized "participant observation" -- viewing individuals

either as a member of a group you are studying or as a "total

observer." *See Id.* at 54:2-21. Dr. Simi testified that he has

been using participant observation and interviews with white

supremacist groups since 1996 in which he's observed and

interviewed hundreds of members of white supremacist groups in

their "natural environment." *Id.* at 25:12-26:9. For instance,

Dr. Simi performed "thousands of hours" of fieldwork in

preparation to write his book *American Swastika,* including time

where he "lived with families" that had white supremacist

members. *Id.* at 29:11-30:4.

      Dr. Simi also testified regarding his use of "open

source data analysis," a sociological methodology that "relies

on secondary sources," such as websites or publicly available

court documents. *Id.* at 32:2-34:4. As one example, Dr. Simi

testified that he used that methodology to conduct long-term

research into the backgrounds of individuals indicted on

federal terrorism charges using federal court documents. *Id.*

at 32:2-34:4. In addition, Dr. Simi has conducted hundreds of

interviews of members with white supremacist groups, including

in order to study disengagement and deradicalization from white

supremacist movements. *Id.* at 38:2-38:25.

      Dr. Simi also utilizes "virtual ethnography" -- a

methodology that is "very much" accepted in the sociological

field.  Tr. 69:8-10.  That methodology involves strategy such
as participant observation, interviewing observation, and
observation coupled with participation and observation in
virtual online spaces.  *Id.* at 57:16-58:17.  Dr. Simi explained
that he's conducted virtual ethnography using web forums like
"Stormfront," which is "one of the . . . older kind of white
supremacist web forums," as well as "Telegram, Discord, and
Gab*."  Id.* at 65:14 to 66:3.  He explained that he spend
"thousands of hours" studying such fora and has analyzed
"hundreds, if not thousands," of virtual spaces in the course
of his research on the white supremacist movement.  *Id.*
67:11-15.  Dr. Simi also noted that virtual ethnography is
particularly apt for studying white supremacist groups because
there is "such an emphasis within the white supremacist
movement on the virtual realm, that to really understand the
movement, you have to go where they congregate to understand
[its] cultural dimensions . . . ." *Id.* 67:16-24.

        Importantly, Dr. Simi has applied those principles are
and methods reliably to his study of O9A.  Dr. Simi testified
that he has undertaken a review of all of the scholarly
literature that he is aware of that addresses O9A in whole or
in part*.  Id.* 124:8-125:7.  Dr. Simi also reviewed journalistic
materials, estimating that he had reviewed "dozens of
journalistic materials relating to O9A*."  Id.* 126:13-127:4.

        Further, Dr. Simi's research included review of

M6GHMelC

primary sources, including O9A's specific works written by the

supposed founder of O9A, Anton Long, such as *The Sinister*

*Tradition* and *Hostia*.  Tr. at 123:9-23.  Dr. Simi also reviewed

multiple websites that appeared to have been created by O9A

adherents, such as O9A.org.  *Id.* 127:21-128:8.

In addition, Dr. Simi used virtually ethnography to

learn about O9A.  He noted that virtual ethnography was a

particularly apt tool for the study of O9A, since members of

O9A tend to be a "hard-to-reach group," such that O9A -- that

may be inaccessible in terms of participant observation and/or

interviews.  *Id.* at 130:8-20.  He explained that virtual

ethnography allowed him to "access . . . that community culture

. . . in order to try and employ some of the methods of

fieldwork in studying the communication [and] the way people

present themselves . . . ."  *Id.*  He testified that he used the

Telegram platform in his virtual ethnography and had observed

approximately ten Telegram channels that relate to O9A in order

to discern themes and patterns present in the data and

communications sent via those channels.  *Id.* 131:4-133:17.

Finally, Dr. Simi testified that he had encountered

O9A-related content in his fieldwork related to more general

white supremacy.  For instance, he testified that more than 20

of his interviews with white supremacists related to

neopaganism*.  Id.* 127:5-20.  He also testified that he had

reviewed academic scholarship on white supremacy that included

M6GHMe1C

1    in discussion of O9A.  Tr. 125:17-25.

