United States District Court
Southern District of New York
--------------------------------------------
United States of America,

    -against-                             S1 20 Cr. 314 (GHW)

Ethan Phelan Melzer,

                    Defendant.
--------------------------------------------


**ETHAN MELZER'S SENTENCING MEMORANDUM**


Federal Defenders of New York
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700


To:  Damian Williams, Esq.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn: Sam Adelsberg, Esq.
           Matthew J.C. Hellman, Esq.
           Kimberly J. Ravener, Esq.
           Assistant United States Attorneys

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 3, 2023

By ECF

Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:   United States v. Ethan Phelan Melzer, S1 20 Cr. 314 (GHW)**

Dear Judge Woods:

When Ethan Melzer pled guilty in June 2022, he told this Court: "I'm sorry, and I regret every single thing I did." Those words were not scripted by counsel—they were Ethan's alone, and they were true. To be around him now is to know his palpable remorse, his guilt, his shame. They are always in the room.

Ethan will appear for sentencing on March 3, 2023, having pled guilty to and accepted responsibility for grave offenses: attempted murder of U.S. service members, in violation of 18 U.S.C. § 1114; provision of material support in furtherance of attempted murder, in violation of § 2339A; and unlawful transmission of national defense information, in violation of § 793(d). These offenses carry maximum sentences of 20, 15, and 10 years, respectively, for an aggregate maximum sentence of 45 years (540 months). The PSR calculates an advisory Guidelines range of 45 years' imprisonment. We do not object to that calculation.[1]

Ethan knows he is due a lengthy sentence—his crime merits nothing less. But a sentence at or near 45 years would be far in excess of what is required. We respectfully request that the Court sentence him to 15 years' imprisonment, to be followed by 10 years'

---

[1] At the time of this submission, only the first-draft PSR, dated November 4, 2022, has issued. *See* ECF No. 154. All "PSR" citations are to that document. As will be discussed below, we have lodged several objections to that document's "Offense Conduct" section.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                        Page 2 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

supervised release. That is a significant sentence that satisfies § 3553(a)'s "parsimony clause," which directs that sentences be "sufficient, but not greater than necessary," to comply with the purposes of sentencing.

As will be discussed, Ethan comes from a troubled background, including a childhood in Kentucky marked by severe neglect and abuse. He was raised by a single mother, an alcoholic with untreated mental illness who, despite her best intentions, was unable to provide the attention and guidance he needed. He was a sensitive child who largely had to fend for himself. While still in elementary school, he found refuge in internet message boards and role-playing video games. Those habits endured as he entered his difficult teen years, a period when he abused drugs, dropped out of high school, and found that his life was falling apart. But at 20 he was able to turn things around and achieve success in the Department of Labor's Job Corps program, which he used as a steppingstone to military service, the realization of his long-held goal to join the many members of his family who had served.

By April 2020, Ethan was 21 years old and stationed with his Army unit in Vicenza, Italy. He was struggling to adjust to military life and was lonely and alienated. He was also in thrall to a bizarre satanic cult with white supremacist and "accelerationist" political beliefs, the Order of the Nine Angles ("O9A"), that he had discovered in obscure corners of the internet the year before. The then-emergent COVID-19 pandemic had struck Italy with great force and the entire country, Ethan's unit included, was subject to a draconian lockdown. He was confined to his barracks, drinking heavily, and spending far too much time online.

From this toxic stew emerged a toxic idea to attack a U.S. military interest in service of O9A's reprehensible agenda. Ethan discussed the idea in internet chats with purported O9A adherents. First the idea was to launch a fatal attack on Ethan's own unit when it deployed to a military base in Turkey in about three weeks' time. That idea quickly shifted to an attack on a different unit that would supposedly arrive at the base many months later. In furtherance of these ideas, Ethan disseminated sensitive national defense information concerning his unit and the military base.

Without question, this offense conduct was repugnant, but it is not unmitigated. The fact is that there was never a coherent plan of attack and no one to execute it even if there

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 3 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

had been. The group's ideas never became anything more than that, ideas. The "plan" was entirely online and bordering on non-existent. And the group was uniquely incapable of carrying out any real-world action. Its leader was "CC-1," a 15-year-old boy living at home in Canada but role-playing online as a former paratrooper. Another main participant was "Red Hourglass," a government informant pretending to be CC-1's girlfriend and an O9A devotee, who unsuccessfully tried to urge the group forward at every turn. Frustrated at the lack of progress, she would colorfully describe the group as a "confederacy of dunces" the day before Ethan's arrest. In the end, no attack was ever close to occurring.

But Ethan offers no excuses for his misconduct. He is profoundly remorseful. He has written a searching letter to this Court where he describes his overwhelming feelings of guilt, shame, and disappointment in his behavior. *See* Letter of Ethan Melzer (Ex. A). He is a still-young man with the chance to change direction. In the time since his arrest he has gained insight into his difficult background and its impact on his decision-making, and has worked hard to improve himself. He renounces extremism in all forms, including O9A and its bankrupt, nihilistic worldview. He wants only to atone for his misconduct, serve his time, and continue his path to redemption.

**Ethan's background[2]**

*A lonely child contending with isolation, abuse, and neglect*

Ethan was born in 1998 in Louisville, Kentucky. He is now 24 years old, though at the time of his offense he was 21. (He turned 22 four days before his arrest.) His parents are Julie Presley and Nick Melzer. Julie and Nick were teenagers when they began their relationship and Julie's pregnancy with Ethan was unplanned. Nick and Julie married just before Ethan's birth, but the marriage was ill-fated from the start. They split up when Ethan was three. After the separation Nick moved across town and Ethan remained with Julie, though he saw Nick with some regularity, mostly on weekends. Today, Nick works for Direct TV; Julie is a waitress.

Ethan has described his childhood as "chaotic as hell." Mercer Report 3 (Ex. B). Life under Julie's care was difficult—she suffered from untreated ███████████ and was an

---

[2] The facts in this section are drawn from conversations with Ethan, the PSR, a report from Erik Mercer, L.C.S.W. ("Mercer Report"), and letters from Ethan's family and community.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                    Page 4 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

alcoholic, having begun drinking heavily when she just 10 years old. After she and Nick split,
various boyfriends cycled in and out of her life and the family home. Several were abusive,
including the longest-lasting one, ███████ ████████ He, like Julie, was a severe alcoholic.
Together they partied hard and paid scant attention to Ethan. Ethan recalls that he was "left
to [his] own devices." *Id.* Julie offers her own candid self-assessment of her neglectful
parenting: "[G]rowing up, I [] made Ethan feel unimportant and like he didn't belong,
because drinking was more important to me than being at home with him." Letter of Julie
Presley (Ex. C). Julie, though, also suffered greatly herself. She was frequently abused by her
various partners. ███████ in particular had a great capacity for violence—he spit on and beat
Julie frequently, often in front of Ethan.



