UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

                    -v.-                                    S1 20 Cr. 314 (GHW)

ETHAN MELZER,

                                    Defendant.

---

## THE GOVERNMENT'S SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Sam Adelsberg
Matthew Hellman
Kimberly Ravener
Assistant United States Attorneys
    *Of Counsel*

## **TABLE OF CONTENTS**

THE OFFENSE CONDUCT .................................................................................................. 4

   I. Overview of O9A ...................................................................................................... 4

   II. The Defendant's Radicalization ............................................................................. 6

   III. The Defendant's Infiltration of the U.S. Army ................................................... 19

   IV. October 2019 - April 2020: Melzer Begins to Communicate with CC-1 About Joining the RapeWaffen Division ...................................................................................... 24

   V. May 2020: Melzer Plans the Deadly Ambush on His Platoon ............................. 31

   VI. The Arrest and Melzer's Post-Arrest Interviews ................................................ 44

THE GUIDELINES RECOMMEND A 45-YEAR SENTENCE ............................................. 48

ARGUMENT ....................................................................................................................... 50

   I. The Section 3553(a) Factors Compel a 45-Year Sentence .................................... 50

     A. The Nature and Circumstances of the Defendant's Crimes .............................. 50

     B. The Need for Specific Deterrence and to Protect the Public from Further Crimes of the Defendant ....................................................................................................... 60

     C. The Need to Promote General Deterrence and Respect for the Law ............... 64

   II. The Defendant's Sentencing Arguments Are Unpersuasive ................................ 67

     A. The Defendant's Deception Is An Aggravating, Not Mitigating, Factor .......... 67

     B. A Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities ........ 70

     C. The Guidelines Call for Consecutive Sentences Totaling 45 Years' Imprisonment ........ 75

     D. The Totality of the Defendant's History and Characteristics Do Not Warrant Leniency 77

CONCLUSION .................................................................................................................... 84

## **INTRODUCTION**

The defendant, Ethan Melzer, infiltrated the U.S. Army in service of a neo-Nazi, jihadist, Satanist group and used his membership in the military to pursue an appalling goal: the brutal murder of his own fellow U.S. servicemembers.  He carefully plotted to join our country's armed forces while actively hiding his affiliation with the Order of the Nine Angles, or "O9A," and his dedication to its diabolical aims.  As soon as Melzer learned of his unit's impending deployment to a sensitive location in the proximity of jihadist forces, Melzer treasonously turned to plan an attack on the very soldiers he was entrusted to protect.  He revealed highly sensitive—and largely classified—information to other O9A members and jihadists in order to murder his fellow soldiers in an ambush.  His motive for causing such a mass casualty event was to bring about an even broader, bloodier conflict: embroiling the United States in another war in the Middle East, and ultimately a race war to advance his mission of white supremacy.  Based on his crimes, the Sentencing Guidelines recommend a 45-year sentence, the statutory maximum.  All of the factors relevant to sentencing support the implementation of that recommendation.

As detailed further below, prior to joining the military, Melzer was a committed member of O9A, a group advocating extreme violence, including murder, as a means by which to accelerate the demise of liberal democracies and Western civilization.  As an O9A member, Melzer touted his history of involvement in selling drugs and working with gang members as his first "insight roles"—an O9A practice to infiltrate organizations, including street gangs, law enforcement, and the military—and his recruitment of others to join O9A's vicious cause.  Melzer demonstrated his willingness to personally use violence during this period as well, ruthlessly shooting an individual while robbing him in a drug deal in 2017.  In 2018, Melzer escalated his commitment to O9A by

setting out to infiltrate the U.S. Army in an insight role.  When enlisting in the Army, Melzer actively hid his O9A affiliation, and his desire to use the military to gain skills for furthering the O9A agenda and to recruit others to join O9A, and disingenuously swore an oath "to support and defend the Constitution of the United States against all enemies foreign and domestic."  Instead, over the next two years, Melzer worked to aid, embolden, and galvanize our nation's enemies—foreign and domestic—culminating in a murderous plot intended to drag the United States into a bloody war.

After undergoing basic training and joining the 173rd Airborne Infantry Division in the summer of 2019, and then deploying to Italy in September 2019, Melzer was in a position to strike, to realize his goals of furthering O9A's macabre aims through brutal violence and bloodshed. Melzer waited for an opportunity to harm the United States from within the ranks of those entrusted with ensuring its security, and then pounced as that opportunity arose in April 2020 when he was transferred to a new platoon set to deploy on a mission to guard a sensitive military facility in Turkey (the "Military Base").  After learning of the deployment and attending briefings about the transfer, Melzer began to pass sensitive and classified information about the deployment to O9A members of a Telegram channel affiliated with O9A known as "RapeWaffen Division."  Melzer passed information to his co-conspirators regarding, among other things, the precise location of the Military Base in Turkey, the number of soldiers who would be guarding the installation, and how they would be armed.  Melzer provided this information to—in his own words—facilitate a "mascal," or "mass casualty" attack on his platoon.  Melzer's goal was that such a direct attack on the American military would provoke the United States into engaging in a foreign war, causing mass bloodshed and terrible harm to the very country he had sworn to protect.  All in service of a

2

depraved, white supremacist organization bent on sadistic violence and destroying civilized society.

The sentence of no more than 15 years' imprisonment that the defense requests is utterly divorced from the reality of what happened in this extraordinary case. The defendant joined a Satanic neo-Nazi group; enlisted in the Army to further its revolting agenda; orchestrated a devious, sophisticated, and treasonous plot to ambush his own platoon; shared sensitive and classified Army information with O9A co-conspirators to effectuate the attack by jihadist terrorists; and was thwarted just days before his platoon was slated to travel to the site of the planned ambush. There is no basis whatsoever to vary downward from the Guidelines sentence of 45 years' imprisonment—the statutory maximum penalty, which caps a Guidelines recommendation that would otherwise be life imprisonment as a result of the gravity of Melzer's terrorism crimes. The Guidelines sentence of 45 years' imprisonment is necessary and appropriate to reflect the extremely serious and abhorrent nature of the defendant's offenses; to provide just punishment for his conduct; to deter and prevent him from resuming his activities in support of the vicious white supremacist and radical terrorist ideology that motivated his crimes; to protect the public from future acts of terrorism and violence by the defendant; and to deter others, including other young men and military members, from seeking to join dangerous extremist groups like O9A. Melzer engaged in an appalling, unparalleled attempt to take up arms against his country and murder his fellow soldiers in cold blood. The Court should sentence him to 45 years' imprisonment, as called for by the Guidelines. That is the appropriate sentence in this case.

**THE OFFENSE CONDUCT**

The defendant operated a one-man sleeper cell for O9A within the U.S. Army.  Poised to maximize carnage in furtherance of O9A's poisonous ideology, he waited, under cover, until an opportunity presented itself in April 2020.  As detailed further below, the defendant seized upon his platoon's imminent deployment to guard the Military Base to plan a deadly ambush for O9A, working together with other O9A members and in concert with its jihadist confederates.

## I.  Overview of O9A

O9A is a white supremacist, neo-Nazi, Satanist, and jihadist group that promotes extreme violence to accelerate and cause the demise of Western civilization.  (Presentence Report ("PSR") ¶ 17).  O9A's ideology is centered on the worship of Satan and the supremacy of the white race. (*Id*.)  O9A teaches that the natural essence of the world is a pagan society dominated by unbridled "survival of the fittest," and that Western civilization has deviated from this natural ethos by restraining violence, embracing multiculturalism, and imposing social norms derived from Judeo-Christian beliefs.  (*Id*.)  At the core of O9A's ideology is a militant support for the promotion of extreme violence in order to overthrow Western civilization, in the hopes of giving way to this purported "natural" order of chaos.  (*Id*.)  O9A's leaders and members admire Adolf Hitler and genocidal Nazi Germany as a model society.  (*Id*.)  O9A advocates "culling," a form of human sacrifice, to eliminate Jews, people of color, and others deemed to be inferior under their Social Darwinist views, as well as rape and sexual assault as a means of asserting domination, breaking social norms, and propagating the expansion of the white race.  (*Id*.)  O9A embraces terrorism, including radical Islamic jihadist ideology and the violent tactics of jihadist groups, such as the

Islamic State of Iraq and al-Sham ("ISIS") and al Qaeda, as a means to accelerate the decline of Western society and to attack Jewish people in particular.  (*Id.*)

O9A members are instructed by the group to fulfill "sinister" deeds, including "insight roles," in which they attempt to infiltrate various organizations, including the military and street gangs, to gain training and experience in violent tactics, commit acts of violence, identify and recruit like-minded individuals, and ultimately subvert those groups from within.  (*Id.*)  Members and associates of O9A have participated in acts of violence, including murders, in pursuit of these aims, and O9A encourages human self-sacrifice as a means of demonstrating commitment to its cause.  (*Id.*)  O9A lays out a "Seven Fold Way" as a "sinister path" for members to follow, which reflects various stages of progression within the organization.  (*Id.*)  O9A members publish texts to promote O9A's extremist violent mission, and also maintain various methods of communication by which its followers communicate with each other.  (*Id.*)  These communications platforms include encrypted online applications such as Telegram, on which, for example, O9A members and supporters have maintained and frequented a channel dedicated to an O9A "nexion," or cell, known as the "RapeWaffen Division."  (*Id.*)  O9A's RapeWaffen Division is also aligned with a related white supremacist extremist group, the Atomwaffen Division ("AWD"), which runs self-proclaimed hate camps in the United States, promotes paramilitary guerrilla warfare as a means of accelerating a race war, embraces jihadi terrorism, and has been linked to at least five murders in the United States.  (*Id.*)

## II.   The Defendant's Radicalization

Melzer became a follower of O9A before he joined the military.  (PSR ¶ 18).  Melzer's own statements link his membership in O9A to his first "insight role" for the organization, which involved gang- and narcotics-related activities beginning in or about 2016.  (*Id.*)

### A.   Melzer Commits a Shooting as Part of an Insight Role for O9A

On or about January 9, 2017, when he was a member of the Bounty Hunter Bloods gang working as a street-level drug dealer, Melzer shot an individual ("Victim-1") during a drug transaction ("Shooting-1").  (PSR ¶ 21).  Shooting-1 occurred in the vicinity of the Louisville, Kentucky apartment complex where Melzer lived at the time.  (*Id.*)  Victim-1 agreed to meet and sell Melzer a quantity of marijuana.  (*Id.*)  Melzer came to the transaction armed, and, after receiving the marijuana from Victim-1, Melzer ran from the car, and Victim-1 gave chase.  (*Id.*)  Melzer then drew a handgun and fired several shots at Victim-1, striking Victim-1.  (*Id.*)  Victim-1 and Melzer engaged in a physical struggle in the moments after Shooting-1 until Victim-1 realized he had been hit.  Melzer then ran inside one of the apartment complex buildings.  (*Id.*)  Victim-1 was treated at a local hospital; he sustained a gunshot wound to his left arm that shattered his humerus and caused him to lose full use of the arm.  (*Id.*)

Melzer contemporaneously discussed Shooting-1, his gang affiliation, and other acts of violence with others.  (PSR ¶ 22).  For example, one friend of Melzer's ("Witness-1") knew that from approximately 2015 to 2017, Melzer associated with a gang with predominantly black members located in downtown Louisville.  (*Id.*)  From conversations with Melzer during that period, Witness-1 learned that Melzer robbed stores with those gang members, sold drugs, and wore a red bandanna every day in his rear pants pocket, signifying his gang affiliation.  (*Id.*)  In or

about early 2017, Witness-1 learned about Shooting-1 from Melzer.  (*Id*.)  In particular, Melzer

told Witness-1 that Victim-1, whom Witness-1 knew, was going to sell an ounce of marijuana to

Melzer; that Melzer told Victim-1 he was going to rob Victim-1; that Melzer shot Victim-1 with a

handgun; and that Melzer stole Victim-1's marijuana.  (*Id*.)

Melzer also discussed Shooting-1 with another friend ("Witness-2"), who lived with

Melzer from the time Witness-2 was a sophomore in high school until his freshman year of college.

(PSR ¶ 23).  Witness-2 knew Melzer sold marijuana and ecstasy, and Witness-2 learned that in

2016 or 2017—during the period Witness-2 lived with Melzer—Melzer planned to rob Victim-1

during a drug deal.  (*Id*.)  Melzer told Witness-2 that when an altercation ensued with Victim-1,

Melzer shot Victim-1 in the shoulder with a .44 caliber Highpoint pistol.  (*Id*.)  Witness-2 recalled

seeing a photograph of Victim-1's injuries taken inside the hospital shortly after the incident.  (*Id*.)

Witness-2 knew that Melzer sold the handgun used in Shooting-1 on an online firearms exchange

forum.  (*Id*.)  Melzer also told Witness-1 that in 2015 or 2016, Melzer committed a robbery of an

individual ("Victim-2") in the street, and shot Victim-2 ("Shooting-2") because Victim-2 refused

to provide his wallet.  (*Id*. & n.7.)

Melzer further made statements to Witness-2 demonstrating the progression of his radical

ideology over time.  (*Id*.)  For example, Witness-2 described Melzer as being interested in neo-

Nazi ideology years before he joined the military, and Melzer growing an interest in radical

extremism as he got older.  (*Id*.)  In or about 2013, Melzer told Witness-2 that Melzer purchased

Doc Martin brand boots because Melzer believed they were worn by Nazis, and discussed that he

would use the boots to "stomp" an "[n-word]" in the event he was fighting a black person.  (*Id*.)

And following the June 2016 Orlando Pulse Nightclub shooting, which was perpetrated by an ISIS

follower and left 50 dead and dozens injured, Melzer told Witness-2 that he was happy the shooting had happened because gay people were killed.  (*Id.*)  Melzer also told Witness-2 he was happy about the occurrence of the October 2017 Las Vegas mass shooting, which left 60 dead and hundreds injured.  (*Id.*)  Melzer also told Witness-2 about his anti-Jewish views and made racist comments, and Witness-2 knew from his conversations with Melzer that Melzer held those beliefs before Melzer joined the military.  (*Id.*)

Melzer later recounted these early insight role activities to fellow O9A adherents in both group and individual chats using Telegram.  (PSR ¶ 19).  For example, on April 21, 2020, in a one-on-one chat, Melzer told the creator and administrator of the RapeWaffen Division Telegram channel, CC-1,[1] that Melzer had "already self initiated" into O9A and was willing to join CC-1's RapeWaffen Division "nexion" of O9A.  (*Id.*)  CC-1 then asked Melzer to respond to a series of 40 vetting questions regarding Melzer's desire, qualifications, and suitability to join CC-1's O9A nexion.  (*Id.*)  Some of these questions, and Melzer's answers, directly invoked Melzer's prior acts as part of insight roles for O9A (including drug- and gang-related activity and violence), including the following portions of the exchange, among others:[2]

CC-1:          19. What are your skills/traits you have?

Melzer:        19. Military training, survival, links to other groups

---

[1] In his post-arrest interviews, Melzer identified CC-1 as a Canadian resident who previously served in the Canadian armed forces as a paratrooper.  Based on the Government's investigation, it appears that CC-1 is likely a minor based in Canada who was posing as a Canadian ex-paratrooper.

[2] CC-1's questions were sent in a single list, and Melzer's answers came in subsequent blocks; CC-1's questions and Melzer's corresponding answers are combined here for ease and clarity of

| CC-1: | 20. Are you ready to cause damage both mentally, physically and magickally, and be serious. |
|---|---|
| Melzer: | 20.i already have so yes |
| CC-1: | 21. Do you own any firearms? |
| Melzer: | 21. not here but yes |
| CC-1: | 22. Do you have any issues with substance abuse or use illegal drugs? (To be in RWD [RapeWaffen Division] you must be able to use these substances regulated, and you cannot be addicted. ) |
| Melzer: | 22. no but I can't do them now it would compromise what I have going rn |
| CC-1: | 27. How do you incorporate the Sinister-Numinous way in your life? |
| Melzer: | 27. Always working on some form of insight role working the pathways when I have time, building up to internal adept[3] |

(*Id.*)

On or about May 8, 2020, in an O9A-affiliated Telegram channel with approximately 50 participants, Melzer further discussed his participation in the above-described gang- and drug-related activities prior to joining the military.  (PSR ¶ 20).  First, Melzer expressed his interest in participating in drug sales to a chat participant, discussing his prospective involvement in narcotics distribution, writing, "When I get back I might want to help out if your willing…I should still have some connects I can get back into contact with."  (*Id.*)  As the conversation continued, Melzer wrote, "I used to work with just bloods an GDs," which appear to be references to street gangs.

review.  Throughout this brief, unless otherwise indicated, spelling and grammatical errors are set forth as they appear in the original communications.