2              Second, Dr. Simi's testimony is grounded in facts and

3    data.  As explained above, Dr. Simi collected the facts and

4    data that contribute to his expertise in white supremacy

5    through extensive academic research and "thousands of hours" of

6    fieldwork -- including by embedding himself in white

7    supremacist communities, gatherings, and online spaces.  *See,*

8    *e.g.,* Tr. 29:16-30:4.  Dr. Simi supplemented that work with

9    extensive facts and data collection specific to O9A.  He

10   monitored O9A-specific Telegram channels and reviewed numerous

11   O9A-related publications -- both primary and secondary sources.

12   Given that Dr. Simi relied on a variety of reliable O9A-related

13   data sources, I find his testimony to be sufficiently grounded

14   in facts and data.

15             Defendant objects to Dr. Simi's testimony on the basis

16   that O9A is "anything but a 'traditional' white supremacist

17   group."  Mot. at  13.  However, Dr. Simi credibly explained

18   that O9A fits solidly within the orbit of the greater white

19   supremacist movement, such that Dr. Simi's expertise in white

20   supremacy provides an apt foundation for his testimony

21   regarding O9A.  Specifically, Dr. Simi testified that the white

22   supremacist movement is composed of multiple subgroups,

23   including O9A, the Ku Klux Klan, neo-Nazis, National

24   Socialists, Christian Identity, and skinhead.  According to

25   Dr. Simi, there are "porous boundaries between those

M6GHMelC

subgroups." *Id.* 17:11-24.  Those subgroups are united by "key

beliefs and emotions" that are also shared by O9A.  Those

include a racist ideology (one that includes anti-Black racism,

antisemitism, and anti-immigrant sentiments) and a common goal

of developing a "white ethnostate" or some "restructuring of

society that is consistent with . . . [those] core beliefs."

*Id.* 80:7-12.

He further explained that white supremacists hold core

beliefs about social hierarchies rooted in social Darwinism --

white supremacists, including adherents to O9A, have a "sense

some people are intellectually and physically superior to

others," and that other groups are "weakening society." *Id.* at

107:21-108:18.  And to the extent defendant argues that O9A's

focus on the occult and satanism renders Dr. Simi's expertise

less applicable to O9A, Dr. Simi testified that neopaganism,

which he defined to include satanism, "features . . .

prominently among white supremacists." *Id.* 128:9-20.

Moreover, it's simply not the case that Dr. Simi would

testify about O9A based solely on his expertise in general

white supremacy.  As explained above, Dr. Simi has conducted

significant specific research into O9A, applying widely

accepted methodologies, and has been able to situate the

information he's collected about O9A into his broader

experience in white supremacy.  In short, the Court is

convinced that Dr. Simi may reliably testify about O9A.

M6GHMelC

1        Defendant also objects on the basis that in previous

2  cases, including his testimony in *Sines v. Kessler*, utilized

3  somewhat different methodologies than Dr. Simi applied to his

4  research into O9A; namely, defendant notes that Dr. Simi's

5  testimony in the *Sines* case involved a quantitative analysis of

6  Discord posts related to the Unite the Right Rally in

7  Charlottesville, Virginia, but Dr. Simi's analysis in this case

8  involved no such quantitative review.  *Id.* at 215:14-216:17.

9  However, Dr. Simi testified that the core elements of the

10 [virtual ethnography] methodology are still intact" between

11 both cases, including because in both cases he conducted a

12 study of online messages to make an assessment about the data

13 as it relates to white supremacy and, in this case, O9A.  *Id.*

14 at 224:14-225:19.  The Court agrees that the differences

15 between the methodologies Dr. Simi used in this case, as

16 compared to others, do not render his testimony unreliable.

17        In short, the government has established that

18 Dr. Simi, a professor of sociological methodologies, utilized

19 well-accepted sociological methods to derive the testimony he

20 will deliver in this case, and also that his testimony is

21 grounded in facts and data.  Accordingly, the Court concludes

22 that Dr. Simi's testimony is reliable.

23        C.  Helpfulness to the Jury

24        Dr. Simi's testimony will also assist the trier of

25 fact.  The government's supplemental notice provides that

M6GHMelC

Dr. Simi will testify regarding seven topics. I will address
each of those topics in turn.