        There were still other disturbing aspects of Ethan's youth. His childhood home was
suffused with racist, homophobic, and anti-Semitic beliefs. Julie's grandfather had been a
member of the Ku Klux Klan, and her father was a virulent racist as well; Julie had adopted
many of their beliefs and parroted their racist language. ███████ too, "spewed hatred"
toward people of color, Jews, and gay people. *Id.* at 4. He and Julie casually deployed the n-
word and disparaged Black people. Though Ethan would himself use some of this language
when he grew older, as a child it made him recoil. Julie writes: "Ethan never joined in on it,
and would even correct me if I said anything he didn't like. He didn't like my dad and never
wanted to be around him because of the racist things he said." Letter of Julie Presley.

        For his part, Nick cared about Ethan, but had moved to another part of Louisville and
remarried, beginning a fresh life with a new family. Nick also traveled frequently for work
and so had less and less time to devote to Ethan. What's more, Nick's new wife and Ethan
never got along—she could be quite mean to Ethan—and she and Nick had three other
children who monopolized their attention. Ethan felt like something of a stranger in his
father's home.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                     Page 5 of 28

Re:   United States v. Ethan Phelan Melzer
        S1 20 Cr. 314 (GHW)



*Ethan (r) with his father, stepmother, and stepsiblings*

Fortunately, Nick's mother, Linda, cared deeply for Ethan and made her home something of a space safe for him. Ethan loved being in his grandmother's care. She writes, "Ethan was always respectful, happy, and loving. … He would come over and help me mow, or play with his cousins who also came over on Fridays. He was always good about sharing his games and toys with the other boys." Letter of Linda Melzer (Ex. D). But as Ethan lived primarily with Julie, Linda's grandmotherly love could only accomplish so much.

School provided little relief from Ethan's troubles in Julie's house. He was a sensitive boy who loved art and music, but he soon learned that these interests set him apart from his classmates. "Ethan learned quickly that acceptance for a boy depended on athleticism while art and music were considered feminine pursuits." Mercer Report 4. He was overweight, quiet, and nerdy, and the other children bullied him relentlessly. They threw objects at him and called him things like "pussy" and "bitch." *Id.* One of Ethan's uncles recalls: "Ethan was a nerdish and sensitive child which contributed to him being severely bullied in school. I believe this all added up to him feeling powerless and insignificant." Letter of Marcus Melzer

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                       Page 6 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

(Ex. E). Julie confirms this: "Kids made fun of him for being fat and having glasses and being a nerd. They really tortured him." Letter of Julie Presley.

Ethan's gentle nature made him something of an oddball to his family. One of his uncles, for example, often called him "weak." Mercer Report 4. To remedy Ethan's perceived softness, they encouraged him to participate in more traditionally masculine pursuits. Julie began taking him to the firing range when he was 12. Mr. Mercer observes that "[m]ost adults in Ethan's world owned firearms and gun ownership was seen as a rite of passage for boys." *Id.* at 5. Ethan ultimately developed a keen interest in guns, particularly their mechanical qualities—he enjoyed tinkering with them, taking them apart, and putting them back together. His interest in firearms would earn him rare praise from the adults in his life: "In the midst of his painfully isolated existence, firearms offered Ethan an unprecedented opportunity for affirmation and connection." *Id.*

But ultimately Ethan was most drawn to the escapism of the digital world. While still in elementary school, he began seeking refuge online. Julie allowed him unrestricted access to the internet and he was soon spending upwards of nine hours a day exploring its possibilities. He felt more at ease reading through message boards and mastering video games than interacting with his peers in the real world. The earliest video games he enjoyed were role-playing games—those where players control a main character navigating an immersive fantasy world. Ethan loved to lose himself in those games—he played Pokémon, in particular, ad nauseam. He would spend even more time online and in the gaming world as he entered his teen years.

*A searching teenager desperate to belong*

As Ethan entered high school, Julie's drinking had grown worse. The meager stability she had provided in Ethan's youth was now totally absent. She says: "I was completely out of control. I started drinking all day, every day. … I came home completely wasted and didn't give [Ethan] any attention." Letter of Julie Presley. Ethan was truly on his own. He spent hours upon hours playing video games in his room. Then he started skipping school.

In the midst of his fraught adolescent years, Ethan also struggled with the realization that he was gay. This burgeoning sexual identity terrified him—he was already considered "soft" by classmates and family; the fact that he was gay would be yet another way he would

Honorable Gregory H. Woods                     February 3, 2023
United States District Judge                          Page 7 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

marked as different by the culture that surrounded him. He says the message was clear: "The only thing I knew for sure was, don't be gay." Mercer Report 6. He told no one.

Like many teenagers, Ethan was desperate to belong somewhere, to find his tribe. Unfortunately this effort saw him turn to drugs and alcohol. In seventh grade he began smoking marijuana. The next year he began abusing Xanax. Using drugs made him feel cool, and he received approbation from his peers, something entirely new to him. The attention felt wonderful.

As he grew older Ethan's drug use worsened. He began using ecstasy and then methamphetamine. The meth was particularly problematic—finding and consuming it became a central focus of his life. By 17 he was using daily. His drug abuse took a predictable toll on his schooling. Throughout tenth grade his attendance at Louisville's Waggener High School steadily declined. With no responsible adult around to advise him otherwise, he dropped out before finishing the school year.

Out of school, Ethan spent his time either online or with a friend group that was organized largely around drug use. His life at home was empty. When he was 16, Julie married a former Army Ranger named ██████████ Like so many other men in her life, ████ was abusive toward Julie, but his abuse encompassed Ethan as well. On multiple occasions Ethan intervened when ████ was beating Julie, only to be beaten himself. Julie describes: "██████ used to punch Ethan over and over while Ethan laid on the couch with his hands over his head. One time ████ choked me until I was unconscious." Letter of Julie Presley.