[3] The phrase "internal adept" refers to the fourth level of advancement within O9A's "Seven Fold Way."

(*Id.*)  Asked about particular "set" affiliations within the gangs Melzer had mentioned, Melzer replied, "Victor park and fuckin bounty hunter bloods…Victor park was crips also though."  (*Id.*)

Later, on or about May 26, 2020, in a one-on-one chat with Melzer, CC-1 asked, "Yo can you give me some background like some sinister deeds you've done[?]"  (*Id.*)  Melzer affirmed that his prior gang and drug activity was not only part of an insight role, but also constituted "sinister deeds" directly connected to his self-initiation into O9A, writing, "Well we've talked about it a little but first actual insight role was being a runner[4] for some bhbs [Bounty Hunter Bloods] when I was younger. That was about 4-5 years."  (*Id.*)  As set forth above, Melzer carried out Shooting-1 while working as a runner for the Bounty Hunter Bloods about three to four years earlier, in January 2017.  (PSR ¶ 21)  Also during the direct chat on May 26, 2020, Melzer told CC-1 that following the gang- and drug-related insight role activity described above culminating in the 2017 shooting, he had performed another insight role by infiltrating the Antifa movement, writing, "even though I didn't actually go even a full 6 months I trained with some antifa faggots but they were insufferable."  (PSR ¶ 24)

### B.  Melzer Enrolls in the Job Corps and U.S. Army in Furtherance of O9A

In 2018, Melzer enrolled in the U.S. Department of Labor's Job Corps program, while in parallel he accessed and consumed materials relating to O9A and its American affiliate, the Temple of Blood.[5]  (PSR ¶ 25)  Melzer began performing Satanic rites during this period, which are rituals

---

[4] The term "runner" is commonly used to refer to a person engaged in street-level drug transactions and acts of street violence perpetrated by drug distribution organizations.

[5] Also known as "Temple ov Blood" and "Tempel ov Blood."

promoted by O9A involving the worship of Satan and the drawing of blood.  (*Id*.)  In the same May 26, 2020 Telegram conversation described above, Melzer told CC-1 that while in the Job Corps, he engaged in recruitment efforts related to O9A, and noted, "[in] Job Corp got a small following of people and used them for feeding [*i.e.*, O9A recruiting].  If we're talking like actual growth wise."  (*Id*.)

Continuing his mission of infiltrating U.S. government organizations in pursuit of O9A's violent objectives, Melzer enlisted with the U.S. Army in December 2018.  (PSR ¶ 26).  Shortly after his enlistment in early 2019, Melzer extensively discussed online his existing affiliation with O9A, attempted to identify like-minded individuals, accessed and consumed additional O9A materials, and found additional places to discuss O9A using internet applications, including Discord.  (*Id*.) Melzer expressed on Discord his commitment to O9A, attempted to build an O9A nexion with others, and discussed his impending military service and plans to hide his O9A affiliation from the U.S. Army.  (*Id*.)

For example, in February 2019, Melzer created a Discord account and began discussing O9A.  (PSR ¶ 27).  On February 28, 2019, Melzer asked others for information about one of O9A's American nexions, "Temple of Blood," writing, "Ok so I was going down the rabbit hole and found this group called temple ov blood…but there's literally no info I can find on them."  (*Id*.) Melzer then shared a YouTube video and channel with O9A-related videos and a website dedicated to Temple of Blood information, and asked for information about groups more extreme than Temple of Blood, asking "on a scale of 1-10 how bad is this on a occult level" and following up by asking "so what's a 10 I've got nothing to do for a minute."  (*Id*.)  Asked by another user, "you want to go full throttle?"  Melzer replied, "Yes."  (*Id*.)  Later, in the same Discord channel, on May

11

14, 2019, Melzer told others that he was enrolled in the Job Corps and confirmed his continued participation in and concealment of O9A-related activities, writing, "I've had to keep most of this stuff highly under wraps here too because they have a no satanic imagery rule which is really weird." (*Id*.)

In another Discord channel in early March 2019, Melzer continued pressing others for information while also revealing the extent of his knowledge regarding O9A. (PSR ¶ 28). For example, Melzer asked, "So how the fuck does [Atomwaffen Division] have anything to do with them…because sometbody said there connected but didn't explain." (*Id*.) And, moments later, "So let me get this straight…there satanic nazi edgelords…but Nazi actually fits the bill this time…because they are actually for real Nazis." (*Id*.) After receiving confirmation that his information was correct and that O9A was a Nazi group connected to the terroristic neo-Nazi organization Atomwaffen Division, Melzer wrote, "This is gonna sound bad but I want to go further down the rabbit hole…so say someone where to go all the way trying to look for these people how bad of an idea is this like out of 10." (*Id*.) Melzer went on to discuss his goal of joining a nexion: "Alright, so I'm guessing I should probably act like I want to be recruited or something. Would they be active on political discord or what." (*Id*.)

In a direct conversation in March 2019 with another Discord user who identified as an O9A member, Melzer discussed his interest in joining the Temple of Blood nexion, writing, "Definitely interested, also is there any PDFs I should get ahold of and read, can't really get a hold of any physical books where I'm at…emailed the temple ov blood website about there book but didn't get a reply…I believe it's called liber 333." (PSR ¶ 29). As the conversation unfolded, Melzer and the 09A member discussed insight roles, and the member's prior affiliation with individuals

he believed to be members of ISIS.  (*Id.*)  Melzer told the other user, "Reminds me of when I

fucked with some isis supporters from France…that was fun" to which the O9A member

responded, "I spent nearly 2 years as a secondary Insight Role as a devout Taliban supporter and

Hanafi (Deobandi) Muslim, heh.  That was horrible." (*Id.*)  Melzer and the O9A member then

exchanged greetings in Arabic, and Melzer wrote: "Hahaha I didn't know that I just brushed up on

some Arabic saying and French saying to make sure I could keep going without getting found

out…never know when you might need to remember it though so that's good…luckily they were

all in France or the uk so I could keep it atleast kind of simple." (*Id.*)  The O9A member told

Melzer, "It's necessary that you believe in your role to some extent, at least enough to inject

yourself into situations that you could never imagine otherwise…it's all a balancing act in the end."

(*Id.*)  Melzer then acknowledged his understanding of a fully immersive insight role, stating,

"that's what I did even though it was to a lesser degree by a lot…idk got bored one day decided to

fuck with isis members so I went and looked for them…found them some supporters on some

extremist videos and said fuck it…they all had ps4 accounts so they had little chat groups where I

would make them have infighting and stuff like that but nothing crazy." (*Id.*)  Asked about his

purpose, Melzer wrote, "General chaos." (*Id.*)  Melzer thanked the O9A member for the PDFs

and information regarding Temple of Blood, and wrote: "I wouldn't have gone through all this

work if I didn't think I would [study the Temple of Blood and O9A materials] though…I'll

message you if I have questions about anything…thanks again it means a lot to me." (*Id.*)

In March and April 2019, Melzer downloaded and saved nearly a dozen O9A and Temple

of Blood texts to his iPhone.  (PSR ¶ 30).  In mid-April 2019, the defendant messaged an associate

that he had "99% of the [O9A] pdfs" and that the associate should let the defendant know if he

"need[s] any of the books." (*Id.*) Melzer's possession of a robust collection of O9A books and pdfs was coupled with his continued active engagement with other O9A adherents online, including on Discord. (*Id.*)

Melzer also worked to recruit and indoctrinate others to embrace O9A's violent mission. (PSR ¶ 31). On March 16, 2019, Melzer texted a contact (saved in his phone's contacts list as "Jaiden333," with the repetition of three "3s" a common signal of O9A affiliation) an image of a dark figure with red glowing eyes floating in front of the burning Twin Towers destroyed in al Qaeda's September 11, 2001 attacks. (*Id.*) The next day, Melzer wrote to Jaiden333, "Allahu akbar," an Arabic phrase meaning "God is great" that has been appropriated as a battle cry by al Qaeda and other jihadist groups. (*Id.*) On April 2, 2019, Melzer texted a contact saved in his phone's contacts list as "Mark" a copy of "Hostia: The Secret Teachings of the O.N.A.," an O9A text that provides a guide to O9A insight roles and its Satanic beliefs in "do[ing] evil" and "cultivat[ing] evil," including "human culling" to "improv[e] the human stock" by taking action to "direct/influence/control events in real time…and so produce historical change (war/strife/struggle/change and so on)." (*Id.*) On May 1, 2019, Melzer provided Jaiden333 with (1) an electronic copy of the O9A handbook, "The Seven Fold Way"; and (2) "Tales of Sinister Influence," a text attributed to Temple of Blood. (*Id.*) Following his enlistment (prior to reporting for duty), Melzer also obtained a distinctive tattoo, symbolizing "chaos," a concept consistent with O9A's mission of destroying existing Western civilization to give way to Satanic forces and unrestrained violence.[6] (*Id.*)

---

[6] The terms of Melzer's enlistment specifically prohibited him from obtaining any tattoo affiliated with or symbolizing extremist philosophies, organizations, or activities. (PSR ¶ 31 & n.12).

By May 2019, Melzer advised others in a Discord channel where he and others discussed their O9A knowledge that he would soon be in the U.S. military full time: "They gave me infantry and airborne, going to try and go to ranger school too…I'm not in yet just went through [Military Entrance Processing Station] going to basic June 13th." (PSR ¶ 32). Melzer made clear to others in the channel that he would conceal his membership in O9A from the Army, writing, "I want to buy actual books but I don't know what will happen if I get caught with them…im thinking about when I go to the military I might act like a devout Christian or something." (*Id*.) On May 6, 2019, noting that his attempts to spread O9A information to others via Discord had been successful, Melzer wrote, "I've actually gotten a couple people here to start reading liber azerate and other stuff though so I'm pretty happy." (*Id*.) Explaining that he anticipated that basic training would interrupt his O9A activities and consumption of literature, Melzer wrote on May 8, 2019 that "I just hope I'm able to keep reading and stuff after basic because I don't [think] I'll have enough time to get through most the stuff before then…been trying to read as much of goetia liber azerate, the requisite Ona, and sitra achra as possible."[7] (*Id*.)

Later, on May 9, 2019, Melzer explained that "where I get out of here and basic though I'm buying physical copies of all of them though…except liber 333 because it's like 400$." (PSR ¶ 33). Melzer then confirmed to another user asking about O9A initiation that "Self initiat[ion]" was the way to join the organization. (*Id*.) Asked if he was a member, Melzer claimed, "No, I'm thinking about initiating but not for now for obvious reasons." (*Id*.) However, just over an hour

---

[7] Goetia, Liber Azerate, The Requisite ONA, and Sitra Achra are all considered foundational O9A texts.

later, Melzer noted during another conversation in the same Discord channel, "No real O9a member is supposed to just do that sort of thing your supposed to deny when asked if you're a member most the time I hear…member…term used loosely [of course]."  (*Id.*)  That same day, Melzer discussed O9A's practice of "culling," or killing others in furtherance of O9A's goals, writing, "[you don't have to kill someone to get in] but they say culling is necessary…some nexion believe in culling all Magians and mundanes to further there aims."[8]  (*Id.*)  Further explaining O9A's activities to the channel, Melzer described the link between culling and insight roles for O9A, writing, "I don't know what to call it besides a path, because [of course] they don't do terrorist activities in the normal sense but at the same time they do in a way…insight roles and such."  (*Id.*)

In other Discord channels, Melzer repeatedly noted his affiliation with O9A and described his intention to mask his O9A membership from the Army.  (PSR ¶ 34).  For example, on May 6, 2019, Melzer told others in a Discord channel that he "didn't want to buy physical copies [of O9A texts] unless I get into it actually…also im going into basic next month so I don't think I should have a physical copy on me kek."  (*Id.*)  During the same conversation, another Discord user warned Melzer, "Not to dissuade you but you're kinda playing with fire, Dagger [Melzer's username].  The UCMJ [Uniform Code of Military Justice] has a few things to say about members of the Armed Forces holding affiliations with, 'extremist groups'.  Just food for thought if you're serious about being initiated or whatever."  (*Id.*)  Melzer responded by denying that he had already initiated in O9A, writing, "I appreciate it obv this is only something I've thinking about haven't

---

[8] "Magian" is a term used by O9A to refer to individuals of Jewish descent or faith, and "mundane" is a term used by O9A to refer to any outsiders who do not follow O9A.

gone through with it yet I mean it's not like I get a brand when I initiate so that's good [I guess]," referring to his ability to continue to hide his O9A membership from the U.S. Army. (*Id.*) Melzer then asked if the Army would search his cellphone when he joined, asking, "do they check phones btw." (*Id.*) When another user responded, "They will confiscate all of your possession upon arrival at basic, including your phone, yes" and another wrote, "which means they'll probably search your phone," Melzer responded, "that's fine I already knew they would do that I'll clear my phone." (*Id.*)

In other Discord chats around the same time, Melzer made efforts to spread materials related to O9A and other terrorist organizations, such as ISIS. (PSR ¶ 35.) For example, on May 13, 2019, Melzer shared a link to a download for an ISIS propaganda video with a song, known as a Nasheed, titled "Qariban Qariba," extolling ISIS acts of violence and conquest. (*Id.*) On May 21, 2019, Melzer wrote in another channel that he was working on creating a "megaupload," or cloud-based downloading link, with an array of O9A texts that he referenced, writing, "I'm going to make a mega…I'll post it in literature…expect Hostia, naos, codex searus, codex Aristarchus, false prophets, and the shit version of liber 333…also siege if I can find it…and army training manuals." (*Id.*)

Also in May 2019, Melzer joined a private channel to discuss forming O9A groups with others. (PSR ¶ 36.) When he first joined the channel, Melzer asked the others to confirm the group was O9A-affiliated, writing, "Ok so to make sure we're on the same page you all know about Ona [O9A] and ToB [Temple of Blood] literature right…and [of course] siege." (*Id.*) In a later discussion, Melzer suggested the group's motto: "That or the classic…Total. Aryan. Victory." Melzer advised caution in admitting new members, telling the others: "Honestly these things take

a while we're going to have to filter who comes in hardcore as shit, search for people we know, find new people but make sure we scope them out before hand." (*Id*.)  Weeks before leaving for basic training, on May 20, 2019, Melzer wrote, "Honestly we could create a nexion…considering the fact that we're all pretty up date on our shit I'd hope." (*Id*.)  Melzer then outlined the purpose of his proposed O9A nexion: "Short term) get enough people to actually get this ship on the water Long term) smash [Atomwaffen Division] and also be a nexion for like minded people Big term) total victory…again we have to focus on the small things first…we're talking about short term and long term goals." (*Id*.)  Advocating hiding their true intentions to gain members, Melzer wrote, "be EXTREMELY careful with who we let in to here if they show potential…short term we make a 'far right'-like discord and they'll come running like moths to a flame….this political thing is just short term in my eyes at least…get members of this by scoping out others with potential then the real work begins…we can't forget siege pretty much said that invading politics is completely pointless, which he's correct (James mason)[9]…but that doesn't mean for the moment we can't use it to gain people and momentum in our group." (*Id*.)  In the days following this discussion, Melzer and others from the channel vetted other Discord users regarding joining the nexion, including by asking questions about fascism, such as, "How long have you been interested in fascism/ [national socialism]?" and "what is fascism to you?" (*Id*.)  Melzer also asked questions more directly linked to O9A, such as, "Do you believe in survival of the fittest?" (*Id*.)  Within approximately three

[9] James Mason is the author of "Siege," a neo-Nazi publication, and one of the founders of the Atomwaffen Division.

weeks of his attempt to form an O9A nexion and recruit others, Melzer deployed for basic training at Fort Benning, Georgia.  (*Id.*)

### III.   The Defendant's Infiltration of the U.S. Army

Consistent with O9A directives, Melzer kept his affiliation with O9A a secret when he joined the military, knowing that his O9A membership was in direct contravention of his agreements with and commitments to the U.S. Army.  (PSR ¶ 37).  For example, O9A literature found on Melzer's iPhone 11 instructs O9A members that they are "forbidden from telling anyone - however close a friend - why they are doing what they are doing. The Initiate must appear committed to the chosen task, as they must live and identify with the role they have chosen to such an extent that those around them believe they are genuinely committed to whatever task or profession or way of life they have chosen."  (*Id.*)  In December 2018, as a condition of enlisting in the Army, Melzer executed a "Statement of Enlistment," which contained, among other things, a regulation entitled "Participation in Extremist Organizations or Activities," stating that "[m]ilitary personnel must reject participation in extremist organizations and activities" and are prohibited from "[a]ttending a meeting or activity with knowledge that the meeting or activity involves an extremist cause when on duty, when in uniform, when in a foreign country (whether on− or off−duty or in uniform), when it constitutes a breach of law and order, when violence is likely to result, or when in violation of off-limits sanctions or a commander's order."  (*Id.*)

Although Melzer signed enlistment paperwork in December 2018, his service in the military did not begin until June 4, 2019, the day he reported for active duty at Fort Benning.  (*Id.*)  The day he began active-duty service in June 2019, Melzer completed and signed another "Statement of Enlistment" form, which again informed Melzer that he was prohibited from joining

19

or associating with extremist organizations or activities.  (*Id*.)  Melzer falsely disclaimed any association with extremist organizations and activities, which the U.S. Army specifically defined in the form as including groups that "advocate racial, gender, or ethnic hatred or intolerance; advocate, create, or engage in illegal discrimination based on race, color, sex, religion, or national origin; advocate the use of or use force or violence or unlawful means to deprive individuals of their rights under the United States Constitution or the laws of the United States or any State; or advocate or seek to overthrow the Government of the United States, or any State by unlawful means."  (*Id*.)  Despite acknowledging that he had reviewed and understood the military's strict prohibitions on affiliating with extremist groups, as described herein, Melzer was in fact actively accessing, consuming, and disseminating O9A materials prior to and throughout his military service.  (*Id*.)