O9A's origins within the white supremacist movement:
Testimony regarding O9A's origins within the white supremacist
movement will assist the trier of fact. The average juror is
unlikely to have any degree of familiarity with O9A or its
ideology, including its "militant support for the promotion of
extreme violence in order to overthrow western civilization."
Notice at 1. Nor is the average juror likely to be familiar
with the fact that O9A's goal is to enact a "major change in
society that would move away from . . . multiculturalism and
away from [an] idea of Judeo-Christian domination" and toward
the "establishment of a Nazi-like state." Tr. at 146:3-147:5.

Further, the testimony's relevant to the facts in this
case. Most prominently, defendant is alleged to have been an
active member of O9A. Thus, testimony about O9A's origins and
its connection with the greater white supremacist movement will
give the jury necessary background information about a
fundamental aspect of this case. Moreover, testimony regarding
O9A's interest in furthering the demise of western civilization
would shed light on including defendant's testimony or
statements regarding dying in the attack on his military base
would mean that he "would have died successfully" because
"another ten years war in the Middle East would definitely
leave a mark." *See* Opp'n at 10. Dr. Simi's testimony could

also assist jurors in understanding defendant's alleged

admiration for Nazism and Adolph Hitler.  In short, Dr. Simi's

testimony regarding O9A's origins and its connections to the

larger white supremacist movement will assist the trier of

fact.

O9A Literature and Philosophy:  So too will Dr. Simi's

proposed testimony regarding the importance of certain O9A

texts and their contents be helpful to the jury.  Given that

the jurors are unlikely to be familiar with O9A, they're

similarly unlikely to have any knowledge of key O9A texts, such

as *The Sinister Tradition*, *Hostia*, or *The Seven-Fold Way of the

Order of Nine Angles*.  Nor are jurors likely to have any

background in the principles espoused in those works, including

the performance of "insight roles" as a "type of infiltration."

*Id.* 149:4-23.  Such information is likely beyond the ken of the

average juror.

Dr. Simi's testimony on this topic is relevant to the

facts in this case.  In particular, the government alleges that

the defendant possessed copies of those key O9A works in his

barracks.  An expert's insight into the contents of the works

that defendant possessed is relevant to defendant's adherence

to O9A's ideology and, in turn, his motive for committing the

charged crimes.  Further, Dr. Simi's testimony regarding

insight's roles will provide necessary background information

to understand defendant's express references in his

M6GHMelC

communications to the "insight role" he was performing as a

member of the U.S. military, as well as his comments to CC-1

that he had "thought about" joining al Qaeda to perform an

insight role. *See* Opp'n at 18. Accordingly, Dr. Simi's

testimony on this topic is relevant to the facts of this case.

With regard to testimony about insight roles,

defendant argues that the "jury will hardly require expert

testimony to understand that a person affiliated with O9A might

not wish to publicize that fact." However, according to

Dr. Simi, the concept of an insight role is more nuanced than

simply keeping private one's participation in an extremist

group. As Dr. Simi explained, the goal of performing an

insight role is to "be able to influence society in [a] kind of

more surreptitious way by getting into the system and starting

to exert influence in that respect." Tr. 149:4-23. Further,

according to the government, defendant expressly used the term

"insight role" in conversations with the alleged

coconspirators -- it's not the case that he simply told those

individuals that he would keep his membership to O9A to

himself. In short, the concept of an insight role is more

nuanced than defendant's argument suggests. Defendant's

argument illustrates the value of expert testimony on this

issue to illustrate such nuances. The Court determines that

Dr. Simi's testimony on O9A's literature and philosophy --

including testimony regarding insight roles -- will assist the

M6GHMelC

1    trier of fact.

2          O9A Structure:  Dr. Simi's proposed testimony

3    regarding O9A's structure will also be helpful to the jury.

4    First, the jurors are unlikely to be familiar with O9A's

5    structure as a "largely clandestine" organization that

6    "purposely conceals its members."  Tr. at 166:14-21.

7    Similarly, jurors are not likely to be familiar with the fact

8    that the group typically operates under the name "Temple ov

9    Blood" in the United States, nor are jurors likely to be

10   familiar with the O9A's "seven-fold" self-initiation process

11   which involves "various rituals" and "various practices,"

12   including performing insight roles.  Tr. at 147:6-148:4.