Ethan's home was now not just neglectful, but unsafe. There was little keeping him there. He moved to a rough part of downtown Louisville and fell in with a problematic group of people. He was essentially homeless before moving into a flophouse where drug dealers, gang members, and other unsavory people shuffled in and out. Ethan began selling drugs and placing himself in dangerous situations, including a shooting incident involving another drug dealer. *See* PSR ¶ 21 (referring to the incident as "Shooting-1"). He describes that desolate time of his life as a "total blur." Mercer Report 7.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                    Page 8 of 28

Re:    United States v. Ethan Phelan Melzer
       S1 20 Cr. 314 (GHW)

*A young man endeavoring to improve himself*

Shortly after the shooting incident, Ethan realized that his life was falling apart. He decided it was time to turn things around. He quit drugs, returned to Julie's home, and got a job cooking and cleaning at Shiraz Mediterranean Grill in eastern Louisville. He had previously held jobs at a number of fast food places but none had lasted more than a few months. At Shiraz he put his head down, worked hard, and impressed his bosses. His manager, who would become his friend, reports: "He always showed up clean and appropriate and he was always pleasant. He wanted to do well. He usually had to walk four miles to and from work because his mother wouldn't drive him." *Id.*

Ethan's manager told Ethan that he had previously participated in the Department of Labor's Job Corps program—a residential career training and education program for young people—and had gotten a lot out of it. He thought Ethan might similarly benefit from participating. Ethan researched the program and decided it would be a good fit, so he signed up at the Greenville, Kentucky, location. He saw Job Corps as a steppingstone to military service, which had long appealed to him. Nick says that Ethan "had idolized [the Army] for much of his youth. He had always admired the military and wanted to follow the path of his relatives who have served. His Great grandfather was there at D-Day, and his uncles and grandfathers served in Korea and Vietnam." Letter of Nicholas Melzer (Ex. F). Ethan's great uncle confirms the family's long history of service: "I served in the Marine Corps during Vietnam. … I was far from the first in my family to serve; Ethan's paternal great grandfather landed on Omaha beach on D-Day and fought in five major WWII campaigns, including the Battle of the Bulge." Letter of Kim Spafford (Ex. G).

Ethan began his time at Job Corps in September 2018, when he was 20 years old. He enrolled with the express goal of joining the military—a common aim of Job Corps participants—and set himself on that path from day one. The program's military liaison, who worked closely with Ethan during his time there, writes: "Immediately upon enrollment, Ethan expressed interest in the Army." Letter of Rita Peterson (Ex. H). "On October 25, 2018 I referred him to the Army recruiter who worked with him until his enlistment date June 3, 2019." *Id.*

In addition to successfully enrolling in the Army, Ethan thrived at Job Corps in other ways. The program's relatively strict structure helped him focus on his goals and the steps

Honorable Gregory H. Woods                                    February 3, 2023
United States District Judge                                      Page 9 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

he'd need to take to achieve them. He used his time at the program to earn his high school
diploma and a certificate in heavy-equipment operation. PSR ¶¶ 111–12. He worked hard
and earned the staff's respect. His career counselor writes that Ethan "was well liked by staff.
He was friendly and approachable. He occasionally volunteered to work in the cafeteria to
help clean the kitchen, serve food, and take out trash." Letter of Matthew Osborne (Ex. I).
And his heavy-machinery instructor reports that Ethan was one of the hardest working
participants he had encountered in 13 years on the job. Mercer Report 8. He said of Ethan,
"We used to say, 'I'll take fifty more like him.'" *Id.*

Ethan completed Job Corps in May 2019, and the following month he left for military
basic training in Fort Benning, Georgia. There, he again thrived in a structured environment,
though basic's intensity of course far outpaced anything he had done previously. Ethan liked
the drills, the hard work, and the comradery of his fellow recruits. Julie writes, "In basic
training, he would talk all the time about his friends—he called them his brothers. He was
very close to the people there. I was so proud of him." Letter of Julie Presley.

Ethan would later describe basic training as one of the best experiences of his life. He
was proud of his achievements and of the beginning of his service to the country. His
family drove to Georgia for his graduation. Nick writes, "My wife, my mother, and [Ethan's]
siblings all attended his graduation from boot camp in Fort Benning, Georgia. It was
honestly the proudest day of my life." Letter of Nicholas Melzer. Ethan confirms the joy he
and his family felt that day: "The day I [graduated] I got to see my dad proud of me for the
first time ever. My whole family had never come together before to tell me I did a good job
and show that they were proud of me. It was amazing." Mercer Report 11.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                  Page 10 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)



*Ethan with his father, at Job Corps*

After basic training Ethan moved on to Airborne School, also at Fort Benning. He spent three weeks there and graduated successfully. Afterward, he had several free days in Georgia. Having recently turned 21, he went to some bars and live music shows to celebrate his achievements. He even attended an LGBT-rights rally in Atlanta, though he left quickly, fearful of being seen. *Id.* He then returned home to Louisville for a couple of weeks before shipping off to begin his military service in Italy.

**Ethan's immersion in O9A**

Ethan performed well and made great progress during his time at Job Corps. While there, however, he also found himself with a lot of downtime and, as was his custom, he spent much of that time online. He had long been interested in what might be broadly termed "the occult"—dark magic, paranormalism, esotericism, and various supernatural belief systems. He spent a significant amount of time on /x/, a well-known paranormal channel on the website 4chan, and other occult-related internet message boards. He eventually came across O9A and the group piqued his curiosity; he decided he wanted to learn more.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                       Page 11 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

Ethan's dive into O9A began in February 2019, on the messaging application Discord. *See* PSR ¶ 27 ("[I]n February 2019, Melzer created a Discord account and began discussing O9A."). His chats there show conclusively that he knew almost nothing of O9A until that time, and that he in fact learned about O9A primarily through Discord. On February 28, 2019, for example, Ethan entered a Discord channel for people interested in the occult and introduced himself by saying, "Hello. … I have questions about some group I found. Don't know if you all could help." USAO_012508 - UvM_000031801 (Ex. J).[3] He explained: "Ok so I was going down the rabbit hole and found this group called temple ov blood [the U.S.-based O9A affiliate] … But there's literally no info I can find on them." *Id.*; PSR ¶ 27. Ethan was then asked why he was interested in the group and whether he wished to join, and he responded: "Somebody in the comments talked about there [sic] connected to some shit called O9A. No just morbid curiosity." Ex. J. Ethan explained that he was "[a]lways interested in really obscure shit" and that O9A and Tempel ov Blood seemed "really bizarre." *Id.* After another chat participant told Ethan that "Tempel ov Blood is vampirism," Ethan asked, "So [are they] like generic vampires or what[?]." *Id.* A chat participant said that members of the group are "serious" vampires and involved in "the infiltration and manipulation of organizations" including "neo-nazi groups." *Id.* Ethan then said, "So there [sic] Nazi vampires. Ok then." *Id.*