On June 14, 2019, Melzer began his basic training at Fort Benning.  (PSR ¶ 38).  During his first few months in the Army, Melzer received several trainings relating to counterintelligence, counterterrorism, appropriate internet use, and operational security.  These trainings outlined, among other things, the importance of servicemembers maintaining proper operational security, the dangers associated with releasing sensitive information on social media, the harm jihadists seek to cause to American servicemembers in particular, and the type of national security damage that could result from the unauthorized disclosure of sensitive U.S. Government information.  (*Id*.) Melzer trained to become an airborne paratrooper.  (*Id*.)  During this time, Melzer continued to pursue his commitment to O9A, including by acquiring a physical copy of a seminal O9A text, "The Sinister Tradition," which he proceeded to carry during his military service.  (*Id*.)

20

In September 2019, after completing basic training, Melzer deployed to Camp Ederle, which is part of a joint Italian-American military complex in Vicenza, Italy, where the U.S. Army Command for Africa and the 173rd Airborne Division are headquartered, and thousands of U.S. military active-duty personnel and civilian employees serve.  (PSR ¶ 39).  On November 19, 2019, Melzer obtained SECRET and SECRET/NATO security clearances and signed a "Classified Information Nondisclosure Agreement," which stated, among other things, that unauthorized disclosure of classified information may constitute a violation of federal criminal law.  (*Id.*)

Melzer continued to discuss his affiliation with O9A and his efforts to deceive the military online during this period.  (PSR ¶ 40).  For example, in November 2019, Melzer wrote in a Discord channel: "Sinister boys…I still need to catch up on reading but I've been in processing and I'm in a room with a sgt [Sergeant] so I don't want them reading into shit if they see the cover…need to get fake book covers or something because it will only lead to problems if they look it up."  (*Id.*)  Earlier, in October 2019, Melzer discussed the same topic using Discord, and specifically noted his awareness that he was violating military regulations and law by associating with O9A.  (*Id.*)  On October 23, 2019, Melzer discussed O9A reading materials on Discord, writing, "shit yea recommend some books…not gonna have a phone for a while so I'm gonna need to stock up…preferably stuff that doesn't have a super suggestive cover btw don't want some sergeant seeing them and then ucmj steps in."  (*Id.*)

On Discord, Melzer continued to openly declare his violent and deceptive purpose in joining the service.  (PSR ¶ 41).  For example, on December 16, 2019, Melzer discussed his desire to see the "boogaloo" or "day of the rope"—both references to outbreaks of race-based violent attacks in the United States to precipitate a race war.  (*Id.*)  Melzer specifically told another user

who complained that the race war was too long in coming, "I'm working on it ok…give me 3 years and I gotchu…motherfucker I'm in the army [right now] specifically for this…*I mean I literally did join for this exact reason*…can't really do anything when I'm in fucking Italy…my unit is stationed in Italy." (*Id.* (emphasis added)).  When asked by another user about his military service, "what's it like serving the enemy?" Melzer replied "good and terrible…hate what they have us preparing to fight for and there ideals behind it…but there's some stuff here that's nice." (*Id.*)

In December 2019, Melzer again made clear to another Discord user that his Army service was purely an insight role for O9A.  (PSR ¶ 42).  On December 14, 2019, the Discord user asked Melzer, "I must ask…is you being in the military an insight role? What's that like? I was going to enlist myself but I have a heart problem.  Thought of becoming a cop as a role too but prior criminal record prevents that."  Melzer replied, "Yes.  It's good for me because the ideals behind the military are literally polar opposite of mine also you get good training alongside this the only reason I give a pass to talk about it here is because it's the internet and I don't know any of you personally.…*it's truly one of the best experiences I've had with an insight role it covers all the ground too*." (*Id.* (emphasis added)).  Melzer and the Discord user then discussed their prior insight roles, and Melzer told the user, "I've done gang member before this…interesting experience"—another instance of Melzer confirming that his prior gang-related activity, discussed above, was part of an insight role for O9A.  (*Id.*)

In his later Telegram communications, Melzer reiterated that he joined the Army to perform another insight role for O9A, and explained his disdain for patriotism or allegiance to the U.S. military.  (PSR ¶ 43).  For example, on April 19, 2020, Melzer advised a user in an O9A-affiliated channel who was considering U.S. military service, "do it for the training…that's

literally it…the ridiculous forced patriotism bullshit can go fuck itself…just play the game for 4 years and gtfo [get the fuck out] but stronger smarter, and more dangerous of course."   (GX 201).[10]   Later, on April 21, 2020, Melzer described himself to CC-1 as an active-duty member of the U.S. military immediately before writing that he wanted to join RWD [RapeWaffen Division] because they were "like minded people, [and to] hopefully help this become an actual active nexion." (PSR ¶ 43).  Days later, on April 25, 2020, Melzer wrote to another O9A member ("Individual-1"), who was considering joining the U.S. Marine Corps, "Good luck it's great for training……*Just don't become a fuckin patriot…train and get the fuck out…I'm not patriotic for shit…all of these places the vast majority deserve to be burned*." (*Id*. (emphasis added)).

Melzer also told CC-1 that his military service was another "insight role" to further his goals and skills within O9A.  (*Id*.)  In one exchange, CC-1 suggested to Melzer that joining a group such as al Qaeda could also be valuable to O9A as "an insight role," and Melzer replied, "I've thought about it…But it would have to be after this."  (*Id*.)  Melzer next described the potential fallout if he joined a terrorist organization before leaving the military, writing, "The amount of heat from a us paratrooper goes awol and joined [redacted][11]…. After these 4 years are up I can't wait to actually start doing shit." (*Id*.)  After CC-1 responded by asking Melzer if he had reenlisted in the Army, Melzer answered, "Fuck no…Well not 4 years now but still…Like 2 but fuck it…Not re-enlisting I got what I wanted."  (*Id*.)

---

[10] "GX" indicates Government exhibits marked and previously provided to defense counsel in anticipation of trial in this case.

[11] As in original.

**IV.   October 2019 - April 2020: Melzer Begins to Communicate with CC-1 About Joining the RapeWaffen Division**

Once Melzer arrived in Italy, he joined the 173rd Airborne Brigade Combat Team.  (PSR ¶ 44).  At the same time, Melzer accelerated his involvement with O9A.  (*Id*.)  For example, as depicted below, an image located on Melzer's iPhone from December 29, 2019 depicts him masked and holding up an O9A book with blood smeared on a passage.  (*Id*.)  The book, with blood smeared on the same passage, was later retrieved during a search of Melzer's barracks.  (*Id*.)



Similarly, another image, depicted below, from January 2020 shows Melzer—hooded except for his eyes and nose—holding a knife with a bandage around his hand.  (PSR ¶ 45).



By April 2020, building on the prior Discord communications with other O9A adherents described above, Melzer began explicitly communicating via Telegram with other members of O9A, identifying himself as a self-initiate of O9A and a member of the U.S. armed forces, while continuing actively to consume jihadist propaganda and O9A materials.  (PSR ¶ 46).  On April 7,

2020, Melzer's cellphone captured the below photograph, which appears to depict Melzer with an M4 rifle and a skull mask.[12]  (*Id.*)



Then, on April 17, 2020, Melzer accessed a video of a deadly jihadist ambush on a U.S. military convoy from the vantage point of a U.S. soldier wearing a helmet-mounted camera during the attack.  (PSR ¶ 47).  Throughout the video, ISIS's black flag appears in the top right corner and several U.S. servicemembers appear to be injured or killed in the video.[13]  (*Id.*)  While consuming these videos, Melzer knew he had to hide his O9A affiliation given his status as a U.S. soldier: in Telegram communications with another O9A member dated April 19, 2020, Melzer

---

[12] The photo was obtained from Melzer's iPhone 11 and metadata associated with the photo indicates that Melzer's device was used to create the image.  Furthermore, the firearm in the photo appears to be Melzer's Army-issued rifle.  During a subsequent search of Melzer's barracks, Army investigators recovered what appears to be the skull mask depicted in the photo.

[13] This footage matches video released as propaganda by ISIS in the wake of a 2017 ambush that resulted in the deaths of four American servicemembers in Niger.  *See, e.g.*, "In Niger Ambush, Rushing Into the Gunfire to Save the Fallen," *The New York Times*, May 10, 2018, https://www.nytimes.com/2018/05/10/us/politics/niger-report-video.html (retrieved Jan. 25, 2022).

explained that he had "to be careful as fuck just because I feel like shit would be harsher considering my current circumstances." (*Id.*) Nevertheless, Melzer shared with his O9A accomplices an "archive link for most of the IS nasheeds"—*i.e.*, ISIS propaganda videos—and "[i]t's got most of the ones that have been wiped everywhere else." (*Id.*) Melzer further continued to link his O9A affiliation with his ongoing insight role of infiltrating the military, as reflected, for example, in the below photographs taken by Melzer on April 18 and 19, 2020, which depict O9A books alongside a military-issued bag and uniform. (*Id.*)



In addition to O9A materials, Melzer possessed a book titled "The Anarchist's Cookbook," which contains detailed instructions for the manufacture and use of explosives and weapons. The book, recovered in a search following his arrest and depicted below, has been described as "a

diagram- and recipe-filled manifesto that is believed to have been used as a source in heinous acts of violence since its publication in 1971, most notably the killings of 12 students and one teacher in 1999 at Columbine High School in Littleton, Colo[rado]" and was renounced by its author.[14]



On April 21, 2020, Melzer and CC-1 exchanged Telegram messages regarding Melzer joining the RapeWaffen Division.  (PSR ¶ 48).  After CC-1 told Melzer that O9A initiation was a

---

[14] "William Powell, 'Anarchist Cookbook' Writer, Dies at 66," *The New York Times* (Mar. 29, 2017); *see also* "I wrote the Anarchist Cookbook in 1969. Now I see its premise as flawed," *The Guardian* (Dec. 19, 2013) ("The Cookbook has been found in the possession of alienated and disturbed young people who have launched attacks against classmates and teachers. . . . and the Cookbook may have added to their sense of isolation.").

prerequisite to membership in the RapeWaffen Division, Melzer confirmed that he had already been initiated into O9A.  (*Id.*)  In the detailed responses to the series of vetting questions posed by CC-1, Melzer outlined his extremist views and detailed his efforts to join O9A.  (*Id.*)  Melzer asserted his belief in "Anarcho-fascism," that he looked up to "heros" including "AH [Adolf Hitler], Stalin, [and] David Myatt [the purported founder of O9A]," and attributed his early interest in O9A to "family" and "reading."  (*Id.*)  In response to a question from CC-1 regarding fascism and Melzer's worldview, Melzer replied, "fascism is more the law of nature than anything, [my] world view is that by causing absolute chaos, anarchy, whatever you want to call it, the law of nature will naturally take over once again."  (*Id.*)  And in response to a question from CC-1 about Melzer's views about "Jews, Alt-Light, Homosexuals, Israel, and our Current Leader[,]" Melzer replied, "all of them deserve to be [redacted]."[15]  (*Id.*)

The day after this exchange, on April 22, 2020, Melzer took a photograph, depicted below, of a book titled "The Sinister Tradition: Order of Nine Angles," along with a knife, a skull mask, and his Army beret, which included his battalion's unique insignia.[16]  (PSR ¶ 48).  "The Sinister Tradition: Order of Nine Angles" is an O9A manifesto setting forth the core beliefs for the group, including the importance of engaging in sinister deeds and insight roles, which, as described above,

---

[15] As in original.

[16] The photo was obtained from Melzer's iPhone 11 and metadata associated with the photo indicates that Melzer's device was used to create the image on April 22, 2020.  The book, along with what appears to be the skull mask depicted in the photograph, were retrieved during a subsequent search of Melzer's barracks.

involve O9A followers attempting to infiltrate and undermine organizations such as the military. (*Id.*)



Melzer also continued consuming neo-Nazi propaganda during this period.  (PSR ¶ 50). For example, on April 23, 2020, Melzer accessed a pdf on his phone titled "Understanding National Socialism," which describes the "Lies of Genocide," calls the Holocaust a "total hoax," and urges other followers of Nazi ideology to "wake up; it's time to do something! It's time to stand up and raise your right arm!"  (*Id.*)  As noted above, two days later, on April 25, 2020, Melzer wrote to O9A member Individual-1, "I'm not patriotic for shit…all of these places the vast majority deserve to be burned."  (*Id.*)  At the same time, Melzer was consuming extremist O9A content, including a video depicting the lynching of a black woman by men standing in front of a Confederate flag,

Nazi propaganda, and an image of a man standing in front of an O9A flag pointing an automatic weapon at a hooded and bound kneeling woman. (*See* Dkt. No. 90 at 25).

### V.  May 2020: Melzer Plans the Deadly Ambush on His Platoon

In approximately early May 2020, the Army assigned Melzer to a platoon scheduled for a classified foreign deployment (the "Platoon"), where the Platoon would be guarding an isolated and sensitive military installation, the Military Base, in Turkey. (PSR ¶ 51). The assignment required an active security clearance, and the details of the mission were not permitted to be disclosed outside of the approximately 40 Platoon members. (*Id*.) Over the course of the next month, in preparation for the deployment to Turkey, Melzer and his platoonmates received extensive training for the deployment, including an orientation about the geography, layout, security, and purpose of the Military Base, potential attack scenarios at the facility, battle drill rehearsal, and classified and unclassified briefings regarding the Military Base. (*Id*.) As Melzer was briefed on the details of his deployment, in parallel, he accessed and stored additional O9A and jihadist propaganda materials and literature, including videos and graphics disseminated by jihadist media outlets celebrating and depicting brutally violent attacks on Western forces, jihadist ambushes, and the execution of captive soldiers. (*Id*.) For example, on May 3, 2020, Melzer accessed a video depicting an ambush by jihadists on a military compound. (*Id*.) The video shows jihadists attacking a military installation and recovering what appears to be a U.S. military uniform before setting the installation on fire. (*Id*.) The video depicts the body of what appears to be a soldier who had been killed during the attack and the brutal execution of several individuals by gunfire and knife, and ends with an arrangement of weapons and material that appear to have been seized by jihadist forces. (*Id*.)