13          Further, Dr. Simi's proposed testimony is relevant to

14   the facts of this case.  Here, the government alleges that

15   defendant participated in the O9A self-initiation process

16   during which he outlined his extremist views in his responses

17   to a series of vetting questions.  Opp'n at 19.  Defendant also

18   referred to the Temple ov Blood in his online communications,

19   and information on that term is thus relevant to understanding

20   those communications.  *Id*.  The government also proffers that

21   it will establish that defendant performed various initial

22   rituals to prove his commitment to O9A, as evidenced by photos

23   of defendant cutting his hand in a form of ritual sacrifice.

24   Dr. Simi's testimony will assist the jurors by providing

25   context to explain how such evidence relates to defendant's

M6GHMelC

1    purported dedication to O9A's ideology and goals, which is

2    relevant to his motive to plan an attack on his fellow service

3    members.  Accordingly, Dr. Simi's testimony on O9A's structure

4    will assist the trier of fact.

5         The Convergence of O9A and Jihadists:  Dr. Simi's

6    testimony regarding the convergence of O9A and Jihadists will

7    also be helpful to the jury.  As jurors are unlikely to have

8    any knowledge or awareness of O9A, they're similarly unlikely

9    to be aware of the connections between an O9A and Jihadists.

10   Thus, the average jurors is not likely understand O9A's

11   admiration of the "idea of jihadi extremism" without expert

12   testimony.  Tr. at 161:12-162:25.

13        Similarly, that testimony is relevant to the facts of

14   this case.  The government asserts that it will establish that

15   defendant and his O9A coconspirators conspired to plan a

16   jihadist attack on a U.S. military base using a Telegram

17   channel alternatively named "Jihad" and then named "Jihadist

18   Caliphate."  Opp'n at 21.  Dr. Simi's testimony will allow the

19   jury to understand the connections between defendant's

20   adherence to O9A's ideology and his attempt, alleged attempt,

21   to plan a jihadist attack on a U.S. military base.

22   Accordingly, Dr. Simi's testimony on the convergence of O9A and

23   jihadists will assist the trier of fact.

24        O9A's Emphasis on Dissention and Violence:  In large

25   part, Dr. Simi's testimony regarding O9A's emphasis on

M6GHMelC

deception and violence will be helpful to the jury.  Beginning

with O9A's emphasis on violence, it is unlikely that jurors are

aware of the ways that white supremacist groups and O9A, in

particular, view violence.  While some jurors may be aware that

certain white supremacist groups have enjoyed -- employed,

pardon me, violent tactics in the past, Dr. Simi testified that

O9A "valorizes" violence and speaks of it in "heroic terms in

many respects."  Tr. at 155:24-56:14.  The degree of respect

for violent tactics is unlikely to be within the ken of the

average juror.  Similarly, jurors are unlikely to be aware that

O9A adherents valorize and celebrate sexual violence.  *Id*.  In

particular, O9A adherents see rape as a means of forcibly

producing a new generation of offspring that would "allow for

the survival of the white race."  *Id.* 158:17-23.  Thus,

Dr. Simi's testimony regarding O9A's emphasis on violence is

likely to provide the jurors with information that they would

not otherwise know without expert testimony.

        In addition, such testimony is relevant to the facts

of this case where the government alleges that defendant and

his coconspirators aimed to plan a violent attack on a U.S.

military base.  It's also relevant to explaining references to

"rape" by defendant and his alleged coconspirators, as well as

the fact that the Telegram channel on which the individuals

communicated was named the "Rapewaffen Division."  Dr. Simi's

testimony would provide useful context for understanding

M6GHMelC

defendant's alleged adherence to O9A's ideology and, as a

result, his motive to plan a jihadist attack on his military

base.  Accordingly, Dr. Simi's testimony regarding O9A's focus

on violence will assist the trier of fact.

As to O9A's focus on deception, to the extent that

Dr. Simi's testimony will contextualize O9A's observation as an

idiosyncratically clandestine organization, such information is

unlikely to be known by the average juror.  That information is

also relevant to the nature of defendant's membership in and

interactions with O9A.  Thus, to the extent that Dr. Simi will

testify that O9A is generally a clandestine organization that

does not publicize its members, that testimony will be

permitted.