The next day, March 1, 2019, Ethan entered another occult channel on Discord and told the group that he "used to go on /x/ a lot." USAO_012518 - UvM_000031811 (Ex. K). Ethan said that he had decided to download Discord and come to the occult channel "mainly because somebody on [/x/] was ta[l]king about some group called O9A and I wanted to dig deeper into that." *Id.* He then asked in reference to O9A: "What are they[?]"; "Is [O9A] a meme or is it real[?]" *Id.* A chat participant then told Ethan, "The things they have to go through to move up the chain [in O9A] is extreme and inhumane," to which Ethan asked, "Like what[?]" *Id.* Later, he asked, "What do they even believe in … if anything?" *Id.* Ethan informed the chat: "The only thing I've found even related to this is something called temple [sic] ov blood," which is "[r]eally out there they only have a website

---

[3] Ethan's Discord chats were obtained from Discord by the government pursuant to a search warrant. The chats were produced to the defense as Excel spreadsheets. Ethan is "Deleted User 831034ef#9727." For the Court's convenience, in our exhibits, which are excerpts of those chats, we have highlighted Ethan's communications in purple. All formatting errors are original to the government's production.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                    Page 12 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

which half the shit I don't really understand." *Id.* When another chat participant asked
Ethan, "What makes you interested in these cults[?]" he replied, "Really morbid curiosity.
Seemed fucked up so I said fuck it and looked it up more." *Id.*

     That Ethan did not begin exploring O9A until he joined Discord in 2019 is further
confirmed by the fact that all O9A-related documents found on his electronic devices came
into his possession in 2019 or later. In fact, he obtained many of those documents from a
"library" on Discord itself, as the PSR confirms. PSR ¶¶ 29–30.

     This all amounts to overwhelming—in fact dispositive—proof that Ethan did not
perform O9A "insight roles" in 2016–18, since he had not yet learned about O9A and would
have had no idea what an insight role was or that O9A advocated them. In fact, Ethan
objects to any claim in the PSR, explicit or implicit, that he was familiar in any meaningful
way with O9A prior to February 2019. Any claim Ethan made online to the contrary was
bluff and bluster designed to overstate his experience with and knowledge of O9A in order
to impress the group's adherents in the chats.

     Accordingly, neither Shooting-1 nor any other criminal activity on Ethan's part prior to
2019 had anything to do with O9A. *Id.* ¶¶ 21–22. To be clear, Ethan does not deny
participating in Shooting-1, but does deny that the shooting was in any way related to O9A.
Next, Ethan denies being a member of the Bloods gang at any point, but does not deny
associating with unsavory individuals, including some who might have been gang members
themselves, during the difficult period during his teen years when he had left home and was
living in downtown Louisville, as discussed above. Again, though, none of this activity was
related to O9A in any way, and none of it was an "insight role." Ethan also denies, for the
same reasons, that he performed an insight role with Antifa around 2017. *Id.* ¶ 24. And he
denies that he "enlisted with the U.S. Army in December 2018 in pursuit of O9A's violent
objectives." *Id.* ¶ 26. Ethan's decision to enlist had nothing to do with O9A.

     Nevertheless, there is no denying that Ethan—young, immature, and highly
impressionable—went "down the rabbit hole" and became consumed by O9A in 2019. In
short order, he voraciously consumed O9A texts and found online community with
purported O9A adherents. He was fascinated by the group's occultist elements and would
eventually even perform certain O9A-inflected "rituals," including, at one point, cutting his
hand and bleeding on an O9A book. *See id.* ¶ 44. Moreover, Ethan's politics had always

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 13 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

leaned anti-establishment, and O9A's "accelerationist" ideology—which endorsed violence
to hasten Western civilization's demise—was convincing to him as well. And having grown
up in a home saturated with racism and anti-Semitism, Ethan also felt little discomfort with
O9A's white supremacist rhetoric.

      At the same time, Job Corps staff and residents considered Ethan "accepting and
comfortable with diversity." Mercer Report 9. Indeed, Ethan has had close relationships with
people of color for most of his life, including his biracial cousins and many friends over the
years. *See, e.g.*, Letter of Linda Melzer ("Nick's brother, Nathan, married a Black woman and
Ethan was always close with his cousins."). These contradictions can be hard to reconcile.
The government has sought to paint Ethan as an unreconstructed white supremacist, but he
is not. Ethan, like most people, is not a one-dimensional caricature and is capable of
contradictory thoughts. He is someone who was friends with people of all races, but has said
and written racist things. He is someone who is gay, yet has said and written homophobic
things. And he is someone who was once proud of serving in the military, but has said and
written derogatory things about the United States and his own patriotism. Ethan was a
young man searching for his place in the world, and none of these various sides of him was
"true" to the exclusion of the others. As Mr. Mercer concludes, "Ethan's identification with
radical ideology is not enduring." Mercer Report 16.

**Ethan's offense conduct**

      By early 2020, Ethan was stationed in Vicenza, Italy, and feeling lonely and alienated.
The comradery he had experienced in basic training was no more, and he found that he was
not forming close connections with his new platoon members. He was depressed, isolating
himself, and continuing his immersion in O9A. His world was turning darker and darker.
When he wasn't training with the Army, he often drank by himself in bars around Vicenza.
For months he was so despondent that he even stopped frequenting the internet chat rooms
that were his usual respite from the travails of the real world.

      Things turned even worse for him when, in February 2020, the COVID-19 pandemic
struck Italy, with dire consequences. *See, e.g.*, Jason Horowitz, *How Italy Turner Around Its
Coronavirus Calamity*, N.Y. Times (July 31, 2020), https://nyti.ms/3VYuRgx ("When the
coronavirus erupted in the West, Italy was the nightmarish epicenter, a place to avoid at all
costs and a shorthand in the United States and much of Europe for uncontrolled

Honorable Gregory H. Woods                          February 3, 2023
United States District Judge                           Page 14 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

contagion."). Restrictions began in the country's north, and by early March 2020 the entire
country was "under a dramatic total lockdown." Di Donato et al., *All of Italy is in lockdown as
coronavirus cases rise*, CNN (March 13, 2020), https://cnn.it/3IDtVeo. That lockdown included
Ethan and his unit in Vicenza, in the Italy's northeastern Veneto region. Ethan was almost
entirely restricted to the base. His unit stopped training. He languished in his room. He
watched movies and played video games. His drinking escalated. And he retreated to the
internet.