On May 6 and May 7, 2020, Melzer and his Platoon received a set of detailed briefings about the Military Base in a secured location at Camp Ederle. (PSR ¶ 52). One of the briefings involved the use of a terrain model—a cardboard replica used as a training aid—of the Military Base. (*Id.*) Melzer was among the soldiers who helped construct the terrain model. (*Id.*) During these briefings, the Platoon was also provided with a detailed overview of the Military Base, the number of soldiers who would be present at the facility, a breakdown of the Platoon's duties and responsibilities at the Military Base, its uniform and weapons requirements during the deployment, and its chain of command. (*Id.*) The Platoon also received an in-depth training about possible threat scenarios at the Military Base, including how to react to insider and outsider threats,[17] protests, and indirect fire. (*Id.*) The briefing materials, including as depicted below, explained the Platoon's training, tactics, and procedures in the event the Military Base experienced any of these threats. (*Id.*) The presentation materials noted that the Platoon at the Military Base would include "38 total personnel" and Melzer was informed that the Platoon would be carrying only M4 rifles.[18] (*Id.*)

---

[17] An insider threat typically refers to a security risk that comes from within an organization or facility (*i.e.*, from within the U.S. Army or within the Military Base). An outsider threat, on the other hand, emanates from outside an organization or facility.

[18] Melzer and his platoonmates were notified that the Platoon was petitioning for permission to bring along pistols as well.



On May 6, 2020, the first day of his above-described briefings regarding the Military Base, Melzer took a screenshot of a satellite photo of the Military Base, which investigators later recovered from his iPhone 11.  (PSR ¶ 53).

Immediately after his May 7 briefing, Melzer notified members in the RapeWaffen Division that he was "[g]oing to Turkey soon," following up the next day by noting that he would be at a "base there" in the "[b]eginning of June."  (PSR ¶ 54).  At the same time, Melzer began taking on more of a leadership role within the RapeWaffen Division.  (*Id.*)  For example, on May 7, 2020, Melzer counseled another member—Individual-1, who had previously sought advice from Melzer about joining the military—for acting inappropriately, writing, "Don't let it happen again. I encourage you to continue your own sinister path but I'm not responsible for anything that happens if you do some wild shit like that again" and exhorting him to "[s]tay on track."  (*Id.*)

On May 14, 2020, Melzer and CC-1 discussed Melzer's desire to further O9A and the RapeWaffen Division's mission.  (PSR ¶ 55).  For example, after CC-1 asked why Melzer wanted to join RapeWaffen Division and how he thought he could benefit the group, Melzer explained that he planned to "hopefully help this become an actual active nexion" and "to help it grow, I'd be lying if I didn't say to help me grow as well."  (*Id*.)  Melzer explained that he could offer RapeWaffen Division his "military training, survival, [and] links to other groups."  (*Id*.)  Melzer was also actively drawing on the violent teachings of O9A literature during this period, explaining in his Telegram communications how he possessed several canonical O9A texts, including "False Prophets" and "Tales of Sinister Influence."  (*Id*.)

 By May 17, 2020, Melzer had informed CC-1 about the upcoming deployment.  (PSR ¶ 56).  That day, CC-1 asked Melzer whether he had arrived in Turkey, to which Melzer responded, "Getting ready to go."  (*Id*.)  CC-1 explained that he asked because, "[another co-conspirator ("CC-2")] needs to know, he has plans…inshallah my brother, allahu akbar."  Melzer then replied, "Fuck yea…28th[,]" a reference to May 28, 2020 as the date of the Platoon's deployment.  (*Id*.)  Later in the same conversation, CC-1 identified "[CC-2]" to Melzer as "a grey wolf…he was joining the Turkish army at some point for training…was*…forgot he's joining AQ lmao."[19]  (*Id*.)  In response, Melzer wrote optimistically about [CC-2's] potential, and stated "Well I'm sure they have the re[s]ources."  (*Id*.)  CC-1 responded "yeah fair enough…but you do realize what AQ is right? Al Q****…is all I'll say."  (*Id*.)  Melzer then expanded on his belief that al Qaeda could

---

[19] The Grey Wolves are a Turkish far-right organization and movement affiliated with an ultra-nationalistic, radical Islamist, and neo-fascist ideology.

assist in the ambush attack on his Platoon, and replied, "Obviously…They have links everywhere

they should definitely at least have one Turkish army guy." (*Id.*) During this exchange, CC-1 also

sent Melzer several documents including the CIA Explosives for Sabotage Manual, the U.S. Army

Intelligence Interrogation Manual, and an academic article titled "The Psychology of Espionage."

(*Id.*) The latter publication begins with the following passage:

> People who commit espionage sustain double lives. When a person passes
> classified information to an enemy, he or she initiates a clandestine second identity.
> From that time on, a separation must be maintained between the person's secret
> "spy" identity, with its clandestine activities, and the "non-spy" public self.

(*Id.*)

On May 20, 2020, Melzer signed another "Classified Information Nondisclosure

Agreement" and received two briefings—one classified and one unclassified—regarding the

Platoon's upcoming deployment. (PSR ¶ 57). Before the classified briefing, the shades were

drawn and all phones were left outside the briefing room. (*Id.*) The unclassified briefing included

a country threat briefing about Turkey and noted that foreign intelligence entities would find value

in information about the U.S. military's "Operational Plans/Intentions, Force Capabilities,

Organizational Structure, [and] Force Protection Vulnerabilities." (*Id.*) The briefing also

addressed "proper OPSEC for Social Networking,"[20] and, as depicted in a slide from one of the

briefings below, the "Terrorist Planning Cycle." (*Id.*) This slide set forth the planning stages that

terrorists typically undergo before orchestrating an attack, including "Target Selection,"

---

[20] OPSEC or operations security is a process that identifies sensitive information and outlines
selected measures to prevent the information from getting into the wrong hands.

"Surveillance," and "Planning," and also included a "Potential Observation Indicators" section intended to educate the Platoon about how to spot individuals planning an attack.[21]   (*Id.*)



Before the May 20, 2020 classified briefing, Melzer signed another "Classified Information Nondisclosure Agreement," which stated, among other things, that unauthorized disclosure of classified information may constitute a violation of federal criminal law.  (PSR ¶ 58).  Melzer and his platoonmates then received the classified briefing, which included classified information

---

[21]  The portion marking "FOUO" on the slide denotes the dissemination control marking, "For Official Use Only."

relating to the deployment, including the sensitive purpose of the Military Base and its strategic importance to U.S. national security, and specific attack scenarios, including attacks involving jihadist forces. (*Id*.) Melzer and his Platoon were also briefed about jihadist threats in Turkey, including threats posed by ISIS and the Kurdistan Workers' Party ("PKK").[22] (*Id*.)

Between May 21 and May 29, 2020, Melzer, using the alias "Etil Reggad," identified himself in at least two O9A Telegram chats as a member of the U.S. Army in Vicenza, Italy set to depart on a deployment to Turkey. (PSR ¶ 59). On May 23, 2020, five days before the planned deployment, CC-1 forwarded approximately four of Melzer's initial communications about the proposed attack on his Platoon to a Telegram O9A chat group titled "Order of Nine Rapes" with 18 members, including Melzer and an FBI confidential source (the "CS"). (*Id*.) Melzer then sent a series of messages to the group, writing that he was a U.S. servicemember stationed in Vicenza who was "[g]oing to Turkey for a deployment" and that a "date and time [for the deployment] will be given soon." (*Id*.) Melzer and the group members discussed the possibility of a jihadist attack on the Platoon's deployment, and Melzer mentioned that he "[u]sed to be cool with a couple IS [ISIS] members who lived in France." (*Id*.) When asked whether he was willing to die in an attack on the Platoon, Melzer responded "[i]f we were to trigger this the right way the amount of shit this would cause would cover it," and that his "life would be absolutely meaningless in the amount of shit it would cause" if the Platoon was attacked in Turkey. (*Id*.) Melzer described the proposed attack as "mascal," which another participant in the exchange explained meant "mass casualty." (*Id*.)

---

[22] The PKK is a Kurdish militant political organization and armed guerrilla movement, which operates primarily in southeastern Turkey and northern Iraq.

On May 24, 2020, Melzer and CC-1 exchanged a series of direct messages on Telegram. (PSR ¶ 60).  CC-1 asked Melzer, "are we literally organizing a jihadi attack[?]"  Melzer replied, "And yes probably…as long as I get the info I need to give you all."  (Id.)  CC-1 approvingly replied, "that's kinda baste."[23]  (Id.)  Melzer agreed: "Actually like a 8 outta 10 on the baste scale if I do say so myself…as long as I get what I need."  (Id.)  After CC-1 highlighted again that Melzer could die in the attack Melzer was proposing, Melzer replied, "Who gives a fuck…the after effects of a convoy getting attacked would cover it…it would be another war…I would've died successfully…cause if another 10 year war in the Middle East would definitely leave a mark." CC-1 concurred: "Yeah true."  (Id.)

On May 25, 2020, CC-1 asked Melzer to provide additional, specific information:

> "Okay, how many people will be in the convoy, are you gonna be there, is it gonna be air to ground, or is it gonna be on the ground…What will be carried…Whats the plans…And, I heard you may be reconsidering, but, make a [Telegram] group for you, me, and the rest of the people.  We still need the info, so give it us out of good faith…Also this is a serious thing, if you [get] this done we need proper organization…. we're not into larping [live action role-playing] or big tall, especially not her.  So if youre not serious, let her/us know."

(PSR ¶ 61).  Melzer quickly replied by disclosing national defense information he and his fellow soldiers had received in the briefings: "40 people [in the convoy] that are actual soldiers…small arms…for all [I know] so far [the vehicles] could just be busses."  (PSR ¶ 62).  Melzer also explained that he believed an attack on the Military Base, rather than the attack on the Platoon's convoy to the Military Base as he initially proposed, would be ideal: "That's what I meant by reconsidering because I found out that units replace each other up there every 2-4 months…more

---

[23] "Baste" is an alternative spelling of the term "based," a phrase rooted in white supremacist ideology that members of RapeWaffen Division used to express agreement or approval.

time to plan it out especially since I mean haven't really been there before and all we were shown was a satellite image for 2 seconds." (*Id*.)  In response to CC-1's request for a map or a description of the location's topography, Melzer replied, "[the Military Base]…look that up…[they're] storing artillery there as well." (*Id*.)  Using information provided to him by Melzer, CC-1 subsequently located and posted an open-source satellite image of the Military Base, along with the facility's coordinates, and then asked Melzer if the particular coordinates he had found were accurate. (*Id*.) Melzer confirmed the coordinates and provided additional sensitive information about the purpose and defensive capabilities of the U.S. Army installation at the Military Base. (*Id*.)  CC-1 asked, "okay, []…so…its near the mountains, so we could have some guys doing watch-over there?" and then provided latitude/longitude coordinates. (*Id*.)  In response to a question from CC-1 regarding the possible presence of mobile armor, meaning tanks, at the Military Base, Melzer replied, "yea should be…none…haven't been on the base yet but they would usually say if there was." (*Id*.)

Later that day, CC-1 started a smaller, invite-only chat group on Telegram and invited vetted participants, including Melzer, a third co-conspirator ("CC-3"), and the CS. (PSR ¶ 63). Confirming the group's core plan to provide Melzer's information to jihadists who would commit the attack, CC-1 initially named the group "Jihad," changed it later to "Jihadist Caliphate," and later changed it again to "Op Hardrock."[24] (*Id*.)  There, the participants further planned the prospective attack on the Military Base. (*Id*.)  Melzer explained again that he "need[s] some Turkish people to cause some shit to put it lightly," and, when asked how many "jihadis" he wished

---

[24] Telegram group names are visible to all participants on a banner with text located at the top of the chat display.

to recruit, Melzer responded "squad size" or "Plt [platoon] size actually if [they're] placed right again gonna [go] over the layout of the terrain later today." (*Id.*) As Melzer received increasing information from the series of Army briefings, Melzer passed that information, nearly in real-time, to the group for the purpose of facilitating the contemplated murderous attack on his own fellow soldiers. (*Id.*) Melzer disclosed the geographic coordinates for the Military Base to the group; described the facility's sensitive purpose; revealed the fact that it was guarded by a "max" of 40 individuals with "[s]mall arms" and "just m4s"[25]; that the non-U.S. Army employees at the base would not be armed; and confirmed the route that the Platoon would take to travel there. (*Id.*) Melzer knew that the Army had limited defenses for the deployment, because it would be subject to the rules of a foreign nation. (*Id.*) Melzer explained the Platoon's vulnerability to the ambush-style attack he was proposing in detail, informing his co-conspirators that "[e]very fire-team [would be] essentially crippled," and that there would be no "Carl Gustavs/at4s" or "CAG support."[26] (*Id.*) Melzer further revealed that the Military Base had no "mg's or 320s so they'll be severely underpowered to a force that would mgs rpgs and whatever else."[27] (*Id.*) Melzer clarified that "no matter what they won't be facing fire from a 240 or even a 249."[28] (*Id.*)

---

[25] This appears to be a reference to pistols and M4 rifles, which, as noted above, Melzer had previously learned would likely be the Platoon's only weaponry during the deployment.

[26] "Carl Gustavs" and "at4s" are references to anti-armor weapons that can also be used against enemy personnel and/or fortified positions, and "CAG support" refers to close air support, such as helicopters or jet aircraft.

[27] "Mg's" is a reference to machineguns, "320s" is a reference to M320 grenade launchers, and "rpgs" is a reference to rocket-propelled grenades.

[28] "240" and "249" are references to machinegun calibers.

On May 25, 2020, Melzer promised to give the group the frequency and channel for U.S. Army radio communications, so that his co-conspirators could, in the words of CC-1, "[l]isten in on shit in real time." (PSR ¶ 64). Melzer further noted that the Military Base was in an extremely isolated location "on a mountaintop so when I get there I'll scout out a spot that could be good" and that the base would not be on "high alert." (*Id.*) Melzer also informed the group of the anticipated date of the Platoon's deployment and proposed that the attack could be conducted against a unit set to replace his Platoon in several months, which would allow more time for Melzer to research the Military Base, identify additional vulnerabilities, and pass information to his co-conspirators to plan the attack. (*Id.*) Melzer promised that he would use a "burner" phone and a VPN[29] when he arrived in Turkey and would send photographs and additional details from the Military Base to facilitate the attack planning on U.S. soldiers. (*Id.*) Melzer told his co-conspirators to "[e]xpect more when I get there." (*Id.*)

In another exchange in the group, as CC-1 and CC-3 further discussed the information Melzer had provided, CC-1 suggested that attackers should mount the assault from high ground by firing weapons from multiple directions at the Military Base. (PSR ¶ 65). CC-3, whom Melzer in his post-arrest interview identified as a Turkish or Arab male in his 20s or 30s, replied that attackers "should come from the mountain. . . could make them panic the shit outta them," and then asked, "Do you know which nations?…are within the walls of the base." (*Id.*) CC-1 responded, "American." (*Id.*) CC-3 replied "aight…Well if it is done very quickly…then no worries about air support…Plus I guess they wouldn't bomb their own base." (*Id.*) CC-3 further

---

[29] VPN stands for "Virtual Private Network," and refers to technology that encrypts internet traffic and disguises online identity, making it more difficult for third parties to track activities online.

stated, "Since you know the approximately number of soldiers in the base, you already won the battle, as sun tzu says lol." (*Id*.)  CC-1 later asked, "So…with the turks already riled up…and the severly underdefended [the Military Base]. . . This..is look good?" (*Id*.)  CC-3 replied, "Fuck yeah lol." (*Id*.)