However, the government also asserts that Dr. Simi's

testimony would be "relevant to contextualize . . . why

[defendant] was not fully truthful in his postarrest statements

with law enforcement" and also relevant to rebut any argument

that defendant was not, in fact, a member of O9A because "O9A

adherents are instructed to lie about their affiliation with

O9A and that the jury should evaluate the defendant's

statements regarding his association with the group in that

context."  Opp'n at 22.

While Dr. Simi may testify to the fact that O9A is

generally secretive, he may not opine that defendant actually

possessed the requisite mental state to be convicted of the

charged offense, despite defendant's statements to the

contrary.  Rule 704(b) prohibits the expert from expressing an

"opinion or inference as to whether the defendant did or did

not have the mental state or condition constituting an element

of the crime charged or the defense thereto."  Fed. R. Evid.

704(b).  This disables even an expert from "expressly finding

or stating the final conclusion or inference as to a

defendant's actual mental state" at the time of the crime.

*United States v. Richard*, 969 F.2d 849, 854 (10th Cir.), cert.

denied, 506 U.S. 887, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992),

and petition for cert. filed, No. 92-6588 (Nov. 16, 1992);

accord *United States v. McBride*, 786 F.2d 45, 50 (2d Cir. 1986)

("A district court may exclude psychiatric testimony which

merely offers an opinion about the defendant's capacity to form

the mental state required to commit the offense charged,

without suggesting the presence of a mental disease or defect .

. . ").  To the extent that Dr. Simi is asked to opine that the

jury should write off defendant's denial of any membership in

O9A as the product of O9A's clandestine nature and that

defendant, in turn, possessed the requisite mental state to

commit the offenses for which he was charged, that testimony

evidently will not be permitted.  We can talk about that some

more at the end of this decision.

        The Use of Certain Terms Images, Symbols, and Memes in

the White Supremacist Community:  Dr. Simi's testimony

M6GHMelC

regarding the use of certain terms, images, symbols, and memes in the white supremacist community will also be helpful to the jury.  First, the idiosyncratic use of certain terms, including terms like "rape, baste, and kek" in O9A and white supremacist parlance is unlikely to be understood by the average juror. Similarly, and as mentioned above, jurors are unlikely to be familiar with the manner by which O9A adherents and white supremacists view sexual violence, including rape.  Testimony regarding these terms is also relevant to the facts in this case given defendant's and his coconspirators' use of those terms in their online communications.

As to Dr. Simi's testimony regarding "double speak," "just joking," and "front-stage/back-stage strategies," the Court agrees that jurors are unlikely to be familiar with those concepts.  For instance, the average juror is probably not aware that members of white supremacist groups employ front-stage/back-stage as a recruitment strategy, Tr. at 88:4-89:2, and that they use humor and "just joking" strategies to help "sow confusion" and "avoid culpability."  Tr. at 98:24-99:22.

To an extent, such information is relevant to the facts of this case.  Broadly speaking, information about these strategies is relevant to the language and strategies used in O9A-related primary sources, and Dr. Simi will be permitted to testify as to the use of "double speak," "just joking," and

M6GHMelC

1    "front-stage/back-stage strategies" as they appear in those

2    primary sources.

3            However, Dr. Simi will not be permitted to testify as

4    to the manner by which these strategies were or were not

5    employed by defendant and his alleged coconspirators in this

6    case.  As explained above, experts in criminal cases are not

7    permitted to express an "opinion or inference as to whether the

8    defendant did or did not have the mental state or condition

9    constituting an element of the crime charged or of a defense

10   thereto."  Fed. R. Evid. 704(b).  And to permit testimony

11   regarding defendant's use of these strategies -- particularly

12   with regard to defendant's statements during postarrest

13   interviews -- would impermissibly suggest that defendant

14   possessed the requisite mental state to commit the charged

15   offenses despite his denials of that fact.  Thus, Dr. Simi's

16   proposed testimony is limited to the use of these strategies in

17   the abstract, i.e., as it appears in O9A primary source

18   materials, as opposed to the use of these strategies by

19   defendant and his coconspirators.