       By April 2020 he was again communicating online with purported O9A adherents,
primarily via the messaging application Telegram. He became active in a chat belonging to
the so-called RapeWaffen Division ("RWD"), which held itself out as an O9A-affiliated
"nexion," or, cell, which appears to have existed entirely online. The name was a play on the
Atomwaffen Division, a U.S. neo-fascist group founded in 2013 and influenced by O9A
ideology. RWD's leader was an individual the government would later call "CC-1," a 15-year-
old boy posing as a former Canadian paratrooper. PSR ¶ 19 n.1. The RWD chat was a
strange mix of O9A ideology, racist, homophobic, and anti-Semitic rhetoric, ironic trolling,
dark humor, and juvenile absurdity. Vile memes and childish sex jokes abounded.[4]

       In May 2020, Ethan learned that his platoon would deploy to a military base in Turkey
in approximately three weeks. *Id.* ¶ 51. Under the sway of O9A's bleak worldview, Ethan
signed on to the belief that an attack on a U.S. military interest would advance the
accelerationist political agenda the group endorsed. He and CC-1 developed the idea to
attack his own unit. In furtherance of that idea, Ethan disseminated information about the
unit's upcoming deployment in chat rooms on Telegram, including to a smaller group of
individuals drawn from the larger RWD chat. He provided information about the timing of
the deployment, the number of soldiers involved, and the kinds of weapons they would be
carrying, among other sensitive information he had acquired during his trainings, and
encouraged other chat participants to gather more information about the military base
through open-source internet searches.

       This was utterly shameful conduct for which Ethan offers no excuses. That he
harbored the intent to see his fellow soldiers (and himself) attacked and killed, however
temporarily, is, of course, indefensible.

---

[4] We summarized this content in some detail in our letter motion at ECF No. 137.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 15 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

But we would be remiss to fail to point out salient aspects of the offense that should
bear on sentencing. To begin, the idea of an attack did not go far: the discussions were
entirely online, beyond inchoate, and bordering on non-existent. And the small group with
whom Ethan was communicating appeared singularly incapable of carrying out an attack
anyway. The most significant chat participants were fundamentally misrepresenting
themselves. CC-1, for example, was not a former paratrooper, but a 15-year-old boy living at
home in Canada. Another fixture in the chats, "Red Hourglass," played the role of CC-1's
girlfriend and devoted O9A adherent, but was in fact a government informant whose
primary role was to urge more concrete planning and detailed discussion.

Moreover, the "plan," such as it was, shifted numerous times before seemingly falling
apart altogether. As described above, the group's initial discussions around May 17, 2020,
concerned a plan to attack Ethan's own unit when it deployed to the military base later that
month. *Id.* ¶ 56. But those discussions lasted only a short time before the plan shifted to an
attack on a supposed "replacement unit" that would arrive at the base at some point in the
future, as shown in these May 25, 2020 messages between Ethan ("Etil Reggad") and Red
Hourglass (from the small-group planning chat named "Op Hardrock"):



Honorable Gregory H. Woods                      February 3, 2023
United States District Judge                         Page 16 of 28

Re:   United States v. Ethan Phelan Melzer
       S1 20 Cr. 314 (GHW)

*See also id.* ¶ 62 (describing how, on May 25, 2020, Ethan "explained that he believed an attack on the Military Base, rather than the attack on [his] Platoon's convoy to the Military Base as he initially proposed, would be ideal").

By May 26, 2020, just four days before Ethan's arrest, CC-1 (messaging as "GvlagKvlt") wrote the group to acknowledge the reality that they had no coherent, much less realistic, plan at all:

Conversation - Instant Messages (21)

> **1219277995 GvlagKvlt**
>
> also, does anyone have any ideas on what to do? Because it seems like an easy go, but theres still a fair amount of risk about, you know. Trying to essentially invade a ▇▇▇ base
>
> 5/26/2020 4:23:57 AM(UTC+2)

Source Info:
00008030-000344811AD1802E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/8E2B6D5A-DCF5-43C1-A93F-09A9D2BDF8AB/telegram-data/account-14256679229049001387/postbox/db/db_sqlite : 0xEADB22 (Table: t7, t2, Size: 15925248 bytes)

> **1219277995 GvlagKvlt**
>
> Because other than a really basic plan of attack and a lot of info, we dont really have much else. And a plan of attack doesnt work without people to..you know, do the attack
>
> 5/26/2020 4:24:57 AM(UTC+2)

Source Info:
00008030-000344811AD1802E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/8E2B6D5A-DCF5-43C1-A93F-09A9D2BDF8AB/telegram-data/account-14256679229049001387/postbox/db/db_sqlite : 0xEAD6AD (Table: t7, t2, Size: 15925248 bytes)

> **1219277995 GvlagKvlt**
>
> And a plan of attack most definitely wont work until we know what we're actually dealing with in order to make sure of what we might have to change, add, get rid of, and whatnot in said plan
>
> 5/26/2020 4:26:10 AM(UTC+2)

For his part, around this time Ethan had gone silent for four full days—he did not communicate with the group at all from May 25 at 11:30 p.m. until May 29, 2020, at 5:50 p.m. Meanwhile, the group's discussions had grown futile as they struggled to identify a plan of attack or anyone capable of carrying one out. On May 29, Red Hourglass, the

Honorable Gregory H. Woods                           February 3, 2023
United States District Judge                          Page 17 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

government informant, expressed frustration with the group's lack of progress and general
ineptitude, describing them as a "confederacy of dunces":

> 925117783 Red Hourglass
>
> Jesus this is a Confederacy of Dunces
>
> 5/29/2020 2:47:26 AM(UTC+2)

Source Info:
00008030-
00034481l1AD1802E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/8E2B6D5
A-DCF5-43C1-A93F-D9A9D2BDF8AB/telegram-data/account-
1425667922904900l387/postbox/db/db_sqlite : 0xEF881B (Table: t7, t2, Size: 15925248
bytes)

        Then, when Ethan finally again messaged the group on May 29, the day before his
arrest, he used his first communications to lie to the group by claiming he was at an airbase
in Aviano, Italy, preparing to deploy to Turkey with his unit. He was not in Aviano, and he
was not boarding a flight to Turkey. *See* Gov't Opp'n to Mot. Dismiss at 19, ECF No. 71
("Melzer posted again in the Op Hardrock chatroom on May 29, 2020, hours before military
authorities took him into custody . . . . Melzer falsely reported to the chat participants that he
had already left the garrison at Vicenza and traveled to the Air Force installation in Aviano,
Italy to make final preparations for his deployment to Turkey."). Moreover, throughout the
chats, Ethan had failed to disclose important information, including classified information,
that would have appeared important to the group's ability to carry out any attack. We
specified some of this information in a disclosure pursuant to Section 5(a) of the Classified
Information Procedures Act (18 U.S.C. app. 3 § 5(a)). *See* ECF No. 109. This all speaks to
Ethan's reservations about his role in assisting a possible attack.