By on or about May 26, 2020, the CS exposed the scheme to law enforcement, which, in turn, identified the Platoon from the information Melzer had provided in the Telegram messages. (PSR ¶ 26).  The Platoon's scheduled May 28, 2020 deployment to the Military Base was postponed by the military to ensure the safety of the soldiers as the investigation continued. (*Id*.)  On May 29, 2020, Melzer posted again in the Op Hardrock chatroom, reaffirming his commitment to the attack on the Military Base. (*Id*.)  Melzer explained additional measures he expected to take once he deployed to Turkey, including collecting additional intelligence once he had arrived at the Military Base. (*Id*.)  CC-1 asked whether Melzer had any new information, to which Melzer replied, "Until I get there no…but when I do if you know anybody that could pull location from pics that would be based…cause there gonna have us put up our phones during patrols but I'm bringing a shitty burner on me so I can take pics…at like the guard towers and shit that they'll probably set us up at." (*Id*.)  When CC-1 expressed doubt that the metadata from the images would provide helpful information, Melzer replied, "I figure even if you can't get the local just being able to see what they can see from the towers would help…you'll be able to see what anyone in those towers can see and that would help a lot more." (*Id*.)  CC-1 agreed, and asked if Melzer could obtain additional information for planning the attack: "Likely would, a full overview of the base from a tower would also be useful" to which Melzer replied, "Exactly that's the plan…Only place I can't go into is  the rad[ar] zone…but I'll probably be able to see it from one of the posts I

imagine though." (*Id*.) CC-1 and Melzer then discussed the function of the Military Base. (*Id*.) CC-1 asked if Melzer could get clear images when taking photographs of the Military Base, to which Melzer replied, "Definitely…if not I'll literally take pics of anything important but I figure the posts are elevated." (*Id*.) As to the installation's defenses, Melzer also advised "the road has those barricades up to make you have to snake a car through…the road is the only entrance [that] exist[s] from what I'm hearing." (*Id*.)

In this same chat, the CS asked Melzer a series of questions about Melzer's involvement in the attack plot. (PSR ¶ 67.) In one exchange, the CS asked Melzer, "what makes you think that you can actually get away with fucking with the US military[?]" Melzer responded, "because I fly under the radar already act completely normal around other people outside and don't talk about my personal life or beliefs with anyone." (*Id*.) Relying on information received in the briefings, Melzer also explained that his involvement in orchestrating the attack would likely be undetected as "isis and the Turks have been getting heavier near the border again…So that would also cover it I'd imagine considering IS isn't exactly a country anymore." (*Id*.) Later, after the CS expressed skepticism that Melzer could use his "burner" iPhone to take pictures of the Military Base, Melzer explained, "Obviously I'm going to be more careful about it th[a]n just holding it up in front of everyone." Melzer also noted that "[t]he don't even know I'm brining 2 phones." (*Id*.)

By this time, law enforcement and the military, working around the clock while investigating Melzer's conduct had successfully identified Melzer's unit based, in part, on the truthful specificity of Melzer's descriptions of his own unit and the anticipated deployment. While working to link Melzer directly to the encrypted chats, the military monitored Melzer closely and was forced to delay the unit's deployment while masking the true cause of the delay to avoid

alerting Melzer or coconspirators to the investigation.  As investigators worked, Melzer continued to discuss the plot with the CS, and his fears of being detected.  The CS also asked why Melzer had deleted messages from earlier chats.  (PSR ¶ 68).  Melzer explained, in substance, that he was nervous about law enforcement detection.  After further discussion on the topic, the CS wrote, referring to Melzer's discussion in the deleted messages about the attack plot, "You deleted them because that's treason…Duh" to which Melzer replied, "Kek."[30]  (*Id*.)  Melzer further noted that in response to the attack, the U.S. "would be in a frenzy to send people out there and start another war."  (*Id*.)  Hours later, the military detained Melzer based on this investigation.  (*Id*.)

## VI.  The Arrest and Melzer's Post-Arrest Interviews

On May 30, 2020, military investigators took Melzer into custody as the Platoon was getting ready to board buses to the airport in Italy en route to the Military Base.  (PSR ¶ 69).  The Platoon, including Melzer, was in a staging area waiting for transport and were fully packed for the deployment, with their quarters locked and sealed for the safety of their personal effects during their time away from the base.  (*Id*.)  In Melzer's bag, packed for deployment, were O9A texts (depicted in the images below), as well as two phones—his iPhone 11 and an old iPhone 8, which appears to be the "burner" iPhone that Melzer referenced in his Telegram chats.  (*Id*.)  At the time his iPhone 11 was seized, Melzer had drafted—but had yet to send—a message, in which he was

---

[30] "Kek" is an alternative form of the internet shorthand "lol" and is commonly used in far-right community chatrooms.

continuing his responses to additional questions from CC-1 in order to affirm the depth of his ideological commitment to O9A.  (*Id.*)

 

(GX 357, 358).

The Platoon ultimately deployed, as planned, to the Military Base and completed a multi-month protection mission at the facility.  (PSR ¶ 71).  Due to Melzer's disclosures, including his release of classified information on Telegram, the Platoon was forced to change certain operational plans and engage in enhanced security protocols.  (*Id.*)  Below is an image depicting Melzer's intended murder victims, his fellow Platoon members on duty:[31]

---

[31] A senior member of the Platoon requested—and was granted—permission to take this photograph given that the image and its backdrop did not reveal any sensitive information.



On the day that he was taken into military custody in Italy, and during his subsequent transport to the United States to face the charges in this case, Melzer participated in a series of *Mirandized* interviews. (PSR ¶¶ 70, 72-73). Over the course of those interviews, among other things, Melzer admitted to disclosing sensitive information about the Platoon's upcoming deployment—including regarding the nature of security and defensive weaponry at the Military Base—in the RapeWaffen Division channel and elsewhere on Telegram for the purpose of facilitating a deadly attack on his fellow soldiers, and that he had placed his Platoon in danger by doing so, including because his co-conspirators were serious about committing an attack. (*Id.*) He also admitted to using the "Etil Reggad" username and, when shown Telegram communications on his cellphone, admitted to sending those messages. (PSR ¶ 70). Melzer acknowledged that his actions rendered him a traitor, and that he was aware during his conduct that his attempt to kill his

fellow soldiers was tantamount to treason.  (*Id.*)  However, Melzer also denied that he was a member of O9A and repeatedly falsely attempted to minimize his conduct as satire or dark humor, a claim utterly belied by the evidence described above, and now also by his guilty plea to attempted murder of U.S. officers, among other terrorism crimes.  (*Id.*)

## PROCEDURAL HISTORY

On June 22, 2020, a grand jury sitting in this District indicted Melzer, and a superseding indictment was returned on August 18, 2020 charging Melzer in eight counts: (1) conspiracy to murder U.S. nationals outside the United States, in violation of 18 U.S.C. § 2332(b); (2) attempting to murder U.S. nationals outside the United States, in violation of 18 U.S.C. § 2332(b); (3) conspiracy to murder U.S. military servicemembers, in violation of 18 U.S.C. §§ 1114 and 1117; (4) attempting to murder U.S. military servicemembers, in violation of 18 U.S.C. § 1114; (5) attempting to provide and providing material support to terrorists, in violation of 18 U.S.C. § 2339A; (6) conspiracy to murder and maim in a foreign country, in violation of 18 U.S.C. § 956; (7) illegal transmission of national defense information believing that it could be used to the injury of the United States, in violation of 18 U.S.C. § 793(d); and (8) illegal delivery of national defense information, in violation of 18 U.S.C. § 794(a).  (PSR ¶ 1).  Trial was scheduled to commence on July 6, 2022, following extensive motion practice and two *Daubert* hearings.  Melzer faced a potential maximum sentence of life imprisonment upon conviction at trial.  Less than two weeks before trial, on June 24, 2022, the Government allowed Melzer to plead guilty pursuant to a plea agreement to three counts of the Indictment: (1) attempting to murder U.S. military servicemembers, in violation of 18 U.S.C. § 1114, which carries a maximum sentence of 20 years in prison; (2) attempting to provide and providing material support to terrorists, in violation of 18

U.S.C. § 2339A, which carries a maximum sentence of 15 years in prison; and (3) illegally transmitting national defense information believing that it could be used to the injury of the United States, in violation of 18 U.S.C. § 793(d), which carries a maximum sentence of 10 years in prison.  (PSR ¶ 11).  As a result of Melzer's guilty plea, he faces a combined maximum sentence of 45 years' imprisonment.  (PSR ¶¶ 12, 122-123).

## THE GUIDELINES RECOMMEND A 45-YEAR SENTENCE

There is no dispute as to the applicable Guidelines in this case.  Consistent with the plea agreement, the PSR reflects that a total offense level of 43 applies to Melzer's crimes, and that Melzer falls within criminal history category VI.  (PSR ¶¶ 123-24).  The Guidelines imprisonment range would therefore be life imprisonment.  (*Id.*).  However, because that range exceeds the statutorily authorized maximum sentence, the Guidelines term of imprisonment is the statutory maximum of 45 years.  (*Id.*).

The Probation Office recognizes that the "nature of this case is egregious and Melzer clearly poses a threat to the community, if not society in general," and that "[t]he intended deadly consequences for [Melzer's] military unit are clear; the potential greater level of harm posed by any U.S. response to that attack is almost limitless."  (PSR at 43).  The Probation Office nonetheless recommends a variance sentence of approximately 25 years for Melzer in the "hope" it might be sufficient, based on his age, his "difficult upbringing marred by reported family violence and his own [self-]reported…victimization," and his purported status as a "first-time offender" because he was never previously caught or held accountable for Shooting-1, Shooting-2, or his prior drug crimes.  (*Id.*).  The defendant seeks an even more drastic variance sentence of 15 years, primarily relying on the same factors relating to his history and characteristics, as well

as his claims that his activities were never close to causing true harm and that he has now abandoned O9A.  (*See* Dkt. No. 157 ("Def. Ltr.")).  The Probation Office's recommendation and the defense's request are woefully inadequate and fail to account for the gravity of the defendant's crimes, the threat that he poses, the need to protect the public and deter such heinous conduct, and the other sentencing factors discussed at greater length below, which collectively militate conclusively in favor of imposing the only appropriate sentence in this case: the Guidelines sentence of 45 years in prison.

## APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a):  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

 (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

 (B)  to afford adequate deterrence to criminal conduct;

 (C)  to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## ARGUMENT

### I.  The Section 3553(a) Factors Compel a 45-Year Sentence

#### A.  The Nature and Circumstances of the Defendant's Crimes

The defendant's treasonous, murderous conduct—an active-duty U.S. soldier attempting the unthinkable: the mass murder of his platoonmates at the hands of terrorists while stationed overseas—marks one of the most stunning betrayals from within the ranks of the U.S. military ever to be prosecuted in a federal court.  The nature and circumstances of the defendant's crimes are shocking and abhorrent.  *See* 18 U.S.C. § 3553(a)(1).  The defendant sought to murder his fellow servicemembers in a devastating attack on a highly sensitive military installation overseas.  Daily, the defendant lived and trained alongside these young men, having sworn an oath of loyalty to this country and tasked with the mission of protecting each other and protecting the United States, and running drills to purportedly prepare for that mission.  But instead, the defendant was secretly plotting his own mission: to kill the very servicemembers in his midst.  The defendant sat among them, taking mental notes in classified briefings not to prepare for their deployment to guard the Military Base, but rather so that he could swiftly share details of the servicemembers' mission and movements with neo-Nazis and jihadists planning to murder them and dedicated to ending Western civilization.  Steeped in racist, jihadist, and nihilist ideologies, his broader goal was to start a war, in which many more Americans and others would die.  In seeking to have his fellow soldiers maimed and murdered, the defendant turned his back on his country and his unit

while aligning himself with and empowering our nation's sworn enemies. The defendant subordinated his oath of loyalty to the U.S. Army to his loyalty to O9A and their jihadist allies, groups bent on America's destruction. While any terrorism offense is inherently serious, consideration of the defendant's background, the context in which he committed his offenses, and the specific details of those offenses underscore the exceptionally grave and terrifying nature of his conduct and necessitate a Guidelines sentence reflecting the statutory maximum.

The defendant's betrayal of his country and his comrades was no momentary lapse in judgment; he had been building up to this treasonous conduct for years. As described above, and as the defendant explicitly and repeatedly stated to his O9A confederates, he *joined* the military in the first place for the purpose of carrying out an insight role and sinister deed for O9A. *See supra* 21-23 (assuring another O9A adherent, for example, that a race war would be coming, stating, "I'm in the army [right now] specifically for this…I mean I literally did join for this exact reason…"). It bears emphasizing this appalling fact: the defendant, as a follower of a neo-Nazi group bent on toppling civilized society, methodically and cunningly infiltrated this country's armed forces—lying at every turn about his true affiliations and loyalties—for the sole, express purpose of attempting to attack that organization and harm the United States from within. The defendant's actions, his treasonous mass murder plot, were calculated, cold-blooded, and exceedingly premeditated.

After successfully infiltrating the military, and biding his time to strike, an opportunity presented itself with the planned deployment to the Military Base, and Melzer sprang into action and prepared to execute his sinister plan. In the period leading up to his deployment to Turkey, Melzer accelerated his downloading and consumption of graphic jihadist videos, including those

containing executions, beheadings, and mutilated bodies.  Notably, Melzer also accessed and saved videos of jihadists attacking military bases, convoys, and American soldiers.  He was conducting due diligence.  For example, on April 17, 2020, Melzer accessed a video of a jihadist attack on a Western military convoy.  (PSR ¶ 47).  On May 3, 2020, the defendant accessed a video depicting an ambush by jihadists on a military compound, recovering what appears to be a U.S. military uniform before setting the installation on fire, and executing several individuals.  (PSR ¶ 51).  And on May 5, 2020—the week the defendant was notified of his impending deployment to the Military Base—the defendant accessed a video depicting a deadly attack by jihadists on a U.S. military convoy, which includes depictions of a U.S. soldier killed during the attack and the screams of a wounded soldier while he was being pursued by jihadist fighters.  (*See* Dkt. No. 111 at 62-64).  The defendant had evolved into a hardened O9A operative eagerly willing to support jihadist forces in furtherance of their shared goals: killing as many U.S. soldiers as possible.

The defendant's decision to plan an attack on the Platoon was thus the culmination of his commitment to the violent extremist ideologies underpinning O9A.  From his prior acts of crime and violence in Kentucky to his joining the military as an insight role, Melzer had demonstrated his willingness to undertake and execute real-world actions—and violence—to further O9A's goals.  And when the opportunity arose to leverage his access to sensitive and classified U.S. national defense information to further those deadly aims, the defendant did not hesitate.  He shared a constant stream of actionable information about the Platoon and its impending deployment with one goal in mind: maximizing carnage.  He was ready, willing, and able—indeed, eager—to perpetrate violence on behalf of O9A by betraying the Platoon.  He disclosed its location, its strength, its manpower, its movements within Turkey, and its armaments to members

of a group with a murderous history and their jihadist allies.  He did so in near real-time, learning information about the deployment from members of the Platoon and then sharing it with members of the RapeWaffen Division to effectuate the ambush.  For example, almost immediately after Melzer received a briefing on May 6 and 7, 2020 about the deployment to the Military Base, Melzer notified members in the RapeWaffen Division that he was "[g]oing to Turkey soon," following up the next day by noting that he would be at a "base there" in the "[b]eginning of June." Two weeks later, on May 20, 2022, Melzer received a set of classified and unclassified briefings about the upcoming deployment.  Over the next few days, Melzer shared more tactical information about the Platoon and the Military Base, revealing vulnerabilities that could be exploited by O9A and its jihadist allies.  Beyond providing information about the Platoon's manpower and weaponry, Melzer confirmed the route that the Platoon would take to travel to the Military Base, knowing that the Army had limited defenses during this trip.