20           I also point out that defendant's counsel asserted at

21   the *Daubert* hearing that the government's notice states that

22   O9A "regularly" employs strategies like doublespeak, "just

23   joking," and "front-stage/back-stage strategies."  Tr. at

24   214:24-215:13.  I note that the government's notice does not

25   contain the word "regularly," though the government's

M6GHMelC

opposition suggests that the notice does.  *See* Opp'n at 23.
During cross-examination, Dr. Simi conceded that he had
reviewed only a limited set of O9A communications.  Thus, the
Court is dubious of testimony that would suggest that O9A
"regularly" utilizes these strategies -- a more apt description
would be that O9A "uses" these strategies.  The Court trusts
that Dr. Simi's testimony will be more precise than what is
suggested.

     O9A's Use of Encrypted Messaging Applications:
Testimony regarding O9A's use of encrypted messaging
applications will also be helpful to the jury.  The average
juror is unlikely to have significant familiarity with the
extent to which white supremacist groups use encrypted
messaging services like Telegram and Discord.  *See* Tr. at
65:14-66:3 (explaining that white supremacists have "developed
a pretty substantial presence" on those platforms).  That
testimony is also relevant to this case, as the government
asserts that defendant and his coconspirators communicated
extensively via Telegram.  That defendant used Telegram as a
platform is less relevant to his purported membership in O9A
and, consequently, his motive to commit the charged offenses.
Accordingly, Dr. Simi's of use of encrypted messaging
applications would be helpful to the jury.

     Here too, however, I note that the government's notice
states that Dr. Simi will testify that O9A "primarily"

M6GHMelC

communicates via encrypted messaging applications like

Telegram.  During cross-examination, Dr. Simi conceded that

instead of the word "primarily," he would likely use a

different term.  Tr. at 221:9-13.  Again, the Court anticipates

that Dr. Simi's testimony will be more precise than the notice

in this respect.

　　　　D.  Hearsay

　　　　Despite defendant's arguments to the contrary,

Dr. Simi's testimony will not be precluded on the basis that it

impermissibly relies on hearsay.  "Under Rule 703, experts can

testify to opinions based on inadmissible evidence, including

hearsay, if 'experts in the field reasonably rely on such

evidence in forming their opinions.'"  *United States v. Mejia*,

545 F.3d 179, 197 (2d Cir. 2008) (quoting *United*

*States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993).  Here, and

as discussed, Dr. Simi utilized well-accepted sociological

methodologies to come to the conclusions in his testimony,

including the review of academic literature and primary

sources, ethnographic fieldwork, and virtual ethnography.  Nor

is it the case that Dr. Simi will "repeat information that is

essentially already in evidence."  Tr. at 236:10-237:4.

Rather, Dr. Simi, a preeminent expert in white supremacy, will

provide expert foundational background on O9A that simply

cannot be discerned by review of the evidence, certainly not

during the amount of time that we have for trial.  Indeed, were

M6GHMelC

1   jurors asked to merely read the defendant's online

2   communications -- which are replete with terms like "insight

3   role," "kek," and references to jihad -- it is unlikely that

4   they would have the depth of understanding to properly evaluate

5   the issues and charges in this case.

6         Moreover, the cases upon which defendant relies for

7   this argument can be readily distinguished.  In *Mejia*, for

8   example, the Second Circuit determined that a police officer's

9   testimony was improper because it merely -- it was "merely

10   repeating information he had read or heard" and because he "did

11   not analyze his source materials so much as repeat their

12   contents."  545 F.3d 179, 197 (2d Cir. 2008).  Here, by

13   contrast, Dr. Simi is a trained sociological expert who adeptly

14   described the well-accepted methodologies he used to derive his

15   testimony.  Moreover, his testimony is based on a synthesis of

16   that expertise in white supremacy and his specific research

17   into O9A.  Dr. Simi did not, as defendant implicitly

18   suggests -- merely "repeat the contents" of evidence to be

19   admitted in this case.

20         Accordingly, Dr. Simi's testimony should not be

21   categorically excluded because it constitutes inadmissible

22   hearsay, and it will not be categorically excluded on those

23   grounds.