        In any event, the bottom line is that the group's discussions went nowhere, and no
attack was ever close to occurring. Of course, none of this excuses Ethan's serious
misconduct. He knows that his divulging national defense information to unknown
individuals online—after which he would have no control over who would receive it—by
itself put his fellow soldiers in harm's way.



Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 18 of 28

Re:    United States v. Ethan Phelan Melzer
       S1 20 Cr. 314 (GHW)



---

[5] At the time, Ethan did not recall the passcode for his older phone, an iPhone 8, but told the agents he would nevertheless assist them in attempting to access the phone.

Honorable Gregory H. Woods                February 3, 2023
United States District Judge               Page 19 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)



**Legal framework**

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," namely, "proportionality, deterrence, incapacitation, and rehabilitation." *Id. See also, e.g.*, *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). "[D]istrict courts may impose sentences … based on appropriate consideration of all the factors listed in § 3553(a)." *Pepper v. United States*, 562 U.S. 476, 490 (2011). To be sure, the Guidelines range is one such factor, but it is only one, and "the Sentencing Guidelines are just that, guidelines, and … 'they truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).

Here, Guidelines range excepted, the relevant § 3553(a) factors support a 15-year sentence.

**Section 3553(a)(1): Ethan's personal characteristics and offense conduct**

With respect to Ethan's "history and characteristics," § 3553(a)(1), he is a young man from a troubled background who lacked adequate adult support in his earliest years. He was raised by a severely alcoholic single mother, herself the victim of frequent abuse, who was largely incapable of caring for him. As Mr. Mercer writes, "Ethan's life can be understood as

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 20 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

a cascade of risk factors with minimal protective factors to protect him from their toxic impact." Mercer Report 12.

Yet, desperate to finally overcome his background, Ethan has devoted himself to his rehabilitation. Unplugged from the internet, he has turned to introspection and gained insight into his life and his offense. He has made the most of the limited educational and therapeutic opportunities available to pretrial detainees, first at the now-shuttered MCC, and then at the MDC. He has completed multiple courses, including a three-month course, "Emotional Self-Regulation," that focused on conflict resolution and anger management. *See* BOP Certificates (Ex. N). He has completed additional courses in "Substance Use Behaviors," "Business Acumen," "Soft Skills," and various "Self Help" topics. *Id.* What's more, since June 2022 he was worked six hours a day in food services at the MDC, first as a dishwasher, then preparing trays of food for his fellow detainees. *See* BOP Pay Records (Ex. O); PSR ¶ 15. And he has spent untold hours reckoning with the traumas of his past and coming to terms with his sexuality. Mr. Mercer summarizes these efforts: "The experience of living authentically for the first time has led to an internal recalibration for Ethan: he feels good about who he is; he is taking care of himself by exercising and feels confident in his body; and most significantly, the organizing principle of his life is now about authenticity rather than fear, shame and secrecy." Mercer Report 16. Ethan's history and characteristics thus support our requested sentence.

With respect to the "nature and circumstances of the offense," § 3553(a)(1), we acknowledge its particular severity. But it is not unmitigated. In particular, this Court should consider that Ethan was just 21 years old at the time of his offense. (He turned 22 four days before his arrest.) The Supreme Court has held, based on "the evolving standards of decency that mark the progress of a maturing society," *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (*quoting Trop v. Dulles*, 356 U.S. 86, 100–01 (1958)), that "youth matters in sentencing." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021).[6] The Supreme Court has thus "insisted … that a sentencer have the ability to consider the 'mitigating qualities of youth,'" *Miller v. Alabama*, 567 U.S. 460, 475 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)), which

---

[6] Unless otherwise indicated, all internal citations, quotation marks, alterations, emphases, and footnotes are omitted from case citations.

Honorable Gregory H. Woods                     February 3, 2023
United States District Judge                    Page 21 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

include "immaturity, susceptibility, salvageability, dependence." *United States v. Ramsay*, 538 F.
Supp. 3d 407, 416–17 (S.D.N.Y. 2021) (collecting cases).

       In *Ramsay*, Judge Rakoff summarized the Supreme Court's evolving jurisprudence and
the most current research in cognitive neuroscience impacting the treatment of young
defendants, including young adults, at sentencing. Judge Rakoff found that underdeveloped
cognitive functioning is present well into a person's early 20s and thus "bears on the
sentencing of someone over 18." *Id.* at 417. "The prevailing neuroscientific explanation for
adolescents' immaturity begins with the fact that the frontal lobes, home to key components
of the neural circuitry underlying 'executive functions' such as planning, working memory,
and impulse control, are among the last areas of the brain to mature; they may not be fully
developed until halfway through the third decade of life." *Id.* at 417–18; *see also id.* at 418
("Evidence suggests that, in the prefrontal cortex, the area responsible for 'executive
functions,' [development] is not complete until the early 20s or later.").

       A defendant's relative youth, Judge Rakoff found, impacts all the purposes of
sentencing: just punishment, deterrence, incapacitation, and rehabilitation. *Id.* at 423 (citing
18 U.S.C. § 3553(a)(2)). Fundamentally, a 21 year old's criminal conduct is not as "morally
reprehensible" as that of an older adult. *Id.*; *see also Miller*, 567 U.S. at 472 ("[T]he distinctive
attributes of youth diminish the penological justifications for imposing the harshest
sentences on juvenile offenders, even when they commit terrible crimes."). Accordingly, "to
impose a sentence that is 'sufficient, but not greater than necessary,' … courts cannot simply
treat anyone over 18 as an 'adult' for sentencing purposes but must inquire whether the
human being they are about to sentence is still in many respects an adolescent." *Id.*; *see also*
*United States v. Rengifo*, 569 F. Supp. 3d 180, 194 (S.D.N.Y. 2021) (considering youth in
sentencing a defendant who was 23 at the time of his offense); *United States v. Espino*, 2022
WL 4465096, at *2 (D. Kan. Sept. 26, 2022) ("In light of the timing of adolescent brain
development, it is clear to the court that defendant, at just twenty years of age, necessarily
possessed a lack of maturity and underdeveloped sense of responsibility that made him
more likely to make egregious mistakes and engage in poor decision[-]making.").