The gravity of Melzer's conduct is further demonstrated by the fact that Melzer shared specific—and, in many cases, classified—information with his O9A co-conspirators.  Melzer was fully aware of the sensitivity of this information; in fact, minutes before he attended a classified briefing about the deployment on May 20, 2022, the shades in the room were drawn, all phones were left outside the briefing room, and Melzer signed a form acknowledging that unauthorized disclosure of classified information may constitute a violation of federal criminal law.  Moreover, the very nature of the information Melzer received—and then shared with his O9A co-conspirators—demonstrates its sensitivity, including classified information relating to the sensitive purpose of the Military Base, specific attack scenarios, including attacks involving jihadist forces, and the numbers, movements, and weaponry of the Platoon.  Because Melzer released this

information outside official channels—to extremists bent on attacking the United States—the lives of the young men serving in the Platoon were endangered, the mission of the Military Base was threatened, and the U.S. Army was required to shift its security protocols to protect its soldiers, and the Military Base, in the wake of Melzer's unauthorized disclosures.

The seriousness of the conduct is also reflected in Melzer's complete dedication to a successful ambush, to maximizing bloodshed. After CC-1 highlighted again that Melzer could die in the attack that Melzer was plotting, Melzer replied, "Who gives a fuck…the after effects of a convoy getting attacked would cover it…it would be another war…I would've died successfully…cause if another 10 year war in the Middle East would definitely leave a mark." (PSR ¶ 60). And when Melzer was later asked by his co-conspirators whether he was willing to die in an attack on the Platoon, Melzer responded, "[i]f we were to trigger this the right way the amount of shit this would cause would cover it," and stated that his "life would be absolutely meaningless in the amount of shit it would cause" if the Platoon was attacked in Turkey. (PSR ¶ 59). Melzer's own actions and statements show again and again that this attack—designed to be catastrophically deadly itself—was just one step in Melzer's deep commitment to an even more horrifying cause, the sinister agenda of O9A and its vicious hybrid of Satanist, neo-Nazi, white supremacist, and jihadist aims.

Melzer's goals were clear and monstrous: he sought to murder his platoonmates to force the United States into prolonged armed conflict. He plotted to cause the deaths of as many soldiers as possible, describing the planned attack as "mascal," meaning "mass casualty." (PSR ¶ 59). He wanted to "cripple" the "fire-team[s]" of the Platoon. (PSR ¶ 63). His traitorous conduct was a betrayal of his fellow soldiers, his unit, and his country. And it was only because an FBI

confidential source happened to be in the Rapewaffen Division Telegram channel that the Government learned of his conduct and thwarted the attack, just days before the Platoon's planned deployment to the Military Base.

As the facts set forth above and in the PSR make abundantly clear, the defendant's self-serving claim at sentencing that his plan to foment an attack on his unit was "beyond inchoate and bordering on non-existent" is simply wrong. (Def. Mem. at 15). As the defendant allocuted, "with the intent that U.S. service members be killed, I disclosed sensitive information about my Army unit's upcoming deployment to individuals I was communicating with online." (Dkt. No. 148 at 23). In other words, the defendant admittedly worked with others and disclosed sensitive national defense information in an attempt to murder his fellow servicemembers—the seriousness of that conduct alone warrants imposition of the Guidelines sentence in this case. Importantly, neither the defendant's provision of material support in furtherance of that plan nor the disclosure of national defense information to facilitate it were "beyond inchoate" offenses; they were, quite to the contrary, completed offenses.

To the extent the defendant attempts to minimize his conduct based on the fact that the Military Base has not been attacked as a result of his crimes, that is the result of "fortuity" and the prompt actions of law enforcement to disrupt his murderous plot. That Melzer ultimately did not succeed should not inure to his benefit. He failed, not because he thought better of his murderous goals—to the contrary, he was chillingly and relentlessly committed to his depraved O9A mission—but because the plot was disrupted by law enforcement—just days before the Platoon's deployment—and he was arrested. Had the attack played out as Melzer planned and hoped, the lives of numerous soldiers would have been lost, families devastated, and the U.S. military—and

this country—seriously shaken and harmed.  *See United States v. Stewart*, 590 F.3d 93, 175 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) ("[W]e are not relegated to wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." (internal quotation marks omitted)).  "Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism crime but that the absence of proven harm does not mitigate such a crime."  *Id.*  As in *Stewart*, the absence of more concrete injuries "is in no sense attributable" to the defendant.  *Id.* He targeted the United States and its armed forces despite the fact that he had sworn an oath to support and defend this country.  And the harm resulting from his treasonous actions is ongoing, as he provided information about the Military Base—including classified information—to members of O9A; information O9A members or others could use in an attempt to support an attack in the future.  The impact on Melzer's intended victims—his platoonmates—is also very real and lasting, as they all must live with the enduring knowledge that their fellow soldier betrayed and plotted to murder them in cold blood.  The Government anticipates that one of the Platoon's commanding officers, who was responsible for overseeing the deployment to Turkey, will provide a victim impact statement in connection with sentencing, further describing some of the lasting impact Melzer's crimes have had on him, the Platoon, and the military.

The defense submission mistakenly relies on unsupported speculation about the abilities of the direct participants in the conversations with the defendant to mount an attack, in an effort to insist that there was little if any harm caused by Melzer's conduct.  First, from the content of the chats themselves, it is evident that the individual group participants never intended to carry out any attack personally, and their direct participation in an ambush was never discussed.  Instead, as

described in detail above, Melzer plotted an attack to be mounted by members of foreign terrorist organizations, such as al Qaeda or ISIS, who Melzer knew from his military trainings and briefings had access and posed a threat to the region where his Platoon would deploy.  It was always his clear intention, as repeatedly noted in his messages with the O9A group, CC-1, and others, to relay information to jihadists willing to commit their resources to an attack on the convoy.  For these reasons, any purported inability of the specific online group members to personally mount an attack is totally beside the point, and whether or not some participants misrepresented aspects of themselves or their capabilities to Melzer is an irrelevant distraction.  Notably, the defendant highlights CC-1's being a minor—which in no way prevented CC-1 from disseminating Melzer's information online to terrorist operatives or possessing a genuine commitment to O9A and the attack plan—while ignoring CC-2 and CC-3, who appear to have accurately described themselves and their locations, including CC-2's location in Kurdistan and CC-3's unsuccessful efforts to infiltrate a foreign military and connections to jihadist extremism.[32]  (*See, e.g.,* PSR ¶ 56 (describing CC-2 as a "grey wolf" interested in joining the Turkish army "for training" with ties to al Qaeda); *id.* ¶ 65 (describing CC-3 as a Turkish or Arab male in their 20s or 30s participating in the attack plan)).

Melzer's purpose in the O9A Telegram group was to conceive of the plot, bring together contributors to the plot who had even more contacts to exploit, and to provide a clandestine, encrypted forum spreading his insider knowledge of U.S. national defense information without revealing his identity.  The group members had conversations about contacting specific terrorist

---

[32] Melzer acknowledged this understanding of CC-2 and CC-3 in his post-arrest interviews, and this information was corroborated by the Government's investigation and produced to the defense.

groups to share the information, including by using encrypted applications, for exactly these reasons.  In addition, the information the defendant shared made its way far beyond the chat room, just as the defendant intended.  For example, one participant in the larger O9A chatroom even posted satellite images of the Military Base via Twitter.

Melzer's concept and plan for the attack was deeply rooted in reality and specific information that he derived from trainings and briefings in the run-up to his Platoon's deployment.  The defendant asked his confederates to relay the information about the deployment to members of particular jihadist groups because he was aware that those groups had presence and reach with respect to the Military Base and the operational capacity to attack it.  Moreover, the vulnerabilities Melzer assessed and disclosed were far from generalized fantasies or speculation.  Instead, Melzer drew from the threat awareness training he received and the specific details obtained during the briefings about the deployment, and repackaged those trainings and briefings into proposals for attacks that he relayed to others in the group.  The defendant weaponized the information he was provided that was intended to provide situational awareness to his Platoon and save their lives in the event of contact with an enemy force—a genuine threat to the Platoon given the nature and location of the deployment.

Though counsel argues that the defendant did not disclose every specific piece of information he received in the classified briefings, the true harm was not in the volume of the information the defendant provided, but in the discretion he employed by describing the threat scenarios and vulnerabilities that were identified to him as among the most serious to the Platoon.  Moreover, as the plan progressed, Melzer promised to provide additional specific intelligence about the Military Base by smuggling a contraband phone and taking photographs, and that second

cellphone was found in Melzer's effects packed and ready to go on the deployment. It is no mystery why the defendant chose to disseminate the specific information from the briefings that he sent to his confederates: because the defendant hoped for a mass casualty event, the decimation of his Platoon in an ambush against which they would have difficulty defending precisely because of the information that the defendant shared. Moreover, the massacre of approximately 40 U.S. servicemembers in an ambush was only where the defendant saw the loss of American life beginning; he posited that such an incident would draw the United States into prolonged conflict, costing lives and resources, and weakening America's position as the world's leading democracy. This was Melzer's O9A "accelerationist" goal: to bring about the demise of multicultural democracy, to spark chaos resulting in ethnic and racial conflict, and to cause such death and destruction so that a white supremacist ethnostate inspired by Hitler could emerge.

Melzer's offenses were abhorrent and extremely serious. Deeply committed to a white supremacist ideology, he illegally disclosed classified information to other neo-Nazis in an effort to facilitate a terrorist attack that would slaughter his fellow American soldiers, soldiers he served alongside, lived with, and who trusted him with their lives. It was only a stroke of good luck— that Melzer began communicating in a group with someone who was, unbeknownst to him, a source for the FBI—that likely saved numerous American lives and thwarted what could have been a devastating attack on the military and U.S. national security. A Guidelines sentence is necessary to reflect the depravity and seriousness of a U.S. soldier taking up arms against his country and trying to kill his fellow servicemembers. The extraordinary seriousness of Melzer's conduct alone warrants the Guidelines sentence of 45 years' imprisonment.

**B.   The Need for Specific Deterrence and to Protect the Public from Further Crimes of the Defendant**

A Guidelines sentence is also necessary to adequately deter the defendant's criminal conduct—in this case, terrorism aimed at harming Americans, American interests, and advancing white supremacy—and to protect the public from future potential crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(B)-(C).  The undisputed application of the so-called "terrorism enhancement" in this case, at U.S.S.G. § 3A1.4(a) (*see* PSR ¶¶ 83, 95), "reflects Congress' and the [Sentencing] Commission's policy judgment 'that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.'"  *Stewart*, 590 F.3d at 172-73 (Walker, J., concurring in part and dissenting in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).  As Judge Walker observed in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  *Stewart*, 590 F.3d at 181.

The defendant is a radicalized, committed O9A member bent on white supremacy and the destruction of world order, who infiltrated the U.S. military, devised a treasonous plot to have jihadists ambush and kill his fellow soldiers, and passed sensitive and classified national defense information to his O9A co-conspirators to effectuate the plot.  His conduct occurred over a long period of time, was deeply premeditated and highly calculated, and terrifyingly real and concrete. He presents a grave and very clear threat to the community and to U.S. national security.  Simply put, the defendant poses an acute, highly significant risk of returning to dangerous crimes.  The defendant's committed membership in a terrorist hate group substantially elevates that risk.  As a

60

result, the risk of recidivism and the need to protect the public weigh heavily and unambiguously in favor of incapacitating the defendant through the imposition of the most substantial possible prison sentence—the Guidelines term of 45 years.

The defendant's actions, statements, and voracious consumption of O9A and jihadist propaganda reflect a steadfast commitment to violence and radical extremist ideology that underscores the risk that he poses.  There is absolutely no reason, based on the record of this case, why the Court should have any confidence that the defendant is anything other than a live threat, necessitating a Guidelines sentence to deter and prevent him from resuming his violent white supremacist activities, and to protect the public.  While defense counsel describes the defendant as passively falling down a "rabbit hole" and the defendant now suddenly and predictably claims to have abruptly abandoned all of his long-held racist, Satanist, and jihadist beliefs just in time for sentencing, the record exposes a very different picture.  The evidence shows that the defendant was an avowed racist who embraced the use of violence for white supremacist purposes; that he very intentionally sought out not only information about O9A, but also an O9A nexion or community to join for the purpose of committing "sinister" deeds; that he intensely devoted himself to O9A through blood rituals, a tattoo, study of O9A manuals and texts, and repeatedly participating in online communities devoted to O9A's mission of hate; and that he actively recruited and indoctrinated others to join O9A at least as early as 2019.  Videos from the defendant's devices are filled with violent imagery depicting the murder of non-whites and U.S. soldiers.  His consistent consumption of media glorifying martyrdom in the pursuit of violence, and his expressed willingness to die in the attack on his Platoon if it meant advancing O9A's agenda, further belie any notion that the Court should accept his claims of rehabilitation.  Melzer's

61

possession, use, and dissemination of Nazi and O9A literature and poetry and his performance of O9A rituals further betray his unyielding commitment to white supremacy and neo-Nazism. These influences motivated the defendant to persist in his conduct for years, and there is no reason to believe he has suddenly divorced himself from those violent ideologies and his long-held white supremacist mission as he approaches sentencing. The Court should consider this critical context when assessing the continuing and lasting threat Melzer poses to the United States.

The defendant's willingness to risk his life and liberty in service of O9A also underscore the need for a lengthy sentence to most effectively incapacitate him. Terrorism crimes come with high recidivism rates and the rehabilitation of terrorism defendants like Melzer is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). Up until the moment of his arrest, the defendant was actively plotting the attack and, just hours before he was disrupted, proudly noted that, in response to the attack, the United States "would be in a frenzy to send people out there and start another war." *See supra* 45. Melzer's absolute commitment to O9A and the radical ideology that it espouses, his aspiration to commit the ultimate sacrifice, to martyr himself for O9A and its cause, and his efforts to inspire others to do the same all powerfully support a single conclusion: the incapacitation of Melzer should be for the full term of 45 years permitted by statute and called for by the Guidelines. The fact that Melzer is a young man, fully capable of resuming his violent white supremacist activities, firmly reinforces that conclusion. Indeed, his youth counsels strongly in favor of, not against, the 45-year sentence called for by the Guidelines, in order to achieve the necessary incapacitation in this case.

The defense's misguided effort to downplay the severe national security threat posed by O9A as a "millenarian cult with an outlandish cosmology and irrational belief system" that no adult would follow is contradicted by history, and by the defendant's own conduct in this very case.  (Def. Ltr. 22.)  Nazism is not, and never was, a "rational belief system."  Yet it spawned a world war and the systemic genocide of millions.  As Dr. Simi's expert testimony reflected, O9A is just another variation on well-worn ideologies within the violent white supremacist movement.  (*See* Dkt. No. 128 at 137-38, 144-47.)  White supremacy too is "outlandish," "irrational," and discredited by almost all adults.  Al Qaeda, ISIS, and other jihadist terrorist ideologies find no superior refuge in logic.  Nonetheless, O9A and all of these other terrorist groups continue to attract adherents willing to kill, and even die, for their cause.  The defendant was, and is, one of them.

Like the attempt to minimize O9A, the defendant's minimization of his murder plot is equally unavailing.  Contrary to the defendant's claim that "discussions went nowhere, and no attack was ever close to occurring" (Def. Ltr. 17), the defendant repeatedly shared real national defense information with his co-conspirators, reaffirmed the sincerity of his commitment to the ambush, and closely tracked its progress and viability.  The defendant identified his co-conspirators as including individuals he viewed as dangerous and committed O9A members and associates, including members and associates of foreign terrorist organizations or those who could access such members.  Indeed, the defendant's plea to the chilling offenses of conviction—including *attempted murder* of U.S. soldiers—dispels any notion that his actions could somehow be minimized as a disturbed fantasy.  The defendant posed an extraordinary danger to the lives of American soldiers, the safety and operations of the American military, and even sought to provoke a bloody war that would destabilize the United States, its allies, and the Middle East region, costing

countless more lives.  The defendant's limitless pursuit of death and destruction presents a danger that must be deterred and prevented, to protect the public.

Another reason that the defendant poses an ongoing risk, is that he has learned information about the manner in which the U.S. Army plans, trains, and executes its missions that would be valuable to any enemy of the United States.  In this regard,

> [e]spionage differs from all other crimes in one unique, highly significant respect.  The purpose of espionage is political: to undermine the government of the United States with a view to its destruction. This goal is shared by all enemies of this country.