24         E.  Rule 403.

25         Nor will Dr. Simi's testimony be precluded under

1    Rule 403.  Under Rule 403, relevant evidence may be excluded if

2    "its probative value is substantially outweighed by a danger of

3    one or more of the following: unfair prejudice, confusing the

4    issues, misleading the jury, undue delay, wasting time, or

5    needlessly presenting cumulative evidence."  Fed R. Evid. 403

6    403.

7         The Second Circuit has instructed that will "district

8    courts have broad discretion to balance probative value against

9    possible prejudice" under Rule 403.  *United States v. Bermudez*,

10   529 F.3d 158, 161 (2d Cir. 2008)(citation omitted).  Because

11   virtually all evidence is prejudicial to one party or another,

12   to justify exclusion under Rule 403, the prejudice must be

13   unfair.  *See* Fed. R. Evid. 403.  Weinstein's Federal Evidence

14   Section 403.04[1][a] (2019) (citing cases).  "The unfairness

15   contemplated involved some adverse effect beyond tending to

16   prove a fact or issue that justifies admission."

17   *Constantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164,

18   174-75 (2d Cir. 2000).  Further, as the advisory committee

19   notes to Federal Rule of Evidence 403 explain, "'Unfair

20   prejudice' within its context means an undue tendency to

21   suggest decision on an improper basis commonly, though not

22   necessarily, an emotional one."  Fed. R. Evid. 403 advisory

23   committee notes.

24         Here, defendant's primary objection to Dr. Simi's

25   testimony under Rule 403 appears to be related to testimony

M6GHMelC

1    about "key events in O9A's history, including historical acts

2    of violence perpetrated by O9A members and associates."  *See*

3    Mot. at 11.  However, the defendant has removed this topic in

4    its supplemental notice, such that defendant's objection is

5    moot.  I understand that such testimony will not be offered.

6            To the extent defendant objects under Rule 403 to the

7    other aspects of Dr. Simi's testimony as I've outlined it, such

8    objections do not have merit.  I have considered all of the

9    relevant factors under Rule 403 and engaged in a careful

10   balancing of the probative value of this evidence against the

11   adverse consequences outlined in the rule.

12           As explained above, the testimony offered by Dr. Simi

13   is highly probative, including because testimony regarding

14   O9A's core tenets provides necessary context to understand

15   defendant's alleged membership in O9A, and consequently, his

16   motive to facilitate an attack on the U.S. military base, as

17   well as his planning of said attack.

18           I'm going to reserve decision, as I said earlier, with

19   respect to the, I'll call it, correlation between white

20   supremacy and the military.  I have substantial concerns about

21   that proposed testimony.  I just want to consider it further

22   before taking a position.  I will do so before trial.

23           For the forgoing reasons, defendant's motion *in limine*

24   to excluded the testimony of Dr. Simi is denied.

25           So thank you very much, counsel, for your patience as

M6GHMelC

1    I reviewed the reasoning behind my decision with respect to the

2    testimony of Dr. Simi.  As you can see, the Court has examined

3    carefully all of the evidence presented with respect to

4    Dr. Simi and his anticipated testimony after -- with the

5    benefit of a hearing.  Having balanced all the relevant factors

6    in light of the governing law, I believe that his testimony is

7    admissible with the limitations that I outlined during the

8    course of my decision here.

9            Good.  So I think that's all that I had on my agenda.

10   I look forward to seeing the submissions by the defendant in

11   response to the government's motion regarding its proposed

12   expert.  I'm going, again, to expect to see you here next

13   Wednesday for our hearing with respect to the admissibility of

14   that expert's testimony, an issue as to which the defense bears

15   the burden of proof.

16           Anything else that we should take up here before we

17   adjourn?  First, counsel for the United States?

18           MS. RAVENER:  No, your Honor.

19           THE COURT:  Thank you.

20           Counsel for defendant?

21           MR. MARVINNY:  No, thank you.

22           THE COURT:  Good.  Thank you all very much.  Again,

23   thank you for your indulgence.  I look forward to seeing you

24   back here on Wednesday.  This proceeding is adjourned.

25           (Adjourned)