       Consistent with these principles, the National Institute of Justice ("NIJ"), the research,
development and evaluation agency of the U.S. Department of Justice, has conducted
research on juvenile and young adult offenders and concluded that "young adult offenders
ages 18–24 are more similar to juveniles with respect to their offending, maturation and life

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 22 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

circumstances." *See* NIJ, *From Juvenile Delinquency to Young Adult Offending* (2014),
https://bit.ly/3D4UsxH. NIJ recommendations include the establishment of "special courts
for young offenders ages 18–24" and an "'immaturity discount' for young offenders that
would involve a decrease in the severity of penalties, taking into account a young person's
lower maturity and culpability." *Id.*

     Ethan's immaturity—including his underdeveloped impulse control, executive
functioning, and consequential thinking—was evident in his offense conduct. It is no
coincidence that his offense arose from a particularly juvenile online milieu, and more
specifically in a series of chats with a group of teenagers, including CC-1, who, at 15 years
old, was the group's "leader." Ethan's immaturity was also evident in his ready susceptibility
to O9A's influence. He was seduced by a millenarian cult with an outlandish cosmology and
irrational belief system that a mature adult would have recognized as absurd and dangerous
from the start. But Ethan's insufficiently developed moral framework precluded that
realization. "The moral framework within which Ethan operated was deeply distorted by his
childhood immersion in a culture of hate, the failure of his caretakers to shield him from
dangerous and confusing content on the internet and his desperate need to be accepted and
loved." Mercer Report 14.

     At bottom, Ethan's age and lack of maturity at the time of his offense matter, and
should be adequately accounted for in this Court's sentence.

**Section 3553(a)(2): the statutory sentencing objectives**

     With respect to the need for the sentence to punish, deter, and incapacitate,
§ 3553(a)(2)(A)–(C), a 15-year sentence suffices.

     As for general deterrence, a sentence of 15 years is a tremendously long sentence—
especially for a young person with no criminal record—that would send a clear message to
others that conduct similar to Ethan's will be treated harshly. There is little reason to
conclude that a longer sentence would have a greater deterrent effect. Vast amounts of
research on general deterrence show that the chance of being arrested—that is, "caught"—is
a substantially more powerful deterrent than the severity of punishment. *See, e.g., United States
v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and
general deterrence, there is overwhelming evidence in the scientific literature that the
certainty of being caught is a vastly more powerful deterrent than the severity of the

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                    Page 23 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

punishment.") (cleaned up); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]he evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

        As for specific deterrence, Ethan's acceptance of responsibility, remorse for his offense, and efforts at rehabilitation all offer reasons for optimism. A defendant who pleads guilty "demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary." *Brady v. United States*, 397 U.S. 742, 753 (1970). Ethan has not made excuses or shirked responsibility for his misconduct. His remorse is profound. In a letter to this Court, he writes:

> I cannot begin to put into words the shame, guilt, and disappointment I feel in myself knowing that what I did cannot be changed. Knowing that I betrayed the trust of my comrades and others that put their faith in me has destroyed me. Every day and night since my arrest I have thought about the damage I have done to the people who were supposed to trust me with their lives. … The feeling of betrayal my company must feel haunts me.

Letter of Ethan Melzer. The fact that Ethan has worked diligently to improve himself and gain insight into the root causes of his offense conduct also augurs well. He writes, "I know now that the ideas of the group I was associated with were fictions that were atrocious and disgusting. For the rest of my life I will stay as far as humanly possible away from these kinds of people and their beliefs . . . ." *Id.* These are the words of a person who has been specifically deterred.



Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                    Page 24 of 28

Re:  United States v. Ethan Phelan Melzer
     S1 20 Cr. 314 (GHW)

████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

**Section 3553(a)(6): unwarranted sentencing disparities**

"[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), also supports a 15-year sentence. In many ways this case is *sui generis*—including because, among other things, the relevant conduct took place entirely in the context of online chats—so finding on-point cases is more challenging than usual. It will be useful, then, to begin with pertinent U.S.-wide sentence averages, since § 3553(a)(6) requires district courts to consider nationwide disparities. *See United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). According to Sentencing Commission data for FY 2021, the mean length of imprisonment for assault offenses, which include attempted murder, was 63 months. *See* U.S. Sent'g Comm'n, *Sentence Imposed by Type of Crime FY 2021*, *available at* https://bit.ly/3XLfgm2 (Ex. P). The mean length of imprisonment for national defense offenses—which include treason, sabotage, espionage, and providing material support to foreign terrorist organizations, among others—was 42 months. *Id.* And the mean length of imprisonment for murder offenses was 245 months. *Id.* Here, with a top count of attempted murder, a sentence of 15 years (180 months) would not only send a strong punitive message, but would also be on the high side of the relevant national averages.

While cognizant of the unusual nature of the purely internet-based conduct at issue here, our research has revealed roughly comparable cases that demonstrate that a 15-year sentence would not create any unwarranted disparity. These cases include:

- *United States vs. Jalloh*, 16 Cr. 163 (LO) (E.D. Va.). Defendant was a former member of the Virginia Army National Guard who decided not to reenlist after watching online lectures by an Al-Qaeda leader. Defendant attempted to join ISIS by traveling to Sierra Leone and Niger and meeting with ISIS members. Defendant then worked with an ISIS member abroad to plot an attack on U.S. servicemembers in the United States, and met with a CI in the United States to discuss attack operations. Defendant stated that he wished to conduct a mass-

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                       Page 25 of 28

Re:    United States v. Ethan Phelan Melzer
       S1 20 Cr. 314 (GHW)

     casualty attack. Defendant went to gun dealership and purchased an assault rifle, and was arrested immediately after. He was sentenced to 132 months.

- *United States v. Redzepagic*, 17 Cr. 228 (DRH) (E.D.N.Y.). Defendant communicated with an individual he believed to be both a member of ISIS and the commander of a battalion in Syria and attempted to join that individual's battalion to engage in violent jihad. Defendant traveled to Turkey and, later, to Jordan, in efforts to cross the border into Syria. Defendant stated on social media that he was in the Middle East to perform jihad and told law enforcement that he was prepared to utilize a bomb in furtherance of that mission. He was sentenced to 200 months.