*United States v. Kostadinov*, 572 F. Supp. 1547, 1551 (S.D.N.Y. 1983).  The defendant's work as an O9A plant within the military will serve him well—and so too our enemies—and further reinforces the need for a Guidelines sentence to protect the community and the U.S. national security from this defendant.

### C.  The Need to Promote General Deterrence and Respect for the Law

"[G]iven the increasingly common nature of terrorism-related crimes," general deterrence should "play a large part in the court's considerations" at sentencing.  *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018); *see also United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021) ("General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it."); U.S.S.G. § 3553(a)(2)(A)-(B).  This case and others involving violent extremists bent on causing death and destruction currently pose significant security risks to the United States, domestically and abroad. People all over the world considering joining O9A—or other likeminded organizations—must understand that, if apprehended, they will be punished to the maximum extent of the law.  The Court's sentence in this case will represent the first time that a terrorist is held accountable for

working with O9A to carry out an attack on the U.S. military, and it is critical that the sentence deter others from doing so—and from joining and following O9A and its violent, perverted ideology in the first place.  It is particularly important for the sentence to send an adequate deterrent message given the defendant's specific role as an insider working from within the Army to further O9A's destabilizing mission in support of global white supremacy.  Accordingly, the need for general deterrence to mitigate the threat posed by individuals affiliated with neo-Nazi, white supremacist, violent terrorist groups like O9A is an important feature of this sentencing, amplified by the significant and specific danger posed by insider threat actors, like the defendant, in particular.

Moreover, the capacity of extremist organizations like O9A to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers, like Melzer, who are committed to advancing and serving O9A's murderous agenda.  It is only through this support that O9A and other extremist groups are able to fulfill their missions of hate, murder, and violence.  Deterring such conduct is particularly important in today's environment, when many young people in the West, including in the United States, have become radicalized by propaganda online.  Notably there has been a documented rise in extremist groups recruiting servicemembers and veterans into their ranks.[33]  As Dr. Simi testified, white supremacist groups not only try to recruit soldiers, but also "advocate for infiltration into the military," as Melzer did.  (Dkt. No. 128, Tr. 37.)  This reported, ongoing effort by extremist groups to recruit and radicalize soldiers poses

---

[33] *Pentagon Report Cites Threat of Extremism in Military,* Associated Press (Mar. 2, 2021), https://apnews.com/article/us-news-race-and-ethnicity-72fde7f5168daa205bcad742e425ed50.

a potential threat to the safety of the American public and to the integrity and strength of the U.S. military.[34]

It is vital for our country's national security that other young men and women in uniform—or those considering joining our armed forces—who have embraced or are considering embracing hateful extremism be deterred from choosing to follow a path similar to Melzer's and engaging in potentially devastating conduct in support of such groups.  It is important for members of and those contemplating joining extremist organizations to know that the consequences for using the military or law enforcement to further extremist aims are severe.  And it is important for the public to know that those who seek to join and support murderous organizations by subverting and threatening the national security will face serious punishment preventing them from causing harm to society and eroding the public faith in our most hallowed institutions.  It is just as vital that the men and women of the armed forces know that acts of treason from within the ranks are met with severe and incapacitating punishment.  The defendant knew he had to hide his O9A adherence from recruiters and drill instructors and other members of the military during his earliest days in the Army because he was well aware that there was no place in the Army for violent white supremacist extremism.  Others who might, like Melzer, view the military as a training ground or a place to find other like-minded individuals committed to pursuing racially motivated violence must know that such conduct will not be tolerated and that the consequences of pursuing those plans are serious.  Similarly, those with access to sensitive and classified information must be deterred from sharing

---

[34] *See* Jacob Ware, "The Violent Far-Right Terrorist Threat to the U.S. Military," Council on Foreign Relations (Jan. 31, 2023), *available at* https://www.cfr.org/blog/violent-far-right-terrorist-threat-us-military (cataloguing the severe threat of violent extremism that can be posed by radicalized U.S. soldiers, including Melzer).

that information unlawfully, and must understand that the consequences for sharing that information to facilitate terrorism will be appropriately severe.  As evidenced here, disclosure of tactical military information carries real world risks and endangers the lives of other Americans. A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism and espionage offenses.

Similarly, nothing less than a Guidelines sentence is warranted to promote respect for the law, and respect for the lives of the 40 innocent victims targeted by Melzer.  The young soldiers of the Platoon each came from different walks of life to serve their country and to work every day to protect our nation.  These soldiers risk their lives for us and for our country.  They should never have had to face an enemy from within.  The sentence imposed in this case must show these soldiers, and all members of the armed services, that their lives and sacrifice are deeply valued, and that decisive action will be taken against those who seek to cause them harm, including—and especially—against those like Melzer who seek to do so from within.  The just sentence in this case in light of those considerations is the Guidelines sentence of 45 years' imprisonment.

## II.  The Defendant's Sentencing Arguments Are Unpersuasive

The defendant presents a series of arguments minimizing his offense conduct in an effort to obtain leniency.  The Court should reject these claims.

### A.  The Defendant's Deception Is An Aggravating, Not Mitigating, Factor

In the face of overwhelming evidence showing the depth of the defendant's commitment to O9A and its violent racist objectives, and the defendant's own admissions before this Court that he provided material support to terrorists and attempted to murder his fellow soldiers including by disclosing sensitive Army information, the defense seeks to paint an alternative picture of the

defendant as a proud member of the U.S. Army, a model employee in the Job Corps program, and a person with "contradictory thoughts" (Def. Ltr. 13), who is not really a racist.  This is truly remarkable, and wrong, in light of the undisputed facts of what the defendant did in this case.  In support of their position, the defense marshals letters from the defendant's family and Job Corps supervisors who repeatedly express that they had no idea about the defendant's crimes, O9A membership, or racist and violent agenda.  That was of course precisely part of the defendant's plan.  In reality, these accounts from people purportedly close to the defendant show a very different, consistent theme: the defendant successfully deceived virtually everyone around him. Just as O9A doctrine teaches, *see supra* 16, 19, the defendant covered his tracks.  Indeed, even during the period of the murder plot, the U.S. Army soldiers in the Platoon training day in and day out to deploy alongside the defendant had no idea that at the very same time, the defendant was plotting to kill them, revealing the movements and armaments of their convoy, and working with terrorists to bring the plot to fruition.

The uncontroverted evidence shows that the defendant repeatedly took actions to hide his O9A affiliation from the U.S. Army, dating back to his time in basic training, PSR ¶¶ 32-34 (reflecting Melzer's plan to delay acquiring physical copies of O9A books and to "clear my phone" in order to avoid detection by the military); used the Job Corps program to attempt to recruit others to join O9A, PSR ¶¶ 25, 31; and deleted evidence of his plot to murder his fellow soldiers because he knew his actions were tantamount to treason, PSR ¶ 68 (CS stating, "You deleted them because that's treason…Duh," to which Melzer replied, "Kek").  (*See also* PSR ¶¶ 67 (Melzer responding to the question of how he "can actually get away with fucking with the US military[?]" by explaining that "because I fly under the radar already act completely normal around other people

outside and don't talk about my personal life or beliefs with anyone.")).  Likewise, the defense submission demonstrates that the defendant also completely and successfully deceived his family, friends, and supervisors.  Their impressions of the defendant are quite simply contradicted by the evidence.  Moreover, the Government notes that some of these accounts seem radically at odds with information the writers knew about Melzer and previously admitted to the FBI, including that the defendant had engaged in acts of serious violence, such as a shooting during a drug robbery during a period when the defendant associated with gang members.

Long before joining the Army, the defendant espoused racist beliefs and even discussed O9A with family members.  Some supporters point to the defendant's admiration of his grandfather's service in the U.S. military, including his participation in the D-Day landings during World War II, to suggest the defendant had an honest commitment to the United States and its armed forces, but this sad irony only underscores the depth of the defendant's deceptions.  The defendant's rank admiration of Hitler and his efforts to murder his fellow servicemembers are an immediate repudiation of the sacrifices his family members made in service to this country and in battle against Nazism.  Indeed, as the defendant told one of his O9A confederates, the defendant believed that "the ideals behind the military are literally polar opposite of mine."  (PSR ¶ 42).  The defendant's pattern of deception, and the use of deception as a core tenet of O9A, further shows that there is no reason for the Court to accept the defendant's claimed sudden renunciation of O9A ideology and his criminal, violent path.

Similarly, the evidence does not support the defense's claim that "[b]y the time of his arrest," Melzer was "already prepared to denounce" the murder plot.  (Def. Ltr. 17.)  Quite the contrary, that very day, Melzer was actively plotting the attack and proudly noted that, in response to the

attack, the United States "would be in a frenzy to send people out there and start another war." *See supra* 45. He packed his second burner cellphone, as planned, to photograph the Military Base. *See supra* 42. And Melzer had drafted—but had yet to send—a message, in which he was responding to additional questions from CC-1 in order to affirm the depth of his ideological commitment to O9A. *See supra* 45-46. Moreover, Melzer was interviewed multiple times precisely because he continued to lie and minimize his conduct after he was confronted by the FBI and the military. Nor, contrary to the suggestion in the defense submission (*see* Def. Ltr. 18 (noting that on page 199 of the transcript of Melzer's post-arrest interview, he stated "Is there any way I can help you all?")), did Melzer provide any assistance to law enforcement meriting a downward variance; he was thwarted and arrested just days before the Platoon was scheduled to deploy to the site of his planned ambush, he lied and minimized his conduct when interviewed by the FBI, and he pled guilty two weeks before trial, when the Government allowed him the possibility of avoiding what otherwise would have been the recommended sentence under the Guidelines of life imprisonment. To the extent Melzer's professed willingness to assist law enforcement after he was caught and arrested—even as he simultaneously lied to the FBI and falsely minimized his conduct—merits any consideration whatsoever, it was accounted for in the Government's decision to allow Melzer to plead to an agreement avoiding the possibility of life imprisonment.

**B. A Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities**

This is an extraordinary case reflecting extreme conduct and multiple national security offenses. The appropriate sentence to meet that conduct is 45 years of imprisonment, consistent with the Guidelines. That sentence is also necessary to avoid unwarranted disparities across other terrorism cases.

Fundamentally, this is a case involving an attempt to commit a mass casualty terrorist attack on Americans. Thankfully, that attack, or further harm the defendant could have independently caused once deployed to the Military Base, was thwarted, solely because the defendant happened to communicate with an FBI confidential source about his deadly plans days before deploying to the Military Base. As a result of the swift actions of law enforcement, the attack was disrupted and lives were saved. Courts across the country have imposed life sentences in terrorism cases where, as here, the defendant conspired or attempted to carry out an attack targeting Americans, but the plot ultimately was thwarted or unsuccessful such that nobody was hurt, and life imprisonment was not mandatory. *See, e.g.*, *United States v. Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y. Jan. 18, 2008) (life sentence for al Qaeda operative who conspired to bomb U.S. embassies in Singapore and the Philippines); *United States v. Richard Reid*, 02 Cr. 10013 (WGY) (D. Mass. Jan. 30, 2003) (life sentence for al Qaeda supporter who attempted to detonate shoe bomb during international flight); *United States v. Abdul Hakim Murad*, 93 Cr. 180 (LAK) (S.D.N.Y. May 15, 1998) (life sentence for al Qaeda operative who participated in plot to place bombs on airliners bound for United States from Asia); *see also United States* v. *Oussama Kassir*, 04 Cr. 356 (JFK) (S.D.N.Y. Sept. 15, 2009) (life sentence for al Qaeda supporter who attempted to establish a jihad training camp in the United States and disseminated bomb-making manuals).

To the extent there are any mitigating considerations, such as the defendant's age and his willingness — albeit on eve of trial — to accept responsibility for his actions, those factors were fully accounted for by the Government's carefully considered decision to allow the defendant to plead guilty to three counts of the Indictment carrying a maximum sentence of 45 years. As the

defendant's stipulation in the plea agreement reflects, 45 years' imprisonment is the sentence recommended by the Guidelines in this case. The multiple counts of conviction together capture and account for the core components of the defendant's heinous and multi-faceted conduct: attempting to kill servicemembers, providing material support to terrorists in furtherance of that effort, and the espionage crime of transmitting sensitive and classified information to America's enemies. Those counts carry a sentence of 45 years. Nothing less is appropriate, and no further lenience beyond the plea agreement is warranted.

The defendant's suggestion that, contrary to the Guidelines, the statutory maximum sentence is not appropriate or would be somehow unusual is simply wrong. As reflected above, courts have regularly imposed even more severe statutory maximum sentences of life imprisonment in analogous thwarted terrorist attack cases. Indeed, even in material support cases involving lesser conduct, courts have also imposed statutory maximum sentences, further reinforcing that conclusion. *See, e.g., United States v. Raishani*, 17 Cr. 421 (RA) (S.D.N.Y.) (imposing the statutory maximum on each count for defendant who attempted to travel abroad to join ISIS); *United States v. Alimehmeti*, 16 Cr. 398 (PAE) (S.D.N.Y.) (imposing statutory maximum sentence for material support offense where defendant had radicalized, supported ISIS, and attempted to facilitate the travel of an undercover agent to join ISIS overseas); *United States v. Clark*, 20 Cr. 76 (NRB) (S.D.N.Y.) (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit lone-wolf attacks in United States).

The handful of cases cited by the defendant are not comparable data points to this case and certainly do not support a downward variance here.  For example, in *United States v. Peace, et al.*, 14 Cr. 11 (SCJ) (N.D. Ga.), the defendants were sentenced in sealed proceedings following pleas that included provisions for cooperation and related downward departures from their applicable Guidelines.  The defendant in *United States v. Jalloh*, 16 Cr. 163 (LO) (E.D. Va.) also cooperated with the Government and pleaded guilty to an information prior to the filing of any charges.  *Id.*, Dkt. Nos. 36, 38, 39, and 55 at 10.  The sentences in *United States v. Abdul-Latif, et al.*, 11 Cr. 228 (JLR) (W.D. Wash.) were dictated by the unusual circumstances of Rule 11(c)(1)(C) plea agreements that expressly provided that "the appropriate sentence to be imposed by the Court at the time of sentencing is a sentence of imprisonment within the range of 17-19 years (204-228 months)."  *See id.*, Dkt. No. 211 at 4.  The 120-month sentence imposed in *United States v. Abu-Jihaad*, 07 Cr. 57 (MRK) (D. Conn.) fails to provide any useful comparison because, as the defense acknowledges, that sentence reflected the statutory maximum available in that case.  Likewise, the court's sentence in *United States v. Redzepagic*, 17 Cr. 228 (DRH) (E.D.N.Y.) reflects a modest 40-month variance below the statutory maximum sentence of 240 months available in that case, for a defendant who had unsuccessfully attempted to travel to Syria to join a foreign terrorist organization (and who had not, unlike here, attempted to carry out a terrorist attack).  The facts of the remaining two cases cited by the defendant, *United States v. Wright*, 12 Cr. 238 (N.D. Ohio) and *United States v. Batiste*, 06 Cr. 20373 (S.D. Fla.), reflected significant mitigating circumstances that undermined the severity of the conduct, circumstances which are clearly not present here.  *See Wright*, Dkt. No. 205-1 at 11 (granting downward variance because the explosives at issue were "inert and would not have caused any damage" and because the "conduct

of the CHS" had "necessarily facilitate[d] in considerable measure the conduct of the defendant," given that Wright was a homeless man and heroin user who was offered money to participate in the crime); *Batiste*, Dkt. No. 1503 at 151-152 (finding that Batiste "lacked both the means and ability to carry out his defined activity without assistance that was not present," that "the facts of this case remove this case regarding Mr. Batiste from the guidelines' heartland," and that the case was highly similar to another prosecution in which the Eleventh Circuit had found even a sentencing range of 188 to 235 months "excessive").  None of the circumstances in these cases are sufficiently similar to this case to provide any support for a downward variance.