- *United States v. Abdul-Latif et al.*, 11 Cr. 228 (JLR) (W.D. Wash.). Defendants Abdul-Latif and Mujahidh agreed with an informant to kill U.S. military personnel—specifically, Department of Defense employees and military recruits at the Military Entrance Processing Station in Seattle—in retribution for perceived wrongs committed by the U.S. military in the Middle East. Defendants surveilled the building, paid money for the purchase of machineguns and hand grenades from a CI, and planned the attack in granular detail. Regarding the attack's purpose, Abdul-Latif stated: "We're not only trying to kill people, we're trying to send a message. We're trying to get something that's gonna be on CNN and all over the world. … That's what we want." Federal agents arrested defendants as they inspected automatic rifles in an FBI-rented garage. Defendants pled guilty to conspiracy to murder federal officers and conspiracy to use weapons of mass destruction, and were sentenced to 228 and 204 months, respectively.

- *United States v. Batiste*, 06 Cr. 20373 (S.D. Fla.). Defendant Narseal Batiste was the leader of the so-called Liberty City Seven, a group of Miami-based individuals attempting to commit attacks on U.S. government interests. Batiste stated that he sought to wage jihad against the U.S. government by building an "Islamic Army." He took an oath of loyalty to Al-Qaeda and endorsed a plan (proposed by a CS) to conduct coordinated attacks against FBI buildings in five cities. During the planning, Batiste and the CS, whom Batiste believed was affiliated with Al-Qaeda, surveilled the buildings, took photos and video, and discussed how to launch a successful attack. Following his conviction at trial, Batiste was sentenced to 162 months.

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 26 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

- *United States v. Wright*, 12 Cr. 238 (N.D. Ohio). Defendant Douglas Wright was a
  27-year-old member of the "Occupy Cleveland" movement. Along with various
  coconspirators, he discussed the possibility of using stink bombs, explosives, or
  paint guns to destroy various vehicles and buildings, including a casino in
  downtown Cleveland. Wright's group later placed explosives at the base of a
  bridge in Brecksville, Ohio, and attempted to detonate them. Wright pled guilty
  to conspiring and attempting to use a weapon of mass destruction. He was
  sentenced to 138 months.

- *United States v. Peace et al.*, 14 Cr. 11 (SCJ) (N.D. Ga.). Defendants Cannon, Peace,
  and Williamson participated in internet chat rooms where they discussed starting
  a revolution against the U.S. government by conducting an attack on the
  infrastructure supporting the Transportation Security Administration, the
  Department of Homeland Security, and the Federal Emergency Management
  Administration. According to defendants' conversations, their goals included
  forcibly removing government officials whom they believed had acted beyond
  the scope of the U.S. Constitution. The defendants were ultimately arrested when
  they took possession of inert pipe bombs and thermite devices provided by an
  undercover, having planned to detonate those devices at a local police station.
  They pled guilty to conspiracy to use weapons of mass destruction and were
  each sentenced to 144 months.

Perhaps the case most comparable to Ethan's is *United States v. Abu-Jihaad*, 07 Cr. 57
(MRK) (D. Conn.), where an active-duty U.S. Navy signalman stationed aboard his warship
provided classified information to jihadists concerning the anticipated movements of 10 U.S.
Navy ships carrying roughly 15,000 U.S. sailors and marines being deployed to the Persian
Gulf. Abu-Jihaad transmitted that information to the jihadists so that they would replicate a
recent suicide bombing aboard the U.S.S. Cole that had killed 17 servicemembers. After
being convicted at trial, he was sentenced to 120 months. To be sure, 120 months was the
statutory maximum for his offense of conviction—unlawful transmission of national
defense information under § 793(d)—since, for whatever reason, the government chose not
to charge him with attempted murder, as it has Ethan.[7] But Abu-Jihaad's sentence is

---

[7] Abu-Jihaad was also convicted of providing material support to terrorists under § 2339A,
but the district court dismissed that count after trial because it found that the classified

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 27 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

nevertheless instructive in determining whether a 15-year sentence—one 50% higher and
pursuant to a guilty plea, not a trial conviction—is sufficient here.

**The Court should impose concurrent sentences on all counts.**

The Court should impose 15 years on the attempted murder count and concurrent
sentences on the remaining two counts. We acknowledge that the Court denied Ethan's
pretrial motion to dismiss certain counts of the indictment as multiplicitous as a matter of
law, including the attempted murder and material support counts to which he has since pled
guilty. *See* Tr. 7/26/21 at 32–36 (ECF No. 79). But the Court may nevertheless consider that
the conduct underlying all three counts of conviction is identical when determining whether
to impose concurrent or consecutive sentences. That is, Ethan's divulging of national
defense information was the very material resource he provided in furtherance of the
attempted murder count and was also the "substantial step" that count required. *See, e.g.*,
*United States v. James*, 415 F. Supp. 2d 132, 164 n.30 (E.D.N.Y. 2006) (attempted murder
requires that defendant "willfully took some action that was a 'substantial step' toward the
commitment of the crime"). And 15 years is appropriate because it is a lengthy, meaningful
sentence that accomplishes all legitimate sentencing aims, meaning consecutive sentences
would be greater than necessary. *See* U.S.S.G. § 5G1.2(c) ("If the sentence imposed on the
count carrying the highest statutory maximum is adequate to achieve the total punishment,
then the sentences on all counts shall run concurrently, except to the extent otherwise
required by law.").

**Conclusion**

Ethan committed serious wrongs and understands he must be punished for them. He
has spent a great deal of time reflecting on his life and his actions. He feels deep remorse for
what he did in this case. He has shown keen insight into his behavior and a commitment to
rehabilitation. These are all reasons to conclude that he is prepared to leave his past behind
him for good. As he puts it: "If I am given a second chance, whenever that is, I am going to
show my friends and family that I can be a good person and an actual productive member of

---

information Abu-Jihaad had transmitted did not qualify as a "physical asset," which the
version of § 2339A in place at the time required. 600 F. Supp. 362, 394–402 (D. Conn. 2009).

Honorable Gregory H. Woods                    February 3, 2023
United States District Judge                   Page 28 of 28

Re:   United States v. Ethan Phelan Melzer
      S1 20 Cr. 314 (GHW)

society. I can't change what I have done, I can only try to make up for it every day for the rest of my life." Letter of Ethan Melzer.

The Court should impose a sentence of 15 years' imprisonment, to be followed by 10 years' supervised release. That sentence would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Hannah McCrea
Ariel Werner
Assistant Federal Defenders
212.417.8792
jonathan_marvinny@fd.org