In the end, the unique attributes of this case and the depravity of the defendant's offense conduct leave it without a perfect analogue in precedent.  The defendant betrayed his country in service of a violent and secretive hate group, exploited his access to classified information in order to supply it to terrorists, plotted to murder scores of innocent American soldiers, and attempted to trigger an international war in order to destabilize the United States and the democratic world order and advance the hateful cause of white supremacy.  The particular combination of the defendant's three separate and appalling offenses, coupled with his position inside the military, is exceptionally egregious and calls for comparison with notorious traitorous conduct.  His devotion to O9A and his motive to pursue its toxic mission of white supremacy through "culling" and extreme violence permeates all aspects of his conduct with an even more terrifying threat.  The harm that could have been caused by the defendant's actions, had he not been discovered and apprehended, is immeasurable.  For these reasons, the only appropriate sentence in this case is the statutory maximum recommended by the Guidelines of 45 years' imprisonment.  That sentence would be fully consistent with other terrorism cases involving thwarted mass casualty terrorist attacks on

Americans, and would be the appropriate sentence necessary to avoid unwarranted disparities to those gravest of cases.

### C.   The Guidelines Call for Consecutive Sentences Totaling 45 Years' Imprisonment

The defense argues that the Guidelines somehow call for concurrent sentences, ignoring that the Guidelines sentence is in fact the statutory maximum of 45 years' imprisonment, and tries to collapse the defendant's three distinct offenses into one.  The argument is utterly meritless.  The defendant's reliance on U.S.S.G. § 5G1.2(c) is misplaced, because the applicable Guidelines range, or in this case sentence, is 45 years, such that the requested 15-year sentence is not "adequate to achieve the total punishment," *see id.*, since the adequate total punishment is the recommended Guidelines sentence of 45 years.  (*See* Def. Ltr. 27).  The Guidelines expressly contemplate the precise scenario of this case in U.S.S.G. § 5G1.2(d) (not (c)), which provides that where, as here, the available sentence on the count carrying the highest statutory maximum (here, 20 years on Count Four) is less than the total punishment (here, the recommended 45 years), "then the sentence imposed on one or more of the other counts shall run consecutively" in order "to produce a combined sentence equal to the total punishment"—*i.e.*, the Guidelines call for the imposition of consecutive sentences on the three counts of conviction in this case to yield the total recommended punishment of 45 years.  *See, e.g.*, *United States v. McLeod*, 251 F.3d 78, 82 (2d Cir. 2001) ("If this 'total punishment' exceeds the highest statutory maximum on any count, the Guidelines require that the sentences run consecutively, to the extent necessary to achieve the 'total punishment.'").

Moreover, though not even germane to the analysis above, as the Guidelines indisputably call for consecutive sentences totaling 45 years irrespective of any parsing of the relatedness of the

offenses of conviction, the defense's attempt to portray those offenses as all one and the same is simply wrong. While the defendant's offense conduct all related to the plot to cause the murder of his fellow servicemembers, the defendant plainly committed three wholly distinct offenses, each acting to exacerbate the other and capturing different components of his conduct and the harm that it caused. Indeed, by allowing the defendant to plead to these three particular offenses, the Government ensured that the disposition reflected the three core aspects of his conduct. The attempted murder of his fellow soldiers forms the nucleus of Melzer's conduct, and he completed two other extremely serious criminal acts in furtherance of that attempt. As described in detail above, the defendant sought a particular outcome: the ambush murder of his Platoon by jihadist terrorists. To that end, Melzer specifically provided information to members of an O9A group he understood had the ability to transmit his sensitive information to jihadists. Indeed, Melzer was advised that at least one member of the chat group was affiliated with al Qaeda. The defendant chose this particular approach, and thereby violated the statute criminalizing the provision of material support to terrorists, not only to ensure that the attack would be carried out by those with the capacity to do so, but for an even more chilling reason: because he perceived an attack by jihadists *in particular* would draw the United States into protracted conflict, apart from and in addition to the planned disastrous harm of an attack on his fellow soldiers or the Military Base. Thus, the defendant's utilization of terrorist resources to commit the attack by providing sensitive information was a unique offense that deserves punishment separate from the underlying attempted murder offense. The defendant's decision to disseminate classified national defense information, likewise, is another completed offense that should be separately sanctioned from the other two. The defendant could have sought an attack on U.S. forces in a general sense, called for a broad

attack on American military personnel, or otherwise promulgated attacks, but his decision to divulge sensitive information directly related to the safety, movements, armaments, and other pertinent aspects of his Platoon was a unique harm that worsened the underlying offenses and independently damaged the national security.  In short, the suggestion that concurrent sentences are appropriate, under the Guidelines or otherwise, is without merit.

### D.   The Totality of the Defendant's History and Characteristics Do Not Warrant Leniency

Nor do the defense's efforts to highlight the defendant's relative youth at the time of the offenses, his allegedly troubled childhood, and his claimed struggles with his sexuality merit a downward variance in this case, especially in the face of the exceptionally aggravating circumstances discussed herein.  To the contrary, the totality of the defendant's personal history and characteristics reinforce that he is a danger to the public, with a longstanding commitment to a violent ideology of white supremacist terrorism, and that prior opportunities provided to the defendant have not mitigated that danger at all.

The evidence shows that the defendant's crimes cannot be reasonably attributed to his life challenges, even crediting the defense's account of his upbringing, because he committed these heinous crimes at the exact point in time when the defense claims he was "turning things around" towards "success."  (Def. Ltr. 2.)  The defense claims that "Ethan performed well and made great progress during his time at Job Corps" (Def. Ltr. 10), but the facts show this was merely a front for Melzer's further descent into O9A.  It was during this purportedly positive time in Job Corps that the defendant was actively recruiting for O9A, distributing its literature of hate, and performing O9A rituals involving the worship of Satan and the drawing of blood.  *See supra* 10-18.  The defense further claims that upon joining the U.S. Army, the defendant "thrived in a

structured environment"; that the defendant "liked the drills, the hard work, and the comradery of his fellow recruits" in particular, calling his fellow soldiers "his brothers," and viewed "basic training as one of the best experiences of his life," leading to pride in "his achievements and of the beginning of his service to the country." (Def. Ltr. 9). The defendant's grandmother notes that to her, "he seemed so excited about his future" and the family "thought he was doing pretty well there" in the Army. Nothing could be further from the truth, as the undisputed facts make clear.

The defendant's military service presented him with every opportunity for success, but his own words from this period show he was cravenly abusing that opportunity for the darkest of aims. As the defendant wrote to one contact, the military was useful for its training in weapons and survival, but "just don't become a fucking patriot." *See supra* 22-23. The defendant made clear again and again that his determined and consistent focus was on learning tactics that could be put to use by white supremacists and O9A adherents in a race war, that is, using his military service as an O9A insight role. It was during this time that he marked himself with a tattoo signifying the O9A concept of chaos, and performed a blood ritual to pledge his allegiance to O9A. The defendant's entry to the U.S. Army was a tremendous opportunity and a positive chance in his life. He chose to corrupt and destroy that opportunity. He chose to treat that opportunity as a forum to pursue the gravest acts of evil possible: betraying his fellow soldiers, the soldiers whose comradery he allegedly valued; attempting to murder them; and working with other neo-Nazis and terrorists to carry out a vile, racist mission to effectuate his deadly plans and try to spark an international war to cause vast destruction and death.

Nor can the defendant's actions be excused or explained away as some fleeting, extreme reaction to the March 2020 onset of the COVID pandemic and related restrictions.[35] Indeed, the defendant started on this path by performing insight roles for O9A as far back as 2016, as he explicitly discussed with other O9A adherents. His Telegram and Discord chats are littered with specific references to his past roles on behalf of O9A, including as a gang member and drug dealer, and his willingness to commit violence on behalf of O9A outside the virtual realm is demonstrated in stark terms by his involvement in Shooting-1 in January 2017. As set forth extensively above, those references are not confined to the defendant's comments to CC-1 during the offense conduct of the murder plot in 2020, but extend well before he began basic training, as the defendant distributed O9A materials to other Job Corps members and worked on creating a "megaupload" for disseminating his O9A texts, developed plans for O9A nexions with others via Discord, and discussed ways to hide his membership in O9A from the military knowing his affiliation alone was violative of the UCMJ. (PSR ¶¶ 25-26, 28-36, 40). And despite seeking leniency now as a "first time offender," in truth, the defendant admits he used deadly force to shoot and maim a young man in cold blood during a petty drug deal well before committing the crimes for which he

---

[35] Nor is it true that the defendant somehow struggled once in Italy because he was deprived of the "comradery" he enjoyed in basic training. (*See* Def. Ltr., Ex. B (Mercer Report) at 2 ("No one from Ethan's basic training unit was stationed with him.")). The defendant's closest friend from basic training also deployed to Italy with him, and although they were housed separately, they spent their free time together, and were further joined by others who attended airborne school with them after basic training. Chillingly, that same close friend later served in one of "replacement units" that would have been targeted by the defendant's evolving ambush plot. The defendant's loss of any "comradery" in the military was the result of his own actions to plan the murders of his "brother" soldiers.

now faces sentencing.[36]   For a very long period before the offense conduct, the defendant's dedication to O9A permeated his entire life.   As detailed above, he secretly performed O9A rituals—including a ritual requiring him to cut his hand and draw blood—to demonstrate his devotion to O9A and its practices.   He devoured and disseminated O9A literature.   He worked to recruit and indoctrinate others to embrace O9A's violent mission.

Joining the military was an obvious next step in Melzer's development as an O9A adherent. O9A prizes access to institutions such as the military and Melzer was eager to provide it.   As detailed above, Melzer talked openly in online chats about how his military service was all in furtherance of an O9A insight role, and any suggestion to the contrary in the defense submission is simply divorced from the indisputable record reflected in the PSR.   For example, on April 25, 2020, he wrote to another O9A member who was considering joining the U.S. Marine Corps, "Good luck it's great for training…Just don't become a fuckin patriot…train and get the fuck out…I'm not patriotic for shit…all of these places the vast majority deserve to be burned."   *See supra* 22-23.   And he consistently linked his role in the military to O9A, including in the photographs depicted above where Melzer intentionally juxtaposed O9A symbols with his Army equipment or uniforms.   Similarly, Melzer told CC-1—in terms that could not have been more

---

[36] The defense objected to the PSR's characterization of Shooting-1 as an insight role for O9A. (PSR at 39).   As set forth at length herein, the defendant repeatedly, in the most explicit terms possible, stated—in encrypted communications with his confederates—that his prior drug- and gang-related activity and violence was part of an insight role for O9A.   (*See* PSR ¶¶ 19-20, 24, 29, 42-43 (affirming that his military service was an insight role, and that he had "done gang member before").   But to be clear, resolution of any dispute on this point is by no means necessary to the conclusion that the appropriate sentence in this case is the Guidelines sentence of 45 years.   At bottom, Melzer's admitted participation in a brazen shooting—an act of real-world violence that easily could have killed another human being—is powerful proof that he fully intended and was prepared to cause the murder of his fellow servicemembers.

explicit—that his military service was another "insight role" to further his goals and skills within O9A and, in direct response to a vetting question from CC-1 in the leadup to the planned ambush, Melzer invoked his past insight roles and his purported value to O9A as a U.S. servicemember—specifically, after CC-1 asked, "What are your skills/traits you have?" Melzer replied, "military training, survival, links to other groups." In response to another question—"Are you ready to cause damage both mentally, physically and magickally, and be serious[?]," Melzer chillingly responded, "*i already have so yes*." (PSR ¶ 19). Melzer's O9A experience and expertise positioned him perfectly to support and defend O9A's objectives when he should have been supporting and defending the American people as a soldier in the U.S. Army.

Melzer understood that he needed to keep his affiliation with O9A secret as he enlisted in the Army, underwent basic training, obtained multiple security clearances, and was deployed to Europe. This is especially true since, as reflected in the enlistment forms Melzer was required to complete, and the oath he was required to swear, the military screens for exactly these types of threats, requiring enlistees to affirm at various junctures that they are not affiliated with extremist groups. Recognizing these filtering mechanisms, O9A members are instructed that they are "forbidden from telling anyone - however close a friend - why they are doing what they are doing." (PSR ¶ 37). The seriousness of Melzer's crimes is underscored by his years-long deceptive measures to keep his O9A affiliation hidden from those closest to him as well as the military. As Melzer toggled between his outward life as a U.S. Army paratrooper and his secret life as an O9A extremist, he continued to consume O9A and jihadist materials and to spread those depraved ideologies to others.

Beyond his active participation in O9A insight roles and his adoption and promotion of O9A's violent ethos, the defendant's intentions are reflected in the violent and jihadist propaganda that he actively consumed in private.  The defendant spent years engrossing himself in the darkest parts of the Internet, gaining a perverse appreciation for racists and jihadist groups alike.  He consumed a video depicting the lynching of a black woman by men standing in front of a Confederate flag, videos of Nazi propaganda from the Holocaust, and an image of a man standing in front of an O9A flag pointing an automatic weapon at a hooded and bound kneeling woman.  (*See* Dkt. No. 90 at 25).  And he downloaded and watched hours of graphic jihadist videos showcasing groups such as ISIS and their tactics, and praised mass casualty attacks in Orlando and Las Vegas.  Nor did Melzer just passively consume terrorist propaganda.  He actively shared ISIS videos with others.  For example, on May 13, 2019, Melzer shared a link to a download for an ISIS propaganda video with a song, known as a Nasheed, titled "Qariban Qariba," extolling ISIS acts of violence and conquest.  (PSR ¶ 35).

In sum, the defendant's commitment to white supremacist and jihadist terrorist ideology was honed over years of real-world conduct and online activity.  As the mountain of indisputable evidence makes plain, the defendant did not just discover O9A in 2019; but regardless, even accepting this as true (and there is no reason to do so), it does nothing to mitigate his conduct or support a sentence of less than the Guidelines term of 45 years: the defendant attended basic training well after embracing O9A's values and planning ways to hide his O9A affiliation from the military.  His adherence to O9A only grew in scope after basic training.  Indeed, by May 23, 2020, Melzer had adopted a clear sense of leadership in encouraging others in an O9A chat room,

I want to see you all become something stronger than just a bunch of bumbling retards on the internet / I know this shit has potential

> but really you've gotta somehow find a way to stop the infighting /
> That's what ruins every single one of these groups ever / At the end
> of the day this shit just requires loyalty it's pretty fucking simple /
> I'm saying that people who come here yes of course we're
> aggressive but that doesn't mean "I can't play with others to reach
> a goal" / I encourage aggression but not working with people on
> the same side just causes problems / The last thing you should want
> is stagnation

(GX 274).  It is undisputed that by the time of the murder plot, Melzer's commitment to O9A was

absolute, regardless of the precise date Melzer settled on O9A as his committed system of belief.

Finally, the defendant's reliance on troubling aspects of his upbringing cannot bear the

weight it is assigned.  Melzer drew on his past experiences not to improve himself or commit to

his country's service in the Army, but instead to inform a philosophy of destruction and hate.  More

importantly, he acted on it, and believed that O9A would help him commit an act of savage

violence, murder his fellow servicemembers, and maybe even start a war.  Even crediting that the

defendant did encounter serious and troubling challenges in his youth, that simply cannot explain

or excuse his exceptionally grave conduct, which amounted to an attempt to mass murder

American soldiers from within the ranks of the Army.  He was methodical, premeditated, and cold-

blooded.  The defendant used his skills and training—both from the military and from O9A—to

hide in the ranks of an elite fighting force, wait until he acquired particularly sensitive information,

and, seizing a perceived opportunity, set the stage for an O9A-inspired massacre of Americans.

He crossed every conceivable line, lying to recruiters, superior officers, fellow soldiers, classified

briefers, and more, so that he could receive classified information and pass it to an organization as

to which he knew even association was grounds for removal from the Army.  The defendant's

history and circumstances cannot explain much less justify his long-term and deep commitment to

O9A, nor his ultimate decision to serve its goals in violation of every American value he was sworn to protect.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should impose a sentence of 45 years' imprisonment, as called for by the Guidelines.

Dated: New York, New York
February 17, 2023

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    _____/s/_____
Sam Adelsberg
Matthew Hellman
Kimberly Ravener
Assistant United States Attorneys
212-637-2494 / 2278 / 2358

Cc:    Defense Counsel
(Via ECF)